# EXHIBIT C

1  JOHNSON BOTTINI, LLP
   FRANK J. JOHNSON, Cal. Bar No. 174882
2  FRANCIS A. BOTTINI, JR. Cal. Bar No. 175783
   BRETT M. WEAVER, Cal. Bar No. 204715
3  DEREK J. WILSON, Cal. Bar No. 250309
   655 West Broadway, Suite 1400
4  San Diego, California 92101
   Telephone: 619/230-0063
5  Facsimile: 619/233-5535

6  Attorneys for Plaintiffs  **ADR**

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

9  BRIAN VAUGHN, RON DOCKSWELL and      )
   MIRIAM LOGAN, On Behalf of Themselves )  C 07  06197 VRW
10 and All Others Similarly Situated,    )
                                         )  CLASS ACTION
11                    Plaintiffs,        )
                                         )  COMPLAINT FOR VIOLATION OF THE
12        vs.                            )  FEDERAL SECURITIES LAWS
                                         )
13 VERIFONE HOLDINGS, INC., DOUGLAS      )
   G. BERGERON, and BARRY               )
14 ZWARENSTEIN,                          )
                                         )
15                    Defendants.        )  DEMAND FOR JURY TRIAL
                                         )
16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

## SUMMARY AND OVERVIEW

2      1.     This is a securities class action on behalf of all purchasers of the common stock of

3  VeriFone Holdings, Inc. ("VeriFone" or the "Company") between September 1, 2006 and November

4  30, 2007 (the "Class Period"), against VeriFone and certain of its officers and directors for violations

5  of the Securities Exchange Act of 1934 (the "1934 Act").

6      2.     VeriFone designs, markets, and services transaction automation systems that enable

7  secure electronic payments among consumers, merchants, and financial institutions.

8      3.     During the Class Period, defendants issued false and misleading statements regarding

9  the Company's business and prospects. The true facts, which were known by each of the defendants

10  but concealed from the investing public during the Class Period, were as follows:

11          (a)     the Company's in-transit inventory was grossly overvalued due to accounting

12  errors related to allocation of manufacturing and distribution overhead to inventory, each of which

13  affects VeriFone's reported costs of net revenues;

14          (b)     the Company was not on track to achieve profitability in 2007, but rather

15  losses due to problems at Lipman which the Company discovered or was reckless in not discovering

16  during the due diligence pertaining to the Company's acquisition of Lipman in the fall of 2006;

17          (c)     the Company's gross margin projections were overstated;

18          (d)     the Company's accounting during the Class Period was false and misleading;

19  and

20          (e)     that as a result of (a)-(d) above, the Company's estimates of an eleventh

21  consecutive quarter of double digit revenue growth for the first quarter of 2007 and income per share

22  growth of 20% or more were grossly inflated and the Company's reported assets and inventory were

23  materially overstated as described at ¶¶26 ff.

24      4.     As a result of the defendants' false statements, VeriFone's stock price traded at

25  inflated levels during the Class Period, increasing to as high as $50 just one month before the end of

26  the Class Period. The artificial inflation of the Company's stock allowed the individual defendants

27  to sell more than $83 million worth of their own shares.

28

## JURISDICTION AND VENUE

5.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

6.    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

7.    The Company's principal executive offices are located at 2099 Gateway Place, Suite 600, San Jose, CA 95110, where the day-to-day operations of the Company are directed and managed.

## THE PARTIES

8.    Plaintiffs Brian Vaughn, Ron Dockswell and Miriam Logan purchased VeriFone common stock as described in the attached certification and were damaged thereby.

9.    Defendant VeriFone designs, markets, and services transaction automation systems that enable secure electronic payments among consumers, merchants, and financial institutions.

10.    Defendant Douglas G. Bergeron ("Bergeron") is the Chief Executive Officer and Chairman of VeriFone.  During the Class Period, Bergeron sold more than 2 million shares of his stock for illegal insider proceeds of more than $78 million.

11.    Defendant Barry Zwarenstein ("Zwarenstein") is the Chief Financial Officer and Executive Vice President of VeriFone.  During the Class Period, Zwarenstein sold more than 187,000 shares of his stock for illegal insider proceeds of more than $7 million.

12.    The individuals named as defendants in ¶¶10-11 are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of VeriFone's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were

1  being concealed from the public and that the positive representations which were being made were

2  then materially false and misleading. The Individual Defendants are liable for the false statements

3  pleaded herein at ¶¶26 ff, as those statements were each "group-published" information, the result of

4  the collective actions of the Individual Defendants.

**SCIENTER**

6      13.    In addition to the above-described involvement, each Individual Defendant had

7  knowledge of VeriFone's problems and was motivated to conceal such problems. Zwarenstein, as

8  CFO, was responsible for financial reporting and communications with the market. Many of the

9  internal reports showing VeriFone's forecasted and actual growth were prepared by the finance

10  department under Zwarenstein's direction. During the Class Period, Zwarenstein sold 187,000

11  shares of VeriFone common stock at artificially inflated prices for proceeds of over $7 million.

12      14.    Defendant Bergeron, as CEO and Chairman, was responsible for the financial results

13  and press releases issued by the Company and/or projections issued by the Company. Each

14  Individual Defendant sought to demonstrate that he could lead the Company successfully and

15  generate the growth expected by the market.

16      15.    Defendants were motivated to engage in the fraudulent practices alleged herein in

17  order to extract monies via bonuses from the Company and/or pocket illegal insider trading

18  proceeds. During the Class Period, Bergeron sold 2,250,000 shares of VeriFone common stock at

19  artificially inflated prices for proceeds of over $78 million. During the Class Period, Zwarenstein

20  sold 187,000 shares of VeriFone common stock at artificially inflated prices for proceeds of over $7

21  million. The Defendants' illegal insider selling was as follows:

| INSIDER/total | DATE (Mo/Day/Yr) | SHARES | PRICE (in $) | PROCEEDS (in $) |
|---|---|---|---|---|
| **BERGERON** | 11-26-07 | 38,000 | 44.70-46.43 | 1,631,000 |
| | 11-19-07 | 14,405 | 44.70-44.93 | 645,000 |
| | 11-14-07 | 130,792 | 44.70-45.95 | 5,912,000 |
| | 10-10-07 | 200,000 | 45.13-46.56 | 9,137,000 |
| | 09-24-07 | 893 | 38.64 | 34,505 |
| | 09-10-07 | 200,000 | 38.73-39.39 | 3,218,000 |
| | 08-10-07 | 83,700 | 39.05-39.15 | 3,273,000 |
| | 07-12-07 | 200,000 | 36.31-37.00 | 7,325,000 |
| | 06-22-07 | 894 | 36.36 | 32,505 |
| | 06-12-07 | 150,000 | 32.43-33.10 | 4,916,000 |

| | | | | |
|---|---|---|---|---|
| 1 | | 05-14-07 | 88,100 | 37.78-37.99 | 3,338,000 |
| | | 05-10-07 | 97,435 | 37.78-38.34 | 3,702,000 |
| 2 | | 04-11-07 | 24,000 | 37.50-37.80 | 904,000 |
| | | 03-22-07 | 3,575 | 37.60 | 134,420 |
| 3 | | 03-15-07 | 200,000 | 35.83-36.27 | 7,191,000 |
| | | 01-10-07 | 200,000 | 35.30-35.55 | 7,085,000 |
| 4 | | 12-13-06 | 100,040 | 36.39-37.21 | 3,665,000 |
| | | 12-11-06 | 99,900 | 35.55-36.50 | 3,588,000 |
| 5 | | 12-04-06 | 82,000 | 33.99-34.57 | 2,807,000 |
| | | 12-01-06 | 68,000 | 33.26-33.63 | 2,270,000 |
| 6 | | 11-01-06 | 125,000 | 29.29-30.30 | 3,731,000 |
| | | 10-02-06 | 28,300 | 28.05-28.45 | 797,000 |
| 7 | | 09-05-06 | 119,800 | 27.97-28.76 | 3,363,000 |
| 8 | **Total** | | **2,254,834** | | **$78,699,430** |
| 9 | **ZWARENSTEIN** | 11-13-07 | 17,878 | 43.53-44.37 | 799,000 |
| | | 10-09-07 | 18,000 | 43.45-45.73 | 805,501 |
| 10 | | 09-24-07 | 222 | 38.64 | 8,578 |
| | | 09-12-07 | 3574 | 39.85 | 142,423 |
| 11 | | 09-11-07 | 18,000 | 39.00-39.99 | 714,000 |
| | | 08-14-07 | 18,000 | 36.35-37.52 | 663,000 |
| 12 | | 07-10-07 | 18,000 | 36.07-36.76 | 655,000 |
| | | 06-22-07 | 224 | 36.36 | 8,144 |
| 13 | | 06-12-07 | 18,000 | 32.50-33.00 | 590,000 |
| | | 05-08-07 | 18,000 | 37.14-37.88 | 672,000 |
| 14 | | 04-10-07 | 18,000 | 37.48-38.04 | 682,000 |
| | | 03-22-07 | 894 | 37.60 | 33,614 |
| 15 | | 03-15-07 | 18,000 | 35.75-36.22 | 647,000 |
| | | 01-09-07 | 4,000 | 35.21-35.58 | 142,000 |
| 16 | | 12-12-06 | 4,000 | 36.86-37.57 | 149,000 |
| | | 11-30-06 | 4,000 | 32.82-33.75 | 133,000 |
| 17 | | 10-31-06 | 4,000 | 29.00-29.22 | 116,000 |
| | | 09-29-06 | 4,000 | 28.55-29.00 | 115,000 |
| 18 | **Total** | | **186,792** | | **$7,075,260** |
| 19 | | | | | |
| 20 | **COMBINED TOTAL** | | **2,441,626** | | **$83,774,690** |

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

16.     Each defendant is liable for (i) making false statements, *or* (ii) failing to disclose adverse facts known to him about VeriFone. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of VeriFone common stock was a success, as it (i) deceived the investing public regarding VeriFone's prospects and business; (ii) artificially inflated the price of VeriFone common stock; (iii) allowed defendants to obtain larger bonuses which were directly tied to the performance of VeriFone; (iv) allowed defendants to arrange to sell and actually

1    sell in excess of $83 million worth of VeriFone shares at artificially inflated prices; and (v) caused

2    plaintiffs and other members of the Class to purchase VeriFone common stock at inflated prices.

3    ## BACKGROUND TO THE CLASS PERIOD

4    17.    VeriFone and Lipman have been familiar with each other's businesses for several

5    years. There were intermittent informal contacts between representatives and VeriFone and Lipman

6    at various times prior to VeriFone's initial public offering in April 2005.

7    18.    On May 10, 2005, Douglas Bergeron contacted Isaac Angel, the CEO of Lipman, and

8    suggested a meeting to discuss whether a future business combination or strategic transaction would

9    be feasible.

10    19.    To facilitate discussions, VeriFone and Lipman entered into a confidentiality

11    agreement on June 1, 2005.

12    20.    On June 7, 2005, Mr. Angel and Mike Lilo, the CFO of Lipman, met with Mr.

13    Bergeron and Mr. Swarenstein in New York to discuss the possibility of a business combination.

14    21.    On September 28, 2005, Lipman announced that it was lowering its full year 2005

15    earnings guidance with respect to revenues and net income per share as a result of substantially

16    weaker than expected performance at its dione subsidiary. Lipman's stock price decreased by

17    approximately $6 per share on the news.

18    22.    On December 4, 2005, Mr. Bergeron contacted Mr. Angel to inquire whether Lipman

19    was interested in renewing discussions with VeriFone. On December 7, 2005, Mssrs. Angel, Lilo,

20    Bergeron and Swarenstein participated in a conference call and agreed to renew merger discussions.

21    During the next several months, into the spring of 2006, Lipman and VeriFone engaged in

22    significant merger discussions which included their legal and financial advisors.

23    23.    On March 17, 2006, VeriFone's outside legal counsel delivered a formal request for

24    due diligence to outside counsel for Lipman.

25    24.    On March 23, 2006, VeriFone and Lipman signed an exclusivity letter providing for

26    an exclusivity period up to and including April 15, 2006. The parties commenced a due diligence

27    process on March 24, 2006 when Lipman's electronic data room became accessible to

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 5 -

1  representatives of VeriFone.  Between March 24, 2006 and April 10, 2006, VeriFone and its

2  financial advisors and legal counsel conducted due diligence on Lipman.

3      25.      On April 10, 2006, Lipman and VeriFone signed a merger agreement pursuant to

4  which VeriFone acquired Lipman.

5                          **FALSE AND MISLEADING STATEMENTS**

6      26.      On August 31, 2006, the Company announced record Q3 2006 financial results,

7  sending the Company's shares soaring. The Company announced net revenues for the third quarter

8  of $147.6 million, an increase of 17% over net revenues of $125.7 million for the comparable period

9  of 2005. The Company announced the results in a press release entitled: "VeriFone Reports Third

10 Quarter Fiscal 2006 Results," which stated as follows:

11      "Net revenues for the three months ended July 31, 2006, were $147.6 million, an
        increase of 17% over net revenues of $125.7 million for the comparable period of
12      fiscal 2005. The increase was driven by a 19% increase in net revenues from
        VeriFone's North America business and a 16% increase in net revenues in VeriFone's
13      International business.

14      Gross margins, under generally accepted accounting principles (GAAP), for the three
        months ended July 31, 2006, were 45.0%, compared to 40.7% for the three months
15      ended July 31, 2005. Gross margins, excluding non-cash amortization of purchased
        intangibles and stock-based compensation expense, expanded for the seventh
16      consecutive quarter and reached 45.9% compared to 42.0% for the three months
        ended July 31, 2005.

17
        Net income for the three months ended July 31, 2006, was $16.8 million, or $0.24
18      per diluted share, compared to $6.5 million, or $0.10 per diluted share, for the
        comparable period of fiscal 2005. Net income, as adjusted, which excludes non-cash
19      amortization of purchased intangibles and debt issuance costs, as well as non-cash
        stock-based compensation expense, for the three months ended July 31, 2006, was
20      $19.7 million, or $0.28 per diluted share, compared to $13.1 million, or $0.20 per
        diluted share, for the comparable period of fiscal 2005.
21
        "We are once again extremely pleased with the consistency of our quarterly results,
22      demonstrated by our tenth consecutive quarter with double digit revenue growth and
        our eighth consecutive quarter of expanded EBITDA as adjusted margins, which
23      reached a record level of 22.6% in the quarter," said Douglas G. Bergeron, Chairman
        and Chief Executive Officer. "We are expecting to close the acquisition of Lipman
24      Electronic Engineering Ltd. by November 1, 2006, and remain confident that we will
        receive clearance by the United States Department of Justice very shortly. We remain
25      on track to deliver another year of outstanding results and *we remain confident in
        our long-term model, which calls for annual revenue growth of 10 to 15% and*
26      *annual adjusted net income per share growth of 20% or more.*"

27      "Based on our confidence with our near term and long term outlook, *we are raising
        our FY06 year end guidance to $1.07 to $1.08 of adjusted net income per share.
28      We are also raising our FY07 guidance to $1.40 to $1.42 of adjusted net income*

---

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 6 -

*per share*, assuming a November 1, 2006, completion of the Lipman acquisition," continued Bergeron.

27.    On this news of this increased guidance, the Company's shares soared to $28.47 per share on September 1, 2006.

28.    On September 5, 2006, Bergeron sold 119,800 shares of VeriFone stock at approximately $28 per share.

29.    On September 7, 2006, the Company issued the following press release:

VeriFone's Proposed Acquisition of Lipman Receives Department of Justice Clearance

SAN JOSE, CA, and ROSH HAAYIN, Israel - September 07, 2006 - VeriFone Holdings, Inc. (NYSE: PAY) and Lipman Electronic Engineering Ltd. (NASDAQ: LPMA; TASE: LPMA) today announced they have received clearance from the United States Department of Justice (DOJ) to complete VeriFone's pending acquisition of Lipman. Shareholder meetings for each company are scheduled for mid-September and, if each group of shareholders approves the transaction, the parties expect to close on November 1 following the expiration of a 30-day waiting period required by Israeli law after the Lipman shareholders' meeting.

30.    On September 15, 2006, VeriFone issued the following press release:

"San Jose, CA - September 15, 2006 - VeriFone Holdings, Inc. (NYSE: PAY) announced that at a special meeting today its stockholders overwhelmingly voted to approve its acquisition of Lipman Electronic Engineering Ltd. At the VeriFone special meeting more than 99.5 percent of the shares represented were voted in favor of the issuance of VeriFone stock in the transaction, constituting a substantial majority of the outstanding VeriFone shares. The acquisition had previously been approved by the Lipman shareholders in a special meeting held on September 14. "We are very pleased by the strong support for the transaction from both VeriFone and Lipman shareholders," said Douglas G. Bergeron, chairman and chief executive officer of VeriFone. *"This combination will provide VeriFone with the product breadth, global reach and R&D capabilities to drive significant value for shareholders, customers and employers*. We look forward to completing the Lipman acquisition on November 1, 2006, as planned."

31.    On September 29, 2006, Zwarenstein sold 4,000 shares of VeriFone stock at approximately $29 per share.

32.    On December 7, 2006, VeriFone announced the following financial results:

VeriFone Reports Fourth Quarter and Fiscal 2006 Results

Fourth-Quarter Revenues Increased 20% to $157 Million

EBITDA, as Adjusted, Margins Increased to 24.2% for the Quarter

Fourth Quarter Net Income, as Adjusted, Increased 50% to $22.3 Million

SAN JOSE, Calif.--(BUSINESS WIRE)--Dec. 7, 2006--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months and fiscal year ended October 31, 2006.

Net revenues for the three months ended October 31, 2006, were $156.6 million, an increase of 20% over net revenues of $130.5 million for the comparable period of 2005. The increase was driven by a 30% increase in net revenues from VeriFone's International business and a 14% increase in net revenues from VeriFone's North America business.

Gross margins, under generally accepted accounting principles (GAAP), for the three months ended October 31, 2006, were 46.0%, compared to 42.7% for the three months ended October 31, 2005. Gross margins, excluding non-cash amortization of purchased intangibles and stock-based compensation expense, expanded for the eighth consecutive quarter and reached 47.1% for the three months ended October 31, 2006, compared to 44.0% for the comparable period of 2005.

Net income for the three months ended October 31, 2006, was $13.9 million, or $0.20 per diluted share, compared to $12.1 million, or $0.18 per diluted share, for the comparable period of fiscal 2005. GAAP net income was impacted in the quarter by the $4.1 million after-tax write off of debt issuance costs, attributable to the refinancing of outstanding debt in connection with the Lipman acquisition. Net income, as adjusted, which excludes non-cash amortization of purchased intangibles and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended October 31, 2006, was $22.3 million, or $0.32 per diluted share, compared to $14.9 million, or $0.22 per diluted share, for the comparable period of fiscal 2005.

EBITDA, as adjusted, which excludes non-cash amortization of purchased intangibles and debt issuance costs, as well as non-cash stock-based compensation expense, expanded for the ninth consecutive quarter and reached a record level of $38.0 million, a 44% increase over the $26.5 million recorded in the three months ended October 31, 2005. EBITDA, as adjusted, margins for the three months ended October 31, 2006, reached 24.2%, as compared to the 20.3% recorded in the three months ended October 31, 2005.

Net revenues for the fiscal year ended October 31, 2006, were $581.0 million, an increase of 20% over the $485.4 million recorded for fiscal 2005.

Net income for the fiscal year ended October 31, 2006, was $59.5 million, compared to $33.2 million for fiscal 2005. Net income, as adjusted, for the fiscal year ended October 31, 2006, was $76.4 million, compared to $49.7 million, for fiscal 2005.

EBITDA, as adjusted, for the fiscal year ended October 31, 2006, was $130.4 million, an increase of 51% over the $86.4 million recorded for fiscal 2005. EBITDA, as adjusted, margins for the fiscal year ended October 31, 2006, were 22.4%, compared to 17.8% for the comparable period of 2005.

"VeriFone has completed another outstanding quarter and achieved record revenue and earnings for fiscal year 2006. This year was highlighted by our transformative acquisition of Lipman which combined the two strongest financial performers in the industry to create the world leader in payment technology," said Douglas G. Bergeron, Chairman and Chief Executive Officer.

"We enter our new financial year poised to capitalize on our numerous competitive advantages and our very wide range of product offerings," continued Bergeron. "The integration of Lipman into VeriFone has been completed ahead of schedule and we have created a single-branded, unified company with tremendous scale advantages. Already, we are enjoying several supply chain efficiencies and earnings accretion."

"As a result, we have increased our internal expectations for fiscal Q1 2007 net earnings per share, as adjusted, to be in the range of $0.33 to $0.34. We remain very confident of our prospects in fiscal 2007."

33.    On March 1, 2007, VeriFone issued the following press release:

SAN JOSE, Calif.--(BUSINESS WIRE)--March 1, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended January 31, 2007. The Company's first quarter results reflect the November 1, 2006, acquisition of Lipman and, because of the integration of Lipman's products and distribution channels as well as the lack of comparable quarter ends of VeriFone and Lipman, are compared to pre-acquisition results of prior fiscal periods.

Net revenues, for the three months ended January 31, 2007, were $216.6 million, 61% higher than the net revenues of $134.6 million for the comparable period of 2006. The record revenues were driven by the Lipman acquisition and a strong performance internationally.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, were 47.1%, for the three months ended January 31, 2007, compared to 45.6% for the comparable period of 2006. GAAP gross margins for the three months ended January 31, 2007, were 37.6%, compared to 44.3% for the three months ended January 31, 2006, as a result of increased amortization of purchased technology assets and the step-up in inventory.

EBITDA, as adjusted, margins for the three months ended January 31, 2007, expanded for the tenth consecutive quarter and reached a record level of 25.7%, compared to the 21.0% recorded in the three months ended January 31, 2006.

GAAP EPS for the three months ended January 31, 2007, was a loss of ($0.01) per diluted share, compared to $0.20 per diluted share, for the comparable period of fiscal 2006, due to acquisition related charges and a higher GAAP tax rate. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended January 31, 2007, increased 54% to $0.37 per diluted share, compared to $0.24 per diluted share, for the three months ended January 31, 2006.

"VeriFone has successfully completed its first quarter since our transformative acquisition of Lipman. I am delighted both with the progress that we have made in integrating Lipman's business into VeriFone and in generating another very strong quarter financially and operationally," said Douglas G. Bergeron, Chairman and Chief Executive Officer.

"VeriFone's newly configured worldwide sales force is serving customers through a fully integrated distribution channel and supply chain. At the same time we have been reducing inventory and generating considerable operating cash flow," continued Bergeron.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 9 -

"Based on these results, we are increasing our second quarter internal expectations for net income, as adjusted, per share to be in the range of $0.36 to $0.37. We remain very confident of our prospects for fiscal 2007."

34.     On March 6, 2007, VeriFone issued the following press release:

San Jose, CA - March 06, 2007 - VeriFone Holdings, Inc. (NYSE: PAY; TASE: PAY) today announced that it has installed one of the largest and most complex card payment systems in the UK for retail giant Argos. VeriFone's PAYware Merchant system has been rolled out to more than 600 Argos stores in the UK, allowing Argos to process 50 transactions per second – more than 100 million transactions every year.

Argos – part of the Home Retail Group which also owns Homebase – has implemented the PAYware Merchant system nationwide as part of its move to EMV Chip and PIN, enabling secure authorization of payments in seconds and providing sophisticated management and reporting capabilities, including a comprehensive audit trail.

PAYware Merchant is ideal for medium- and large-size retailers who need a secure, reliable, and easy-to-implement credit and debit card authorization and settlement solution that supports EMV Chip and PIN. This fully scalable, bank-certified solution provides rapid payment processing that is tightly integrated with any front-end environment and is proven to increase revenue, reduce costs and improve customer satisfaction.

"We saw the move to Chip and PIN as an opportunity to review our existing EFT system," said Jacqui Glenn, head of Argos IT. "As a business-critical system, we were looking for a card payment solution that offered security, speed and reliability. We chose PAYware because of its proven success with other retailers, and the smooth implementation and fast 'go live' confirmed that we made the right decision."

Nigel Bidmead, managing director for VeriFone EMEA added, "The PAYware Merchant system deserves its excellent reputation as a robust and reliable solution for high-volume environments. We are very pleased to add Argos to the list of major UK retail customers who are gaining tangible business benefits from VeriFone's card payment systems."

PAYware Merchant accepts all major cards and supports the latest fraud prevention initiatives, including EMV and 3D Secure for Internet payments. Designed with industry best practices for data security, it enables retailers to become compliant with the Payment Card Industry Data Security Standard (PCI DSS). All of this guards against fraud and helps protect brand reputation and consumer confidence.

35.     On April 18, 2007, VeriFone issued the following press release:

San Jose, CA - April 18, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today announced that it has secured a key contract with leading transaction switching and electronic payment processing company InterSwitch Nigeria Limited to enable inter-bank electronics payments for Nigerian cardholders. VeriFone's GPRS-enabled V_x 610 payment systems are being rolled out nationwide to InterSwitch's bank and merchant customers.

InterSwitch is the leading e-payment solutions provider in Nigeria – Africa's most populous country – and, according to Financial Standard Newspaper, one of Nigeria's top 10 recognized brands. Any Nigerian cardholder will now be able to use their Nigeria Debit Cards, CashCards and other payment cards issued on the InterSwitch platform at ATMs and point of sale devices deployed by banks other than their own. Currently, InterSwitch has an online real-time integration to 23 out of the 25 banks in Nigeria. This infrastructure allows almost all of the country's banks to share ATM and point of sale systems.

"We have a high regard for VeriFone and its excellent product offerings," said Mitchell Elegbe, CEO of InterSwitch Nigeria. "VeriFone has earned a strong reputation in West Africa through its commitment to helping develop this growing payments sector, and with access to such advanced payment systems it will create the opportunity for us to enhance our strong market presence here."

Nigel Bidmead, managing director for VeriFone EMEA, said, "VeriFone's advanced GPRS technology payment systems are especially suited to Nigeria's large developing payments markets, where a constant online communication channel between the merchant and InterSwitch is the key to fast and secure transactions."

36.    On May 29, 2007, VeriFone announced record second quarter 2007 financial results in the following press release:

SAN JOSE, Calif.--(BUSINESS WIRE)--May 29, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended April 30, 2007.

Net revenues, for the three months ended April 30, 2007, were $217.2 million, 53% higher than the net revenues of $142.2 million for the comparable period of 2006. VeriFone's International business increased 97% and VeriFone's North America business increased 19%. The significant increase in sales was driven largely by the acquisition of Lipman, which closed November 1, 2006.

Subsequent to the end of the quarter, management determined that booked orders of approximately $4 million could not be recognized as revenue due to incomplete sales administration requirements in our international operations. These orders were largely sourced from VeriFone's new Israeli and Turkish facilities and all were headed to high growth markets in Asia, Eastern Europe and Africa. The Company is confident that the shortcomings in applying these field processes have now been remedied. All of this revenue has now been fully recognized and is reflected in guidance for the third quarter.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.1%, for the three months ended April 30, 2007, compared to 45.7% for the comparable period of 2006. GAAP gross margins for the three months ended April 30, 2007, were 41.5%, compared to 44.6% for the three months ended April 30, 2006, as a result of increased amortization of purchased technology assets, the step-up in inventory and stock-based compensation.

GAAP operating expenses for the three months ended April 30, 2007, were $72.9 million compared to $37.8 million for the comparable period of 2006. In addition to the effect of the Lipman acquisition and related integration expenses, the Company incurred higher non-cash stock compensation expenses and amortization of

purchased intangible assets. Stock based compensation for the three months ended April 30, 2007 was $9.8 million compared to $1.0 million for the comparable period of 2006. This increase was primarily due to the acceleration of the vesting of options of Lipman executives, the increase in the number of option holders following the Lipman acquisition and the grant of performance-based restricted stock units to the Company's Chief Executive Officer. Amortization of purchased intangible assets for the three months ended April 30, 2007 was $6.1 million compared to $1.2 million for the comparable period of 2006, primarily due to the Lipman acquisition.

EBITDA, as adjusted, margins for the three months ended April 30, 2007, expanded for the eleventh consecutive quarter and reached a record level of 26.3%, compared to the 21.6% recorded in the three months ended April 30, 2006.

GAAP EPS for the three months ended April 30, 2007, was $0.06 per diluted share, compared to $0.22 per diluted share, for the comparable period of fiscal 2006, due to acquisition related non-cash charges, higher stock-based compensation expense primarily related to the Lipman acquisition and to a significantly higher GAAP tax rate driven by an increase in the valuation allowance related to Lipman. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense and Lipman integration costs, for the three months ended April 30, 2007, increased 50% to $0.39 per diluted share, compared to $0.26 per diluted share, for the three months ended April 30, 2006.

"I am pleased to report on another very successful quarter for VeriFone as we once again achieved record profitability," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "During the quarter, our record margins drove our robust EPS growth, and also resulted in strong cash flow," continued Bergeron. "We were especially pleased with our continuing success of our wireless products and were delighted with the resurgence of our North American business which grew sequentially 8 percent from the previous quarter."

"Based on these results and the $4 million of revenue which has been recognized in the third quarter, *we are increasing our third quarter internal expectations for net revenue to $225 - $227 million and increasing our guidance for net income, as adjusted, per share to a range of $0.39 - $0.40. We remain confident of our prospects for the remainder of fiscal 2007.*"

37.    On July 12, 2007, VeriFone issued the following press release:

New York, NY - July 12, 2007 - VeriFone Holdings, Inc. (NYSE:PAY) announced today an agreement to be the preferred vendor of integrated payment solutions to the largest licensed leasing association in New York City, the Committee for Taxi Safety with 3,000 member taxis. VeriFone also announced that more than 5,000 New York City taxis are signed or committed to comprehensive multi-year agreements for in-taxi acceptance of credit cards.

Last month, systems implemented by VeriFone's US-based taxi business, VeriFone Transportation Systems, were the first authorized by the NYC Taxi and Limousine Commission (TLC) for the city's more than 13,000 taxis.

Jeff Dumbrell, VeriFone senior vice president, North America, said, "New York City currently has over 13,000 active yellow cabs that have been mandated to provide card payment and passenger information services by the end of the year. We

are continuing our sales campaign and expect to make further progress in the months ahead."

Committee for Taxi Safety Agreement Amos Tamam, president and CEO of VeriFone Transportation Systems, said the company is eager to work with member organizations of the Committee for Taxi Safety. "In addition to providing customers with convenient payment choices, member organizations will benefit from improved fleet management and the potential for enhanced revenue through advertising," Tamam said. "They will be able to provide better customer service to New York residents and visitors through up-to-the-minute access to real-time traffic information, news, sports, weather and entertainment."

According to David Pollack, executive director of the Committee for Taxi Safety, "Reliability, previous experience and a wealth of functionality made VeriFone Transportation Systems the logical choice for all members of our organization. We are pleased to begin this new era in technology with a company that has impeccable equipment and software for our drivers, passengers and members."

Beginning October 1, 2007, upon their next scheduled inspection all New York taxis are mandated to have technology-based customer service improvements that will include credit/debit card acceptance and an interactive electronic passenger map and information screen.

Previously, VeriFone was awarded similar services for 100 percent of the Philadelphia taxi fleet, and a significant award in Mexico City, Mexico. Discussions and pilots continue with several other worldwide metropolitan organizations.

The VeriFone-based solution utilizes wireless technology to provide integrated payment in the passenger cab, including a card swipe and contactless payment for credit and debit payment of fares, in an easy-to-use ATM style interface. The riding experience is further enhanced with the Passenger Information Monitor, a 10.4-inch touch-screen monitor that provides exclusive news and content for passengers through an exclusive partnership with market-leading WABC-TV New York.

A smaller model utilizes the VeriFone MX870, which supports secure credit card transactions and PIN-based debit card transactions with contactless payment and electronic signature capture, as well as advertising and content delivery. The smaller option will provide an ideal solution for the integration of potentially smaller hybrid vehicles.

VeriFone is the majority shareholder of VeriFone Transportation Systems, a joint venture between VeriFone Holdings, Inc. and TaxiTronics, the company that services over 8,000 of the taxi meters in the city cab fleet.

38.     Between November 14, 2007 and November 26 2007, Bergeron sold 383,197 shares of VeriFone stock at prices between $44.70 and $46.43 per share.

39.     On September 6, 2007, VeriFone publicly announced its Q3 '07 financial results:

SAN JOSE, Calif.--(BUSINESS WIRE)--Sept. 6, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended July 31, 2007.

Net revenues, for the three months ended July 31, 2007, were $231.9 million, 57% higher than the net revenues of $147.6 million for the comparable period of 2006. Net revenues from VeriFone's International business increased 106% while net revenues from VeriFone's North America business increased 22%. The significant increase in net revenues was driven largely by the acquisition of Lipman Electronic Engineering Ltd., which closed November 1, 2006.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.2%, for the three months ended July 31, 2007, compared to 45.9% for the comparable period of 2006. GAAP gross margins for the three months ended July 31, 2007, declined to 44.0% from 45.0% for the three months ended July 31, 2006, primarily as a result of increased amortization of purchased technology assets.

GAAP operating expenses for the three months ended July 31, 2007 were $65.5 million compared to $38.0 million for the comparable period of 2006. This increase was primarily due to the Lipman acquisition and related integration expenses.

EBITDA, as adjusted, margins for the three months ended July 31, 2007, expanded for the twelfth consecutive quarter and reached a record level of 27.3%, compared to the 22.6% recorded in the three months ended July 31, 2006.

GAAP EPS for the three months ended July 31, 2007, was $0.16 per diluted share, compared to $0.24 per diluted share, for the comparable period of fiscal 2006. *This decline resulted from acquisition related non-cash charges, higher stock-based compensation expense and a higher GAAP tax rate driven by an increase in the valuation allowance related to the Lipman acquisition.* Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense and Lipman integration costs, for the three months ended July 31, 2007, increased 50% to $0.42 per diluted share, compared to $0.28 per diluted share, for the comparable period in 2006.

"I am extremely pleased to report on another outstanding quarter as we once again achieved exceptional financial results," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "During the quarter, we achieved record revenues and record gross and operating margins, all which led to strong EPS growth," continued Bergeron. "Our North American business continued to surge, growing 9% sequentially. Our compelling portfolio of wireless solutions and our strength in emerging markets were also significant factors driving our success this quarter."

"We are increasing our internal expectations for the fourth quarter and now expect to repeat these record third quarter results. Our guidance for the fourth quarter, therefore, is for net revenue of $231 - $233 million and net income, as adjusted, per share of $0.41 - $0.42. As a result, we are also increasing our full year fiscal year 2007 expectations for net income, as adjusted per share to $1.59 to $1.60 per share. As well, given the out-performance in profitability that we have consistently enjoyed since the closing of the Lipman acquisition last November, we are now taking this opportunity to update our long term financial model. We are reaffirming our revenue growth rate projection in the 10% - 15% range and we are increasing our margin expectations as reflected in the table below."

Long Term Model

|  | Prior | New |
|---|---|---|
| Gross Margin | 42%-47% | 45%-50% |
| EBITDA Margin | 18% - 24% | 25% - 30% |
| Net Margin | 12% - 17% | 15% - 20% |

40.    On October 11, 2007, VeriFone issued the following press release:

San Jose, CA - October 11, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today announced it has added Ruth's Chris Steak House of Austin to the roster of restaurants using its ON THE SPOT payment at the table solution.

Servers at the fine dining restaurant at 107 West Sixth Street will bring their patrons a small, handheld VeriFone V$_x$ 670 payment system that allows them to swipe their own credit or debit cards at their table. ON THE SPOT speeds service to Ruth's Chris's customers and allows for a secure transaction with no fear of identity theft.

Sal Olivas, Ruth Chris's general manager, said he turned to ON THE SPOT to streamline the payment transaction and serve his customers faster. "When people want to leave the table, they want to leave," he said. "We try to expedite their needs on their timetable.

Olivas said he believes ON THE SPOT will speed his guests' transaction time by five to 10 minutes. "On a busy night, when customers need a table, that will be crucial," Olivas said of the quicker table turns. But he also noted the security benefits for customers: "We're doing this for our guests' sake, for their conveniences, security and peace of mind."

"Ruth's Chris's use of ON THE SPOT shows the versatility of our suite of products," said Paul Rasori, VeriFone's vice president of global product marketing. "In today's environment, payment at the point of service is more important than ever, as operators and patrons want security against identity theft. The additional value the product brings to an operator is greater operational efficiency and profitability as it relates to table turns, server time and processing fees."

ON THE SPOT is designed to cut down on the increasingly common problem of credit card fraud and also allows restaurant operators to take advantage of lower-cost PIN debit payment.

By allowing patrons to slide their own cards rather than handing them to another person, ON THE SPOT virtually eliminates the possibility of a server "skimming" a card and cloning account information. TransUnion has estimated that 70 percent of all skimming takes place in a restaurant environment.

ON THE SPOT uses special encryption and other security features to protect all financial data transacted over a restaurant's Wi-Fi network. These security features are a necessity today, with credit card fraud now the most common form of identity theft, according to the Federal Trade Commission. ON THE SPOT has pioneered the use of Wi-Fi and GPRS cellular communications to provide online payment authorization at the point of service in North American restaurants.

41.    On November 1, 2007, VeriFone issued the following press release:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 15 -

San Jose, CA - November 01, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) announced today that it will report its financial results for the three months ended and fiscal year ended October 31, 2007, on December 6, 2007.

The management of VeriFone will host a conference call on December 6, 2007, at 1:30 p.m. (PST) to discuss VeriFone's fourth quarter and year end results, which will be simultaneously webcast. Management may also provide forward looking guidance on this call.

42.   On November 13, 2007, Zwarenstein sold 17,878 shares of VeriFone stock at approximately $44 per share.

43.   On December 3, 2007, VeriFone shocked the stock market by announcing the following press release:

**VeriFone Announces Anticipated Restatement of 2007 Quarterly Financial Statements**

San Jose, CA - December 03, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today announced that following a review by and on the recommendation of management, it has concluded that its unaudited interim consolidated financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007 and the three and nine months ended July 31, 2007 should no longer be relied upon, principally due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects VeriFone's reported costs of net revenues. The restatements are anticipated to correct errors that overstated previously reported inventories in material amounts as of January 31, 2007, April 30, 2007 and July 31, 2007, and understated cost of net revenues in material amounts for the three month periods ended January 31, 2007, April 30, 2007, and July 31, 2007. Accordingly, investors are cautioned not to rely on VeriFone's historical financial statements and earnings press releases and similar communications for the periods ended January 31, 2007, April 30, 2007, and July 31, 2007.

Based on its review to date, management currently anticipates that the restatement will result in reductions to previously reported inventories of approximately $7.7 million, $16.5 million and $30.2 million as of January 31, 2007, April 30, 2007 and July 31, 2007, respectively, and reductions to previously reported pre tax income of approximately $8.9 million, $7.0 million and $13.8 million for the three month periods ended January 31, 2007, April 30, 2007 and July 31, 2007, respectively. VeriFone is currently evaluating the anticipated effect of the restatement on after-tax income for those periods.

These estimates include corrections of other unrelated errors detected in the course of VeriFone's review to date, are based on currently available information and are subject to change during the course of the company's restatement process. While VeriFone is not currently aware of other accounting errors requiring adjustment to any prior period financial statements, there can be no assurances that VeriFone or its independent registered public accounting firm will not find additional accounting errors requiring further adjustments in those or earlier periods.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                - 16 -

1    44.    On this news the Company's shares plummeted by almost 46% to close at

2  approximately $26.03, a dramatic fall from the opening price of $48.03 that VeriFone's stock opened

3  trading at on the preceding business day.  The volume of VeriFone shares traded on December 3,

4  2007 was 49.8 million shares, compared to just 1.4 million shares traded on the preceding trading

5  day.

6    45.    The true facts, which were known by each of the defendants but concealed from the

7  investing public during the Class Period, were as follows:

8    (a)    the Company's in-transit inventory was grossly overvalued due to accounting

9  errors related to allocation of manufacturing and distribution overhead to inventory, each of which

10  affects VeriFone's reported costs of net revenues;

11    (b)    the Company was not on track to achieve profitability in 2007, but rather

12  losses due to problems at Lipman which the Company discovered or was reckless in not discovering

13  during the due diligence pertaining to the Company's acquisition of Lipman in the fall of 2006;

14    (c)    the Company's gross margin projections were overstated;

15    (d)    the Company's accounting during the Class Period was false and misleading;

16  and

17    (e)    that as a result of (a)-(d) above, the Company's estimates of an eleventh

18  consecutive quarter of double digit revenue growth for the first quarter of 2007 and beyond and

19  income per share growth of 20% or more were grossly inflated and the Company's reported assets

20  and inventory were materially overstated as described herein.

21    **VERIFONE'S FALSE FINANCIAL**
**REPORTING DURING THE CLASS PERIOD**

22

23    46.    In order to inflate the price of VeriFone stock, defendants caused the Company to

24  falsely report its results during the Class Period by failing to "write down" the value of its inventory

   in violation of Generally Accepted Accounting Principles ("GAAP").

25

26    47.    GAAP are those principles recognized by the accounting profession as the

   conventions, rules and procedures necessary to define accepted accounting practice at a particular

27

   time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the

28

1   SEC which are not prepared in compliance with GAAP are presumed to be misleading and

2   inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial

3   statements must also comply with GAAP, with the exception that interim financial statements need

4   not include disclosure which would be duplicative of disclosures accompanying annual financial

5   statements. 17 C.F.R. §210.10-01(a).

6         48.    The Individual Defendants caused VeriFone to falsify its reported financial results by

7   failing to write down its inventory.

8         49.    GAAP, as set forth in Accounting Research Bulletin ("ARB") No. 43, Chapter 4,

9   Inventory Pricing, requires that inventories be recorded at the lower of cost or market.  ARB No. 43,

10  Chapter 4, Statement 5 states:

11        A departure from the cost basis of pricing the inventory is required when the
          utility of the goods is no longer as great as its cost.  Where there is evidence that the
12        utility of goods, in their disposal in the ordinary course of business, will be less than
          cost, whether due to physical deterioration, obsolescence, changes in price levels, or
13        other causes, the difference should be recognized as a loss of the current period.  This
          is generally accomplished by stating such goods at a lower level commonly
14        designated as market.

15        50.    Due to these accounting improprieties, the Company presented its financial results

16  and statements in a manner which violated GAAP, including the following fundamental accounting

17  principles:

18        (a)    The principle that interim financial reporting should be based upon the same

19  accounting principles and practices used to prepare annual financial statements was violated (APB

20  No. 28, ¶10);

21        (b)    The principle that financial reporting should provide information that is useful

22  to present and potential investors and creditors and other users in making rational investment, credit

23  and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

24        (c)    The principle that financial reporting should provide information about the

25  economic resources of an enterprise, the claims to those resources, and effects of transactions, events

26  and circumstances that change resources and claims to those resources was violated (FASB

27  Statement of Concepts No. 1, ¶40);

28

---

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 18 -

1        (d)    The principle that financial reporting should provide information about how

2  management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

3  for the use of enterprise resources entrusted to it was violated. To the extent that management offers

4  securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

5  accountability to prospective investors and to the public in general (FASB Statement of Concepts

6  No. 1, ¶50);

7        (e)    The principle that financial reporting should provide information about an

8  enterprise's financial performance during a period was violated. Investors and creditors often use

9  information about the past to help in assessing the prospects of an enterprise. Thus, although

10  investment and credit decisions reflect investors' expectations about future enterprise performance,

11  those expectations are commonly based at least partly on evaluations of past enterprise performance

12  (FASB Statement of Concepts No. 1, ¶42);

13        (f)    The principle that financial reporting should be reliable in that it represents

14  what it purports to represent was violated. That information should be reliable as well as relevant is

15  a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

16        (g)    The principle of completeness, which means that nothing is left out of the

17  information that may be necessary to insure that it validly represents underlying events and

18  conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

19        (h)    The principle that conservatism be used as a prudent reaction to uncertainty to

20  try to ensure that uncertainties and risks inherent in business situations are adequately considered

21  was violated. The best way to avoid injury to investors is to try to ensure that what is reported

22  represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

23        (i)    Further, the undisclosed adverse information concealed by defendants during

24  the Class Period is the type of information which, because of SEC regulations, regulations of the

25  national stock exchanges and customary business practice, is expected by investors and securities

26  analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

27  be the type of information which is expected to be and must be disclosed.

28

---

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 19 -

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

51. Plaintiffs incorporate the preceding paragraphs by reference.

52. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

 (a) Employed devices, schemes, and artifices to defraud;

 (b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

 (c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of VeriFone common stock during the Class Period.

54. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for VeriFone common stock. Plaintiffs and the Class would not have purchased VeriFone common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

55. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of VeriFone common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

56. Plaintiffs incorporate the preceding paragraphs by reference.

1     57.     The Individual Defendants acted as controlling persons of VeriFone within the

2     meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of

3     VeriFone, and their ownership of VeriFone stock, the Individual Defendants had the power and

4     authority to cause VeriFone to engage in the wrongful conduct complained of herein.  VeriFone

5     controlled each of the Individual Defendants and all of its employees.  By reason of such conduct,

6     the Individual Defendants and VeriFone are liable pursuant to §20(a) of the 1934 Act.

7                          **CLASS ACTION ALLEGATIONS**

8     58.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

9     of Civil Procedure on behalf of all persons who purchased VeriFone common stock (the "Class") on

10    the open market during the Class Period.  Excluded from the Class are the defendants.

11    59.     The members of the Class are so numerous that joinder of all members is

12    impracticable.  The disposition of their claims in a class action will provide substantial benefits to

13    the parties and the Court.  VeriFone had more than 83 million shares of stock outstanding, owned by

14    hundreds if not thousands of persons.

15    60.     There is a well-defined community of interest in the questions of law and fact

16    involved in this case.  Questions of law and fact common to the members of the Class which

17    predominate over questions which may affect individual Class members include:

18              (a)     Whether the 1934 Act was violated by defendants;

19              (b)     Whether defendants omitted and/or misrepresented material facts;

20              (c)     Whether defendants' statements omitted material facts necessary to make the

21    statements made, in light of the circumstances under which they were made, not misleading;

22              (d)     Whether defendants knew or deliberately disregarded that their statements

23    were false and misleading;

24              (e)     Whether the price of VeriFone common stock was artificially inflated; and

25              (f)     The extent of damage sustained by Class members and the appropriate

26    measure of damages.

27    61.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class

28    sustained damages from defendants' wrongful conduct.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 21 -

1    62.    Plaintiffs will adequately protect the interests of the Class and have retained counsel

2    who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict

3    with those of the Class.

4    63.    A class action is superior to other available methods for the fair and efficient

5    adjudication of this controversy.

**PRAYER FOR RELIEF**

7    WHEREFORE, Plaintiffs pray for judgment as follows:

8    A.    Declaring this action to be a proper class action pursuant to FRCP 23;

9    B.    Awarding Plaintiffs and the members of the Class damages, including interest;

10    C.    Awarding Plaintiffs reasonable costs and attorneys' fees; and

11    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

12    proper.

**JURY DEMAND**

14    Plaintiffs demands a trial by jury.

15    DATED: December 6, 2007

FRANCIS A. BOTTINI, JR.

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON, Cal. Bar No. 174882
FRANCIS A. BOTTINI, JR. Cal. Bar No. 175783
BRETT M. WEAVER, Cal. Bar No. 204715
DEREK J. WILSON, Cal. Bar No. 250309
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone:  619/230-0063
Facsimile:  619/233-5535

Attorneys for Plaintiffs Brian Vaughn, Ron Dockswell, and Miriam Logan

1

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2        Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3    named parties, there is no such interest to report to Plaintiffs' knowledge.

4

5                                                    ATTORNEY OF RECORD FOR

6                                                    PLAINTIFFS BRIAN VAUGHN, RON
                                                     DOCKSWELL, and MIRIAM LOGAN
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS            - 23 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Brian Vaughn ("Plaintiff), declare:

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff represents and warrants that Plaintiff is fully authorized to enter into and execute this certification.

5.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6.      Plaintiff purchased shares of VeriFone Holdings, Inc. stock during the Relevant Period, as follows:

| Date | Number of shares | Price per share |
|------|------------------|-----------------|
| 1. 6-15-07 | 25 | 37.048 |
| 2. 6-28-07 | 25 | 40.516 |
| 3. 9-20-07 | 25 | 39.638 |
| 4. 9-28-07 | 50 | 44.699 |

7.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _6_ day of December, 2007.

_Brian Vaughn_
BRIAN VAUGHN

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Ron Dockswell ("Plaintiff), declare:

1.    Plaintiff has reviewed the complaint and authorizes its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff represents and warrants that Plaintiff is fully authorized to enter into and execute this certification.

5.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6.    Plaintiff purchased shares of VeriFone Holdings, Inc. stock during the Relevant Period, as follows:

| Date | Number of shares | Price per share |
|------|------------------|-----------------|
| 1. 1/25/07 | 50 | 39.99 |
| 2. | | |
| 3. | | |
| 4. | | |

7.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th____ day of December, 2007.

RON DOCKSWELL

- 1 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Miriam Logan ("Plaintiff), declare:

1.    Plaintiff has reviewed the complaint and authorizes its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff represents and warrants that Plaintiff is fully authorized to enter into and execute this certification.

5.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6.    Plaintiff purchased shares of VeriFone Holdings, Inc. stock during the Relevant Period, as follows:

| Date | Number of shares | Price per share |
|------|------------------|-----------------|
| 1. 7/9/07 | 3 | 36.72 |
| 2. | | |
| 3. | | |
| 4. | | |

7.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _5_ day of December, 2007.

_(signature)_
MIRIAM LOGAN

- 1 -