# EXHIBIT B

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


In re:                            :
                                  :
ROYAL DUTCH/SHELL TRANSPORT       :          **O P I N I O N**
SECURITIES LITIGATION             :
                                  :
----------------------------------:
JOHN BROCKAMP, Individually       :
and on behalf of all others       :
similarly situated,               :
                                  :
            Plaintiffs,           :
                                  :
        v.                        :     Civil Action No. 04-374(JWB)
                                  :
N.V. KONINKLIJKE NEDERLANDSCHE    :
PETROLEUM MAATSCHAPPIJ, a/k/a     :
ROYAL DUTCH PETROLEUM COMPANY;    :
THE SHELL TRANSPORT AND           :
TRADING COMPANY, PLC;             :
SHELL PETROLEUM N.V.; THE         :
SHELL PETROLEUM LIMITED;          :
MAARTEN VAN DER BERGH; JUDY       :
BOYNTON; MALCOLM BRINDED;         :
S.L. MILLER; HARRY J.M. ROELS;    :
PAUL D. SKINNER; M. MOODY-        :
STUART; JEROEN VAN DER VEER       :
and PHILIP R. WATT,               :
                                  :
            Defendants.           :
----------------------------------:
COLBERT BIRNET, L.P., Individ-    :
ually and on behalf of all        :
others similarly situated,        :
                                  :
            Plaintiff,            :
                                  :
        v.                        :     Civil Action No. 04-431(JWB)
                                  :
N.V. KONINKLIJKE NEDERLANDSCHE    :
PETROLEUM MAATSCHAPPIJ, a/k/a     :

```
ROYAL DUTCH PETROLEUM COMPANY;
THE SHELL TRANSPORT AND           :
TRADING COMPANY, PLC; et al.,
                                  :
          Defendants.
-----------------------------:
BETTY BINDER, Individually and
on behalf of all others          :
similarly situated,
                                  :
          Plaintiffs,
                                  :
          v.                       Civil Action No. 04-639(JWB)
                                  :
N.V. KONINKLIJKE NEDERLANDSCHE
PETROLEUM MAATSCHAPPIJ, a/k/a :
ROYAL DUTCH PETROLEUM COMPANY;
THE SHELL TRANSPORT AND           :
TRADING COMPANY, PLC; et al.,
                                  :
          Defendants.
-----------------------------:
LEO J. FARRELL, Individually
and on behalf of all others      :
similarly situated,
                                  :
          Plaintiffs,
                                  :
          v.                       Civil Action No. 04-708(JWB)
                                  :
N.V. KONINKLIJKE NEDERLANDSCHE
PETROLEUM MAATSCHAPPIJ, a/k/a :
ROYAL DUTCH PETROLEUM COMPANY;
THE SHELL TRANSPORT AND           :
TRADING COMPANY, PLC; et al.;
                                  :
          Defendants.
-----------------------------:
GEORGE ALALA, Individually and
on behalf of all others          :
similarly situated,
                                  :
          v.                       Civil Action No. 04-717(JWB)
                                  :
N.V. KONINKLIJKE NEDERLANDSCHE
PETROLEUM MAATSCHAPPIJ, a/k/a :
ROYAL DUTCH PETROLEUM COMPANY;
THE SHELL TRANSPORT AND           :
```

```
TRADING COMPANY, PLC; et al.,
                Defendants.    :
-------------------------------
SANDRA J. LEWIS and            :
MELISSA LOVELL, Individually
and on behalf of all others    :
similarly situated,
                               :

                Plaintiffs,
                               :

        v.                         Civil Action No. 04-893(JWB)
                               :
N.V. KONINKLIJKE NEDERLANDSCHE
PETROLEUM MAATSCHAPPIJ, a/k/a :
ROYAL DUTCH PETROLEUM COMPANY;
THE SHELL TRANSPORT AND        :
TRADING COMPANY, PLC; et al.;
                               :
                Defendants.
-----------------------------:
ANTHONY LAZORKO, Individually  :
and on behalf of all others
similarly situated,            :

                               :
                Plaintiffs,
                               :   Civil Action No. 04-894(JWB)
        v.
                               :
N.V. KONINKLIJKE NEDERLANDSCHE
PETROLEUM MAATSCHAPPIJ, a/k/a :
ROYAL DUTCH PETROLEUM COMPANY;
THE SHELL TRANSPORT AND        :
TRADING COMPANY, PLC; et al.;
                               :
                Defendants.
-----------------------------:
THE POLICEMEN AND FIREMEN
RETIREMENT SYSTEM OF THE       :
CITY OF DETROIT, Individually
and on behalf of all others    :
similarly situated,
                               :

                Plaintiffs,
                               :   Civil Action No. 04-1030
        v.
                               :
N.V. KONINKLIJKE NEDERLANDSCHE
PETROLEUM MAATSCHAPPIJ, a/k/a :
```

```
ROYAL DUTCH PETROLEUM COMPANY;
THE SHELL TRANSPORT AND          :
TRADING COMPANY, PLC; et al.;
                                 :
            Defendants.
-----------------------------:
THOMAS BENNETT III, Individ-
ually and on behalf of all       :
others similarly situated,
                                 :
            Plaintiffs,
                                 :    Civil Action No. 04-1031(JWB)
        v.
                                 :


N.V. KONINKLIJKE NEDERLANDSCHE:
PETROLEUM MAATSCHAPPIJ, a/k/a
ROYAL DUTCH PETROLEUM COMPANY;:
THE SHELL TRANSPORT AND
TRADING COMPANY, PLC; et al.; :

            Defendants.          :
-----------------------------
TIMOTHY DAILEADER, Individ-       :
ually and on behalf of all
others similarly situated,       :

            Plaintiffs,          :
                                      Civil Action No. 04-1366(JWB)
        v.                       :

N.V. KONINKLIJKE NEDERLANDSCHE:
PETROLEUM MAATSCHAPPIJ, a/k/a
ROYAL DUTCH PETROLEUM COMPANY;:
THE SHELL TRANSPORT AND
TRADING COMPANY, PLC; et al.; :

            Defendants.          :
-----------------------------
WILLIAM SINNREICH, Individ-       :
ually and on behalf of all
others similarly situated,       :

            Plaintiff,           :
                                      Civil Action No. 04-1370(JWB)
        v.                       :

N.V. KONINKLIJKE NEDERLANDSCHE:
```

```
PETROLEUM MAATSCHAPPIJ, a/k/a
ROYAL DUTCH PETROLEUM COMPANY;:
THE SHELL TRANSPORT AND
TRADING COMPANY, PLC; et al.;  :

                 Defendants.    :
------------------------------
DAVID NOBOA, Individually and :
on behalf of all others
similarly situated,             :

                 Plaintiff,     :
                                     Civil Action No. 04-1377(JWB)
            v.                  :

N.V. KONINKLIJKE NEDERLANDSCHE:
PETROLEUM MAATSCHAPPIJ, a/k/a
ROYAL DUTCH PETROLEUM COMPANY;:
THE SHELL TRANSPORT AND
TRADING COMPANY, PLC; et al.;  :

                 Defendants.    :
------------------------------
GERSH KORSINSKY, on behalf of :
himself and all others
similarly situated,             :

                 Plaintiffs,    :
                                     Civil Action No. 04-1419(JWB)
            v.                  :

ROYAL DUTCH PETROLEUM COMPANY;:
SHELL TRANSPORT AND TRADING
COMPANY, P.L.C.; SHELL          :
PETROLEUM, N.V.; et al.,
                                :
                 Defendants.
---------------------------:
WILLIAM HARMOND, Individually
and on behalf of all others   :
similarly situated,

                                :
                 Plaintiffs,
                                :    Civil Action No. 04-1462(JWB)
            v.
                                :
N.V. KONINKLIJKE NEDERLANDSCHE
PETROLEUM MAATSCHAPPIJ, a/k/a :
```

-5-

```
ROYAL DUTCH PETROLEUM COMPANY;
THE SHELL TRANSPORT AND            :
TRADING COMPANY, PLC; et al.;
                                   :
              Defendants.
----------------------------:
```

**APPEARANCES**:

    LITE DePALMA GREENBERG & RIVAS
    By: Joseph J. DePalma, Esquire
    Two Gateway Center, 12th Floor
    Newark, New Jersey 07102
    (Attorney for Plaintiffs
    John Brockamp,, George Alala,
    Anthony Lazorko, William Sinnreich,
    David Noboa and William Harmond)

    BERNSTEIN, LIEBHARD & LIFSHITZ
    By: Robert J. Berg, Esquire
    2050 Center Avenue, Suite 200
    Fort Lee, New Jersey 07024
    (Attorneys for Plaintiff
    Colbert Birnet, L.P.)

    McDOWELL & RIGA
    By: Ellen M. McDowell, Esquire
    46 West Main Street
    P.O. Box 127
    Maple Shade, New Jersey 08052
    (Attorneys for Plaintiff
    Leo Farrell)

    COHEN, MILSTEIN, HAUSFELD & TOLL
    By: Adam T. Savett, Esquire
    1100 New York Avenue, N.W.
    Washington, D.C.  20005
    (Attorneys for Plaintiffs
    Sandra J. Lewis and Melissa Lovell)

WINDELS MARX LANE & MITTENDORF
By: William C. Cagney, Esquire
120 Albany Street Plaza, 6th Floor
New Brunswick, New Jersey 08901
(Attorneys for Plaintiff
The Policemen and Firemen Retirement System
of the City of Detroit)

COHN LIFLAND PEARLMAN HERRMANN & KNOPF
By: Peter S. Pearlman, Esquire
Park 80 Plaza West - One
Saddle Brook, New Jersey 07663
(Attorneys for Plaintiff
Thomas Bennett III)

SQUITIERI & FEARON
By: Olimpio Lee Squitieri, Esquire
13 James Street
Morristown, New Jersey 07960
(Attorneys for Plaintiff
Timothy Daileader)

ZIMMERMAN, LEVI & KORSINSKY
By: Jean-Marc Zimmerman, Esquire
226 St. Paul Street
Westfield, New Jersey 07090
(Attorneys for Plaintiff
Gersh Korsinsky)

TRUJILLO RODRIGUEZ & RICHARDS
By: Lisa J. Rodriguez, Esquire
8 Kings Highway West
Haddonfield, New Jersey 08033
(Attorneys for Plaintiffs
Jose Valadez, Oscar Pena,
Hernando Rivera and John R. Rosenboom)

JOHN A. MAHER, ESQUIRE
450 Springfield Avenue
Summit, New Jersey 07901
(Attorney for Plaintiff
State Teachers Retirement
System of Ohio)

ROBERTSON, FREILICH, BRUNO & COHEN
By: William W. Robertson, Esquire
One Riverfront Plaza
Newark, New Jersey 07102-5468

    - and -

DEBEVOISE & PLIMPTON
By: Ann M. Ashton, Esquire
555 - 13th Street, N.W.
Washington, D.C.  20004
(Attorneys for Defendants
Royal Dutch Petroleum Company;
N.V. Koninklijke Nederlandsche
Petroleum Maatschappij;
The "Shell" Transport and
Trading Company, PLC;
Shell Petroleum, N.V.; and
The Shell Petroleum Company Limited)

**BISSELL**, <u>Chief Judge</u>

    The Court has before it several threshold motions in certain class actions which will be generically described hereafter as the "Securities Actions" and the "ERISA Actions."  The Securities Actions are brought on behalf of all persons who purchased on the open market the securities of defendants N.V. Koninklijke Nederlandsche Petroleum Maatschappij a/k/a Royal Dutch Petroleum Company ("Royal Dutch") and/or The Shell Transport and Trading Company, P.L.C., Shell Petroleum N.V. and The Shell Petroleum Limited ("Shell Transport").  Those claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated by the Securities and Exchange Commission.  The

-8-

ERISA Actions are brought on behalf of participants in the Shell
Provident Fund and allege that defendants breached their
fiduciary duties under the Employee Retirement Income Security
Act (ERISA") of 1974).  Before the Court are motions to
consolidate the Securities Actions and to consolidate the ERISA
Actions as well as motions to appoint a Lead Plaintiff, Lead
Counsel and Lead Liaison Counsel.

### FACTS AND BACKGROUND[1]

Defendant Royal Dutch is a Netherlands corporation with its
principal executive office located at 30, Carel van Bylandtlaan,
2596 The Hague, the Netherlands.  (Brockamp Am. Compl., ¶ 8).
Defendant Shell Transport is a British corporation with its
principal executive offices located at Shell Centre, London SEI,
7NA.  (Id., ¶ 9).  In 1907 Royal Dutch and Shell Transport agreed
to merge their interests on a 60:40 basis while remaining
separate and distinct entities; the melded company is commonly
referred to as "Shell".  (Id., ¶ 27).  Consistent with this
arrangement, Royal Dutch and Shell Transport shared ownership

---

[1]    Although 21 individual complaints have been filed thus
far, the factual predicates asserted in the complaints are nearly
identical.  As such, the Court primarily cites the amended
complaint filed in <u>Brockamp v. N.V. Koninklijke Nederlandsche
Petroleum Maatschappij, et al.</u>, Civil 04-374(JWB).  When
applicable, the Court also cites the ERISA complaint filed in
<u>Lancaster v. Royal Dutch Petroleum Company, et al.</u>, Civil 04-
1398(JWB).  In doing so hereafter, the Court is referring solely
to allegations in this matter and is making no findings of fact
at this early stage of the litigation.

interests in energy and petrochemical companies (the "Group Companies"). (Id., ¶ 25). The Group Companies are comprised of service companies (the "Group Service Companies"), which provide advice and services to other Shell companies, and operating companies (the Group Operating Companies"), which are engaged in the business of exploration and production, gas and power, chemicals, renewables and other activities in 145 countries worldwide. (Id., ¶ 26). Royal Dutch is a 60% owner and Shell Transport is a 40% owner of Shell Petroleum Netherlands and Shell Petroleum UK.[2] (Id., ¶¶ 26-28). Individual "Group Managing Directors" are also named as defendants in this action. (Id., ¶ 30). The named individual defendants are Maarten van den Bergh, Judy Boynton, Malcolm Brinded, S.L. Miller, Harry J.M. Roels, Paul D. Skinner, M. Moody-Stuart, Jeroen van der Veer and Philip R. Watts.[3] (Id., ¶ 12).

---

[2] As used here, the term "the Company" refers collectively to each of the Parent Companies (Royal Dutch and Shell Transport), the Group Companies and to Shell Petroleum N.V. (Netherlands) and Shell Petroleum UK. Shell Petroleum Netherlands and Shell Petroleum UK hold all of the shares of the Group Service Companies and hold directly or indirectly all Group interest in the operating companies. (Brockamp Am. Compl., ¶ 28).

[3] Every member of the Board of Management of Royal Dutch and every managing director of Shell Transport is also a member of the Presidium of the Board of Directors of Shell Petroleum Netherlands and a managing director of Shell Petroleum UK; thus, they are generally known as the "Group Managing Directors." (Brockamp Am. Compl., ¶ 29). Each of the individually named defendants was an executive officer of Royal Dutch or Shell Transport and served as Group Managing Director at various times during the class period. The ERISA Actions also name Pervis

-10-

The Securities Actions plaintiffs represent all persons who purchased or otherwise acquired the securities of Royal Dutch and/or Shell Transport on the open market during the class period.[4] Similar actions based on the same facts, instituted on behalf of participants in the Shell Provident Fund (the "Plan"),[5] were brought under ERISA. The facts outlined below apply to the Securities as well as the ERISA Actions.

In the petroleum industry, there are two key measures of a company's operating performance and future prospects: reported reserves and future discounted cash flows. (Id., ¶ 39). The complaint allege that during the class period Royal Dutch and Shell Transport reported reserves and future discounted cash flows that were materially false and misleading. (Id.) On December 3, 1999, both Shell Transport and Royal Dutch filed with the Securities and Exchange Commission ("SEC") annual reports on Form 20-F for fiscal year "(FY") 1998. (Id., ¶ 44). With

_____

Thomas, Jr. as an individual defendant. (Lancaster Compl., ¶ 18). Thomas is the Chief Information Officer of Royal Dutch/Shell and is designated by Shell Provident Fund as its Administrator. (Id.)

[4]    The majority of the complaints designate December 3, 1999 to January 9, 2004 as the class period. However, as detailed infra, some of the actions assert a different class period.

[5]    The Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts or other participants which may be allocated to such participant's accounts. (Lancaster Compl., ¶ 27).

-11-

respect to reported reserves, the report stated:

### Critical Accounting Policies

In order to prepare the Financial Statements in conformity with generally accepted accounting principles in the Netherlands and the USA, management has to make estimates and assumptions. The matters described below are considered to be the most critical in understanding the judgments that are involved in preparing the Financial Statements and the uncertainties that could impact the amounts reported on the results of operations, financial condition and cash flows. Accounting policies are described in Note 2 to the Financial Statements.

### Estimation of oil and gas reserves

Oil and gas reserves have been estimated in accordance with industry standards and SEC regulations. Proved oil and gas reserves are the estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions. These estimates do not include probable or possible reserves. Estimates of oil and gas reserves are inherently imprecise and represent only approximate amounts and are subject to future revision, as they are based on available reservoir data, prices and costs as of the date the estimate is made. Accordingly, the financial measures that are based on proved reserves are also subject to change.

### Supplementary Information - Oil and Gas Reserves

Proved reserves are the estimated quantities of oil and gas which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years

-12-

from known reservoirs under existing economic
and operating conditions. Proved developed
reserves are those reserves which can be
expected to be recovered through existing
wells with existing equipment and operating
methods. The reserves reported exclude
volumes attributable to oil and gas
discoveries which are not at present
considered proved. Such reserves will be
included when technical, fiscal and other
conditions allow them to be economically
developed and produced.

Proved reserves are shown net of any
quantifies of crude oil or natural gas that
are expected to be taken by others as
royalties in kind but do not exclude certain
quantities related to royalties expected to
be paid in cash or those related to fixed
margin contracts. Proved reserves include
certain quantities of crude oil or natural
gas which will be produced under arrangements
which involved Group companies in upstream
risks and rewards but do not transfer title
of the product to those companies.

(Brockamp Am. Compl., ¶¶ 45-46).

With respect to future cash flows related to proved oil and

gas reserve quantities, a key measure of prospective operating

performance based in substantial part on proved oil and gas

reserves, both Forms 20-F stated:

The carrying amounts of fixed assets are
reviewed for possible impairment whenever
events or changes in circumstances indicate
the carrying amounts of those assets are
written down to fair value. For this purpose
assets are grouped based on separately
identifiable and largely independent cash
flows. Estimates of current cash flows of
assets related to hydrocarbon production
activities are based on proved reserves,
except in circumstances where it is probable
that additional resources will be developed

-13-

and contribute to cash flows in the future.

United States accounting principles require the disclosure of a standardized measure of discounted future cash flows, relating to proved oil and gas reserve quantities and based on prices and costs at the end of each year, currently enacted tax rates and a 10% discount factor.  The information so calculated does not provide a reliable measure of future cash flows from proved reserves, nor does it permit a realistic comparison to be made of one entity and another because the assumptions used cannot reflect the varying circumstances within each entity.  In addition, a substantial but unknown proportion of future real cash flows from oil and gas production activities is expected to derive from reserves which have already been discovered, but which cannot yet be regarded as proved.

(<u>Id</u>., ¶. 47).

Royal Dutch/Shell Transport reported that future net cash flows related to proved oil and gas reserve quantities were $59,460,000 for FY 1998.  (<u>Id</u>., ¶ 48).  Applying a discount factor, Royal Dutch/Shell Transport then reported that its standardized measure of discounted future cash flows for FY 1998 yielded the sum of $30,669,000.  (<u>Id</u>.)

On April 11, 2000, Royal Dutch/Shell Transport each filed an annual report with the SEC on Form 20-F for FY 1999.  (<u>Id</u>., ¶ 49).  The information contained in the critical accounting policies, estimation of oil and gas reserves, supplementary information and future cash flow portions of the FY 1999 annual report are identical to those portions of the FY 1998 report

-14-

which are detailed above. (Id., ¶¶ 49-52). The reports stated that Royal Dutch/Shell Transport's proved oil and gas reserves for FY 1999 were 19,869 million barrels and its future net cash flows related to proved oil and gas reserve quantities were $102,785,000. (Id., ¶ 51). After the discount factor was subtracted, the reported standardized measure of discounted future cash flows for FY 1999 was $54,799,000. (Id., ¶ 53).

For FY 2000, Royal Dutch/Shell Transport once again reported the same information with respect to its critical accounting policies, estimation of oil and gas reserves, supplementary information and future cash flow. (Id., ¶ 54). The reports stated that Royal Dutch/Shell Transport's proved oil and gas reserves were 19,095 million barrels and its future net cash flows related to proved oil and gas reserve quantities were $114,861,000. (Id., ¶¶ 56, 58). After the discount factor was applied to the future net cash flows, the reported standardized measure of discounted future cash flows for FY 2000 yielded $63,041,000. (Id., ¶ 58).

Royal Dutch/Shell Transport reported the same information in the areas of critical accounting policies, estimation of oil and gas reserves, supplementary information and future cash flow for fiscal years 2001 and 2002. (Id., ¶¶ 59-67). The reports stated that Royal Dutch/Shell Transport's proved oil and gas reserves were 19,095 million barrels for FY 2001 and 19,347 million

-15-

barrels for FY 2002.  (<u>Id</u>., ¶¶ 61, 66).  Its future net cash

flows related to proved oil and gas reserve quantities were

$86,354,000 for FY 2001 and $123,185,000 for FY 2002.  (<u>Id</u>., ¶¶

63, 68).  After the discount factor was subtracted from the

future net cash flows each year, the reported standardized

measures of discounted future cash flows were $45,878,000 and

$65,702,000 for FYs 2001 and 2002 respectively.  (<u>Id</u>.)

After internal reviews had been conducted, on January 9,

2004, Royal Dutch/Shell Transport announced that some proved

hydrocarbon reserves would be recategorized.  (<u>Id</u>., ¶, 70).  It

stated that the total non-recurring recategorization, relative to

the proved reserves as stated at December 31, 2002, represents

3.9 billion barrels of oil equivalent ("BOE") of proved reserves,

or 20% of proved reserves at that date.  (<u>Id</u>.)  Furthermore, the

Company announced that over 90% of the total change is a

reduction in the proved undeveloped category; the balance is a

reduction in the proved developed category.  (<u>Id</u>.)  Royal

Dutch/Shell Transport also stated that of the recategorization,

two thirds (2.7 billion barrels) relates to crude oil and natural

gas liquids, and one third (1.2 billion BOE) to natural gas.

(<u>Id</u>.)  According to Royal Dutch/Shell Transport, this could

impact the FAS 69 standardized measure of discounted future cash

flows associated with the proved reserves.  (<u>Id</u>.)

Royal Dutch/Shell Transport further stated that the reserves

-16-

affected were mainly booked in the period 1996 to 2002 and that a significant proportion of the recategorization related to the current status of project maturity and that a number of countries are affected by the change with the largest impact in Nigeria and Australia.  (Id.)  As a result of this announcement, shares of Royal Dutch fell 7.8%, or $4.15 per share, on heavy volume, to close at $48.61 per share on January 9, 2004.  (Lancaster Compl., ¶ 78).  That same day shares of Shell Transport fell 6.9%, or $3.12 per share, on heavy volume, to close at $41.69 per share.[6] (Brockamp Am. Compl., ¶ 71).

On January 12, 2004, an article titled "*Shell Cuts Reserve Estimate 20% As SEC Scrutinizes Oil Industry*" appeared in The Wall Street Journal.  (Id., ¶ 72).  This article, written by Chip Cummins, Susan Warren and Michael Schroeder, stated that "Royal Dutch/Shell Group's disclosure that it overstated its proven reserves by 20% rattled energy investors and is raising questions about whether the oil industry has inflated a lifeblood measure of its future prospects."  (Id.)  The article quoted Lynn Turner, a former SEC chief accountant, as stating" "[T]he revision, [sic] looked like more than a mistake.  A 20% restatement of proven reserves is a humongous error[.] ...  For a company like Shell to have missed its proven reserves by that much is not an oversight.

---

[6] The complaints do not indicate whether the Royal Dutch/Shell Transport stocks were typically traded on heavy volume.

It's an intentional misapplication of the SEC's rules."  (<u>Id</u>.)

The article stated the following with respect to proved reserves:

> Reserves are at the heart of an oil and gas company because they represent what can be taken from the ground in the future.  Since companies must replace the oil and gas they produce each year just to stay even, reserve growth is a crucial indicator of how well a company is doing.  If the reserve size falls, the company is less valuable to investors and its stock price will tumble.

(<u>Id</u>., ¶ 73).

Two days later, <u>The Wall Street Journal</u> published another article on this subject titled "*Shell's Watts Draws Fire, Chairman Criticized Amid Overbooking Flap, Likely SEC Probe*."

(<u>Id</u>., ¶ 74).  The January 14, 2004 article, written by Chip Cummins and Michael Schroeder, stated in pertinent part:

> As the Securities and Exchange Commission looks poised to delve into a huge overbooking of reserves by Royal Dutch/Shell Group, the company's chairman, Philip Watts, has come under increasing fire for his stewardship of one of the world's largest oil producers. Last week Shell said it erroneously overbooked reserves by 20%.  Reserves are a crucial indicator of an oil company's value. Shares in the group's two holding companies – Royal Dutch Petroleum Co. of the Netherlands, and Shell Transport & Trading Co. of London – have fallen sharply since the disclosure Friday.  The unprecedented size of the overstatement makes an SEC investigation likely.  "The Shell matter seems significant," said SEC Commissioner Roel Camps.  "I am sure our enforcement staff will look into it.  It is hard to see how [Shell] could miss so badly."

(Brockamp Am. Compl., ¶ 74).  On March 3, 2004, defendant Watts,

-18-

as well as Walter van de Vijver, head of Shell's Exploration &
Production operations, were forced to step down from their posts.
(Lancaster Compl., ¶ 83).  The Wall Street Journal published
articles on March 8th and 9th which alleged that former and
current Royal Dutch/Shell Transport management were advised of
the shortfalls in proven oil and natural gas reserves in 2002 and
knew of the potential consequences.  (Lancaster Compl., ¶ 85).

Plaintiffs allege that on March 18, 2004, Royal Dutch/Shell
Transport made a series of announcements relating to its recent
recategorization of proved hydrocarbon reserves.  (Brockamp Am.
Compl., ¶ 77).  According to plaintiffs, the company stated, in
pertinent part:

> During the finalisation of the 2003 reserves
> data, concerns arose about the volume of the
> proved reserves booking proposed for the
> Ormen Lange field in Norway.  As a result,
> the Group's senior management engaged Ryder
> Scott Company as consultants in March to help
> conduct a fast-track review of selected
> fields covering approximately 40% of the
> global Shell portfolio, including some 60% of
> proved undeveloped reserves.  A number of
> issues have been identified to date, leading
> to the recategorisation of a further 250
> million barrels of oil equivalent ('boe') as
> at the end of 2002.  In addition Shell has
> reduced the volume of proved reserves it
> planned to book in 2003 by approximately 220
> million boe of proved reserves (including
> volumes from Ormen Lange).  The 220 million
> boe were included in the reserve replacement
> ration ('RRR') disclosed on February 5th
> 2004; correcting for these volumes represents
> a reduction in the 2003 RRR of some 16
> percentage points.  Approximately 95% of the
> volumes impacted by these reductions were

-19-

> previously booked as proved undeveloped
> reserves from non-producing fields.  As a
> result, the expected impact on earnings is
> approximately $20 million.  In addition well
> write-off costs related to the original
> [recategorisation] have been defined,
> amounting to $10 million after tax.

(Brockamp Am. Compl., ¶ 77).

The complaints in the Securities Actions allege that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, by issuing a series of materially false and misleading statements to the investing public between 1999 and 2004.  (Id., ¶¶ 2, 87). The ERISA Actions allege that defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 502(a)(2) and (3) in two principal ways:  (a) negligently misrepresenting and negligently failing to disclose material facts to the Plan and the Participants in connection with the management of the Plan's assets; and (b) negligently permitting the Plan to purchase and hold Royal Dutch stock when it was imprudent to do so.  (Lancaster Compl., ¶ 2).  The ERISA plaintiffs therefore seek appropriate equitable relief and, pursuant to 29 U.S.C. § 1109(a), seek to hold defendants personally liable to reimburse the Plan for the losses resulting from each alleged breach of fiduciary duty.  (Id.)  Additionally, all plaintiffs claim that defendants violated the rules of the Securities and Exchange Commission and the Society of Petroleum

Engineers ("SPE") as well as "Generally Accepted Accounting
Principles." (Lancaster Compl., ¶¶ 88-94; Brockamp Am. Compl.,
¶¶ 80-86).

### DISCUSSION

## I. Consolidation

In 1995 Congress enacted the Private Securities Litigation
Reform Act ("PSLRA"), a statute which, inter alia, guides
district courts through the process of selecting a lead plaintiff
and choosing and retaining lead counsel in securities class
actions. The PSLRA requires that "if more than one action on
behalf of a class asserting substantially the same claim or
claims arising under this chapter has been filed, and any party
has sought to consolidate those actions for pretrial purposes or
for trial" then the Court should reserve decision on appointing
the lead plaintiff until the issue of consolidation has been
addressed. 15 U.S.C. § 78u-4(a)(3)(B)(ii). The consolidation of
actions is governed by Fed. R. Civ. P. 42. When "common
questions of law or fact are pending before the court", Rule 42
gives the court the authority to "order a joint hearing or trial
of any or all of the matters in issue in the actions ... order
all the actions consolidated ... and make such orders concerning
proceedings therein as may tend to avoid unnecessary costs or
delay." Fed. R. Civ. P. 42(a). In the case at bar, the
Securities plaintiffs wish to consolidate their actions and the

ERISA plaintiffs request consolidation of their actions.  The mere existence of common issues does not require consolidation. Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp., 149 F.R.D. 65, 81 (D.N.J. 1993) (citing Waste Distillation Tech. Inc. v. Pan Am. Res., 775 F. Supp. 759, 761 (D. Del. 1991); Dentsply Int'l, Inc. v. Kerr Mfg. Co., 734 F. Supp. 656, 661 (D. Del. 1990); Rohm & Haas Co. v. Mobil Oil Corp., 525 F. Supp. 1298, 1309 (D., Del. 1981)).  "The savings of time and effort gained through consolidation must be balanced against the inconvenience, delay or expense that might result from simultaneous disposition of the separate actions." (Id.)  In the instant case, all of the factors weigh in favor of consolidating the Securities Actions. Because of the virtually identical factual predicates, there is no concern that consolidation would create a likelihood of prejudice by confusing the issues.  Liberty Lincoln, 149 F.R.D. at 81 (quoting Liqui-Box Corp. v. Reid Valve Co., Nos. 85-2355, 87-8098 (W.D. Pa. Sept. 15, 1989)).  In that respect, the Court also finds it prudent to consolidate the ERISA Actions.  Because the Securities Actions and ERISA Actions seek different relief under a different statutory scheme, however, the Court will not also consolidate both sets of actions with each other.  Rather, the Court will, with the assistance of counsel, establish procedures for the coordination of discovery and other related proceedings between the Securities and ERISA Actions.

-22-

## II.  **Appointment of a Lead Plaintiff**[7]

A two-step process for appointing a lead plaintiff is outlined in the PSLRA.  The Court must first identify the presumptive lead plaintiff and then it must determine if any member of the putative class has rebutted the presumption.  See In re Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001)[8]; see also 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) and (II).  Under the PSLRA, when determining the movant that is presumptively entitled to the status of lead plaintiff, the court is to adopt the presumption that the "most adequate" plaintiff is the one which:

> (aa) has either filed the complaint or made a
> motion in response to a notice under
> subparagraph (A)(1);
>
> (bb) in the determination of the court, has
> the largest financial interest in the relief

---

[7]    The Court need only address the appointment of a lead plaintiff and lead counsel with respect to the Securities Actions.  The ERISA plaintiffs have agreed that Gordon Lancaster, John Tristan, Jose Valadez, Oscar Pena, Hernaldo Rivera, John R. Rosenboom and Scott Franklin, Jr. will serve as co-lead plaintiffs.  The co-lead plaintiffs have designated the firms of Wechsler Harwood LLP, Scott & Scott, LLC and Milberg Weiss Bershad Hynes & Lerach LLP as co-lead counsel and Lite DePalma Greenberg & Rivas, LLC as liaison counsel.

[8]    As the Third Circuit noted in In re Cendant, the PSLRA always speaks of the lead plaintiff in the singular.  In re Cendant, 264 F.3d at 223, n.3; see also 15 U.S.C. § 78u-4(a)(3)(B)(i) and (iii).  The Court observed that this distinction provides that "only one 'entity' is entitled to speak for the class:  the lead plaintiff.... In cases where a group serves as lead plaintiff, it is for the group's members to decide how the group will make decisions, but it is the group - not its constituent members - that speaks for the class."  (Id.) (emphasis in original).

-23-

sought by the class; and

(cc) otherwise satisfies the requirements of
Rule 23 of the Federal Rules of Civil
Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).[9]

The presumption of adequacy "may be rebutted only upon proof

by a member of the purported plaintiff class that the

presumptively most adequate plaintiff:

(aa) will not fairly and adequately protect
the interest of the class; or

(bb) is subject to unique defenses that
render such plaintiff incapable of adequately
representing the class."

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

A.  Computing the Largest Financial Interest

Although the PSLRA provides no formula or guidance for

courts to measure the financial interest of the moving

plaintiffs, the Third Circuit has stated "that courts should

consider, among other things: (1) the number of shares that the

movant purchased during the putative class period; (2) the total

net funds expended by the plaintiffs during the class period; and

(3) the approximate losses suffered by the plaintiffs." In re

---

[9]  The PSLRA's Conference Committee Report and Senate
Report state that the purpose of the legislation was to encourage
institutional investors to serve as lead plaintiff.  In re
Cendant, 264 F.3d at 273-74; see also H.R. Conf. Rep. No. 104-
369, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733; S.
Rep. No. 104-98, at 11 (1995), reprinted in 1995 U.S.C.C.A.N.
679, 690.  The Reports anticipated that the involvement of the
institutional investors would significantly benefit absent class
members.  (Id.)

Cendant, 264 F.3d at 262.[10]

The plaintiffs in the instant action dispute the appropriate method to be used to calculate the losses in securities fraud actions. Some endorse the "Net/Net" approach, which simply compares the dollars spent on securities to dollars received from sales during the class period. Others use the First-In-First-Out ("FIFO") approach. The FIFO approach offsets class period sales against pre-class period holdings.

There are seven groups of plaintiffs vying for the lead plaintiff position. A review of each group's purchased shares, net expenditures and approximate losses is detailed below.

- The Louisiana Municipal Police Employees' Retirement System ("Louisiana Employees") claims to have suffered losses in the amount of $276,189. (Louisiana Br. at 6). The losses were calculated based on the 82,400 shares of Royal Dutch ADRs that were purchased during the class period.[11] (Id)

- The Arkansas Teacher Retirement System ("Arkansas

_____

[10] District courts in Illinois, New Jersey and New York have also been guided by these considerations. Lax v. First Merch. Acceptance Corp., 1997 WL 461036, at *5 (N.D. Ill., Aug. 11, 1997); see also In re Nice Sys. Sec. Litig., 188 F.R.D. 206, 217 (D.N.J. 1999), In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998).

[11] ADR stands for American Depository Receipt. It is a negotiable certificate issued by a U.S. bank representing a specific number of shares of a foreign stock traded on a U.S. stock exchange. The foreign entity must provide financial information to the sponsor bank.

Teachers") submits that it purchased 4,760,853 shares of Royal Dutch/Shell securities and sold only 2,495,449 shares during the class period.[12] (Arkansas Reply Br. at 3). In addition to indicating that it is a net purchaser,[13] Arkansas Teachers claims to have suffered a loss of $7,962,357.32. (Id. at 4). This figure was reached by using the FIFO analysis. Although it notes that the FIFO method is not an accurate indicator of losses for a movant that has significant pre-class period holdings, Arkansas Teachers uses this method to calculate its losses because it is a net purchaser. (Arkansas Br. at 8).

• The Oklahoma Teachers' Retirement System ("Oklahoma Teachers") purchased a combined total of 2,849,576

---

[12]    The Arkansas Teachers define the putative class period as April 8, 1999 to March 22, 2004.

[13]    The distinction between net purchaser and net seller may be relevant to the court's selection of a lead plaintiff. The court in In re McKesson HBOC, Inc., Sec. Litig., 97 F. Supp. 2d 993, 996-97 (N.D. Cal. 1999), noted that "[a] net purchaser will, presumably, have a greater interest in the litigation, because he or she was induced by the fraud to purchase shares, and has been left 'holding the bag' when the fraudulent inflation is revealed. By contrast a net seller has arguably *profited* more from the fraud than it has been injured, possibly reducing its incentive to litigate." (Emphasis in original). Courts have rejected net sellers' applications to be appointed lead plaintiff. See In re Cable & Wireless, PLC, Sec. Litig., 217 F.R.D. 372, 378 (E.D. Va. 2003); In re Comdisco Sec. Litig., 150 F. Supp. 2d 943, 945 (N.D. Ill. 2001) (net seller in that case was "totally out of the running for designation as lead plaintiff").

-26-

Royal Dutch and Shell Transport shares during the class period. (Oklahoma Br. at 14). The funds expended in purchasing these shares totaled $45,065,899.95. (<u>Id</u>.) Oklahoma Teachers notes that it is not possible to calculate precise losses for a variety of reasons including the fact that the precise amount of inflation in the share price on each day of the proposed class period has not yet been determined and the price of defendants' stock continues to decline. (<u>Id</u>.) However, the estimated losses are $3,682,009.00. Oklahoma Teachers adds that as of March 22, 2004, the system continued to own 1,043,920 shares. (<u>Id</u>.)

- KBC Asset Management NV ("KBC-AM") claims that it purchased nearly 14.8 million shares of Royal Dutch and Shell Transport securities during the putative class period. (KBC-AM Opp. at 3). The net funds expended were approximately $46 million and it claims losses of $63,402,475.00. (<u>Id</u>. at 4). As such, KBC-AM qualifies as a net purchaser. (<u>Id</u>. at 6). This figure represents KBC-AM's losses when calculated using the Net/Net method, which only counts those shares that were bought and sold during the class period. (<u>Id</u>.) KBC-AM's calculated losses using the FIFO method are

$76,860,954.00.[14]   (Id. at 5; Toll Decl., ¶ 4).

- The Ohio Public Employees' Retirement System and the State Teachers' Retirement System of Ohio ("Ohio Funds") claim that during the class period, they collectively purchased 4,165,074 shares of Royal Dutch ADRs.  (Ohio Opp. at 5).  Using the FIFO method, they claim combined losses of more than $48.8 million.  (Id.)[15]

- The Itzehoer Aktien Club GbR ("IAC") purchased and continued to own 32,834 shares of Shell stock during the putative class period.[16]  (IAC Br. at 1).  Although no sales were conducted during that period, IAC claims a total unrecognized loss of approximately $568,165.00.  (Id. at 3).

- The Pennsylvania State Employees' Retirement System and the Pennsylvania Public School Employees' Retirement

---

[14]   KBC-AM owned 385,878 shares of Royal Dutch, 991,974 shares of Shell Transport and 12,776 Royal Dutch ADRs prior to the class period.  (KBC-AM Opp. at 5).

[15]   Although the briefs do not address this issue, the Ohio State Teachers' Retirement System bought 3,297,526 shares during the putative class period and sold 5,210,185 shares during that same period.  Thus, OSTRS is considered a net seller.  (See Blocl Decl., Exh. A).  The Ohio Public Employees' Retirement System however, is a net purchaser.  (Id.)  (It bought 2,705,100 shares and sold 304,230 during the putative class period).  When their shares are combined, the Ohio Funds qualify as net purchasers.

[16]   IAC defines the putative class period as the time between March 25, 1999 and March 22, 2004.  (IAC Br. at 1).

System ("Pennsylvania Funds") purchased 41,827,046

shares of Royal Dutch/Shell securities during the class

period.[17] (Pennsylvania Reply Br. at 9). The

Pennsylvania Funds state that the net purchase amount

is 1,269,430 shares during the class period. (<u>Id</u>.)

The net funds expended on all purchases during the

class period is $46,665,146 and their FIFO losses total

in excess of $67 million. (<u>Id</u>. at 11).

## B. KBC-AM has the Largest Financial Interest

When applying those factors enumerated in <u>In re Cendant</u> to

the vying plaintiffs' claims, the Court finds that KBC-AM has the

largest financial interest.[18] The Court's inquiry is far from

finished, however, as its next function  is to determine whether

KBC-AM "'otherwise satisfies the requirements of Rule 23 of the

Federal Rules of Civil Procedure' and is thus the presumptively

most adequate plaintiff." <u>In re Cendant</u>, 264 F.3d at 262; 15

U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). Rule 23 requires, <u>inter</u>

<u>alia</u>, that the claims or defenses of the representative parties

---

[17]    The Pennsylvania Funds define the putative class period
as December 3, 1999 to January 9, 2004. If the Court were to
employ the Ohio Funds' class period of April 8, 1999 through
January 8, 2004, the Pennsylvania funds allege that their net
purchases would be 4,807,180 shares with a calculated loss of
$71.2 million. (Pennsylvania Reply Br. at 10).

[18]    KBC-AM appears to have suffered the greatest loss under
both the FIFO and the Net/Net approach and therefore it is not
necessary for the Court to address the issues raised in the
movants' briefs concerning the appropriate method to calculate
losses.

be typical of the claims or defenses of the class and that the
representative parties fairly and adequately protect the
interests of the class. Fed. R. Civ. P. 23(a)(3) and (4). When
conducting the initial inquiry as to whether the movant with the
largest losses satisfies the typicality and adequacy requirements
of Rule 23, the Third Circuit has held the following:

> [T]he court may and should consider the
> pleadings that have been filed, the movant's
> application, and any other information that
> the court requires to be submitted. In
> keeping with statutory text, however, the
> court generally will not consider at this
> stage any arguments by other members of the
> putative class; rather, such allegations
> should be dealt with in terms of assessing
> whether the lead plaintiff presumption has
> been rebutted rather than in terms of
> deciding whether it has been triggered.

In re Cendant, 264 F.3d at 264. The question is whether KBC-AM
has "stated a prima facie case of typicality and adequacy."
(Id., citing Gluck v. CellStar Corp, 976 F. Supp. 542, 546 (N.D.
Tex. 1997); In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286,
296 (E.D.N.Y. 1998); In re Advanced Tissue Sci. Sec. Litig., 184
F.R.D. 346, 349 (S.D. Cal. 1998); In re Milestone Sci. Sec.
Litig., 183 F.R.D. 404, 414 (D.N.J. 1998)). In order to satisfy
the typicality requirement, the movant's claims must arise from
the same event or course of conduct and rely on legal theories
similar to those of the other class members to prove defendants'
liability, In re Cendant, 264 F.3d at 265. Additionally, to
satisfy Rule 23's adequacy requirement, a court should consider

-30-

whether movant has "the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." (Id., quoting Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988)).

The Third Circuit enunciates two additional factors for courts to consider when making an initial adequacy assessment. First, the court should examine and determine whether the movant has selected competent class counsel and whether the movant has negotiated a reasonable retainer agreement with that counsel. In re Cendant, 264 F.3d at 265; see also In re Quintus Sec. Litig., 201 F.R.D. 475, 485 (N.D. Cal. 2001). The court's function at this stage is not to decide whether it would "approve" the movant's choice of counsel or the terms of the retainer agreement, but rather, as the Third Circuit stressed, "the question is whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all." In re Cendant, 264 F.3d at 266.

The second additional factor for the court to consider only arises "when the movant with the largest interest in the relief sought by the class is a group rather than an individual person

-31-

or entity." <u>In re Cendant</u>, 264 F.3d at 266.  Although the PSLRA
allows a "group of persons" to serve as lead plaintiff, "the goal
of the Reform Act's lead plaintiff provision is to locate a
person or entity whose sophistication and interest in the
litigation are sufficient to permit that person or entity to
function as an active agent for the class."  (<u>Id</u>.)  "If the court
determines that the way in which a group seeking to become lead
plaintiff was formed or the manner in which it is constituted
would preclude it from fulfilling the tasks assigned to a lead
plaintiff, the court should disqualify that movant on the grounds
that it will not fairly and adequately represent the interests of
the class."  (<u>Id</u>.)

KBC-AM is authorized by the Belgian Banking, Finance and
Insurance Commission ("BFIC") to offer asset management and
related services to the investing public.  (Duchateau and
Schoeters Decl., ¶ 6).  It manages assets on behalf of
institutional clients, corporate customers and private investors.
It manages a range of collective investment vehicles such as
investment companies and mutual investment funds.  (<u>Id</u>.)  Of the
range of investment funds that KBC-AM manages, 46 of the funds
purchased Royal Dutch and Shell Transport Securities.  (KBC-AM
Reply Br. at 6).  KBC-AM proffers that although the individual
funds are separate legal entities, the Asset Management Agreement
creates an express fiduciary relationship between KBC-AM and each

-32-

of the funds. (Duchateau and Schoeters Decl., ¶ 12). KBC-AM
also is expressly authorized to maintain claims on behalf of the
funds and pursuant to a Durable General Power of Attorney dated
March 26, 2004, is to act as their attorney-in-fact in this
litigation. (Id., ¶ 16). An investment advisor is not prevented
from serving as lead plaintiff when it can demonstrate to the
Court's satisfaction that it has full authority over the funds'
investments and acts as its agent. See Rent-Way Securities
Litig., 218 F.R.D. 101, 106 (W.D. Pa. 2003); see also Roth v.
Knight Trading Group, Inc., 228 F. Supp. 2d 524, 529-30 (D.N.J.
2002). KBC-AM has submitted that it functions in a fiduciary
capacity with respect to each of the funds, with full
discretionary authority over their funds' investments. (KBC-AM
Reply Br. at 6).

KBC-AM satisfies the prima facie standard of typicality and
adequacy. KBC-AM's claims are typical because they are based on
the same alleged misrepresentations made by defendants and its
legal theory is rooted in the federal securities laws. Every
other Securities Action plaintiff alleges the same claims and
theories of liability. KBC-AM likewise satisfies the adequacy
requirement of Rule 23. It is a large investment advisor that
manages a wide range of investment funds. KBC-AM has chosen the
firms of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Spector,
Roseman & Kodroff, P.C., to represent and serve as co-lead

counsel for the class.  Both firms have substantial experience
and success in the field of class action and securities
litigation.  Accordingly, KBC-AM is presumptively entitled to
appointment as lead plaintiff.

Now that a presumptive lead plaintiff has been located, the
next inquiry is whether the presumption has been rebutted.  The
PSLRA specifically provides that the presumption "may be rebutted
only upon proof by a member of the purported plaintiff class that
the presumptively most adequate plaintiff:  (aa) will not fairly
and adequately protect the interests of the class; or (bb) is
subject to unique defenses that render such plaintiff incapable
of adequately representing the class."  15 U.S.C. § 78u-
4(a)(3)(B)(iii)(I); see also In re Cendant, 264 F. 3d at 268.
The Third Circuit stressed that the language of the PSLRA
suggests that this inquiry is not a relative one and the
individual movants should not be compared to one another.  In re
Cendant, 264 F.3d at 268.

Several objections have been raised as to whether KBC-AM is
the most adequate lead plaintiff.  The most significant of these
objections focuses on KBC-AM's status as a foreign purchaser of
Royal Dutch/Shell securities on a foreign exchange.  Section 27
of the Exchange Act vests federal courts with exclusive
jurisdiction over actions involving violations of the Exchange
Act.  15 U.S.C. § 78aa.  There is no clear statutory guidance as

-34-

to the Act's application to transactions in foreign commerce and
courts have attempted to "discern Congress' intent with respect
to the extraterritorial jurisdiction of the federal securities
laws in transnational fraud cases." Tri-Star Farms, Ltd. v.
Marconi, PLC, 225 F. Supp. 2d 567, 572 (W.D. Pa. 2002) (citing
Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir.
1975)). As a result, two tests for subject matter jurisdiction
have emerged – the effects test and the conduct test. Marconi,
225 F. Supp. 2d at 573 (citing Robinson v. TCI/US W.
Communications, Inc., 117 F.3d 900, 905 (5th Cir. 1997)). The
"conduct" test asks whether the fraudulent conduct that forms the
alleged violation occurred in the United States. The "effects"
test asks whether the conduct outside the United States has had a
substantial adverse effect on American investors or securities
markets. Robinson, 117 F.3d at 905.

This Court clearly has jurisdiction over the claims of the
domestic investors that purchased the shares domestically and
abroad and over the claims of the foreign investors that
purchased the shares on a domestic exchange. However, it remains
to be determined whether this Court will have subject matter
jurisdiction over the claims of the foreign purchasers that
purchased shares on a foreign exchange. This Court does not have
that issue before it at this time. The pending inquiry, however,
is whether potential subject matter jurisdiction defenses will be

-35-

asserted and, if asserted, whether those defenses will present a
material distraction to KBC-AM. Although it is very early in the
litigation, there has been no evidence proffered that significant
or material acts have occurred in the United States.[19] Thus, the
Court does not find it presumptuous to speculate that because 98%
of KBC-AM's shares were purchased on foreign markets, it would be
required to devote a large portion of its time and efforts to
prove it is not subject to the unique defense of lack of subject
matter jurisdiction.

Another related objection raised to appointing KBC-AM as
lead plaintiff is the issue of the <u>res judicata</u> effect of a
United States judgment in a foreign court. It is asserted that
the judgment of a United States court might not be given
preclusive effect in a foreign court; therefore, foreign
plaintiffs may ultimately have to litigate their claims abroad.
(Ohio Opp., at 15). KBC-AM indicates that courts require proof
that a particular foreign court will not give preclusive effect
to a domestic judgment before giving any weight to a <u>res judicata</u>
argument. (KBC-AM Reply Br. at 13; <u>see</u> <u>In re Turkcell Iletisim</u>
<u>Hizmetler, A.S. Sec. Litig.</u>, 209 F.R.D. 353, 360 (S.D.N.Y. 2002);
<u>In re Nortel Networks Corp. Sec. Litig.</u>, 2003 WL 22077464 at *2,

---

[19]    Both Royal Dutch and Shell Petroleum N.V. are
incorporated in the Netherlands and Shell is incorporated in
England. Moreover, the information presented to the Court thus
far indicates that the individual defendants resided abroad
during the class period and all major decision making occurred
outside of the United States. (Pennsylvania Opp. at 2 4).

*7 (S.D.N.Y. Sept. 8, 2003)).  Moreover, KBC-AM notes that in the cases cited by the Ohio plaintiffs, <u>res judicata</u> was only one factor considered in determining lead plaintiff status.  While the Court agrees with KBC-AM that the <u>res judicata</u> effect of a judgment is not determinative, the Court does not preclude the possibility that KBC-AM and other foreign purchasers might be eliminated from the class certification because a judgment in this forum would be incapable of serving their interests.

The final significant objection raised to appointing KBC-AM as lead plaintiff is the alleged prior misconduct by KBC Bank. It is undisputed that KBC Bank is the subject of a pending criminal fraud investigation by the Belgian tax authorities. KBC-AM charges that this investigation has been pending for eight years and has yet to generate a single criminal charge or result in any finding of misconduct.  (KBC-AM Reply Br. at 7). Moreover, KBC-AM notes that as a matter of corporate structure and Belgian law, "KBC-AM is a wholly distinct entity from KBC Bank with only 3 directors in common and no business operations in common."  (<u>Id</u>.)  However, KBC-AM is "managed by a Board of 8 directors."  (Duchateau and Schoeters Decl., ¶ 7).  Thus, nearly half of KBC-AM's board of directors serve on the Board of KBC Bank.

"Courts have refused to appoint individuals of questionable character to serve as fiduciaries in class actions."  <u>Newman v.</u>

-37-

<u>Eagle Building Tech.</u>, 209 F.R.D. 499, 504 (S.D. Fla. 2002)
(citing <u>Hall v. Nat'l Recovery Sys. Inc.</u>, 1996 WL 467512, at *5-6
(M.D. Fla., Aug. 9, 1996); <u>In re Network Assoc., Inc. Sec. Lit.</u>,
76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999) (fraud investigation
of lead plaintiff, KBC, was a "major negative" to its appointment
as lead plaintiff, court was unwilling "to install an enterprise
under such a cloud in a position of trust and confidence")).

   With respect to the aforementioned challenges, the Court
finds that while any one might not be dispositive, when taken as
a whole, the objections form a solid, persuasive basis for
rebutting KBC-AM's status as presumptive lead plaintiff.

### C.  The Pennsylvania Funds have the Next Largest Financial Interest

   The Court now turns to the Pennsylvania Funds' request to
serve as lead plaintiff.  The Pennsylvania Funds collectively
represent that their losses exceed $67 million.  (Pennsylvania
Reply Br. at 11).  Their claims arise from the same course of
conduct, and they rely on the same legal theories to prove
defendants' liability as those asserted by other class members.
Thus, the Pennsylvania Funds satisfy Rule 23's typicality
requirement.

   The Pennsylvania Funds also satisfy the adequacy requirement
of Rule 23 to the extent that they have "the ability and
incentive to represent the claims of the class vigorously," and
"ha[ve] obtained adequate counsel."  The Pennsylvania Funds'

briefs and accompanying certifications indicate their willingness
to pursue actively the claims of the class under the competent
leadership of chosen counsel:  Bernstein, Liebhard & Lifshitz,
L.L.P.  Furthermore, the Pennsylvania Funds assert that they have
negotiated a fee arrangement with chosen counsel which is
significantly lower than the percentage that has typically been
granted in securities class actions in the past.[20]  (Maiale
Decl., ¶ 8).  For the foregoing reasons, the Court finds that the
Pennsylvania Funds qualify as the presumptive lead plaintiff.

The primary rebuttal to the Pennsylvania Funds' designation
as lead plaintiff is advanced by the Ohio Funds.[21]  This
challenge centers on a purported conflict between the
Pennsylvania Funds, as domestic investors that purchased on a
foreign exchange, and domestic purchasers who purchased on the
New York Stock Exchange.  The Ohio Funds claim that 44%, or $27.3
million, of the Pennsylvania Funds' total losses stem from
purchases of Royal Dutch and Shell securities on foreign

---

[20]    While the Pennsylvania Funds' briefs and declarations
do not disclose the specifics of the fee agreement, its counsel
has indicated that it is prepared to disclose the agreement to
the Court for in camera review.  (Maiale Decl., ¶ 8).  The Court
will accept counsel's representation at this time without
reviewing that agreement in camera.

[21]    KBC-AM's rebuttal challenges the FIFO loss calculation
method used by the Pennsylvania Funds; however, as noted supra,
this is irrelevant.

markets.[22] (Ohio Opp. at 20). The Ohio Funds allege that claims based on such foreign purchases give rise to novel issues that are not present for claims based on domestic purchases; therefore, the Pennsylvania Funds will be required to expend a large amount of time, effort and resources litigating issues that would be wholly unnecessary to the domestic claims. (Id. at 20-21). These issues include whether the fraud-on-the-market doctrine can be invoked with respect to securities purchased on foreign markets, and whether the Court has subject matter jurisdiction over each of the purchases on the foreign exchange. (Id. at 21). The Ohio Funds also speculate that the Pennsylvania Funds will have a tremendous interest in litigating to the fullest the novel issues surrounding their foreign claims which will detract from the ability of class counsel to devote their energies toward vigorously prosecuting the domestic claims. (Id. at 22). According to the Ohio Funds, this would "place the claims related to foreign purchases in direct conflict with the claims related to domestic purchases." (Id.)

The Ohio Funds have not persuaded the Court that the Pennsylvania Funds are not the most adequate lead plaintiff. The Ohio Funds attach great significance to the fact that 44% of the

---

[22] The Ohio Funds also allege that "questionable trades" account for $4,991,265.00 of the Pennsylvania Funds' losses. (Ohio Opp. at 19-20). However, even after discounting the Pennsylvania Funds' losses, they still exceed those of the next lead plaintiff candidate by approximately $15 million.

Pennsylvania Funds' securities were purchased on a foreign exchange. The inverse of that observation, however, is that the Pennsylvania Funds purchased 56% of their shares domestically. The Court finds the Pennsylvania Funds able to adequately represent the interests of all investors: those who purchased shares in both domestic and foreign markets.[23]

Moreover, the Ohio Funds do not pose a credible objection to the applicability of the fraud-on-the-market doctrine. Under this doctrine, "a plaintiff is entitled to a presumption of reliance if he bought securities in an efficient market; in an efficient market, the price of the security is assumed to have incorporated the alleged misrepresentations of the defendant." Pinker v. Roche Holdings Ltd.,92 F.3d 361, 373 (3d Cir. 2002) (citing Semerenko v. Cendant Corp., 223 F.3d 165, 178 (3d Cir. 2000)). The Ohio Funds have cited no authority to support the premise that the Pennsylvania Funds, a group of American purchasers, would not be able to employ this doctrine. Furthermore, as the Pennsylvania Funds indicate, it would be difficult to contend that the London and Amsterdam stock exchanges do not qualify, within the ambit of the doctrine's definition, as efficient markets. (Pennsylvania Reply Br. at

---

[23]     A review of the brief filed in connection with this motion reveals that the Ohio and Detroit Funds as well as the Kansas Public Employees' Retirement System have each purchased a percentage of its shares on foreign markets. (See Ohio Opp. at 22, n.8; Kansas Br. at 5; Press Aff., Exh. B)

15).

Accordingly, because the Court finds that the Pennsylvania Funds are the most adequate lead plaintiff, the Court will appoint them to that position.

## III.  Appointment of Lead Counsel

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  The Third Circuit has indicated that the court's role is generally limited to "approv[ing] or disapprov[ing] lead plaintiff's choice of counsel" and the court should generally employ a deferential standard in reviewing the lead plaintiff's choices.  In re Cendant, 264 F.3d at 274 (quoting J.R. Conf. Rep. No. 104-369, at 35 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 734; S. Rep. No. 104-98, at 11-12 (1995), reprinted in 1995 U.S.C.C.A.N 679, 690). Here, the Pennsylvania Funds move for the appointment of the law firm of Bernstein Liebhard & Lifshitz, LLP, to serve as lead counsel.  Bernstein Liebhard is a reputable firm adept in federal securities and class action litigation.  (See Berg Decl., Exh. D).  This Court approves the Pennsylvania Funds' selection of Bernstein Liebhard as lead counsel.

On May 7, 2004, at oral arguments in this matter, Oklahoma Teachers' counsel, Bradley Beckworth of Nix Patterson & Roach, LLP, ("NPR"), presented an argument as to why his firm should be

appointed co-lead counsel. Oklahoma Teachers' counsel proffered that NPR was particularly qualified to serve as co-lead counsel because the valuation of oil and gas reserves (an area in which NPR has considerable experience) is at the core of this litigation. After oral arguments were held, counsel's position was taken under advisement. Having re-examined the briefs and the attached submissions, and for the following reasons, the Court has decided not to appoint NPR as co-lead counsel.

While the subject of oil and gas reserves is central to this matter, the Court does not find those issues to be so unique or sophisticated as to require the appointment of co-lead counsel. Typically, lead counsel hire experts to conduct the necessary analyses and to provide the assistance that is required to fully digest and prosecute the relevant claims. Indeed such experts will be necessary as witnesses in any event. The Court has faith in the ability of Bernstein Liebhard to retain experts or to seek assistance as it sees fit. Furthermore, the Court's decision does not preclude the firm of Nix Patterson & Roach from participating, and assisting its clients, throughout the course of this litigation.

## IV.  Liaison Counsel in the Securities Actions

At the conclusion of oral argument on May 7, this Court announced that it would appoint the firm of Lite DePalma Greenberg and Rivas as liaison counsel in the consolidated

-43-

Securities Actions. However, as stated in its letter of May 13, 2004, that firm has concluded "that potential conflicts between the ERISA plaintiffs and the securities plaintiffs can arise during the course of the litigation." Accordingly, Lite DePalma wishes to decline its appointment as liaison counsel in the consolidated Securities Actions, retaining that status in the consolidated ERISA Actions. The Court grants that request. With notice to other counsel of record in this matter, Bernstein Liebhard & Lifshitz shall provide to the Court the names of one or more attorneys or firms which Bernstein Liebhard desires to serve as liaison counsel and which are willing and able to serve in that capacity. Bernstein Liebhard will not itself be designated liaison counsel, even though that firm has an office in New Jersey. Any such request shall be filed and served by July 12, 2004, with any responses by July 22, 2004. The Court will then either make the appointment or advise the parties of any continuing impediments to such a selection.

## CONCLUSION

for the foregoing reasons, the motion to consolidate the ERISA Actions is granted and Gordon Lancaster, John Tristan, Jose Valadez, Oscar Pena, Hernaldo Rivera, John R. Rosenboom and Scott Franklin, Jr. are appointed co-lead ERISA plaintiffs. The firms of Wechsler Harwood LLP, Scott & Scott, LLC and Milberg Weiss Hershad Hynes & Lerach LLP are appointed co-lead ERISA counsel

and Lite DePalma Greenberg & Rivas, LLC are appointed liaison
ERISA counsel.  A separate Order regarding these actions will be
filed therein.  The motions to consolidate the Securities Actions
are also granted.  The Court grants the Pennsylvania Funds'
motion to be appointed lead plaintiff and its selection of
Bernstein Liebhard & Lifshitz, LLP, as lead counsel is also
approved.  Liaison counsel in the Securities Actions will be
designated in a separate order.


                                  /S/    John W. Bissell
                                        JOHN W. BISSELL
                                         Chief Judge
                                  United States District Court


DATED:  June 30, 2004