EXHIBIT C

82ETSTEA
1

82ETSTEA                    Argument
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    MERRILL STEINBERG, et al.,
3
4                    Plaintiffs,
4
5              v.                          07 CV 9615 (RPP)
5
6    ERICSON LM TELEPHONE CO., et
6    al.,
7
7                    Defendants.
8
8    ------------------------------x
9                                          New York, N.Y.
9                                          February 15, 2008
10                                         2:10 p.m.
10
11   Before:
11
12                    HON. ROBERT P. PATTERSON,
12
13                                         District Judge
13
14                    APPEARANCES
14
15   LEBATON SUCHAROW
15        Attorneys for Movant Ericsson Institutional Investor Group
16   BY:  CHRISTOPHER J. KELLER
16        ANDREI V. RADO
17
17   MURRAY, FRANK & SAILER
18        Attorneys for Movant Jacques Fuhrer
18   BY:  BRIAN P. MURRAY
19        LAWRENCE D. McCABE
19        RANDALL STEINMAYER
20
20   PAUL, WEISS, RIFKIND, WHARTON & GARRISON
21        Attorneys for Defendants
21   BY:  DANIEL J. KRAMER
22        ANOUCK GIOVANOLA
22
23
24
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
2
82ETSTEA                    Argument
1         (Case called)
2         THE COURT:  Who was the first to file?
3         MR. KELLER:  Your Honor, Christopher Keller.  I
4    believe that the first filed complaint was filed on behalf of
5    an investor that is probably not represented here because that
6    investor did --
7         THE COURT:  I'm having trouble hearing you.
8         MR. KELLER:  I believe that the first filed complaint
9    was filed by an investor that is not currently represented here
10   today.

82ETSTEA

```
11              THE COURT:  I know that.  Who filed for lead counsel?
12         MR. KELLER:  We filed on the same date, your Honor.
13              THE COURT:  Okay.  Well, do you want to go first?
14         MR. KELLER:  That's perfectly fine, your Honor.  I
15    would be more than happy to review the pending motions and the
16    standards, et cetera, but if the Court has any specific issues
17    or concerns I would be more than happy to confine my comments
18    initially to them.
19              THE COURT:  Well, I have some concern about multiple
20    plaintiffs.
21         MR. KELLER:  Okay.  Well, I think we can all agree
22    that the statute that governs the application of the PSLRA is a
23    federal statute.  And we start with the plain language of the
24    statute and the construction of the statute.  It specifically
25    provide that the court shall appoint the lead plaintiff movant
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

82ETSTEA                    Argument
```
 1    the person or group of persons that is most adequate to
 2    represent the class.  I think since that time there has been a
 3    series of efforts made by courts to --
 4              THE COURT:  It says person or persons, I don't think
 5    that --
 6         MR. KELLER:  I believe, your Honor, it's a group of
 7    persons.  And I think many courts have tried to sort of
 8    interpret what group means and they each sort of added a
 9    certain gloss.
10              Just to take you through in a very brief way the
11    development, it was a desire --
12              THE COURT:  Is it a group of persons who were
13    previously or is it a group that is created for purposes of the
14    litigation?
15         MR. KELLER:  Your Honor, in 1999 and 2000 many courts
16    were interpreting group of persons to mean any assemblage of
17    far-flung investors, whether they hold ten shares, a hundred
18    shares; and the aggregation of tens of thousands, if not more,
19    was happening on a regular basis.  And the courts -- in an
20    effort to cure that problem, certain courts developed certain
21    sort of limiting criteria.  Some courts said you need to have a
22    prelitigation relationship, other courts said you need to
23    have -- if not a prelitigation relationship, you have to
24    demonstrate to the court why you as a group make sense.
25              That was clearly done in an effort to limit the number
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

82ETSTEA                    Argument
```
 1    of investors getting together.  As far as I know, there is not
 2    a single case that applies that to institutional investors.
 3    Institutional investors were not the problem in 1999 and 2000.
 4    You didn't have hundreds and thousand of institutional
 5    investors getting together.
 6              THE COURT:  But theoretically the investors are
 7    supposed to be the ones who participate in the litigation --
 8         MR. KELLER:  By all means.
 9              THE COURT:  -- in some way, according to the act, I
10    believe.  And you do have this problem of whether they are
11    really going to act as lead plaintiffs or whether counsel is.
12         MR. KELLER:  In connection with the opening motion, my
13    client, the Ericsson Institutional Investor Group is comprised
14    of very sophisticated institutions.  Sitting next to me is
15    Daniel Greene.  He's the associate executive director of the
```

82ETSTEA
16   Boston Retirement System.  It's a $4 million fund in Boston,
17   it's a pension fund.  In addition, Fortis Investments, which is
18   a 2 or $300 billion entity --
19             THE COURT:  There's no question that they're big.
20             MR. KELLER:  On that call you had the general counsel
21   of Fortis, you had Daniel Greene himself on the phone, you had
22   the head investments for Lothian and you had a director-level
23   person for Deka.  These people are decision makers, they're not
24   being led around by attorneys on the phone.  They have all been
25   through the process before.  And they specifically decided that
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                  5
     82ETSTEA                    Argument
1    because Ericsson is a multinational corporation with
2    shareholders principally based in the United States and Europe
3    that it makes sense to have the lead plaintiff group reflect
4    the base of shareholders.  They talked about how they would
5    oversee this litigation, that they would convene conference
6    calls when necessary to decide issues.
7              In fact, your Honor, a perfect example in how that
8    benefits the class, one of these investors had been
9    instrumental in assisting us in our investigation.  Counsel
10   spent tens of thousands of dollars on behalf of their clients
11   in an investigation so far aided in part by our institutional
12   investors in New York to get information from witnesses on the
13   ground in Sweden.  This is a case with international aspects
14   and it's very important, our clients thought, to have that
15   group reflect the larger investor base.  They are very used to
16   overseeing counsel.
17             THE COURT:  What sort of investigation are you talking
18   about?
19             MR. KELLER:  Private investigators, your Honor.
20             THE COURT:  That doesn't answer my question.  I'm
21   asking about the investigation, not who conducted it.
22             MR. KELLER:  I'm sorry?
23             THE COURT:  I'm asking about the scope of the
24   investigation, the nature of the investigation, not who
25   conducted it.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                  6
     82ETSTEA                    Argument
1              MR. KELLER:  The investigation relates to the
2    allegations in the complaints filed by the Boston Retirement
3    System related to --
4              THE COURT:  I read the complaint.  It seemed to me
5    these were public statements and not anything requiring an
6    investigation per se.  These statements were made in connection
7    with the incoming reports and statements made to certain
8    analysts.  That's my recollection.
9              MR. KELLER:  You're correct, your Honor.  At the time
10   the complaints were filed --
11             THE COURT:  So what kind of investigation is
12   necessary?
13             MR. KELLER:  At the time that the complaints were
14   filed the investigation that we had underway had yet to yield
15   more specific information.  Since that time they certainly
16   have.  We have not filed an amended complaint.  We're more than
17   happy to do that to reflect statements of confidential
18   witnesses throughout the world.
19             THE COURT:  I was asking what the investigation
20   consisted of and the nature of it and I haven't gotten an
                          Page 3

82ETSTEA
```
21   answer yet.
22        MR. KELLER:  It involved the interview of former
23   employees of Ericsson in connection with -- to support and
24   further support to the allegations of the complaint filed by
25   the Boston Retirement System.  And I would be more than happy
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

82ETSTEA        Argument
```
1    to provide your Honor the specifics of what we have been told.
2         THE COURT:  No, I want to know what they did.
3         MR. KELLER:  These institutional investors are very
4    used to controlling counsel.  And I assure you, your Honor, we
5    certainly don't tell the general counsel of Fortis Investments
6    what to do.
7         However, as it turned out it's really not an issue in
8    this case.  Every one of the institutional investors here have
9    a larger loss than Mr. Furher.  So whether it's an aggregating
10   group or not, most courts are concerned with aggregating
11   losses.  Here that's really not an issue.  The losses of each
12   member of the group has a larger financial interest than
13   Mr. Furher.
14        In fact, the SEC has taken the position that the
15   appropriate group interpretation under the federal statute is
16   between three and six investors.  Here that falls squarely
17   within the recommended SEC rule.
18        THE COURT:  Is Deka really an investor?
19        MR. KELLER:  Is Deka really an investor?
20        THE COURT:  Or are the funds, individual funds
21   represented by them, the investors, the stockholders?
22        MR. KELLER:  Well, I believe that Deka is acting in a
23   fiduciary capacity on behalf of the funds that have incurred
24   the losses.
25        THE COURT:  Stockholders are actually the individual
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

82ETSTEA        Argument
```
1    funds, aren't they?
2         MR. KELLER:  That would be correct.
3         THE COURT:  So you have got a --
4         MR. KELLER:  There's considerable case law for the
5    support that even when you have separate funds, so long as --
6         THE COURT:  How many funds do they have there?
7         MR. KELLER:  How many funds is included within the
8    Deka --
9         THE COURT:  No, how many separate funds are involved?
10        MR. KELLER:  Your Honor, there is clearly multiple.  I
11   could count for you, but I mean your Honor --
12        THE COURT:  Just offhand how many?
13        MR. KELLER:  Probably ten funds.
14        THE COURT:  Or more.
15        MR. KELLER:  Or more.
16        THE COURT:  Quite a few more.  I just don't feel
17   comfortable with this conglomeration of plaintiffs being, for
18   whatever reason, coming together and seeking to be lead
19   counsel.
20        MR. KELLER:  Certainly in the case of the Lothian fund
21   and the Boston Retirement System, those are garden variety
22   pension funds.  They are the owners of those securities.  They
23   don't represent far-flung funds.  They are the prototypical
24   institutional investor that, by the way, the PSLRA said we want
25   institutions to step forward.  These institutions should not be
```
Page 4

82ETSTEA
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

82ETSTEA                        Argument
1    penalized because they chose to do it together.  They chose to
2    do it together because they want to work the case together.
3    They chose to do it together because they believe they can
4    control counsel and have a greater effect on this case with the
5    international implications.
6                There is nothing that -- there's no reason why they
7    should have beforehand had the foresight to say we shouldn't
8    come together.  The statute says they can come together, the
9    SEC says they can come together.  They, as seasoned executives,
10   have said we're going to come together because we think it
11   makes sense.  Why give defendants one plaintiff to shoot at?
12   Let them shoot at four institutions.  Even if they were to
13   knock one out on some argument later in the case, there is
14   still three that remain.
15               If your Honor, however, believes that only one
16   investor would be appropriate, or two investors, then it
17   certainly could make that decision, but they shouldn't be
18   penalized.
19               THE COURT:  It's a little hard to tell whether they
20   are willing to act alone or whether they're so joined at the
21   hip that they all want to act together.
22               MR. KELLER:  I can make the representation that they
23   understood the risks, they understand the law.  Each of them
24   would be more than willing to stand on their own if the Court
25   so chose.  However, they did choose, and I think that it was a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

10

82ETSTEA                        Argument
1    benefit to the group, and they are putting considerable effort
2    and time into that process.  And I will say that there's a
3    certain -- and I understand the Court's concern and certainly
4    other courts have had a similar concern.
5                I don't think there's a single instance in which a
6    court has rejected a group, small group of institutions that
7    have demonstrated to the court in the form of a joint
8    declaration beforehand before they moved and has excluded them,
9    I don't think there's a single court that has done that, and I
10   think it's been presented to hundreds of courts.
11               MR. MURRAY:  Your Honor, could I address that point
12   for one second?
13               THE COURT:  Let him finish his argument.
14               MR. MURRAY:  Certainly.
15               MR. KELLER:  And your Honor, besides addressing the
16   merits, Mr. Furher himself is a member of a four-person or
17   three-person group serving as lead plaintiff in a different
18   case in California.  The Murray, Frank firm has moved 16 times
19   with groups within the last four years.  In fact, they
20   currently represent Deka, this client, in a case in which Deka
21   is in a group in another jurisdiction.  That they're raising
22   this issue is in fact bizarre.
23               THE COURT:  Well, I gather that the judges have
24   differences in their approach to this.  Just, for some reason,
25   maybe it's because I had to attend partners' meetings or maybe
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

11

82ETSTEA                        Argument
1    even judges' meetings and everyone has a different opinion,
                            Page 5

82ETSTEA

2    they're not -- it's awful hard to get sometimes even a
3    consensus.  My father used to say that you know what a
4    committee was when it was originated, it was one person, there
5    was a committer and a committee, and that was the way it
6    originated.  And then because people didn't want to take
7    responsibility for the decision alone then they said:  Can't we
8    have someone else help us?  So instead of getting decisive
9    decisions and what have you and someone moving the case along,
10   everyone has to meet together and talk together and people have
11   other things to do and things don't get done.  That's kind of
12   my reaction about three or four plaintiffs and different
13   institutions taking on lead plaintiff status.  But that's my
14   hunch, I'm not saying that you're not entitled to do it.
15           Then the next question that arises:  What about
16   counsel?  Are they going to be more -- is one client going to
17   matter more to them than another client in this group?  Have
18   they got a conflict in some way because they represent these
19   large institutions which must be very valuable for purposes of
20   litigation and class?
21           MR. KELLER:  We make it very clear to our clients
22   during the pendency of these cases we look out for -- we are
23   fiduciary to the class as well, and we recommend decisions that
24   are in the best interests of everyone.  And one of the
25   requirements, in fact, of Rule 23 is that the claims of all

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

82ETSTEA                    Argument

1    class members, and certainly the lead plaintiffs, are typical
2    of other class members' claims.  There is not a conflict
3    amongst them.  They all have the same claims.  They all profess
4    the same theories based upon the same facts and they're
5    professing similar damage theories.  So at least at this
6    point --
7           THE COURT:  Has any court ever claimed there was
8    conflicts on the part of counsel when they represent big
9    clients like Deka and Fortis and Lothian?
10          MR. KELLER:  Not that I'm aware of, your Honor.
11          THE COURT:  No cases on that?
12          MR. KELLER:  Not that I'm aware of.  The only thing I
13   could analogize it to, it's certainly not identical, is there
14   were certain challenges made to lead plaintiffs, this goes back
15   to the late '90s, that were institutional investors and they
16   continued to hold large amounts of stock in the defendant
17   corporation when some others had sold, and the allegation was
18   that well, you're a large company and you hold five million
19   shares, you want to see something else happen to the case than
20   others may want to see.
21          And ultimately the courts said while that may give
22   rise to some conflict, the PSLRA wanted institutions to step
23   forward.  And by asking institutions to step forward, along
24   with that comes an understanding that with institutional
25   investors you're not getting individual investors, you're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

82ETSTEA                    Argument

1    getting institutions with general counsel's offices, with
2    investment managers with mutual funds.  This is what you're
3    getting when you get institutions and this is what they wanted.
4           So I guess the short answer would be, your Honor, to
5    the extent that the clients of our firm -- and all four of
6    these clients have been clients in other cases are important,

Page 6

82ETSTEA

```
 7  it doesn't present a conflict nor would it present a conflict
 8  in the operation of this case.
 9          THE COURT:  Any other issues you want to address?
10          MR. KELLER:  With respect to the PSLRA it's a very
11  straightforward statute, as your Honor knows.  Your Honor has
12  presided over other PSLRA cases.  It is a really a two- or
13  three-part test, and the first test is simply to identify which
14  movant professes the largest financial interest in the case.
15  By all estimations the Ericsson Institutional Investor Group
16  possesses an interest far larger than Mr. Furher.
17          THE COURT:  Then I guess you have this issue, which I
18  guess shouldn't be addressed now, but you have this issue about
19  whether the extended class period extended by the plaintiff
20  complaints in the original complaint is something that is
21  lawyer driven or fact driven.  Because I don't see from reading
22  the complaint, frankly, that there's any showing of intentional
23  misstatements in the early quarters, nor do I see any reckless
24  statements in the early quarters from reading the complaint.
25  So at that point I begin to wonder whether class has been --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

82ETSTEA                    Argument
```
 1  the class period hasn't been raised.  But that's something that
 2  it seems to me comes up in the next stage of the proceedings as
 3  opposed to here.
 4          MR. KELLER:  I would agree with your Honor.  I think
 5  that to the extent that the complaint contains allegations even
 6  within the short period, your Honor, if I may be frank, that
 7  what it does is compare earlier statements with later
 8  statements.  So the shorter class period is the two-month class
 9  period, and one would I guess presume that a statement made and
10  two months later a counter statement that is made and is
11  drastically different one can presume that it is made with a
12  certain level of knowledge.  Although as you extend it out more
13  it's not as though the facts within that shorter period somehow
14  demonstrate a strong knowledge, what they really go at is
15  recklessness.  And it's our view that the recklessness goes
16  back until February.  And in the complaint what we make are a
17  series of allegations where Ericsson began to deviate from its
18  competitors.  Its competitors are saying things are slowing --
19          THE COURT:  And also said that the competitors are
20  smaller and they were saying, as I understood, that the
21  competitors were losing and they thought they were gaining.
22          MR. KELLER:  Well, even their largest competitors
23  claim that they had -- they were uniquely positioned to take
24  advantage of certain changes in the marketplace, and during
25  that time certain mergers they were doing were closing, which,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

82ETSTEA                    Argument
```
 1  as your Honor is aware, is evidence of a certain motive to keep
 2  a stock price propped up.  And ultimately they were not
 3  uniquely positioned to do anything other than suffer the same
 4  fate as all of their competitors.  But as your Honor correctly
 5  points out, as your Honor found in the gaming lottery matter --
 6          THE COURT:  It was a mess.
 7          MR. KELLER:  It was a mess.
 8          THE COURT:  And a loser for all the lawyers concerned.
 9          MR. KELLER:  There was a request made to shorten the
10  class period, and your Honor found that was more of a merits
11  issue and one that should be ferreted out at a later date.
```
Page 7

                          82ETSTEA
12              I would be more than happy, if your Honor is at all
13    curious as to more facts that we have to support that longer
14    class period, I would be happy to provide your Honor with an in
15    camera review of reports that we have generated internally that
16    greatly supports a longer class period.
17              In fact, they have not -- Mr. Furher, although arguing
18    for shorter class period, has done two things that the Court
19    should be aware of.  One, although he argues for a shorter
20    class period, he hasn't even provided the financial
21    transactions for a longer class period, which raises an issue.
22    Number two, although they argued for a shorter class period,
23    they never challenged the merits of longer class period.  And
24    number three, all of the cases out there say that you go with
25    the longer class period.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                  16
      82ETSTEA                      Argument
1               The one case Mr. Furher cites, the Piven case out of
2     Florida, and to put it very charitably, overstates its holding,
3     he cites it for the proposition that the Court must accept and
4     utilize the stated class period, its first filed complaint, for
5     the purpose of determining lead plaintiff.  It absolutely
6     positively does not say that.  In fact what it says is it ends
7     up using the longest class period.  And it's a contest taken
8     out of context, and I encourage the Court to review that.
9               THE COURT:  Well, the other question is what about the
10    res judicata effect with respect to these plaintiffs.
11              MR. KELLER:  The res judicata effect is a fairly new
12    issue that courts are beginning to grapple with, as your Honor
13    is well aware.
14              THE COURT:  You all brought those opinions to my
15    attention, one by Judge Stanton.
16              MR. KELLER:  Correct.  In the gaming lottery matter
17    your Honor certified a class that had both Canadian and U.S.
18    residents without recognizing probably at some point, although
19    the early opinion may not be published, that that's an issue,
20    if at all, that affects the class.  Either they're in or
21    they're out.  And it's certainly not unique issue.
22              The Second Circuit in 1975, the name of the case
23    escapes me, came up with the standard that said we're going to
24    allow the class to be certified broadly unless someone
25    demonstrates with a certainty that another jurisdiction will
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                                  17
      82ETSTEA                      Argument
1     not enforce that judgment.  Certainly given that it's their
2     burden to establish certain unique defense, as your Honor is
3     familiar, under PSLRA once you demonstrate the largest
4     financial interest and you meet the adequacy of typicality at
5     least on a preliminary basis you're entitled to a presumption,
6     and it's up to the completing movants to rebut that.  They
7     haven't offered any record evidence to support that the law in
8     any of the countries that have been implicated in this case,
9     Germany, Belgium and the U.K.
10              THE COURT:  I thought Judge Stanton indicated that in
11    his opinion that all but the U.K. were probably not claims that
12    were a determination by this Court if it was a determination of
13    non-liability.
14              MR. KELLER:  I think you're right.  I think that's
15    exactly what Judge Stanton said.  I think that Judge Stanton
16    disagreed with the Second Circuit and did not apply a near
                              Page 8

82ETSTEA

17 certainty standard.  And in fact the Court was very frank by
18 not applying a non-certainty standard because he found it
19 unworkable and came up with a new standard which was more
20 likely than not.  Under that standard he found that, as your
21 Honor correctly notes, that most countries, at least before him
22 at that time, Germany in particular, was more likely than not
23 that it wouldn't be enforced.
24          But there was record evidence, your Honor, on both
25 sides.  That there was affidavits given that -- different
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              18

82ETSTEA                  Argument
1  affidavits, different professors could come forward now and say
2  it's my opinion that it was more likely that it would be
3  enforced.  The affidavit in fact was being utilized in the
4  Glaxo case, which was the Stanton case from an earlier case in
5  2003 involving Daimler Chrysler.  who knows, maybe the law
6  changed in 2003.  It's a fact-dependant analysis and also
7  involves analysis of the law as it develops.
8          However, I would say to your Honor the res judicata
9  issue is really not an issue that needs to be decided at this
10 point because you have Boston, which is clearly a U.S.
11 purchaser, standing before you.  And I think it's sort of
12 unclear, it's quite opaque from the moving papers of Mr. Furher
13 where he resides.  We have evidence from the Oracle case that
14 he resides in Belgium.  We have not had that confirmed.  It's
15 certainly -- I have a deposition transcript here, I would be
16 more than happy to provide it the Court, but we think he's a
17 Belgian resident, which is the same country as Fortis.  So the
18 only --
19          THE COURT:  Same country as what?
20          MR. KELLER:  Fortis investments.
21          So perhaps the only resident before your Honor that is
22 a U.S. citizen in corporate entity is Boston Retirement System.
23 But I will say that Judge Stanton's opinion does stand in the
24 minority.  Recently Judge Chin issued a decision, GPC Biotech,
25 in which he found that the res judicata was a issue not to be
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              19

82ETSTEA                  Argument
1  decided at the lead plaintiff stage saying it's more of a
2  merits issue and it requires a full analysis of the law of all
3  the various countries involved and something that the courts
4  should be doing at the point of lead plaintiff.  We agree with
5  Judge Chin.  In fact, counsel representing Mr. Furher
6  represented the Pay Low Fund and then they were out of Czech
7  Republic, and this is 2007 before Judge Cote, and they were
8  appointed.
9          And to the extent that they raised this issue, it's
10 also slightly odd given that their opening motion papers
11 portended to represent all purchasers wherever they may reside,
12 and I really don't know exactly how they have reformed that.
13 They haven't really necessarily been clear.
14          THE COURT:  In this case where were the purchasers
15 made?  Are all these European institutions buying them in
16 Europe?
17          MR. KELLER:  That's correct, your Honor.
18          THE COURT:  So none, except for --
19          MR. KELLER:  Except for Boston, of course.
20          THE COURT:  Boston would have been the only trades
21 that were affected here in the United States.
                      Page 9

82ETSTEA

```
22          MR. KELLER:  That's correct, your Honor.  Although
23  that is correct, we believe we will establish that there is
24  subject matter jurisdiction over this suit here.
25          THE COURT:  Of course the markets adjust themselves
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

82ETSTEA                    Argument

```
 1  immediately wherever the purchases that were made against
 2  those; isn't that right?
 3          MR. KELLER:  That is correct.  Given the mergers among
 4  some of the largest exchanges, it's practically a worldwide
 5  market.  Most courts that have considered this issue, your
 6  Honor, to briefly summarize, have allowed foreign institutions
 7  to serve as lead plaintiff.
 8          THE COURT:  Are the shares designated differently if
 9  they're on the European market than if they were on the United
10  States stock exchanges?
11          MR. KELLER:  I believe that if your Honor is referring
12  to whether there is an ADR, whether --
13          THE COURT:  That's what I'm referring to.
14          MR. KELLER:  I'll have my counsel and all correct me
15  if I'm wrong, I believe there is a dual listing but I could be
16  wrong, or it could be also ABRs, I'm not certain.
17          THE COURT:  ABRs are the only ones that can be traded
18  here; right?
19          MR. KELLER:  Unless it's a dualistic company.
20          THE COURT:  ABRs can be traded in Europe.  Can they?
21  Are they?
22          MR. RADO:  You Honor, most brokers I know for a fact
23  will allow anybody to buy a stock overseas.  Someone can, out
24  of the Ameritrade account in New York, buy an a foreign
25  exchange.  I'm not sure why they would do that but they
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

82ETSTEA                    Argument

```
 1  certainly have the ability to.
 2          THE COURT:  I'm sure they can do it one way or another
 3  through a broker some sort, but my question was whether -- I
 4  was just thinking ahead, I guess.
 5          Anything further?
 6          MR. KELLER:  Nothing further, your Honor, unless you
 7  have any questions.
 8          THE COURT:  I'll hear from opposing counsel.
 9          MR. MURRAY:  Thank you, your Honor.  My name is Brian
10  Murphy, I represent the movant Jacques Furher.
11          First I would like answer one of your Honor's
12  questions, how many individual funds does Deka own that are at
13  issue in this case that purchase stock.  Mr. McCabe tallied it
14  up while waiting.  It's 51 separate funds represented on the
15  certification that purchase stock for Deka.
16          THE COURT:  I thought it was around that.
17          MR. MURRAY:  Second, before I get into my presentation
18  proper, I would like to correct what I'm sure was an
19  inadvertent misstatement by Mr. Keller in which he said he was
20  not aware of any case in which a court had not approved a group
21  of institutional movants and instead took an individual movant.
22          MR. KELLER:  With the joint declaration before the
23  motion, I said.
24          THE COURT:  Could I hear that again?
25          MR. MURRAY:  Yes.  Mr. Keller said he was not aware of
```

SOUTHERN DISTRICT REPORTERS, P.C.
Page 10

82ETSTEA
(212) 805-0300

22

82ETSTEA                      Argument
1   any case in which a group of institutions moved together and
2   were not allowed to do so if they had a joint declaration
3   before the motion; which I didn't hear him say that but I'll
4   take his word for it.
5           With that caveat maybe there is not, but certainly
6   there is a case here in this district before Judge Berman in
7   which a group of institutional plaintiffs moved together, one
8   of which was Fortis, with three other movants, aggregated their
9   losses and claimed they had a larger collective loss than a
10  single institutional movant, who, coincidentally, was Deka in
11  that case.  Deka argued successfully before Judge Berman that
12  those four movants, one of which was Fortis, should not be
13  allowed to aggregate their losses together and overcome the
14  single loss of Deka.  So certainly in this very courthouse we
15  have a judge saying he's not going to allow institutions to
16  band together and aggregate the losses.
17          Now Mr. Keller added the caveat when I started this
18  saying with the joint declaration before they moved.  I know
19  they had a joint declaration at some point in there, I don't
20  know when it was.  If he is making that statement it must be
21  after the motion was initially made.
22          That brings me to the joint declaration at issue in
23  this case which was made in connection with the initial motion.
24  The conference call was held before the motion was made.  But
25  there's something curiously missing from the joint declaration,
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

23

82ETSTEA                      Argument
1   and that is why those four institutions got on the conference
2   call at all, your Honor.  What made them get together and say:
3   Hey, this might be a good idea, do you want to come in with me?
4   Let's go halves, let's go quarters, let's form a group and move
5   in this case.
6           And there's nothing in that declaration that says that
7   Mr. Greene knew anybody at Fortis, had ever met anybody at
8   Fortis, called him up on the phone and said:  Hey, Mr. Fortis,
9   I got a loss, did you lose anything?  Let's get together.  And
10  I don't think that happened.  And Mr. Greene can tell you if it
11  did, he's right here, but I would wager almost everything that
12  that conference call was at the instigation of counsel, the
13  counsel that represents him in this case.  Obviously, that was
14  counsel's idea to get the four institutions together.  And more
15  than anything that makes it obvious that it's a lawyer-driven
16  group.  And that's the whole point of not allowing people to
17  aggregate.
18          I have seen groups where it's husband and wife, father
19  and son, obviously a family, me and my brother-in-law,
20  whatever, something like that.  But the strong trend in this
21  district, especially strong recently in light of what Judge
22  McMahon just said when she threw out everybody in the moving
23  group and she said, I don't know if three or four people that
24  moved together -- the Piskolis case or something like that,
25  it's cited in our papers -- but Judge McMahon said you four
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

24

82ETSTEA                      Argument
1   people, you moved together.  Individually one of you may have
2   the greatest loss, but since you moved together as a group I'm
                        Page 11

82ETSTEA
3   throwing all of you out collectively and individually.  The
4   mere fact that you move as a group together, that makes you no
5   good.
6          And certainly Mr. Keller said -- I tried to write it
7   down exactly:  No reason to know a group was no good.  Well,
8   certainly Fortis and Deka were aware that group in this court
9   was no good because they're on opposite sides of the issue in
10  the GM case; Deka as the individual, Fortis as part of group.
11  That was declared inadequate to overcome the single individual
12  largest loss of the Deka fund.  So that leaves us with looking
13  at everybody individually.  The threshold issue then --
14         THE COURT:  Did either Judge Berman or Judge McMahon
15  give their reasons, any authority?
16         MR. KELLER:  Your Honor, I believe in the General
17  Motors case the ruling Judge Berman made was in fact supported
18  by most courts that you are not allowed to aggregate losses
19  over the largest individual movant, whether it's an institution
20  or not.  In other words, you can't have three institutions that
21  each have a $3 million loss and overtake an institution alone
22  that has $8 million, which was I believe the facts of the GM
23  case where Deka had a loss of 24 or $22 million and the three
24  institutions together had a loss of 28 but no alone had more
25  than I think 12.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              25
    82ETSTEA                    Argument
1          THE COURT:  He just did it on a calculation based on
2   facts before him.
3          MR. KELLER:  Correct.  In the other case -- did you
4   have a question beyond that one case?
5          THE COURT:  I'm sure it was based on the law in some
6   way.
7          MR. KELLER:  And I believe the Judge McMahon
8   decision -- I'm sorry I'll let him continue.  I'll continue
9   when he's completed.
10         MR. MURRAY:  Well, they relied in part on other cases,
11  like the trend in this district which we have cited the case in
12  our brief that judges like to go with the largest individual.
13  And I think one of the reasons is for the reason you raised
14  while Mr. Keller was speaking, that groups are unwieldy, it's
15  hard to get them move together.  For the obvious reasons why
16  groups are no good I think is why the judges have moved in that
17  direction.
18         So if we look individually, now we're back to the
19  second issue that you raised, the long period -- the initial
20  class period versus the extended class period.  Your Honor, the
21  initial complaint in this case was not filed by my firm, it was
22  not filed by Mr. Keller's firm, it was filed by the Coughlin
23  firm, who has not moved in this case.  Presumably they filed
24  the best complaint they could with the longest class period
25  based on facts available to them and did the best job they
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              26
    82ETSTEA                    Argument
1   could.
2          THE COURT:  Maybe they raced to the courthouse.
3          MR. MURRAY:  Or that, I can't speak to that.  But
4   either way they put forth a class period which they felt was
5   the proper class period for that case.  The problem is if you
6   don't chose the initial class period when you are deciding the
7   lead plaintiff motion it raises all sorts of problems that the
                            Page 12

82ETSTEA

8   PSLRA was supposed to solve.  You're not supposed to have
9   gamesmanship and jockeying, you're simply supposed to have
10  someone come forward with the largest interest in the case that
11  wants to represent the class and lead the case.
12        If people do come forward and say Mr. Coughlin -- I
13  know it wasn't him personally, but the Coughlin firm filed a
14  complaint with the class period of A to B.  Well, if that's the
15  class period, I don't like it, so I'm going to do my own case
16  and file a class period pre-A to B.  Now we have a lot of
17  losses, I could be in the case.
18        It didn't happen in this case because apparently
19  there's not much interest other than the movants, but quite
20  often I'm sure you have seen cases where there's 40 complaints
21  filed and 50 notices put out.  If it's not the first class
22  period basically you're going to have a free for all, everybody
23  will file a complaint for whatever class period suits them and
24  come forth before the Court and say I know the first class
25  period was three months but I want a three-year class period

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

82ETSTEA             Argument

1   and I lost a lot of money in the three years and I want to lead
2   the case.  And next guy says three years, now we got
3   Sarbanes-Oxley, five years, I want a five-year class period, I
4   lost a lot of money over the five years.  It frankly, your
5   Honor, will go beyond if you're not going with the first class
6   period.
7        And the cases we cite and the cases they cite all go
8   to the same point:  This Court should not get involved in
9   making a merits determination at this point.  And really the
10  only way to avoid making a merits determination is to go with
11  the purest class period you can, and that's the first one,
12  because that's presumably not the result of a strategic
13  advantage of what people thought the case would be.
14       Another problem that you will have if you don't go
15  with the first class period is the problem with the notice.
16  I'll call him Mr. Primo since he's first; he failed his
17  complaint, he puts out his notice, the class period is from A
18  to B.  That goes over the news wires, it's picked up by all
19  services, everybody is sitting there saying what happened to my
20  stock today, they check the stories, class action filed against
21  ABC Co. for class period A to B.  They look at it, A to B, I
22  lost money, I didn't lose money, they make a decision.  Maybe
23  they say I lost money outside the class period and make some
24  other decisions as well, maybe they want to call a lawyer.
25       The problem is there is many, many notices filed in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

82ETSTEA             Argument

1   those cases, many firms file, they open up the notice, people
2   are going to be swamped with notices, 50, 100 notices put out
3   in those 60 days by different firms if it's all different class
4   periods.  And people frankly are not reading all the notices,
5   they read the first one, the second one comes up, second class
6   action filed, it's human nature, you say I know, I saw that
7   last week, you're not going to read the second notice and see
8   it as a different class period.  Most people will be working
9   off the initial class period and make a determination.
10      THE COURT:  What law is it that I shouldn't make my
11  decision on that basis?
12      MR. MURRAY:  I'm sorry?

Page 13

```
                           82ETSTEA
13            THE COURT:  What law of the Second Circuit or what law
14    is it that I should not make my decision on that basis?
15            MR. MURRAY:  On which basis?
16            THE COURT:  On the first complaint.
17            MR. MURRAY:  Certainly nothing from the Second Circuit
18    that I'm aware of.  I'm not aware that they ruled on the issue
19    one way or the other.  It's not an issue that -- there's not
20    that many cases.  Between the two of us I think we cited five
21    that discuss the issue and none of them are circuit cases.
22    It's not something that -- nor would it go up, as lead
23    plaintiff decisions are not really the subject of appellate
24    decisions.  So I think the bottom line is as far as, quote, the
25    law is concerned, you can do whatever you think is right in
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
      82ETSTEA                    Argument
 1    this case based on policy and the statute.
 2            So long or short.  I'll take the short class period
 3    first.  I disagree that each of the four movants in the other
 4    group has a larger loss than Mr. Furher individually when you
 5    look -- compare each one to one with Mr. Furher.  Starting with
 6    the short class period, Lothian has losses of a little more
 7    than half a million.  Fortis has losses of a thousand plus
 8    change.  Boston has absolutely nothing.  They didn't get
 9    involved one way or the other with the short class period.  And
10    then we have Deka which does have a substantial over $4 million
11    loss in the short period.
12            In the long period -- oh, sorry, I have to preface all
13    this.  There is another determination that you must make, LIFO
14    versus FIFO; if you're going to use last in, first out or first
15    in, first out.  And again I think the cases strongly support
16    the use of the last in, first out.  And the reason is quite
17    obvious.  First in, first out means that you buy something
18    before then you buy something in the class period.  Let's
19    pretend that never happened.  And what possible reason could
20    there be for that, to pretend this sale never happened, a sale
21    within the class period, a sale in which you benefit by the
22    fraud?  Because you're getting the advantage of inflation.  To
23    adopt a methodology that just ignores that because it doesn't
24    happen makes no sense, and I think that's what the majority of
25    the cases hold.  And certainly the trend is very strong
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
      82ETSTEA                    Argument
 1    recently going to LIFO.  So all the numbers that I gave you
 2    were under a LIFO analysis.
 3            If you look at the long class period, Mr. Furher still
 4    has greater losses than two of the four movants.  If you look
 5    at them individually, Lothian goes up to a 5 to $6 million,
 6    closer to a $6 million loss under the long period, LIFO.
 7    Fortis still only has fewer than $40,000 in losses.  Deka is
 8    now up to only 10 million, and Boston is still under 700,000.
 9    So Mr. Furher with a million dollars is greater than two out of
10    four.
11            So that then leaves us with Lothian and Deka and the
12    points that you were sparring with Mr. Keller about with regard
13    to the res judicata issues addressed to recent cases.  And let
14    me make it clear:  At no point did we argue in our papers or am
15    I arguing now that you have no subject matter jurisdiction over
16    those entities, that they should not be part of the class.
17    Obviously as class counsel we would do everything we could to
                             Page 14
```

82ETSTEA

18  get them included.  Why wouldn't we?  They're the people we
19  represent, we make every argument possible.
20          But the problem is those arguments might not work.
21  And if they don't work, there's a big problem.  Because let's
22  say you appoint I think one of the two, Lothian was the top of
23  my list, you appoint Lothian as the individual with the largest
24  loss, they're the lead plaintiff, we get over the motion to
25  dismiss, the case is going merrily along, we get the class

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

82ETSTEA                    Argument
1  cert, all the sudden you make a determination I'm not going
2  include those people, I don't have subject matter jurisdiction,
3  there's no res judicata, whatever reason, they're thrown out.
4          At that point, your Honor, I speak from experience,
5  it's mayhem.  What happens at that point is every plaintiff's
6  firm in the United States wakes up and says Lothian's out,
7  maybe I can get in.  The motions start flying.  And you'll get
8  one saying a new notice must be published, a new 60 days, then
9  we'll have the motions made and let's see what happens.  I have
10  seen it happen.  It happened in the Williams case in Oklahoma.
11  It holds things up for months.  It's ridiculous.  And like I
12  said, I'm not saying that they're definitely out.  I don't want
13  them to be out, I want them to be in, but there's a chance they
14  may be out.  Why take that chance?  There's to reason to.
15          THE COURT:  Judge Stanton's opinion, or perhaps I have
16  got the opinions confused, indicates that great Britain
17  probably would give full faith and credit to a determination by
18  this Court.
19          MR. MURRAY:  Yes, I do believe that's what the opinion
20  said.  There are arguments that could be made that they still
21  would not though.  And like I said, there's no reason to take
22  the chance.  When I say there is no reason, there is no reason.
23  Mr. Furher, as Mr. Keller has --
24          THE COURT:  Why is Mr. Furher in the same boat?
25          MR. MURRAY:  Mr. Furher is Belgian, as their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

82ETSTEA                    Argument
1  investigation discovered.  However, Mr. Furher made all of his
2  purchases in the United States on United States exchanges.  And
3  for one simple reason, and we asked him when talking to him:
4  why would you purchase here instead of over there?  Isn't it
5  easier to purchase over there?  And he said yes, it is.  He
6  said, however, everything I have seen in the last few years
7  Enron, Worldcom, the complete messes we have had here in Europe
8  Parmalot, Royal Dutch, he says I have very little confidence in
9  what is going on, and if I purchase in Europe I don't get
10  protection if fraud is committed against me when I buy a stock.
11          He buys in the United States so he gets the protection
12  of United States securities laws.  He pays a premium for that
13  protection because he told me today at lunch he's got to pay
14  commission to the guy in Belgium and he's got to pay double
15  commission to pay someone in the United States to execute the
16  trade.  So he is paying double commissions.  But he is doing
17  that specifically so he gets the protection of the U.S.
18  security laws.  And without a doubt a foreigner who purchases
19  here in the United States is certainly entitled the protection
20  of the U.S. securities laws and you're not going to get tossed
21  out at a class certification stage.
22          THE COURT:  What about the fact that most of his

Page 15

```
                              82ETSTEA
23    purchases are puts or calls?  Calls, I guess.
24            MR. MURRAY:  What about it?  He bought of those
25    options in reliance on the fact that the price that all those
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

```
      82ETSTEA                Argument
 1    options was based on was fair.  Whether the stock price was
 2    here or here, that goes into the calculation of what the option
 3    is going to be.  Obviously, those purchases made at the end all
 4    the sudden turns out fraud was committed, the stock plummets,
 5    he's left holding the bag and gets all the stock put to him.
 6    He's relying on the integrity of the markets like everyone else
 7    is.  And I don't think there's aid case that I'm aware of, with
 8    a caveat --
 9            THE COURT:  I think he is eligible, but doesn't that
10    diminish his loss?
11            MR. MURRAY:  It may diminish it but it's still a
12    million dollars.  Even at a diminished stage he definitely lost
13    a million dollars on these trades.  And other than the 8th
14    Circuit where it may have been decided -- although I know it
15    was an open issue at least a decade ago -- options purchasers
16    have standing and are treated just like stock brokers in every
17    other circuit in the United States.
18            Here in the Second Circuit --
19            THE COURT:  It's just I was thinking his losses would
20    likely to be less, but maybe just because I'm thinking in terms
21    of calls, not puts.
22            MR. MURRAY:  Your Honor, he was selling the puts, not
23    buying the puts.  And when the stock went down the stock was
24    put to him and he suffered an extremely serious loss, a million
25    dollar loss.  I really don't think it's of any moment that his
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

```
      82ETSTEA                Argument
 1    purchases are in options rather than stocks.  He relied on the
 2    market like any other serious purchaser did.
 3            THE COURT:  I didn't examine his trades, I just looked
 4    at the category, and it seemed to me the category of trades
 5    would not be likely to create a lot of losses.  But I guess if
 6    he had to buy, buying puts gets a little -- is it buying puts
 7    that he was doing?
 8            MR. MURRAY:  No, he was selling puts.
 9            THE COURT:  Selling puts.  It's a little esoteric for
10    me.
11            MR. MURRAY:  Mr. McCabe from my firm.
12            MR. McCABE:  When you write a put or sell a put, what
13    you are selling is the ability for someone to sell stock to
14    you.  So if I sell a put say January 2009, put it's got a
15    strike price, it's got a premium, I get a premium, $1.50, $2,
16    and the person that buys the put has the right to sell me the
17    stock at the strike price at any time up until January.  And
18    there are certain things that can happen in January that will
19    force the transaction, but what I have done is sold someone
20    the right to sell me the stock at a certain price.
21            MR. MURRAY:  So what I meant is at the end of the
22    class period when the stock plummeted --
23            THE COURT:  It was put to him.
24            MR. MURRAY:  And he's buying stock at 40 and it's out
25    in the market at 20.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                           Page 16
```

82ETSTEA

35

82ETSTEA                    Argument
1    THE COURT:  Well, my understanding -- I don't know
2    that I agree with his investment.
3        MR. MURRAY:  Well, if he had to do it over again he
4    wouldn't do it either.
5        THE COURT:  If he wanted protection from risk by
6    buying over here he might have chosen another vehicle.
7        MR. MURRAY:  Your Honor, he willingly assumed the risk
8    of options trading, he did not assume the risk of being
9    defrauded.
10       So your Honor, in summary, Mr. Furher who purchased
11   here in the United States clearly has standing.  As I said, I
12   would dearly want everybody else to be included in the class as
13   well, and we'll argue strenuously for it if given the
14   opportunity, but there's a chance that won't work.  And given
15   the chances that's not going to work, there's no point, no use
16   in appointing someone that has a chance of being thrown out
17   when you have someone who not going to be thrown out, certainly
18   on those grounds.
19       MR. KELLER:  Your Honor, if I can respond to some of
20   the comments.
21       THE COURT:  He isn't done yet.  He's still standing.
22       MR. KELLER:  Okay.
23       MR. MURRAY:  Your Honor, I may still be standing but
24   in boxing the term is out on my feet, so I will yield to
25   Mr. Keller.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

36

82ETSTEA                    Argument
1        MR. KELLER:  I think I will try to be brief and start
2    with the last issue first because I think it's pretty clear.
3    The concern that the Court will have if it listens to Judge
4    Stanton is a res judicata issue.  The res judicata issue is a
5    concern that the foreign jurisdiction courts will not recognize
6    an adverse judgment to the class.  So Mr. Furher's citizenship
7    in Belgium is what is important, not where he bought the stock.
8        Mr. Furher's in Belgium, buys a stock on the U.S.
9    exchange, is part of this class in the United States, summary
10   judgement against the class, goes I don't like that decision,
11   files a case in Belgium, the defendants rush over and say but
12   there was an adverse judgment in the United States and the
13   Belgian court says we don't recognize that.  But I bought my
14   stock on the U.S. exchange.  So what?  What is determinative
15   for the res judicata concern is residency and citizenship.
16       So what I'm saying is while the purchases and where he
17   bought them may have some impact on the Court's subject matter
18   jurisdiction, it has no impact on res judicata concern.  Which
19   I share is ultimately unavailing, but he is in exactly the same
20   boat as Fortis and Deka as being countries that courts have not
21   found that courts in those countries would be more likely to
22   enforce U.S. judgment.
23       As your Honor correctly notes, that excludes the U.K.
24   Lothian is the U.K.  So even courts that looked at and pored
25   over the expert affidavits, they found certainly Lothian at the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

37

82ETSTEA                    Argument
1    very least.  And I submit that it is a factual determination
2    that the Court does not have a record before it to determine.
3        And as it relates to the PSLRA concern what it is is
                        Page 17

82ETSTEA

4  they're raising the quote, unquote, unique defense, which is
5  not unique, and two, they made no record.  It's their burden.
6  The Court doesn't have the facts before it, doesn't have the
7  expert affidavits, doesn't have the analysis of the courts of
8  Belgium and Czechoslovakia and France and Italy and how they
9  will consider a U.S. judgment.  It simply doesn't have that at
10 this time.  Moreover, there is at the very at least two of its
11 members, Lothian and Boston, that had been vetted by other
12 courts; Lothian certainly in the case of the U.K. and Boston
13 because it's the most prototypical U.S. investor that one can
14 find.
15       I want to touch briefly -- and I promise I won't go
16 into what a put option is because frankly I'm a little at sea
17 with your Honor.  It's a little bit esoteric.  But as I
18 understand it, when you sell a put, you are a seller of a
19 security, not a buyer, you're a seller.  When you buy is when
20 you are forced to buy because someone can make money by making
21 you buy at a price of 45 even though the stock is selling at
22 20.
23       So as your Honor found in the lottery gaming case,
24 market efficiency and fraud on the market and the presumption
25 of reliance, the keystone of that is that you buy like everyone

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

82ETSTEA                    Argument
1  else.  But he wasn't buying like everyone else, he was buying
2  because he had to buy.  I will give him that the put option
3  when he sold he certainly didn't have inside information, but
4  when he bought he wasn't buying because he wanted to buy, he
5  was buying because someone forced him to buy.  whether
6  ultimately he will be unable to recover, I don't know.  I do
7  know one thing, that competent defense counsel behind me will
8  raise that issue at his deposition and turn it inside out and
9  make a motion that he has no losses.
10       But let's assume you carve out those losses.  His
11 losses are a half million dollars.  And as far as a million
12 dollars goes, we have gone through this in the papers, we have
13 very smart people that pored over his trade records for tens of
14 hours and could not possibly replicate how they arrived at
15 $1,080,000.  They could not for the life of them.  The best
16 they were able to come up with was a loss of $760,000, which is
17 far below Boston's loss of over a million dollars at bottom.
18 So all members of the Ericsson group surpass him in terms of
19 financial interest.
20       With respect to -- I believe, your Honor, we have
21 argued considerably about the length of the class period, but
22 if I can make one final note, it's been argued that --
23       THE COURT:  Is there any cases that say just because
24 you are forced, because you have puts to you that you sold the
25 right for them to put the stock to you or you purchased the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

82ETSTEA                    Argument
1  right, I guess?  Maybe I'm not sure --
2       MR. MURRAY:  He sold the right.
3       MR. McCABE:  He sold the right, your Honor.
4       THE COURT:  That isn't -- that loss isn't engendered
5  by the market?
6       MR. KELLER:  There are some cases that have looked at
7  options investors uniquely.  I know there are cases that say
8  you cannot have only an options purchaser representing a class

Page 18

82ETSTEA
```
 9  of all security holders.  But I also know there are courts out
10  there that said that a buyer of a call relies on the same
11  market integrity.  I have never read a decision that involves,
12  to my knowledge, the seller of a put with forced stock
13  purchases back because the buying decision of the stock is not
14  based upon reliance of the market.  The buying decision is the
15  contractual obligation you have made that you will buy that
16  stock at a later date.  The only investment decision you made
17  is the put decision.
18          THE COURT:  Based on market forces.
19          MR. KELLER:  Granted, your Honor.  I can give you
20  that.  All I could say is there are technical reasons, I think,
21  why strong arguments or at least arguments could be made that
22  someone that ultimately buys that stock back is no longer
23  making an investment decision when they buy it and therefore
24  the losses associated with the purchase should not be
25  calculated.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

82ETSTEA                    Argument
```
 1          THE COURT:  Well, all right.
 2          MR. KELLER:  Just to tough briefly on the short versus
 3  long class period, I think your Honor has heard that there are
 4  no cases that support opposing counsel's view.  The only cases
 5  that exist, and there may behalf a dozen, nine, something, they
 6  all support the notion that you go with the longest class
 7  period.  The lead plaintiff stage is not the time in which
 8  we're going to be having a full-blown hearing on the merits to
 9  determine whether there is a basis or there isn't a basis.  But
10  I will say this:  It doesn't mean you can't use common sense.
11  If someone comes before your Honor and argues for a five-year
12  class period when there is not a fact in the complaint that is
13  even remotely related to any scheme or any allegations, I think
14  your Honor is then free to do what your Honor deems to be
15  right.
16          In fact, the judge in United Health when the class
17  period was so long there was a period of time where the stock
18  price was below the price at which the stock dropped to, he
19  said it's impossible, they cannot have damages.  You can't have
20  damages.  So we're going to lop off that class period.  But as
21  it relates to this case, the facts as alleged in complaint
22  certainly have basis.
23          As I mention, I will be more than happy to provide
24  your Honor an in camera review of the results of our
25  investigation which absolutely uncategorically support that
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

82ETSTEA                    Argument
```
 1  class period.  And the danger, the slippery slope argument that
 2  counsel had made regarding people adjusting the class period,
 3  et cetera, people would be rushing file the first complaint so
 4  they can stay with the class period, there would be a new
 5  renewed race to the courthouse because you know if you filed
 6  the first complaint you get to pick what it is.  And people
 7  would rush to say I'm going to be first because I'm going to
 8  say it's a two-month class period, a two-week class period.
 9  why?  Because I have an investor who bought 10,000 shares last
10  week and if I make it a two-week class period I guaranteed
11  myself this case and a year down the road I will extend it,
12  allowing other complaints to be provided, so long as notice is
13  provided, they were aware of it clearly.  The certification
```
Page 19

82ETSTEA

14    that they received from Mr. Furher was on I believe the date
15    the motions were due, although it's signed weeks earlier.
16          So in terms of the parade of horribles, I have just
17    laid out a real horrible, and precisely what the PSLRA was
18    meant to avoid, which is to get rid of the race to the
19    courthouse.  And to answer Mr. Murray's challenge, every one of
20    these clients are clients of the firm.  We advised them on a
21    regular basis of all new filings.  They contact us, and we as a
22    matter of course advise them of other clients that are
23    interested in it and they decide to go together.  We do not
24    tell these institutions what to do, I assure you.
25          THE COURT:  Well, I'm not sure that's the response to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

82ETSTEA             Argument

1    the argument about how they got joined.
2          MR. KELLER:  It's really argument about a
3    prelitigation relationship, which, by the way, doesn't apply to
4    institutions as a logical matter.
5          THE COURT:  Just because you have clients who booked
6    you on a regular basis, it seems to me, if I understood you
7    correctly, that when one of these comes up you advise them of
8    other clients who have similar interests.
9          MR. KELLER:  Well, we certainly don't do that without
10   asking.
11          THE COURT:  Then they agree to go along with the other
12   clients at your suggestion.
13          MR. KELLER:  It sounds like a decision they have made.
14          THE COURT:  First they have to make a decision, but
15   that doesn't mean it isn't lawyer generated.
16          MR. KELLER:  I think the fear certainly that the
17   courts were attempting to address is where you have an attorney
18   that has multiple individual investors who are unsophisticated
19   in the ways of maybe not the market but certainly of the law,
20   and attorneys get on the phone and say you're going join,
21   you're going join up and we're going to put you together.  That
22   does not happen.
23          The judicial gloss that was put on the group of
24   persons portion of the statute was in an effort -- the
25   prelitigation relationship was an effort to draw some bright

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

82ETSTEA             Argument

1    line.  Clearly it was meant to individuals.  Entities don't
2    necessarily have prelitigation relationships, people have
3    relationships.  That was effectively saying that institutions
4    can't have a prelitigation relationship because what does it
5    matter if Fortis and Deka ten years ago had a joint venture but
6    ten years later the people aren't the same?
7          THE COURT:  But I'm thinking of the litigation process
8    and whether really Congress intended that to start a situation
9    where lawyers become clients of a firm for litigation purposes,
10   so to speak, and because of this law which Congress passed are
11   then assembled so that single counsel could represent them or a
12   number of them together and thereby gain control of the suits
13   and get the fees.  I'm not sure that is what Congress intended.
14          MR. KELLER:  Your Honor, again, since each member of
15   the Ericsson institutional investor group has far greater
16   financial interest in this case than Mr. Furher, an aggregation
17   really isn't an issue for your Honor.  And again, there should
18   be no penalization to those who look at a statute that says

Page 20

82ETSTEA

19    group of persons and say I want to be a group, I think it will
20    help the case, it's a European investor base, it's a U.S.
21    investor base.  These are sophisticated folks who have made
22    their own decision to do something.  I certainly think that the
23    drafters of the PSLRA would be smiling proudly at this group.
24    It is exactly precisely what they intended when you have
25    general counsels on the phone of some of the largest financial
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                44
82ETSTEA                    Argument
1    institutions in the world.  I really do believe that, your
2    Honor.
3            Your Honor, if you have nothing further, thank you.
4            MR. MURRAY:  If I could make a couple of points, about
5    one minute.
6            THE COURT:  Yes.
7            MR. MURRAY:  First, just to finish up that last point,
8    if the drafters of the PSLRA are smiling it's because they're
9    laughing right now, not smiling with happiness at what
10   happened.  I think what Mr. Keller said made it clear this is a
11   lawyer-driven group.  They called them up and said:  Do you
12   want to be part of the group?  And I don't think, whether
13   institution or individual, that's what the drafters of the
14   PSLRA had in mind.
15           But what I really want to talk about is the
16   calculation of Mr. Furher's loss, which is quite simple under
17   our methodology.  He sold the put at a certain point.  A put
18   has a certain intrinsic value; under water, over water, you can
19   make very simple calculation what it's going to be worth and
20   you're disregarding what the other factors that go into an
21   option, the time, value of money, volatility, et cetera, you
22   say right now it's in the money and based on in the money it's
23   worth X, and that's very simple.
24           So what we did in this case is look at the value of
25   the put, the price which he sold it on, take the 90-day average
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                45
82ETSTEA                    Argument
1    for the PSLRA at the end of the class period, which caps the
2    losses, and look at the difference between what he sold the put
3    at and what the price was at the end of the class period, the
4    90-day average, and look that intrinsic value of what the put
5    would have of the sales price minus the 90-day average and use
6    that as what his loss would be.
7            THE COURT:  Wait.  The puts don't necessarily end at
8    the end of 90 days; right?
9            MR. MURRAY:  No, they don't, but we were trying to
10   find out --
11           THE COURT:  They don't end at the end of the class
12   period either.
13           MR. MURRAY:  Yes, your Honor, but we were trying to
14   find out what the value of that put really should have been.
15   And we used the 90-day average to say the price of stock during
16   the class period should have been X.  It was actually way above
17   X where he sold that put, and it was basically the price should
18   have been down here.  An even put would have been down at the
19   90-day average, he was selling his put way up here.  He lost
20   all that money between what he sold at and what the true value
21   of the stock was.
22           THE COURT:  I don't know that he did, that's why I'm
23   worried from your description it doesn't sound like he did.
                        Page 21

                          82ETSTEA
24          MR. MURRAY:  Mr. McCabe knows more about this than me.
25          MR. McCABE:  I'm sorry, I don't mean to interrupt my
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                46
    82ETSTEA                  Argument
1   colleague, but there are a couple of points that have been made
2   about puts and all this stuff, and it can get a little
3   confusing.
4           Let's start off with a very simple idea.  A put gets
5   priced, it gets priced on a couple of things; its strike price,
6   which is dictated by the market.  In other words, in the case
7   of Mr. Furher, Mr. Furher -- writing a put is selling a put --
8   wrote a January 42 and a half put.  What that means is he sold
9   somebody the right to sell him stock at 42 and a half.
10          THE COURT:  In a certain period of time.
11          MR. McCABE:  In a certain period of time, and he gets
12  a premium, and the premium he received was $4.16.  That premium
13  recognizes two things; that the market price of the stock at
14  the time he sells the put, plus a timed value of money.  In
15  other words, over this period of time we think that the option
16  is worth X, plus a factor for volatility.  What does this stock
17  do in a three-month period; does it go up, does it go down,
18  what its market factor is.  And when you get that premium, that
19  $4.16, it's supposed to reflect all of that, and it's all based
20  on the current market value of the stock.
21          So when Mr. Keller says well, I don't know if the
22  fraud on the market theory applies, the put is priced based on
23  the current market price of the stock, it's relied on based on
24  the current market value of the stock.  It is simply one of the
25  purest forms of fraud on the market reliance.  It is purely
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                47
    82ETSTEA                  Argument
1   driven by the market.  There is no news that affects it except
2   for what is absorbed by the market.  When he writes the put he
3   receives the premium.
4           Now in a number of cases, in a good number of options
5   that Mr. Furher wrote, he would then buy back the option at the
6   end of the class period after the stock had dropped.  Once the
7   stocks dropped, Mr. Furher bought back as many of the options
8   as possible to close the class period, often at premiums
9   substantially above that which he received.  In some
10  instances -- in the instance of the one I described, the
11  January 42 and a half, he sold 5,000 options.  He was able to
12  buy back 500 at $12 and change.
13          THE COURT:  But these puts probably aren't more than
14  30 days, 60 days out.
15          MR. McCABE:  Yes, the January was puttable up until
16  January of this year, but it can be put -- it's not like a bond
17  where the payment is made at the end.  When you sell the right
18  to put, the right to sell exists throughout the life of the
19  option.  In other words, if I sell you an option on day one and
20  the option is for 90 days, a person can sell -- if the stock
21  drops at any point in those 90 days the person who holds the
22  option can exercise it against you at any time in those 90
23  days.  So if I sell it on day one and the fraud was disclosed
24  on day two and the stock drops like a rock and goes 40 percent,
25  as in the case of Ericsson, that person --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                48

                          Page 22

82ETSTEA

1    THE COURT:  Not on day one and day two in January.
2        MR. McCABE:  No, January is the day that the option
3    tanks.  At that point there's a decision to be made, either the
4    option expires worthless, which means that Mr. Furher has
5    earned his $4.16 and he has no threat of stock being sold to,
6    or the shareholder at that time will, which is what is called a
7    forced exercise.  If the stock is -- in the case of a put, if
8    the stock price is below the strike price the exchange
9    automatically sells the stock to Mr. Furher.  That was never an
10   issue with Mr. Furher's stocks because all of the exercise
11   dates were beyond the close of the class period.
12       So Mr. Furher has sold someone the right from the date
13   he wrote the put or sold the put until January to sell him
14   stock in Ericsson at $42.50 per share.
15       THE COURT:  The example you gave me, January of 2006?
16       MR. McCABE:  No, January 2008.
17       THE COURT:  2007, sorry.
18       MR. McCABE:  No, no, January 2008, sir.
19       MR. MURRAY:  January of this year, last month.
20       MR. McCABE:  So at any point between the time that he
21   sold it in September of 2007 until January -- the last Saturday
22   in January of 2008.
23       THE COURT:  He sold them all in September.
24       MR. McCABE:  He sold them all in -- as Mr. Furher is
25   telling me, the CEO of the company made very positive
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

49
1    statements about the company in September.  After he made these
2    positive statements about the company, Mr. Furher wrote or sold
3    all of his options at that point.  Some of the options would
4    expire in October, the last Saturday in October, some were in
5    November, some were in January.  But what that meant was that
6    at any point between the day he sold the option and the final
7    date, the expiration date of the option, the person who bought
8    the option could sell the stock to him.
9        THE COURT:  My problem was with your beginning date in
10   January.
11       MR. McCABE:  Sorry, your Honor.
12       MR. MURRAY:  Your Honor, Mr. McCabe can go on with the
13   technical aspects forever but I won't let him.
14       THE COURT:  Wait a minute, let's think about it a
15   second.  Isn't he in a position during that time to offset --
16   to do other trading which would offset the losses?
17       MR. McCABE:  You're asking if Mr. Furher was engaging
18   in stock or other options.
19       THE COURT:  The news comes out.
20       MR. McCABE:  The news comes out, the stock drops.
21       THE COURT:  Now isn't he able to balance off his
22   objective losses so that he won't have any further losses?  He
23   finally sees the news.
24       MR. McCABE:  No, your Honor.  At that point there's a
25   problem.  He has two choices, mostly because he's given a
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

50
1    contractual letter, he can either try to buy the option back,
2    in other words, he can buy an option on the open market for the
3    same price, another same strike price.  But when he does that,
4    and he did it on a number of occasions, and they're in our

82ETSTEA

5  chart, he has to pay a premium for it.  And because the stock
6  has dropped so low, his premium in order to buy back the option
7  is substantially higher than the premium he received in the
8  first place.
9        THE COURT:  What about counter bets; not buying it
10  back, but counter bets?
11        MR. McCABE:  At that point, no, because there's a
12  contractual --
13        THE COURT:  Don't you get into the problem of having
14  to look to see what his other trading was?
15        MR. McCABE:  All of his trades in Ericsson are listed.
16  And the only way you can -- there are ways you can hedge
17  initially.  In other words, you can do a hundred different
18  options strategies, none of which Mr. Furher engaged in, that
19  will hedge over time.  But once you have a drop as substantial
20  as the one in Ericsson, that 40 percent drop, there are two
21  choices you have; buy back the option or you're going to get
22  exercising rights.  And in a number of instances Mr. Furher was
23  able to buy back.  Again, that's part of his loss calculation,
24  the cost it cost him to buy back the option.
25        What we didn't include in his calculation was the for
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

82ETSTEA                 Argument
1  sale, because at that point you get into a lot of other
2  arguments.  What we did then was what Mr. Murray described
3  going to the intrinsic value of the options.
4        MR. MURRAY:  Your Honor, the short answer is this is
5  the exact methodology used by Mr. Furher's company to calculate
6  its loss in Oracle, which the Court accepted.  Mr. Furher's
7  company was certified with his options purchases, the put
8  sales, same as are at issue here, as a class representative in
9  Oracle.  So you asked for a precedent where this was dealt with
10  by a court.  Well, there's at least one case where a seller of
11  put options was considered a proper class representative using
12  the exact methodology for figuring losses that we used here.
13        THE COURT:  Thank you.
14        MR. KELLER:  Your Honor, just with respect to the
15  Oracle matter that they raise, my understanding is that was not
16  a contested motion, it was agreed upon; movants moved together
17  and presented to the court with a joint stipulation and the
18  court signed a stipulation.  I don't believe it was contested.
19  I don't believe it was challenged.  I don't believe it was
20  briefed.  I don't believe there's any decision that goes to the
21  merits.  If I'm wrong they'll correct me, I'm sure.  That's my
22  understanding.
23        MR. STEINMAYER:  Your Honor, this was a contested --
24        MR. KELLER:  Sorry, who are you?
25        MR. STEINMAYER:  It was a contested class cert motion.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

82ETSTEA                 Argument
1        MR. KELLER:  Sorry, who are you, your name?
2        MR. STEINMAYER:  Randall Steinmayer.
3        It was a contested cert motion.  So at least at the
4  class cert stage it was highly contested.  They brought this
5  before the judge and the judge --
6        MR. KELLER:  That's only with respect to whether a put
7  options purchaser can represent a class, not whether his
8  damages were calculated adequately.
9        MR. MURRAY:  Your Honor, I submit it's the exact same
Page 24

82ETSTEA
10    analysis.  If he's not acceptable --
11            MR. KELLER:  They certainly haven't made a record,
12    your Honor.
13            MR. KRAMER:  Your Honor, Dan Kramer from Paul, Weiss
14    for the defendants.  As we indicated to the Court in January,
15    we don't take any position in this fight for who is going to be
16    lead plaintiff.  I simply stand up to indicate that, as both
17    counsel have indicated today, any decision your Honor makes
18    here is obviously very preliminary because there is no record
19    here.  As the case moves on we will have a chance to address a
20    lot of these issues and will revisit the subject matter
21    jurisdiction issue.
22            This is a Swedish company, Swedish defendants, the
23    statements issued out of Sweden, the accounting happened in
24    Sweden, so there will be a record made on the subject matter
25    and whether someone who doesn't bind the U.S. under those
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              53
      82ETSTEA              Argument
1    circumstances have subject matter jurisdiction.  I think it's a
2    very serious issue for the Court.  You heard the res judicata
3    issue, whether some of these plaintiffs if they lose here will
4    be able to get a second bite of the apple in the home country.
5    The res judicata is a very important question for the Court,
6    and I think what all counsel can agree to is we should really
7    try to avoid appointing a lead plaintiff who at some point down
8    the road is going to be found to be inappropriate for one
9    reason or another, because that's just a mess.
10            THE COURT:  Why don't you make an argument for
11    multiple plaintiffs?
12            MR. KRAMER:  Well, the PSLRA and all of the
13    lawyer-driven litigation that your Honor is worried about sort
14    of leans against that.
15            The only suggestion I'm making, your Honor, is if it
16    would be helpful early in the proceedings to have a proceeding
17    about subject matter jurisdiction but have a proceeding about
18    res judicata so we don't take a step today that gets undone
19    later on, defendants obviously would be willing to accelerate
20    those parts of the case so that we could proceed efficiently
21    here.
22            So we take no position today on any of this.  We stand
23    ready, your Honor, to accelerate any part of the case if it
24    should be helpful in making the decision, otherwise we'll sit
25    back and take it in the order in which it usually comes.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              54
      82ETSTEA              Argument
1            Thank you, your Honor.
2            THE COURT:  Let me take a few minutes.  I want to just
3    think about what -- it seems to me there are disadvantages in
4    every regards.  I'm not convinced on the methodology used by
5    Mr. Furher's calculation of loss after hearing the description
6    of it.  He's a trader, really, as opposed to an investor, and
7    I'm not sure that there aren't offsetting trades he could have
8    made to limit his losses during the periods.  If it went to
9    January it seems to me that there are opportunities that might
10    exist.
11            And as to Deka, we have this problem about the res
12    judicata effect.  We have the same problem with Fortis.
13    According to Mr. Keller, we have the same problem with Fuhrer,
14    if it does relate to -- if he is a citizen over there he may
                              Page 25

82ETSTEA

```
15  not be able to recover, according to Mr. Keller.  I'm not sure
16  that's the case.  I haven't heard any response to it.  I didn't
17  hear any response to that, so I take it it is the case.
18          And Boston's purchases, as Mr. Furher points out, were
19  early on, quite early on in the year.  And as I read the
20  complaint, there's no allegation of recklessness at that point,
21  they just recite the statements made.  And Lothian, I was
22  thinking of Lothian as plaintiff, but if they had been gathered
23  into this because really the situation of the lawyers, I don't
24  know who is the first plaintiff there.  I'm very unhappy with
25  the thought of the lawyers gathering institutions into a stable
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

55

82ETSTEA                    Argument

```
1   and then whenever a class action comes up making an application
2   putting lead counsel for the group, and yet I have to make a
3   decision.  Then I have the problem of Lothian.  They bought all
4   their stock in the foreign exchange just as Deka and Fortis
5   did, and we don't want to lose jurisdiction.
6          MR. MURRAY:  Excuse me, your Honor.  With all the
7   calculations of how to do the options I did get side tracked
8   and forget to address the point of Mr. Keller about the res
9   judicata effect on Mr. Furher, which would also affect Fortis.
10  They're both Belgian.  To my knowledge there is no decisions
11  that address the adequacy of Belgium with regards to res
12  judicata.  As far as I know, that's open.
13         THE COURT:  Pretty much have to be the same.  All the
14  European countries have pretty unified treatment of these
15  things, all the ones in the E.U.
16         MR. MURRAY:  That's not true, your Honor.  In fact, if
17  you look the Vendi opinion it distinguishes between the
18  countries and how advanced their roles are with respect to
19  recognizing class judgments.  And some are in, some are out,
20  Belgium was not addressed.
21         THE COURT:  I don't think it is been addressed, I
22  agree with you, but it's pretty apt to be the same.
23         MR. KELLER:  If it's the same as France, which is its
24  close neighbor, then under the Vendi opinion there would be res
25  judicata effect.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56

82ETSTEA                    Argument

```
1          THE COURT:  You've got both the Flemish and what's the
2   other group, the Walloons?
3          MR. MURRAY:  I make no statement about the Flems and
4   the Walloons, your Honor.
5          THE COURT:  You better not; might lose a client.
6          MR. KELLER:  Your Honor, I take --
7          THE COURT:  They're not necessarily friendly, but
8   you'll let your counsel talk, please, Mr. Furher.
9          MR. KELLER:  I think it highlights -- the record at
10  this point is very premature on a lot of these issues, but most
11  particularly on the res judicata issue, which is an issue which
12  is in the minority.  It is an issue that most courts will defer
13  until at least a merits decision on a motion to dismiss, class
14  certification.  One of the reasons why the group of the
15  institutions makes no sense is because they have both domestic
16  and foreign.  But I leave that to your Honor.
17         THE COURT:  But the problem is that all these stocks
18  were purchased for part of Deka, Lothian and Fortis on the
19  European exchanges.
```

Page 26

82ETSTEA

20          MR. KELLER:  It's still not a unique issue in the
21 sense that it's going to be true as to one as to all.  Either
22 they're all in or they're all out.  But that's not something
23 that I think your Honor has to decide.
24          THE COURT:  I don't know about -- yes, on that issue,
25 but on the res judicata issue Lothian stands a little better.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

82ETSTEA                    Argument

1           MR. KELLER:  That is certainly true.
2           THE COURT:  And of course Boston is better on all
3 those issues.  And then if we do it on purchases of the
4 exchange here, Mr. Furher certainly, according to his estimate,
5 has far greater losses than Boston.
6           MR. KELLER:  Your Honor, I don't believe that to be
7 true.  Even assuming Mr. Furher's calculations are correct,
8 which we have been unable to replicate, he claims a loss of
9 1,080,000 and Boston has a loss of 1,016,000.
10          THE COURT:  LIFO?
11          MR. KELLER:  No, FIFO.
12          THE COURT:  LIFO.  It's got to be LIFO.
13          MR. KELLER:  Okay.
14          THE COURT:  It's got to be purchases and reliance on
15 the market in the most recent time, it can't be purchases that
16 go back over a long period of time.  But again I have problems
17 with him being a trader, really, or a heavy trader.  And if the
18 class period is short, Boston doesn't have the losses; right?
19          MR. KELLER:  That's true, your Honor.  If I could
20 simply clarify --
21          THE COURT:  If there's a motion at a certain point
22 here, do we lose the lead plaintiff?
23          MR. KELLER:  Your Honor, with respect to the longer
24 class period, if I could simply comment to that, you're right,
25 I don't think there are any allegations that -- the allegations

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

58

82ETSTEA                    Argument

1 are the statements they were making were simply reckless at the
2 time they were being made.
3           THE COURT:  I don't think it even says reckless.  I
4 don't think there's any claim that those statements were
5 reckless at the time they were made.  I think I have just
6 assumed that that must be what your claim was because that's
7 what the law is, but it certainly doesn't say they were
8 intentionally false.  But you may be able to point it out to
9 me.
10          MR. KELLER:  Frankly it's replete with allegations
11 that all the statements identified as false were made with
12 scienter.
13          THE COURT:  You may have a general allegation.
14          MR. KELLER:  Beginning with paragraph 27 where it
15 begins the class period ending February of '07, it certainly
16 recites a series of continuing disclosures that run through
17 May, July, September, which is certainly the disclosure that
18 was referenced earlier, and then it really leads to --
19          THE COURT:  I don't see anything preceding those
20 statements or after that says reckless, they were reckless.
21          MR. KELLER:  Beginning on page 21, the allegation is
22 that the statements above were false and misleading when made.
23          THE COURT:  That may be.  Paragraph 57, is that it?
24          MR. KELLER:  Beginning with paragraph 55, as a result

Page 27

82ETSTEA
25    of defendant's false statements Ericsson Securities traded at
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

82ETSTEA                    Argument
 1    inflated levels, referring to the statements above.  In fact,
 2    throughout the class period defendants had good visibility into
 3    the tightening demand for its products.  According to the
 4    telecam analysts they were somewhat shattered.  This calls into
 5    question their ability to control the company.  In the loss
 6    causation section there's a general allegation that they
 7    engaged in a scheme to deceive the market and engage in a
 8    course of conduct that artificially inflated the price of
 9    securities.  The allegations generally are that all of these
10    statements, beginning with the February statements, were false
11    and misleading, that defendants were either reckless or had --
12              THE COURT:  Where does it say that?
13              MR. KELLER:  Beginning with paragraph 59.
14              THE COURT:  Okay.  You have got the additional
15    scienter allegation.
16              MR. KELLER:  Paragraph 76, defendants had actual
17    knowledge of the misrepresentations and omissions of material
18    facts set forth herein or acted with recklessness.
19              THE COURT:  You have a general scienter allegation.
20    It does not necessarily apply to all the statements, but I will
21    take it for what it's worth.
22              Anyway, I wish I could see the path that's sure to
23    lead us through this.  Let me take a break just for five
24    minutes.  You may wander too.
25              (Recess taken)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

82ETSTEA                    Argument
 1              MR. MURRAY:  May I make a point of clarification?
 2    Mr. Furher was speaking to me on a break, and with regard to
 3    your question about why he didn't do more to ameliorate his
 4    loss and engage in other trades, what he told me is the morning
 5    the bad news came out, the initial bad news in October and the
 6    stock dropped $20, it was immediately put to him.  So he had no
 7    chance to do anything, he had to buy the stock.  And he
 8    couldn't say I will do this trade and that trade.  I know they
 9    can do fancy stuff, he didn't have a chance to do anything, it
10    was all put to him and there was nothing left to do.
11              THE COURT:  Well, really I guess looking at the --
12    thinking about the litigation going forward, it seems to me
13    that the Court had two alternatives, and it really came down to
14    those two as being the least likely to cause further disruption
15    in the litigation, and each of them have a down side.  I think
16    Boston has a down side, and I'm not at all certain the earlier
17    allegations are indicative of recklessness.  And they purchased
18    all together in that period.  As the period gets shortened,
19    which could well be, they wouldn't be a satisfactory plaintiff
20    because all their purchases were then.
21              On the other hand, Mr. Furher's purchases were not in
22    that period.  I suppose the amended complaint could benefit the
23    investigations that have been done by the Furher plaintiffs
24    firms could -- or the attorneys for them could develop that
25    evidence, and their losses are smaller than Mr. Furher's.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

82ETSTEA                    Argument
                            Page 28

82ETSTEA
1  Mr. Furher, since he traded here, stands above Deka and Lothian
2  and Fortis, it seems to me.
3          On the other hand, the down side is that he may well
4  be excluded when the motion comes from defendants that
5  according to Belgian law there weren't be res judicata on
6  Belgian law.  I don't know if that motion is coming or not, but
7  it could.  And then the other problem is that I really don't
8  like this I guess what's become a habit by plaintiffs' counsel
9  on these matters to gather clients together and make a joint
10 application in an effort to get lead counselship.
11         So I think I come down for Mr. Furher.  And I have to
12 make a decision, I'll make it.  Mr. Furher will be the lead
13 plaintiff.  So ordered.
14         MR. KELLER:  Your Honor, if I may, would your Honor
15 accept an in camera review of the witness statements that we
16 have that absolutely support --
17         THE COURT:  No, because I don't like -- I really don't
18 like this idea of having this stable of people whom you put
19 together to be lead counsel.  I don't like that idea.  That
20 seems to be what happened here.  I don't think that's what
21 Congress intended, and I don't think it's good for the bar as a
22 whole, but that clients make a determination on their own
23 whether they want to be lead counsel.
24         MR. KELLER:  Don't you think that unfairly penalizes
25 institutions that choose to come together relying upon people
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    62
       82ETSTEA              Argument
1  persons statute?
2          THE COURT:  It isn't that they chose to come together,
3  it's the manner in which they chose to come together, that's my
4  problem.  Maybe no one else will probably feel that way, it's
5  just how I feel and other judges may feel differently.
6          All right.  What's the next thing to do?  Set a date
7  for what?
8          MR. KRAMER:  Your Honor, we have a stipulation and
9  order in the case that I believe predates either of these firms
10 with the initial firm which provided for a schedule for going
11 forward which your Honor has already signed, and it provides 60
12 days for after your decision on lead plaintiff for an amended
13 complaint, then to be followed with defendant's response 60
14 days later.  That's the current schedule in the case and we
15 would be willing to abide by it.
16         THE COURT:  Does that make sense or should it be
17 shortened?
18         MR. KRAMER:  We would be delighted with a shorter
19 schedule as well, your Honor.
20         MR. MURRAY:  Your Honor, since Mr. Furher had not
21 filed the initial complaint, was simply movant, I would like to
22 use all of those 60 days at least to prepare his complaint.  I
23 am willing to discuss a briefing schedule of a shorter nature
24 than 60 days if necessary.
25         MR. KRAMER:  Your Honor, I would be willing to shorten
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    63
       82ETSTEA              Argument
1  both periods but I think it would be inappropriate for
2  plaintiffs' counsel to insist on the full date and to shorten
3  my time.
4          THE COURT:  How often I have heard that.
5          MR. KRAMER:  So I can go either way but I think it
                           Page 29

82ETSTEA

```
 6   should be the same.
 7             MR. MURRAY:  Then we would like the 60, 60, and we
 8   would like 30 days for opposition briefing, since I assume
 9   they're moving, not answering.
10             THE COURT:  All right.  Any time you can shorten
11   matters let me know.
12             MR. MURRAY:  We'll try to do so, your Honor.
13             MR. KRAMER:  Thank you, your Honor.
14             MR. MURRAY:  Thank you, your Honor.
15                           oOo
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300