TIMONEY, KNOX, L.L.P.
BY:    CHARLES J. WEISS, ESQUIRE
      Attorney I.D.#: 15771                      Attorney for Plaintiffs
400 Maryland Drive
P.O. Box 7544
Fort Washington, PA  19034-7544
(215) 646-6000

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Eran Rubinstein<br>3444 Wiltshire Road<br>Furlong, PA 18925<br><br>and<br><br>Susan Boltz Rubinstein<br>3444 Wiltshire Road<br>Furlong, PA 18925<br><br>          Plaintiffs<br><br>    v.<br><br>Berman DeValerio Pease Tabacco Burt & Pucillo<br>One Liberty Square, 8th Floor<br>Boston, MA 02109,<br>425 California Street, Suite 2100<br>San Francisco, CA 94104,  and<br>Esperante Building<br>222 Lakeview Avenue, Suite 900<br>West Palm Beach, FL 33401<br><br>Berman DeValerio & Pease, LLP<br>One Liberty Square, 8th Floor<br>Boston, MA 02109<br><br>Berman DeValerio Pease & Tabacco, P.C.<br>425 California Street, Suite 2100<br>San Francisco, CA 94104<br><br>Burt & Pucillo, LLP<br>Esperante Building<br>222 Lakeview Avenue, Suite 900<br>West Palm Beach, FL 33401 | CIVIL ACTION<br><br>NO.<br><br><br><br>JURY TRIAL DEMANDED |

Glen DeValerio                          :
670 East Shore Road                     :
Jamestown, RI  02835                    :
                                        :
Norman Berman                           :
12 Beechcroft Road                      :
Newton, MA  02458                       :
                                        :
Kathleen Donovan-Maher                  :
232 Old School House Road               :
Hanover, MA  02339                      :

Defendants

## COMPLAINT

### I. Jurisdiction and Venue

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 (diversity):

(a)      Plaintiffs, husband and wife, at all relevant times have been and currently are residents and citizens of the Commonwealth of Pennsylvania.

(b)      Defendants, at all relevant times, have been and currently are residents and citizens of states other than Pennsylvania:

(i)      Defendant, Berman DeValerio Pease Tabacco Burt & Pucillo ("BDPTBP"), at all times has had and currently has its principal office(s) and place(s) of business in Boston, Massachusetts and/or West Palm Beach, Florida and/or San Francisco, California;

(ii)      Defendant, Berman DeValerio and Pease, LLP ("BDP") at all times has been and currently is registered to do business in Massachusetts, with its principal place of business in Boston, Massachusetts;

(iii)    Defendant, Berman DeValerio Pease & Tabacco, P.C. ("BDPT"), at all times has been and currently is registered to do business in California, with its principal place of business in San Francisco, California;

(iv)    Defendant, Burt & Pucillo, LLP ("B&P"), at all times has been and currently is registered to do business in Florida, with its principal place of business in West Palm Beach, Florida;

(v)    Defendant, Glen DeValerio ("DeValerio"), at all times has been and currently is a partner of defendants, BDPTBP, BDP, and BDPT, with a residence in Jamestown, Rhode Island and his principal place(s) of business in Boston, Massachusetts and/or San Francisco, California;

(vi)    Defendant, Norman Berman ("Berman"), at all times has been and currently is a partner of defendants, BDPTBP, BDP, and BDPT, with his residence in Newton, Massachusetts, and his principal place(s) of business in Boston, Massachusetts and/or San Francisco, California; and

(vii)    Defendant, Kathleen Donovan-Maher ("Maher"), at all times has been and currently is a partner of defendants, BDPTBP and BDP, with her residence in Hanover, Massachusetts, and her principal place of business in Boston, Massachusetts.

(c)    The amount in controversy herein meets the requirement of 28 U.S.C. §1332(a) as Plaintiffs seek, inter alia, compensatory damages in excess of the requisite jurisdictional amount. More specifically, Plaintiffs seek compensatory damages in excess of Five Million Dollars ($5,000,000.00).

2.    Venue is proper in this judicial district since a substantial part of the events or omissions giving rise to the claim(s) hereinafter stated occurred in this judicial district and/or

because one or more of the defendants was/is subject to personal jurisdiction in this judicial district at the time of commencement of this action.

## II.    Parties

3.    Plaintiff, Susan M. Boltz Rubinstein ("Boltz"), is an adult individual who is an attorney licensed to practice law in the Commonwealth of Pennsylvania, the U.S. District Court for the Eastern District of Pennsylvania, and in the State of New York, with a residence located at 3444 Wiltshire Road, Furlong, PA 18925.

4.    Plaintiff, Eran Rubinstein ("Rubinstein"), is an adult individual who is an attorney licensed to practice law in the Commonwealth of Pennsylvania and the U.S. District Court for the Eastern District of Pennsylvania, with a residence located at 3444 Wiltshire Road, Furlong, PA 18925.

5.    Defendant, BDPTBP, is, on information and belief, a general partnership for the practice of law comprised of three law firm entities, each entity operating a separate office of the law firm, one in Massachusetts at One Liberty Square, 8th Floor, Boston, MA 02109, one in Florida at Esperante Building, 222 Lakeview Avenue, Suite 900, West Palm Beach, FL 33401, and one in California at 425 California Street, Suite 2100, San Francisco, CA 94104.

6.    Defendant, BDP is a professional limited liability partnership registered in the Commonwealth of Massachusetts, with its office at One Liberty Square, 8th Floor, Boston, MA 02109.  BDP functions as part of the BDPTBP law firm, represents itself and its personnel at all times as BDPTBP, and at no time does it present itself publicly as BDP.

7.    Defendant, BDPT is a California professional corporation registered in California, with its office at 425 California Street, Suite 2100, San Francisco, CA 94104.  BDPT functions as part of BDPTBP, represents itself and its personnel at all times as part of BDPTBP, and at no time does it present itself publicly as BDPT.

8.     Defendant, B&P, is a limited liability partnership registered in the State of Florida, with its office at Esperante Building, 222 Lakeview Avenue, Suite 900, West Palm Beach, FL 33401. B&P functions as part of BDPTBP, represents itself and its personnel at all times as BDPTBP, and at no time does it present itself publicly as B&P.

9.     Oliver C. Burt and Michael J. Pucillo, partners in B&P, are the owners of the registered fictitious name of BDPTBP in West Palm Beach, Florida.

10.     Page two of the application by B&P for the registered fictitious name, titled "Additional Pages to Application for Registration of Fictitious Name Re: Berman DeValerio Pease Tabacco Burt & Pucillo," notes the full firm name of BDPTBP and references eleven individuals as a "partner list to application," including Norman Berman (with his office address in Massachusetts), Peter Pease (with his office address in Massachusetts), Jeffrey Block (with his office address in Massachusetts), Michael Lange (with his office address in Massachusetts), Glen DeValerio (with his office address in Massachusetts), Kathleen Donovan-Maher (with her office address in Massachusetts), Wendy H. Zoberman (with her office address in Florida), R. Scott Palmer (with his office address in Florida), Nicole Lavalee (with her office address in California), Joseph Tabacco (with his office address in California), and Christopher T. Heffelfinger (with his office address in California).

11.     Defendant, Berman, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts and the state of Connecticut, with a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.

12.     Defendant, DeValerio, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts, with a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.

13.     Defendant, Maher, is an adult individual who is an attorney licensed to practice law in the Commonwealth of Massachusetts, with a regular office and place of business located at One Liberty Square, 8th Floor, Boston, MA 02109.

### III.     Statement of Facts

14.     Plaintiffs incorporate herein by reference paras. 1 - 13 hereof as fully as though the same were set forth at length.

15.     At all relevant times herein, defendants acted by and through their authorized agents, servants, employees, principals, and/or representatives, who at all times acted within the course and scope of their duties and authority for and on behalf of defendants.  At all times herein BDP, BDPT, and B&P comprised BDPTBP, and the actions and omissions of BDPTBP included authorized actions and omissions on behalf of BDP, BDPT, and B&P.

16.     Plaintiffs are class action attorneys. They have worked in the class action industry for over six years on several high profile cases, first on the defense side, later on the plaintiffs' side. Over the last several years, a significant part of the services rendered by plaintiffs in addition to case work, has been obtaining international institutional investors as clients to serve as lead plaintiffs in U.S. based securities class actions.  Plaintiffs have been successful in their endeavors, have developed a good reputation in the business, and have become known as attorneys with a book of clients and contacts made up of international institutional investors, most notably in Israel and Ireland.

17.     Plaintiffs' client development efforts, particularly in regard to Israel and Ireland, began in 2002. At that time, plaintiffs began to develop relationships with valuable contacts and clients. These efforts grew and accelerated over the next few years. The relationships that plaintiffs developed through substantial investments of time and money overseas were direct and

personal ones that were not dependent upon their affiliation or employment with any particular law firm or company.

18.     Before contacting defendants, plaintiffs prior affiliation with a law firm in California, ended amicably on March 15, 2007.

19.     Before any contact with defendants, two Israeli clients committed to sign monitoring agreements to allow plaintiffs to act as monitoring and evaluation counsel on their behalf regardless of plaintiffs' law firm employment or affiliation. One of these clients scheduled a meeting with plaintiffs for a time in April, 2007, for the purpose of signing a monitoring agreement.

20.     One of plaintiffs primary contacts substantially aiding them in their client development and outreach efforts overseas is/has been an agency in New York State ("NY State Agency"). While plaintiffs' contacts at this agency have been and are willing to continue working with them at whatever law firm they are employed by or affiliated with, as a New York State agency, they have been and are only able to continue to do so if the law firm, plaintiffs have been and are employed by or affiliated with had/has a registered office for doing business in New York City.

21.     Plaintiffs initial contact with the law firm of BDPTBP occurred on March 17, 2007, when Boltz sent an email to Maher, a partner in the firm's Boston office. During a phone conversation the next day, Rubinstein and Maher discussed plaintiffs' accomplishments in terms of client base and contacts. Among other things, they discussed pre-existing commitments from clients in Israel, Ireland, South Africa and other places, all of which were not dependent on plaintiffs' employment by or affiliation with any particular law firm.

22.     During the March 18, 2007 phone conversation with Maher, Rubinstein explained to her that plaintiffs required two things as part of any contractual arrangement to assure

continued commitment and loyalty of their clients and to continue effectively with their client development efforts. Rubinstein explained to Maher that the first of these was a law firm with an effective monitoring program, with personnel capable of understanding and working with data from international institutional investors and having the ability to provide the appropriate monitoring services. Maher assured Rubinstein that BDPTBP's in-house monitoring program was unique and superior and that its personnel were very experienced and superior as well.

23.     Rubinstein further explained to Maher that the second of these requirements was that the law firm must open a registered office in Manhattan, New York. Rubinstein explained that international institutional investors want a New York City presence for their legal representatives/law firms. Rubinstein also explained that a very important contact of the Plaintiffs, the aforementioned New York State agency, which was then aiding them in their international outreach efforts and client contact and development efforts, also required that the plaintiffs only be associated with a law firm having a legitimate, registered New York City office, Maher stated that this would not be a problem and that she would discuss this with her partners and be back in touch.

24.     Maher then coordinated the scheduling of a meeting in New York City with two of her partners, Berman and Jeffrey Block ("Block"). The meeting was scheduled for March 19, 2007. However, a time was not finalized until very late morning because Maher was waiting to hear back from the two partners, who were in Manhattan attending a final approval hearing in another matter before Judge Hellerstein.

25.     During the meeting with Berman and Block in New York City on March 19, 2007, plaintiffs discussed their client development achievements. Plaintiffs specifically asked about BDPTBP's monitoring program, the capabilities of the program, and the abilities of the firm's monitoring personnel. Plaintiffs again explained that the firm's having and providing a

fully functioning monitoring program, with personnel capable of understanding and handling the data and needs of international clients, was a very important prerequisite to their (plaintiffs) entering into a contractual relationship with BDPTBP. Berman and Block assured plaintiffs that their in-house monitoring program and personnel were excellent. Nothing was said about defendants' past and intended future use of Verteris, an outsourced monitoring service, nor a generic version of Verteris. Plaintiffs also reiterated that it was also essential to any contractual relationship with BDPTBP that the law firm opened and maintained a registered law office in Manhattan. Berman and Block stated that this would be done.

26.     At the March 19, 2007 meeting in New York City, the parties conducted contractual negotiations. Per defendants' earlier request, plaintiffs brought to the meeting their previous contract with their prior law firm. The idea was to use the contract with plaintiffs' prior law firm as the structure and format of any contract between plaintiffs and defendants, and to utilize the clauses and language of that agreement as well. At the conclusion of the meeting, defendants stated that they could utilize plaintiffs' previous contract with plaintiffs' prior law firm, with minimal changes, and that, as the next step, plaintiffs should come to defendants' office in Boston for a "meet and greet" with defendants' other partners.

27.     On March 20, 2007, Maher and Berman contacted plaintiffs and Maher informed them that she had spoken with her partners with regard to plaintiffs' requirement of a requested Manhattan law office for BDPTBP, and that establishment of such an office was not an issue, no problem, and that this would be done as soon as possible.

28.     Plaintiffs then met in person with the seven partners of BDPTBP's Boston office on March 22, 2007, at their office in Boston. Also present by speakerphone was Michael Pucillo from BDPTBP's Florida office. DeValerio explained that, although they had scheduled the

meeting for late morning so that Joseph Tabacco in BDPTBP's San Francisco office could also attend by speakerphone, Tabacco had a conflict and was not able to join in the discussions.

29.    During the March 22, 2007 meeting, plaintiffs discussed their client outreach achievements. Plaintiffs again explained that a fully functioning in-house monitoring program with personnel capable of handling and understanding the data and needs of international clients was a requirement for them (plaintiffs) to form a contractual relationship with BDPTBP. Defendants again assured plaintiffs of the superior nature of their in-house monitoring program. Plaintiffs also reiterated that it was a prerequisite to forming a contractual relationship that the BDPTBP firm open and maintain for the life of the contract a registered law office in Manhattan; defendants agreed that they would do so promptly.

30.    Later that day, plaintiffs had a brief discussion with Leslie Stern ("Stern"), a partner in the BDPTBP Boston office, who Berman and Maher had stated was the head of the firm's in-house monitoring team.  Stern briefly discussed and demonstrated her tracking of Bloomberg stock drops.  Stern would continue to exhibit confusion and lack of knowledge or ability with regard to her understanding of client data and the monitoring of trade data as to international clients, and on or about July 24, 2007, after repeated complaints by plaintiffs, DeValerio finally admitted that Stern "continues to remain mystified" as to the trading data.

31.    On March 23, 2007, Berman opened a Manhattan office on behalf of the BDPTBP law firm at 410 Park Avenue through the management company of Manhattan Business Centers ("MBC"). Berman stated at that time, as he had in earlier conversations with plaintiffs, that this office would also serve as a place from which plaintiffs could file New York cases on behalf of BDPTBP. MBC agreed to provide a dedicated phone and fax number for the BDPTBP firm and a live dedicated receptionist who would answer phones on behalf of the

BDPTBP firm; conference room space and secretarial support staff were also to be made available to all BDPTBP personnel.

32.    Several meetings took place over the next few months in BDPTBP's Manhattan office, including a meeting in early April 2007 between Joseph Tabacco and plaintiffs, and a meeting on July 24, 2007, between plaintiffs and DeValerio.

33.    On March 25, 2007, plaintiffs sent an email to Maher and Berman reiterating the NY State Agency's requirement of a New York City office, explaining that it had to be a legitimate office and registered to do business in New York, and that plaintiffs would not contact the NY State Agency in regard to certain international initiatives then planned until the New York office was registered and appeared on BDPTBP's website.

34.    On March 26, 2007, plaintiffs received a pdf by email of an "of counsel" agreement signed by BDPTBP. With defendants' permission, one edit was made to the agreement by plaintiffs, a caveat to the six month termination clause, who then signed and, thus, accepted, the finalized agreement and sent it back to defendants. This contract is attached hereto and incorporated herein by reference as Exhibit "A".

35.    The contract required, inter alia, that defendants cooperate with plaintiffs and, also, comply with all applicable laws, regulations and ethical requirements. The contract also required, implicitly or otherwise, that defendants act in good faith at all times.

36.    On March 29, 2007, in an email to Maher and Berman, Rubinstein stated that plaintiffs would be designated as contacts for an Israeli client. Rubinstein also stated that plaintiffs would put Stern in direct contact with the operational people at this client. Berman responded by stating "That makes sense. We have no problem with that."

37.    Also on March 29, 2007, Richard Lorant, BDPTBP's Director of Marketing and Client Relations, emailed plaintiffs a copy of the firm's custodial request direction letter to use

for acquiring data from international clients' custodians. However, the direction letter was inadequate and bereft of adequate descriptive details concerning data necessary for portfolio monitoring.

38.    On March 30, 2007, plaintiffs sent an email to Berman and Maher asking "when our names and the New York office will be added to the website?"

39.    On April 2, 2007, plaintiffs sent an email to Berman, Maher, DeValerio, and Stern detailing plaintiffs' progress with the clients in Israel.

40.    On April 3, 2007, plaintiffs sent an email to Maher again asking "when our bios and the New York office are going up on the website?"

41.    On April 18, 2007,  plaintiffs met in Boston with several of defendants' partners for "face time."  Stern also advised plaintiffs for the first time that the firm used Verteris, an outside monitoring service, and she warned plaintiffs to never use or reveal the name Verteris with/to clients, and that this was a firm policy. Plaintiffs were told that defendants wanted clients to think that all monitoring work was done in-house and, also, to think that the firm had a full service, in-house monitoring department.

42.    Plaintiffs later discussed with defendants the need to customize or enhance BDPTBP's online monitoring interface to better address the unique needs of international clients, but defendants resisted. Plaintiffs were told that the generic Verteris service was used without any enhancements. Despite plaintiffs offer of assistance with this and advice that enhancements to the program be utilized to benefit international institutional investor clients, defendants stated that they did not wish to expend additional effort or expense to make any modifications to Verteris' generic service.

43.    Plaintiffs also informed defendants that a  number of plaintiffs' securities class action firms that utilized the services of Verteris used it to enhance their own in-house

monitoring capabilities, and that some of these law firms made/make note on their own public website of their use of Verteris. However, despite this, defendants continued in their refusal to cooperate in implementing enhancements, and they continued to insist that Verteris be kept a secret from clients.

44.    On April 25, 2007 Berman sent an email to plaintiffs, copying Maher, in which he discussed the completion of paperwork for the NY State Agency application on behalf of BDPTBP. In the same email, Berman asked for clarification as to who to make the checks out to. This email was in response to an email sent that morning from plaintiffs to Berman and Maher, wherein Rubinstein stated that the New York State Agency must deal with BDPTBP's New York City office.

45.    On April 25, 2007, Rubinstein sent an email to MBC. The email stated that paperwork would be fedexed to MBC from Furlong, Pennsylvania, and that checks would be fedexed from Boston, for the purpose of applying from the New York City office of BDPTBP for assistance from the aforesaid New York State agency. MBC's instructions were to combine both of these and have them couriered to the New York State agency from BDPTBP's New York City office.

46.    Also on April 25, 2007, Berman, after an unsuccessful attempt to reach Boltz by phone, sent Rubinstein an email with "NY" in the subject line requesting that Rubinstein call Berman. Later on April 25, 2007, plaintiffs engaged in a phone conference with Berman and Maher, who stated that they wished to run the idea by them of having plaintiffs create an LLC in New York for the benefit of BDPTBP and register the LLC in their (plaintiffs') names, without revealing or mentioning BDPTBP. According to defendants, plaintiffs' LLC could then make all necessary filings and interactions in New York, including any contacts or interactions with any New York governmental agencies.

47.     When asked the reason for this, Maher and Berman stated that BDPTBP had in the past and currently was prosecuting class action cases in New York and that, as a result, there was an issue of New York tax liability. They explained that the creation of an LLC by plaintiffs in their names only would help BDPTBP avoid its tax liability in New York by enabling BDPTBP to avoid a profile through any public filings with any government agencies.

48.     Plaintiffs responded that the existence of a New York City office should not be a factor in whether or not BDPTBP had tax liability to New York since the law firm would owe the taxes as a consequence of work done in New York irrespective of the existence of an office there. Berman and Maher then explained that the firm had as recently as early 2007 received "large hits [recoveries] in New York" from cases worked there which, in itself, would likely result in tax liability "in the hundreds of thousands of dollars," and, therefore, the firm wished to "stay under the radar" in New York, and that this could best be accomplished through the creation of an LLC as suggested by them. Plaintiffs said that this didn't sound right.

49.     On April 25, 2007, Rubinstein sent another email to MBC stating that the checks from Boston would not be arriving the next day but, rather, probably not until the following week. When plaintiffs protested this delay to defendants, Berman admitted that BDPTBP was not ready to apply to the New York State Agency until the New York City office issue was resolved.

50.     The next morning, April 26, 2007, Berman sent an email to Rubinstein stating that "I had a thought about the NY issue. Please give me a call." Plaintiffs then had a conference call with Berman and Maher. Plaintiffs again declined defendants' suggestion that they (plaintiffs) file the application for assistance with the New York State agency under their own names without the BDPTBP law firm, which defendants again stated would let BDPTBP "stay under the radar." Berman and Maher again brought up the idea of plaintiffs' establishment of an LLC

in their names in New York. Again, plaintiffs declined defendants' suggestion and expressed concern as to the legality and ethics of defendants' suggestion.

51.     After the above conversations with Maher and Berman, plaintiffs sought an independent opinion as to the propriety of opening an LLC in their names in New York. As memorialized in part in an email to Berman and Maher from Rubinstein on May 4, 2007, based on plaintiffs' reservations and the independent opinion obtained, they unequivocally opposed having an LLC in their names since the purpose of doing so was, according to defendants, to enable them (defendants) to "stay under the radar" so as to avoid or evade their tax liability in New York.

52.     In addition, prior to execution of the contract, defendants had maintained a website with a grid face showing defendants' three offices in Boston, West Palm Beach, and San Francisco, and listing the attorneys at each office under a heading for each office.

53.     Shortly after execution of the contract with plaintiffs, plaintiffs advised defendants to add them to the attorney listings on the firm's website under a heading listing the firm's New York City office. Defendants suggested instead that plaintiffs be listed on a separate section of the website, separate from the firm's attorneys, devoted exclusively to international outreach efforts. Plaintiffs objected to this and advised defendants that the New York City office needed to be added to the office listings throughout the firm's website, wherever BDPTBP's offices or locations were listed.

54.     Thereafter, defendants instead decided on their own to change the face of the grid on the attorney bio section of their website to remove any reference to defendants' offices or addresses, resulting in a listing of attorneys for the attorney bio section of the website without identifying or disclosing any office locations or addresses on the face of the grid. At the same time, plaintiffs were added to defendants' website in an "of counsel" column, without a reference

to or disclosure of an office location, address, or phone number, and with only a general reference to plaintiffs being of counsel in New York. No BDPTBP New York City office was disclosed.

55.    Defendants subsequently advised plaintiffs that photos would be taken to add to the attorney bio section of the firm's website.

56.    Around the same time, plaintiffs spoke to Maher about the website changes noted in para. 54 hereof. Plaintiffs stated that the website changes were not as requested and, also would undermine their efforts to successfully perform the contract. Maher responded that the website was changed by defendants so that those who viewed the website could not tell where the attorneys were located without an additional hyperlink to individual attorney bios on separate web pages. Plaintiffs' complained that the website, as modified by defendants, was bereft of any reference to a New York City office of BDPTBP.

57.    After photos were taken for the attorney bio section of the firm's website, sometime in or about May, 2007, when the photos were added to the website, office addresses and phone numbers for each attorney were added next to each photo, except that, although plaintiffs' photos were added to their bios listing them as "of counsel in New York," but without any office address or phone number, without any disclosure that BDPTBP had a New York City office.

58.    Plaintiffs complained to Berman about the inadequacy of their listing in the firm's website and the lack of an office address for them or BDPTBP in New York City.

59.    Subsequently, the checks for the New York State Agency were sent by defendants and the application to the agency was filed, but not until May 30, 2007. During this time, Berman continued to stall plaintiffs regarding proper acknowledgment or listing of BDPTBP's New York City office on the firm's website, stating that this acknowledgment was imminent but

that, in addition to tax liability concerns, the partners had to make a decision in terms of style and placement on the firm's website.

60.    Plaintiffs' relationship with Berman and Maher gradually began to deteriorate after plaintiffs' rejection of Berman and Maher's request that plaintiffs establish an LLC in New York so that BDPTBP could "stay under the radar" in New York.  The relationship also gradually continued to deteriorate as these two partners continued to stall regarding the registration and legitimate establishment of the firm's New York City office, while, at the same time, they continued to pressure plaintiffs to bring in their clients' confidential trade data and demanded to meet the same clients.

61.    Disclosure of BDPTBP's New York City office was included in a draft of a new marketing brochure that was to be used for international and domestic purposes according to a May 14, 2007 email from Maggie Carlson ("Carlson"), BDPTBP's Marketing Manager.  This inclusion was the result of efforts by plaintiffs along with Carlson and Richard Lorant, the firm's director of marketing.  On May 22, 2007, Carlson stated in another email that she was giving the brochure "to Norm [Berman] and Kathleen [Maher] to review."

62.    Subsequently, Berman, Maher and/or Carlson continued to mislead plaintiffs by informing them that the brochure would be completed over time, but that they were busy with other matters, and that defendants wished to have one universal brochure to be utilized for both domestic and international clients. However, ultimately, Carlson admitted to plaintiffs that the firm did not want a brochure disclosing a New York City office to be disseminated for domestic use and, therefore, the brochure remained on defendants' desk and was never approved to plaintiffs' knowledge.

63.    The lack of a proper listing of the New York City office on BDPTBP's website also was questioned repeatedly by certain of plaintiffs' contacts and/or clients in New York,

Europe, Asia, the Middle East, Africa, and Israel. Contacts in Europe, Asia, the Middle East, Africa, and Israel continued to pressure plaintiffs to supply them with marketing brochures to effectively aid plaintiffs in their client development efforts. Both the lack of proper acknowledgment or listing of BDPTBP's New York City office on the firm's website and the refusal to supply plaintiffs with marketing brochures disclosing the New York City office were ongoing impediments which deprived plaintiffs of the ability to effectively perform their services under the contract and interfered with their client development efforts overseas.

64.     Defendants were specifically advised by plaintiffs that their bad faith and lack of cooperation and compliance, not to mention their attempts to violate New York law and tax reporting and payment requirements, were interfering with and negatively impacting plaintiffs ability to successfully perform under the contract.

65.     In June and July 2007, plaintiffs had ongoing communications by phone and email with Stern, Berman, and Maher regarding an issue related to the data download from certain Israeli clients. Plaintiffs stated that they would set up a phone conference with Stern during a meeting on July 5, 2007 with one of the Israeli clients. Stern, however, supposedly the head of BDPTBP's monitoring program and the one allegedly most knowledgeable with regard to the program, begged off, which was consistent with her comments that she did not understand the data download issues concerning the local custodian banks in Israel. For example, she asked repeatedly for a definition of "local custodian," ultimately requesting that the issue be defined by plaintiffs in writing to her before including the firm's "data expert" in any conference call with the Israeli clients.

66.     It was not until July 24, 2007, that plaintiffs learned from DeValerio that the firm's "data expert" was actually an outside consultant (Dan Shinnick) who worked for Verteris, defendants' outside monitoring service provider.

67.    In an email dated July 18, 2007, plaintiffs advised DeValerio that the six month termination option of the contract was approaching and that they had received an invitation to work with their prior law firm. In an effort to work things out, plaintiffs asked to speak with DeValerio directly.

68.    On July 19, 2007, plaintiffs sent an email to DeValerio in which they stated, in relevant part, "we need to resolve this issue of the NYC office. Before we agreed to come on board Kathleen [Maher] and Norm [Berman] proclaimed to us that it is not an issue. We still don't have a New York office as it is referred to nowhere on your website and this fact continues to be pointed out to us by contacts and clients. If we are to continue to perform client outreach for this firm we need the NYC office on the website."

69.    DeValerio agreed to meet with plaintiffs on July 24, 2007 in BDPTBP's New York City office. On July 22, 2007 plaintiffs emailed DeValerio a memo describing their client development efforts to date. At the meeting on July 24, 2007, DeValerio stated that there was still refusal within the firm to complete the requirements for a legitimate, publicly acknowledged and New York City office because of tax liability concerns.  DeValerio further stated, as had Berman and Maher, that BDPTBP wished to "stay under the radar" in New York because, just based on the business in New York that year, (2007), "hundreds of thousands of dollars" of tax liability was at issue.

70.    In regard to the ongoing data download issue with Israeli clients, DeValerio stated that Stern remained "mystified" and did not comprehend the data download issues which necessarily preceded the monitoring process.

71.    DeValerio requested that plaintiffs schedule a conference call between Dan Shinnick of Verteris and certain Israeli clients to address the data download issues.  DeValerio also stated that the Israeli clients were not to be made aware of Shinnick's position within the

Verteris company, but, rather, were to be led to believe that Shinnick was an employee of BDPTBP. Plaintiffs rejected DeValerio's request or advice, believing that this was improper and unethical.

72.     Plaintiffs insisted that they could not continue their client development efforts under these circumstances, which included defendants' bad faith, lack of cooperation, improper efforts to deceive clients, and violations of New York law, and that these issues would have to be resolved so that a legitimate New York City office would and could exist and be properly registered. DeValerio stated that he would meet with his partners to work on the New York City office issue and requested that, in the meantime, plaintiffs send him by email a "list of needs" necessary to continue their client development efforts. Plaintiffs sent DeValerio the requested list in an email on July 25, 2007. Featured first on this list was the need for the firm to acknowledge/list BDPTBP's New York City office on the firm's website and marketing materials.

73.     Also included in plaintiffs' list of needs email to defendants was their request, originally made in late June 2007, to post on the firm's website a favorable feature article published in Ireland, the draft of which Maher had pre-approved, which plaintiffs stated would help them in their performance of the contract.   However, Berman subsequently informed plaintiffs that the firm did not want to post the article on its website because, despite Maher's approval of the draft, the author included in the article a last minute reference to Boltz as resident in BDPTBP's Manhattan office.

74.     On July 25, 2007, DeValerio sent plaintiffs an email stating that the meeting with his partners went "generally well" and that his partners "agreed to most of what I proposed." Rather than explaining any further, DeValerio stated that he would get back to plaintiffs when his hectic schedule cleared up.

75.    It was not until one week later, on August 1, 2007, that DeValerio phoned Rubinstein. DeValerio stated that he wanted to speak with Rubinstein before he authorized the wire transfer of plaintiffs' paycheck, due that day. DeValerio stated that Berman was working on the July 25 list of needs email, including doing what was necessary to assure that the firm's New York City office was legitimately registered and publicly acknowledged, and that Berman was working with other partners on this and awaiting feedback from them.  DeValerio promised to update plaintiffs soon in that regard. DeValerio also stated that "what I want from you now" is to hasten the download of the Israeli clients' trade data and to schedule meetings for him with clients in Israel and Ireland at the end of August or September.

76.    On or about August 20, 2007, DeValerio phoned Rubinstein and stated that everything had been completed in regard to the New York City office and all that remained were questions of style for placement on the website. When Rubinstein raised the question of properly registering the office in New York, DeValerio said the paperwork was all done and that registration would be filed once the website style issues were resolved.

77.    Given defendants' continued misconduct, deceptions, and breaches as aforesaid, late in the evening of August 31, 2007, plaintiffs, having determined that defendants had not complied and would not comply with their contractual obligations or New York law, decided to accept an offer made by their prior law firm requiring them to begin work "of counsel" on September 1, 2007, at a fixed rate plus expenses, with the option for a future contractual relationship of a similar nature.

78.    As late as September 10, 2007, despite defendants' representations and promises, upon receipt of plaintiffs' July 25, 2007 list of needs email, plaintiffs had still not received any substantive response to same or any meaningful follow-up after Rubinstein's conversation with DeValerio on or about August 20, 2007. Defendants had not and did not further communicate

concerning proper disclosure or placement of BDPTBP's New York City office on the firm's website and marketing brochures; nor did defendants do anything to obviate Plaintiffs' concerns over defendants' continued stated desire to "stay under the radar" of the New York tax authorities.

79.     As a result of defendants' continued bad faith, deceptive conduct as to clients and the New York tax authorities, misrepresentations, failure/refusal to cooperate with plaintiffs, the failure/refusal to have, maintain, or provide a sufficient in-house monitoring program, with knowledgeable and competent personnel and the refusal to comply with the laws and regulations of New York, as well as ethical requirements, all of which alone or combined constituted material breaches of the contract, plaintiffs were forced to formally terminate the contract by notice sent to DeValerio on September 10, 2007.

80.     Plaintiffs informed defendants in their September 10, 2007 termination letter that they were represented by counsel.  The letter set forth Charles J. Weiss, Esquire as plaintiffs' counsel and provided contact information for Mr. Weiss. Plaintiffs requested that any further communications regarding this matter be directed to Mr. Weiss.

81.     DeValerio, on behalf of defendants, nevertheless sent a letter dated September 12, 2007, to plaintiffs, Mr. Weiss, and two named partners at plaintiffs' new law firm. In that letter, defendants accused plaintiffs of, inter alia, unprofessional conduct, deception, egregious misconduct, breach(es) of contract, and improper badgering for payment of salary. The letter was/is not privileged. The statements in the letter accusing plaintiffs of improper, misleading, deceptive, or unprofessional conduct were/are false and DeValerio knew such statements were false. This letter is attached hereto and incorporated herein by reference as Exhibit "B".

82.     Defendants primary, if not sole, purpose in sending this letter to plaintiffs' new law firm was to defame plaintiffs by ruining or damaging their character and reputations among

firms handling securities class actions and to interfere with, induce, and encourage plaintiffs' new law firm to terminate plaintiffs' existing contractual relationship with that firm and/or plaintiffs' prospective contractual or other business relations with that firm as well as others.

83.    Defendants have no justification or privilege to send or disseminate this letter (Exhibit "B") to plaintiffs' new law firm.  The communication to the new law firm was in bad faith and was not necessary to protect or vindicate any real or legitimate right, claim, interest, or concern of defendants.  Moreover, even if, theoretically, defendants were privileged or justified in sending this letter to plaintiffs' new law firm, the privilege or justification was abused since, inter alia, the letter was/is knowingly false and defamatory, and, as noted, any such communication to plaintiffs' new law firm was unnecessary.

84.    On September 17, 2007, Rubinstein emailed a copy of plaintiffs' letter of resignation/termination of September 10, 2007 to Darren Robbins, named partner at their new law firm, at Robbins' request after Robbins had received a copy of defendants' September 12, 2007 letter from defendants.

85.    On September 17, 2007, plaintiffs' counsel, Mr. Weiss, sent a formal letter of representation to defendants, confirming plaintiffs' notice in their September 10, 2007 letter that plaintiffs were represented by counsel, Mr. Weiss.

86.    On September 18, 2007, DeValerio, on behalf of defendants, sent a letter to Weiss in which defendants acknowledged that they had sent their September 12, 2007 letter with knowledge that plaintiffs were represented by Weiss and that they had sent the letter despite having said knowledge.

## COUNT I
## BREACH OF CONTRACT/BAD FAITH

87.     Plaintiffs incorporate herein by reference paras. 1 - 81 hereof as fully as though the same were set forth at length.

88.     Defendants materially breached the contract with plaintiffs as follows:

(a)     Acting in bad faith; for example, without limitation, by attempting to deceive and/or attempting to induce plaintiffs to deceive clients and the state/city of New York, specifically the New York Department of Tax and Finance, including efforts to get plaintiffs to cover for BDPTBP's efforts to violate New York law and tax reporting and payment obligations, concealing, until much later, their use and reliance upon independent monitoring services, such as Verteris, misrepresenting the sufficiency, competence, and capabilities of their alleged in-house monitoring program, and personne, and repeated misrepresentations to plaintiffs during the course of the contract;

(b)     failing/refusing to cooperate and support plaintiffs' contract performance by, inter alia, the actions set forth in subparagraph (a) above, failing/refusing to have, maintain, or provide competent and sufficient in-house monitoring services and/or personnel, and failing/refusing to properly list or disclose BDPTBP's New York City office on its website and in its marketing materials; and

(c)     violating the requirements of good faith and cooperation, and their contractual duty to comply with all laws, regulations, and ethical requirements, by reason of their conduct and/or omissions set forth in subparagraphs (a) and (b) above and, also, in failing/refusing to open or establish a legitimate, registered, publicly acknowledged New York City office of BDPTBP, particularly insofar as the New York tax authorities are concerned.

89.     By reason of the foregoing, plaintiffs were discharged from any further contractual obligations to defendants or duty to perform under the contract, and they were entitled to formally terminate same and to seek other employment or contractual relations.

90.     By reason of the foregoing, plaintiffs have sustained a loss of expected income in the sum of at least One Hundred Fifty Thousand Dollars ($150,000.00), together with future expected losses of income and, perhaps, other consequential damages as well.

WHEREFORE, plaintiffs, jointly and severally, demand judgment against defendants, jointly and severally, in a sum in excess of One Hundred Fifty Thousand Dollars ($150,000.00), plus interest and costs.

## COUNT II
## DEFAMATION

91.     Plaintiffs incorporate herein by reference paras. 1 - 90 hereof as fully as though the same were set forth at length.

92.     On information and belief, the statements by DeValerio, acting on behalf of defendants, in his letter of September 12, 2007 (Exhibit "B") were made within the course and scope of his duties and authority as a Managing Partner and authorized representative of BDPTBP, with the knowledge of all defendants.

93.     DeValerio's letter was sent to and received by plaintiffs' new law firm without consent, privilege, or justification for doing so.

94.     Defendants' letter, without limitation as to the entire scope of the defamatory and false meanings contained therein, was defamatory as to plaintiffs and was intended to and did in fact convey to the recipients thereof, either expressly or by implication, that plaintiffs, and only plaintiffs, in the course of their contract with defendants, were deceptive in their profession and business, engaged in egregious, unprofessional and/or unethical misconduct in their profession and

228146-1                                    25

business, and that they (plaintiffs) ultimately breached the contract with defendants by reason of such conduct.

95.    Defendants' letter, which was unnecessary and without justification sent to plaintiffs' law firm, was intentionally, willfully, and maliciously published to plaintiffs' new law firm for the specific purpose of damaging plaintiffs' character and professional reputations and, thus, their ability to develop successful contractual relations with clients and/or other law firms.

96.    Defendants' letter was sent with knowledge that the claims, accusations, and statements as to plaintiffs, and the misconduct attributed to them, were false or was sent in reckless disregard for the truth or falsity of same.

97.    Defendants' letter was understood by the persons who received it, including, but not limited to, the two named partners of plaintiffs' new law firm identified in defendants' letter, as being defamatory in nature and intent.

98.    Even if, theoretically, defendants had a privilege or justification for sending their letter to plaintiffs' new law firm, the privilege or justification was abused under the circumstances.  At no time herein were plaintiffs public figures.

99.    Defendant's statements were/are actionable and defamatory per se.  In addition, plaintiffs have sustained or likely will sustain the damages set forth in paragraphs 104 - 105, 113 hereof, as well as significant damage to their business, livelihood, and professional and personal character and reputations, which damage will likely continue for an indefinite time in the future.

100.    As a further direct and proximate result of the false and malicious statements of defendants, as aforesaid, plaintiffs have suffered and will likely continue to suffer for an indefinite time in the future pain and suffering and emotional distress, and personal and professional embarrassment and humiliation, as well as serious and irreparable injury to their names and reputations.

101.   Defendants' actions, as aforesaid, were intentional, malicious, outrageous, and in reckless disregard of plaintiffs' rights and interests, and were designed specifically to harm them personally and to destroy or substantially diminish their ability to earn a living in their chosen profession.

WHEREFORE, plaintiffs, jointly and severally, demand judgment against defendants, jointly and severally, for compensatory damages in an amount in excess of Five Million Dollars ($5,000,000.00), plus punitive damages in a sum in excess of Five Million Dollars ($5,000,000.00), plus interest and costs.

## COUNT III
## INTENTIONAL INTERFERENCE WITH PLAINTIFF'S ACTUAL AND/OR PROSPECTIVE BUSINESS RELATIONS AND CONTRACTS

102.   Plaintiffs incorporate herein by reference paras. 1 - 101 hereof as fully as though the same were set forth at length.

103.   Defendants intentionally, improperly, and without privilege or justification tortiously interfered with plaintiffs' existing and prospective contractual relations with plaintiffs' new law firm by, inter alia, inducing them or otherwise causing them not to perform their agreement(s) and/or prospective agreement(s) with plaintiffs.

104.   As a direct and proximate result of defendants' unlawful intentional interference with plaintiffs existing and prospective business and contractual relations, as aforesaid, plaintiffs have likely been severely damaged in their ability to maintain, perform, or continue performing existing contracts and/or in obtaining, maintaining, performing, and continuing to perform prospective contracts with their new law firm and/or other securities class action law firms, and other law firms as well, which will likely result in substantial financial injury and harm including, but not limited to, loss of income and business and financial opportunities in excess of at least Two Hundred Fifty Thousand Dollars ($250,000.00) and probably a great deal more.

105. As a further direct and proximate result of the false and malicious statements of defendants, as aforesaid, plaintiffs have suffered and will likely continue to suffer for an indefinite time in the future pain and suffering and emotional distress, and personal and professional embarrassment and humiliation, as well as serious and irreparable injury to their names and reputations.

106. Defendants' actions, as aforesaid, were intentional, malicious, outrageous, and in reckless disregard of plaintiffs' rights and interests, and were designed specifically to harm plaintiffs personally and destroy or substantially diminish their ability to earn a living in their chosen profession.

WHEREFORE, plaintiffs, jointly and severally, demand judgment against defendants, jointly and severally, for compensatory damages in an amount in excess of Five Million Dollars ($5,000,000.00), plus punitive damages in a sum in excess of Five Million Dollars ($5,000,000.00), plus interest and costs.

## COUNT IV
## FRAUDULENT INDUCEMENT

107. Plaintiffs incorporate herein by reference paras. 1 - 106 hereof as fully as though the same were set forth at length.

108. Plaintiffs were fraudulently induced to enter into the contract (Exhibit "A") with defendants.

109. Defendants' fraudulent inducement consisted of the following knowing, intentional, and malicious material false statements of fact or intention and/or concealments, which were designed to induce plaintiffs to enter into the contract with defendants:

(a) defendants' stated intent and contractual promise to cooperate with plaintiffs and to comply with their requirements for successful development and retention of international institutional investor clients, who, defendants knew, plaintiffs intended to

228146-1                                                        28

produce for the purpose of their signing up with defendants for their monitoring program; defendants at all times had no intent to cooperate as required, promised, or contemplated by the contract;

(b)    defendants' stated intent and contractual promise to open/establish and register a legitimate New York City office; defendants at all times had no intent to cooperate in this regard, act in good faith, or to establish a legitimate, registered office as promised or contemplated by the contract since, inter alia, their real goal, first revealed to plaintiffs post-contract, was to deceive clients and contacts into believing that they had a legitimate New York City office while at the same time keeping the office hidden from New York tax authorities, specifically the New York Department of Tax and Finance, in order to facilitate their violations of New York law and tax reporting and payment obligations;

(c)    defendants' stated intent and contractual promise to comply with all laws, regulations, and ethical requirements, as evidenced by, inter alia, the facts alleged in subparagraph (b) above, defendants' past and ongoing violations of New York law and tax reporting and payment obligations, which had occurred prior to and at the time the contract was executed, and defendants' post-execution conduct including, for example, their continued failure and refusal to disclose their New York City office as BDPTBP's office, as repeatedly requested by plaintiffs, on their website or marketing materials;

(d)    defendants' representations that they had a unique and superior in-house monitoring program that would be used under the contract and that this program was more than sufficient for the contract and would be run by competent and knowledgeable personnel, specifically Leslie Stern; defendants knew at all times, and did not reveal to plaintiffs until after execution of the contract, that they regularly utilized and intended to utilize a generic version (without enhancements) of Verteris, an independent monitoring

service, and that Stern was incapable of understanding or administering the data from international clients.

110.    Defendants knew or recklessly disregarded the fact that the foregoing misrepresentations and/or concealments were false and that they were intentionally made or omitted in order to deceive plaintiffs so as to induce them to rely upon same for the purpose of executing the contract (Exhibit "A").

111.    Defendants' misrepresentations/concealments were material to the contract herein, and defendants knew this, based on, inter alia, their (defendants') experience and past practices and, also, information provided and statements made to them prior to execution of the contract by plaintiffs related to the significance of, inter alia, (a) defendants' cooperation needed for successful performance of the contract and plaintiffs' ability to produce international institutional investor clients for defendants, (b) defendants need to have a sufficient in-house monitoring program run by knowledgeable and competent personnel, and (c) defendants need to have a registered, legitimate New York City office of BDPTBP.

112.    Prior to executing the contract, plaintiffs believed defendants' statements, representations, and promises and, in justifiable reliance thereon, executed the contract (Exhibit "A") based on same.    If plaintiffs had known that defendants' statements, representations, inducements, and promises were false, as stated above, they would not have entered into the contract, or any contract, with defendants.

113.    As a proximate result of defendants' fraudulent inducement, plaintiffs have suffered damages to their professional reputations, the possible loss of clients, other contract opportunities that likely would otherwise have developed, and, as a result, they have likely sustained a permanent impairment of their earnings and/or earning power.

114.    As a further direct and proximate result of defendants' fraudulent inducement, as aforesaid, plaintiffs have suffered and will likely continue to suffer for an indefinite time in the future pain and suffering and emotional distress, and personal and professional embarrassment and humiliation, as well as serious and irreparable injury to their names and reputations.

115.    Defendants' actions, as aforesaid, were intentional, malicious, outrageous, and in reckless disregard of plaintiffs' rights and interests; defendants knew, or recklessly disregarded the fact, that plaintiffs would be harmed and that their reputations, credibility, relations with international clients, and ability to earn a living in their chosen profession would be destroyed or diminished because of defendants' actions.

WHEREFORE, plaintiffs, jointly and severally, demand judgment against defendants, jointly and severally, for compensatory damages in an amount in excess of Five Million Dollars ($5,000,000.00), plus punitive damages in a sum in excess of Five Million Dollars ($5,000,000.00), plus interest and costs.

TIMONEY, KNOX, L.L.P.

By:_____
CHARLES J. WEISS, ESQUIRE
Attorney for Plaintiffs
Attorney I.D. #15771

BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO

ATTORNEYS AT LAW

ONE LIBERTY SQUARE
BOSTON, MA 02109
TEL: (617) 542-8300
FAX: (617) 542-1194
WWW.BERMANESQ.COM
LAW@BERMANESQ.COM

425 CALIFORNIA STREET, 21st FLOOR
SAN FRANCISCO, CA 94104
TEL: (415) 433-3200
FAX: (415) 433-6382

222 LAKEVIEW AVENUE, SUITE 900
WEST PALM BEACH, FL 33401
TEL: (561) 835-9400
FAX: (561) 835-0322

March 26, 2007
By DHL and email

Susan M. Boltz Rubinstein, Esq.
Eran Rubinstein, Esq.
410 Park Avenue, Suite 1530
NY, NY 10022

Re:    Of Counsel Relationship with Berman DeValerio Pease Tabacco Burt &
Pucillo

Dear Susan and Eran:

Berman DeValerio Pease Tabacco Burt & Pucillo ("Berman DeValerio") has
agreed to offer you an "Of Counsel" relationship with our Firm on the terms set forth
herein. The term of this agreement will be 12 months, effective March 26, 2007. At the
end of the first 6-month period, however, Berman DeValerio has the option to terminate
the relationship. If Berman DeValerio chooses not to terminate the relationship after 6
months, the relationship will expire at the end of the 12-month period unless we mutually
agree to extend it.

*[handwritten: Only in the event that clients are not brought in to the firm.]*

The terms of the 12-month agreement are as follows:

1.    You both will assume an "Of Counsel" relationship with Berman
DeValerio. Your principal duties will be institutional outreach to
communicate with and secure clients for the Berman DeValerio
institutional investor portfolio monitoring program. We will cooperate
with you and assist you in your outreach efforts.

2.    In performing your institutional outreach work you will interact most
frequently and directly with Kathleen Donovan-Maher, a partner in our
Firm, with the day-to-day responsibility for the operation of our
international outreach program. However, other Berman DeValerio
partners will be available to you as needed and, of course, assist in any
client presentations, etc. You will act as the primary liaison on behalf of
our Firm with the clients you introduce to the Firm.

BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO

Susan M. Boltz Rubinstein, Esq.
Eran Rubinstein, Esq.
March 26, 2007
Page 2 of 3

3.  You will be independent contractors and we will pay you $25,000 per month for this work, commencing April 1, 2007.

4.  You will receive 10% of any fees Berman DeValerio receives as a result of representing clients you produce in cases where the client is appointed lead plaintiff. The total of the $25,000 per month payments you will have received will be credited against, i.e., deducted from the 10% of fees to be paid to you.

5.  There may be instances when the client you produced is only partly responsible for the leadership position, or when it is necessary to adjust the percentage of fees to be paid to you on account of other payments that the Firm may be obliged to make in connection with a particular matter. This may result in a reduction of your percentage. For example, if a group of Berman DeValerio's clients come together to form a group to be designated lead plaintiff under the PSLRA, then the client you produced will be only proportionately responsible for the leadership position, and the percentage may be reduced accordingly. Similarly, compensation may be owing to others outside the firm when more than one client has been appointed lead plaintiff. In such cases the percentage to be paid to you and others may be negotiated. In such an instance, we may be willing, at our discretion, to increase the total percentage paid to no more than 15% to accommodate these various interests.

6.  To assist you in doing your outreach work, we will reimburse you for your reasonable and necessary out-of-pocket expenses of up to $50,000 on an annual basis. This limit reflects our mutual expectation of the total amount. It may, with our advance permission, be exceeded. To obtain reimbursement, you must comply with our Firm's expense approval and documentation policies and practices, working with our accounting department in Boston. Proper receipts and records are required.

7.  Any clients obtained through your efforts while operating as Of Counsel to our Firm will be considered clients of the Berman DeValerio Firm. In the event our relationship later terminates, those clients will remain with our Firm unless and until the client independently decides to terminate the relationship with our Firm. You will not, in such a circumstance, encourage such a client to terminate its relationship with our Firm or establish a relationship with any competitor firm.

BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO

Susan M. Boltz Rubinstein, Esq.
Eran Rubinstein, Esq.
March 26, 2007
Page 3 of 3

8.     This agreement is subject to and shall be performed in all respects in full
compliance with all requirements of law and ethical rules in effect in all
applicable jurisdictions.

If the foregoing is acceptable and agreeable to you, would you both please sign where
indicated below and return one of the duplicate originals enclosed herewith to me as soon
as possible. We are very enthusiastic about your international efforts and look forward to
working with you.

Very truly yours,

Norman Berman

cc:     Kathleen M. Donovan-Maher, Esq.

Agreed to this 26 day of March, 2007

Susan M. Boltz Rubinstein

Eran Rubinstein