UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOEL EICHENHOLTZ, individually and on behalf of all others similarly situated, | No. C 07-06140 MHP |
| Plaintiff, | **MEMORANDUM & ORDER** |
| v. | **Re: Appointment of Lead Plaintiff and Lead Counsel** |
| VERIFONE HOLDINGS, INC., et al., | |
| Defendants. / | |

Presently pending before this court are a number of related securities fraud class action lawsuits filed against VeriFone Holdings, Inc. ("Verifone") and certain of its officers and directors (collectively "defendants"), on behalf of purchasers of Verifone common stock beginning August 30, 2006 through December 3, 2007. Each action alleges violations of various federal securities laws. Now before the court are various plaintiffs' applications for appointment as lead plaintiff and for their attorneys as lead counsel. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND

This order assumes familiarity with the background of this action as described in this court's order dated May 14, 2008. See Docket No. 124. In that order, the court set forth background facts and declared consolidated all related actions herein. The court also ordered certain parties to provide further information to the court. This information has been submitted and is discussed in further detail below.

LEGAL STANDARD

The Private Securities Litigation Reform Act of 1995 ("PSLRA") sets forth a three-tiered procedure for the selection of a lead plaintiff to oversee securities class actions. 15 U.S.C. § 78u-4(a)(3); In re Cavanaugh, 306 F.3d 726 (9th Cir. 2002). First, the plaintiff who files the initial action must, within twenty days of filing the action, publish a notice to the class informing class members of their right to file a motion for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Within sixty days after publication of the required notice, any member of the proposed class may apply to the court to be appointed lead plaintiff, whether or not they have previously filed a complaint. Id. § 78u-4(a)(3)(A)(i)(II). Next, the court appoints as lead plaintiff the movant or movants that the court determines to be most capable of adequately representing the interests of class members. Id. § 78u-4(a)(3)(B)(i). The statute creates a rebuttable presumption that the most adequate plaintiff:

> (aa) has either filed the complaint or made a motion in response to a notice under [the PSLRA];
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

Id. § 78u-4(a)(3)(B)(iii)(I). For purposes of appointing lead plaintiff, the focus is only on the typicality and adequacy prongs of Rule 23. See Cavanaugh, 306 F.3d at 730.

Only by a showing that a presumptive lead plaintiff will not fairly and adequately represent the class, or is subject to unique defenses that will render such plaintiff incapable of adequately representing the class, will the presumption be overcome. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

DISCUSSION

As the court discussed in its May 14, 2008 order, there are only three sets of plaintiffs in serious contention for the position of lead plaintiff. See Docket No. 124. That order also set forth the calculation mechanism and the class period that the court will use to determine the plaintiff with the largest financial interest in this litigation. Before reaching the merits, the court first discusses: 1) its rationale for the class period used; 2) its loss calculation mechanism; and 3) its decision to

2

exclude from the loss calculation shares of Lipman Electronic Engineering Ltd. ("Lipman") that were converted to Verifone shares upon Verifone's acquisition of Lipman.

I.     Preliminary Matters

    A.     Class Period

The court finds the appropriate class period, for purposes of appointing lead plaintiff, to be August 31, 2006 to December 3, 2007. Certain plaintiffs propose that the class period used here be limited to March 1, 2007 to December 3, 2007, even though that argument is inimical to the interests of the class members those plaintiffs purportedly represent. Though a shorter class period may simplify the litigation, no benefits accrue by shortening the class period at this stage in the litigation. Indeed, it is unclear why a plaintiff would argue for a shorter class period at this stage, which would have the effect of reducing the class size and limiting the potential amount of damages, unless it was in the best interest of that particular plaintiff only. Consequently, at this stage, the court is wary of arguments advocating a shorter class period instead of the longest potential class period. Nevertheless, the court addresses the relevant arguments.

The financial statements that were restated by Verifone on December 3, 2007 were all released on March 1, 2007 or later. This is why certain plaintiffs propose a March 1, 2007 to December 3, 2007 class period. Many courts have not hesitated "to consider loss causation on the pleadings when faced with a pre-discovery motion." In re Comverse Tech., Inc. Sec. Litig., No. 06-CV-1825 (NGG)(RER), 2007 WL 680779, at *5 (E.D.N.Y. March 2, 2007) (reducing the class period based on the earliest corrective disclosures alleged in the complaint). Indeed, "failure to demonstrate loss causation constitutes a fatal flaw that necessitates removing those losses from the financial interest calculation." Id. n.6 (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005)).

Here, the Lien and Westend complaints allege that defendants made materially false and misleading statements to the public beginning with Verifone's August 31, 2006 third-quarter earnings release. See Lien v. Verifone Holdings, Inc., C 07-06195 MHP, Docket No. 1; Westend Capital Management LLC v. Verifone Holdings, Inc., C 07-06237 MHP, Docket No. 1. The

3

1  complaints provide reasons why the statements were materially false and misleading when made,
2  including that the company: 1) was materially overstating its inventory; 2) was understating its cost
3  of revenue; 3) was misstating its gross margins; 4) was violating generally accepted accounting
4  practices; 5) had misrepresented the financial success of the integration with Lipman; and 6) lacked
5  internal and financial controls. Of these reasons, the court finds the potential misrepresentation
6  regarding the acquisition of Lipman to be critical.

7  The March 1, 2007 class period start date misses a key event that occurred during the period
8  covered by the March 1 financial disclosure, November 1, 2006 to January 31, 2007. On November
9  1, 2006 Verifone acquired Lipman. Thus, the admitted misreporting includes the day that Verifone
10 acquired Lipman. At this early stage in the litigation, it is unclear whether Verifone made
11 misrepresentations with respect to the Lipman acquisition.[1] Since allegations of misrepresentation
12 have been made, it would be premature for the court to use a class period that disregards damages
13 potentially suffered due to Verifone's alleged misrepresentation of the acquisition's benefits.

14 "[I]t is clear that under Dura and its progeny, any losses that [a plaintiff] may have incurred
15 before [defendant's] misconduct was ever disclosed to the public are not recoverable, because those
16 losses cannot be proximately linked to the misconduct at issue in this litigation." In re Comverse,
17 2007 WL 680779, at *4. Here, there is evidence that some plaintiffs bought Verifone shares during
18 the November 1, 2006 to March 1, 2007 period. Further, Verifone restated financial statements that
19 affect exactly this period. Though the statements in question were not released until March 1, 2007
20 or later, the court is certain that statements in connection with the acquisition were made
21 contemporaneous with the acquisition. Indeed, discovery may well reveal misleading statements
22 made in connection with the acquisition. Thus, to the extent that any potential class member bought
23 shares during the November to March period and incurred losses upon Verifone's restatement, those
24 losses may be recoverable. Consequently, at this early stage in the litigation, the court declines the
25 invitation to artificially shorten the class period when determining the plaintiff with the greatest
26 financial interest in this litigation.

27 The appointed lead plaintiffs can decide how to frame their amended complaint to allege an
28 appropriate class period. The ruling on a motion for class certification will determine whether the

4

claims of Verifone purchasers in the class periods thus far alleged require subclasses, or whether the lead plaintiff can be representative of the entire class. See In re Star Gas Sec. Litig., No. 3:04CV1766(JBA), 2005 WL 818617, at *7 (D. Conn. April 8, 2005).

In sum, the court finds the appropriate class period, for purpose of lead plaintiff appointment, to be August 31, 2006 to December 3, 2007.[2] These dates incorporate the last quarterly earnings release made by Verifone before the Lipman acquisition—the August 31, 2006 third-quarter earnings release—as well as Verifone's subsequent restatements made in December 2007.

### B. Calculation Mechanism

When calculating the greatest financial interest, the court adopts the retained share methodology, which primarily looks to shares bought during the class period that are retained at the end of the class period. During the class certification stage in a very similar case, this court used the retained shares methodology to determine whether plaintiffs had demonstrated loss causation. See In re Cornerstone Propane Partners, L.P. Sec. Litig., No. C 03-2522 MHP, 2006 WL 1180267, at *8–*9 (N.D. Cal. May 3, 2006) (Patel, J.). There, this court held that "since corrective disclosure is alleged to have occurred only from July 2001 onwards, under Dura there can be no loss causation for plaintiffs who purchased and sold stock at the inflated share price prior to that disclosure, and thus these plaintiffs may not recover at all." Id., at *8. Thus, loss causation can only be demonstrated with respect to shares retained as of the date of the corrective disclosure. This standard was also used in the above discussion, where the court found that plaintiffs who bought Verifone shares in November 2006 and retained them until the corrective disclosure date may be class members.

Here, using the Dura standard achieves a dual purpose because "the issue of loss causation is not only relevant in determining the level of damages, but, pursuant to Dura, it is also relevant in establishing whether a securities fraud claim has been adequately pled." Id. This court held:

> In the present action, defendants are correct in their assertion that plaintiffs who sold their stock before July, 27 2001, when the first corrective disclosure occurred, did not suffer any loss causally related to defendants' alleged misrepresentations. The court finds that these plaintiffs are excluded from the definition of the Class.

Id., at *9. Consequently, based on the same rationale, the court finds no reason to include losses in its calculations that would later be considered uncompensable. Indeed, it is difficult, if not

5

impossible, to demonstrate loss causation for shares bought *and* sold before the disclosure of the misstatements or omissions. Thus, for substantially the same reasons as those described in In re Cornerstone, the court uses the retained shares methodology here. See also In re McKesson HBOC, Inc. Sec. Litig., 97 F. Supp. 2d 993 (N.D. Cal. 1999) (Whyte, J.).

The court must now determine what purchase price to use when calculating the losses suffered due to the retained shares. There are two potential methods and the difference between the two in this context is straightforward. Under the first method, the purchase price of the retained shares is calculated according to the shares purchased most recently, but within the class period. Under the second method, the purchase price of the retained shares is calculated according to the shares purchased at the beginning of the class period. The court finds that use of the first method is appropriate since it maximizes the potential losses suffered by the plaintiffs here. Specifically, the purchase price used is the price closest in time to, but before, the corrective disclosure. When, as here, a stock price was generally increasing during the class period, this measure will maximize the potential damages. Although this calculation will not necessarily be used during the damages phase of this action, at this stage in the proceedings, when the greatest financial interest is used to determine the lead plaintiff, the court finds it appropriate to use the method of calculation that maximizes potential damages.[3]

In sum, the court calculates damages by determining the shares bought during the class period that were retained as of December 3, 2007. The amount paid for the shares retained as of December 3, 2007 are calculated according to the price paid for the shares bought most recently in time, but prior to, December 3, 2007. The losses on the retained shares are calculated according to the following formula: if a share was not sold within 90 days subsequent to December 3, 2007, the loss is to be measured using an average of the daily closing price of Verifone stock during the 90-day period beginning December 3, 2007. If a share was sold within 90 days subsequent to December 3, 2007, the loss is to be measured using the higher of the actual sale price or an average of the daily closing price from December 3, 2007 to the date of sale.

6

### C. Lipman shares

Some of the moving plaintiffs held Lipman shares immediately before Verifone's acquisition of Lipman. These Lipman shares were bought on the Tel Aviv Stock Exchange ("TASE"). Subsequent to the acquisition, these shares were converted into Verifone shares. For the following two reasons, when determining the plaintiff with the greatest financial interest, the court will not include losses incurred due to the devaluation of these converted Lipman shares. First, the shares of the Israeli company Lipman were originally acquired on the TASE, which raises questions regarding this court's jurisdiction over wrongdoings at Lipman. See In re SCOR Holding (Switzerland) AG Litig., 537 F. Supp. 2d 556 (S.D.N.Y. 2008). Second, since the Lipman shares were converted into Verifone shares through an acquisition, it is unclear to the court whether a "purchase" or "sale" of Verifone shares, as defined by United States securities laws, occurred with respect to the converted shares. See In re Sonus Networks, Inc. Sec. Litig., 247 F.R.D. 244, 250 (D. Mass. 2007). Consequently, in order to avoid these complications at this early stage in the proceedings, the court will not implicate Lipman shares converted to Verifone shares when calculating the losses incurred by the proposed lead plaintiffs.

## II. Lead Plaintiff

### A. Losses suffered

#### 1. Israeli Group

The first set of plaintiffs vying for the lead plaintiff designation consists of the Phoenix Insurance Company ("Phoenix"), Prisma Provident Funds ("Prisma Provident"), Prisma Mutual Funds ("Prisma Mutual"), Harel Insurance Company ("Harel Insurance") and Harel Pia Mutual Funds ("Harel Pia") (collectively "Israeli Group").

Phoenix purchased 277,408 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $11,276,098. During this same period, Phoenix sold 187,120 shares for proceeds of $8,150,841. The 90,288 retained shares cost $3,422,135 and led to a loss of $1,632,627. All of these losses were sustained through shares held by funds for which Phoenix had exclusive authority to buy, sell and vote the shares. There are, however, two instances where Phoenix does not have

authority to buy, sell and vote the shares. Phoenix did not clarify how many shares would be affected by these exceptions.

Prisma Provident purchased 822,148 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $31,272,133. During this same period, Prisma Provident sold 362,182 shares for proceeds of $14,972,654. The 459,965 retained shares cost $16,672,409 and led to a loss of $7,555,896. All of these losses were sustained through shares held by funds for which Prisma Provident had exclusive authority to buy, sell and vote the shares.

Prisma Mutual purchased 190,605 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $7,572,846. During this same period, Prisma Mutual sold 121,992 shares for proceeds of $5,107,252. The 68,613 retained shares cost $2,692,131 and led to a loss of $1,332,222. All of these losses were sustained through shares held by funds for which Prisma Mutual had exclusive authority to buy, sell and vote the shares.

Harel Insurance purchased 234,275 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $7,590,500. During this same period, Harel Insurance sold 6,716 shares for proceeds of $282,397. The 227,559 retained shares cost $7,296,966 and led to a loss of $2,786,746. All of these losses were sustained through shares held by funds for which Harel Insurance had exclusive authority to buy, sell and vote the shares. There are, however, certain isolated instances where Harel Insurance does not have authority to buy, sell and vote the shares. Harel Insurance did not clarify how many shares would be affected by these isolated exceptions.

Harel Pia purchased 230,571 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $8,579,059. During this same period, Harel Pia sold 98,544 shares for proceeds of $4,148,350. The 132,027 retained shares cost $4,733,867 and led to a loss of $2,117,092. All of these losses were sustained through shares held by funds for which Harel Pia had exclusive authority to buy, sell and vote the shares. Harel Pia, however, did not have authority to buy, sell and vote the shares held by Harel Pia Stocks - Yahalom (Diamond), Harel Pia fund number 1153, which retained 3,247 shares as of December 3, 2007.

In sum, the Israeli Group purchased 1,755,007 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $66,290,636. During the same period, the Israeli Group sold

8

776,554 shares for proceeds of $32,661,493. The 978,452 retained shares costs $34,817,507 and led to a loss of $15,424,582. Although most of these losses were sustained through shares held by funds for which members of the Israeli Group had exclusive authority to buy, sell and vote the shares, it is unclear to the court how many shares were held by funds for which members of the Israeli Group did not have this authority.

### 2. CLAL Group

The second set of potential lead plaintiffs consists of CLAL Finance Batucha Investment Management ("CLAL Finance") and Direct Investment House ("Direct") (collectively "CLAL Group").

CLAL Finance purchased 476,882 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $21,078,680. During this same period, CLAL Finance sold 380,839 shares for proceeds of $16,547,247. The 96,043 retained shares cost $4,802,408 and led to a loss of $2,559,975. Of this loss, only $644,257 was actually incurred by CLAL Finance. The other losses of $1,915,719 were incurred by other entities such as MAROM 100 TTEE ESSLAVEMENT and MAROM 25 LTD; however, CLAL Finance had authority to purchase, sell and vote those shares.

Direct purchased 80,545 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $3,088,135. During this same period, Direct sold 47,568 shares for proceeds of $1,853,980. The 32,977 retained shares cost $1,364,421 and led to a loss of $407,390. All of these losses were sustained through shares for which Direct had exclusive authority to buy, sell and vote the shares.

In sum, the CLAL Group purchased 557,427 Verifone shares from August 30, 2006 through December 3, 2007 at a cost of $24,166,815. During the same period, the CLAL Group sold 428,407 shares for proceeds of $18,401,227. The 129,020 retained shares cost $6,166,829 and led to a loss of $2,967,365.

### 3. NEF

The third plaintiff in contention is the National Elevator Fund ("NEF"). NEF purchased 242,750 shares of Verifone between August 30, 2006 through December 3, 2007 at a cost of $8,998,977. During this same period, NEF sold 72,764 shares for proceeds of approximately

1  $2,885,873. The 169,986 retained shares cost approximately $6,942,525 and led to a loss of

2  approximately $2,857,357. NEF had no pre-class purchases of Verifone shares and all their sales of

3  Verifone shares occurred within ten days of the closing of the class period.[4]

4  Based on the above losses, the court now discusses the presumptive lead plaintiff.

### B. Presumptive Lead Plaintiff

#### 1. Israeli Group

Given the losses described above, at first blush, the presumptive lead plaintiff would seem to be the Israeli Group. However, the Israeli Group may be not be appointed lead plaintiff because it is an impermissible grouping of plaintiffs.

The PSLRA expressly permits a "person or group of persons" to be appointed lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The PSLRA does not define what a "group" can or should be and, in Cavanaugh, the Ninth Circuit expressly left it to the district courts to decide whether a "group of persons" can aggregate their losses for purposes of becoming lead plaintiff. 306 F.3d at 731 n.8 ("we are not asked to determine whether a group can satisfy the 'largest financial interest' requirement by aggregating losses"). "Where a statute fails to define a key term, this court's duty, in matters of statutory construction, is to give effect to the intent of Congress." Padilla v. Lever, 463 F.3d 1046, 1057 (9th Cir. 2006) (quotation omitted).

A group of five entities may be appointed lead plaintiff in the appropriate circumstances. See Memorandum of the Securities and Exchange Commission, Amicus Curiae, Introduction and Summary of the Commission's Position, at 1, attached to In re Baan, 186 F.R.D. 214, 224 (D.D.C. 1999) ("Construing the term 'groups of person' in light of the language and purposes of the Act, a court generally should apply approve a group small enough to be capable of effectively managing the litigation and the lawyers. The Commission believes that ordinarily this should be no more than three to five persons, a number that will facilitate joint decision-making and also help to assure that each group member has a sufficiently large stake in the litigation.").

The Israeli Group is made of five separate entities. Although the PSLRA allows groups to serve as lead plaintiffs, "courts have uniformly refused to appoint as lead plaintiff groups of

10

1  unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to
2  become the presumptive lead plaintiff." In re Gemstar-TV Guide Int'l, Inc. Sec. Litig., 209 F.R.D.
3  447, 451 (C.D. Cal. 2002). Courts have held either that this construction fails to meet the adequacy
4  prong of Rule 23 or that it makes the group unfit to be appointed lead plaintiff because it is contrary
5  to legislative intent. In either event, the analysis and the result are the same because acting contrary
6  to the purposes of the PSLRA, which was designed to benefit class members, would also threaten
7  the interests of the purported class.

8  There is widespread disagreement amongst district courts regarding this issue. The various
9  plaintiffs provide citations to district courts across the country that have made irreconcilable
10 conclusions based on similar facts. For instance, courts in the Third and Eleventh circuits do not
11 seem to inquire about the relationship between the parties that comprise a group. See In re Cendant
12 Corp. Litig., 264 F.3d 201, 266 (3d Cir. 2001); Edward J. Goodman Life Income Trust v. Jabil
13 Circuit, Inc., 2007 WL 170556, at *2 (M.D. Fla. Jan. 18, 2007). Nevertheless, these courts will
14 inquire into group composition if they are concerned about the plaintiffs' ability to monitor counsel.
15 See In re Cedent, 264 F.3d at 267 ("If, for example, a court were to determine that the movant
16 'group' with the largest losses had been created by the efforts of lawyers hoping to ensure their
17 eventual appointment as lead counsel, it could well conclude, based on this history, that the members
18 of that 'group' could not be counted on to monitor counsel in a sufficient manner."); Edward J.
19 Goodman Life Income Trust, 2007 WL 170556, at *2 (holding that aggregation was "acceptable for
20 the purposes of lead plaintiff in private securities litigation," and that "in appointing a lead plaintiff,
21 the court focuses on whether each of the respective groups is adequate to serve as lead plaintiff
22 rather than the composition of the groups.").

23 Other courts directly inquire into group composition. See, e.g., Gemstar-TV Guide, 209
24 F.R.D. at 451; In re Network Assocs., Inc., Sec. Litig., 76 F. Supp. 2d 1017, 1026 (N.D. Cal. 1999)
25 (Alsup, J.) ("It is not sufficient for counsel merely to aggregate large numbers of unaffiliated persons
26 into a 'group' and, because this assemblage collectively has the largest claimed losses, have it
27 appointed as lead plaintiff. A 'group of persons' within the meaning of the Act should, like an
28 institution or single large investor, be able to actively oversee the conduct of the litigation and

**United States District Court**
For the Northern District of California

11

monitor the effectiveness of counsel"); Wenderhold v. Cylink Corp., 188 F.R.D. 577, 586 (N.D. Cal. 1999) (Walker, J.) ("Aggregation solely for the purpose of creating a group that would have the 'largest financial interest in the relief sought by the class' would seem to contravene the PSLRA's purpose of shifting control of the litigation from the lawyers to the investors"); see also In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997) ("To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff.").

This court agrees with the latter group and other decisions in this district which find that ignoring the basis of the group formation and appointing a group of unrelated investors undercuts the primary purpose of the PSLRA: to eliminate lawyer-driven litigation. In re Network Assocs, 76 F. Supp. 2d at 1023 ("To allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation. Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff."). Concurrently, the court also finds that a pre-existing relationship between entities that comprise a group is not required if the resulting group is small and cohesive enough such that it can adequately control and oversee the litigation. See In re Waste Mgmt, Inc., 128 F. Supp. 2d 401, 413 (S.D. Tex. 2000) ("at a maximum a small group with the largest financial interest in the outcome of the litigation and a pre-litigation relationship based on more than their losing investment, satisfies the terms of the PSLRA and serves the purpose behind its enactment."); Schriver v. IMPAC Mortg. Holdings, Inc., No. SACV 06-31 CJC, 2006 U.S. Dist. Lexis 40607, at *25 (C.D. Cal. May 1, 2006) ("The Court agrees with Gemstar and other cases holding that groups of unrelated investors, while not per se impermissible lead plaintiffs under the PSLRA, are not adequate class representatives absent a showing that they are able to coordinate their efforts in the litigation."); In re Enron Corp. Sec. Litig., 206 F.R.D. 427, 455–57 (S.D. Tex. 2002) (reviewing applications of groups seeking appointment as lead plaintiff to determine if the grouping is a "manipulated effort to aggregate largest losses" or a grouping which has affirmatively decided to work together and agreed upon a decision-making structure).

Here, it is unclear whether the entities that comprise this group were related prior to the litigation.[5] Specifically, the constituent members of the Israeli Group have not shown how and when

12

1 they were joined together, how they intend to conduct discovery or how they will coordinate
2 litigation efforts and strategy. They simply claim they are "sophisticated institutional investors"
3 with the "capability and experience to oversee this litigation" and "ample resources" that have
4 "significant interest in the outcome of this action" which is why they are "committed to working
5 closely with class counsel." See generally Docket No. 85, Israeli Group Joint Dec. in Support of
6 Motion.[6] The group claims their communication amongst themselves was "facilitated by [their] pre-
7 existing and professional and personal relationships." Id., ¶ 13. However, they neglect to elucidate.

8     The court notes that these "sophisticated institutional investors" are competitors of others in
9 the group. Such investors are likely to have different investment strategies and may be subject to
10 unique defenses. They have no clarified how they will resolve their differences. Instead, they
11 merely assert that they "affirmatively decided that it would be a benefit to ourselves and the Class
12 we seek to represent if we, together, as five sophisticated investors, sought appointment as Lead
13 Plaintiff as part of a small, cohesive group." Id., ¶ 15. Finally, the entities state they intend to
14 communicate regularly, devote in-house counsel to the litigation and exercise joint decision-making.
15 Id. ¶ 19. The joint decision-making, however, is simply one vote per constituent entity, independent
16 of the number of shares held by the entity. Id. In sum, the declaration does not state any pre-
17 existing relationships nor does it clarify how the group will tackle the massive coordination and
18 strategic issues that are certain to arise in this litigation. Simply stated, this conclusory declaration
19 has little or no substance.

20     In light of the above discussion, the court finds that the members of the Israeli Group have
21 been unable to demonstrate how they intend to coordinate their efforts in this litigation. The
22 coordination problems inherent within the five distinct entities involved here, which are competitors,
23 will outweigh whatever gains are to be had through the grouping. The court finds no rationale for
24 this grouping other than to manufacture the greatest financial interest in order to be appointed lead
25 plaintiff.[7]

26     The situation here is similar to Network Assocs., where Judge Alsup held:

27     The only thing the investors in any group have in common, however, is the lawyer.
They have no link to each other. They are not organized with any group
28     decisionmaking apparatus. They attended no organizing meetings. They have no

13

> cohesive identity. They have no name other than one arbitrarily selected by the lawyers.

76 F. Supp. 2d at 1022. Indeed, it is clear that the Israeli Group was "created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel" and, as such, are "groups" of the sort district courts in this circuit and throughout the country look upon with disfavor. Cendant, 264 F.3d at 267; see Gemstar-TV Guide, 209 F.R.D. at 451; In re Vaxgen Sec. Litig., C 03-1129 JSW, 2004 U.S. Dist. LEXIS 29812, at *16 (N.D. Cal. April 14, 2004) (Whyte, J.); Schriver, 2006 U.S. Dist. LEXIS 40607, at *20–*32.

The court also notes that the Israeli Group retained new counsel while this motion was pending before the court. This substitution raises further questions regarding the stability of the Israeli Group's decision-making structure and its relationship with its counsel. It is critical as lead plaintiff and lead counsel that the Group and its counsel work for the benefit of the proposed class. Changing counsel at this stage of the case is cause for concern..

In sum, the court finds that the Israeli Group is not fit to be appointed lead plaintiff. The fitness of the Israeli Group to be lead plaintiff is further compounded by language barriers, esoteric United States securities laws and problems inherent in communicating across continents. See Network Assocs., 76 F. Supp. 2d at 1030.[8] Since the group may not be appointed lead plaintiff, the court will now analyze the movant with the next greatest financial interest—the CLAL Group.

    2.    CLAL Group

The statutory presumption in the PSLRA for appointing a lead plaintiff "may be rebutted only upon proof by a member of the purported class that the presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

The CLAL Group suffers from the same grouping and foreign investor issues that apply to the Israeli Group, albeit with only two entities as opposed to five. Courts have, however, allowed aggregation with two or three entities. See, e.g., In re Oxford Health Plans, Inc. Sec. Litig., 182 F.R.D. 42, 45 (S.D.N.Y. 1998) (appointing group of three as lead plaintiff). The group's declarations contend that its two constituent entities had a pre-existing relationship, that they intend

14

to meet regularly with counsel and that they will send executive level representatives to California as necessary. See generally Alharal & Zarechansky Dec.

The court agrees that the coordination and logistical issues present with five members are likely not present when only two members comprise the group. There is, however, scant evidence regarding the pre-existing relationship, the leadership and the decision-making structure of the group. Furthermore, the court only has counsel's conclusory statements demonstrating that the CLAL Group is its clients' attorney-in-fact.[9] Even assuming that the CLAL Group could be a proper lead plaintiff, the court finds it could be subject to a unique defense.

The CLAL Group may have a day-trader member that can subject it to additional defenses. Specifically, CLAL Finance made over 5,000 trades in Verifone's shares during a nine-month period. CLAL Finance claims that as Israel's largest brokerage house, it makes thousands of trades a day for many customers. Thus, since it is not always possible to trade in large blocks of shares, CLAL Finance argues it must break up its transactions into smaller blocks. This argument is unpersuasive. On June 14, 2007, CLAL Finance, on behalf of account number 248004, made five separate purchases of Verifone shares to acquire 419 shares. The same day, it made twenty separate sales of Verifone shares to divest 1,681 shares. Five of those sales involved the sale of fewer than ten shares, and in one instance, the sale of one share. Dahlstrom Dec., Exh. B at Attachment 1 at 1. The contrast is starker for purchases and sales made for the same account on June 20, 2007, a mere six days later. Id. at 2–3. That day, of the forty-one transactions conducted, twenty-nine purchase transactions bought 2,245 Verifone shares and twelve sale transaction sold 1,416 shares. Id. It is therefore not surprising that CLAL Finance made an average of nineteen trades a day in Verifone shares for the entirety of the nine months. Specifically, account number 248004 seems to have made over 1,400 trades in Verifone shares over a five and a half month period. Id. at 2–25. This amounts to an average of over eight trades a day for a significant portion of the class period. Thus, the court finds that CLAL Finance, and consequently the CLAL Group, may have an account that is a day-trader.

CLAL Finance argues that being a day-trader is not fatal. This day-trader would not be typical of the class because the class's damages stem from reliance upon the company's financial

15

1  statements, not upon daily market volatility. Specifically, it may be subject to a unique defense

2  regarding its reliance upon publicly available information. See, e.g., In re Silicon Storage Tech. Sec.

3  Litig., No. C 05-0295 PJH, 2005 U.S. Dist. Lexis 45246, at *25 (N.D. Cal. May 3, 2005)

4  (Hamilton, J.) (refusing to appoint an in-and-out trader as lead plaintiff because it did not meed

5  typicality requirement); In re Bally Total Fitness Sec. Litig., No. 04 C 3530, 2005 U.S. Dist. Lexis

6  6243, at *16–*18 (N.D. Ill. Mar. 15, 2005) (same).[10]

7  It is worth noting that even had the CLAL Group succeeded in its contention that the

8  appropriate class period here should be shorter than the court holds it to be, it would nevertheless

9  have been unsuccessful in its bid for lead plaintiff due to the vulnerability created by the unique day-

10  trader defense. The same would be true had the court adopted CLAL Group's contention that the

11  LIFO methodology of calculating damages be adopted. Consequently, in light of possible day-

12  trading issues, the CLAL Group cannot be appointed lead plaintiff. The court now analyzes NEF,

13  with the next greatest financial interest, as a potential lead plaintiff.[11]

14         3.    NEF

15  The National Elevator Fund appears to be typical. The typicality requirement is met because,

16  like other class members, NEF: 1) purchased Verifone securities during the class period; 2) at prices

17  that were allegedly artificially inflated by the defendants' materially false and misleading

18  statements; and 3) suffered damages as a result.

19  Competing movants for lead plaintiff argue that NEF will not adequately represent the class

20  because general counsel for NEF, O'Donoghue & O'Donoghue, has earned fees as class counsel in

21  such actions in the past. See generally Kathrein Dec. This conflict of interest wherein the law firm

22  is serving both as class representative and class counsel, they claim, is inimical to the interests of the

23  absent members of the class. To this end, they submit a declaration in support of attorneys' fees

24  from an attorney at O'Donoghue in a similar action. Id., Exh. C. This, they claim, impermissibly

25  blurs the distinction between class representative and class counsel here.

26  This issue can be easily resolved since NEF can and has chosen different class counsel. The

27  O'Donoghue firm is simply not involved in this proceeding at this stage. Indeed, Westend Capital,

28  which raises the issue, states that a conflict will arise, in the future, if NEF intends to permit its

16

general counsel or outside counsel to act as class counsel. There is no evidence or indication that the same will actually occur. Nevertheless, if NEF's general counsel does move for fees at a later stage in this proceeding, the court will examine the same with heightened scrutiny. This potential conflict, standing alone, is insufficient to defeat NEF's appointment as lead plaintiff.

The counsel chosen by NEF, Coughlin Stoia Geller Rudman & Robbins LLP, appears to be qualified, experienced, and competent to pursue the class' claims. See Abadou Dec., Exh. D. Furthermore, the interests of NEF appear well aligned with the interests of the putative class. Consequently, the court appoints NEF and its counsel lead plaintiff and class counsel respectively.

CONCLUSION

For the foregoing reasons, the court GRANTS the National Elevator Fund's motion for appointment as the lead plaintiff and its attorneys as lead counsel. The court DENIES all other motions for appointment as lead plaintiff and lead counsel.

IT IS SO ORDERED.

Dated: August 22, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1.  Verifone announced the Lipman acquisition on April 10, 2006.

2.  Although the court asked for further information regarding stock transactions beginning August 30, 2006, the court does not find this one day discrepancy to have a material effect upon its holding.

3.  The court is aware that using the purchase price of the shares purchased in the beginning of the class period for the retained shares would result in an off-set of class period gains from a plaintiff's ultimate loss, but uses the opposite method in this instance in order to ascertain the plaintiff with the greatest potential losses.

4.  It does not appear to the court that NEF owned any Lipman shares that were subsequently converted into Verifone shares.

5.  Prisma Provident and Prisma Mutual had a pre-litigation relationship. Harel Insurance and Harel Pia also had a pre-litigation relationship. However, the Prisma pair, the Harel pair and Phoenix did not have a pre-litigation relationship.

6.  This declaration was provided in response only after this issue was raised by other plaintiffs.

7.  There is also an argument that Phoenix is controlled by Delek Group, which has wholly owned subsidiaries that have purchased products from Verifone. Although this could lead to a potential conflict, it is highly unlikely and therefore plays no part in the court's decision. In any event, since the aggregation of losses by the Israeli Group is impermissible and Phoenix's losses are lower than that of NEF, resolution of this issue is irrelevant.

8.  None of the individual entities that comprise the Israeli Group has moved to be appointed lead plaintiff. The entity with the largest losses, Prisma Provident, manages provident funds, training funds, compensation funds and funds for sickness remuneration. Israeli Group Joint Dec., ¶ 4.
    Prisma Provident could be subject to unique defenses. First, its opponents can argue that it did not suffer the investment losses itself since it is an asset manager, mutual fund or insurance company. Prisma Provident states it is the beneficial owner of the shares and avers that it has full and complete discretion to buy and sell securities for its accounts as well as to institute legal action on their behalf. The Ninth Circuit has discussed, without deciding, whether investment managers with discretion to buy shares and rely upon public disclosures have standing without a power of attorney. See 505 Pension Trust Fund v. Anchor Capital Advisors, 498 F.3d 920, 922 n.3 (9th Cir. 2007).
    Second, it is unclear if this litigation would be given res judicata effect in Israel. Prisma Provident states that Israeli courts recognize American judgments. It cites to Tahan v. Hodgson, 662 F.2d 862, 868 (D.D.C. 1981) for this proposition. That court, however, only conjectured that "Israel in all probability would enforce a similar American judgment." Id. Although Israel seems to have its own class action equivalent—the Israeli Class Actions Act of 2006—there is no definitive authority on the res judicata effect of this litigation in Israel.
    Finally, the entity's physical distance from this forum may create practical difficulties that may make it difficult for it to be the class representative. Since individuals at Prisma Provident may have to testify at trial, it could be difficult for them to attend a long trial in its entirety. See In re Network Assocs, 76 F. Supp. at 1030.
    Consequently, Prisma Provident would likely not have been appointed lead plaintiff even if it had moved for the same. Though the court finds that any one of the above reasons may not be dispositive, when taken as a whole, they form a solid, persuasive basis to rebut the lead plaintiff status. The same rationale applies to the other individual members of the Israeli Group as well as the Group as a whole.

9.  The CLAL Group provides declarations that demonstrate it has the ability to represent both its own accounts and the accounts of its clients. See generally Alharal & Zarechansky Decs. It also claims Israeli law allows them to do the same. Specifically, according the CLAL Group, Article 76B of the

18

Mutual Joint Investments Law of Israel gives the CLAL Group power of attorney over the shares invested in mutual funds. This is allegedly further buttressed by Article 3 of the Financial Services Supervisor Act, which authorizes the CLAL Group to take all actions available to recover a pension funds' assets.

10. On December 4, 2007, after the price of Verifone shares had declined precipitously, CLAL Finance issued an analyst report that raised its rating for Verifone to "buy" from "underperform." Further, CLAL Finance made reports and recommendations about Verifone during the class period. This, opponents claim, demonstrates CLAL Finance had conversations with Verifone insiders making them privy to non-market information and atypical of the other class members. However, the recommendations and report do not necessarily demonstrate that CLAL Finance had non-public information.

11. The losses of the CLAL Group's other member, Direct, are lower than that of NEF; therefore, the court need not analyze its fitness as lead plaintiff.