1   COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2   CHRISTOPHER P. SEEFER (201197)
    ELI R. GREENSTEIN (217945)
3   100 Pine Street, Suite 2600
    San Francisco, CA  94111
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   chriss@csgrr.com
    elig@csgrr.com
6
    Lead Counsel for Plaintiffs
7
                    UNITED STATES DISTRICT COURT
8
                  NORTHERN DISTRICT OF CALIFORNIA
9

10  NATIONAL ELEVATOR INDUSTRY          )  Master File No. 3:07-cv-06140-MHP
    PENSION FUND,                       )
                                        )  CLASS ACTION
11          Plaintiff,                  )
                                        )  CONSOLIDATED COMPLAINT FOR
12  vs.                                 )  VIOLATIONS OF THE FEDERAL
                                        )  SECURITIES LAWS
13  VERIFONE HOLDINGS, INC., DOUGLAS    )
    G. BERGERON, BARRY ZWARENSTEIN,     )
14  WILLIAM G. ATKINSON AND CRAIG A.    )
    BONDY, and All Others Similarly Situated, )
15                                      )
            Defendants.                 )
16                                      )
    _____ )
17                                      )
    In re VERIFONE HOLDINGS, INC.       )
    SECURITIES LITIGATION               )
18                                      )
    _____ )
19                                      )
    This Document Relates To:           )
20                                      )
            ALL ACTIONS.                )
21  _____ )

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

Page

3   I.      INTRODUCTION ...........................................................................................1

4   II.     JURISDICTION AND VENUE ...................................................................11

5   III.    THE PARTIES............................................................................................11

6   IV.   CONFIDENTIAL WITNESSES ................................................................14

7   V.    DEFENDANTS' ACCOUNTING MANIPULATIONS AND FRAUDULENT
COURSE OF CONDUCT ...........................................................................17

8

         A.     VeriFone's Gross Margin Was the Most Important Financial Metric to
9               Measure Its Financial Performance and Was Negatively Impacted by
               International Sales, Which Were Lower Margin than North American
10            Sales .................................................................................................17

11      B.     April 10, 2006: VeriFone Announces the Acquisition of Lipman and
               Bergeron and Zwarenstein Assure Investors It Will Increase the
12            Company's Gross Margins and Earnings in 2007 Even Though Lipman's
               Gross Margins and Operating Margins Had Been Declining for Years and
13            Just About All of Lipman's Sales Were Lower-Margin International Sales .........19

14      C.     April 10, 2006-August 30, 2006: VeriFone's Stock Price Declines Due to
               Concerns About Declining Margins at Lipman and the Possibility of Lost
15            Customers
               ........................................................................................22

16      D.     Numerous Facts from Corroborating Sources Establish that VeriFone
               Reported Materially False and Misleading Financial Results in 2007 and
17            Raise a Strong Inference Bergeron and Zwarenstein Knew Their
               Statements During the Class Period Were Materially False and Misleading .........24

18

               1.    The Restatement Establishes that VeriFone's Financial Results
19                    Were Not Fairly Presented in Accordance with GAAP, that the
                    Company's Disclosure Controls and Procedures Were Not
20                  Effective and that VeriFone's Gross Margins and Earnings Did
                   Not Increase as Bergeron and Zwarenstein Falsely Represented
21                 During the Class Period .........................................................24

22               2.    The Company's Explanations for the Restatement and Information
                   Provided by Former VeriFone Accounting Employees Raise a
23                  Strong Inference that Bergeron and Zwarenstein Knew About the
                  Erroneous Manual Journal Entries and Other Internal Control
24                 Deficiencies that Caused the Restatement .................................30

25               3.    Former VeriFone Employees Said There Were Problems Obtaining
                   Accurate Financial Data from Lipman Because VeriFone and
26                 Lipman Used Different Oracle ERP Systems............................35

27

28

Page

4.   The Termination of Zwarenstein and VeriFone's Admission that There Were Material Weaknesses with the Company's Internal Controls over Financial Reporting Strengthens the Inference Bergeron and Zwarenstein Knew the Company's Financial Results Were False .................................................38

5.   Bergeron and Zwarenstein Concealed the Problems with the Company's Financial Reporting Controls, Knew VeriFone Was Reporting False Financial Results and Took Credit for Them .................42

6.   Bergeron, Zwarenstein, Atkinson and Brody Suspiciously Sold More than $443 Million of Their VeriFone Stock While Concealing the Financial Reporting Control Problems and Falsely Representing VeriFone's Better-than-Expected Results Were Fairly Presented .................................................45

7.   Defendants' Compensation and Bonuses Were Tied Directly to VeriFone's Earnings Targets .................................................48

VI.   FALSE AND MISLEADING STATEMENTS .................................................52

A.   False and Misleading Statements in 2006 .................................................52

B.   False and Misleading 1Q07 Statements .................................................56

C.   False and Misleading 2Q07 Statements .................................................64

D.   False and Misleading 3Q07 Statements .................................................70

VII.   VERIFONE ADMITS THE STATEMENTS MADE DURING THE CLASS PERIOD WERE MATERIALLY FALSE AND MISLEADING BY DISCLOSING THE NEED TO RESTATE THE COMPANY'S FINANCIAL RESULTS, CAUSING SUBSTANTIAL DECLINES IN THE COMPANY'S STOCK PRICE .................................................76

VIII.   LOSS CAUSATION .................................................79

IX.   VERIFONE'S FALSE FINANCIAL STATEMENTS .................................................83

X.   CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE .................................................95

XI.   PRAYER FOR RELIEF .................................................103

XII.   JURY DEMAND .................................................104

I.       INTRODUCTION

1.       This is a securities fraud class action on behalf of all persons who purchased the publicly traded securities of VeriFone Holdings, Inc. ("VeriFone" or the "Company") between August 31, 2006 and April 1, 2008 (the "Class Period") against defendants VeriFone, Douglas G. Bergeron ("Bergeron"), the Company's Chief Executive Officer ("CEO") and former Chairman of the Board of Directors ("Board"), Barry Zwarenstein ("Zwarenstein"), the Company's former Chief Financial Officer ("CFO") and Executive Vice President ("EVP"), William G. Atkinson ("Atkinson"), the Company's former EVP of Global Marketing and Business Development, and Craig A. Bondy ("Bondy"), a former VeriFone director, for violations of §§10(b), 20(A) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rules 10b-5 and 10b5-1 promulgated thereunder, 17 C.F.R. §§240.10b-5, 240.10b5-1.

2.       Defendant VeriFone engages in the design, manufacturing, marketing, and service of electronic payment solutions that enable acceptance and processing of electronic and point-of-sale ("POS") payments for goods and services.  On April 10, 2006, VeriFone announced the acquisition of Lipman Electronic Engineering Ltd. ("Lipman"), an Israeli provider of wireless electronic payment systems.   The acquisition did not close until November 1, 2006, the beginning of VeriFone's 2007 fiscal year.[1]

3.       Beginning on April 10, 2006, defendants told investors the Lipman acquisition would be a huge success and would increase VeriFone's gross margins[2] and earnings in 2007.  Bergeron and Zwarenstein stated that the Company's gross margin was "*the ultimate barometer of the operational success of [VeriFone]*," and they touted the Company's gross margin in every quarterly earnings release, major public filing and conference call with Wall Street analysts.  Indeed, Wall Street analysts that followed the Company also focused on gross margin and said it was "*the most important measure of VeriFone's financial performance*."

---

[1]       VeriFone's fiscal year began on November 1 and ended on October 31.

[2]       Gross margin is gross profit (net revenues minus the cost of net revenues) as a percentage of net revenues.

4.     The types of sales impacted the gross margin.  VeriFone reported its financial results in two segments – North America (the United States and Canada) and International.  In 2006, North American sales comprised 57% of total sales, and international sales comprised 43% of total sales. As the Company disclosed in its reports filed with the Securities and Exchange Commission ("SEC"):

> Our international sales tend to carry **lower prices and therefore have lower gross margins** than our sales in North America.  As a result, if we successfully expand our International sales, any improvement in our results of operations **will likely not be as favorable** as an expansion of similar magnitude in the US and Canada.

5.     Because a majority of Lipman's sales were outside the United States and Canada, VeriFone's international sales increased substantially from 43% of total sales in 2006 to **55%-60%** in 2007.  Leading up to the Class Period, investors and Wall Street analysts were increasingly concerned that VeriFone's gross margins and earnings would be negatively impacted by the Lipman acquisition because Lipman's gross margins and operating margins had been declining for several years.  For example, on August 10, 2006, one analyst wrote a report stating that "[VeriFone] has lost about 34% of its value since May 26, [2006] as valuations in our universe have reset and ***investor concern regarding potential customer losses at Lipman*** have dampened enthusiasm for the pending merger."   But the same analyst also noted that, based on representations from VeriFone itself, despite expected revenue losses, "the combined companies' steadily improving pro forma gross margin, coupled with significant additional supply chain efficiencies will yield ongoing combined operating margin improvement."

6.     Thus, although defendants assured investors the acquisition would increase VeriFone's gross margins and earnings in 2007, there were concerns that would not in fact occur. As a result, VeriFone's stock price declined 34%, from $32.55 on April 10, 2006, the date the Lipman acquisition was announced, to $23.30 on August 30, 2006, the day before the beginning of the Class Period.

7.     Bergeron and Zwarenstein defrauded class members by: (a) representing that the Lipman acquisition would increase gross margins and earnings in 2007; (b) causing VeriFone to report materially false and misleading financial results in violation of Generally Accepted

Accounting Principles ("GAAP") and the Company's publicly reported accounting policies; (c) falsely representing that VeriFone's financial results were fairly presented in all material respects; (d) falsely representing that the favorable financial results were the result of supply-chain efficiencies and integration success of the Lipman acquisition; (e) falsely representing that they had designed, established and maintained disclosure controls and procedures[3] to provide reasonable assurance that VeriFone's financial reporting was reliable and in accordance with GAAP; and (f) falsely representing that they had evaluated the Company's disclosure controls and procedures and concluded they were effective.

8.      On August 31, 2006, the first day of the Class Period, Bergeron and Zwarenstein represented that the Lipman acquisition would increase VeriFone's 2007 pro forma earnings per share ("EPS") by $0.12 to $1.40-$1.42 and that gross margins would expand.  Specifically, defendants stated, "I have to tell you that with Lipman's manufacturing in-house and with this hybrid model that we are very cleverly putting together and getting the best of both worlds, ***there is going to be gross margin expansion in our future***."  On December 7, 2006, Bergeron made additional false statements concerning the Lipman acquisition:

> The integration of Lipman into VeriFone has been completed ahead of schedule and we have created a single-branded, unified company with tremendous scale advantages.  ***Already, we are enjoying several supply chain efficiencies and earnings accretion. . . .  As a result, we have increased our internal expectations for fiscal Q1 2007 net earnings per share. . . .***

9.      In 2007, VeriFone reported fictitious increases in the Company's pro forma gross margins, just as Bergeron and Zwarenstein had falsely represented.  The reported pro forma gross margin increased from 45.9% in 3Q06 and 47.1% in 4Q06, to 47.1% in 1Q07, 48.1% in 2Q07 and 48.2% in 3Q07.  VeriFone's reported pro forma EPS also increased in 2007, to $0.37 in 1Q07, $0.39 in 2Q07 and $0.42 in 3Q07, and the Company appeared to be on track to report pro forma EPS in

---

[3]      Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the 1934 Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.  SEC Rule 13a-15(e), 17 C.F.R. §240.13a-15(e); SEC Rule 15d-15(e), 17 C.F.R. §240.15d-15(e).

line with the $1.40-$1.42 guidance.  In fact, when reporting 3Q07 results on September 6, 2007, Bergeron and Zwarenstein falsely told investors VeriFone would *exceed* the initial guidance and report pro forma EPS of $1.59-$1.60 in FY07.  Bergeron and Zwarenstein repeatedly attributed the Company's apparent success to its "*supply chain efficiencies and earnings accretion*," "*integration*" benefits of the acquisition and a "*phenomenal supply chain management team*." Indeed, on September 6, 2007, Bergeron falsely stated that VeriFone was "*getting supply chain efficiencies in Israel that we never experienced before*."

10.     Wall Street analysts following the Company repeatedly questioned Bergeron and Zwarenstein about the better-than-expected pro forma gross margins during the Company's quarterly earnings conference calls and issued reports in which they highlighted their surprise that VeriFone's pro forma gross margins were better than expected despite the addition of the lower-margin Lipman sales.

11.     Numerous facts from corroborating sources conclusively establish that defendants' representations during the Class Period were materially false and misleading and raise a strong inference that Bergeron and Zwarenstein knew it.  On December 3, 2007, VeriFone disclosed that the Company's financial results in 1Q07, 2Q07 and 3Q07 were materially false and misleading and would have to be restated.  As shown in the following chart, the restatement was massive and revealed that VeriFone's earnings were overstated by as much as *600%* and that its gross margins were nowhere near the 47%-48% represented to investors:

|  | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|
| Originally Reported Pro Forma Gross Margin | 47.11% | 48.06% | 48.2% |
| Restated Pro Forma Gross Margin | 41.4% | 42.3% | 41.2% |
| Originally Reported Pro Forma EPS | $0.37 | $0.39 | $0.42 |
| Restated Pro Forma EPS | $0.32 | $0.24 | ($0.26) |
| Originally Reported GAAP EPS | ($0.01) | $0.06 | $0.16 |
| Restated GAAP EPS | ($0.07) | ($0.06) | ($0.51) |

12.     In 3Q07, one of the most egregiously manipulated quarters, VeriFone's restatement revealed that the $0.42 pro forma EPS reported to investors was actually a *net loss of $0.26*.  Under GAAP, the impact of the restatement in 3Q07 was even worse.  GAAP EPS was restated from a purported $0.16 per share profit to a *net loss of $0.51*.  In other words, when defendants told

investors during the Class Period that VeriFone was earning hefty profits and increasing gross margins that exceeded Wall Street earnings estimates, the truth was that the Company's gross margins and earnings were actually plummeting and the Company was incurring huge losses each quarter as illustrated below:



13.     The restatement also confirmed that VeriFone materially overstated inventories and materially understated the cost of net revenues, which in turn caused gross margins and earnings to be overstated by tens of millions of dollars.  Despite defendants' false representations that the Company's "supply-chain efficiencies" were a primary driver of its financial results, defendants were forced to admit that erroneous manual journal entries by the Company's supply-chain accounting organization caused VeriFone to report materially false and misleading financial results. Specifically, defendants admitted that the Company improperly: (a) recorded millions of dollars of intercompany in-transit *inventory that did not exist* by making identical manual journal entries for both in-transit inventories and direct shipments when the manual entries should not have been made

1    for the direct shipments; (b) double booked millions of dollars of manufacturing and distribution

2    overhead costs to inventory at former Lipman subsidiaries by making duplicate manual journal

3    entries; and (c) failed to eliminate millions of dollars in intercompany profit in inventory.

4          14.     Bergeron and Zwarenstein paid very close attention to the Company's gross margins

5    and were admittedly obsessed with them.  As Bergeron stated during VeriFone's December 7, 2006

6    conference call with Wall Street analysts, "we think revenue quality as evidenced by our continuing,

7    almost ***obsessive approach to gross margin expansion***, is something that is an important part of

8    VeriFone's future."   Bergeron and Zwarenstein also repeatedly assured investors they were

9    intricately involved with the Company's financial reporting and they certified that the Company's

10   false financial results were fairly presented in all material respects.  They spoke in detail about the

11   Company's financial results during the quarterly earnings conference calls and assured investors

12   they had personally designed, established and maintained an effective financial reporting process

13   that ensured material information was made known to them ***before*** it was publicly reported.

14         15.     The magnitude of the restatement, and the fact that VeriFone originally reported an

15   inexplicable increase in pro forma gross margins ***after*** the Company's lower-margin international

16   sales increased from 43% of total sales before the Lipman acquisition to 55%-60% after the Lipman

17   acquisition, raise a strong inference Bergeron and Zwarenstein were deliberately reckless in

18   representing that the Company's financial results were fairly presented in accordance with GAAP.

19   Indeed, Wall Street analysts following the Company repeatedly questioned Bergeron and

20   Zwarenstein about the better-than-expected pro forma gross margins during the Class Period.  After

21   the Class Period, VeriFone reported pro forma gross margins in the low to mid-30s, and Bergeron

22   admitted VeriFone would not even be able to report 40% pro forma gross margins until the end of

23   FY09 because the Lipman acquisition increased the Company's international sales from 40% of total

24   sales to 60% of total sales.  These facts were all known to defendants at the time they made their

25   false statements.

26         16.     In addition, information provided by former VeriFone employees establishes that

27   Bergeron and Zwarenstein knew VeriFone was having problems obtaining accurate financial data

28   from Lipman due to the companies' use of different Oracle Corporation ("Oracle") Enterprise

1   Resource Planning ("ERP") general ledger accounting systems. VeriFone was using version 10.7,

2   and Lipman was using version 11i. Defendants knew VeriFone could not simply transfer Lipman

3   financial data from Lipman's 11i system to VeriFone's 10.7 system. Instead, Lipman financial data

4   had to be transferred from 11i to Excel spreadsheets and then transferred from the Excel

5   spreadsheets to VeriFone's 10.7 system. Defendants also knew that process was generating

6   inaccurate financial data because the macro formulas in the Excel spreadsheets were incorrect.

7   Former VeriFone employees stated Zwarenstein was personally involved in consolidating and

8   adjusting the Company's financial results and that he knew about the problems obtaining accurate

9   financial information from Lipman.

10         17.    Bergeron and Zwarenstein also knew that the Company's supply-chain controller,

11   based in Rocklin, California, had to prepare manual journal entries to post Lipman inventory data to

12   the Company's 10.7 system because the companies used different Oracle ERP accounting systems.

13   Those manual journal entries overstated inventories and understated the cost of net revenues by tens

14   of millions of dollars (which, in turn, caused gross profit and earnings to be overstated by tens of

15   millions of dollars). On December 3, 2007, Bergeron told investors the erroneous manual journal

16   entries were discovered when accounting personnel reviewed them.

17         18.    But as the former VeriFone accounting employees stated, the manual journal entries

18   were received and reviewed by the San Jose, California accounting department headed up by

19   Zwarenstein *before* VeriFone reported its financial results. Further, Bergeron and Zwarenstein

20   repeatedly assured investors that they had "designed" and "evaluated" the Company's disclosure

21   controls and procedures and concluded they were "effective" to ensure material information was

22   made known to them *before* the Company reported its financial results. Defendants also admitted

23   under oath that they "*[e]nsured the adoption of VeriFone's accounting policies and processes for

24   Lipman's transactions*." In fact, according to VeriFone's Proxy Statement, filed with the SEC on

25   September 10, 2008, Zwarenstein's salary was increased for 2007 because of "*his work in building

26   out [VeriFone's] financial and accounting infrastructure*" and his instrumental efforts towards the

27   successful completion of the Lipman acquisition. Thus, Bergeron and Zwarenstein knew about the

28   manual journal entries before they were included in the Company's false financial results.

1    19.    Moreover, Bergeron and Zwarenstein knew there were more fundamental problems

2    with the Company's financial reporting process.  Several former VeriFone employees who worked

3    in the Company's San Jose accounting department headed up by Zwarenstein said the San Jose

4    accounting department was disorganized, understaffed and in a general state of disarray, which

5    caused customary accounting duties – including, reviewing journal entries and conducting

6    reconciliations – to be compromised.  Indeed, when asked how VeriFone could even report its

7    consolidated results given the severe problems, a former senior accountant said, "I have no idea, but

8    that's the million dollar question."  Another former VeriFone employee was specifically hired in

9    August 2007 to rebuild the finance and accounting department but was unable to do so because of

10   VeriFone's poor reputation among both financial and accounting professionals and recruiters

11   because of the high turnover.  After the Class Period, VeriFone admitted the Company's financial

12   reporting controls were deficient and that it did not have qualified accounting personnel during the

13   Class Period.

14   20.    The abrupt and suspicious "termination" of Zwarenstein after the restatement was

15   publicly disclosed strengthens the inference that he knew about the undisclosed problems that caused

16   VeriFone to report false financial results.   VeriFone initially reported on April 1, 2008 that

17   Zwarenstein had "resigned."   Subsequently, buried in a footnote in a 78-page SEC filing, the

18   Company let it slip that Zwarenstein was actually "terminated."  Moreover, the Company reported

19   that Zwarenstein was required to repay $150,000 that he improperly received during the Class Period

20   based on the false financial results.

21   21.    Bergeron and Zwarenstein were motivated to report false pro forma gross margin and

22   earnings during the Class Period because it would cause the Company's stock price to increase after

23   declining 34% from April 10, 2006 to August 30, 2006 due to concerns about the impact of the

24   Lipman acquisition on VeriFone's financial results.  And the stock price did increase as a result of

25   defendants' false statements, from $23.15 on August 31, 2006, the first day of the Class Period, to a

26   Class Period high of $50.00 on October 31, 2007.

27   22.    Bergeron and Zwarenstein took full advantage of VeriFone's false results and inflated

28   stock price by selling over ***two million*** VeriFone shares for more than ***$80 million*** in illicit proceeds,

1  at prices as high as $46.00 per share.  Defendant Zwarenstein sold over **98%** of his shares, all of

2  which were acquired by exercising stock options for prices as low as $3.28 per share.  Bergeron sold

3  55% of his available shares.

4          23.     Bergeron and Zwarenstein were not alone in dumping their stock before the bad news

5  hit the tape.  Atkinson, who was heavily involved in the Lipman acquisition and was given 40,000

6  restricted stock awards as an extra bonus "in recognition of [his] efforts on the Lipman acquisition,"

7  unloaded over **$5.1 million** in VeriFone stock, over **96%** of his holdings, before the restatement was

8  announced.  On July 18, 2007, during the heart of the Class Period, Atkinson was suddenly fired.

9          24.     Bondy, a VeriFone Board member and one of the principal architects of the spin-off

10  and recapitalization of VeriFone from Hewlett-Packard Company ("HP"), unloaded over **$358**

11  **million** in VeriFone stock, $100 million of which was jointly owned by two other VeriFone

12  executives.  Bondy later resigned from the Board, only a few months before the restatement was

13  disclosed.

14          25.     Class members, on the other hand, purchased the Company's stock at artificially

15  inflated prices and suffered over a billion dollars in losses when VeriFone began to reveal its true

16  financial condition.  When defendants first announced on December 3, 2007 that the Company

17  would have to restate its financial results, VeriFone's stock price collapsed – dropping $22.00 per

18  share, from $48.03 to $26.03, or **46%** in a **single trading day** – erasing nearly $2 billion in market

19  capitalization.

20          26.     On December 31, 2007, after defendants announced a delay in reporting the

21  restatement, VeriFone's stock declined another **15%**, from $23.25 to $19.81.  On March 6, 2008,

22  defendants unexpectedly cancelled an appearance at an investor conference, which Wall Street

23  analysts reported was an indication VeriFone might delay the restatement yet again.  On this news,

24  VeriFone's stock price dropped another **21%**, from $19.64 to $15.45.  Finally, on April 1, 2008, the

25  day the Class Period ended, when VeriFone announced that defendant Zwarenstein was "resigning"

26  and that the restatement was far larger than initially represented on December 3, 2007, VeriFone's

27  stock price declined another **19%**, from $16.83 to $13.64 – capping a catastrophic 75% decline from

28

1    the Class Period high.  VeriFone's stock price has not recovered and currently trades at $11.36 per

2    share.

3          27.    Following the April 1, 2008 announcements, Wall Street analysts who had repeatedly

4    relied upon VeriFone's inflated financial results during the Class Period issued reports stating that

5    the restatement was "more than a simple mistake."  The Company's financial disclosures during the

6    Class Period are also being investigated by the SEC.  Not surprisingly, without the benefit of

7    defendants' accounting manipulations, VeriFone has reported substantially lower pro forma gross

8    margins in every quarter since 3Q07.  In stark contrast to the huge earnings increases touted during

9    the Class Period, the Company reported a *$51.2 million net loss* in 4Q07, a *$33.5 million net loss* in

10   1Q08, an *$18 million net loss* in 2Q08 and a *$7.2 million net loss* in 3Q08.

11         28.    These facts and others detailed herein, considered with the sheer magnitude of the

12   restatement, raise a strong inference that Bergeron and Zwarenstein were deliberately reckless in

13   falsely representing that VeriFone's financial results were fairly presented and that the Company's

14   disclosure controls and procedures were adequate and effective.

15         29.    The following chart (which is also attached hereto in foldout form) illustrates how the

16   false and misleading statements and omissions caused the price of VeriFone's stock to be inflated;

17   the insider sales by Bergeron, Zwarenstein, Atkinson and Bondy; and how class members were

18   damaged when the Company's true financial condition began to be revealed to the market:

19

20

21

22

23

24

25

26

27

28



## II.   JURISDICTION AND VENUE

30.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

31.     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the acts alleged herein, including the dissemination of misleading statements and omissions substantially occurred in this District.  The Company's corporate headquarters are in San Jose, California where the daily operations of the Company are directed and managed.

32.     In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications and the facilities of national securities exchange markets.

## III.   THE PARTIES

33.     National Elevator Industry Pension Fund ("National Elevator Fund") was appointed lead plaintiff in this action on August 22, 2008.  National Elevator Fund purchased VeriFone

1  securities at artificially inflated prices during the Class Period as a result of defendants' misconduct

2  and suffered economic damages when the artificial inflation was removed from the stock price.

3        34.    Defendant VeriFone is a public corporation which has its principal place of business

4  located at 2099 Gateway Place, Suite 600, San Jose, California, 95110.  VeriFone was founded and

5  incorporated in Hawaii on April 14, 1981 and shortly thereafter introduced the first check

6  verification and credit authorization device ever utilized by merchants in a commercial setting.  In

7  1984, the Company introduced the first mass-market electronic payment system intended to replace

8  manual credit card authorization devices for small merchants.  The Company went public on the

9  NASDAQ (National Association of Securities Dealers Automated Quotation System) in 1990.

10        35.    In 1995, the Company's shares moved to the NYSE (New York Stock Exchange), and

11  in 1997, it was acquired by HP.  In June 2001, Gores Technology Group acquired VeriFone from HP

12  in a transaction led by Bergeron.  In July 2002, Bergeron and certain funds associated with GTCR

13  Golder Rauner led a recapitalization of the Company in which VeriFone Holdings, LLC acquired all

14  of the shares of VeriFone.

15        36.    VeriFone completed an initial public offering ("IPO") on April 19, 2005 at $10.00 per

16  share, raising $85 million in gross proceeds.  On May 4, 2005, the Company's underwriters

17  exercised the over-allotment of 2.31 million shares from selling stockholders.  On September 20,

18  2005, VeriFone completed a follow-on offering, raising another $52 million in gross proceeds.

19  VeriFone has 2,224 employees and its stock trades on the NYSE under the ticker symbol "PAY."

20        37.    Defendant Bergeron was the CEO and Chairman of VeriFone during the Class Period.

21  Bergeron prepared the Company's quarterly earnings release and repeated the information contained

22  in the press releases during VeriFone's conference calls.  He also signed and certified the quarterly

23  and year-end financial statements filed with the SEC.  Bergeron also signed sworn certifications

24  pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") attesting to the truth and accuracy

25  of VeriFone's financial statements.  Bergeron also certified that he designed, reviewed and ensured

26  the effectiveness of the Company's internal controls over financial reporting.  During the Class

27  Period, Bergeron sold 2,026,262 million shares of VeriFone stock for proceeds of $74.7 million,

28  while in possession of material, adverse, undisclosed information about VeriFone.

1     38.     Defendant Zwarenstein was VeriFone's CFO and EVP during the Class Period.

2  Zwarenstein prepared the Company's quarterly earnings releases and repeated the information

3  contained in the press releases during VeriFone's conference calls.  He also signed and certified the

4  quarterly and year-end financial statements filed with the SEC and approved the Company press

5  releases during the Class Period.  Zwarenstein also signed sworn certifications pursuant to Sarbanes-

6  Oxley attesting to the truth and accuracy of VeriFone's financial statements.  Zwarenstein also

7  certified that he designed, reviewed and ensured the effectiveness of the Company's internal controls

8  over financial reporting.  During the Class Period, Zwarenstein sold 142,585 shares of his VeriFone

9  stock for proceeds of $5.38 million, while in possession of material, adverse, undisclosed

10  information about VeriFone.  On April 1, 2008, VeriFone announced that Zwarenstein was

11  "resigning" in connection with the Company's restatement – but in fact the Company later admitted

12  that he was actually "terminated."

13     39.     Defendant Atkinson worked for VeriFone beginning August 2001 and was

14  VeriFone's EVP of Global Marketing and Business Development during the Class Period until he

15  was terminated on July 17, 2007.  Atkinson was heavily involved in VeriFone's acquisition of

16  Lipman and, along with defendant Zwarenstein, was awarded tens of thousands of bonus stock

17  option grants by VeriFone's compensation committee "in recognition of [his] efforts on the Lipman

18  acquisition."  During the Class Period, Atkinson sold 138,188 shares and over 96% of his VeriFone

19  stock for proceeds of $5,100,570.

20     40.     Defendant Bondy was a member of VeriFone's Board from July 2002 to October 1,

21  2007, when he resigned.  Bondy was also a principal partner of GTCR Golden Rauner LLC

22  ("GTCR"), a private equity firm that manages numerous investment funds, including GTCR Fund

23  VII, L.P., GTCR Capital Partners, L.P. and GTCR Co-Invest.[4]  In July 2002, GTCR invested in

24  _____

25  [4]     According to VeriFone's 2006 Proxy Statement, the GTCR entities are related through a
26  cryptic labyrinth of partnership agreements as follows: "GTCR Golder Rauner, L.L.C. is the **general**
   **partner of the general partner** of GTCR Fund VII, L.P., the **general partner of the general partner**
27  **of the general partner** of GTCR Capital Partners, L.P., and the **general partner** of GTCR Co-Invest,
   L.P. GTCR Golder Rauner, L.L.C."

28

VeriFone, and after the Company's IPO on April 27, 2005, GTCR, Bondy, Collin E. Roche (another VeriFone director) and Daniel Timm (a former member of the Board) became Verifone's largest shareholder, owning 22.5 million shares, or 33.2%, of the Company's stock.  According to the Company's 2006 Proxy Statement filed with the SEC on February 27, 2007, Bondy, GTCR and Roche were the Company's largest shareholder, owning 16.5 million shares, or 20%, of VeriFone's common stock.  During the Class Period, Bondy sold 9.8 million shares of Verifone stock for $358.5 million, then resigned from the Board.

41.     In 2006, Bondy was a member of the VeriFone Board's "Corporate Governance and Nominating Committee."  According to the Company's 2006 Proxy Statement, that Committee met six times during fiscal year 2006 and "met in executive session at each such meeting."  In the 2006 Proxy Statement, Bondy signed the "Report of the Corporate Governance and Nominating Committee," which represented, among other things, that the Committee reviewed "VeriFone's Corporate Governance Guidelines" to determine whether any changes were "deemed necessary or desirable" by the Committee.

42.     Defendants Bergeron and Zwarenstein are the Individual Defendants.  In addition to the statements directly attributed to each of the Individual Defendants, they are liable for the false statements pled in §VI., as those statements were "group-published" information and each defendant was substantially involved in preparing, disseminating and certifying VeriFone's press releases and SEC filings.

## IV.     CONFIDENTIAL WITNESSES

43.     Several of the allegations included herein are based on information provided by several former VeriFone employees referred to as confidential witnesses ("CW").  The information provided by the former employees is reliable and credible because: (1) each of the witnesses worked at VeriFone during the Class Period; (2) each witness stated he/she had personal knowledge of the information provided; (3) the witnesses' job titles and responsibilities show they had personal knowledge of the information provided; (4) many of the witness accounts corroborate one another; and (5) the witness accounts are corroborated by other information alleged herein.

1        44.     CW1 was an accounting manager at VeriFone's San Jose headquarters from August

2  2005 until July 2007 when CW1 resigned. CW1 reported to the Company's Controller for North

3  America (which included various individuals due to high rates of attrition and reorganizations of the

4  principal accounting group) who reported to corporate controller Laura Merkl, who reported to

5  defendant CFO Zwarenstein. CW1 was responsible for reviewing accounting information from the

6  Company's Rocklin office, knew about the problems that caused the restatement and also described

7  numerous problems with the Company's accounting department.

8        45.     CW2 was a senior accountant at VeriFone's San Jose headquarters from December

9  2005 until February 2007 when CW2 resigned. CW2 also reported to the Company's Controller for

10  North America. CW2 managed a group of staff accountants that handled accounting functions

11  (journal entries and reconciliations) for various accounts, including marketing, facility allocation,

12  executive expenses and bonus plans. CW2 also participated in monthly balance sheet review

13  meetings with CW1, North American Controller Mike Dowd, Merkl and other accounting personnel.

14  Like CW1, CW2 knew about the problems that caused the restatement and also described numerous

15  problems with the Company's accounting department.

16        46.     CW3 was a controller at Lipman's Syosset, New York facility from February 2006

17  until February 2007 when CW3 was laid off in conjunction with the closing of the Syosset facility.

18  As controller, CW3 was responsible for all of Lipman's major accounting functions in North

19  America. CW3 reported to Lipman's North America CEO Robert Striano. As detailed herein, CW3

20  was directly involved in providing Lipman financial information to the San Jose accounting

21  department, described problems in providing accurate financial information due to VeriFone and

22  Lipman utilizing different versions of the Oracle ERP general ledger system, and discussed the

23  problems with defendant Zwarenstein.

24        47.     CW4 worked at VeriFone from 1992 to June 2008 when CW4 resigned. CW4 was

25  the project manager for supply-chain solutions since early 2003 at the Company's Rocklin facility

26  and reported to Chief Information Officer ("CIO") Ipolani Tano, who was based in Hawaii and

27  reported to defendant Bergeron. As detailed herein, in September 2006, CW4 became the project

28

1    manager for the implementation of the Oracle 11i system and described various problems with the

2    implementation involving supply chain and inventory.

3          48.    CW5 was a business systems analyst at VeriFone's San Jose headquarters from 2001

4    until December 2007 when CW5 resigned. CW5 reported to Information Technology Manager Tina

5    Pegg, who reported to CIO Ipolani Tano, who reported to defendant Bergeron. As detailed herein,

6    CW5 knew about problems with retrieving financial data from Lipman caused, in part, by Lipman

7    utilizing the Oracle 11i platform while VeriFone was utilizing the 10.7 platform.

8          49.    CW6 was a temporary staff accountant at VeriFone's Alpharetta, Georgia facility for

9    several weeks in April or May 2007. According to CW6, a great deal of data from Lipman was lost

10   when it was transferred to VeriFone because the data was not properly mapped before being

11   transferred from Lipman's 11i system to VeriFone's 10.7 system. Specifically, CW6 said that

12   VeriFone could not identify the customers associated with hundreds of Lipman's receivables that

13   were transferred to VeriFone's system, and it was CW6's job to determine the customers for the

14   receivables. However, CW6 was transferred to another company before commencing work on the

15   project. The temporary agency informed CW6 that Lisa Hamm, CW6's supervisor, had informed it

16   that VeriFone did not want any more accounting staff.

17         50.    CW7 was a senior accountant at VeriFone's San Jose headquarters from May 2006 to

18   August 2007 when CW7 resigned. CW7 reported to CW1 and then Chris Cunningham, who became

19   the accounting manager after CW1 resigned in July 2007. Like the other CWs, CW7 stated that

20   working in the VeriFone accounting department was very stressful and confusing and caused CW7

21   to resign.

22         51.    CW8 was a contractor and assistant controller at VeriFone for several weeks in

23   August 2007. CW8 was responsible for rebuilding the finance and accounting department to staff a

24   large number of vacant positions and to hire full-time employees to replace consultants. CW8 said

25   that it was difficult to hire accounting and finance employees because recruiters told CW8 that

26   VeriFone had a poor reputation among finance and accounting personnel as well as recruiters

27   because there was so much turnover.

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                          - 16 -

1        52.     CW9 was a financial analyst at VeriFone's Rocklin, California facility from October

2   2005 to March 2007, when CW9 resigned.  CW9 reported to supply-chain controller Paul Periolat,

3   who reported to Vice President of Financial Analysis Dave Gilford who reported to Zwarenstein.  As

4   a financial analyst, CW9 was responsible for profit and loss forecast-to-budget variance analyses for

5   all research and development groups at VeriFone.  As detailed herein, CW9 described how the

6   erroneous manual journal entries that led to the restatement were posted to the Company's Oracle

7   10.7 ERP general ledger accounting system, how the journal entries were reviewed by the San Jose

8   accounting department headed by Zwarenstein and how CW9, Periolat and other Rocklin personnel

9   participated in monthly financial statement review teleconferences with Zwarenstein, Merkl, Gilford

10   and others.

11        53.     CW10 was Vice President of Operations at Lipman's Syosset, New York facility

12   from 1994 until December 31, 2006, when CW10 and many other personnel at the Syosset facility

13   were laid off.  Following the close of the Lipman acquisition on November 1, 2006, CW10 was

14   primarily involved in transferring inventory from Syosset to a VeriFone warehouse in California.  As

15   detailed herein, CW10 said there were difficulties converting the accounting for Lipman's Syosset

16   operations to VeriFone because the companies used different Oracle ERP general ledger accounting

17   systems and because the companies did not have the same fiscal year.  CW10 also said that VeriFone

18   personnel, including Patrick McGivern and Mark Norman, knew the Syosset facility was holding

19   excess and obsolete inventory due to a cancelled customer order.

20  **V.     DEFENDANTS' ACCOUNTING MANIPULATIONS AND FRAUDULENT
        COURSE OF CONDUCT**

21

22     **A.     VeriFone's Gross Margin Was the Most Important Financial Metric
           to Measure Its Financial Performance and Was Negatively Impacted
           by International Sales, Which Were Lower Margin than North
           American Sales**

23

24        54.     VeriFone's gross margin was one of the most important financial measures of

25   VeriFone's overall financial condition, to which Bergeron and Zwarenstein paid very close attention.

26   During the April 10, 2006 conference call announcing the acquisition of Lipman, Bergeron said the

27   *gross margin was "the ultimate barometer of the operational Excellence of this business*," and

28   during VeriFone's December 7, 2006 conference call, Bergeron stated that "revenue quality as

evidenced by our continuing, almost ***obsessive approach to gross margin expansion***, is something that is an important part of VeriFone's future."  As detailed herein, in every quarterly earnings release, major SEC filing and conference call, Bergeron and Zwarenstein touted the Company's gross margins.

55.    Wall Street analysts also focused on the gross margin and considered it the most important measure of VeriFone's financial performance.  For example, after VeriFone reported its results for 2Q06, the quarter preceding the Class Period, SunTrust Robinson Humphrey ("SunTrust") analyst Andrew W. Jeffrey ("Jeffrey") issued a report in which he noted the importance of gross margins:

> Gross margin expanded again in 2Q06.  ***We believe this is the most important measure of VeriFone's financial performance***, as it demonstrates the company's pricing power, the relative superiority of its solutions and its ***impressive supply chain efficiency***.  ***VeriFone continues enjoying the highest gross margin in the POS terminal industry, and management expects further gross margin expansion following the Lipman acquisition***.

56.    VeriFone reported its financial results in two business segments – North America and International.  As reported in the Company's 2006 Form 10-K, international sales generated lower gross margins than sales in North America:

> Our International sales tend to carry lower prices and therefore ***have lower gross margins*** than our sales in North America.  As a result, if we successfully expand our International sales, any improvement in our results of operations will likely not be as favorable as an expansion of similar magnitude in the United States and Canada. . . .

57.    During the September 6, 2007 conference call, Bergeron stated that "***there's a huge variation in the gross margin percentage, domestically versus internationally***."

58.    In 2006, lower-margin international sales accounted for approximately 43% of the Company's total sales, and North American sales accounted for approximately 57% of total sales.  In 2006, international operating income was 24.5% of international sales.  By contrast, North American operating income was 38.8% of North American sales.

1

**B.    April 10, 2006: VeriFone Announces the Acquisition of Lipman and Bergeron and Zwarenstein Assure Investors It Will Increase the Company's Gross Margins and Earnings in 2007 Even Though Lipman's Gross Margins and Operating Margins Had Been Declining for Years and Just About All of Lipman's Sales Were Lower-Margin International Sales**

2

3

4

59.    On April 10, 2006, VeriFone announced its acquisition of Lipman, an Israeli provider of wireless electronic payment systems.  Bergeron assured investors the acquisition would be a success, increase the Company's gross margins and be accretive from day one.  For example, in the April 10, 2006 press release, it was reported that "[f]ollowing the acquisition, VeriFone will become the largest global provider of electronic payment solutions and services, capitalizing on accelerating growth in the emerging markets and demand for IP-based and wireless payment systems."  Bergeron was quoted in the press release as follows:

5

6

7

8

9

10

11

"The acquisition provides exciting opportunities for VeriFone.  The two companies are the fastest growing and most profitable providers of point of sale electronic payment technologies. Geographically, the businesses are complementary, and will be a leader in North America and the emerging markets, and number one or number two in most other key markets world-wide.  Through this acquisition we will extend technology leadership, particularly in the rapidly growing wireless and IP segments. Most importantly, we will be able to bring new technologies to market more quickly, offer a broader set of solutions and increased level of service and support to our customers worldwide."

12

13

14

15

16

60.    Lipman's President and CEO Isaac Angel also touted the benefits of the acquisition by stating it would allow the combined company to increase international sales:

17

18

"Since its founding in 1974, Lipman has established a track record of innovation and leadership in wireless payment technology, which is crucial to emerging markets that lack wired telephone infrastructure and to capture mobile payments throughout the world.  The ability to leverage VeriFone's worldwide sales and marketing channels will increase the rate at which we can penetrate the emerging markets that have tremendous growth potential."

19

20

21

22

61.    During the April 10, 2006 conference call, Bergeron continued to assure investors the acquisition would be successful due to the Company's "highly disciplined and experienced managers":

23

24

25

*Within the last five years and as a public company over the last one year, hopefully we've defined ourselves to our shareholders as a company with fantastic operational Excellence [and] as a company that is built by highly disciplined and experienced managers.*

26

27

28

We generated industry-leading revenue growth and industry-leading profitability and consistently management has overachieved across all of our financial matrices.

\*        \*        \*

[W]e have consistently generated revenue growth rates above our long-term range. In our last quarter our revenue growth rate was 21%. **Our gross margins, in many respects – the ultimate barometer of the operational Excellence of this business**, has been increasing sequentially for five quarters in a row – last quarter providing 45.6%. Our EBITDA margins have grown over the last five quarters from 15.6% in the first quarter of 2005 to 21% in first quarter of 2006.

\*        \*        \*

Lipman today markets in 20 countries worldwide. It has been very, very adroit at focusing in many of the emerging markets with the highest growth – China, India, Brazil, Turkey and in everywhere they compete they have the leading share of the wireless installed base and, they have the leading share of the U.S. wireless installed base as well.

Lipman has an extremely attractive financial profile. They have a history of 20% plus revenue growth and 40% plus gross margins. . . .

**There is a strategic rationale for VeriFone and Lipman joining forces. The first, strong financial performance plus strong financial performance equals stronger financial performance and immediate accretion and very complementary geographic profile.** Together this cements VeriFone's leading position in North America. This creates the number [one] position for VeriFone across emerging markets. And finally, it creates a number 1 or number 2 position in most other markets worldwide.

62.     Bergeron told investors gross margins would increase as a result of the acquisition and assured investors that VeriFone's management team had "proven integration experience," was "extremely operationally focused" and that as a joint business the management team would "continue [its] profit focus, disciplined approach to sales, and to running VeriFone":

Let me talk a little about the integration plan. Firstly, this will be a full integration of the businesses at every level. **VeriFone's management team has proven integration experience. This is the management team**, consistently, that bought the business out of HP five years ago, and **is extremely operationally focused.**

And as a joint business, **we will continue our profit focus, disciplined approach to sales, and to running VeriFone.**

\*        \*        \*

We believe as a combined business our long-term model will keep us in the 10-15% [revenue growth] range, although I would expect that in the first year of the acquisition we will tend [sic] towards the lower end of that range and hopefully migrate up through the range over time.

As you can see the gross margin profile for the business are very similar, and as a result, *we are increasing our pro-forma gross margin expectations from 41-44% which was an improvement from the 40-43% model we issued during the IPO to a new pro-forma gross margin model of 42-47%.*

63.     Following the April 10, 2006 announcement, analysts issued reports noting their enthusiasm for the deal because it would position VeriFone as the undisputed global POS terminal leader.  They also repeated Bergeron's statements that management expected the acquisition to be accretive from day one without assuming significant operating cost savings, but due to increased purchasing power that would benefit gross margins.  For example, Credit Suisse-North America ("Credit Suisse") analyst Paul Bartolai ("Bartolai") issued a report on April 10, 2006 in which he wrote the following:

VeriFone announced today a definitive agreement to acquire Lipman . . . .  Lipman (LPMA) is the fourth largest POS terminal provider worldwide, increasing PAY's geographical profile while also providing the company with significant market share in the important wireless terminal market.

LPMA's geographical exposure is complementary to PAY's foothold, providing significant exposure to Western Europe and various markets in Asia.  The combined company will have leading market share in North America and in emerging markets.  Management specifically highlighted India and China as significant opportunities . . . .

*Management expects the acquisition to be accretive from day one without assuming significant cost savings.  Most of the cost savings will stem from increased purchasing power to the benefit of gross margin.*

64.     SunTrust analyst Jeffrey issued a report on April 11, 2006 in which he wrote the following (first emphasis in original):

[Lipman's] revenue is more concentrated outside of North America, compared with VeriFone.  Lipman generated about 25% of its revenue in the U.S. in calendar 2005 while the U.S. accounted for nearly 60% of VeriFone's revenue in the same period.  By contrast, all of Europe, including Israel, was 46% of Lipman's revenue in calendar 2005.  This compared with 18% at VeriFone.  Lipman is also strong in Asia, generating 10% of its revenue there in calendar 2005, compared with 7% for VeriFone.  *The relative lack of geographic overlap is a particularly attractive aspect of this proposed transaction, in our opinion.*

In international markets, where wireless is more prevalent than it is domestically, it is our opinion that Lipman's strong market presence will augment VeriFone's aggressive expansion efforts.  Wireless terminals generally carry higher gross margins than their wired counterparts, suggesting that a more favorable blended-company revenue mix could boost long-term sustainable profitability.  In fact, *VeriFone management indicated on the conference call yesterday that the high end of its long-term sustainable gross margin range is 47%.  This is at least 200 basis points higher than our previous expectations.*

C.      **April 10, 2006-August 30, 2006: VeriFone's Stock Price Declines Due to Concerns About Declining Margins at Lipman and the Possibility of Lost Customers**

65.     On November 1, 2006, the first day of 1Q07, VeriFone announced that the acquisition was formally complete.  Thus, beginning in 1Q07, VeriFone's financial results included the financial results of Lipman.  Just about all of Lipman's sales were lower-margin international sales, and Lipman had been reporting declining gross margins and operating margins since 2001:

| ($ in 000s, Except EPS) | 2001 | 2002 | 2003 | 2004 | 2005 | 1Q06 |
|---|---|---|---|---|---|---|
| Net Revenues | $62,958 | $85,534 | $117,667 | $180,533 | $234,400 | $57,632 |
| Cost of Net Revenues | $27,781 | $37,116 | $58,413 | $99,630 | $136,381 | $33,464 |
| Gross Profit | $35,177 | $48,418 | $59,254 | $80,923 | $99,019 | $24,168 |
| **Gross Margin** | **55.9%** | **56.6%** | **50.4%** | **44.8%** | **42.1%** | **41.9%** |
| Operating Income | $9,609 | $23,605 | $29,299 | $36,749 | $26,515 | $8,537 |
| Operating Margin | 15.3% | 27.6% | 24.9% | 20.3% | 11.3% | 14.8% |

66.     As shown in the following chart, VeriFone's lower-margin international sales just about doubled after Lipman's results were included, and the percentage of lower-margin international sales increased from 43% in 2006 to 55%-60% in 2007:

| ($ in 000s, Except EPS) | 1Q06 | 2Q06 | 3Q06 | 4Q06 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|---|
| Int'l Revenues | $57,657 | $61,845 | $62,289 | $66,592 | $129,070 | $122,095 | $128,027 |
| North American Revenues | $77,175 | $80,446 | $85,404 | $90,628 | $89,070 | $96,040 | $104,570 |
| Corp. Revenues | ($202) | ($14) | ($76) | ($694) | ($1,514) | ($922) | ($652) |
| Total Revenues | $134,630 | $142,190 | $147,617 | $156,633 | $216,626 | $217,213 | $231,945 |
| Int'l Revenues/ Total Revenues | 42.8% | 43.5% | 42.2% | 42.5% | **59.6%** | **56.2%** | **55.2%** |

67.     Thus, although Bergeron told investors on April 10, 2006 that VeriFone's gross margins would increase from 41%-44% to 42%-47%, there were concerns VeriFone's gross margins and operating margins would decline in 2007 because the added sales were in the lower-margin international business segment.  For example, on April 10, 2006, it was reported that Standard & Poor's Ratings Services revised its outlook on VeriFone to negative from stable due to the Lipman acquisition:

> "The outlook revision reflects our concerns about potential operational disruptions, given that the acquisition represents the largest transaction undertaken by the company to date, as well as Lipman's decline in EBITDA margins over the past two years," said Standard & Poor's credit analyst Lucy Patricola.

68.     In fact, VeriFone's stock price declined following the announcement of the Lipman acquisition from a high of $33.56 per share on the day the Lipman acquisition was announced, to

1   $23.15 on the first day of the Class Period due to concerns about the impact of the Lipman

2   acquisition.  For example, SunTrust analyst Jeffrey wrote in a report issued on June 21, 2006 that the

3   recent share price weakness (the price of VeriFone's stock had declined from $33.56 on April 10,

4   2006 to $28.03 on June 21, 2006) could continue because VeriFone's revenues would be

5   increasingly derived from international markets, particularly following the completion of the Lipman

6   acquisition.  But Jeffrey also wrote that VeriFone would drive increased supply-chain efficiencies

7   through a low-cost manufacturing operation and the ability to better price its outsourced assembly

8   and manufacturing, which could increase the combined company's gross margins from the mid-40s

9   to 50% over the next several years.

10          69.     On August 10, 2006, Jeffrey issued a report in which he wrote that "PAY has lost

11  about 34% of its value since May 26, [2006] as valuations in our universe have reset and *investor*

12  *concern regarding potential customer losses at Lipman* have dampened enthusiasm for the pending

13  merger."  But Jeffrey also stated that, based on representations from VeriFone, despite expected

14  revenue losses, "the combined companies' steadily improving pro forma gross margin, coupled with

15  significant additional supply chain efficiencies will yield ongoing combined operating margin

16  improvement":

17          ***Gross Margin is Overstated And The Balance Sheet Is Deteriorating.***  A recent
            competitor's report asserts that VeriFone over-stated its gross margin by 140 basis
18          points in 2Q06, owing to a one-time settlement with a supplier.  It also points out that
            [Days Sales Outstanding] rose from 62 days in 1Q06 to 68 days in 2Q06.  The
19          analyst concluded from these observations that VeriFone's business is becoming
            more difficult and that the company is reaching to exceed the Street mean EPS
20          estimate.

21                  While our competitor makes an articulate argument, we disagree with his
            conclusions.   Specifically, ***VeriFone notes*** that there were at least equal and
22          offsetting costs incurred in 2Q06 which effectively negated the one-time benefit to
            gross margin. . . .

23          70.     Credit Suisse analyst Bartolai issued a report on August 30, 2006, the day before

24  VeriFone issued its 3Q06 results and noted that "*[t]here has also been concern regarding PAY's*

25  *gross margins*; however we believe the company will continue to generate solid gross margin

26  improvements."

27

28

71.     After VeriFone released its 3Q06 and FY06 results, analysts noted they expected the Company's gross margin to expand once Lipman's results were included.  For example, on November 21, 2006, SunTrust analyst Jeffrey issued a report in which he wrote the following:

> We . . . believe **prospective gross margin expansion** and operating leverage will result in higher fiscal 2007 EPS guidance.
>
> *        *        *
>
> We [also] believe a combination of **strong supply chain efficiencies and benefits from the recently completed Lipman acquisition** will allow the company to continue **boosting its gross margin**.  In addition, a highly-scalable, **centralized management structure and stringent expense control** should result in considerable fixed-cost leverage and meaningful operating margin expansion.

72.     Thus, before VeriFone reported 1Q07 results, defendants repeatedly told investors the Lipman acquisition would be immediately accretive and cause the Company's pro forma gross margin to increase from 41%-44% to 42%-47%.  They also told investors that the gross margin was the "ultimate barometer of the operational Excellence" of VeriFone's business and assured them the Company's management would deliver the promised results because they had "proven integration experience" and were "extremely operationally focused."

73.     But Bergeron and Zwarenstein also knew there were concerns about the impact of the acquisition on VeriFone's financial results that caused the Company's stock price to decline from $32.55 on April 10, 2006, the day the Lipman acquisition was announced, to $23.30 on August 30, 2006, the day before the beginning of the Class Period.

**D.     Numerous Facts from Corroborating Sources Establish that VeriFone Reported Materially False and Misleading Financial Results in 2007 and Raise a Strong Inference Bergeron and Zwarenstein Knew Their Statements During the Class Period Were Materially False and Misleading**

**1.     The Restatement Establishes that VeriFone's Financial Results Were Not Fairly Presented in Accordance with GAAP, that the Company's Disclosure Controls and Procedures Were Not Effective and that VeriFone's Gross Margins and Earnings Did Not Increase as Bergeron and Zwarenstein Falsely Represented During the Class Period**

74.     VeriFone reported the following financial results during the Class Period:

| ($ in 000s, Except EPS) | 3Q06 | 4Q06 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|
| Revenues | $147,617 | $156,633 | $216,626 | $217,213 | $231,945 |
| Cost of Net Revenues | $81,156 | $84,550 | $135,246 | $127,013 | $129,934 |
| GAAP Gross Profit | $66,461 | $72,083 | $81,380 | $90,200 | $102,011 |
| GAAP Gross Margin | 45.02% | 46.02% | 37.57% | 41.53% | 43.98% |
| Pro forma Gross Profit | $67,736 | $73,815 | $102,060 | $104,382 | $111,857 |
| Pro forma Gross Margin | 45.89% | 47.13% | 47.11% | 48.06% | 48.23% |
| Operating Income | $28,459 | $31,091 | $11,788 | $17,287 | $36,506 |
| Operating Margin | 19.28% | 19.85% | 5.44% | 7.96% | 15.74% |
| Pro forma Net Income | $19,660 | $22,305 | $31,151 | $32,635 | $35,585 |
| Pro forma EPS | $0.28 | $0.32 | $0.37 | $0.39 | $0.42 |
| GAAP Net Income | $16,755 | $13,926 | ($984) | $4,859 | $13,439 |
| GAAP EPS | $0.24 | $0.20 | ($0.01) | $0.06 | $0.16 |
| Inventories | $73,870 | $86,631 | $130,815 | $125,390 | $145,398 |

75.     The financial results were originally reported in press releases and then repeated during the Company's conference calls, in reports issued by Wall Street analysts that followed the Company and in VeriFone's Reports on Forms 10-Q filed with the SEC.  Bergeron and Zwarenstein also represented that VeriFone's financial results were "fairly present[ed] in all material respects" in accordance with GAAP.  To assure investors they had a legitimate basis for making these statements, and to prevent them from later claiming to be unaware of material information that rendered the Company's financial results false, they also certified that they: (1) were each "responsible for establishing and maintaining disclosure controls and procedures"; (2) had "designed such disclosure controls and procedures . . . to ensure that material information . . . is made known to [them] by others within [VeriFone] . . . , particularly during the period in which the [Form 10-Q was] prepared"; (3) had personally "evaluated the effectiveness of [VeriFone's] disclosure controls and procedures" and "concluded" they were "effective"; and (4) had "disclosed . . . to [VeriFone's] auditors and the audit committee . . . all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [VeriFone's] ability to record, process, summarize and report financial information."

76.     Beginning on December 3, 2007, Bergeron and Zwarenstein admitted these representations were false and that the Company's financial results in 1Q07, 2Q07 and 3Q07 would have to be restated.

77.     As shown in the following charts, VeriFone's originally reported better-than-expected results were overstated by substantial amounts.  The amounts by which the originally reported results were overstated, considered with the other facts alleged herein, raise a strong inference that Bergeron and Zwarenstein were deliberately reckless in certifying the accuracy of the Company's financial results and the effectiveness of the Company's disclosure controls and procedures:

| Corrected Consolidated Quarterly Financial Statements ($ in 000s, Except EPS) | | | | |
|---|---|---|---|---|
| **1Q07: Quarter Ended January 31, 2007** | | | | |
| | **Originally Reported on March 1, 2007** | **Restated** | **Amount Overstated** | **% Reported Amount was Overstated** |
| Net Revenues | $216,626 | $216,363 | $263 | 0.12% |
| Cost of Net Revenues | **$135,246** | **$147,740** | **($12,494)** | **-9.24%** |
| GAAP Gross Profit | $81,380 | $68,623 | $12,757 | 15.68% |
| GAAP Gross Profit % | 37.57% | 31.72% | | 15.57% |
| Pro forma Gross Profit | $102,060 | $89,597 | $12,463 | 12.21% |
| Pro forma Gross Profit % | 47.11% | 41.41% | | 12.10% |
| Pro forma Net Income | $31,151 | $26,631 | $4,520 | 14.51% |
| Pro forma EPS | **$0.37** | **$0.32** | **$0.05** | **13.51%** |
| GAAP Net Income | ($984) | ($5,679) | $4,695 | 477.13% |
| GAAP EPS | **($0.01)** | **($0.07)** | **$0.06** | **600.00%** |
| Inventories | **$130,815** | **$117,481** | **$13,334** | **10.19%** |

| 2Q07: Quarter Ended April 30, 2007 ($ in 000s, Except EPS) | | | | |
|---|---|---|---|---|
| | **Originally Reported on May 29, 2007** | **Restated** | **Amount Overstated** | **% Reported Amount was Overstated** |
| Net Revenues | $217,213 | $216,883 | $330 | 0.15% |
| Cost of Net Revenues | **$127,013** | **$139,237** | **($12,224)** | **-9.62%** |
| GAAP Gross Profit | $90,200 | $77,646 | $12,554 | 13.92% |
| GAAP Gross Profit % | 41.53% | 35.80% | | 13.79% |
| Pro forma Gross Profit | $104,382 | $91,675 | $12,707 | 12.17% |
| Pro forma Gross Profit % | 48.06% | 42.27% | | 12.04% |
| Pro forma Net Income | $32,636 | $20,422 | $12,214 | 37.43% |
| Pro forma EPS | **$0.39** | **$0.24** | **$0.15** | **38.46%** |
| GAAP Net Income | **$4,859** | **($4,818)** | **$9,677** | **199.16%** |
| GAAP EPS | **$0.06** | **($0.06)** | **$0.12** | **200.00%** |
| Inventories | **$125,390** | **$101,449** | **$23,941** | **19.09%** |

| 3Q07: Quarter Ended July 31, 2007<br>($ in 000s, Except EPS) | | | | |
|---|---|---|---|---|
| | **Originally Reported on September 6, 2007** | **Restated** | **Amount Overstated** | **% Reported Amount was Overstated** |
| Net Revenues | $231,945 | $231,701 | $244 | 0.11% |
| Cost of Net Revenues | **$129,934** | **$146,105** | **($16,171)** | **-12.45%** |
| GAAP Gross Profit | $102,011 | $85,596 | $16,415 | 16.09% |
| GAAP Gross Profit % | 43.98% | 36.94% | | 16.00% |
| Pro forma Gross Profit | $111,857 | $95,444 | $16,413 | 14.67% |
| Pro forma Gross Profit % | 48.23% | 41.19% | | 14.58% |
| Pro forma Net Income | $35,585 | ($21,697) | $57,282 | 160.97% |
| Pro forma EPS | **$0.42** | **($0.26)** | **$0.69** | **164.29%** |
| GAAP Net Income | **$13,439** | **($42,386)** | **$55,825** | **415.40%** |
| GAAP EPS | **$0.16** | **($0.51)** | **$0.67** | **418.75%** |
| Inventories | **$145,398** | **$104,784** | **$40,614** | **27.93%** |

78.     As the above illustrates, defendants' accounting violations were not limited to one or two mistakes or negligent applications of GAAP.  The misconduct caused a huge overstatement of the Company's gross margins and earnings that fundamentally altered its entire financial condition and future prospects.  In 1Q07, defendants Bergeron and Zwarenstein reviewed and issued ***EPS results that were overstated by 600%***, while simultaneously signing sworn certifications attesting that the Company's reported results "fairly present[ed]" the financial condition of the Company.  In 2Q07, EPS was ***overstated by 200%***.  In 3Q07, ***EPS was overstated by more than 400%.***

79.     Gross margins for 1Q07, 2Q07 and 3Q07 declined substantially after the restatement. Moreover, gross margins reported in 4Q07, 1Q08, 2Q08 and 3Q08 were substantially less than the false gross margins reported in 1Q07, 2Q07 and 3Q07:

| | **1Q07** | **2Q07** | **3Q07** | **4Q07** | **1Q08** | **2Q08** | **3Q08** |
|---|---|---|---|---|---|---|---|
| **GAAP Gross Margin** | 37.6%<br>31.7% (R) | 41.5%<br>35.8% (R) | 43.98%<br>36.9% (R) | 28.3% | 31% | 31.5% | 34.2% |
| **Pro Forma Gross Margin** | 47.1%<br>41.4% (R) | 48.06%<br>42.3% (R) | 48.2%<br>41.2% (R) | 32.5% | 35.7% | 34.9% | 37.6% |

80.     The magnitude and proximity of the drastic reduction in gross margins, as compared to the inflated margins represented during the Class Period, reinforces a strong inference of deliberate recklessness.

1    81.    The amount of the erroneous manual journal entries that were received and reviewed

2 by the San Jose accounting department headed up by Zwarenstein increased each quarter:

3         (a)    Inventories were overstated by $13.3 million in 1Q07, $23.9 million in 2Q07

4 and $40.6 million in 3Q07;

5         (b)    The amount of manufacturing and distribution overhead improperly recorded

6 to Lipman inventories was $7.7 million in 1Q07, $7.7 million in 2Q07 and $10.5 million in 3Q07;

7         (c)    The amount of fictitious in-transit inventory improperly recorded was $12.7

8 million in 2Q07 and $20.1 million in 3Q07; and

9         (d)    The amount of intercompany profit in inventory improperly recorded was $3.2

10 million in 1Q07, $3.9 million in 2Q07 and $6.3 million in 3Q07.

11    82.    The complete description of the accounting improprieties that caused inventories to

12 be overstated and cost of net revenues to be understated is set forth below:

13    83.    **1Q07 Inventories:** VeriFone reported that the $13.3 million reduction in inventory in

14 1Q07 included: (1) a $7.7 million decrease due to the duplicate recording of manufacturing and

15 distribution overhead to inventories at former Lipman subsidiaries; (2) a $2.2 million decrease

16 related to inventory recorded in 2Q07 for a change in inventories at former Lipman entities due to

17 standards revaluation that should have been recorded in 1Q07; (3) a $3.2 million decrease to

18 eliminate intercompany profit in inventory; and (4) a $200,000 net decrease as a result of various

19 adjustments, each individually less than $500,000.

20    84.    **1Q07 Cost of Net Revenues:** The Company also reported that the $12.5 million

21 understatement of the cost of net revenues in 1Q07 was caused by: (1) the duplicate recording of

22 $7.7 million of manufacturing and distribution overhead to inventories at former Lipman

23 subsidiaries; (2) the failure to record a $2.2 million expense to reduce Lipman inventories due to

24 standards revaluation; (3) the failure to record $900,000 of component inventory replacement costs

25 for Lipman inventory; (4) the failure to record $900,000 of costs when recording and eliminating

26 intercompany transactions; and (5) the failure to record $800,000 in other various unidentified costs.

27    85.    **2Q07 Inventories:** VeriFone reported that the $23.9 million reduction in inventory in

28 2Q07 included: (1) a $12.7 million decrease to eliminate intercompany in-transit inventory that did

1   not exist; (2) a $7.7 million decrease due to the duplicate recording of manufacturing and

2   distribution overhead to inventories at former Lipman subsidiaries; (3) a $3.9 million decrease to

3   eliminate intercompany profit in inventory; (4) a $500,000 decrease to correct errors in recording

4   and eliminating intercompany transactions; and (5) a $100,000 decrease due to various unidentified

5   adjustments.

6          86.    **2Q07 Cost of Net Revenues:** The Company also reported that the $12.5 million

7   understatement of the cost of net revenues in 2Q07 was caused by: (1) the failure to record a $11.5

8   million expense to eliminate in-transit inventory that did not exist; (2) the failure to record a $3.5

9   million expense to eliminate intercompany profit in inventory; (3) the failure to record $800,000 of

10  overhead expenses that were improperly capitalized to inventory; (4) the improper recording of $2.2

11  million of expenses to reduce inventory that should have been recorded in 1Q07; and (5) the failure

12  to record $500,000 in other various unidentified costs.

13         87.    **3Q07 Inventories:** VeriFone reported that the $40.6 million reduction in inventory in

14  3Q07 included: (1) a $20.1 million decrease to eliminate intercompany in-transit inventory that did

15  not exist; (2) a $10.5 million decrease due to the duplicate recording of manufacturing and

16  distribution overhead to inventories at former Lipman subsidiaries; (3) a $6.3 million decrease to

17  eliminate intercompany profit in inventory; (4) a $2.4 million decrease to correct errors in the

18  capitalization of overhead; (5) a $600,000 decrease to correct errors in excess and obsolete

19  inventory; (6) a $1.1 million decrease to correct errors in recording and eliminating intercompany

20  transactions; and (5) a $400,000 net increase due to various unidentified adjustments.

21         88.    **3Q07 Cost of Net Revenues:** The Company also reported that the $16.2 million

22  understatement of the cost of net revenues in 3Q07 was caused by: (1) the failure to record a $8.4

23  million expense to eliminate in-transit inventory that did not exist; (2) the failure to record a $2.8

24  million expense due to the duplicate recording of manufacturing and distribution overhead to

25  inventories at former Lipman subsidiaries; (3) the failure to record a $2.4 million expense to

26  eliminate intercompany profit in inventory; (4) the failure to record $2.1 million of overhead

27  expenses that were improperly capitalized to inventory; (5) the failure to record $600,000 of

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                                          - 29 -

1  expenses to write down excess and obsolete inventory; and (6) the failure to record $100,000 in other

2  various unidentified costs.

3        89.    As detailed in §IX., the restatements are admissions that the financial statements

4  originally issued were materially false and misleading and not prepared in accordance with GAAP.

5  The magnitude and materiality of the restatements are evidence that Bergeron and Zwarenstein were

6  deliberately reckless in representing VeriFone's financial results were fairly presented in all material

7  respects and that the Company's disclosure controls and procedures were effective.

8            **2.**     **The Company's Explanations for the Restatement and**
                  **Information Provided by Former VeriFone Accounting**

9                   **Employees Raise a Strong Inference that Bergeron and**
                  **Zwarenstein Knew About the Erroneous Manual Journal**

10                   **Entries and Other Internal Control Deficiencies that Caused**
                  **the Restatement**

11

12        90.    Information provided by former VeriFone accounting employees who worked in the

13  Company's Rocklin, California facility and the San Jose accounting department headed up by

14  Zwarenstein, and the Company's explanation for the restatement establish that Bergeron and

15  Zwarenstein knew the erroneous manual journal entries were received and reviewed by the San Jose

16  accounting department run by Zwarenstein and that there were numerous problems with the

17  accounting department that contributed to the restatement.

18        91.    VeriFone initially disclosed the restatement in a press release and during a conference

19  call on December 3, 2007 and provided additional information in the Company's April 1, 2008 press

20  release and in the amended SEC reports filed on August 19, 2008.  VeriFone disclosed that the

21  restatement was required because of erroneous manual journal entries made by the Company's

22  supply-chain accounting organization that caused VeriFone to overstate inventories and understate

23  the cost of net revenues by tens of millions of dollars.  On December 3, 2007, Bergeron stated the

24  manual journal entries were required because VeriFone's Oracle ERP system was not configured to

25  automatically account for these critical financial statement accounts.  Specifically, the supply-chain

26  management team:

27

28

1

2

3
- • improperly recorded millions of dollars of intercompany in-transit inventory that did not exist by making identical manual journal entries for both in-transit inventories and direct shipments when the manual entries should not have been made for the direct shipments;[5]

4

5
- • improperly double booked millions of dollars of manufacturing and distribution overhead costs to inventory at former Lipman subsidiaries by making identical manual journal entries for in-transit inventories and direct shipments when the entries should not have been made for the direct shipments; and

6

7
- • improperly failed to eliminate millions of dollars in intercompany profit in inventory acquired by one VeriFone entity from another VeriFone entity that should have been eliminated upon consolidation.

8      92.    Information provided by several former VeriFone accounting employees with direct

9  knowledge of the problems that led to the restatement establish that Bergeron and Zwarenstein knew

10  the erroneous manual journal entries were received and reviewed by the San Jose accounting

11  department headed up by Zwarenstein, that Zwarenstein participated in monthly teleconferences

12  with the personnel who prepared and submitted the journal entries, and that Bergeron and

13  Zwarenstein knew there were numerous problems with VeriFone's accounting department that led to

14  the accounting improprieties.

15      93.    CW1 and CW2 stated that the Company's San Jose accounting department handled

16  consolidated accounting and general ledger closing procedures.  CW1 and CW2 said VeriFone

17  created a Consolidations Group in late 2006 that was tasked with consolidating the accounting data

18  from Lipman's financial system to VeriFone's financial system.  According to CW1 and CW2, the

19  San Jose accounting department was headed up by Zwarenstein.  CW1 and CW2 reported to the

20  Company's Controller for North America, and both stated that was initially Gil Lacuna.  CW1 and

21  CW2 said Lacuna was replaced by John Marsh in August 2006.  Marsh was replaced by Selena

22  Miller, who was replaced by Mike Dowd, who was replaced by Rosalie Aducci.  The Company's

23  Controller for North America reported to Corporate Controller Laura Merkl, who reported to

24  Zwarenstein.

25  _____

26  [5]    According to the Company, intercompany in-transit inventory was inventory that was in the

27  process of being shipped between VeriFone entities, primarily from either Israel or Singapore to the United States.

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

94.     According to CW1, CW2 and CW9, Paul Periolat was the controller at the Rocklin facility who was responsible for initially posting the erroneous manual journal entries that led to the restatement.   CW1, CW2 and CW9 said Periolat was responsible for reviewing all accounting procedures and activities for supply-chain operations in North America.   That included assigning and approving valuations for VeriFone inventory, which, in turn, included assigning manufacturing and distribution overhead costs to the inventory.   CW1 and CW 9 said Periolat made the journal entries directly into VeriFone's Oracle general ledger system for Lipman inventory because the two companies had different Oracle general ledger systems.   Lipman was using the Oracle 11i system, and VeriFone was using the Oracle 10.7 system.   VeriFone was in the process of upgrading to 11i, but the upgrade was not completed until November 2007.

95.     According to CW9, the journal entries for the Lipman inventory and cost of net sales were prepared, reviewed and approved by Periolat, then entered onto Excel spreadsheets, and then posted to the 10.7 general ledger accounting system.   CW9 said hard copies of the journal entries and Excel spreadsheets were kept on file for audit purposes and were reviewed by the Company's internal auditors.   CW9 also said that once the entries were posted to the Oracle 10.7 general ledger accounting system, they were reviewed by various accounting personnel in San Jose.   As part of the monthly and quarterly closing process, CW1 reviewed VeriFone's Oracle 10.7 general ledger system to make sure Periolat had input the manual journal entries and informed Corporate Controller Merkl that the entries had been made.   CW1 said that Merkl would then review the actual entries.

96.     According to CW9, the erroneous manual journal entries were the result of the companies using different Oracle ERP general ledger systems.   In fact, CW9 said the Lipman acquisition, the fact that the two companies used different Oracle ERP general ledger systems, and problems with the conversion from 10.7 to 11i by VeriFone overwhelmed the Company.

97.     CW1, CW2 and CW9 also said they attended monthly balance sheet review meetings that were also attended by Zwarenstein, Merkl and other accounting personnel.   According to CW9, personnel from the Rocklin facility, including CW9, Periolat and others, participated in monthly financial statement review teleconferences with Zwarenstein, Merkl and Gilford.   CW9 said that

1   during these meetings, Rocklin's reported financial results – which would have included the

2   overstated Lipman's inventory and understated Lipman's cost of net revenues – were discussed.

3         98.     Thus, the erroneous manual journal entries that were posted to VeriFone's Oracle

4   10.7 general ledger system and caused the Company to report materially false and misleading

5   financial results were received and reviewed by Merkl, Zwarenstein's direct report, and the financial

6   results of the Rocklin facility which included the false financial results were discussed with

7   Zwarenstein during monthly meetings.  CW1, CW2 and CW9 believed that Periolat was terminated

8   due to the inventory issues that led to the restatement.

9         99.     In the Company's Proxy Statement filed on Form 14-A with the SEC on September 8,

10  2008, it was reported that Zwarenstein's salary was increased in 2007 because of "***his work in

11  building out [the Company's] financial and accounting infrastructure***" and his instrumental efforts

12  towards the successful completion of the Lipman acquisition.  Several former VeriFone accounting

13  employees stated that the San Jose accounting department headed up by Zwarenstein was

14  disorganized, understaffed, plagued by high turnover and in a general state of disarray.  CW1 and

15  CW2 said it was very difficult to work for Merkl because she constantly made unrealistic demands

16  on her subordinates and constantly changed the directives she had previously given to them.  CW1

17  said Merkl's management style and directives compromised VeriFone's accounting operations as a

18  whole.  CW2 said Merkl's constant changing of the directives she assigned to the accounting group

19  led to inefficiencies.  CW2 said accounting personnel were often told to work on "special projects"

20  ordered by Zwarenstein that caused customary accounting duties such as reviewing journal entries

21  and conducting reconciliations to be compromised.

22        100.    The problems were magnified at the end of the month and quarter because, as CW2

23  stated, there was a significant increase in the work for the accounting department at the end of each

24  month and especially at the end of each quarter.  CW2 said some of the increased workload was

25  caused by VeriFone's increased efforts at the end of a reporting period to send out as many products

26  as possible so the Company would meet or exceed its financial forecasts.  The Company disclosed in

27  its SEC reports that quarterly revenues were "back end loaded" because "sales orders are received

28  and revenue recognized disproportionately towards the end of each fiscal quarter."  CW2 said this

1    resulted in accounting personnel having to work very long hours, including working until midnight

2    at the end of every quarter.  CW2 described the work environment in San Jose as extremely chaotic,

3    where everyone was running around like chickens with their heads cut off.  CW2 said various

4    personnel expressed their frustrations and concerns about the intense work conditions to Merkl but

5    also said Merkl never took steps to modify and improve working conditions.

6        101.    CW5 also stated that VeriFone was chronically understaffed and that it resulted in

7    VeriFone's constantly reacting to problems that often arose because of the understaffing, as opposed

8    to being proactive and preventing problems from occurring in the first place.  CW5 had decreasing

9    confidence in VeriFone's senior management, was not proud of the direction taken by the Company

10   and stated that employee morale was extremely low for more than a year before CW5 resigned in

11   December 2007.

12       102.    CW1 and CW2 stated many employees resigned because they were dissatisfied with

13   Merkl, the heavy workload, the changing directives and overall inefficiencies in the accounting

14   department.  In fact, that is why CW1 and CW2 resigned.  CW2 said the Consolidations Group

15   experienced a very high rate of attrition that severely impacted the efforts to properly consolidate

16   and reconcile Lipman's financial records.  CW2 also said the Consolidations Group was often unable

17   to locate or reconcile Lipman's financial data and documents.  CW2 said that Lipman personnel did

18   not provide needed information to close the books at the end of the quarter on a timely basis, which

19   caused VeriFone personnel in San Jose to rush their reconciliation of the information and the closing

20   of the Company's books.  CW2 said CW1 and North American Controller Dowd were very

21   frustrated by these issues because they were responsible for integrating the Lipman financial data.

22   Indeed, when asked how VeriFone could report its consolidated results given the problems, CW2

23   stated, "I have no idea, but that's the million dollar question."

24       103.    The general state of disarray in the finance and accounting department was also

25   confirmed by CW8, who was hired as a contractor and assistant controller in August 2007 to rebuild

26   the finance and accounting department.  CW8 said the rebuilding required CW8 to staff a large

27   number of vacant positions and hire full-time employees to replace consultants.  But CW8 said that it

28   was difficult to hire accounting and finance employees because recruiters told CW8 that VeriFone

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP

1  had a poor reputation among finance and accounting personnel as well as recruiters because there

2  was so much turnover.  CW8 left VeriFone after a few weeks because of the inability to fill the

3  positions.

4        104.    As detailed in §V.D.4., after the Class Period, VeriFone admitted the Company's

5  financial reporting controls were deficient and that it did not have qualified accounting personnel

6  during the Class Period.

7           **3.**      **Former VeriFone Employees Said There Were Problems**
                     **Obtaining Accurate Financial Data from Lipman Because**

8                       **VeriFone and Lipman Used Different Oracle ERP Systems**

9        105.    As noted above, Bergeron and Zwarenstein knew Periolat submitted Lipman

10  inventory data to the San Jose accounting department by posting manual journal entries to

11  VeriFone's Oracle 10.7 ERP system because VeriFone's 10.7 system was not configured to

12  automatically retrieve this information from Lipman's 11i system.  Other former employees of

13  VeriFone and Lipman confirmed there were problems retrieving accurate financial data from

14  Lipman's 11i system because the two companies utilized different versions of Oracle ERP system.

15        106.    CW4 and CW5 said VeriFone was in the process of converting from the 10.7 system

16  to the 11i system in 2006 and 2007 because Lipman was using 11i.  CW1 and CW2 stated the

17  conversion was extremely problematic for a number of reasons.  CW1 and CW2 both stated that the

18  integration of Lipman, the high attrition rate and chaotic atmosphere in the accounting group

19  negatively impacted overall productivity and delayed and impaired the implementation process.

20  CW5 said the conversion to 11i was not completed until November 2007.  Although not involved,

21  CW9 was aware of problems with the implementation of Oracle 11i and said those problems,

22  combined with the additional work created by the Lipman acquisition, overwhelmed the Company.

23        107.    CW4 was the project manager for the implementation of 11i since September 2006

24  and said the upgrade from 10.7 to 11i was initiated in conjunction with the acquisition of Lipman

25  because Lipman was already using the 11i platform.  CW4 said the plan to complete the

26  implementation in less than 18 months was very aggressive and that there were many problems and

27  challenges.

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP

108.     The delay in converting VeriFone's 10.7 system to an 11i system until November 2007 and the inability to automatically transfer Lipman financial information on the 11i system to VeriFone's 10.7 system created problems, including the need for Periolat to post manual journal entries for Lipman inventory data to the 10.7 system.   Other employees explained additional problems.

109.     CW3 was the controller at Lipman's Syosset distribution center from February 2006 until February 2007 when CW3 was laid off after the Syosset distribution center was closed.   CW3 was responsible for all of Lipman's major accounting functions in North America.   According to CW3, the Syosset distribution center began winding down its operations after the Lipman acquisition was completed in November 2006 and shipped all its inventory to VeriFone's facility in Alpharetta, Georgia. CW3 said this process was completed in February 2007.

110.     Like other witnesses, CW3 said that Lipman utilized the Oracle 11i ERP system and VeriFone used the Oracle 10.7 ERP system.   CW3 said there were problems transmitting accurate Lipman financial data to accounting personnel in San Jose because the two systems were not interlinked.   Because the systems were not interlinked, CW3 e-mailed financial reports on Excel spreadsheets to personnel in VeriFone's San Jose headquarters.

111.     Approximately one or two weeks before the close of a month or quarter, VeriFone personnel in San Jose e-mailed CW3 an Excel spreadsheet containing various fields for CW3 to input Lipman's North American financial information.   The spreadsheet included "macros" which performed various calculations to assist VeriFone personnel when they consolidated the financial data into VeriFone's comprehensive financial reports.   CW3 would download data from Lipman's 11i system into the Excel spreadsheet but said VeriFone had substantial difficulty "merging" the information into the Company's consolidated financial reports.   According to CW3, the totals in the VeriFone Excel spreadsheet were not balancing with the financial information in VeriFone's San Jose headquarters because the "macros" included in the spreadsheet were incorrect and did not allow the spreadsheet to properly "roll up" into VeriFone's consolidated financial reports.

112.     On several occasions CW3 was directed by accounting personnel in San Jose to change the macros so the Excel spreadsheets would include proper balances thereby allowing the

1   figures in the spreadsheet to properly rollup into VeriFone's consolidated financial reports.

2   Zwarenstein knew about this problem because he called CW3 at home on a Friday and directed CW3

3   to go back to the Syosset distribution center to adjust the macros in the Excel spreadsheet and then

4   resubmit the spreadsheet.  CW3 said Zwarenstein needed the corrected information for an earnings

5   conference call the following week.

6          113.   CW10, the former Vice President of Operations at Lipman's Syosset facility, was also

7   aware of the difficulties converting the accounting for the Syosset operations over to VeriFone

8   caused by the companies' use of different Oracle ERP general ledger accounting systems.  CW10

9   said another factor contributing to the problem was the fact that Lipman and VeriFone had different

10  fiscal years.  VeriFone's fiscal year ended on October 31, and Lipman's fiscal year ended on

11  December 31.

12         114.   CW10 also said the Syosset facility was holding excess and obsolete inventory when

13  the acquisition closed on November 1, 2006 because a customer had cancelled an order for Lipman's

14  Nurit 20-55 terminals.  According to CW10, Lipman was unable to sell the terminals after the

15  cancellation by the customer and understood that VeriFone did not plan to include the Nurit 20-55

16  model in its product suite.  CW10 said that VeriFone personnel at the Syosset facility, including

17  Mark Norman and Patrick McGivern, knew about the excess and obsolete inventory.  The VeriFone

18  restatement included a $600,000 adjustment to correct errors for excess and obsolete inventory.

19         115.   CW5 explained that the Oracle 10.7 ERP system included all transactional data

20  related to VeriFone's various business operations, including accounting, finance, sales and

21  inventories.  CW5 said Sivar Saravanan was responsible for handling inventory data in the Oracle

22  10.7 system and that reports were generated from the 10.7 system.  CW5 said VeriFone input a wide

23  variety of the transactional data from the Oracle 10.7 ERP system to a data warehouse because the

24  data warehouse offered superior reporting functions.  CW5 said the data warehouse stored sales,

25  invoicing, ordering, revenue – including sales identified by customer and region – and other data

26  which allowed various reports to be generated.  Tano, CW5's boss, was responsible for creating

27  reports from the data warehouse and directed CW5 to input data needed to prepare the reports.

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                                                    - 37 -

116.    Lipman data could not be automatically transferred to the data warehouse because the data could not be automatically transferred from Lipman's 11i system to VeriFone's 10.7 system. Instead, CW5 received the data from the individual controllers responsible for Lipman's myriad of business segments. According to CW5, some Lipman operations, including facilities in New York and the United Kingdom, were shut down, which required the data to be transferred to VeriFone's 10.7 system.

117.    Like CW3, CW5 said transferring data from 11i to 10.7 involved major challenges in "data mapping" that could have caused significant problems. CW6 knew of one such problem even though CW6 only worked at VeriFone for a few weeks in April or May 2007. CW6 said a great deal of accounts receivable data from Lipman was lost when it was transferred to VeriFone because the data was not properly mapped before being transferred from Lipman's 11i system to VeriFone's 10.7 system. Specifically, CW6 said that VeriFone could not identify the customers associated with hundreds of Lipman's receivables that were transferred to VeriFone's system, and it was CW6's job to determine the customers for the receivables.

118.    The above facts establish that Bergeron and Zwarenstein knew there were many problems obtaining accurate financial information from Lipman throughout 2007 because the companies were using different versions of the Oracle ERP system and had different fiscal years. Nevertheless, they recklessly caused VeriFone to report materially false and misleading financial results, including gross margins in 1Q07, 2Q07 and 3Q07 that were higher than the gross margins reported in 2006 despite the fact that the Company's lower-margin international sales had doubled.

**4.    The Termination of Zwarenstein and VeriFone's Admission that There Were Material Weaknesses with the Company's Internal Controls over Financial Reporting Strengthens the Inference Bergeron and Zwarenstein Knew the Company's Financial Results Were False**

119.    On April 1, 2008, the Company issued a press release announcing the "resignation" of Zwarenstein and that it was removing Bergeron as Chairman. However, in the Company's Proxy Statement filed with the SEC on September 10, 2008, it was reported that Zwarenstein was actually "terminated." Moreover, it was reported that the separation agreement between VeriFone and

1  Zwarenstein required Zwarenstein to reimburse the Company $150,000 of bonuses that he was paid

2  in 2007 because the Company's restated results did not achieve the quarterly bonus targets.

3          120.    On April 1, 2008, the Company also announced that it had terminated the Company's

4  supply-chain controller but did not disclose the name of that individual.  As noted above, CW1,

5  CW2 and CW9 stated that Paul Periolat was the supply-chain controller who submitted the

6  erroneous journal entries to the San Jose accounting department and that they believed he was fired.

7          121.    In the April 1, 2008 press release and the Reports on Forms 10-Q and 10-K filed with

8  the SEC on August 19, 2008, VeriFone acknowledged that there were numerous material

9  weaknesses in VeriFone's internal control over financial reporting throughout 2007 – which was

10  contrary to their repeated representations during the Class Period that the Company's disclosure

11  controls and procedures were effective – and that management had taken, and would continue to

12  take, steps to remediate each of the material weaknesses.  In the April 1, 2008 press release, the

13  Company reported that "***management has concluded that VeriFone did not maintain effective***

14  ***internal control over financial reporting***" and that a number of remedial measures had been taken,

15  including:

16          •       Implementation of a more stringent voucher approval process for manual journal
                   entries;
17

18          •       Implementation of enhanced information technology/enterprise resource planning
                   systems commensurate with the increased size and complexity of VeriFone's
19                 businesses;

20          •       Adding appropriate accounting and finance resources through additional centralized
                   staffing with individuals having sufficient knowledge and experience in cost
21                 accounting and other GAAP principles;

22          •       Enhanced segregation of duties between the financial planning and accounting and
                   control functions;
23
            •       Improvements in governance and compliance functions to improve control
24                 consciousness and appropriate adherence to [GAAP], as well as improved tone,
                   communication, documentation, education and training for employees involved in
25                 the financial reporting process, including the appointment of a chief legal and
                   compliance officer; and
26
            •       Personnel actions, including the termination of the Company's supply-chain
27                 controller, enhanced supervision and other actions.

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                                        - 39 -

122.     The Company also disclosed that the results of the Audit Committee's investigation had been shared with the SEC and that the SEC asked VeriFone to produce documents and was interested in interviewing several current and former VeriFone officers and employees.  During VeriFone's August 19, 2008 conference call, Bergeron stated the SEC was still investigating.

123.     VeriFone disclosed additional material weaknesses in its SEC reports filed on August 19, 2008, including:

- *A transaction-level material weakness in the design and operation of control activities relating to the preparation, review, approval and entry of manual, non-standard journal entries* . . . ;

- *An entity-level material weakness in the control environment related to our period-end financial reporting process due to an insufficient number of qualified personnel* with the required proficiency to apply our accounting policies in accordance with U.S. GAAP following the November 1, 2006 acquisition of Lipman . . . ;

- *An entity-level material weakness in control activities related to the design and operation of our supervision, monitoring, and monthly financial statement review processes* . . . ;

- A transaction-level material weakness in the design and operating effectiveness of controls related to income taxes.  Specifically, processes and procedures were not designed to provide for adequate and timely identification, documentation and review of various income tax calculations, reconciliations and related supporting documentation required to apply [VeriFone's] accounting policy for income taxes in accordance with U.S. GAAP, particularly following the November 1, 2006 acquisition of Lipman . . . .

124.     VeriFone reported that these control deficiencies gave rise to the required restatements of VeriFone's interim consolidated financial statements for the first three quarters of FY07 and that they could result in additional misstatements in the aforementioned accounts that might result in a material misstatement to VeriFone's interim or annual consolidated financial statements that might not be prevented or detected.

125.     VeriFone also reported that it planned to continue the efforts already underway to review and make necessary changes to improve the Company's internal control over financial reporting, including:

- an enhanced manual journal entry policy, including a more stringent manual journal entry review and approval process that requires tiered approval levels in which escalating dollar amounts require additional approval by increasingly more senior personnel;

1      • the migration to a new worldwide, integrated, ERP system. The new ERP system is
2         our principal computing platform and provides for a single unified chart of accounts
          worldwide. This system was activated for the majority of [VeriFone's] worldwide
          operations in the first fiscal quarter of 2008 and by the end of the second fiscal
3         quarter of 2008 over 90% of [VeriFone's] consolidated net revenues and cost of net
          revenues were processed on this system;

4
       • *the addition of qualified accounting and finance personnel* having sufficient
5         knowledge and experience in general accepted accounting principles, cost
          accounting, tax, and management of financial systems;

6
       • *enhancing the Company's review process over the monthly financial results by*
7         *requiring additional documentation and analysis to be provided that will then be*
          *reviewed by appropriate key senior personnel from both finance and non-finance*
8         *areas*;

9      • enhancing the segregation of duties between the financial planning and the
          accounting and control functions; and
10
       • enhancing the Company's governance and compliance functions to improve control
11        consciousness and prevention of errors in financial reporting, as well as to improve
          tone, communication, education, and training for employees involved in the financial
12        reporting process, including the appointment of a chief legal and compliance officer.

13        126.    These admissions were made after Zwarenstein's salary was actually increased in

14  2007 because of his purported work in "*building out VeriFone's financial and accounting*

15  *infrastructure*." Moreover, the admissions were made after Bergeron and Zwarenstein repeatedly

16  certified, under oath, in SEC filings on March 9, 2007, May 31, 2007 and September 6, 2007, that

17  they had personally "evaluated" the Company's internal controls, certified the financial results and

18  that the controls were sufficient to detect improprieties to ensure that VeriFone's financial results

19  were fairly presented and complied with GAAP. As noted above, several witnesses stated that

20  Zwarenstein was personally involved in adjusting Lipman financial information, knew Lipman

21  financial information was inaccurate and that he presided over the San Jose accounting department

22  that was disorganized, understaffed, plagued by high turnover and in a general state of disarray.

23        127.    The termination of Zwarenstein, the requirement that he pay back the improper bonus

24  payments received in 2007, the admission that VeriFone did not maintain effective internal controls

25  over financial reporting, the witness accounts about the chaotic state of the San Jose accounting

26  department, the fact that the erroneous manual journal entries were received and reviewed by the San

27  Jose accounting department, the fact that Bergeron and Zwarenstein certified as accurate the false

28  financial results reported by VeriFone in 1Q07, 2Q07 and 3Q07 before the restatement and the fact

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                                      - 41 -

1    that Zwarenstein was the senior most financial officer at the Company all show that he knew or was

2    deliberately reckless in not knowing that VeriFone's financial results were false and that its

3    disclosure controls and procedures were ineffective.

4              **5.      Bergeron and Zwarenstein Concealed the Problems with the
                         Company's Financial Reporting Controls, Knew VeriFone
5                        Was Reporting False Financial Results and Took Credit for
                         Them**

6

7    128.    As detailed above, Bergeron and Zwarenstein knew about the problems with the

     Company's financial reporting controls described by the witnesses and acknowledged by VeriFone
8
     when the restatement was announced.  As detailed in §V.A.-C., they also knew that before the Class
9
     Period there were concerns about VeriFone's ability to report increased gross margins and earnings
10
     because just about all of Lipman's sales were lower-margin international sales, Lipman's gross
11
     margins and operating margins had been declining for years and Lipman and VeriFone were
12
     expected to lose some sales as a result of the acquisition.
13

14   129.    In 1Q07, 2Q07 and 3Q07, VeriFone reported increases in pro forma gross margins

15   and appeared to be on track to exceed the pro forma EPS guidance of $1.40-$1.42 they told investors

16   to expect.  The Wall Street analysts that followed the Company reported VeriFone's gross margins

     were "***better-than-expected***" given the inclusion of the lower-margin Lipman sales but and attributed
17
     them to Bergeron and Zwarenstein's explanations, *i.e.*, "lower than expected integration costs related
18
     to the Lipman acquisition," "best-in-class supply chain management" and "overhead expense
19
     controls."
20

21   130.    After VeriFone reported 1Q07 results on March 1, 2007, several analysts noted their

     surprise at the reported margins given the inclusion of the lower-margin Lipman sales:
22

23        •    Credit Suisse analyst Bartolai issued a report on March 2, 2007, in which he
               reported: "***PAY generated solid margin expansion despite strong international
24             growth (lower margin), as the company is already beginning to see leverage
               benefits from the LPMA deal. . . .  The gross margin expansion was impressive
25             given the strong int'l growth and the inclusion of the lower-margin LPMA
               business***. . . .  Adjusted gross margin increased 154 basis points from last year and
26             was 132 basis points ahead of our model."  (Emphasis in original.)

27        •    Morgan Keegan & Co. ("Morgan Keegan") analyst Robert J. Dodd ("Dodd") issued
               a report on March 2, 2007 and wrote: "***Gross margin*** (ex. intangible amortization)
28             ***was 47.1%*** in the quarter, up from 45.6% in Q1:06 and ***well ahead of our 44.5%
               estimate***. . . ."

- In his March 2, 2007 report, SunTrust analyst Jeffrey wrote: "Gross margin expanded again in the quarter, from 45.5% in 1Q06 to 47.1% in 1Q07. ***This is particularly notable, in our opinion, as Lipman's historic gross margin was significantly lower than VeriFone's*** . . . . We believe gross margin is the most important measure of VeriFone's operating efficiency, particularly in the context of ongoing market share gains. In other words, we believe the company is gaining share through superior product and service, rather than buying it."

- In a follow-up report on March 20, 2007, Jeffrey wrote that ***VeriFone "enjoys roughly a 1,000 basis point gross margin advantage, compared with its primary competitors, Hypercom and Ingenico."***

131. Analysts issued similar reports after VeriFone reported 2Q07 results on May 29, 2007. Although the Company reported disappointing revenues for the quarter, the analysts reported that earnings exceeded expectations due to "better than expected gross margins" caused by "best-in-class supply chain management" and "lower than expected integration expenses related to the Lipman acquisition."

- In a May 29, 2007 report, Credit Suisse analyst Bartolai wrote that VeriFone's 2Q07 adjusted EPS of $0.39 was $0.03 ahead of his model and that "***continued strong gross margins drove the upside to our estimate***." He also wrote that ***the 48.1% gross margin was "96bps ahead of our model."*** (Emphasis in original.)

- In a May 30, 2007 report, SunTrust analyst Jeffrey wrote: "***VeriFone continues improving its superior gross margin. 2Q07 gross margin was an impressive 48.1%, up 100 basis points, sequentially, and 250 basis points year-over-year***. . . . We submit that ***the company's superior profitability is a reflection of leading technology and best-in-class supply chain management***."

- Wachovia Capital Markets, LLC ("Wachovia") analyst Daniel R. Perlin ("Perlin") issued a report on May 30, 2007 and wrote that 2Q07 EPS of $0.39 was $0.02 above Wachovia's estimate and that the $0.02 upside "was ***primarily due to better than expected gross margin*** in system solution of 40.5% vs. our 36.5% estimate. . . . ***We attribute the higher than expected gross margin to lower than expected integration expenses related to the Lipman acquisition*** and higher profitability from the company's wireless product in North America."

- Morgan Keegan analyst Dodd wrote in a May 30, 2007 report that ***2Q07 earnings were "ahead of our expectations from stronger gross margins."***

132. After VeriFone reported 3Q07 results on September 6, 2007, analysts reported that earnings exceeded their estimates due to "better than expected adjusted gross margins" caused by "lower than expected integration expenses related to the Lipman acquisition" and "overhead expense controls":

- Wachovia analyst Perlin issued a report on September 6, 2007 and wrote that 3Q07 EPS of $0.42 was $0.02 above Wachovia's estimate and Street consensus "***primarily due to better than expected adjusted gross margin of 48.2%*** vs. our estimate of

47.3% . . . .  **We attribute the higher than expected gross margin to lower than expected integration expenses related to the Lipman acquisition** and higher profitability from the company's wireless product. . . .  Adjusted **gross margins remained at record levels coming in at 48.2%, 90 bps above are [sic] estimate**."

- Morgan Keegan analyst Dodd issued a report on September 7, 2007 and wrote that "overall, the 3Q:07 results showed solid revenue growth . . . along with **continued gross margin improvements and overhead expense controls**."

- Credit Suisse analyst Bartolai issued a report on September 7, 2007 and wrote that the 3Q07 EPS of $0.42 was $0.02 above consensus and $0.03 above his model and that "*[t]he upside was driven by* solid growth in both Domestic and International with **continued margin improvements**."  He added that "**adjusted gross margins were 20 bps ahead of our model, increasing 234 basis points YTY to 48.2%. . . . PAY once again generated solid margin expansion**, with improvements in both gross margin and operating expenses."  (Emphasis in original.)

133.    After the Class Period, VeriFone admitted that, without the benefit of fraudulent accounting manipulations, its true pro forma gross margins were substantially lower than the false pro forma gross margins reported in 1Q07, 2Q07 and 3Q07.  VeriFone reported a pro forma gross margin of 32.5% in 4Q07, 35.7% in 1Q08, 34.9% in 2Q08 and 37.6% in 3Q08.  These facts demonstrate the magnitude and impact of defendants' accounting fraud.  The fraud changed their entire business.

134.    Moreover, after the Class Period, Bergeron acknowledged that he knew VeriFone would not be able to report increasing pro forma gross margins once Lipman's lower-margin sales were included in the Company's consolidated results.  During VeriFone's August 19, 2008 conference call, Bergeron stated that 45% pro forma gross margins were "very doable" **before** the Lipman acquisition when 60% of the Company's sales were in the U.S.  But he said VeriFone would not even report 40% pro forma gross margins for five or six quarters or until the end of FY09 because after the Lipman acquisition, approximately 60% of the Company's revenues were international revenues.

135.    In short, Bergeron and Zwarenstein concealed the problems with VeriFone's financial reporting controls, particularly the problems getting accurate Lipman financial information and the flawed process of preparing manual journal entries for Lipman inventory and cost of net sales, took credit for the severely false financial results reported by VeriFone in 1Q07, 2Q07 and 3Q07, told investors they were fairly presented in all material respects and assured investors they had a

1   legitimate basis for making these statements because they had evaluated the Company's disclosure

2   controls and procedures and concluded they were effective.

3           **6.      Bergeron, Zwarenstein, Atkinson and Brody Suspiciously Sold
                       More than $443 Million of Their VeriFone Stock While
4                      Concealing the Financial Reporting Control Problems and
                       Falsely Representing VeriFone's Better-than-Expected Results
5                      Were Fairly Presented**

6           136.    While Bergeron and Zwarenstein concealed the financial reporting control problems

7   and falsely represented VeriFone's better-than-expected financial results were fairly presented, they

8   and the other defendants suspiciously sold millions of their VeriFone shares for proceeds of over

9   *$443 million*.  The sales are illustrated in the following chart:

| Date Range | Insider | Shares Sold | Proceeds | Percentage of Shares Sold |
|---|---|---|---|---|
| August 31, 2006-<br>March 1, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 823,040<br>24,000<br>64,671<br>3,000,000 | $27,283,433<br>$745,768<br>$2,305,031<br>$107,340,000 | – |
| March 2, 2007-<br>May 29, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson | 320,222<br>26,585<br>14,742 | $11,905,070<br>$976,867<br>$537,635 | – |
| June 1, 2007-<br>September 6, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 390,400<br>38,000<br>32,375<br>3,500,000 | $13,932,888<br>$1,341,672<br>$1,123,825<br>$123,795,000 | – |
| September 7, 2007-<br>December 3, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 492,600<br>54,000<br>26,400<br>3,300,000 | $21,655,248<br>$2,319,275<br>$1,134,079<br>$127,413,000 | – |
| **Subtotal** | **1. Bergeron**<br>**2. Zwarenstein**<br>**3. Atkinson**<br>**4. Bondy** | **2,026,262**<br>**142,585**<br>**138,188**<br>**9,800,000** | **$74,776,639**<br>**$5,383,582**<br>**$5,100,570**<br>**$358,548,000** | **57.20%**<br>**96.51%**<br>**96.51%**<br>**50.36%** |
| **Grand Total** | **–** | **12,107,035** | **$443,808,791** | **–** |

137.    As illustrated above, the timing, amount, and percentage of the insider selling is

highly suspicious and supports a strong inference of scienter.  Each of the inside sellers is set forth

below:

**Defendant CEO/Chairman Bergeron:**

1       138.    During the Class Period, Bergeron sold over two million shares, or over **54%**, of his total holdings of VeriFone stock for proceeds of **$74.7 million**.  Notably, $47.4 million of Bergeron's sales occurred **after** March 1, 2007, the date on which VeriFone first announced its false financial results for 1Q07, the first restated quarter.  Of that amount, Bergeron sold $21.6 million **after** VeriFone announced its 3Q07 results on September 6, 2007.  Bergeron continued selling shares as late as November 26, 2007, only one week before defendants disclosed the restatement that caused VeriFone's stock price to plummet 46% in a single day.

        139.    The suspicious timing and amount of Bergeron's massive stock sales strengthen the inference he knew VeriFone's better-than-expected financial results were not fairly presented and that the Company's disclosure controls and procedures were not effective.  Indeed, the sales explain why Bergeron concealed the false earnings, gross margins, and problems with the Company's financial reporting controls – when some of the problems were initially (but incompletely) disclosed on December 3, 2007, VeriFone's stock price declined 46% to $22.00 per share in a single day.  Bergeron sold his two million shares for prices as high as $46.00 per share.

**Defendant CFO Zwarenstein:**

        140.    During the Class Period, Zwarenstein sold 142,584 shares of his VeriFone stock for proceeds of **$5.38 million**.  Zwarenstein's sales constituted **98%** of his total shares and **44.4%** of his combined shares and vested options.  Notably, hundreds of thousands of shares that Zwarenstein sold for prices as high as $46.00 per share were acquired through stock options at prices as low as **$3.28** per share.

        141.    Zwarenstein sold $4.63 million in stock **after** VeriFone released its false financial results for 1Q07 on March 1, 2007 and **after** Zwarenstein certified VeriFone's financial results and represented that they were fairly presented in all material respects and that the Company's disclosure controls and procedures were effective.  Further, Zwarenstein sold $2.32 million of his VeriFone shares **after** he certified VeriFone's false 3Q07 results on September 6, 2007, the quarter in which earnings were overstated by 600%.  Zwarenstein continued selling shares up until November 13, 2007, just three weeks before VeriFone's stock dropped 46% in one day on the news of the pending

1   restatement.  Although the Company tried to mislead investors by representing that Zwarenstein

2   "resigned," he was in fact "terminated" after the Company disclosed that its restatement would be

3   larger than represented to investors.  The suspicious timing and amount of Zwarenstein's stock sales,

4   followed by his termination strengthen the inference he knew about the problems with VeriFone's

5   financial working controls and that the Company's financial results were not fairly presented in all

6   material respects.

7   **Former EVP Defendant Atkinson:**

8       142.   During the Class Period, former VeriFone EVP of Global Marketing and Business

9   Development, William Atkinson, sold over 138,000 shares, or *96%*, of his total VeriFone holdings

10   for proceeds of over ***$5.1 million***.  Atkinson was substantially involved in the Lipman merger, at one

11   point bragging to investors on September 6, 2006 that VeriFone and Lipman "***will begin Day 1,***

12   ***completely integrated.  We are locked and loaded***."  Notably, Atkinson sold $3.1 million of his

13   VeriFone shares ***after*** VeriFone announced its false results for 1Q07, which was the first quarter that

14   had to be restated.  VeriFone's false 1Q07 results were also significant because it was the first

15   quarter in which Lipman's results were consolidated with VeriFone as a combined entity.  Atkinson

16   was later fired on July 18, 2007, but not before selling over $5.1 million in VeriFone stock.

17   Defendant Bergeron reportedly took over Atkinson's duties upon his termination.

18   **Former Director Defendant Bondy:**

19       143.   During the Class Period, VeriFone director Bondy unloaded a shocking ***9.8 million***

20   ***shares*** of VeriFone stock for proceeds of over ***$358 million***.  Millions of shares were sold indirectly

21   through a private equity/hedge fund partnership, GTCR Golden Rauner, Fund VII, run by Bondy and

22   two other VeriFone directors for $100 million.  Bondy's sales represented over 50% of the VeriFone

23   shares he owned.  Notably, Bondy and GTCR were principal architects of the spinoff of VeriFone

24   from HP in 2002 and later took an equity stake and Board positions at the Company, continuing

25   through its IPO in 2005.  After Bondy's massive insider-trading and just a few months before the

26   Company disclosed its accounting manipulations, Bondy inexplicably (and conveniently) resigned in

27   August 2007.

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP

1   144.   The unusual amount and timing of defendants' and other executives' stock sales is

2   evidence that they possessed adverse non-public information regarding VeriFone's inflated financial

3   statements.   Defendants Atkinson and Bondy sold their stock *before* the restatement and adverse

4   news was disclosed to investors.   While investors holding VeriFone stock on December 3, 2007

5   watched their VeriFone shares plummet *46% in a single trading day* after defendants announced the

6   restatement, defendants sold over two million shares at prices as high as $46.00 per share.   Investors

7   subsequently watched their stock drop another *15%, 21% and 19%* on December 31, 2007, March 6,

8   2008, and April 1, 2008, respectively, when VeriFone disclosed additional adverse facts concerning

9   its accounting fraud.   Defendants had already sold, of course, and walked away with nearly $80

10  million in illicit proceeds.   Atkinson and Bondy had already left the Company with over $363

11  million in insider-trading proceeds.

12                  **7.      Defendants' Compensation and Bonuses Were Tied Directly to
                              VeriFone's Earnings Targets**

13

14  145.   In addition to the massive $443 million of insider sales, defendants were also

15  motivated to keep VeriFone's gross margins, earnings and stock price inflated during the Class

16  Period by the prospect of receiving millions of dollars in bonuses, incentives and stock option grants,

17  all of which were contingent on VeriFone maintaining its artificially inflated stock price and

18  earnings targets in 2006 and 2007.

    **Defendant Bergeron:**

19  146.   In addition to Bergeron's $74.7 million in illicit stock sales during the Class Period,

20  he also received millions of dollars in bonuses and stock option grants as a result of VeriFone's

21  inflated earnings and stock price.   In 2006, Bergeron received a base salary of $600,000 and *$1.5*

22  *million* in cash bonuses for 2006.   These bonuses were 200% of Bergeron's stated "target bonus" of

23  $750,000 and were specifically tied to VeriFone's earnings and stock price performance in 2006.

24  The Company stated that "[b]ased on VeriFone's performance during fiscal 2006, the Compensation

25  Committee, in its discretion, determined that for fiscal 2006 Mr. Bergeron should receive an annual

26  bonus of *200%* of his target bonus."   Bergeron also was given *$1.1 million* in new restricted stock

27

28

1 awards during 2006 at prices of $28.86, and 225,000 stock options to buy VeriFone shares at prices

2 of $28.82 with a stated potential realizable value of more than $6 million.

3        147.    On January 4, 2007, Bergeron and VeriFone entered into an "amended and restated"

4 employment contract, which raised his 2007 base salary to $700,000, plus a target cash bonus of

5 $900,000 with a potential of $1.8 million if certain performance metrics were met.  Additionally,

6 Bergeron was given 900,000 restricted stock units over a three-year period "based upon **growth in**

7 **our net income per share** as adjusted and if **certain improvements to our share price are achieved**."

8 For 2007, Bergeron's amended and restated contract stated that 200,000 restricted stock units would

9 vest if the Company "report[s] improvements in **net income**, as adjusted, per share that **exceed**

10 **management's current expectations**."

11        148.    In the 2008 Proxy Statement, VeriFone provided more detail on the metrics used for

12 the vesting of Bergeron's 900,000 restricted stock shares.  The Proxy Statement stated that "[f]or

13 fiscal year 2007, vesting of 200,000 RSUs [Restricted Stock Units] required that we report net

14 income, as adjusted, per share of **$1.60, which exceeded management's guidance** for fiscal year

15 2007 at the date of the agreement."  Notably, when VeriFone reported its false 3Q07 financial

16 results, on September 6, 2007, Bergeron stated the Company was increasing FY07 pro forma EPS

17 expectations to $1.59-$1.60, the target Bergeron needed to hit in order to trigger the vesting of

18 200,000 restricted stock shares.  This fact further demonstrates Bergeron's motive in inflating

19 VeriFone's earnings results in 2007.

20        149.    Bergeron was also motivated to keep VeriFone's earnings and stock price inflated

21 because he received "substantial equity" in VeriFone when it was spun off from HP, and that equity

22 coincidentally did not become fully vested until the **end of 3Q07**.  In the Company's 2008 Proxy

23 Statement, VeriFone noted that the Compensation Committee undertook a "review" of Bergeron's

24 compensation in 2007 and the "**substantial equity** that Mr. Bergeron had acquired in 2002 in

25 connection with our investment and recapitalization led by Mr. Bergeron and GTCR Golder Rauner

26 and that **the portion of the equity acquired in 2002 that was subject to vesting conditions would**

27 **become fully vested by the end of the third quarter of fiscal year 2007**."

28

150.    In other words, Bergeron had powerful financial motives to keep VeriFone's net income, gross margin earnings and stock price inflated until the end of 3Q07, which he did. Bergeron received millions in concrete benefits as a direct result of defendants' accounting manipulations and the resulting artificial increase in VeriFone's stock price.  When combined with Bergeron's massive $74.7 million insider trades, Bergeron's stock grants and bonuses provided a powerful incentive to report false financial results that "exceed[ed] management's current expectations" for VeriFone's earnings and stock price.

**Defendant Zwarenstein:**

151.    In addition to Zwarenstein's $5.3 million in stock sales during the Class Period, he also received millions of dollars in bonuses and stock option grants that were directly correlated to VeriFone's inflated earnings and stock price.  In 2006, Bergeron received a base salary of $319,000 and a cash bonus of $250,000, based on VeriFone's earnings and stock price performance in 2006. Zwarenstein also received over ***$1.38 million*** in new restricted stock awards during 2006, including 10,000 restricted stock units granted in March 2006, and a special Lipman bonus award of 40,000 additional restricted stock units in September 2006.  Notably, the Company stated that the 40,000 additional units were granted to Zwarenstein "***in recognition of [his] efforts on the Lipman acquisition***."

152.    Further, Zwarenstein's 10,000 restricted stock grants issued in March 2006 were priced at $28.86, the closing price of VeriFone stock on March 22, 2006.  The 40,000 stock grants issued in September 2006 were issued at $27.75 per share, the closing price on September 12, 2006. The terms of the restricted stock grants provided that 25% of the shares vest on the "first anniversary of the grant date" and 6.25% of the grants "vest quarterly thereafter."  Notably, on March 22, 2007, the "first anniversary" and vesting date of 2,500, or 25%, of the March 2006 stock grants, VeriFone's shares were trading at $37.60, a 30% premium from the price that Zwarenstein received for the stock grant.  On September 12, 2007, the "first anniversary" and vesting day of 10,000, or 25%, of Zwarenstein's September 2007 restricted grants, VeriFone's stock was trading at $39.85 – over 43% higher than the grant price of Zwarenstein's September 2007 stock awards.

153.     In 2007, Zwarenstein's salary was raised from $320,000 to $400,000.  The Proxy Statement noted the following:

> In the case of Mr. Zwarenstein, the Compensation Committee noted his work in **building out our financial and accounting infrastructure**.  In addition, the Compensation Committee considered the increased job responsibilities that Mr. Zwarenstein undertook in our business and corporate development.  In particular, the Compensation Committee noted that **Mr. Zwarenstein's efforts were instrumental towards our successful completion of the acquisition of Lipman** in the prior fiscal year and that his base salary should be adjusted accordingly.

154.     Ironically, VeriFone later announced that Zwarenstein was "resigning" in connection with the Company's restatement.  That turned out to be a gentle (and misleading) euphemism for getting fired – VeriFone later disclosed in a footnote in their 2008 Proxy Statement that Zwarenstein was actually "terminated" by the Company.  Zwarenstein was also forced to "reimburse" the Company for $150,000 in cash bonuses received in 2007 because VeriFone's "restated results did not achieve the quarterly bonus targets."

**Former EVP Defendant Atkinson:**

155.     Former EVP Atkinson was also motivated to maintain VeriFone's inflated earnings and stock price.  Atkinson's base salary in 2006 was $300,000, and he received a cash bonus of nearly $225,000.  Like Zwarenstein, Atkinson was awarded $1.38 million in restricted stock awards in 2006, comprised of 50,000 restricted stock shares, 10,000 of which were granted in March 2006, and 40,000 issued in September 2007.  Also, like Zwarenstein, the 40,000-share grant issued to Atkinson in September 2006 was "**in recognition of [his] efforts on the Lipman acquisition**."  The vesting schedules for Atkinson's restricted stock awards were the same as Zwarenstein's, with 2,500 shares being fully vested on March 22, 2007 and 10,000 shares becoming fully vested on September 12, 2007.  According to VeriFone's 2007 Proxy Statement, Atkinson's "performance-based goals were based on (A) the amount contributed by their respective business unit to our operating income for the quarter and (B) the **gross margin achieved by their respective business unit for the quarter**."

156.     In 2007, Atkinson's base salary was increased from $300,000 to $348,120.  The Company stated that the 33% raise "was appropriate in light of our strong performance in international and emerging markets."  Atkinson was then inexplicably fired on July 18, 2007, but not

1    before unloading over 96% of his VeriFone shares for $5.1 million in insider-trading proceeds and

2    receiving more than a quarter of a million dollars in cash bonuses.

3    **VI.    FALSE AND MISLEADING STATEMENTS**

4        **A.    False and Misleading Statements in 2006**

5        157.    **August 31, 2006 Press Release:** On August 31, 2006, VeriFone issued a press

6    release announcing its 3Q06 financial results.   In the press release, Bergeron increased the

7    Company's guidance for 2007:

> "Based on our confidence with our near term and long term outlook, we are raising
> our FY06 year end guidance to $1.07 to $1.08 of adjusted net income per share. *We
> are also raising our FY07 guidance to $1.40 to $1.42 of adjusted net income per
> share, assuming a November 1, 2006 completion of the Lipman acquisition*."

8        158.    **August 31, 2006 Conference Call:** During the Company's August 31, 2006

11   conference call, Zwarenstein provided additional details on the 2007 pro forma EPS guidance:

> Based upon our improved 2006 results, our expectations for 2007 adjusted
> earnings are now in the range of $1.28 to $1.30 excluding the impact of the Lipman
> acquisition.  Incremental to this, we are also reaffirming our previous statements
> made on April 10, 2006 where we announced the Lipman offer.  That is, we expect
> to enjoy the benefit of full-year accretion from the acquisition of approximately
> $0.12 per share.

> Taking into account both the anticipated organic growth and the accretion
> from the Lipman acquisition, we are currently anticipating *EPS, on a net income
> adjusted basis, in the range of $1.40 to $1.42 per share for fiscal 2007 year starting
> November 1, 2006*.

19       159.    In response to a question from SunTrust analyst Jeffrey about whether VeriFone

20   would be reporting better gross margins, Bergeron falsely said gross margins would, in fact, expand

21   as a result of the Lipman acquisition:

> JEFFREY: You guys have done a great job of delivering revenue growth,
> coupled with gross margin expansion.  This is the first quarter in which we have
> really seen some meaningful operating leverage as well, R&D and SG&A.  Anything
> particular to this quarter or is this the start of a trend during which we are going to
> see better gross margin and better cost ratios?

> BERGERON: I think, starting two quarters ago, on these conference calls and
> on our public meetings with shareholders or webcasts or whatever, we have said that,
> looking forward, the big story here is EBITDA margin expansion more than gross
> margin expansion.  That was pre-Lipman. *I have to tell you that with Lipman's
> manufacturing in-house and with this hybrid model that we are very cleverly
> putting together and getting the best of both worlds, there is going to be gross
> margin expansion in our future.*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                                          - 52 -

160.    **December 7, 2006 Press Release:** On December 7, 2006, VeriFone issued a press release announcing its 4Q06 and FY06 financial results.  In the press release, Bergeron represented that the integration of Lipman had been completed ahead of schedule and that VeriFone was already enjoying several supply-chain efficiencies and earnings accretion:

> *"The integration of Lipman into VeriFone has been completed ahead of schedule and we have created a single-branded, unified company with tremendous scale advantages.  Already, we are enjoying several supply chain efficiencies and earnings accretion."*

> "As a result, we have increased our internal expectations for fiscal Q1 2007 net earnings per share, as adjusted, to be in the range of $0.33 to $0.34.  We remain very confident of our prospects in fiscal 2007."

161.    **December 7, 2006 Conference Call:** During the Company's conference call, Bergeron represented that the combined company was functioning very well:

> With respect to integration, I could not be happier with the results.  We invested a lot of time and money planning for a November 1 integration of two companies as one. *Lipman is not being run as a standalone entity.  The integrated management team, which was announced on November 1 and which includes several key Lipman executives, is functioning very well.  Everyone throughout the Company clearly understands the organizational structure and the reporting relationships. . . .*

**Facts Establishing the Material Falsity of the Statements and Raising a Strong Inference Bergeron and Zwarenstein Knew or Were Deliberately Reckless in Not Knowing Their Statements Were Materially False and Misleading**

162.    The following facts raise a strong inference the statements made by Bergeron and Zwarenstein were materially false and misleading and that they knew or were deliberately reckless in not knowing their statements were materially false and misleading:

163.    VeriFone did not report pro forma EPS of $1.40-$1.42 in 2007, as Bergeron and Zwarenstein represented on August 31, 2006.  In fact, after restating its financial results, VeriFone reported pro forma EPS of just $0.72 in 2007.

164.    In addition, the inclusion of Lipman's in-house manufacturing did not expand gross margins in 2007, as Bergeron represented during the August 31, 2006 conference call.  After reporting a pro forma gross margin of 45.9% in 3Q06 and 47.1% in 4Q06, VeriFone's pro forma gross margin declined to 41.4% in 1Q07, 42.3% in 2Q07, 41.2% in 3Q07, 32.5% in 4Q07, 35.7% in 1Q08, 34.9% in 2Q08 and 37.6% in 3Q08.

1      165.    The restatement also establishes that VeriFone was not "already enjoying several

2    supply chain efficiencies and earnings accretion," as Bergeron represented on December 7, 2006.

3    Indeed, although Bergeron and Zwarenstein stated the Lipman acquisition would increase FY07 pro

4    forma EPS by $0.12 to $1.40-$1.42, VeriFone's actual pro forma EPS in FY07 was $0.72.

5      166.    Bergeron and Zwarenstein knew there was no basis to represent pro forma gross

6    margins would increase in 2007 after Lipman's financial results were also included in VeriFone's

7    consolidated results because VeriFone's lower-margin international sales would, and did, double

8    from $66.6 million in 4Q06 to $129.1 million in 1Q07.  As a result, VeriFone's lower-margin

9    international sales increased from 42.5% of total sales in 4Q06 to 59.6% in 1Q07.  Bergeron and

10    Zwarenstein also knew Lipman gross margins and operating margins were declining since 2001 and

11    were less than 42% and 15% in 2006. In fact, analysts repeatedly noted VeriFone's reported pro

12    forma gross margins were better than expected given the inclusion of the lower-margin Lipman sales

13    and issued reports noting their surprise at the better-than-expected margins.

14      167.    Bergeron's comments during VeriFone's August 19, 2008 conference call confirm he

15    and Zwarenstein knew VeriFone would not legitimately report an increase in pro forma gross

16    margins after the lower-margin Lipman sales were included in the Company's consolidated results.

17    During the August 19, 2008 conference call, Bergeron stated that 45% pro forma gross margins were

18    "very doable" *before* the Lipman acquisition when 60% of the Company's sales were in the U.S.

19    But he said VeriFone would not even report 40% pro forma gross margins for five or six quarters or

20    until the end of FY09 because after the Lipman acquisition, approximately 60% of the Company's

21    revenues were international revenues.  This candid admission by Bergeron was contrary to his

22    representations on August 31, 2006 and December 7, 2006.

23      168.    In addition, Bergeron and Zwarenstein knew that there were problems obtaining

24    accurate financial data from Lipman because the companies were using different versions of Oracle

25    ERP general ledger system.  VeriFone could not simply transfer Lipman financial data from its 11i

26    system to VeriFone's 10.7 system.  Instead, Lipman financial data had to be transferred from 11i to

27    Excel spreadsheets and then transferred from the Excel spreadsheets to VeriFone's 10.7 system.

28    That process was generating inaccurate financial data because the macro formulas in the Excel

1   spreadsheets were incorrect.  As a result, Bergeron and Zwarenstein knew the financial information

2   received from Lipman in 2007 was inaccurate.

3       169.   Because Lipman and VeriFone used different Oracle ERP systems, Bergeron and

4   Zwarenstein also knew that manual journal entries would be required to post Lipman inventory data

5   to the Company's 10.7 system in 2007.  Those manual journal entries overstated inventories and

6   understated the cost of net revenues by tens of millions of dollars (which in turn caused gross

7   margins and earnings to be overstated by tens of millions of dollars) which Bergeron claimed the

8   Company discovered when accounting personnel reviewed the manual journal entries.

9       170.   But as the former VeriFone accounting employees stated, the manual journal entries

10  were received and reviewed by the San Jose accounting department headed up by Zwarenstein and

11  discussed during monthly meetings *before* VeriFone reported its 1Q07, 2Q07 and 3Q07 results.

12  Further, Bergeron and Zwarenstein repeatedly assured investors that they had "designed" and

13  "evaluated" the Company's disclosure controls and procedures and concluded they were "effective"

14  to ensure material information was made known to them before the Company reported its financial

15  results.  In fact, according to VeriFone's Proxy Statement filed with the SEC on September 10, 2008,

16  Zwarenstein's salary was increased for 2007 because of "***his work in building out [VeriFone's]***

17  ***financial and accounting infrastructure***" and his instrumental efforts towards the successful

18  completion of the Lipman acquisition.  Thus, Bergeron and Zwarenstein knew about the manual

19  journal entries and the amount of Lipman inventory and cost of net revenues before they were

20  included in the Company's false financial results.

21      171.   Given their positions at VeriFone and the importance of the Company's accounting

22  operations and disclosure controls and procedures in light of the Lipman acquisition and the fact that

23  the two companies were using different Oracle ERP systems, the only plausible inference is that

24  Bergeron and Zwarenstein also knew about the problems in the San Jose accounting department

25  described by the witnesses and acknowledged by VeriFone after the restatement was announced.

26  That is, Bergeron and Zwarenstein knew the San Jose accounting department was disorganized,

27  understaffed and in a general state of disarray.

28

172.    The termination of Zwarenstein and the removal of Bergeron as Chairman after the restatement was publicly disclosed strengthens the inference they knew about the undisclosed problems that caused VeriFone to report false financial results in 1Q07, 2Q07 and 3Q07 and that they knew in 2006 that VeriFone would not report increasing pro forma gross margins and earnings in 2007.

173.    Of course, Bergeron and Zwarenstein were motivated to tell investors the Company's pro forma gross margins and earnings would increase after the Lipman acquisition.  VeriFone's stock price had declined from $32.55 on April 10, 2006, the date the acquisition was announced, to $23.15 on August 31, 2006, the first day of the Class Period and they wanted to sell their stock at higher prices.  After telling investors on August 31, 2006 that pro forma gross margins and earnings would increase, the Company stock price increased 23% from $23.15 to $28.47.  The stock price increased further to $34.34 by December 7, 2006 when VeriFone reported the Company's 4Q06 and FY06 results and again assured investors the acquisition would increase pro forma gross margins and earnings.  The next day, the stock price increased 5% to $36.05 and continued to trade in the high $30s/low $40s from December 2006 to March 1, 2007.  Between August 31, 2006 and March 1, 2007, Bergeron and Zwarenstein took advantage of the inflated stock price.  Bergeron sold 823,040 shares for $27.3 million and Zwarenstein sold 24,000 shares for $745,768 during that time period.

174.    In addition to the insider sales, as set forth in ¶¶145-154, Bergeron and Zwarenstein knew they would receive larger bonuses and additional stock awards if VeriFone reported increased pro forma gross margins and earnings in 2007.

**B.    False and Misleading 1Q07 Statements**

175.    **March 1, 2007 Press Release:** On March 1, 2007, VeriFone issued a press release announcing its 1Q07 financial results, including the following:

| Quarter Ended January 31, 2007 | | | |
|---|---|---|---|
| ($ in 000s, Except EPS) | Quarter as Stated | Sequential Change % | Year over Year Change % |
| Net Revenues | $216,626 | 38.30% | 60.90% |
| Cost of Net Revenues | $135,246 | 59.96% | 80.26% |
| Gross Profit | $81,380 | 12.90% | 36.54% |
| Gross Profit % | 37.57% | -8.45% | -6.70% |
| Pro forma Gross Profit | $102,060 | 38.26% | 66.36% |
| Pro forma Gross Profit % | 47.11% | -0.01% | 1.55% |
| Pro forma Net Income | $31,151 | 39.66% | 87.53% |
| Pro forma EPS | $0.37 | 15.47% | 54.51% |
| GAAP Net Income | ($984) | -107.07% | -107.13% |
| GAAP EPS | ($0.01) | -106.00% | -106.06% |
| Inventories | $130,815 | 51.00% | 235.22% |

176.    In addition to announcing VeriFone's financial results, the Company specifically touted its gross margins as a key factor in attaining its 1Q07 results:

"**Gross margins**, excluding non-cash acquisition related charges and stock-based compensation expense, were **47.1%**, for the three months ended January 31, 2007, compared to 45.6% for the comparable period of 2006."

177.    The financial results reported in the March 1, 2007 press release were subsequently repeated during the Company's March 1, 2007 conference call, in reports issued by analysts following the Company and in VeriFone's 1Q07 Form 10-Q filed with the SEC on March 9, 2007.

178.    **March 1, 2007 Conference Call:** During the conference call, defendants Bergeron and Zwarenstein repeated the false 1Q07 financial results above and touted the purported record gross margins and the purported significant earnings accretion:

BERGERON: *Gross margins, excluding acquisition charges and stock-related expenses were 47.1%. Now, this is equal to the record level obtained last quarter despite the incorporation of Lipman, which, as we've indicated, had gross margins in the low 40's for the last several quarters that they reported publicly. This is also despite the Excellent performance of our international business, which traditionally earned lower gross margins than our domestic business.*

EBITDA margins reached a record level of 25.7%, primarily *due to the operating leverage benefits which we obtained as an integrated company*.

The successes we achieved in our first quarter go well beyond the strength of our earnings. Specifically, *we completed the corporate-wide integration of a major cross-border acquisition of Lipman and we achieved a significant earnings accretion in this, the first full quarter of combined operations*.

\*          \*          \*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

- 57 -

1
     ZWARENSTEIN: As Doug discussed in some detail, I will begin with **non-GAAP gross margins, which came in at 47.1%, equal to the fourth quarter of 2006 record. This is despite** the two factors that Doug mentioned, namely **the inclusion of Lipman and the strong international sales. The main drivers for maintaining the sequential level of gross margins were** greater proportion of high margin wireless revenue, which in the first quarter account for 21% of the worldwide systems sales, **better supply chain efficiencies** and better sourcing of strategic components.

2

3

4

5
     179.    In response to a question from an analyst surprised by the reported margins, Bergeron

6
again attributed the surprising results to VeriFone's supply-chain efficiencies:

7
     BARTOLAI, ANALYST, CREDIT SUISSE: **First question – just on the gross margin I mean a pretty solid result there given the inclusion of Lipman and the international growth. Can you give us some sense of where the improvement came?** Was it mostly on the legacy VeriFone side? And do you still have a lot more room to improve the Lipman operations?

8

9

10
     BERGERON: **There really isn't Lipman operations any longer. The business is treated at the gross margin level as one entity, driven by one senior executive, who is doing a splendid job. We have said somewhat repeatedly that we think we're in the ZIP code that can be sustained.** The only variance there is the effect of wireless sales are a net positive and the effect of some of our emerging market sales can be a net negative. But **we're very comfortable in this range**.

11

12

13

14
     And as to the first-quarter results, I think we spoke to it or Barry spoke to it in some length, but it was a combination of quality revenue, Paul, brings quality margins, and we were all about quality revenue this quarter. That's the first thing. **And then our supply chain efficiencies – listen, when you are putting $215 million, $220 million worth of revenue through in a quarter, your fixed overhead per dollar of sale goes down. And that's arithmetically beneficial to the Company.**

15

16

17
     Then we already have started to see and we entered it this last earnings call some nice **procurement synergies that come from our size.** And the good news is the last of those two or three things are not possible with competitors. **So we now have developed a structural gross margin advantage, which is going to be tough to beat.**

18

19

20
     180.    As detailed in ¶130, after VeriFone reported 1Q07 results, several analysts issued

21
reports in which they noted their surprise at the reported financial results given the inclusion of the

22
lower-margin Lipman sales.

23
     181.    **1Q07 Form 10-Q and Sarbanes-Oxley Certifications:** On March 9, 2007, VeriFone

24
filed its Form 10-Q with the SEC that was signed by Bergeron and Zwarenstein.  The Form 10-Q

25
repeated the false financial results reported on March 1, 2007.  Further, Bergeron and Zwarenstein

26
stated in the Form 10-Q that the 1Q07 financial results were fairly presented in accordance with

27
GAAP:

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                               - 58 -

The accompanying consolidated balance sheet as of January 31, 2007 and the consolidated statements of operations and cash flows for the three months ended January 31, 2007 and 2006 are unaudited.  These unaudited interim condensed consolidated financial statements *have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information and Form 10-Q and Article 10 of Regulation S-X.*  In the opinion of the Company's management, *the unaudited interim condensed consolidated financial statements* have been prepared on the same basis as the annual consolidated financial statements and *include all adjustments of a normal recurring nature necessary for the fair presentation of the Company's financial position as of January 31, 2007 and its results of operations and cash flows for the three months ended January 31, 2007 and 2006*. . . .

182.    Bergeron and Zwarenstein also assured investors they had evaluated the Company's disclosure controls and procedures and concluded they were effective:

(a)    Evaluation of disclosure controls and procedures.

*With the participation of our Chief Executive Officer and Chief Financial Officer, management has carried out an evaluation of the effectiveness of our disclosure controls and procedures* (as defined in Rule 13a-15(e) and 15d-15(f) under the Securities Exchange Act of 1934).  *Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.*

183.    Bergeron and Zwarenstein also signed sworn certifications that were attached to the Form 10-Q in which they assured investors the Company's financial results were fairly presented in all material respects and that they knew that to be the case because they had designed and evaluated VeriFone's disclosure controls and procedures and concluded they were effective.  Specifically, Bergeron and Zwarenstein each certified that:

1.    I have reviewed this quarterly report on Form 10-Q of VeriFone Holdings, Inc.;

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact* or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4.    *The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant *and have*:

      (a)    ***Designed such disclosure controls and procedures,*** or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

      (b)    ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;*** and

      (c)    ***Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter*** (the registrant's fourth fiscal quarter in the case of an annual report) ***that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting***; and

5.    ***The registrant's other certifying officer(s) and I have disclosed,*** based on our most recent evaluation of internal control over financial reporting, ***to the registrant's auditors and the audit committee*** of the registrant's board of directors (or persons performing the equivalent functions):

      (a)    ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;*** and

      (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

184.    Bergeron and Zwarenstein also signed a joint certification that was attached to the Form 10-Q, in which they represented that the Company's financial results were fairly presented in all material respects:

> ***I, Douglas G. Bergeron, Chief Executive Officer, and I, Barry Zwarenstein, Chief Financial Officer, each certify,*** pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, ***that the Report of VeriFone Holdings, Inc. (the "Company") on Form 10-Q for the quarterly period ended January 31, 2007, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company.***

**Facts Establishing the Material Falsity of the Statements and Raising a Strong Inference Bergeron and Zwarenstein Knew or Were Deliberately Reckless in Not Knowing Their Statements Were Materially False and Misleading**

185.    The following facts conclusively establish the statements made by Bergeron and Zwarenstein were materially false and misleading and raise a strong inference they knew or were deliberately reckless in not knowing their statements were materially false and misleading.

186.   **Restatement:** As shown in the following chart, the restatement establishes that VeriFone's 1Q07 financial results were not fairly presented in accordance with GAAP and that the Company's disclosure controls and procedures were not effective:

| 1Q07: Quarter Ended: January 31, 2007 | | | | |
|---|---|---|---|---|
| ($ in 000s, Except EPS) | Originally Reported | Restated | Amount Overstated | % Reported Amount was Overstated |
| Net Revenues | $216,626 | $216,363 | $263 | 0.12% |
| Cost of Net Revenues | $135,246 | $147,740 | ($12,494) | -9.24% |
| GAAP Gross Profit | $81,380 | $68,623 | $12,757 | 15.68% |
| GAAP Gross Profit % | 37.57% | 31.72% | | 15.57% |
| Pro forma Gross Profit | $102,060 | $89,597 | $12,463 | 12.21% |
| Pro forma Gross Profit % | 47.11% | 41.41% | | 12.10% |
| Pro forma Net Income | $31,151 | $26,631 | $4,520 | 14.51% |
| Pro forma EPS | $0.37 | $0.32 | $0.05 | 13.51% |
| GAAP Net Income | ($984) | ($5,679) | $4,695 | -477.13% |
| GAAP EPS | ($0.01) | ($0.07) | $0.06 | -600.00% |
| Inventories | $130,815 | $117,481 | $13,334 | 10.19% |

187.   As shown in the above chart, the 47.11% reported 1Q07 pro forma gross margin was substantially overstated and was actually 41.41%. As a result, the originally reported GAAP net loss was understated by $4.7 million or 477% and the originally reported GAAP loss per share of $0.01 was understated by $0.06 or 600%.

188.   Bergeron and Zwarenstein knew the reported 1Q07 gross margin of 47.1% was equal to the record gross margin of 47.1% in 4Q06 and greater than the 45.6% gross margin reported in 1Q06 despite the fact that the inclusion of the Lipman sales caused VeriFone's lower-margin international sales to double from $66.6 million in 4Q06 to $129.1 million in 1Q07. As a result, VeriFone's lower-margin international sales increased from 42.5% of total sales in 4Q06 to 59.6% in 1Q07. They knew Lipman gross margins and operating margins were declining since 2001 and were less than 42% and 15% in 2006. In fact, during the March 1, 2007 conference call, analysts noted the gross margin was better than expected given the inclusion of the lower-margin Lipman sales and issued reports noting their surprise at the better-than-expected margins.

189.   Bergeron's comments during VeriFone's August 19, 2008 conference call confirm he and Zwarenstein knew the 47.11% pro forma gross margin could not be accurate because VeriFone's 1Q07 results included the lower-margin Lipman sales. During the August 19, 2008 conference call,

1    Bergeron stated that 45% pro forma gross margins were "very doable" ***before*** the Lipman

2    acquisition when 60% of the Company's sales were in the U.S.  But he said VeriFone would not

3    even report 40% pro forma gross margins for five or six quarters or until the end of FY09 because

4    after the Lipman acquisition, approximately 60% of the Company's revenues were international

5    revenues.

6          190.    Further, after the Class Period, VeriFone reported pro forma gross margins that were

7    substantially lower.  VeriFone reported a pro forma gross margin of 32.5% in 4Q07, 35.7% in 1Q08,

8    34.9% in 2Q08 and 37.6% in 3Q08.

9          191.    In addition, Bergeron and Zwarenstein knew that there were problems obtaining

10   accurate financial data from Lipman because the companies were using different versions of Oracle

11   ERP general ledger system.  VeriFone could not simply transfer Lipman financial data from its 11i

12   system to VeriFone's 10.7 system.  Instead, Lipman financial data had to be transferred from 11i to

13   Excel spreadsheets and then transferred from the Excel spreadsheets to VeriFone's 10.7 system.

14   That process was generating inaccurate financial data because the macro formulas in the Excel

15   spreadsheets were incorrect.  As a result, Bergeron and Zwarenstein knew the financial information

16   received from Lipman for 1Q07 was inaccurate but said nothing about the problems when analysts

17   questioned them about the better-than-expected margins.

18         192.    Because Lipman and VeriFone used different Oracle ERP systems, Bergeron and

19   Zwarenstein also knew that manual journal entries were required to post Lipman inventory data to

20   the Company's 10.7 system.  Those manual journal entries overstated 1Q07 inventories by $13.3

21   million and understated the cost of net revenues by $12.5 million (which in turn caused gross profit

22   and earnings to be overstated by millions of dollars), which Bergeron claimed the Company

23   discovered when accounting personnel reviewed the manual journal entries.

24         193.    But as the former VeriFone accounting employees stated, the manual journal entries

25   were received and reviewed by the San Jose accounting department headed up by Zwarenstein and

26   discussed during monthly meetings before VeriFone reported its 1Q07 results.  Further, Bergeron

27   and Zwarenstein repeatedly assured investors that they had designed and evaluated the Company's

28   disclosure controls and procedures and concluded they were effective to ensure material information

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                                              - 62 -

1  was made known to them before the Company reported its financial results.  In fact, according to

2  VeriFone's Proxy Statement filed with the SEC on September 10, 2008, Zwarenstein's salary was

3  increased for 2007 because of "his work in building out [VeriFone's] financial and accounting

4  infrastructure" and his instrumental efforts towards the successful completion of the Lipman

5  acquisition.  Thus, Bergeron and Zwarenstein knew about the manual journal entries and the amount

6  of Lipman inventory and cost of net revenues before they were included in the Company's false

7  financial results.

8       194.    Given their positions at VeriFone and the importance of the Company's accounting

9  operations and disclosure controls and procedures in light of the Lipman acquisition and the fact that

10  the two companies were using different Oracle ERP systems, the only plausible inference is that

11  Bergeron and Zwarenstein also knew about the problems in the San Jose accounting department

12  described by the witnesses and acknowledged by VeriFone after the restatement was announced.

13  That is, Bergeron and Zwarenstein knew the San Jose accounting department was disorganized,

14  understaffed and in a general state of disarray which, considered with the other facts, raises a strong

15  inference they knew the Company's disclosure controls and procedures were not effective and

16  therefore could not know if VeriFone's 1Q07 results were fairly presented in all material respects.

17       195.    The termination of Zwarenstein and the removal of Bergeron as Chairman after the

18  restatement was publicly disclosed strengthens the inference they knew about the undisclosed

19  problems that caused VeriFone to report false financial results in 1Q07.

20       196.    Bergeron and Zwarenstein were motivated to tell investors the Company's 1Q07 pro

21  forma gross margin and earnings were better than expected because it would maintain the artificial

22  inflation in the Company's stock price. The stock price had already increased from $23.15 on August

23  31, 2006 to $38.79 on March 1, 2007.  After VeriFone reported better-than-expected 1Q07 results,

24  the Company's stock price declined 0.2% but that decline was substantially less than the 1.1%

25  decline in the S&P 500 and the 1.9% decline in the peer group. The stock price traded in the mid- to

26  high $30s from March 1, 2007 to May 29, 2007.  If VeriFone had reported accurate financial results

27  the price of the stock would have declined as it did following the disclosure of the restatement on

28  December 3, 2007. Between March 1, 2007 and May 29, 2007, Bergeron and Zwarenstein took

1  advantage of the inflated stock price. Bergeron sold 320,222 shares for $11.9 million and
2  Zwarenstein sold 26,585 shares for $976,867.

3      197.    In addition to the insider sales, as set forth in ¶¶145-154, Bergeron and Zwarenstein
4  knew they would receive larger bonuses and additional stock awards if VeriFone reported increased
5  pro forma gross margins and earnings in 2007.

6      198.    The foregoing facts considered together raise a strong inference Bergeron and
7  Zwarenstein knew the Company's better-than-expected financial results could not be accurate.
8  Nevertheless, they assured investors that the Company's 1Q07 financial results were fairly presented
9  in accordance with GAAP, that the Company's disclosure controls and procedures were effective
10 and even boasted that the better-than-expected "record" gross margins were the result of "supply
11 chain efficiencies" and the development of "a structural gross margin advantage." They also
12 received bonuses and stock awards to which they were not entitled and sold millions of dollars of
13 their VeriFone stock at artificially inflated prices.

14   **C.    False and Misleading 2Q07 Statements**

15     199.    May 29, 2007 Press Release.  On May 29, 2007, VeriFone issued a press release
16 announcing its 2Q07 financial results, including the following:

| Quarter Ended April 30, 2007 | | | |
|---|---|---|---|
| ($ in 000s, Except EPS) | Quarter as Stated | Sequential Change % | Year over Year Change % |
| Net Revenues | $217,213 | 0.27% | 52.76% |
| Cost of Net Revenues | $127,013 | -6.09% | 61.20% |
| Gross Profit | $90,200 | 10.84% | 42.27% |
| Gross Profit % | 41.53% | 3.96% | -3.06% |
| Pro forma Gross Profit | $104,382 | 2.28% | 60.64% |
| Pro forma Gross Profit % | 48.06% | 0.94% | 2.36% |
| Pro forma Net Income | $32,636 | 4.77% | 82.68% |
| Pro forma EPS | $0.39 | 3.94% | 49.65% |
| GAAP Net Income | $4,859 | -593.80% | -67.68% |
| GAAP EPS | $0.06 | -575.11% | -73.53% |
| Inventories | $125,390 | -4.15% | 161.50% |

26     200.    VeriFone also reported in the press release that $4 million of booked orders could not
27 be recognized as revenue due to incomplete sales administration requirements in the Company's
28 international operations, which caused the price of VeriFone's stock to decline 6% the next day. But

1    like they did when reporting VeriFone's 1Q07 financial results, Bergeron and Zwarenstein touted the

2    Company's gross margins:

3         *Gross margins, excluding non-cash acquisition related charges and stock-based
          compensation expense, expanded to a record 48.1%, for the three months ended
4         April 30, 2007, compared to 45.7% for the comparable period of 2006.* . . .

5         201.    The 2Q07 financial results reported in the press release were subsequently repeated

6    during the Company's May 27, 2007 conference call, in reports issued by analysts following the

7    Company and in the 2Q07 Form 10-Q filed with the SEC on May 31, 2007.

8         202.    **May 29, 2007 Conference Call:** During the May 29, 2007 conference call, Bergeron

9    and Zwarenstein repeated the Company's 2007 financial results and touted the Company's record

10   gross margins that exceeded their own expectations:

11        BERGERON: *We had an outstanding quarter of margin performance, well
          exceeding our own expectations for profitability metrics. Adjusted gross margins
12        of 48.1% were a record, and our 10 quarter period of gross margin expansion
          continues.*

13                                    *       *       *

14
          ZWARENSTEIN: As Doug discussed revenue in some detail I will begin [with]
15        *non-GAAP gross margins, which came in at 48.1%, well in excess of the 47.1% in
          the first quarter of 2007 and the 45.7% in the prior year*. . . .
16
          203.    Analysts were again surprised at the gross margins and asked about them.  In fact, the
17
     first question during the conference call was whether any unusual items contributed to the better-
18
     than-expected margin of 48% and whether it was sustainable.  Zwarenstein assured investors there
19
     were no unusual items, that the margin was sustainable, that the Company's margin depended on
20
     country mix and that the margin could actually increase further:
21
          TIEN-TSIN HUANG – JPMorgan – Analyst: I guess I will kick off with a question
22        on *gross margins, 48% was well ahead of our expectation, curious to hear [if] this
          level is sustainable going forward and were there any unusual items in the*
23        *quarter?*  Sounds like wireless was a big contributor.

24        ZWARENSTEIN: Let me take the second part of the question first and the answer is,
          *no, there was no unusual items.*  In terms of the wireless margins they are superior
25        as you know.  It depends on the particular wireless products and country mix and
          domestic and international mix but come to be talking about 10 percentage point
26        differential between the two.  Now, obviously that will give us a tailwind to the
          extent that wireless continues to grow faster and support the margin.  That being said
27        though, in any given quarter the mix, product mix and the country mix can have a
          material impact on the margin.  So we would be more comfortable in saying that,
28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                                          - 65 -

1    yes, maybe **the 48% is sustainable but it could drop to maybe 47% or something like that or it could go up to beyond that.**  It really depends on the mix.

2

3    204.    Atlantic Trust analyst Fred Weiss also asked what caused the significant improvement

4    in gross margins and Bergeron primarily attributed the increase to increased wireless sales and lower

5    fixed costs:

6       WEISS, Atlantic Trust Analyst: Two questions, one at a time.  Could you just talk about the gross margin variance, big positive move in it, despite the revenues didn't come quite as good as expected or you hoped for, is it, could you talk about the factors behind that again?  **I'm trying to understand exactly what led to the significant improvement in gross margins.**

7

8

9       BERGERON: There's probably three categories.  **The first is the increase in the proportion of our systems which are wireless.**  You pointed to it.

10       WEISS: Yes.

11       BERGERON: That has a more material impact.  **The second is scale.** Despite the fact that we use outsourced manufacturing for 65% of our business, let's not underestimate the high fixed cost that a proper Company like VeriFone has in running a worldwide supply chain.

12

13                              *       *       *

14       And **as we grow, our variable cost grows but our fixed cost as a percentage of our overall cost declines, so that is almost a mathematical contributor of margin expansion** that will continue to play out as revenue grows quarter-over-quarter, hopefully in the years ahead.  I guess those are the two main factors. . . .

15

16

17    205.    As detailed in ¶131, after VeriFone reported 2Q07 results, several analysts issued

18    reports in which they noted their surprise at the reported financial results – particularly gross

19    margins – given the inclusion of the lower-margin Lipman sales.

20    206.    **2Q07 Form 10-Q:** On May 31, 2007, VeriFone filed its 2Q07 Form 10-Q with the

21    SEC.  The Form 10-Q was signed by Bergeron and Zwarenstein, included the 2Q07 financial results

22    originally reported on May 29, 2007 and also included the same representations and Sarbanes-Oxley

23    certifications that were included in the 1Q07 Form 10-Q filed on March 9, 2007.

24    **Facts Establishing the Material Falsity of the Statements and Raising a Strong Inference Bergeron and Zwarenstein Knew or Were Deliberately Reckless in Not Knowing Their Statements Were Materially False and Misleading**

25

26    207.    The following facts conclusively establish the statements made by Bergeron and

27    Zwarenstein were materially false and misleading and raise a strong inference they knew or were

28    deliberately reckless in not knowing their statements were materially false and misleading:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP
- 66 -

1       208.   **Restatement:** As shown in the following chart, the restatement establishes that

2   VeriFone's 2Q07 financial results were not fairly presented in accordance with GAAP and that the

3   Company's disclosure controls and procedures were not effective:

| Quarter Ended April 30, 2007 | | | | |
|---|---|---|---|---|
| ($ in 000s, Except EPS) | Originally Reported | Restated | Amount Overstated | % Reported Amount was Overstated |
| Net Revenues | $217,213 | $216,883 | $330 | 0.15% |
| Cost of Net Revenues | $127,013 | $139,237 | ($12,224) | -9.62% |
| GAAP Gross Profit | $90,200 | $77,646 | $12,554 | 13.92% |
| GAAP Gross Profit % | 41.53% | 35.80% | | 13.79% |
| Pro forma Gross Profit | $104,382 | $91,675 | $12,707 | 12.17% |
| Pro forma Gross Profit % | 48.06% | 42.27% | | 12.04% |
| Pro forma Net Income | $32,636 | $20,422 | $12,214 | 37.43% |
| Pro forma EPS | $0.39 | $0.24 | $0.15 | 38.46% |
| GAAP Net Income | $4,859 | ($4,818) | $9,677 | 199.16% |
| GAAP EPS | $0.06 | ($0.06) | $0.12 | 200.00% |
| Inventories | $125,390 | $101,449 | $23,941 | 19.09% |

13       209.   As shown in the above chart, the 48.06% reported 2Q07 pro forma gross margin was

14   substantially overstated and was actually 42.27%. As a result, the originally reported GAAP net

15   income of $4.9 million was overstated by $9.7 million or 199% and was actually a net loss of $4.8

16   million and the originally reported GAAP EPS of $0.06 was overstated by 200% and was actually a

17   net loss of $0.06 per share.

18       210.   Bergeron and Zwarenstein knew the 2Q07 gross margin of 48.1% was a "record,"

19   exceeded the Company's own expectations, was greater than the record 47.1% reported in 1Q07, and

20   larger than the 45.7% gross margin reported in 2Q06 despite the fact that the inclusion of the Lipman

21   sales caused VeriFone's lower-margin international sales to almost double from $66.6 million in

22   4Q06 to $122.1 million in 2Q07. As a result, VeriFone's lower-margin international sales increased

23   from 42.5% of total sales in 4Q06 to 56.2% in 2Q07. They knew Lipman gross margins and

24   operating margins were declining since 2001 and were less than 42% and 15% in 2006. In fact,

25   during the May 29, 2007 conference call, analysts asked about the better-than-expected gross margin

26   and, as alleged in ¶131, issued reports stating the margins were better than expected given the

27   inclusion of the lower-margin Lipman sales. Bergeron and Zwarenstein knew, or were deliberately

28

1   reckless in not knowing, that VeriFone's 2Q07 financial results were not accurate given the inclusion

2   of the lower-margin Lipman sales.

3          211.    Bergeron's comments during VeriFone's August 19, 2008 conference call confirm he

4   and Zwarenstein knew the 48.06% pro forma gross margin could not be accurate because VeriFone's

5   2Q07 results included the lower-margin Lipman sales.  During the August 19, 2008 conference call,

6   Bergeron stated that 45% pro forma gross margins were "very doable" *before* the Lipman

7   acquisition when 60% of the Company's sales were in the U.S.  But he said VeriFone would not

8   even report 40% pro forma gross margins for five or six quarters or until the end of FY09 because

9   after the Lipman acquisition, approximately 60% of the Company's revenues were international

10  revenues.

11         212.    Further, after the Class Period, VeriFone reported pro forma gross margins that were

12  substantially lower.  VeriFone reported a pro forma gross margin of 32.5% in 4Q07, 35.7% in 1Q08,

13  34.9% in 2Q08 and 37.6% in 3Q08.

14         213.    In addition to knowing that VeriFone was reporting better-than-expected financial

15  results, particularly gross margins, despite the inclusion of the lower-margin Lipman sales, Bergeron

16  and Zwarenstein knew VeriFone was having problems obtaining accurate financial data from

17  Lipman due to the companies use of different versions of Oracle ERP general ledger system.

18  VeriFone could not simply transfer Lipman financial data from Lipman's 11i system to VeriFone's

19  10.7 system.  Instead, Lipman financial data had to be transferred from 11i to Excel spreadsheets and

20  then transferred from the Excel spreadsheets to VeriFone's 10.7 system.  That process was

21  generating inaccurate financial data because the macro formulas in the Excel spreadsheets were

22  incorrect.  As a result, Bergeron and Zwarenstein knew the financial information received from

23  Lipman for 2Q07 was inaccurate but said nothing about these problems when analysts questioned

24  them about the better-than-expected margins.

25         214.    Bergeron and Zwarenstein continued to conceal the fact that manual journal entries

26  were required to post Lipman inventory data to the Company's 10.7 system because the companies

27  used different versions of the Oracle ERP general ledger system.  Those manual journal entries

28  overstated inventories in 2Q07 by $23.9 million and understated the cost of net revenues by $12.2

1   million (which in turn caused gross profit and earnings to be overstated by millions of dollars) which

2   Bergeron claimed the Company discovered when accounting personnel reviewed the manual journal

3   entries.

4         215.     But as the former VeriFone accounting employees stated, the manual journal entries

5   were received and reviewed by the San Jose accounting department headed up by Zwarenstein and

6   discussed during monthly meetings before VeriFone reported its 2Q07 results.  Further, Bergeron

7   and Zwarenstein repeatedly assured investors that they had designed and evaluated the Company's

8   disclosure controls and procedures and concluded they were effective to ensure material information

9   was made known to them before the Company reported its financial results.  In fact, according to

10  VeriFone's Proxy Statement filed with the SEC on September 10, 2008, Zwarenstein's salary was

11  increased for 2007 because of "his work in building out [VeriFone's] financial and accounting

12  infrastructure" and his instrumental efforts towards the successful completion of the Lipman

13  acquisition. Thus, Bergeron and Zwarenstein knew about the manual journal entries and the amount

14  of Lipman inventory and cost of net revenues before they were included in the Company's false

15  financial results

16        216.     Given their positions at VeriFone and the importance of the Company's accounting

17  operations and disclosure controls and procedures in light of the Lipman acquisition and the fact that

18  the two companies were using different Oracle ERP systems, the only plausible inference is that

19  Bergeron and Zwarenstein also knew about the problems in the San Jose accounting department

20  described by the witnesses and acknowledged by VeriFone after the restatement was announced.

21  That is, Bergeron and Zwarenstein knew the San Jose accounting department was disorganized,

22  understaffed and in a general state of disarray which, considered with the other facts, raises a strong

23  inference they knew the Company's disclosure controls and procedures were not effective and

24  therefore could not know if VeriFone's 2Q07 results were fairly presented in all material respects.

25        217.     The termination of Zwarenstein and the removal of Bergeron as Chairman after the

26  restatement was publicly disclosed strengthens the inference they knew about the undisclosed

27  problems that caused VeriFone to report false financial results in 2Q07.

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP

1    218.    Bergeron and Zwarenstein were motivated to tell investors the Company's 2Q07 pro

2    forma gross margin and earnings were better than expected because it would maintain the artificial

3    inflation in the Company's stock price. The stock price had already increased from $23.15 on August

4    31, 2006 to $37.05 on May 29, 2007.   Although VeriFone's stock price declined 6.1% after it

5    reported disappointing 2Q07 revenues, the stock continued to trade at artificially inflated prices

6    because the market did not know the Company was reporting false financial results.  The stock price

7    traded in the mid- to high $30s from May 29, 2007 to September 6, 2007. If VeriFone had reported

8    accurate financial results the price of the stock would have declined as it did following the disclosure

9    of the restatement on December 3, 2007. Between May 29, 2007 and September 6, 2007, Bergeron

10   and Zwarenstein took advantage of the inflated stock price.  Bergeron sold 390,400 shares for $13.9

11   million and Zwarenstein sold 38,000 shares for $1.3 million.

12   219.    In addition to the insider sales, as set forth in ¶¶145-154, Bergeron and Zwarenstein

13   knew they would receive larger bonuses and additional stock awards if VeriFone reported increased

14   pro forma gross margins and earnings in 2007.

15   220.    The foregoing facts considered together raise a strong inference Bergeron and

16   Zwarenstein knew the Company's better-than-expected financial results could not be accurate.

17   Nevertheless, they assured investors the Company's 2Q07 financial results were fairly presented in

18   accordance with GAAP and that the Company's disclosure controls and procedures were effective.

19   They concealed the adverse facts described above, boasted about how the 2Q07 gross margin was a

20   record that exceeded their own expectations and represented the record gross margins were

21   sustainable and could even increase in the future.  They also received bonuses and stock awards they

22   were not entitled to and sold millions of dollars of their VeriFone stock at artificially inflated prices.

23   **D.    False and Misleading 3Q07 Statements**

24   221.    **September 6, 2007 Press Release:** On September 6, 2007, VeriFone issued a press

25   release announcing its 3Q07 financial results, including the following chart:

26

27

28

| Quarter Ended July 31, 2007 | | | |
|---|---|---|---|
| ($ in 000s, Except EPS) | Quarter as Stated | Sequential Change % | Year over Year Change % |
| Net Revenues | $231,945 | 6.78% | 57.13% |
| Cost of Net Revenues | $129,934 | 2.30% | 60.10% |
| Gross Profit | $102,011 | 13.09% | 53.49% |
| Gross Profit % | 43.98% | 2.45% | 39.61% |
| Pro forma Gross Profit | $111,857 | 7.16% | 65.14% |
| Pro forma Gross Profit % | 48.23% | 0.17% | 2.34% |
| Pro forma Net Income | $35,585 | 9.04% | 81.00% |
| Pro forma EPS | $0.42 | 8.79% | 48.19% |
| GAAP Net Income | $13,439 | 176.58% | -19.79% |
| GAAP EPS | $0.16 | 175.94% | -34.33% |
| Inventories | $145,398 | 15.96% | 96.83% |

222.    In addition to announcing VeriFone's financial results, Bergeron and Zwarenstein again touted VeriFone's gross margins:

> **Gross margins**, excluding non-cash acquisition related charges and stock-based compensation expense, **expanded to a record 48.2%**, for the three months ended July 31, 2007, compared to 45.9% for the comparable period of 2006. . . .

223.    The Company's 3Q07 financial results were repeated during the VeriFone's September 6, 2007 conference call, in numerous reports issued by analysts that followed the Company and in VeriFone's 3Q07 Form 10-Q filed with the SEC on September 7, 2007.

224.    **September 6, 2007 Conference Call:** During the conference call, Bergeron and Zwarenstein continued to tout VeriFone's gross margins:

> BERGERON: ***I am delighted to report another outstanding quarter with records in each of the following key financial metrics.   Net revenues, gross margin percentage, EBITDA percentage, net income as adjusted, and operating cash flow. . . . Our 11-quarter period of gross margin expansion continues and reached 48.2%.***

> *              *              *

> ZWARENSTEIN: As Doug discussed revenue in some detail, I'll begin with ***non-GAAP gross margins, which came in at 48.2% in excess of the 48.1% in the second quarter of 2007 and the 45.9% in the prior year.***   These margins reflect an essentially stable sequential domestic international mix and wireless/non-wireless mix. . . .

225.    In response to a question from Wachovia analyst Perlin about whether VeriFone would outsource Lipman production or continue with the Lipman business model of manufacturing in house, Bergeron stated that VeriFone would continue to maintain Lipman's manufacturing

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

- 71 -

capabilities, that VeriFone was getting supply-chain efficiencies in Israel that they had never seen before and that it was a key factor in driving gross margin expansion:

> PERLIN – Wachovia Analyst: On the manufacturing side, have you made, I guess a definitive decision as to whether or not all of the Lipman production is going to be outsourced, or are you going to maintain in their existing business model ? I forgot kind of where you left that off?

> BERGERON: No, we are extremely happy with the decision that we took this time last year and that was to maintain Lipman's manufacturing capabilities in Israel and optimize those facilities in a way that allowed us to run them at 100% capacity, something they were never able to do before, by moving some of the volatility in and out of our contract manufacturers to Israel, and then use all of the volatility in our product mix as business for the contract manufacturers. *This has proven to be wonderful because we're getting supply chain efficiencies in Israel that we never experienced before, and something we mentioned as well, we have tremendous transparency, financial transparency into the true cost of manufacturing and all the little nuanced items that roll up into that as a result of having 30%, 35% of our own inside.* So it's worked out splendidly and we're committed to it.

> PERLIN: And *would you say this has been a key facet in driving gross margin expansion* in addition to the wireless mix?

> BERGERON: It's hard to pull them apart and in many cases, there's more than one component.  But *there's clearly that, there's clearly wireless, there's clearly scale in general, and there's clearly just better commercial execution in many respects.*

226.    As detailed in ¶132, after VeriFone reported 3Q07 results, several analysts issued reports in which they noted their surprise at the reported financial results – particularly gross margins – given the inclusion of the lower-margin Lipman sales.

227.    **3Q07 Form 10-Q:** On September 7, 2007, VeriFone filed its 3Q07 Form 10-Q with the SEC.  The Form 10-Q was signed by Bergeron and Zwarenstein, included the 3Q07 financial results originally reported on September 6, 2007, and also included the same representations and Sarbanes-Oxley certifications that were included in the 1Q07 Form 10-Q filed on March 9, 2007 and the 2Q07 Form 10-Q filed on May 31, 2007.

**Facts Establishing the Material Falsity of the Statements and Raising a Strong Inference Bergeron and Zwarenstein Knew or Were Deliberately Reckless in Not Knowing Their Statements Were Materially False and Misleading**

228.    The following facts conclusively establish that the statements made by Bergeron and Zwarenstein were materially false and misleading and raise a strong inference they knew or were deliberately reckless in not knowing their statements were materially false and misleading:

229.   **Restatement:** As shown in the following chart, the restatement establishes that VeriFone's 3Q07 financial results were not fairly presented in accordance with GAAP and that the Company's disclosure controls and procedures were not effective:

| Quarter Ended July 31, 2007 | | | | |
|---|---|---|---|---|
| ($ in 000s, Except EPS) | Originally Reported | Restated | Amount Overstated | % Reported Amount was Overstated |
| Net Revenues | $231,945 | $231,701 | $244 | 0.11% |
| Cost of Net Revenues | $129,934 | $146,105 | ($16,171) | -12.45% |
| GAAP Gross Profit | $102,011 | $85,596 | $16,415 | 16.09% |
| GAAP Gross Profit % | 43.98% | 36.94% | | 16.00% |
| Pro forma Gross Profit | $111,857 | $95,444 | $16,413 | 14.67% |
| Pro forma Gross Profit % | 48.23% | 41.19% | | 14.58% |
| Pro forma Net Income | $35,585 | ($21,697) | $57,282 | 160.97% |
| Pro forma EPS | $0.42 | ($0.26) | $0.69 | 164.29% |
| GAAP Net Income | $13,439 | ($42,386) | $55,825 | 415.40% |
| GAAP EPS | $0.16 | ($0.51) | $0.67 | 418.75% |
| Inventories | $145,398 | $104,784 | $40,614 | 27.93% |

230.   As shown in the above chart, the 48.23% reported 3Q07 pro forma gross margin was substantially overstated and was actually 41.19%.  As a result, the originally reported GAAP net income of $13.4 million was overstated by $55.8 million or 415% and was actually a net loss of $42.4 million.  The originally reported GAAP EPS of $0.16 was overstated by $0.67 or 419% and was actually a loss per share of $0.51.

231.   Bergeron and Zwarenstein knew the 3Q07 gross margin of 48.2% was a "record," was greater than the record 48.1% reported in 2Q07 and was larger than the 45.9% gross margin reported in 3Q06, despite the fact that the inclusion of the Lipman sales caused VeriFone's lower-margin international sales to almost double from $66.6 million in 4Q06 to $128 million in 3Q07.  As a result, VeriFone's lower-margin international sales increased from 42.5% of total sales in 4Q06 to 55.2% in 3Q07.  They knew Lipman's gross margins and operating margins were declining since 2001 and were less than 42% and 15% in 2006.  During the September 7, 2007 conference call, analysts asked about the better-than-expected gross margin and, as alleged in ¶132, issued reports stating the margins were better than expected given the inclusion of the lower-margin Lipman sales.  Bergeron and Zwarenstein knew, or were deliberately reckless in not knowing, that VeriFone's 2Q07 financial results were not accurate given the inclusion of the lower-margin Lipman sales.

1    232.    Bergeron's comments during VeriFone's August 19, 2008 conference call confirm he

2    and Zwarenstein knew the 48.23% pro forma gross margin could not be accurate because VeriFone's

3    3Q07 results included the lower-margin Lipman sales.  During the August 19, 2008 conference call,

4    Bergeron stated that 45% pro forma gross margins were "very doable" *before* the Lipman

5    acquisition when 60% of the Company's sales were in the U.S.  But he said VeriFone would not

6    even report 40% pro forma gross margins for five or six quarters or until the end of FY09 because

7    after the Lipman acquisition, approximately 60% of the Company's revenues were international

8    revenues.

9    233.    Further, after the Class Period, VeriFone reported pro forma gross margins that were

10   substantially lower.  VeriFone reported a pro forma gross margin of 32.5% in 4Q07, 35.7% in 1Q08,

11   34.9% in 2Q08 and 37.6% in 3Q08.

12   234.    In addition to knowing that VeriFone was reporting better-than-expected financial

13   results, particularly gross margins, despite the inclusion of the lower-margin Lipman sales, Bergeron

14   and Zwarenstein knew VeriFone was having problems obtaining accurate financial data from

15   Lipman due to the companies use of different versions of Oracle ERP general ledger system.

16   VeriFone could not simply transfer Lipman financial data from Lipman's 11i system to VeriFone's

17   10.7 system.  Instead, Lipman financial data had to be transferred from 11i to Excel spreadsheets and

18   then transferred from the Excel spreadsheets to VeriFone's 10.7 system.  That process was

19   generating inaccurate financial data because the macro formulas in the Excel spreadsheets were

20   incorrect.  As a result, Bergeron and Zwarenstein knew the financial information received from

21   Lipman for 3Q07 was inaccurate but said nothing about these problems when analysts questioned

22   them about the better-than-expected margins.

23   235.    Bergeron and Zwarenstein continued to conceal the fact that manual journal entries

24   were required to post Lipman inventory data to the Company's 10.7 system because the companies

25   used different versions of the Oracle ERP general ledger system.  Those manual journal entries

26   overstated 3Q07 inventories by $40.6 million and understated the cost of net revenues by $16.2

27   million (which in turn caused gross profit and earnings to be overstated by millions of dollars) which

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                                                      - 74 -

1    Bergeron claimed the Company discovered when accounting personnel reviewed the manual journal

2    entries.

3        236.    But as the former VeriFone accounting employees stated, the manual journal entries

4    were received and reviewed by the San Jose accounting department headed up by Zwarenstein and

5    discussed during monthly meetings before VeriFone reported its 3Q07 results.  Further, Bergeron

6    and Zwarenstein repeatedly assured investors that they had designed and evaluated the Company's

7    disclosure controls and procedures and concluded they were effective to ensure material information

8    was made known to them before the Company reported its financial results.  In fact, according to

9    VeriFone's Proxy Statement filed with the SEC on September 10, 2008, Zwarenstein's salary was

10   increased for 2007 because of "his work in building out [VeriFone's] financial and accounting

11   infrastructure" and his instrumental efforts towards the successful completion of the Lipman

12   acquisition. Thus, Bergeron and Zwarenstein knew about the manual journal entries and the amount

13   of Lipman inventory and cost of net revenues before they were included in the Company's false

14   financial results.

15       237.    Given their positions at VeriFone and the importance of the Company's accounting

16   operations and disclosure controls and procedures in light of the Lipman acquisition and the fact that

17   the two companies were using different Oracle ERP systems, the only plausible inference is that

18   Bergeron and Zwarenstein also knew about the problems in the San Jose accounting department

19   described by the witnesses and acknowledged by VeriFone after the restatement was announced.

20   That is, Bergeron and Zwarenstein knew the San Jose accounting department was disorganized,

21   understaffed and in a general state of disarray which, considered with the other facts, raises a strong

22   inference they knew the Company's disclosure controls and procedures were not effective and

23   therefore could not know if VeriFone's 3Q07 results were fairly presented in all material respects.

24       238.    The termination of Zwarenstein and the removal of Bergeron as Chairman after the

25   restatement was publicly disclosed strengthens the inference they knew about the undisclosed

26   problems that caused VeriFone to report false financial results in 3Q07.

27       239.    Bergeron and Zwarenstein were motivated to tell investors the Company's 3Q07 pro

28   forma gross margin and earnings were better than expected because it would maintain the artificial

1    inflation in the Company's stock price. The stock price had already increased from $23.15 on August

2    31, 2006 to $36.99 on September 6, 2007.  VeriFone's stock price increased 5.9% to $39.18 after

3    3Q07 results were reported on September 6, 2007 and the stock price increased further reaching a

4    Class Period high price of $50.00 on October 31, 2007.  The stock continued to trade in the high

5    $40s until December 3, 2007 when VeriFone announced the restatement.  Between September 6,

6    2007 and December 3, 2007, Bergeron and Zwarenstein took advantage of the inflated stock price.

7    Bergeron sold 492,600 shares for $21.7 million and Zwarenstein sold 54,000 shares for $2.3 million.

8         240.    In addition to the insider sales, as set forth in ¶¶145-154, Bergeron and Zwarenstein

9    knew they would receive larger bonuses and additional stock awards if VeriFone reported increased

10   pro forma gross margins and earnings in 2007.

11        241.    The foregoing facts considered together raise a strong inference Bergeron and

12   Zwarenstein knew the Company's better-than-expected financial results could not be accurate.

13   Nevertheless, they assured investors the Company's 3Q07 financial results were fairly presented in

14   accordance with GAAP and that the Company's disclosure controls and procedures were effective.

15   They concealed the adverse facts described above, boasted about how the 3Q07 gross margin was a

16   record and that they were getting supply-chain efficiencies in Israel that that VeriFone had never

17   experienced before.  Those false statements caused the price of VeriFone's stock to increase to a

18   Class Period high price of $50.00 per share and Bergeron and Zwarenstein took advantage of the

19   artificial inflation and sold additional shares for millions of dollars.

20   **VII.   VERIFONE ADMITS THE STATEMENTS MADE DURING THE CLASS
          PERIOD WERE MATERIALLY FALSE AND MISLEADING BY**
21   **       DISCLOSING THE NEED TO RESTATE THE COMPANY'S FINANCIAL
          RESULTS, CAUSING SUBSTANTIAL DECLINES IN THE COMPANY'S**
22   **       STOCK PRICE**

23        242.    As late as November 30, 2007, four days before VeriFone announced its restatement,

24   analysts were still touting the Company's gross margins and earnings potential for 4Q07, based on

25   defendants' earlier representations as follows:

26        243.    In a November 30, 2007 Wachovia report, analysts Perlin and Matthew Roswell,

27   CFA, stated:

28

We believe adjusted gross margin could come in above our 48.3% estimate as PAY (1) continues to leverage its larger purchasing power and in-house manufacturing capabilities with its contract manufactures and (2) benefits from higher wireless sales in high market share regions.  In addition, we believe operating leverage, slightly lower interest expense than modeled, and mostly lower taxes could also provide a lift to cash EPS.

244.     In a November 30, 2007 Wedbush Morgan Securities, Inc. ("Wedbush") report, analysts Gil B. Luria and Nick Setyan stated:

**Margins positioned for continued expansion.**  VeriFone continues to maintain its dominant unit share position in the highest gross margin U.S. market, and wireless terminals, its highest gross margin products, continue to garner a greater mix of overall company sales.   Combined with more operating leverage, we believe VeriFone is well positioned to see margins expand towards the high end of recently increased long-term targets of 45-50% gross and 25-30% EBITDA margins.

245.     On December 3, 2007, however, VeriFone issued a press release announcing that it would be drastically restating its financial results for 1Q07, 2Q07 and 3Q07 and that it expected to complete the restatement in January 2008.  In response, the Company's stock price declined 46% from $48.03 on November 30, 2007 to $26.03 on December 3, 2007, compared to a 0.6% decline in both the S&P 500 and VeriFone's peer group.[6]  The stock price declined another 22.4% from $26.03 on December 3, 2007 to $20.20 on December 6, 2007, compared to a 2.5% increase in the peer group.  Despite the 46% stock price decline on the news of the accounting misconduct, VeriFone's stock price remained inflated because the full extent of the restatement was not yet known to investors.

246.     On December 31, 2007, VeriFone announced that it was delaying the reporting of its final restated financial results.  The Company stated that it had disclosed to the SEC that it was extending the time of filing of its Form 10-K to January 14, 2008, but stated that "it does not expect that it will complete this process and make the required filings prior to March 2008."  On this news, VeriFone's stock declined 15% from $23.75 on December 31, 2007 to $19.81 on January 2, 2008, compared to a 1.4% decline in the S&P 500 and a 3% decline in the peer group.

---

[6]      The peer group index is the same index VeriFone compared its stock price to in its 2007 Proxy Statement and includes Hypercom Corporation, Igenico S.A., IBM, MICROS Systems, Inc. NCR Corporation and Radiant Systems, Inc.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

247.    On March 6, 2008, VeriFone unexpectedly canceled an April appearance at the SunTrust's annual institutional investors' conference.  VeriFone's stock price declined 21% from $19.64 on March 5, 2008 to $15.45 on March 6, 2008 compared to a 2.2% decline in the S&P 500 and a 1.8% decline in the peer group.  Bloomberg reported the cancellation and quoted one Wall Street analyst as stating:  "The cancellation suggests VeriFone will again delay issuing its restated results for the first three quarters of 2007, which had been promised this month . . . .  'There is some concern about the timing of when they'll be done with internal accounting . . . .'"  The analyst did not recommend buying VeriFone stock because "'there is a still a risk that there are more mistakes and accounting issues.'"

248.    On April 1, 2008, VeriFone revealed the restatement would be substantially larger than initially reported on December 3, 2007 and that Zwarenstein had resigned.  In response to this unexpected news, the Company's stock price declined 19% from $16.83 on April 1, 2008 to $13.64 on April 1, 2008, compared to a 0.2% decline in the S&P 500 and a 0.3% decline in the peer group.

249.    Analysts were incensed on the news of a larger restatement and ousting of CFO Zwarenstein and openly questioned management's integrity.  In a report issued on April 3, 2008, entitled "Update Worse than Expected; Outlook Remains Vague," Wedbush analyst Gil B. Luria stated:

> *Results of internal investigation indicate more than a simple mistake*.  We believe the significant reorganization, the stepping down of the CFO, the CEO relinquishing the Chairman position, and the inclusion of the SEC *point to more than the simple clerical error the company previously indicated*. . . .

250.    Wachovia analyst Perlin issued a report on April 4, 2008, openly ridiculing the lack of clarity in management's disclosures:

> **Independent Investigation Complete; Now in the Hands of Government**.  *PAY announced yesterday that it had completed the independent investigation* into its accounting and although *the release was anything but conclusive,* the company did provide some insight into what's to come. . . .

> **Business Update Creates More Questions than Answers**.  Two key points came out of the business update including (1) *4Q07 gross margins are expected to be in the range of 32%-34%* (including a charge, which was not disclosed) and (2) challenging net revenue growth in 1Q08.  So *rather than provide more clarity around these two points the company just left them out there with no additional color*. . . .

251.     On April 30, 2008, VeriFone filed a Form 8-K with the SEC stating that it was not going to meet its previous deadline for filing restated financial results.  It also announced that it was forced to amend its credit agreements with its lenders because of the accounting misconduct and delay in filing of financial statements.  VeriFone agreed to pay an extra 0.25% "lenders fee" on the outstanding debt, an extra 0.75% interest per year on its outstanding debt, and 0.125% per annum to the commitment fee for unused revolving commitments.

252.     On this news, Merrill Lynch cut VeriFone's earnings targets for 2008 and 2009 and stated "*[t]he lack of visibility into future results and potential collateral damage arising from the accounting issues keeps us a 'Neutral' rating as we continue to see a balance risk/reward at current levels*."

253.     On May 14, 2008, *The Financial Times* published an article entitled "***Fidelity Slashes VeriFone Stake***."  The article stated:  "Some institutional investors are fed up with [VeriFone] even though its share has begun to recover from the collapse that followed the company's announcement that it will restate revenue for the past few years.  VeriFone yesterday notified the [SEC] that Fidelity Management & Research Company is no longer a party at interest in the company after selling shares. . . ."

## VIII.  LOSS CAUSATION

254.     During the Class Period, as detailed above, Bergeron and Zwarenstein falsely represented that  VeriFone's financial results were fairly presented in accordance with GAAP and that the Company's disclosures and procedures were effective.  Those false representations artificially inflated  VeriFone's stock price and operated as a fraud or deceit on Class Period purchasers of VeriFone securities.  When VeriFone revealed its true financial condition by reporting the Company's previously reported financial results would have to be restated, VeriFone's stock price declined and the amount of artificial inflation began to come out of the Company's stock price.  As a result, class members who purchased VeriFone stock during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

255.     The false and misleading statements and omissions caused and maintained the artificial inflation in VeriFone's stock price throughout the Class Period.  During the Class Period,

1   VeriFone reported materially false and misleading financial results and falsely represented that the

2   Company's financial reporting controls were effective when, in fact, there were numerous material

3   weaknesses causing VeriFone to report false and misleading financial results.

4         256.   The false and misleading statements and omissions caused VeriFone's stock to trade

5   at artificially inflated prices.  From August 31, 2006 to October 31, 2007, VeriFone's stock price

6   more than doubled from $23.15 on August 31, 2006 to $50.00 on October 31, 2007 and continued to

7   trade at prices above $43.00 per share until December 3, 2007, when VeriFone began to partially

8   reveal the Company's true financial condition by disclosing the need to restate its financial results.

9   Bergeron, Zwarenstein and other VeriFone executives took advantage of the inflated stock price by

10   selling more than $443 million of their VeriFone stock.

11         257.   After VeriFone announced 3Q06 results and Bergeron and Zwarenstein told investors

12   the Lipman acquisition would improve gross margins and be accretive to FY07 EPS, the Company's

13   stock price increased 23% compared to a 0.55% increase in the S&P 500 and a 0.1% increase in the

14   peer group.  After VeriFone  reported 4Q06 results on December 7, 2006, and Bergeron and

15   Zwarenstein again told investors gross margins and EPS would increase in FY07, the Company's

16   stock price increased 5% compared to a 0.18% increase in the S&P 500 and a 0.24% decline in the

17   peer group.  VeriFone's stock price declined 0.2% after it announced 1Q07 results on March 1, 2007

18   significantly less than the 1.1% decline in the S&P 500 and the 2.4% decline in the peer group.

19   VeriFone's stock price declined 6.1% after the Company reported 2Q07 results, including less than

20   expected revenue, compared to a 0.8% increase in the S&P 500 and a 0.4% decline in the peer group

21   but still traded at artificially inflated prices because the market did not know that VeriFone's results

22   were materially overstated.  After VeriFone reported 3Q07 results on September 6, 2007, the

23   Company's stock price increased 6% compared to a 1.7% decline in the S&P 500 and a 1.3% decline

24   in the peer group.  The stock price continued to increase reaching a Class Period high of $50.00 per

25   share on October 31, 2007, and closed at $48.03 on November 30, 2007.

26         258.   Bergeron and Zwarenstein made four partial disclosures on December 3, 2007,

27   December 31, 2007, March 6, 2008 and April 1, 2008 that disclosed *some* of the previously

28   concealed problems and *some* of the impact those problems were having on VeriFone's current

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP

1   financial condition and would have on the Company's future results.  The partial disclosures caused

2   VeriFone's stock price to decline significantly more than the changes in the peer group and the S&P

3   500.  As a result, the price declines following the partial disclosures provide a measurement of class

4   members' economic losses.

5         259.   For example, one of defendants' first partial disclosures of adverse facts about

6   defendants' accounting violations and the restatement occurred on December 3, 2007.  On this news,

7   VeriFone's stock dropped over 46% from the previous day's closing price of $48.03, to $26.03.

8   Thus, some of the inflation of VeriFone's stock price was removed upon the negative disclosures,

9   causing economic loss (damages) to investors.  However, the Company's stock price remained

10   artificially inflated because defendants did not reveal the full extent of the restatement.

11         260.   Just weeks later, on December 31, 2007, VeriFone announced that it was delaying the

12   reporting of its restated financial results.  Upon this news, the stock price declined another 15%

13   compared to a 1.4% decline in the peer group and a 3% decline in the S&P 500.  Despite this

14   removal of inflation built into the stock price, it remained significantly inflated because defendants

15   had not yet revealed the final restated numbers, the full extent of the accounting manipulations and

16   the true financial condition of the Company.

17         261.   On March 6, 2008, VeriFone abruptly cancelled an appearance at a prominent

18   institutional investor conference.  Bloomberg and Wall Street analysts reported that the cancellation

19   suggested that VeriFone's restatement would be delayed further, which it was.  On that news,

20   VeriFone's stock price declined 21%, compared to only a 1.8% drop in the industry peer group.  The

21   removal of additional inflation of VeriFone's stock on March 6, 2008 was directly related to

22   defendants' accounting misconduct and the restatement.

23         262.   Finally, on April 1, 2008, the last day of the Class Period, defendants disclosed that

24   VeriFone's restatement was going to be much larger than originally represented to investors on

25   December 3, 2007.   Defendants also announced that, based on the internal investigation,

26   "management has concluded that VeriFone did not maintain effective internal control over financial

27   reporting."  Finally, defendants disclosed that CFO defendant Zwarenstein was forced to "resign."

28

1    On this news, VeriFone's stock price plummeted 19% (versus a 0.3% drop in the peer group and

2    0.2% drop in the S&P 500), to $12.50 per share, down over 75% from its Class Period high.

3         263.    The declines in VeriFone's stock price as the bad news was incrementally disclosed,

4    revealing the true state of defendants' financial condition and accounting controls, were directly

5    related to defendants' prior misrepresentations and fraudulent conduct.  Each partial disclosure of

6    adverse facts which removed inflation from VeriFone's stock price (thereby causing damages), was

7    directly related to the restatement, defendants' accounting manipulations and the resulting false

8    financial statements.

9         264.    The declines in VeriFone's stock price following the partial disclosures compared to

10   the changes in the peer group and S&P 500 negate any inference that the losses suffered by class

11   members were caused by changed market or industry conditions or Company-specific facts unrelated

12   to the fraudulent conduct.  The following chart (which is also attached hereto in foldout form)

13   illustrates the changes in VeriFone's stock price during the Class Period compared to the peer group

14   and the S&P 500:



VeriFone Holdings, Inc.
Indexed to Peer Group*, S&P 500 Composite Index
April 3, 2006 to August 29, 2008

## IX.    VERIFONE'S FALSE FINANCIAL STATEMENTS

265.    In order to inflate the price of VeriFone securities, defendants caused the Company to falsely report its financial results for the quarters ended January 31, 2007, April 30, 2007 and July 31, 2007, filed with its Forms 10-Q, as well as financial results included in press releases and other SEC filings throughout the Class Period.  Defendants violated GAAP and SEC rules because said financial information was not prepared in conformity with applicable GAAP literature and SEC requirements, nor was the financial information a fair presentation of the Company's operations. Defendants did so primarily by improperly overstating inventory and improperly understating cost of sales expenses, which resulted in overstated gross profit margins, net income and earnings. Defendants primarily accomplished this in the following ways: recording non-existent intercompany in-transit inventory; double-booking overhead costs to inventory; failing to account for certain intercompany transactions appropriately, such as by failing to eliminate intercompany profit in inventory; improperly capitalizing certain overhead into inventory; failing to write off excess and obsolete inventory; and delaying taking a charge to decrease inventory at former Lipman entities due to standards revaluation to a subsequent quarter.

266.    These accounting improprieties violated GAAP and SEC rules.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. §210.10-01(a).

**VeriFone's Restatement**

267.    There is no dispute about the falsity of VeriFone's financial statements.  Defendants have admitted the falsity – describing the improprieties as "errors in accounting" – and restated the previously reported numbers.  As a result of the "errors in accounting" as alleged herein during the Class Period, VeriFone was ultimately forced to restate its previously released financial statements for the first three quarters of FY07 to comply with GAAP.  As detailed in §IX, the restatement was

1   material and had a significant impact on net revenues, cost of net revenues, gross profit, net income

2   and EPS.

3          268.    The fact that VeriFone restated its previous financial statements is an admission that:

4   (a) the financial results originally issued during the Class Period and its public statements regarding

5   those results were materially false and misleading; and (b) the financial statements reported during

6   the Class Period were incorrect based on information available to defendants at the time the results

7   were originally reported.

8          269.    As noted by the SEC, "restatements should not be used to make any adjustments to

9   take into account subsequent information that did not and could not have existed at the time the

10  original financial statements were prepared," and "GAAP only allows a restatement of prior

11  financial statements based upon information 'that existed at the time the financial statements were

12  prepared.'"[7]   The Financial Accounting Standards Board ("FASB"), the governing body that

13  promulgated the accounting rules regarding restatements of prior financial statements, has defined

14  "restatement" as "the process of revising previously issued financial statements to reflect the

15  correction of an error in those financial statements."  *See* Statement of Financial Accounting

16  Standards ("SFAS") No. 154, ¶2.  FASB has also defined the "errors" that may be corrected through

17  a restatement: "an error in recognition, measurement, presentation, or disclosure in financial

18  statements resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight

19  or misuse of facts that existed at the time that the financial statements were prepared."  *Id.*  Indeed,

20  as alleged herein, the restatement at issue here was not due to a simple mathematical error, honest

21  misapplication of a standard or oversight; rather, as admitted by defendants, it was due to accounting

22  errors that plaintiff alleges were due to intentional misuse of the facts that were known at the time.

23

24

25  _____

26  [7]      *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States
    Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine*

27  to Exclude Evidence of the Restatement and Restatement Report at 11, 13 (S.D. Fla. Feb. 22, 2002)
    (quoting APB Opinion 20, ¶13).

28

270.    The SEC has reiterated its position that, in its investigations of restated financial statements, it often finds that the persons responsible for the improper accounting acted with scienter:

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia*, **to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter**. . . .

*Sunbeam*, Order at 2.

271.    The restatement at issue in this case contains at least the following indicators of scienter:

(a)    <u>**The Type of Restatement (Misuse of the Facts)**</u>: The restatement at issue was not due to simple mathematical error or honest misapplication of an accounting standard or oversight.  It was due to misuse of the facts.  As alleged herein, VeriFone knew or was reckless in not knowing the following, among other things, which falsely overstated inventory and understated cost of revenue: duplicate manual journal entries were made that falsely increased inventory; the same manufacturing and distribution overhead was allocated twice to inventories at former Lipman subsidiaries when it only should have been allocated once; intercompany profits for sales between various VeriFone entities were not eliminated in consolidation; certain overhead was improperly capitalized into inventory, thereby further inflating the inventory balance; and known excess and obsolete inventory was not written off.

(b)    <u>**The Size of the Restatement:**</u> The restated net income figures indicate that net income, as originally reported, was inflated by a whopping 477%, 199% and 415% in 1Q07, 2Q07 and 3Q07, respectively.  Cost of net revenues, gross profit, EPS and inventory were also materially misstated.

(c)    <u>**The Duration Over Which the Improper Accounting Was Perpetrated**</u>: As more fully detailed herein, this is not a case of an honest mistake or oversight during a single quarter.  VeriFone restated three quarters of financial statements to correct fraudulent accounting throughout FY07.

1        (d)    **The Types of Accounting Errors Employed:** As detailed herein, the

2 improper accounting corrected by this restatement did not occur as a result of good faith differences

3 in accounting judgments, or interpretations of complicated or vague accounting rules.   The

4 accounting rules and precepts violated by VeriFone were long established, basic accounting

5 standards and concepts, such as the fundamental rule of eliminating intercompany profits so as not to

6 overstate assets or recognize gains from "selling" to oneself.

7        (e)    **The Fact that the Aggregate "Errors" in Each  Restated Quarter Just**

8 **Happened to Inflate, Not Reduce, Net Income and EPS:** In fact, in two of the three quarters, the

9 improper accounting caused the Company to falsely report net income instead of a net loss.

10 **VeriFone Overstated Inventory and Understated Cost of Sales**

11        272.    Among other improprieties during the Class Period, VeriFone overstated its inventory

12 and understated its cost[8] of sales expense, resulting in inflated gross profits and net earnings.

13 VeriFone primarily accomplished this in at least six ways.  First, defendants have admitted in the

14 restated SEC filings that in 2Q07 and 3Q07, VeriFone improperly recorded millions of dollars of

15 intercompany "in-transit inventory" that simply did not exist.  Intercompany in-transit inventory is

16 inventory that is in the process of being shipped between VeriFone entities, primarily from either

17 Israel or Singapore to the United States, but has not yet physically arrived.  VeriFone admits in its

18 restated SEC filings that this non-existent inventory was "originally recorded based upon erroneous

19 methodology and application of source documents."

20        273.    By doing so, defendants violated GAAP, which requires that information be relevant

21 and reliable and that there be correspondence or agreement between a measure and the phenomenon

22 it purports to represent.  *See* Statement of Financial Accounting Concepts ("SFAC") No. 2, ¶¶58-59,

23 63.  The improper accounting also violated ARB No. 43, Chapter 4, Statement 3, which states that

24 "the primary basis of accounting for inventories is cost," which would be zero for nonexistent

25 

---

26 [8]     As applied to inventories, cost is the sum of the applicable expenditures and charges directly
27 or indirectly incurred in bringing an item to its existing condition and location, as defined by
Accounting Research Bulletin ("ARB") No. 43, Chapter 4, Statement 3.

28 

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP

1   inventory.  As admitted in the restated SEC filings, the violation of these basic concepts resulted in

2   an understatement of total cost of net revenues of $11.5 million and $8.4 million in 2Q07 and 3Q07,

3   respectively, and an overstatement of inventory of $12.7 million and $20.1 million in 2Q07 and

4   3Q07, respectively.

5       274.   Second, in order to overstate inventory and understate cost of revenues expense,

6   VeriFone improperly double booked manufacturing and distribution overhead costs to inventory at

7   former Lipman subsidiaries by making identical manual journal entries for (a) in-transit inventories;

8   and (b) direct shipments when the entries should not have been made for the direct shipments.

9       275.   This improper accounting, which defendants admitted to in the restated SEC filings,

10  violated GAAP, which requires that information be relevant and reliable and that there be

11  correspondence or agreement between a measure and the phenomenon it purports to represent.  *See*

12  SFAC No. 2, ¶¶58-59, 63.  The improper accounting also violated ARB No. 43, Chapter 4,

13  Statement 3, which states that inventories are to be stated at cost, which means acquisition and

14  production costs.  As admitted in the restated SEC filings, the violation of these simple concepts

15  resulted in the understatement of total cost of net revenues of $7.7 million and $2.8 million in 1Q07

16  and 3Q07, respectively, and the overstatement of inventory of $7.7 million, $7.7 million and $10.5

17  million in 1Q07, 2Q07 and 3Q07, respectively.

18      276.   Third, in order to overstate inventory and understate cost of revenues expense,

19  VeriFone improperly failed to account for its intercompany transactions appropriately, such as by

20  failing to eliminate intercompany profit in inventory.  As VeriFone explained in its restated SEC

21  filings, "Inventory at the end of a quarter in one VeriFone entity purchased from another VeriFone

22  entity contains intercompany profit which must be eliminated upon consolidation."  This is one of

23  the most fundamental concepts in accounting.

24      277.   Defendants' admittedly improper accounting for intercompany transactions violated

25  GAAP, which states, "Where combined statements are prepared for a group of related companies,

26  such as a group of unconsolidated subsidiaries or a group of commonly controlled companies,

27  intercompany transactions and profits or losses should be eliminated. . . ."  *See* ARB No. 51,

28  *Consolidated Financial Statements*, ¶23.  As admitted in the restated SEC filings, this GAAP

1   violation resulted in the understatement of total cost of net revenues of approximately $900,000, $3.5

2   million and $2.4 million in 1Q07, 2Q07 and 3Q07, respectively; and the overstatement of inventory

3   of approximately $3.2 million, $3.4 million and $7.4 million in 1Q07, 2Q07 and 3Q07, respectively.

4           278.     Fourth, in order to overstate inventory and/or understate cost of revenues expense,

5   VeriFone improperly capitalized certain additional overhead into inventory in violation of GAAP,

6   specifically, ARB No. 43, Chapter 4, Statement 3.   As admitted in the restated SEC filings, this

7   resulted in the understatement of total cost of net revenues of $800,000 and $2.1 million in 2Q07 and

8   3Q07, respectively, and the overstatement of inventory of $2.4 million in 3Q07.

9           279.     Fifth, in order to overstate inventory and understate total cost of net revenue by

10   $600,000 in 3Q07, defendants failed to write off excess and obsolete inventory in violation of

11   GAAP.   GAAP requires excess and obsolete inventory to be written down as a charge against

12   income in the period in which it occurs.   Specifically, ARB No. 43, Chapter 4, Statement 5 states,

13           Where there is evidence that the utility of goods, in their disposal in the ordinary
            course of business, will be less than cost, whether due to physical deterioration,
14         obsolescence, changes in price levels, or other causes, the difference should be
            recognized as a loss of the current period. This is generally accomplished by stating
15         such goods at a lower level commonly designated as market. . . . Thus, in accounting
            for inventories, a loss should be recognized whenever the utility of goods is
16         impaired. . . .

17           280.     In fact, throughout the Class Period, VeriFone stated in its Form 10-K and in all its

18   Forms 10-Q that its policy was to "review the adequacy of [its] inventories valuation on a quarterly

19   basis" and that "inventories are stated at the lower of standard cost or market." Defendants went on

20   to state, "The Company regularly monitors inventory quantities on hand and *records write-downs*

21   *for excess and obsolete inventories*. . . ." By failing to write down the value of excess and obsolete

22   inventory in a timely fashion, defendants knew or recklessly disregarded that VeriFone violated

23   GAAP and its own stated policy, resulting in an overstated gross margin and understated loss in

24   3Q07.

25           281.     Sixth, in order to overstate inventory and understate cost of net revenues expense in

26   1Q07 by $2.2 million, VeriFone delayed taking a necessary charge to decrease inventory at former

27   Lipman entities until a subsequent quarter.   A charge of $2.2 million for a change in inventories at

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP                                                           - 88 -

1  former Lipman entities due to inventory cost standards revaluation in conjunction with the Lipman

2  acquisition, which should have been recorded in 1Q07, was instead improperly recorded in 2Q07.

3      282.   As admitted in the restated SEC filings, this GAAP violation resulted in the

4  understatement of total cost of net revenues of $2.2 million, the overstatement of inventory of $2.2

5  million in 1Q07 and a corresponding overstatement of total cost of net revenues of $2.2 million in

6  2Q07.

7      283.   As a result of the numerous ways that defendants improperly inflated inventory as

8  described above, only a portion of the true costs of manufacturing and distributing VeriFone's

9  products was recognized as expense, and the remaining portion of costs was buried in the inventory

10  balance on VeriFone's books.  This resulted in defendants' understating the total cost of net revenues

11  recorded on the Company's Income Statement and overstating the inventory figure on the Balance

12  Sheet.  ARB No. 43, Chapter 4, ¶4 states:

13      In accounting for the goods in the inventory at any point of time, the major objective
    is the matching of appropriate costs against revenues in order that there may be a

14      proper determination of the realized income.  Thus, the inventory at any given date is
    the balance of costs applicable to goods on hand remaining after the matching of

15      absorbed costs with concurrent revenues.

16      284.   Defendants violated this accounting principle as described above, resulting in

17  materially false financial statements from 1Q07 through 3Q07.  (Refer to the table at ¶77 above for a

18  summary of the effect on key financial statement items.)

19      285.   VeriFone's management knew or was reckless in not knowing that the full cost of

20  manufacturing and distributing its products was not being properly recognized as an expense in the

21  same period the products were sold, and they knew or were reckless in not knowing that inventory

22  balances were overstated for several reasons.  For example, basic accounting techniques exist that all

23  accountants use to ensure that costs are properly matched with revenues in the appropriate period

24  and that inventory is accurate, and VeriFone is no exception.  As mentioned above, VeriFone

25  disclosed in its SEC filings that the Company reviews the adequacy of its inventories valuation on a

26  quarterly basis and regularly monitors inventory quantities on hand.  This was done to ensure that

27  accurate inventory and cost of sales figures exist by analyzing the variances between standard cost

28  and actual cost.

286.    Accordingly, for all the reasons discussed above, defendants knew or were reckless in not knowing throughout FY07 that inventory was inflated but refused to make the necessary adjustments to correct the financial statements because they did not want to recognize the actual expenses.

**VeriFone Knew Its Internal Accounting Controls Were Inadequate**

287.    Internal control[9] is a process, carried out by an entity's board of directors, management and other personnel, designed to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.

288.    Management of any public company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the 1934 Act.

289.    Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP]."  These provisions require an issuer to employ and supervise reliable personnel, maintain reasonable assurances that transactions are executed as authorized, properly record transactions on an issuer's books and, at reasonable intervals, compare accounting records with physical assets.

290.    Notwithstanding the allegations above and the indicators of scienter herein, VeriFone knew or was reckless in not knowing that its system of internal accounting controls governing

---

[9]    AU 319.06, *Internal Control in a Financial Statement Audit*, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP

1    inventory and cost of sales expense was inadequate.  In fact, VeriFone stated that its independent

2    auditor and the investigation commissioned by the Audit Committee concluded there were

3    significant control deficiencies that constituted material weaknesses[10] in the Company's control

4    environment, specifically related to the following: internal controls over the process for preparation,

5    review approval and entry of manual, nonstandard journal entries; maintaining sufficient qualified

6    accounting and finance personnel; the supervision, monitoring and monthly financial statement

7    review processes; and the identification, documentation and review of various income tax

8    calculations, reconciliations and related supporting documentation.  *See* Item 8, Report of

9    Independent Registered Public Accounting Firm, in the Form 10-K for the fiscal year ended October

10   31, 2007, filed August 19, 2008.  Moreover, VeriFone disclosed in its 1Q07 10-Q/A, 2Q07 10-Q/A,

11   3Q07 10-Q/A and FY07 10-K, all filed on August 19, 2008, that it has since begun to implement no

12   less than six remediation initiatives to bring internal controls to an adequate level.

13        291.    Throughout the Class Period, defendants were aware of the numerous control

14   deficiencies.  Defendants knew manual journal entries were submitted to the Company headquarters

15   in San Jose for review by defendant Zwarenstein's group and that the accounting department which

16   was headed by defendant Zwarenstein was disorganized, understaffed, overworked and plagued by

17   high levels of attrition and turnover.  Defendants also knew that there were problems with the

18   integration of the Lipman acquisition, including the inability to obtain necessary accounting

19   information from Lipman to close the Company's books at the end of each quarter.  Defendants

20   knew that the Lipman and VeriFone were using different, incompatible ERP systems.  Despite this

21   knowledge, VeriFone did not comply with the following requirements for internal control over

22   financial reporting: Rules 13a-15(f) and 15d-15(f) under the 1934 Act, §§302, 404 and 906 of

23   Sarbanes-Oxley, and Item 308 of Regulation S-K.

24

25

----

26   [10]    AU 325.06, *Communicating Internal Control Related Matters Identified in an Audit*, defines
     a material weakness as "a significant deficiency, or a combination of significant deficiencies, that
27   results in more than a remote likelihood that a material misstatement of the financial statements will
     not be prevented or detected."

28

292.    For example, VeriFone violated §13(b)(2)(A) of the 1934 Act by failing to maintain accurate records concerning its inventories, costs and net income.  It overstated inventory and earnings and understated cost of revenue.  Moreover, VeriFone's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods throughout FY07.

293.    In addition, VeriFone violated §13(b)(2)(B) of the 1934 Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  VeriFone failed to ensure that proper review and checks were in place to ensure that it was properly valuing inventory.  It failed to ensure that transactions were reported in accordance with its own policies and with GAAP.

294.    Under §302 of Sarbanes-Oxley, the principal officers of the Company are required to certify that they: are responsible for establishing, maintaining and regularly evaluating the effectiveness of the issuer's internal controls; have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls; and have included information in the issuer's quarterly and annual reports about their evaluation.

295.    Under §906 of Sarbanes-Oxley, the CEO and CFO must certify each periodic report containing financial statements filed by an issuer with the SEC pursuant to §13(a) or 15(d) of the 1934 Act, 15 U.S.C. §78m(a) or 78o(d), and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

296.    Under Item 308, *Internal Control Over Financial Reporting*, of Regulation S-K, management is required to provide a report of the registrant's internal control over financial reporting (as defined in Rule 13a-15(f) or Rule 15d-15(f) under the 1934 Act) that contains: (a) a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant; (b) a statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of Rule 13a-15 or Rule 15d-15 under the 1934 Act; (c) management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective – this discussion must include disclosure of any material

weakness in the registrant's internal control over financial reporting identified by management, and management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting; and (d) a statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

297.    During FY07, defendants violated the requirements for internal control over financial reporting alleged above as follows:

(a)    VeriFone's Forms 10-Q contained certifications required by Rule 13a-14(a) of the 1934 Act.  The certifications for the periods ended January 31, 2007, April 30, 2007 and July 31, 2007 were signed by Bergeron and Zwarenstein.  The certifications signed by Bergeron and Zwarenstein knowingly or recklessly were false or misleading given defendants' later admissions about VeriFone's financial reports and internal controls;

(b)    Defendants failed to establish and maintain an adequate system of internal controls and failed to regularly evaluate the status of those controls or the lack thereof;

(c)    Defendants did not maintain effective entity-level control; and

(d)    Defendants did not maintain effective process and transaction level controls.

298.    VeriFone's failure to strengthen its known inadequate internal controls rendered VeriFone's financial reporting inherently unreliable and contributed to the Company's inability to prepare financial statements that complied with GAAP.  Nonetheless, as detailed above, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the known existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

**Other GAAP Violations**

299.    In addition to the GAAP and SEC violations described above, the Company also violated the following fundamental GAAP principles:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

1                (a)      The principle that interim financial reporting should be based upon the same

2 accounting principles and practices used to prepare annual financial statements was violated (APB

3 No. 28, ¶10);

4                (b)      The principle that financial reporting should provide information that is useful

5 to present and potential investors and creditors and other users in making rational investment, credit

6 and similar decisions was violated (SFAC No. 1, ¶34);

7                (c)      The principle that financial reporting should provide information about the

8 economic resources of an enterprise, the claims to those resources, and effects of transactions, events

9 and circumstances that change resources and claims to those resources was violated (SFAC No. 1,

10 ¶40);

11              (d)      The principle that financial reporting should provide information about how

12 management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

13 for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

14 securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

15 accountability to prospective investors and to the public in general (SFAC No. 1, ¶50);

16              (e)      The principle that financial reporting should provide information about an

17 enterprise's financial performance during a period was violated.  Investors and creditors often use

18 information about the past to help in assessing the prospects of an enterprise.  Thus, although

19 investment and credit decisions reflect investors' expectations about future enterprise performance,

20 those expectations are commonly based at least partly on evaluations of past enterprise performance

21 (SFAC No. 1, ¶42);

22              (f)      The principle that financial reporting should be reliable in that it represents

23 what it purports to represent was violated.  That information should be reliable as well as relevant is

24 a notion that is central to accounting (SFAC No. 2, ¶¶58-59);

25              (g)      The principle of completeness, which means that nothing is left out of the

26 information that may be necessary to insure that it validly represents underlying events and

27 conditions was violated (SFAC No. 2, ¶79); and

28

1        (h)     The principle that conservatism be used as a prudent reaction to uncertainty to

2    try to ensure that uncertainties and risks inherent in business situations are adequately considered

3    was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

4    represents what it purports to represent (SFAC No. 2, ¶¶95, 97).

5        300.    Defendant Zwarenstein also admitted in the December 3, 2007 conference call that

6    the Company violated SFAS No. 86, *Accounting for the Costs of Computer Software to Be Sold,*

7    *Leased, or Otherwise Marketed*.

8        301.    Additionally, VeriFone's improper accounting for inventory and cost of revenue was

9    material, given the SEC's guidance on materiality.  Staff Accounting Bulletin ("SAB") Topic 1M,

10    *Materiality*, summarizes GAAP definitions of materiality.  SAB Topic 1M represents the

11    codification of certain SABs, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99

12    became effective August 12, 1999.  SAB Topic 1M says, *inter alia*, "[a] matter is 'material' if there

13    is a substantial likelihood that a reasonable person would consider it important."  It also stresses that

14    materiality requires qualitative, as well as quantitative, considerations.  For example, if a

15    misstatement changes income into a loss, that should be taken into account in determining the

16    materiality of the misstatement.

17        302.    Further, the undisclosed adverse information concealed by defendants during the

18    Class Period is the type of information which, because of SEC regulations, regulations of the

19    national stock exchanges and customary business practice, is expected by investors and securities

20    analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

21    be the type of information which is expected to be and must be disclosed.

22    **X.    CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE**

23

24        303.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

25    of Civil Procedure on behalf of all persons who purchased VeriFone common stock on the open

26    market during the Class Period, and were damaged thereby (the "Class").  Excluded from the Class

27    are defendants, directors and officers of VeriFone and their families and affiliates.

28

1    304.    The members of the Class are so numerous that joinder of all members is

2    impracticable.   During the Class Period, there were approximately 68 million to 84 million

3    outstanding shares owned by hundreds, if not thousands, of persons.  Thus, the disposition of their

4    claims in a class action will provide substantial benefits to the parties and the Court.

5    305.    There is a well-defined community of interest in the questions of law and fact

6    involved in this case.   Questions of law and fact common to the members of the Class that

7    predominate over questions which may affect individual Class members include:

8                  (a)     Whether the federal securities laws were violated by defendants;

9                  (b)     Whether defendants engaged in a fraudulent scheme and omitted and/or

10   misrepresented material facts;

11                 (c)     Whether defendants' statements omitted material facts necessary to make the

12   statements made, in light of the circumstances under which they were made, not misleading;

13                 (d)     Whether defendants knew or recklessly disregarded that their statements were

14   materially false and misleading;

15                 (e)     Whether the prices of VeriFone common stock were artificially inflated;

16                 (f)     Whether defendants' fraudulent scheme, misrepresentations and omissions

17   caused Class members to suffer economic losses, *i.e.*, damages; and

18                 (g)     The extent of damage sustained by Class members and the appropriate

19   measure of damages.

20   306.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

21   purchased VeriFone common stock during the Class Period and sustained damages from defendants'

22   wrongful conduct.   Plaintiff will adequately protect the interests of the Class and has retained

23   counsel who are experienced in class action securities litigation.   Plaintiff has no interests that

24   conflict with those of the Class.

25   307.    A class action is superior to other available methods for the fair and efficient

26   adjudication of this controversy.   A class action will achieve economies of time, effort and expense

27   and provide uniformity of decision to the similarly situated members of the Class without sacrificing

28   procedural fairness or bringing about other undesirable results.  Class members have not indicated an

1   interest in prosecuting separate actions as none have been filed.  The number of Class members and

2   the relatively small amounts at stake for individual Class members make separate suits

3   impracticable.  No difficulties are likely to be encountered in the management of this action as a

4   class action.

5       308.    In addition, a class action is superior to other methods of fairly and efficiently

6   adjudicating this controversy because the questions of law and fact common to the Class

7   predominate over any questions affecting only individual Class members.  Although individual Class

8   members have suffered disparate damages, the fraudulent scheme and the misrepresentations and

9   omissions causing damages are common to all Class members.  Further, there are no individual

10  issues of reliance that could make this action unsuited for treatment as a class action because all

11  Class members relied on the integrity of the market and are entitled to the fraud-on-the-market

12  presumption of reliance.

13      309.    The market for VeriFone's common stock was open, well developed and efficient at

14  all relevant times.  VeriFone's stock met the requirements for listing, and was listed and actively

15  traded, on the NYSE, a highly efficient and automated market.  As a regulated issuer, VeriFone filed

16  periodic public reports with the SEC and the NYSE.  VeriFone regularly communicated with public

17  investors via established market communication mechanisms, including through regular

18  disseminations of press releases on the national circuits of major newswire services and through

19  other wide-ranging public disclosures, such as communications with the financial press and other

20  similar reporting services.

21      310.    As alleged herein, the change in the price of VeriFone's stock – compared to the

22  changes in the peer group and NYSE – in response to the release of unexpected material positive and

23  negative information about the Company shows there was a cause-and-effect relationship between

24  the public release of the unexpected information about VeriFone and the price movement in the

25  Company's stock.  The average weekly trading volume of VeriFone's stock during the Class Period

26  was approximately 7.1 million shares, or 8.5% of total outstanding shares.  Numerous analysts

27  followed VeriFone, attended the Company's conference calls and issued reports throughout the Class

28

1    Period.  The Company was eligible to register securities on Form S-3 during the Class Period.

2    Institutional investors owned between 64% and 90% of the total outstanding shares.

3        311.    As a result of the foregoing, the market for VeriFone common stock promptly

4    digested current information regarding VeriFone from all publicly available sources and reflected

5    such information in the Company's stock price.   Under these circumstances, all purchasers of

6    VeriFone common stock during the Class Period suffered similar injury through their purchases of

7    VeriFone common stock at artificially inflated prices and the subsequent revelations concerning

8    declines in price, and a presumption of reliance applies.

9                              **FIRST CLAIM FOR RELIEF**

10                   For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
                     (Against Defendants VeriFone, Bergeron and Zwarenstein)
11

12       312.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

13       313.    During the Class Period, defendants engaged in a scheme to inflate VeriFone's

14   financial results and disseminated or approved the false statements specified above, which they knew

15   or recklessly disregarded were misleading in that they contained misrepresentations and failed to

16   disclose material facts necessary in order to make the statements made, in light of the circumstances

17   under which they were made, not misleading.

18       314.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

19               (a)     employed devices, schemes and artifices to defraud;

20               (b)     made untrue statements of material facts or omitted to state material facts

21   necessary in order to make the statements made, in light of the circumstances under which they were

22   made, not misleading; or

23               (c)     engaged in acts, practices and a course of business that operated as a fraud or

24   deceit upon plaintiff and others similarly situated in connection with their purchases of VeriFone's

25   publicly traded securities during the Class Period.

26       315.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

27   the market, they paid artificially inflated prices for VeriFone's publicly traded securities and suffered

28   economic loss when the inflation was removed through partial disclosures of adverse facts.  Plaintiff

1 and the Class would not have purchased VeriFone's publicly traded securities at the prices they paid,

2 or at all, if they had been aware that the market prices had been artificially and falsely inflated by

3 defendants' misleading statements.

4        316.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

5 other members of the Class suffered damages in connection with their purchases of VeriFone's

6 publicly traded securities during the Class Period.

7 **SECOND CLAIM FOR RELIEF**

8 For Insider-Trading Violations of Rule 10(b) and SEC Rule 10b5-1<br>(Against Defendants Bergeron, Zwarenstein, Atkinson and Bondy)

9

10        317.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

11        318.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5(1) in that they are liable

12 for making false statements and failing to disclose adverse facts known to them about VeriFone.

13 Defendants alleged herein sold over $43 million worth of VeriFone stock at artificially inflated

14 prices while in possession of adverse, material, non-public information about the Company's false

15 financial results and the overall financial condition of the Company.

16 **THIRD CLAIM FOR RELIEF**

17 For Violation of Section 20A of the 1934 Act<br>(Against Defendants Bergeron, Zwarenstein, Atkinson and Bondy)

18        319.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

19        320.    While VeriFone securities traded at artificially inflated and distorted prices,

20 defendants personally profited by selling a total of more than 12.1 million shares of VeriFone

21 securities while in possession of adverse, material, non-public information about VeriFone,

22 pocketing over $443 million in illegal insider-trading proceeds, as detailed above.

23        321.    Plaintiff National Elevator Fund and other Class members purchased VeriFone

24 securities contemporaneously with defendants' insider sales and suffered damages. All of plaintiff

25 National Elevator Fund's purchases and sales of VeriFone stock during the Class Period are set forth

26 in Exhibit B to the Declaration of Ramzi Abadou in Support of National Elevator Industry Pension

27 Fund's Motion for Appointment as Lead Plaintiff and for Approval of Its Selection of Lead Counsel

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
3:07-cv-06140-MHP

1   (Docket #36-3, filed on February 4, 2008).   Examples of plaintiff National Elevator Fund's

2   contemporaneous purchases of VeriFone stock while defendants were selling are as follows:

3            (a)     On September 5, 2006, defendant Bergeron sold 119,800 shares of VeriFone

4   stock at artificially inflated prices.   On September 7, 2006, plaintiff National Elevator Fund

5   purchased 5,550 VeriFone shares at artificially inflated prices.

6            (b)     On October 2, 2006, Bergeron sold 28,300 shares of VeriFone stock at

7   artificially inflated prices.  On October 4, 5 and 6, 2006, plaintiff National Elevator Fund purchased

8   3,240 shares, 1,360 shares and 2,025 shares, respectively, of VeriFone stock at artificially inflated

9   prices.

10           (c)     On December 1, 2006, defendant Bergeron sold 68,000 shares of VeriFone at

11  artificially inflated prices.  On December 1, 2006, plaintiff National Elevator Fund purchased 2,200

12  shares of VeriFone stock at artificially inflated prices.

13           (d)     On January 10, 2007, defendant Bergeron sold 200,000 shares of VeriFone at

14  artificially inflated prices.  On January 11 and 12, 2007, plaintiff National Elevator Fund purchased

15  2,925 shares and 1,595 shares, respectively, of VeriFone stock at artificially inflated prices.

16           (e)     On March 15, 2007, defendant Bergeron sold 110,687 shares of VeriFone at

17  artificially inflated prices.  On March 19 and 20, 2007, plaintiff National Elevator Fund purchased

18  6,725 shares and 3,075 shares, respectively, of VeriFone stock at artificially inflated prices.

19           (f)     On April 11, 2007, defendant Bergeron sold 24,000 shares of VeriFone stock

20  at artificially inflated prices.  On April 16 and 18, 2007, plaintiff National Elevator Fund purchased

21  4,025 shares and 4,725 shares of VeriFone stock, respectively, at artificially inflated prices.

22           (g)     On November 14, 2007, defendant Bergeron sold 140,495 shares of VeriFone

23  stock at artificially inflated prices.   On November 16, 2007, plaintiff National Elevator Fund

24  purchased 14,000 shares of VeriFone stock at artificially inflated prices.

25           (h)     On October 31, 2006, defendant Zwarenstein sold 4,000 shares of VeriFone

26  stock at artificially inflated prices.  On October 31, 2006, plaintiff National Elevator Fund purchased

27  3,600 shares of VeriFone securities at artificially inflated prices.

28

1            (i)      On November 30, 2006, defendant Zwarenstein sold 4,000 shares of VeriFone

2 stock at artificially inflated prices.  On November 30, 2006, plaintiff National Elevator Fund

3 purchased 5,460 shares of VeriFone stock at artificially inflated prices.

4            (j)      On January 9, 2007, defendant Zwarenstein sold 4,000 shares of VeriFone

5 stock at artificially inflated prices.  On October 31, 2006, plaintiff National Elevator Fund purchased

6 5,600 shares of VeriFone stock at artificially inflated prices.

7            (k)     On March 15, 2007, defendant Zwarenstein sold 12,600 shares of VeriFone

8 stock at artificially inflated prices.  On March 19 and 20, 2007, plaintiff National Elevator Fund

9 purchased 6,725 shares and 3,075 shares, respectively, of VeriFone stock at artificially inflated

10 prices.

11           (l)      On April 10, 2007, defendant Zwarenstein sold 5,785 shares of VeriFone

12 stock at artificially inflated prices.  On April 10, 2007, plaintiff National Elevator Fund purchased

13 5,070 shares of VeriFone stock at artificially inflated prices.

14           (m)    On October 9, 2007, defendant Zwarenstein sold 18,000 shares of VeriFone

15 stock at artificially inflated prices.  On October 9, 2007, plaintiff National Elevator Fund purchased

16 8,200 shares of VeriFone stock at artificially inflated prices.

17           (n)     On November 13, 2007, defendant Zwarenstein sold 18,000 shares of

18 VeriFone stock at artificially inflated prices.  On  November 16, 2007, plaintiff National Elevator

19 Fund purchased 14,000 shares of VeriFone stock at artificially inflated prices.

20      322.   Plaintiff National Elevator Fund and members of the class traded contemporaneously

21 with defendants Atkinson and Bondy and suffered damages thereby:

22           (a)      On October 2, 2006, defendant Atkinson sold 5,000 shares of VeriFone at

23 artificially inflated prices.  On October 4, 5 and 6, 2006, plaintiff National Elevator Fund purchased

24 3,240 shares, 1,360 shares and 2,025 shares, respectively, of VeriFone stock at artificially inflated

25 prices.

26           (b)      On December 1, 2006, defendant Atkinson sold 5,000 shares of VeriFone

27 stock at artificially inflated prices.  On December 1, 2006, plaintiff National Elevator Fund

28 purchased 2,200 shares of VeriFone stock at artificially inflated prices.

1    (c)  On March 1, 2007, defendant Atkinson sold 8,000 shares of VeriFone stock at

2 artificially inflated prices.  On March 5, 2007, plaintiff National Elevator Fund purchased 6,300

3 shares of VeriFone stock at artificially inflated prices.

4    (d)  On April 10, 2007, defendant Atkinson sold 3,215 shares of VeriFone stock at

5 artificially inflated prices.  On  April 10, 2007 plaintiff National Elevator Fund purchased 5,070

6 shares of VeriFone stock at artificially inflated prices.

7    (e)  On June 11, 2007, defendant Atkinson sold 10,000 shares of VeriFone stock

8 at artificially inflated prices.  On June 11, 2007, plaintiff National Elevator Fund purchased 4,325

9 shares of VeriFone stock at artificially inflated prices.

10    (f)  On July 2, 2007, defendant Atkinson sold 8,000 shares of VeriFone stock at

11 artificially inflated prices.  On July 3 and 5, 2007, plaintiff National Elevator Fund purchased 3,025

12 shares and 4,525 shares of VeriFone stock, respectively, at artificially inflated prices.

13    (g)  On September 26, 2007, defendant Atkinson sold 26,400 shares of VeriFone

14 stock at artificially inflated prices.  On September 26 and 28, 2007, plaintiff National Elevator Fund

15 purchased 20,000 shares and 21,000 shares, respectively, of VeriFone stock at artificially inflated

16 prices.

17    (h)  On June 25, 2007, defendant Bondy sold 3.5 million shares of VeriFone stock

18 at artificially inflated prices.  On July 3 and 5, 2007, plaintiff National Elevator Fund purchased

19 3,025 shares and 4,525 shares of VeriFone stock, respectively, at artificially inflated prices.

20   323.  Plaintiff and all the other members of the Class who purchased VeriFone securities

21 contemporaneously with the sales of VeriFone securities by defendants:

22    (a)  have suffered substantial damages in that they paid artificially inflated prices

23 for VeriFone securities as a result of violations of §10(b) of the 1934 Act and Rule 10b-5 herein, and

24 the inflation was removed from the stock price; and

25    (b)  would not have purchased VeriFone securities at the prices they paid, or at all,

26 if they had been aware that the market prices had been artificially inflated and/or distorted by

27 defendants' false and misleading statements and misconduct.

28

1    324.    As a result of the wrongful conduct alleged herein, plaintiff and other members of the

2    Class have suffered damages.

3    325.    By reason of the foregoing, defendants violated §20A of the 1934 Act and are liable

4    to plaintiff and the other members of the Class for the substantial damages they suffered in

5    connection with their purchase of VeriFone securities during the Class Period.

6                              **FOURTH CLAIM FOR RELIEF**

7                         For Violation of Section 20(a) of the 1934 Act
                                    (Against All Defendants)
8

9    326.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

10   327.    By reason of their senior executive positions at VeriFone, their shareholdings and

11   their responsibility for the Company's financial results and overall financial condition, defendants

12   Bergeron, Zwarenstein, Atkinson and Bondy had the power and authority to influence and control,

13   and did influence and control, directly or indirectly, the decision making of the Company, including

14   the content and dissemination of the VeriFone's false financial statements.  The Company had the

15   power to control and influence, and did control and influence, defendants.  By reason of such

16   control, defendants are liable pursuant to §20(a) of the 1934 Act.

17   **XI.    PRAYER FOR RELIEF**

18          WHEREFORE, plaintiff prays for judgment as follows:

19          A.    Declaring this action to be a proper class action pursuant to Rule 23;

20          B.    Awarding plaintiff and the members of the Class damages, interest and costs;

21          C.    Ordering defendants to forfeit and reimburse VeriFone for any bonus or other

22   incentive-based or equity-based compensation received by them, and any profits realized from the

23   sale of securities during the time periods set forth in §304 of Sarbanes-Oxley.

24          D.    Awarding such other relief as the Court may deem just and proper.

25

26

27

28

1    **XII.    JURY DEMAND**

2          328.    Plaintiff demands a trial by jury.

3    DATED:  October 31, 2008                    COUGHLIN STOIA GELLER
                                                    RUDMAN & ROBBINS LLP
4                                                CHRISTOPHER P. SEEFER
                                                 ELI R. GREENSTEIN
5

6                                                _____
                                                              /s/
7                                                CHRISTOPHER P. SEEFER

8                                                100 Pine Street, Suite 2600
                                                 San Francisco, CA  94111
9                                                Telephone:  415/288-4545
                                                 415/288-4534 (fax)
10
                                                 Lead Counsel for Plaintiffs
11    S:\casesSD\verifone 07\cPT00054893.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at:  http://securities.csgrr.com/.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 31, 2008.

  s/ Christopher P. Seefer
CHRISTOPHER P. SEEFER

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:chriss@csgrr.com

## Mailing Information for a Case 3:07-cv-06140-MHP

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com

- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com,sharonv@johnsonbottini.com

- **Brendan P. Cullen**
  cullenb@sullcrom.com,carrejoa@sullcrom.com

- **Timothy Alan DeLange**
  kristinas@blbglaw.com,timothyd@blbglaw.com

- **Daniel C. Girard**
  dcg@girardgibbs.com,cma@girardgibbs.com

- **Eli Greenstein**
  e_file_sf@csgrr.com,Elig@csgrr.com,e_file_sd@csgrr.com

- **Stanley M. Grossman**
  smgrossman@pomlaw.com

- **James Michael Hughes**
  jhughes@motleyrice.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com,mav@girardgibbs.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Mark Cotten Molumphy**
  mmolumphy@cpmlegal.com,mmetzger@cpmlegal.com,oszeto@cpmlegal.com,bgoldman@cpmlegal.com,pskahan@cpmlegal.com,jacosta@cpmlegal.com

- **William H. Narwold**
  bnarwold@motleyrice.com

- **James Lyndon Oberman**
  joberman@kazanlaw.com,efile@kmesa.com,mramirez@kmesa.com

- **Vincent Ian Parrett**
  vparrett@motleyrice.com,MRECF@motleyrice.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Juden Justice Reed**
  plee@schubert-reed.com,akeng@schubert-reed.com,rschubert@schubert-reed.com

- **Joseph F Rice**
  jrice@motleyrice.com

- **Eran Rubinstein**
  erubinstein@chitwoodlaw.com

- **Robert C. Schubert**
  rschubert@schubertlawfirm.com

- **Aaron M. Sheanin**
  ams@girardgibbs.com,amv@girardgibbs.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com,ssawyer@scott-scott.com

- **Michael Howard Steinberg**
  steinbergm@sullcrom.com

- **Steven Noel Williams**
  swilliams@cpmlegal.com,jverducci@cpmlegal.com,cwalker@cpmlegal.com,rjit@cpmlegal.com,aliang@cpmlegal.com,mcompesi@cpmlegal.com,sgross@cpmlegal.com,medling@cp

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)