UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VERIFONE HOLDINGS, INC.<br>SECURITIES LITIGATION.<br><br>This Document Relates to:<br>ALL ACTIONS. | No. C 07-06140 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Defendants' Motion to Dismiss** |

    This consolidated litigation represents nine securities fraud class actions filed against VeriFone Holdings, Inc. ("VeriFone" or "company") and certain of its officers and directors (collectively "defendants"), on behalf of purchasers of VeriFone common stock during the time period of August 30, 2006, through April 1, 2008. Now before the court is defendants' motion to dismiss the complaint on the basis that plaintiffs have failed to allege scienter as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Having considered the arguments and submissions of the parties, the court enters the following memorandum and order.

BACKGROUND[1]

    On a motion to dismiss for failure to state a claim, the court assumes the truth of the allegations of a well-pleaded complaint. The question is not whether the events alleged actually happened but whether, if they did, plaintiff states a claim that would entitle it to relief under the law.

I.    VeriFone

    VeriFone is a Delaware corporation with its principal place of business in San Jose, California. It engages in the design, marketing and service of transaction automation systems,

including point-of-sale devices that enable secure electronic payments among consumers, merchants and financial institutions. Its main customers include global financial institutions, payment processors, large retailers, government organizations and healthcare companies. On November 1, 2006, VeriFone acquired Lipman Electronic Engineering Ltd. ("Lipman"), an Israeli-based developer, manufacturer and seller of electronic payment systems and software. At the time of the acquisition, Lipman was the fourth-largest point-of-sale terminal maker in the world. The acquisition of Lipman made VeriFone the largest global provider of electronic payment solutions and services in the world.

On December 3, 2007, VeriFone shareholders learned, via a company press release, that the company would restate its quarterly financial statements for at least the previous three quarters, to correct errors that overstated previously reported profits. VeriFone publicly announced that its consolidated financial statements for the quarters ended January 31, 2007, April 30, 2007 and July 31, 2007 should not be relied upon due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affected VeriFone's reported gross margins and other financial indicators. That same day, December 3, 2007, shares of VeriFone dropped from $48.03 to $26.03—a decline of over 45%—with over 49 million shares traded.

VeriFone's public announcement of the overstatement of approximately $70 million of its previously reported profits exposed the company to both litigation and regulatory investigations. The following day, December 4, 2007, the first of these related actions was filed in this district, asserting securities fraud claims against VeriFone and certain officers of the company. On December 14, 2007, a shareholder derivative action was filed in this court as well. See In re VeriFone Holdings, Inc. Shareholder Derivative Litigation, Case No. C 07-6347 MHP.

II.     Allegations Relating to Scienter

In the instant consolidated case, plaintiffs assert violations of the Securities and Exchange Act ("the Act") by: VeriFone; Douglas G. Bergeron, the company's Chief Executive Officer (CEO) and former Chairman of the Board of Directors ("Board"); Barry Zwarenstein, the company's former

2

Chief Financial Officer (CFO) and Executive Vice President; William G. Atkinson, the company's former Executive Vice President of Global Marketing and Business Development; and Craig A. Bondy, a former VeriFone director. Specifically, plaintiffs allege violations of sections 10(b), 20A and 20(a) of the Act and Rules 10b-5 and 10b5-1 promulgated under the Act. The consolidated complaint ("complaint") asserts that Bergeron and Zwarenstein defrauded class members by: representing that the Lipman acquisition would increase gross margins and earnings in 2007; causing VeriFone to report materially false and misleading financial results in violation of Generally Accepted Accounting Principles ("GAAP") and the company's publicly reported accounting policies; falsely representing that VeriFone's financial results were fairly presented in all material respects; falsely representing that the favorable financial results were the result of supply-chain efficiencies and integration success of the Lipman acquisition; falsely representing that they had designed, established and maintained disclosure controls and procedures to provide reasonable assurance that the company's financial reporting was reliable and in accordance with GAAP; and falsely representing that they had evaluated the company's disclosure controls and procedures and concluded they were effective. The complaint alleges that these misrepresentations resulted in an inflated stock price, and that the four individual defendants sold their shares while the price was inflated, "dumping their shares before the bad news hit the tape." Class members, on the other hand, purchased the stock at artificially inflated prices and suffered over a billion dollars of losses when the company began to reveal its true financial condition.

The complaint specifies several purported misrepresentations by the company and its officers. During an April 10, 2006, conference call, Bergeron assured investors that the Lipman acquisition would be successful. He described the company's gross margins as "in many respects—the ultimate barometer of the operational Excellence of this business," and stated "we are increasing our pro-forma gross margin expectations from 41-44% which was an improvement from the 40-43% model we issued during the IPO to a new pro-forma gross margin model of 42-47%." Analysts repeated Bergeron's statements and expressed enthusiasm for the Lippman deal. During a December 7, 2007, conference call, Bergeron discussed "our . . . almost obsessive approach to gross

3

margin expansion." During the three quarters after the Lipman acquisition, the company reported increases in gross margins and earnings, which analysts reported were better than expected given the increase in lower-margin international sales that came about as a result of the acquisition. As required by securities laws, Bergeron and Zwarenstein repeatedly certified under oath that the company's financial results were fairly presented in all material respects and assured investors that they had a legitimate basis for those representations, because they had designed, maintained and evaluated the company's disclosure controls and procedures and concluded they were effective. Finally, on August 19, 2008—after the restatement—Bergeron stated that 45% pro forma gross margins had been "very doable" before the Lipman acquisition but that the company would not be able to report even 40% pro forma gross margins until the end of fiscal year 2009 because of the increase in international sales caused by the acquisition.

The restatement affected gross margins and other financial indicators. Gross margins for the first three quarters of fiscal year 2007 were restated from 47.11%, 48.06% and 48.2%, respectively, to 41.4%, 42.3% and 41.2%, respectively. GAAP Earnings Per Share (EPS) for the same quarters were restated from -$0.01, $0.06 and $0.16, respectively, to -$0.07, -$0.06 and -$0.51, respectively. According to the complaint, this means that the GAAP EPS was overstated by 600% in first quarter 2007, by 200% in second quarter 2007 and by 419% in third quarter 2007. The company originally reported GAAP net income of $17.3 million from those three quarters, which was restated to a $52.9 million net loss—representing an overstatement of $70.2 million.

The complaint includes information provided by ten confidential witnesses who are former VeriFone employees.[2] These witnesses paint a picture of an accounting department that was chaotic and understaffed. Some of the confidential witnesses report that their boss, who reported to Zwarenstein, was "very difficult to work for." Several confidential witnesses described the work environment in San Jose as "extremely chaotic, where everyone was running around like chickens with their heads cut off." Some employees allegedly left the company because of the disarray in the department.

4

The information provided by confidential witnesses also sheds light on the challenging nature of the integration of the VeriFone and legacy Lipman accounting systems. VeriFone created a Consolidations Group at its facility in Rocklin, California, in late 2006, to consolidate the accounting data from Lipman's system into VeriFone's incompatible system. Manual journal entries were required to report Lipman inventories and the cost of net revenues. Journal entries for Lipman inventory and cost of net sales were prepared, reviewed and approved, entered into Excel spreadsheets and then posted to VeriFone's system. Rocklin's financial results were discussed with Zwarenstein and other accounting personnel during monthly meetings. The manual journal entries were received and reviewed by the accounting department at the company's headquarters in San Jose. One confidential witness reports that company personnel in San Jose emailed him a spreadsheet containing fields into which he was to input Lipman's North American financial information. Problems were encountered when the macros[3] included in the spreadsheet were incorrect and caused balances to appear incorrectly. Zwarenstein once called that confidential witness at home, asking the witness to adjust the macros in the spreadsheet and resubmit the spreadsheet, which Zwarenstein said he needed for a conference call the following week.

From August 31, 2006, through December 3, 2007, the four individual defendants collectively sold over $443 million worth of their VeriFone stock. Bergeron sold 57.20% of his shares, while Bondy sold 50.36% of his shares, Zwarenstein sold 98% of his shares, and Atkinson sold 96.51% of his.[4] Many of these sales occurred during the first three quarters of VeriFone's 2007 fiscal year, i.e., November 1, 2006, through July 31, 2007—the three quarters for which results were overstated. Additionally, Bergeron and Zwarenstein both had contracts with provisions for bonuses based upon the financial performance of the company. Bergeron's contract stated that he could receive a bonus of $1.8 million in fiscal year 2007 as well as the vesting of 200,000 restricted stock units if the company met certain financial goals in fiscal year 2007. Zwarenstein actually received three $50,000 bonuses in the first three quarters of fiscal year 2007 based on the incorrect financial results, and he was required to pay them back.

Atkinson was terminated on July 18, 2007.  Bondy resigned from the Board in August 2007. On April 1, 2008, the company disclosed that the restatement would be larger than previously expected, and also announced that Zwarenstein had tendered his resignation and that Bergeron would step down from his position as Chairman (while retaining his position as CEO).  Zwarenstein remained CFO until August 19, 2008, and signed the company's restated financials.  See Levine Dec., Exhs. E & F.

III.  Procedural History

The first lawsuit was filed against defendants on December 4, 2007.  Pursuant to 15 U.S.C. section 78u-4(a)(3)(A)(I), the first notice that a class action had been initiated against defendants was published on the same day.  Eight other lawsuits followed.  See Docket No. 124 at 2 n.3.  On August 22, 2008, the court granted the National Elevator Industry Pension Fund's motion for appointment as lead plaintiff.  The consolidated complaint was filed on October 31, 2008.  On December 31, 2008, defendants filed the instant motion to dismiss.  Oral argument was heard on April 20, 2009.

LEGAL STANDARDS

I.  Section 10(b)

Under section 10(b) of the Securities and Exchange Act of 1934 ("the Act"), it is unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  One such rule prescribed under the Act is Securities and Exchange Commission (SEC) Rule 10b-5.  This rule provides, among other things, "It shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).  A plaintiff must prove five elements to prevail on a claim asserting a

6

primary violation of Rule 10b-5: (1) a material misrepresentation or omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss causation; and (5) economic loss. In re Daou Sys., 411 F.3d 1006, 1014 (9th Cir. 2005).

II.     Insider Trading

Section 20A of the Act provides that an insider who trades stock while in possession of material, nonpublic information is liable to any person who traded contemporaneously with the insider. See 15 U.S.C.A. § 78t-1(a). Insider trading can also be a separate, primary violation under section 10(b). See SEC Rule 10b5-1. Such a claim is subject to the section 10(b) pleading requirements discussed below. See Johnson v. Aljian, 394 F. Supp. 2d 1184, 1197 (C.D. Cal. 2004), citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). Section 20A claims require proof of a separate underlying violation of the Act. Id. at 1194, citing In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999).

III.    Control Person Liability

Section 20(a) of the Act makes certain "controlling" individuals liable for primary violations of the Act and its underlying regulations. See 15 U.S.C. § 78t(a). Without a primary violation of the Act, there is no control liability under section 20(a). Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 978 (9th Cir. 1999).

IV.    Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "a court may [typically] look only at the face of the complaint to decide a motion to dismiss." Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002). However, a court may rely upon the doctrine of "incorporation by reference" to consider documents "that were referenced extensively in the complaint and were accepted by all parties as authentic." Id. Outside of the securities litigation context, a motion to dismiss should be granted if a plaintiff fails to proffer

7

"enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, ___ U.S. ___, ___, 127 S.Ct. 1955, 1974 (2007).

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), see 109 Stat. 737, significantly altered pleading requirements in private securities litigation in order to eliminate meritless claims. In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 988 (9th Cir. 1999). The statute requires plaintiffs to state with particularity both the facts constituting the alleged violation and the facts alleging scienter, i.e., the defendant's intention to "deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2504 (2007), quoting Ernst & Ernst, 425 U.S. at 194 & 194 n.12. To meet the first requirement, a plaintiff must (1) identify each statement alleged to have been misleading, (2) state the reason or reasons why the statement is misleading, and, (3) if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. See 15 U.S.C. § 78u-4(b)(1); In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002). To meet the scienter requirement, plaintiffs must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); Tellabs, 127 S.Ct. at 2504 (emphasis added). To qualify as "strong" within the meaning of the statute, an inference of scienter must be more than merely plausible or reasonable—it must, accepting the allegations as true and taking them collectively, be cogent and at least as compelling to the reasonable person as any opposing inference of non-fraudulent intent. Id. at 2504-2505, 2510 & 2511. When assessing a complaint for compliance with this standard, "courts must consider the complaint in its entirety and inquire whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Metzler Investment GmbH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1066 (9th Cir. 2008) (emphasis in original) (citation and internal quotation marks omitted). The pleading standard under the PSLRA is higher than that provided by Federal Rule of Civil Procedure 9(b). See Fed. R. Civ. P. 9(b).

8

In an action predicated on section 10(b), a plaintiff must, to adequately demonstrate that a defendant acted with the required state of mind, allege that the defendant made false or misleading statements either intentionally or with "deliberate recklessness." Silicon Graphics, 183 F.3d at 974. "Deliberate recklessness" is "a form of intentional or knowing misconduct." Id. at 976. Indeed, "although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness." Id. at 974.

DISCUSSION

Defendants contend that the complaint fails to state with particularity facts giving rise to a strong inference that any defendant acted with intent or deliberate recklessness. Plaintiffs point to a number of allegations that they believe justify such an inference. The court addresses each one of these in turn and then discusses their cumulative impact.

I.   Stock Trades

Plaintiffs allege that circumstances surrounding sales of VeriFone shares by Atkinson, Bergeron, Zwarenstein and Bondy during the class period raise, in combination with the other allegations pled, a strong inference of scienter. "Suspicious" stock sales by corporate insiders may constitute circumstantial evidence of scienter, but only when such sales are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Metzler, 540 F.3d at 1066-1067, quoting Silicon Graphics, 183 F.3d at 986. Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history. Id. at 1067, citing Silicon Graphics at 986.

On its face, the sale by each of the individual defendants of a majority of their shares of company stock, totaling over $443 million, appears to be an impressive fact. The problem is that the complaint provides no evidence of prior trading history, and plaintiffs do not explain the omission. The Ninth Circuit recently addressed this very issue. See Zucco Partners, LLC v. Digimarc Corp.,

9

552 F.3d 981, 1005-1006 (9th Cir. 2009). In that case, the complaint alleged that the CFO of the company at issue sold 48% of his total personal stock holdings, including options, during the class period. Id. at 1005. Yet the complaint failed to allege any information about the trading history of the CFO or the other corporate defendant. The court held that plaintiffs must provide a "meaningful trading history for purposes of comparison to the stock sales within the class period." Id. (citation and internal quotation marks omitted). Even though the CFO's stock sales were "significant," "no inference of scienter [could] be gleaned," because there was no allegation within the complaint that the stock sales were inconsistent with usual trading patterns. Id. at 1006.

The instant complaint likewise provides no trading history. Plaintiffs sought to partially remedy this problem by including some additional data for Zwarenstein and Atkinson in a footnote in their opposition. This is too little, too late, for the purposes of the operative complaint. "In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss. Facts raised for the first time in plaintiff's opposition papers should be considered by the court in determining whether to grant leave to amend or to dismiss the complaint with or without prejudice." Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) (citations and internal quotation marks omitted). Even so, the information provided in the footnote is inadequate to meet the requirement of providing a "meaningful trading history for purposes of comparison." See Digimarc, 552 F.3d at 1005. The footnote discusses sales for only two of the four defendants and breaks them into only two periods—"before the Class Period" and "during the Class Period." See Opp. at 29 n.10. To provide a useful comparison, the data would require far more granularity, showing trades over some period of years where such data is available, with specific dates associated with the trades. The content of the footnote does little to provide context for Zwarenstein and Atkinson's trades during the class period.

The allegations in the complaint relating to stock trades fail to meet the minimum standard necessary to provide a basis from which an "inference of scienter can be gleaned." See Digimarc, 522 F.3d at 1006.

10

II.     Restatement

The complaint repeatedly stresses the fact that VeriFone's statements to the SEC concerning the first three quarters of fiscal year 2007 (November 1, 2006, through July 31, 2007) were incorrect, and that the results for those quarters had to be restated. It is well established that the necessity of a restatement is not enough, standing alone, to create a strong inference of scienter. Id. at 1000; see also In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 848 (9th Cir. 2003) (holding inadequate complaints alleging that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers"). There are two exceptions to this rule. "Falsity may itself be indicative of scienter where it is combined with allegations regarding a manager's role in that company that are particular and suggest that defendant had actual access to the disputed information and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." Id.; see South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785-786 (9th Cir. 2008). Plaintiffs argue that Zwarenstein had "actual access" to the incorrectly merged financial documents because those documents were available to the San Jose accounting department. This is a far cry from an allegation that Zwarenstein admitted, for instance, that he monitored portions of the company's database. See id. Moreover, the nature of the fact does not have such prominence that it would be "absurd" to suggest management had no knowledge of the matter. Here, the alleged accounting errors involved inventory accounting judgments. There are no allegations to support a conclusion that it would be absurd to suggest unawareness on the part of the company's officers of the amount of overhead attributable to inventory in foreign subsidiaries of the former Lipman and the amount of inventory in transit between facilities. Absent some particularized allegations to the contrary, there is no reason to believe that top officials of the company would have had particular insight into the movements and booking of inventory.

The second situation in which mere falsehood about core business operations, which may be evidenced by a restatement, may suffice to raise a strong inference of deliberate recklessness is see in the case of Berson v. Applied Signal Tech., Inc., 527 F.3d 982 (9th Cir. 2008). In that case, the

11

1   court found the misrepresentation by a government contractor of the status of stop-work orders
2   enough to infer scienter where the stop-work orders had halted a substantial portion of work,
3   necessitated defendant complete "massive volumes of paperwork," and led to the reassignment of a
4   significant number of employees. See id. at 988 n.5. Where, as in that case, the defendant "must
5   have known" about the falsity of the information they were providing to the public because such
6   information was obvious from the operations of the company, scienter can be inferred. Digimarc,
7   522 F.3d 1001 (discussing Berson). For the same reasons that it would not be "absurd" for VeriFone
8   senior management not to have known about the inventory accounting errors, such errors do not
9   appear to be something about which defendants "must have known." Plaintiffs make no allegation
10  that an inventory accounting error would have the sort of immediate and massive effect upon
11  VeriFone's operations as the stop-work orders had in the Berson case. The mere fact that the gross
12  margin numbers were, in the eyes of analysts, "better than expected" does not lead to an inference of
13  scienter. Indeed, the complaint contains statements of those same analysts offering plausible reasons
14  for an increase in gross margins despite the acquisition of Lipman's lower-margin business.
15      Generally, the restatement of financials is not itself a ground to infer scienter, and plaintiffs
16  have pled nothing that would suggest this case falls within an exception.
17  III.    Incorrect Sarbanes-Oxley Statements and Defendants' Positions
18      Pursuant to the Sarbanes-Oxley Act, a company's "principal executive officer or officers and
19  the principal financial officer or officers" must certify the accuracy and reliability of the company's
20  quarterly financial reports. See 15 U.S.C. § 7241(a). An officer must certify, inter alia, that he has
21  reviewed the report and it is not misleading; that the report fairly presents in all material respects the
22  financial condition of the company; and that the officer is responsible for establishing and
23  maintaining internal controls and has evaluated their effectiveness within the past ninety days. See
24  id. Bergeron and Zwarenstein signed such reports for the first three quarters of fiscal year 2007.
25  Plaintiffs argue that the incorrect reports lend weight to an inference of scienter.
26      Plaintiffs' allegations certainly raise an inference that Bergeron and Zwarnstein were
27  negligent, perhaps inexcusably negligent. However, even inexcusable negligence is not equivalent
28

12

to the mental state required by Rule 10(b). See Silicon Graphics, 183 F.3d at 976. The question is one of scienter, and the Digimarc court held that "[b]oilerplate language in a corporation's 10-K form, or required certifications under Sarbanes-Oxley section 302(a) . . . add nothing substantial to the scienter calculus." 552 F.3d at 1004-1004; see also Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 747-748 (9th Cir. 2002). Plaintiffs provide no reason why the case at bar merits unique treatment. In light of controlling Ninth Circuit law, these allegations add nothing substantial to the scienter inquiry.

IV. Problems With the Accounting Department and the Lipman Merger

Plaintiffs allege that the problems in the company's accounting department were so prominent that it would be absurd for defendants not to have known about them. Yet this does not show that defendants knew about the incorrect journal entries, much less that they intended the entries to be incorrect or were deliberately reckless with regard to that possibility. Not one of the confidential witnesses who was an accounting professional at VeriFone alleges that he or she knew that the entries were incorrect during the three quarters in question. If it was so obvious to the CEO and CFO that the books were wrong, it should have been even more obvious to the accountants who worked with them on a day-to-day basis. Nevertheless, not one witness alleges that he or she believed the gross margins reported during the three quarters in question to be incorrect or implausible. More to the point, the mere fact that an organization is overwhelmed or underprepared to confront the challenges before it does not raise an inference of scienter. The Digimarc court's conclusion speaks directly to the case at bar: "[T]he facts alleged by Zucco point towards the conclusion that Digmarc was simply overwhelmed with integrating a large new division into its existing business." 552 F.3d at 1007. Nothing in the complaint suggests that anything different occurred at VeriFone. Just as the circumstances of the restatement do not meet either of the exceptions carved out by South Ferry or Berson, neither does the alleged chaos of the accounting department do so.

V. Personnel Changes

13

The allegations of the complaint suggest there were suspicious circumstances surrounding the personnel changes involving the four individual defendants. Plaintiffs would have the court infer that Zwarenstein and Atkinson were terminated,[5] Bondy resigned and Begeron was removed as Chairman of the Board (though he retained his position as CEO) because these defendants had been involved in some sort of deceit. There are simply no facts alleged to support this interpretation. The restatement was necessitated by a $70.2 million dollar mistake. The most reasonable inference, absent other support, is that personnel changes occurred because of the mistake and real or perceived underlying negligence. It is particularly unlikely that VeriFone would have kept Zwarenstein on for four months after announcing his resignation, and allowed him to sign the restatement forms, if the auditors, directors or other officers had suspected him of securities fraud. People are at least as likely to be fired for massive mistakes as for fraud.

## VI.   Other Issues

The other issues raised by plaintiffs on this motion do even less to provide support to an inference of scienter. Plaintiffs argue that Bergeron and Zwarenstein's allegedly misleading statements in 2006 are actionable. According to plaintiffs, these defendants knew that their representations about future gross margin expansion were misleading. These statements were prototypical forward-looking statements, as they were predictions of future results of an entity, the combined VeriFone/Lipman business, that was just coming into existence. See 15 U.S.C. § 78u-5(c)(1) (describing safe harbor for forward-looking statements). Plaintiffs argue that the safe harbor should not apply because the "meaningful cautionary statements" in the company's financial disclosures warned that certain things *might* happen which already *had* happened. However, for the safe harbor to be inapplicable, defendants must have actually known that the problems had already occurred, and this has not been adequately pleaded. See In re Convergent Techs. Sec. Litig., 948 F.2d 507, 515 (9th Cir. 1991). Plaintiffs cannot merely support their inferences with other inferences.

Plaintiffs' reliance on purported admissions in 2008 makes even less sense. Plaintiffs allege that at an August 19, 2008, conference call Bergeron "admitted" that gross margins would be lower

14

than previously forecast. It would be odd if the company did not revise its estimates based upon the restatement, which was issued on that day. All one can infer from the revision of estimates is the acknowledgment of changed circumstances.

Finally, plaintiffs argue that the individual defendants compensation was partially tied to the company's financial results, and thus there was a motive for deceit. "A strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter." Digimarc, 552 F.3d at 1004, citing No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 944 (9th Cir. 2003). Here, there is no strong correlation. In comparison to the money being made by the sales of stock already owned by defendants, as alleged in the complaint, the bonuses received by Bergeron and Zwarenstein during the first three quarters of 2007 were modest. It is also unclear from the complaint whether Bergeron actually received the bonuses. Zwarenstein was required to give back his bonuses for the first three quarters of 2007, and plaintiffs have not alleged that such a result of erroneous financial statements would not have been foreseeable by these defendants.

VII.   Totality of the Allegations

None of the allegations is itself cogent or compelling enough to meet the PSLRA's pleading standard, but it must also be considered whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, 127 S.Ct. at 2509. There are many allegations in this case, but they fare no better when read in combination than when read independently. Plaintiffs have convincingly painted a picture of negligence and ineptitude leading to massive mistakes and losses by a company. They have not, however, raised an inference of intent or deliberate recklessness as required by the PSLRA to state a section 10(b) claim. The claims based on that section must be dismissed.

VIII.  Insider Trading and Control Person Liability Claims

Since the complaint does not state a section 10(b) claim, there is no underlying violation for the purposes of section 20A and section 20(a). Accordingly, these claims must be dismissed.

IX.    Leave to Amend

15

Plaintiffs have requested leave to amend in the event that all or part of defendants' motion is granted. The court should freely give leave to amend pleadings when justice so requires. Fed. R. Civ. P. 15(a)(2). This policy is "to be applied with extreme liberality." Eminence Capital LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). In assessing the propriety of a motion for leave to amend, the court considers five factors: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiffs have previously amended their pleading. See Nunes v. Ashcroft, 375 F.3d 805, 808 (9th Cir. 2004), citing Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995). Futility alone can justify the denial of a motion for leave to amend. Id., citing Bonin, 59 F.3d at 845.

In this case, there has been no showing of bad faith, undue delay, or prejudice. The operative complaint is the first consolidated complaint to be filed. Moreover, the court cannot say that amendment is necessarily futile. Additional information about defendants' trading history might be particularly relevant. While Digimarc arguably did not change the requirement to show trading history for allegedly suspicious stock sales, it at least cast the requirement in a starker light. See Digimarc, 552 F.3d at 1005-1006. That opinion was entered on January 12, 2009 (and amended on February 10, 2009), after the consolidated complaint was filed. Assuming plaintiffs have not alleged trading history because they failed to realize its significance, and not because such history undermines their case, they may be permitted to amend their complaint to make such allegations. That is to say, if the trading history actually supports plaintiffs' assertions that the activity during the class period was "dramatically out of line with prior trading practices," see Metzler, 540 F.3d at 1066-1067, an amended complaint with detailed and comprehensive comparisons of trades stretching over the course of a number of years (where such data is available) and containing specific dates for all sales may be more persuasive.

Finally, any amended complaint should be more in the form of a "short and plain statement," see Fed. R. Civ. P. 8(a), and avoid the redundancy and unnecessary length that characterized the first complaint.

////

16

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED with leave to amend if plaintiffs can do so consistent with the foregoing. Any amended complaint shall be filed within thirty (30) days of the date of this order. Defendants shall respond within thirty (30) days thereafter.

IT IS SO ORDERED.

Dated: May 26, 2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

17

**ENDNOTES**

1. Unless otherwise noted, the facts are derived from the allegations contained in the Consolidated Complaint for Violations of the Federal Securities Laws, Docket No. 161.
    Defendants' Request for Judicial Notice is GRANTED as to those documents referenced in the complaint (Levine Dec., Exhs. B-F & H-J; Cullen Dec., Exhs. A-F) and DENIED as to those which are not so referenced (Levine Dec., Exhs. A & G). Plaintiffs refer to these documents, the documents are central to the claims, and no party questions the authenticity of the documents that were filed. Accordingly, the court may assume the truth of these documents for the purposes of adjudicating a motion to dismiss. See In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999); Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006).

2. For the purposes of this motion only, the court takes the statements of the confidential witnesses at face value without discounting their credibility due to the secrecy of their identities. See generally Digimarc, 552 F.3d at 995-996 (describing circumstances in which reliance upon confidential witnesses is appropriate).

3. A "macro" is "an instruction that represents a sequence of instructions in abbreviated form;" macros are commonly utilized by Microsoft Excel users. See entry for "macro" at www.dictionary.com (as visited April 28, 2008, and on file with the court).

4. The complaint is inconsistent in its allegations of the percentage of total shares sold by Zwarenstein. Compare Compl. ¶ 136 ("96.51%") with id. ¶ 140 ("98%"). For the purposes of this motion, the court assumes the higher figure to be true.
    It should be noted that, according to the complaint, Zwarenstein's sales amounted to only 44.4% of his combined shares and vested options. Compl. ¶ 140.

5. The parties dispute whether Zwarenstein resigned or was fired. Plaintiffs' reliance upon a single document referencing Zwarenstein's "termination" is unconvincing where a resignation could be "termination" in the context of the reference. In any event, whether Zwarenstein resigned or was fired does not affect the outcome here.