COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
ELI R. GREENSTEIN (217945)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
elig@csgrr.com
     – and –
PATRICK J. COUGHLIN (111070)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
patc@csgrr.com

Lead Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL ELEVATOR INDUSTRY PENSION FUND, | Master File No. 3:07-cv-06140-MHP |
|        Plaintiff, | <u>CLASS ACTION</u> |
| vs. | SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| VERIFONE HOLDINGS, INC., DOUGLAS G. BERGERON, BARRY ZWARENSTEIN, PAUL PERIOLAT, WILLIAM G. ATKINSON and CRAIG A. BONDY, and All Others Similarly Situated, | |
|        Defendants. | |
| In re VERIFONE HOLDINGS, INC. SECURITIES LITIGATION | |
| This Document Relates To: | |
|     ALL ACTIONS. | |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .................................................................................................1

II.    JURISDICTION AND VENUE ...........................................................................13

III.   THE PARTIES.....................................................................................................13

IV.    CONFIDENTIAL WITNESSES .........................................................................17

V.     BACKGROUND LEADING UP TO THE CLASS PERIOD ...........................21

       A.    VeriFone's Gross Margin Was One of Its Most Important and Closely
             Monitored Financial Metrics.....................................................................21

       B.    April 10, 2006: VeriFone Announces the Acquisition of Lipman and
             Bergeron and Zwarenstein Assure Investors that the Merger Will Increase
             the Company's Gross Margins and Earnings in 2007 ...............................22

       C.    April 10, 2006-August 30, 2006: VeriFone's Stock Price Declines Due to
             Investor Concerns About Declining Margins at Lipman and the
             Operational Impact of the Merger .............................................................24

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
       FRAUDULENT COURSE OF CONDUCT..........................................................26

       A.    VeriFone's False Financial Representations in 1Q07, 2Q07 and 3Q07 ...............26

             1.    The False Financial Results ........................................................26

             2.    Defendants' False Certifications of VeriFone's Internal Controls
                   over Financial Reporting..............................................................28

             3.    Defendants' False Statements to Investors Concerning the Reasons
                   for the Inflated Financial Results ................................................29

                   a.    1Q07 Conference Call: .....................................................29

                   b.    2Q07 Conference Call: .....................................................30

                   c.    3Q07 Conference Call: .....................................................31

                   d.    Analysts Repeated Defendants' False Statements .........................32

       B.    Facts Establishing Falsity and Scienter.........................................................33

             1.    The Facts and Evidence Revealed in the SEC's Enforcement
                   Action Establish Deliberate Recklessness....................................34

             2.    The Magnitude, Nature, and Quality of VeriFone's Restatement
                   Combined with Witness Testimony Concerning Pervasive
                   Inventory Manipulations Reinforce a Strong Inference of Scienter .........39

Page

3.   Information Provided by Multiple Former VeriFone Inventory
     Managers Confirms Defendants' Exploitation of VeriFone's
     Nonexistent Inventory Controls to Falsify the Company's
     Financial Results ....................................................................................43

4.   Defendants' Admissions Regarding Inventory Controls Support a
     Strong Inference of Scienter ..................................................................48

5.   Defendants' Scienter Is Corroborated by Numerous Red Flags,
     Including the Rapidly Declining Margins at Lipman Before the
     Merger and the 93% Increase in VeriFone's Lower-Margin
     International Sales After the Merger.......................................................50

6.   Zwarenstein's Admitted Role in "Building Out [VeriFone's]
     Financial and Accounting Infrastructure" and Defendants'
     Representations of "Tremendous Financial Transparency" After
     the Lipman Merger Reinforce a Strong Inference of Scienter..................52

7.   Information Provided by Former VeriFone Accounting Employees
     Raises a Strong Inference that Bergeron and Zwarenstein Knew
     About the Erroneous Manual Journal Entries and Other Internal
     Control Deficiencies that Caused the Restatement...................................53

8.   Former VeriFone Employees Reported Problems Obtaining
     Accurate Financial Data from Lipman Because VeriFone and
     Lipman Used Different Oracle Accounting Systems................................58

9.   The Termination of Periolat and Zwarenstein and VeriFone's
     Admission that There Were Material Weaknesses in the
     Company's Internal Controls Strengthens the Inference of Scienter.........62

C.   Defendants' False Statements in 2006 Concerning the Financial Benefits
     of the Lipman Merger and the Purported Supply Chain Efficiencies Due to
     the Lipman Merger ........................................................................................65

     1.   False August 2006 Statements ................................................................65

     2.   False September 2006 Statements ...........................................................66

     3.   False December 2006 Statements ............................................................66

D.   Facts Establishing Material Falsity of Defendants' 2006 Statements and a
     Strong Inference of Scienter .........................................................................67

VII.   DEFENDANTS' INSIDER TRADING AND MOTIVE ALLEGATIONS ....................68

A.   The Amount, Timing and Coordination of Defendants' Sales of More than
     $465 Million in VeriFone Stock While Knowing of Periolat's Accounting
     Manipulations and Reporting Financial Results that Were Overstated by as
     Much as 600% Reinforces a Strong Inference of Scienter ...................................68

Page

  B.  Defendants' Compensation and Bonuses Were Tied Directly to VeriFone's Earnings Targets ..................................................................73

VIII. VERIFONE ANNOUNCES A MASSIVE RESTATEMENT AND ADMITS ITS PRIOR STATEMENTS WERE MATERIALLY FALSE CAUSING A 46% STOCK PRICE DECLINE IN A SINGLE TRADING DAY ..........................................77

IX. VERIFONE'S GAAP VIOLATIONS ..............................................................80

X. LOSS CAUSATION...........................................................................................86

XI. CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE .....................................................................89

XII. PRAYER FOR RELIEF ....................................................................................98

XIII. JURY DEMAND................................................................................................98

## I.       INTRODUCTION

1.       This is a securities fraud class action on behalf of all persons who purchased the publicly traded securities of VeriFone Holdings, Inc. ("VeriFone" or the "Company") between August 31, 2006 and April 1, 2008 (the "Class Period").[1] VeriFone designs, manufactures, markets and sells electronic payment solutions, such as credit-card terminals for point-of-sale payments for goods and services.

2.       On April 10, 2006, VeriFone announced the acquisition of Lipman Electronic Engineering Ltd. ("Lipman"), an Israeli provider of wireless electronic payment systems.  The acquisition closed on November 1, 2006, the beginning of VeriFone's 2007 fiscal year.  VeriFone's CEO, Bergeron, and CFO, Zwarenstein, repeatedly represented to investors that the Lipman merger would increase market-share, expand VeriFone's international presence and leverage Lipman's in-house manufacturing capabilities and supply chain.  Most importantly, Bergeron and Zwarenstein told investors that the merger would result in significant increases in the Company's ***gross margin*** (*e.g.*, the amount or "margin" of profit generated on each sale), which would purportedly drive growth in VeriFone's earnings per share ("EPS") and its stock price.

3.       Defendants' representations of increasing gross margin were key to selling investors on the propriety of the merger because gross margin was the focal point of VeriFone's business. Bergeron and Zwarenstein repeatedly told investors that the gross margin was "***the ultimate barometer of the operational success of [VeriFone]***" and that "our continuing, almost ***obsessive approach to gross margin expansion is something that is an important part of VeriFone's future***."[2] Wall Street analysts following the Company also focused on the gross margin as "***the most important measure of VeriFone's financial performance***."

---

[1]       Defendants include: VeriFone; CEO and former Chairman Douglas G. Bergeron ("Bergeron"); former CFO and Executive Vice President Barry Zwarenstein ("Zwarenstein"); former Supply-Chain Controller Paul Periolat ("Periolat"); former Executive Vice President of Global Marketing and Business Development William G. Atkinson ("Atkinson"); and former board member Craig A. Bondy ("Bondy").

[2]       Emphasis is added unless otherwise noted.

4.       On August 31, 2006, the first day of the Class Period, Bergeron and Zwarenstein emphasized the success of the Lipman integration and increased VeriFone's gross-margin expectations and its 2007 pro forma EPS guidance by $0.12 to $1.40-$1.42 per share.  Bergeron specifically attributed the increases to the Lipman merger: "I have to tell you that with Lipman's manufacturing in-house and with this hybrid model that we are very cleverly putting together and getting the best of both worlds, ***there is going to be gross margin expansion in our future***."  During a December 7, 2006 conference call a month after the merger closed, Bergeron continued to mislead investors about the success of the Lipman merger:

> The integration of Lipman into VeriFone has been completed ahead of schedule and we have created a single-branded, unified company with tremendous scale advantages.  ***Already, we are enjoying several supply chain efficiencies and earnings accretion. . . .  As a result, we have increased our internal expectations for fiscal Q1 2007 net earnings per share. . . .***

5.       Throughout the Class Period – as top VeriFone executives were unloading $465 million in VeriFone stock – Bergeron and Zwarenstein repeatedly told investors that the Lipman merger was a financial and operational success.  They represented that the merger was "immediately accretive" to VeriFone's earnings, resulting in "nice procurement synergies" and "supply chain efficiencies" that would provide VeriFone with significant advantages over its competitors.  They falsely reported "record" gross margins of 47.1%, 48.1% and 48.2% in 1Q07, 2Q07 and 3Q07, respectively, despite the fact that Lipman's gross margins were only 41.9% prior to the merger and had rapidly declined for five consecutive years.  During VeriFone's 1Q07 conference call, Bergeron was emphatic: ***"[W]e now have developed a structural gross margin advantage, which is going to be tough to beat."***  Defendants never warned investors about any problems with the integration, accounting or financial condition of Lipman, a foreign company with different management teams and different accounting systems thousands of miles away.

6.       Instead, when pressed by analysts during the Class Period about how VeriFone was reporting such high gross margins and earnings given the inclusion of Lipman's declining gross margins, Bergeron and Zwarenstein falsely attributed the Company's success to the integration benefits of the Lipman merger and its "***supply chain efficiencies and earnings accretion***."  They represented that VeriFone's executives had "***proven integration experience***" and a "***phenomenal***

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                         - 2 -

1  *supply chain management team*" that was "extremely operationally focused" due to "highly

2  disciplined and experienced managers."  They falsely represented that the Company was "*getting*

3  *supply chain efficiencies in Israel that we never experienced before*" and that there was

4  "*tremendous . . . financial transparency*" at the integrated Company that ensured the accuracy and

5  reliability of the post-merger results.  The Company even *increased* CFO Zwarenstein's salary and

6  awarded him extra VeriFone stock bonuses because of his "instrumental" efforts in completing the

7  merger and "*his work in building out [VeriFone's] financial and accounting infrastructure*."

8        7.        Defendants' representations during the Class Period have now been revealed to be

9  materially and deliberately false.  The "financial and accounting infrastructure" built by Zwarenstein

10  was deliberately exploited to execute a pervasive accounting scheme to inflate VeriFone's stock

11  price and enrich defendants at the expense of ordinary investors.  Only after selling $465 million in

12  stock and cashing out did defendants finally admit to a massive financial restatement, including over

13  *$70 million* in fictitious income, *$77 million* in fake inventory, millions in overstated gross margins,

14  *129%* overstatement of operating income, and EPS overstatements of *600%, 200% and 418%* under

15  Generally Accepted Accounting Principles ("GAAP") for three consecutive quarters.   The

16  restatement revealed that VeriFone's publicly reported gross margin of 47%-48% during the Class

17  Period – allegedly the "most important measure of VeriFone's financial performance" – was actually

18  only *41%-42%*, far lower than the level represented to investors:

|  | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|
| **Originally Reported Pro forma Gross Margin** | 47.11% | 48.06% | 48.2% |
| **Restated Pro forma Gross Margin** | **41.4%** | **42.3%** | **41.2%** |
| **Originally Reported Pro forma EPS** | $0.37 | $0.39 | $0.42 |
| **Restated Pro forma EPS** | **$0.32** | **$0.24** | **($0.26)** |
| **Originally Reported GAAP EPS** | ($0.01) | $0.06 | $0.16 |
| **Restated GAAP EPS** | **($0.07)** | **($0.06)** | **($0.51)** |

27        8.        As illustrated above, in addition to the gross-margin impact, defendants' accounting

28  improprieties were so egregious that the restatement erased all of VeriFone's profit in some quarters

and revealed that the Lipman merger caused **net losses** at the combined Company.  For example, VeriFone's financial manipulations were so significant in 3Q07 that reported pro forma EPS of $0.42 was restated to a **net loss of $0.26**.  Under more conservative GAAP rules, the overstatement was even worse – VeriFone's reported EPS of $0.16 per share in 3Q07 was restated to a **net loss of $0.51**.  Following the Class Period, VeriFone's pro forma gross margins plummeted to the **low to mid-30%** range as a result of the disastrous Lipman merger.  The significant impact of defendants' misconduct on VeriFone's EPS results is illustrated below:

## VeriFone's EPS



9.     On September 1, 2009, the Securities and Exchange Commission ("SEC") formally charged VeriFone and its former Supply-Chain Controller, Periolat, with "*falsifying the company's*

*accounting records which boosted gross margins and income reported to shareholders*." Ex. 1 (SEC Litigation Release); Ex. 2 (SEC Complaint).[3]  The SEC's Litigation Release stated:

> The SEC alleges that *in three consecutive quarters in 2007, the company made unsupportable alterations to its records to compensate for an unexpected decline in gross margins, overstating VeriFone's operating income by a total of 129 percent*. When the misrepresentations came to light in December 2007, the company's stock price dropped 46 percent, resulting in a one-day drop in market capitalization of $1.8 billion.

10.     The facts set forth in the SEC's enforcement action, when combined with plaintiff's other allegations, demonstrate that Bergeron's and Zwarenstein's representations to investors throughout the Class Period were deliberately false and misleading.  The SEC Complaint shows that the accounting manipulations giving rise to the restatement were intentionally executed by Periolat at the specific direction and with full knowledge of defendants Bergeron and Zwarenstein.

11.     The SEC Complaint establishes that during each quarterly closing process for 1Q07, 2Q07 and 3Q07, defendants Bergeron and Zwarenstein were provided with internal reports and were *expressly told* that VeriFone's actual gross margins were "*markedly lower than previously released guidance to analysts*." Ex. 1; Ex. 2, ¶¶15-17, 23.  Bergeron and Zwarenstein personally sent e-mails characterizing the low gross margin results as an "*unmitigated disaster*" and instructed Periolat and other financial personnel to "*figure it . . . out*" and "*fix the problem*" so that defendants could "*report results in line with forecasts*" and "*thereby avoid, in the words of a senior officer, [the] unmitigated disaster*." Ex. 1; Ex. 2, ¶¶15-17.

12.     When Periolat could not initially "fix the problem" as Bergeron and Zwarenstein instructed (because, as the SEC confirmed, "the Company's unreported numbers were in fact correct"), Bergeron and Zwarenstein "*began to express increasing frustration*." ¶17.  They knew telling the market that the first post-merger financial results were far lower than public guidance would be disastrous for VeriFone's stock price.  Accordingly, Periolat was provided with "*analyses*" that explained the "relation between specific reductions in COGS [Cost of Goods Sold] and the

---

[3]     Unless otherwise noted, all paragraph ("¶") references are to the SEC Complaint filed on September 1, 2009 in *SEC v. VeriFone Holdings, Inc., et al.* (N.D. Cal.).

1    corresponding *increase in gross margin*." *Id.* As the SEC explained, "[b]ecause gross margin is the

2    result of revenue minus COGS, *if COGS is reduced, gross margin is necessarily increased. One*

3    *way to reduce COGS is to increase inventory*." ¶16. Thus, as part of Bergeron's and Zwarenstein's

4    directive to "fix the problem," Periolat was given a specific road map to increase gross margins by

5    reducing COGS – which is exactly what he did in falsifying VeriFone's results. Periolat made

6    "*unsupportable alterations*" to VeriFone's books and created fictitious inventory, which reduced

7    COGS and increased gross margin and earnings, just as he was directed to do. As the SEC

8    concluded, "*the accounting adjustments allowed the company to meet its internal forecasts and*

9    *guidance to investors*." Ex. 1. As set forth below, these accounting manipulations were not

10   isolated. They continued and even accelerated for three consecutive quarters.

11           13.     <u>1Q07</u>: In early February 2007, *after* 1Q07 already closed but before defendants

12   reported results, Bergeron and Zwarenstein received a report showing that 1Q07 gross margin was

13   only 42.8%, approximately four percentage points below the 45%-47% guidance previously

14   provided to investors. ¶14. Periolat "fix[ed] the problem" by preparing fictitious journal entries and

15   "adjustments" that increased Lipman inventory by approximately $7 million, decreased COGS by $7

16   million and inflated VeriFone's gross margin. ¶¶18-20. According to the SEC, "[a]s a result of the

17   false accounting adjustments" in 1Q07, the Company's gross margin increased from 42.8% to

18   47.1%, and VeriFone "overstated its net income by $12.4 million." ¶22. The accounting

19   adjustments caused VeriFone's 1Q07 GAAP EPS to be overstated by *600%*.

20           14.     The SEC alleged that Periolat "failed to take adequate steps to verify" his improper

21   accounting manipulations. "Had he done so," he would have learned that the adjustments were false.

22   ¶19. Periolat also "had been aware *before* making the adjustments" that Lipman "had proper

23   procedures in place for accounting for inventory." ¶20. Thus, he knew that his manipulations of

24   Lipman inventory had no reasonable basis. He also "learned a month after the quarter close" that

25   Lipman had correctly accounted for inventory, "putting him on notice that his adjustments may have

26   been incorrect." *Id.* Nevertheless, Periolat "*did not take steps to verify or correct his prior*

27   *inventory adjustments*." *Id.*

28

15.   The SEC Complaint concluded that "*[s]enior management was aware of [Periolat's] adjustments* but never questioned them." ¶27.  Bergeron and Zwarenstein also received "*monthly reports showing a sharp and unprecedented increase in inventory as a result of Periolat's adjustments*."  *Id*.  Despite this knowledge, when Bergeron and Zwarenstein were asked point-blank at VeriFone's 1Q07 conference call to explain how the Company could report such inexplicably high gross margins given the incorporation of Lipman's declining margins and the doubling of VeriFone's lower-margin international sales, they deliberately concealed the accounting adjustments and misled investors.  They falsely attributed the "record" results to "significant earnings accretion" and "nice procurement synergies" from the Lipman merger and falsely asserted that "we now have developed a *structural gross margin advantage*, which is going to be tough to beat."  But they knew there was no "structural" advantage at all – the advantage was Periolat's improper accounting adjustments made at their direction *after* the quarter had already closed.

16.   2Q07: In 2Q07, defendants' accounting manipulations accelerated.  At the end of 2Q07, Bergeron and Zwarenstein received internal reports showing a gross margin of 43.7%, far below the 46%-48% guidance provided to investors.  ¶23.  Again, Periolat "fix[ed] the problem" by preparing false journal entries that increased "in-transit" inventory (*e.g.*, inventory purportedly shipped from Lipman to Verifone but not yet received) by approximately $10.6 million, which decreased COGS by $10.6 million.  ¶24.  This fraudulent accounting inflated VeriFone's reported gross margin from 43.7% to 48.06%, causing a *200% overstatement* of GAAP earnings.  The fictitious accounting in 2Q07 allowed defendants to meet public guidance.

17.   The SEC concluded that "*[t]here was no reasonable basis for the manual entries*." ¶26.  In fact, *"goods were never actually shipped between the international headquarters and the United States and as a result could not have been 'in transit.'"*  *Id*.  Despite defendants' knowledge of these improper adjustments, at the 2Q07 conference call, Bergeron and Zwarenstein concealed the accounting manipulations, bragged about the "record" gross margin results and falsely stated that 47%-48% margins were "sustainable" going forward.  When asked pointedly by analysts if there were any "unusual" items that caused VeriFone to report such inexplicably high gross margins, Zwarenstein falsely replied, "no, there was no unusual items."

1    18.   <u>3Q07</u>: In 3Q07, the accounting manipulations were even more egregious than 1Q07

2  and 2Q07.  Bergeron and Zwarenstein again received internal reports showing a gross margin of

3  ***40.5%***, far below the 47%-48% guidance provided to investors.  ¶23.  Periolat again "fix[ed] the

4  problem" by preparing journal entries that increased "in-transit" inventory by approximately $9.4

5  million and decreased COGS by $9.4 million, thereby inflating VeriFone's gross margin from 40.5%

6  to 48.23% to meet public guidance.  The false accounting also caused 3Q07 EPS to be ***overstated by***

7  ***418%***.  ¶25.

8    19.   Incredibly, at the 3Q07 conference call with investors, despite that fact that Bergeron

9  and Zwarenstein "were aware of [Periolat's] adjustments" and knew there "was no reasonable basis

10  for the manual entries" because the "goods were never actually shipped," Bergeron deliberately

11  misled investors by manufacturing false reasons for the increase in gross margin:

12       ***[W]e're getting supply chain efficiencies in Israel that we never experienced***
         ***before***, and something we mentioned as well, we have ***tremendous transparency,***
13       ***financial transparency*** into the true cost of manufacturing and all the little nuanced
         items that roll up into that as a result of having 30%, 35% of our own inside.  So it's
14       worked out splendidly and we're committed to it.

15    20.   These statements had no basis whatsoever and were deliberately false.  Bergeron,

16  Zwarenstein and Periolat knew that the increase in gross margins had nothing to do with "supply

17  chain efficiencies in Israel" or "tremendous . . . financial transparency" between Lipman and

18  VeriFone.  The increase in gross margin was due to Periolat's accounting adjustments – and, as the

19  SEC found, "***[s]enior management was aware of [Periolat's] adjustments***."  ¶27.  Indeed, the

20  "adjustments" were made at the express direction of Bergeron and Zwarenstein to "fix the problem"

21  and avoid the "unmitigated disaster" that would negatively impact VeriFone's stock price if

22  defendants did not meet their public forecasts.

23    21.   Periolat, Bergeron and Zwarenstein were able to freely manipulate VeriFone's

24  financial results because the Company's system of internal controls was virtually nonexistent.  The

25  SEC charged Perolat with "***knowingly*** circumventing a system of internal accounting controls" and

26  concluded that "Periolat was able to make his unwarranted adjustments because ***VeriFone had few***

27  ***internal controls to prevent them . . . .  Nor were there proper controls in place*** to prevent the

28  person responsible for forecasting financial results from ***making adjustments which allowed the***

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 8 -

1   *company to meet the forecasts*."   ¶¶17, 21.  These findings directly contradict Bergeron's and

2   Zwarenstein's sworn certifications to investors under the Sarbanes-Oxley Act of 2002 ("Sarbanes-

3   Oxley") that they "reviewed," "designed" and certified VeriFone's system of internal controls each

4   quarter to ensure the accuracy of VeriFone's financial results, including the journal entries made by

5   Periolat.  *See* §VI.A.2.  In reality, defendants intentionally exploited the lack of internal controls and

6   circumvented any deficient controls that did exist to falsify and inflate VeriFone's financial results.

7          22.    The SEC's findings about VeriFone's inventory manipulations also contradict

8   defendants' representations that they "***review the adequacy of our inventories valuation on a***

9   ***quarterly basis***" and "***regularly monitor[] inventory quantities on hand.***"  VeriFone's restatement

10  confirmed that inventory was overstated by ***$77.8 million*** during the Class Period, including ***$13.3***

11  ***million*** or 11.35% of total inventory in 1Q07, ***$23.9 million*** or 23.6% in 2Q07 and ***$40.6 million*** or

12  39% of total inventory in 3Q07.  VeriFone also admitted improperly booking ***$32.8 million*** in

13  fictitious in-transit inventory, ***$30 million*** in improperly allocated overhead to inventory and ***$13.4***

14  ***million*** in fake intercompany profit during the Class Period – due to the inventory manipulations

15  executed by Periolat and approved and certified by Bergeron and Zwarenstein.

16         23.    Several former VeriFone accounting employees reported that the erroneous manual

17  journal entries that caused gross margins and inventory to be overstated were received and reviewed

18  by the San Jose, California accounting department headed up by Zwarenstein ***before*** VeriFone

19  reported its financial results.  Further, according to former VeriFone inventory managers who

20  worked at VeriFone's "principal" distribution center in Lincoln, California (VeriFone's largest) and

21  were hired to address VeriFone's inventory control problems, the Company's inventories were

22  materially misstated and its inventory controls were severely deficient, causing pervasive and

23  widespread inventory reporting problems, including the false reporting of 25%-31% of inventory

24  that ***did not exist***.  One of those witnesses stated that multiple vice presidents from VeriFone's San

25  Jose headquarters were made aware of the inventory-control problems through reports and

26  conference calls and were constantly threatening to close the Lincoln facility if the problems were

27  not corrected.  The problems were never corrected, and VeriFone was forced to restate.

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 9 -

24. Another former VeriFone employee reported that he/she discovered during the Class Period that VeriFone was applying "wild amounts of overhead" to Lipman inventory which "inflated inventory" valuations. The witness prepared a formal report on the issue and submitted it to Periolat, who rejected the report and included the false inventory in VeriFone's financial results. The report was later corroborated by VeriFone's restatement disclosures, which admitted to pervasive and widespread manipulations of inventory and gross margins – including improper application of overhead to inventory – and a knowingly reckless system of internal controls, just as the witness described.

25. As a result of defendants' financial manipulations and false statements during the Class Period, VeriFone's stock price more than *doubled* – from $23.15 on August 31, 2006 (the first day of the Class Period) to a Class Period high of $50.00 per share on October 31, 2007. While class members unwittingly purchased VeriFone shares at inflated prices, defendants took advantage of their inside information by selling over *$465 million* in VeriFone stock, including *$100 million* in sales by Bergeron and Zwarenstein alone.

26. Given Bergeron's and Zwarenstein's actual knowledge of Periolat's accounting manipulations, their stock sales constituted illegal insider trading. CEO Bergeron sold nearly *$92 million* in VeriFone stock or *62%* of his shares during the Class Period, despite his knowledge that the Company's gross margins were an "unmitigated disaster" and that Periolat was inflating VeriFone's results because Bergeron and Zwarenstein instructed him to "fix the problem." Unlike average investors, Bergeron paid an average price of only *$0.033 per share* for his VeriFone stock and sold at prices as high as $46 per share.

27. Defendant Zwarenstein also fraudulently sold *99%* of his VeriFone shares for *$8.1 million* despite his actual knowledge of Periolat's improper financial adjustments and his purported role in "building out" VeriFone's financial and accounting infrastructure. Prior to those sales, Zwarenstein had only sold $912,672 in VeriFone stock in the preceding two years. Unlike regular investors, Zwarenstein only paid an average price of *$4.38 per share* for the shares he sold, and sold at prices as high as $45.00. Zwarenstein also suspiciously modified his 10b5-1 trading plan during the middle of the Class Period to *increase* his stock sales by 450%, from 4,000 shares per month to

1   18,000 shares per month during the height of the fraud.  Zwarenstein's employment was later

2   "terminated" for his role in VeriFone's misconduct, and he was forced to reimburse VeriFone

3   $150,000 in inflated bonuses.

4            28.      Defendant Atkinson, VeriFone's Executive Vice President of Global Marketing, who

5   was heavily involved in the Lipman acquisition, suspiciously sold over **97%** of his VeriFone stock

6   for proceeds of ***$6.76 million***.  Atkinson apparently did not believe his own misleading statements to

7   investors during the Class Period that VeriFone and Lipman "***will begin Day 1, completely***

8   ***integrated.  [We] are locked and loaded***."  Atkinson was also awarded 40,000 free restricted stock

9   awards as an extra bonus "in recognition of [his] efforts on the Lipman acquisition."  But the Lipman

10  merger had not been completely integrated – it was an operational and financial disaster – and on

11  July 18, 2007, during the heart of the Class Period, Atkinson was suddenly fired.

12           29.      Defendant Bondy, a member of VeriFone Board of Directors and one of the principal

13  architects of the spinoff and recapitalization of VeriFone from Hewlett-Packard in 2002, dumped

14  over ***$358 million*** in VeriFone stock, $100 million of which was jointly owned by two of his private

15  equity firm's partners, who also (not so coincidentally) happened to be VeriFone board executives.

16  After cashing out, Bondy suspiciously resigned from the Board only a few months before the

17  restatement was disclosed to investors.  Bondy's personal biography on his firm's website touts

18  VeriFone as one of his "***successful past investments***."  Average investors were not so "successful."

19  They lost over $1 billion.

20           30.      When defendants suddenly announced the restatement on December 3, 2007,

21  VeriFone's stock price collapsed – dropping $22.00 per share, from $48.03 to $26.03, or ***46%*** in a

22  ***single trading day*** – erasing $1.8 billion in market capitalization in less than eight hours.  When

23  defendants revealed additional negative disclosures relating to the restatement and defendants'

24  misconduct, investors were further damaged as VeriFone's stock suffered additional precipitous

25  drops of 22%, 15% and 21% due to revelations related to defendants' misconduct.

26           31.      Finally, on April 1, 2008, the last day of the Class Period, VeriFone announced that

27  defendant Zwarenstein was "resigning" and that the financial impact of the restatement was far

28  worse than initially represented to investors.  On this news, VeriFone's stock price declined another

19%, from $16.83 to $13.64 – capping a catastrophic **75% decline** from the Class Period high. Following the April 1, 2008 announcements, Wall Street analysts openly questioned the integrity of VeriFone's management and their purported explanation for the restatement.  One analyst observed:

> ***Results of internal investigation indicate more than a simple mistake***.  We believe the significant reorganization, the stepping down of the CFO, the CEO relinquishing the Chairman position, and the inclusion of the SEC ***point to more than the simple clerical error the company previously indicated***. . . .

32.     Now that VeriFone's financial fraud has been exposed, the Company has reported drastically lower pro forma gross margins in every quarter since 3Q07.  In stark contrast to the huge earnings increases touted during the Class Period, the Company reported a ***$51.2 million net loss*** in 4Q07, a ***$425.3 million net loss*** in 2008 and a ***$141.5 million net loss*** in the first three quarters of 2009.  Defendants' fraud has cost shareholders millions of dollars in expenses on government and internal investigations.  Despite defendants' repeatedly glowing statements about the Lipman merger, VeriFone has written off hundreds of millions of dollars in goodwill as a result of the disastrous acquisition.  The SEC investigated and charged the Company with numerous federal securities law violations, and the Company is being investigated by the U.S. Attorney's Office in New York.  VeriFone's stock price has never fully recovered and traded as low as $2.31 per share following the restatement.  VeriFone's current stock price hovers around $18.00 per share, a fraction of the inflated $50.00 price at which the stock traded during the Class Period.

33.     The following chart (which is also attached hereto in foldout form) illustrates the events surrounding defendants' misconduct during the Class Period:

1

2



3

4

5

6

7

8

9

10

11

12

13

14 **II.    JURISDICTION AND VENUE**

15      34.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act").

16 The claims asserted herein arise under §§10(b), 20(a) and 20(A) of the 1934 Act and Rule 10b-5, 17

17 C.F.R. §240.10b-5, promulgated thereunder.

18      35.     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the acts

19 alleged herein, including the dissemination of false statements and omissions substantially occurred

20 in this District.  The Company's corporate headquarters are in San Jose, California where the daily

21 operations of the Company are directed and managed.

22      36.     In connection with the acts, transactions and conduct alleged herein, defendants used

23 the means and instrumentalities of interstate commerce, including the U.S. mails, interstate

24 telephone communications and the facilities of national securities exchange markets.

25 **III.    THE PARTIES**

26      37.     National Elevator Industry Pension Fund ("National Elevator") was appointed lead

27 plaintiff on August 22, 2008.  National Elevator is a Taft-Hartley pension fund and fiduciary for

28 investments made on behalf of tens of thousands of elevator service workers.  National Elevator

1 purchased VeriFone securities at artificially inflated prices during the Class Period as a result of

2 defendants' misconduct and suffered damages when the artificial inflation was removed from the

3 stock price.

4        38.     Defendant VeriFone is a public corporation which has its principal place of business

5 located at 2099 Gateway Place, Suite 600, San Jose, California, 95110. VeriFone was founded and

6 incorporated in Hawaii on April 14, 1981. In 1984, the Company introduced the first mass-market

7 electronic payment system intended to replace manual credit card authorization devices for small

8 merchants. The Company went public on the NASDAQ in 1990.

9        39.     In 1995, the Company's shares moved to the NYSE and was later acquired by

10 Hewlett-Packard in 1997. In June 2001, Gores Technology Group acquired VeriFone from Hewlett-

11 Packard in a transaction led by defendant Bergeron. In July 2002, Bergeron and certain funds

12 associated with defendant Bondy's venture capital firm, GTCR Golder Rauner ("GTCR"), led a

13 recapitalization of the Company in which VeriFone Holdings, LLC acquired all of the shares of

14 VeriFone.

15        40.     VeriFone completed an initial public offering ("IPO") on April 19, 2005 at $10.00 per

16 share, raising $85 million in gross proceeds. On May 4, 2005, the Company's underwriters

17 exercised the over-allotment of 2.31 million shares from selling stockholders. On September 20,

18 2005, VeriFone completed a follow-on offering, raising another $52 million in gross proceeds.

19 VeriFone has approximately 2,224 employees and its stock trades on the NYSE under the ticker

20 symbol "PAY."

21        41.     Defendant Bergeron was the CEO and Chairman of VeriFone during the Class Period.

22 Bergeron prepared and approved the Company's quarterly earnings releases and repeated the

23 information during VeriFone's conference calls. He also signed and certified the quarterly and year-

24 end financial statements filed with the SEC and sworn Sarbanes-Oxley certifications attesting to the

25 truth and accuracy of VeriFone's financial statements and its system of internal controls. During the

26 Class Period, Bergeron sold 2,466,335 shares of VeriFone stock for proceeds of $91,971,802 while

27 in possession of material, adverse, undisclosed information.

28

42.     Defendant Zwarenstein was VeriFone's CFO and Executive Vice President during the Class Period.  Zwarenstein prepared and approved the Company's quarterly earnings releases and repeated the information during VeriFone's conference calls.  He also signed and certified the quarterly and year-end financial statements filed with the SEC and signed sworn certifications pursuant to Sarbanes-Oxley attesting to the truth and accuracy of VeriFone's financial statements and the Company's internal controls over financial reporting.  During the Class Period, Zwarenstein sold 222,000 shares of his VeriFone stock for proceeds of $8,130,447, while in possession of material, adverse, undisclosed information.  On April 1, 2008, VeriFone announced that Zwarenstein was "resigning" in connection with the Company's restatement.  The Company later admitted that his employment was "terminated."

43.     Defendant Periolat was VeriFone's Supply-Chain Controller during the Class Period. Periolat was responsible for, *inter alia*, forecasting gross margins and preparing accounting entries and financial information pertaining to VeriFone's inventory and gross margin results that were provided to Bergeron and Zwarenstein for review and dissemination to investors.  Periolat furnished and disseminated false accounting information with actual knowledge that the information was for the purpose of communicating the results to investors in earnings releases, SEC filings and conference calls.  His deliberate financial manipulations were done in furtherance of defendants' fraudulent scheme and course of conduct to inflate VeriFone's gross margin earnings and stock price to meet Wall Street expectations.  Periolat was charged by the SEC for numerous securities law violations in connection with his primary role in the financial misconduct giving rise to VeriFone's restatement, including "***knowingly*** circumventing a system of internal accounting controls."  The SEC issued a consent decree permanently enjoining Periolat from future violations of the anti-fraud and other provisions of the federal securities laws and charged Periolat a $25,000 civil penalty for his misconduct.

44.     Defendant Atkinson was VeriFone's Executive Vice President of Global Marketing and Business Development during the Class Period until he was fired on July 17, 2007.  Atkinson was heavily involved in VeriFone's acquisition of Lipman and, along with defendant Zwarenstein, was awarded tens of thousands of bonus stock option grants by VeriFone's compensation committee

1   "in recognition of [his] efforts on the Lipman acquisition."  During the Class Period, Atkinson sold

2   180,800 shares and over 97% of his VeriFone stock for proceeds of $6,765,148.

3       45.     Defendant Bondy was a member of VeriFone's Board of Directors from July 2002 to

4   October 1, 2007, when he resigned.  Bondy was also a principal partner of GTCR a private

5   equity/venture financing firm that manages numerous investment funds, including GTCR Fund VII,

6   L.P., GTCR Capital Partners, L.P. and GTCR Co-Invest.[4]  In July 2002, GTCR took a large stake in

7   VeriFone, and after the Company's IPO on April 27, 2005, GTCR, Bondy, Collin E. Roche (another

8   VeriFone director) and Daniel Timm (a former member of the Board of Directors) became

9   VeriFone's largest shareholder, owning 22.5 million shares, or 33.2%, of the Company's stock.

10  According to the Company's 2006 Proxy Statement filed with the SEC on February 27, 2007,

11  Bondy, GTCR and Roche were the Company's largest shareholder, owning 16.5 million shares, or

12  20%, of VeriFone's common stock.  During the Class Period, Bondy sold 9.8 million shares of

13  VeriFone stock for $358.5 million while in possession of material, adverse undisclosed information.,

14  Bondy then resigned from the Board of Directors.

15      46.     In 2006, Bondy was a member of the VeriFone Board of Directors' "Corporate

16  Governance and Nominating Committee."  According to the Company's 2006 Proxy Statement, the

17  committee met six times during FY06 and "met in executive session at each such meeting."  In the

18  2006 Proxy Statement, Bondy signed the "Report of the Corporate Governance and Nominating

19  Committee," which represented, among other things, that the committee reviewed "VeriFone's

20  Corporate Governance Guidelines" to determine whether any changes were "deemed necessary or

21  desirable" by the committee.

22      47.     Periolat, Bergeron and Zwarenstein are the Individual Defendants.  The Individual

23  Defendants are liable for the statements (and omissions of material facts) directly attributed to them

24

25  [4]      According to VeriFone's 2006 Proxy Statement, the GTCR entities are related through a
    cryptic labyrinth of partnerships as follows: "GTCR Golder Rauner, L.L.C. is the *general partner of*
26  *the general partner* of GTCR Fund VII, L.P., the *general partner of the general partner of the*
    *general partner* of GTCR Capital Partners, L.P., and the *general partner* of GTCR Co-Invest, L.P.
27  GTCR Golder Rauner, L.L.C."

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 16 -

1   and also the false statements pled in §VI., as those statements were "group-published" information

2   and the Individual Defendants were substantially involved in preparing, disseminating and certifying

3   VeriFone's press releases and SEC filings.  The Individual Defendants are also liable for VeriFone's

4   false financial results, material omissions and acts in furtherance of the accounting, financial and

5   insider-trading schemes to inflate VeriFone's results and enrich themselves.  Periolat is also liable

6   for knowingly concealing facts necessary to render VeriFone's financial results and its statements

7   not misleading, and for knowingly furnishing false information (and omitting material facts) to

8   investors through VeriFone's earnings releases, SEC filings and conference calls.  Periolat's

9   accounting manipulations were done for the specific purpose of inflating VeriFone's results to meet

10  public guidance, and it was necessary and inevitable that the fraudulent financial information would

11  be communicated to investors.  Bergeron, Zwarenstein, Atkinson and Bondy are the "Insider Trading

12  Defendants" liable for insider trading violations of the federal securities laws.

13  **IV.   CONFIDENTIAL WITNESSES**

14       48.    Some of the allegations included herein are based on information provided by several

15  former VeriFone employees referred to as confidential witnesses ("CW").  The information provided

16  by the former employees is reliable and credible because: (1) each of the witnesses worked at

17  VeriFone during the Class Period; (2) each witness stated he/she had personal knowledge of the

18  information provided; (3) the witnesses' job titles and responsibilities show they had personal

19  knowledge of the information provided; (4) many of the witness accounts corroborate one another;

20  and (5) the witness accounts are corroborated by other information alleged herein.

21       49.    CW1 was an accounting manager at VeriFone's San Jose headquarters from August

22  2005 until July 2007 when CW1 resigned.  CW1 reported to the Company's Controller for North

23  America (which included various individuals due to high rates of attrition and reorganizations of the

24  principal accounting group) who reported to corporate controller Laura Merkl, who reported to

25  defendant CFO Zwarenstein.  CW1 was responsible for reviewing accounting information from the

26  Company's Rocklin office, knew about the problems that caused the restatement and also described

27  numerous problems with the Company's accounting department.

28

50.     CW2 was a senior accountant at VeriFone's San Jose headquarters from December 2005 until February 2007 when CW2 resigned.  CW2 also reported to the Company's Controller for North America.  CW2 managed a group of staff accountants that handled accounting functions (journal entries and reconciliations) for various accounts, including marketing, facility allocation, executive expenses and bonus plans.  CW2 also participated in monthly balance sheet review meetings with CW1, North American Controller Mike Dowd, Merkl and other accounting personnel. Like CW1, CW2 knew about the problems that caused the restatement and also described numerous problems with the Company's accounting department.

51.     CW3 was a controller at Lipman's Syosset, New York facility from February 2006 until February 2007 when CW3 was laid off in conjunction with the closing of the Syosset facility. As a controller, CW3 was responsible for all of Lipman's major accounting functions in North America.  CW3 reported to Lipman's North America CEO Robert Striano.  As detailed herein, CW3 was directly involved in providing Lipman financial information to the San Jose accounting department, described problems in providing accurate financial information due to VeriFone and Lipman utilizing different versions of the Oracle ERP general ledger system, and discussed the problems with defendant Zwarenstein.

52.     CW4 worked at VeriFone from 1992 to June 2008 when CW4 resigned.  CW4 was the project manager for supply-chain solutions since early 2003 at the Company's Rocklin facility and reported to CIO Ipolani Tano, who was based in Hawaii and reported to defendant Bergeron.  As detailed herein, in September 2006, CW4 became the project manager for the implementation of the Oracle 11i system and described various problems with the implementation involving supply chain and inventory.

53.     CW5 was a business systems analyst at VeriFone's San Jose headquarters from 2001 until December 2007 when CW5 resigned.  CW5 reported to Information Technology Manager Tina Pegg, who reported to CIO Ipolani Tano, who reported to defendant Bergeron.  As detailed herein, CW5 knew about problems with retrieving financial data from Lipman caused, in part, by Lipman utilizing the Oracle 11i platform while VeriFone was utilizing the 10.7 platform.

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                                - 18 -

54.     CW6 was a temporary staff accountant at VeriFone's Alpharetta, Georgia facility for several weeks in April or May 2007.  According to CW6, a great deal of data from Lipman was lost when it was transferred to VeriFone because the data was not properly mapped before being transferred from Lipman's 11i system to VeriFone's 10.7 system.  Specifically, CW6 said that VeriFone could not identify the customers associated with hundreds of Lipman's receivables that were transferred to VeriFone's system, and it was CW6's job to determine the customers for the receivables.  However, CW6 was transferred to another company before commencing work on the project.  The temporary agency informed CW6 that Lisa Hamm, CW6's supervisor, had informed it that VeriFone did not want any more accounting staff.

55.     CW7 was a senior accountant at VeriFone's San Jose headquarters from May 2006 to August 2007 when CW7 resigned.  CW7 reported to CW1 and then Chris Cunningham, who became the accounting manager after CW1 resigned in July 2007.  Like the other CWs, CW7 stated that working in the VeriFone accounting department was very stressful and confusing and caused CW7 to resign.

56.     CW8 was a contractor and assistant controller at VeriFone for several weeks in August 2007.  CW8 was responsible for rebuilding the finance and accounting department to staff a large number of vacant positions and to hire full-time employees to replace consultants.  CW8 said that it was difficult to hire accounting and finance employees because recruiters told CW8 that VeriFone had a poor reputation among finance and accounting personnel as well as recruiters because there was so much turnover.

57.     CW9 was a financial analyst at VeriFone's Rocklin, California facility from October 2005 to March 2007, when CW9 resigned.  CW9 reported to supply-chain controller Periolat, who reported to Vice President of Financial Analysis Dave Gilford who reported to defendant Zwarenstein.  As a financial analyst, CW9 was responsible for profit and loss forecast-to-budget variance analyses for all research and development groups at VeriFone.  As detailed herein, CW9 described how the erroneous manual journal entries that led to the restatement were posted to the Company's Oracle 10.7 ERP general ledger accounting system, how the journal entries were reviewed by the San Jose accounting department headed by Zwarenstein and how CW9, Periolat and

1  other Rocklin personnel participated in monthly financial statement review teleconferences with

2  Zwarenstein, Merkl, Gilford and others.

3      58.   CW10 was Vice President of Operations at Lipman's Syosset, New York facility

4  from 1994 until December 31, 2006, when CW10 and many other personnel at the Syosset facility

5  were laid off.  Following the close of the Lipman acquisition on November 1, 2006, CW10 was

6  primarily involved in transferring inventory from Syosset to a VeriFone warehouse in California.  As

7  detailed herein, CW10 said there were difficulties converting the accounting for Lipman's Syosset

8  operations to VeriFone because the companies used different Oracle ERP general ledger accounting

9  systems and because the companies did not have the same fiscal year.  CW10 also said that VeriFone

10  personnel, including Patrick McGivern and Mark Norman, knew the Syosset facility was holding

11  excess and obsolete inventory due to a cancelled customer order.

12      59.   CW11 was an independent contractor and inventory control supervisor at VeriFone's

13  Lincoln, California distribution center (which was VeriFone's primary distribution center) from

14  December 2006 until May 2007 when CW11's contract was terminated.  CW11 was hired to clean

15  up and improve inventory accuracy by performing daily cycle counts of inventory on site at the

16  Lincoln facility, quarterly physical inventory counts and determining the reasons for any variances

17  between inventory on site and inventory recorded on the Company's books.  CW11 reported to

18  David Grantham, the distribution operations manager, who reported to Dave Mangelsdorf, the

19  Lincoln facility site manager and currently Vice President of Global Logistics.  As detailed below,

20  CW11 said there were widespread and chronic inventory control problems at the Company's

21  Lincoln, California facility throughout CW11's tenure.  CW11 reported that 25%-31% of the

22  inventory recorded on the 10.7 system as being located at the Lincoln facility did not exist, and that

23  several vice presidents from VeriFone's San Jose headquarters were told about the inventory

24  problems and constantly threatened to close down the Lincoln facility.  CW11 also documented the

25  missing inventory problems in a report that was submitted to CW11's supervisor and discussed on a

26  quarter-end conference call with VeriFone's vice presidents, but the problems were never fixed.

27  CW11 stated that VeriFone's inventory controls were a "huge mess" when CW11 joined VeriFone

28  in December 2006 and were a "huge mess" when CW11 left in March 2007.

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                      - 20 -

60.     CW12 was a warehouse operations manager at VeriFone's Lincoln, California facility from March 2007 until December 2007 when CW12 left the Company. CW12 oversaw 60-80 warehouse employees and was responsible for all of the receiving, distribution, picking and shipping operations for inventory at the Lincoln, California distribution center. CW12 was also responsible for preparing VeriFone's distribution operations for the upcoming transition to Oracle's 11i ERP system. Like CW11, CW12 reported to Grantham who reported to Mangelsdorf. Also like CW11, CW12 said there were widespread and pervasive problems at the Lincoln facility and that inventory recorded on the 10.7 system as being located at the Lincoln facility did not exist.

61.     CW13 was a former VeriFone senior manager of business processes from October 2006 to February 2008. CW13 was hired to oversee the merger of VeriFone's Oracle 10.7 system with Lipman's 11i system and reported to director of supply chain Don Welch, who reported to Patrick McGivern, VeriFone's Vice President of Global Operations and Supply Chain. CW13's duties included learning the systems used by Lipman and VeriFone and analyzing variances in inventory valuations. CW13 reported that in 1Q07, he/she was asked to analyze a $9 million inventory variance and discovered that the supply chain finance group had applied a "wild amount of overhead" and improper in-transit accruals to inventory which "inflated inventory" levels. CW13 documented the problem in a report and sent it to his/her supervisors, including Periolat, who responded with hostility and rejected the report and later included the inflated inventory valuations in the Company's publicly reported results.

## V.     BACKGROUND LEADING UP TO THE CLASS PERIOD

### A.     VeriFone's Gross Margin Was One of Its Most Important and Closely Monitored Financial Metrics

62.     During the Class Period, defendants positioned investors to believe that VeriFone's gross margin was one of the most important financial measures of its overall financial success. Bergeron and Zwarenstein repeatedly touted and emphasized the Company's increasing "record" gross margins in virtually every public earnings press release, conference call and major public filing with the SEC. For example, during the April 10, 2006 conference call announcing the acquisition of Lipman, Bergeron stated that gross margin was "***the ultimate barometer of the operational***

*Excellence of this business*."  During VeriFone's December 7, 2006 conference call, Bergeron stated that "revenue quality as evidenced by *our continuing, almost obsessive approach to gross margin expansion*, is something that is an important part of VeriFone's future."

63.     Wall Street analysts also focused on VeriFone's gross margin and considered it the most important measure of VeriFone's financial performance.  For example, after VeriFone reported its results for 2Q06 (the quarter preceding the Class Period), SunTrust Robinson Humphrey ("SunTrust") analyst Andrew W. Jeffrey ("Jeffrey") issued a report on June 21, 2006, stating:

> Gross margin expanded again in 2Q06.  *We believe this is the most important measure of VeriFone's financial performance*, as it demonstrates the company's pricing power, the relative superiority of its solutions and its *impressive supply chain efficiency*.  *VeriFone continues enjoying the highest gross margin in the POS terminal industry, and management expects further gross margin expansion following the Lipman acquisition*.

64.     Thus, leading up to the Class Period, defendants closely monitored VeriFone's gross margin and knew that any publicly disclosed negative gross-margin trends or results would cause VeriFone's stock price to decline.

**B.     April 10, 2006: VeriFone Announces the Acquisition of Lipman and Bergeron and Zwarenstein Assure Investors that the Merger Will Increase the Company's Gross Margins and Earnings in 2007**

65.     On April 10, 2006, VeriFone announced its acquisition of Lipman, and Bergeron assured investors the acquisition would be accretive to earnings and increase the Company's gross margins.  VeriFone's April 10, 2006 press release reported that "[f]ollowing the acquisition, VeriFone will become the largest global provider of electronic payment solutions and services, capitalizing on accelerating growth in the emerging markets and demand for IP-based and wireless payment systems."

66.     During the April 10, 2006 conference call, Bergeron touted the "immediate accretion" of the Lipman merger and VeriFone's focus on gross margin expansion:

> Within the last five years and as a public company over the last one year, hopefully we've defined ourselves to our shareholders as a *company with fantastic operational Excellence [and] as a company that is built by highly disciplined and experienced managers*.

*          *          *

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                                                                   - 22 -

*Our gross margins, in many respects – the ultimate barometer of the operational Excellence of this business*, has been increasing sequentially for five quarters in a row – last quarter providing 45.6%.

\*       \*       \*

*There is a strategic rationale for VeriFone and Lipman joining forces. The first, strong financial performance plus strong financial performance equals stronger financial performance and immediate accretion and very complementary geographic profile.* Together this cements VeriFone's leading position in North America. This creates the number [one] position for VeriFone across emerging markets. And finally, it creates a number 1 or number 2 position in most other markets worldwide.

67.     Bergeron also attempted to convince investors that the integration of Lipman would not disrupt VeriFone's business because of the proven integration experience of VeriFone's "management team":

Let me talk a little about the integration plan. Firstly, this will be a full integration of the businesses at every level. *VeriFone's management team has proven integration experience. This is the management team*, consistently, that bought the business out of HP five years ago, and *is extremely operationally focused*.

And as a joint business, *we will continue our profit focus, disciplined approach to sales, and to running VeriFone*.

\*       \*       \*

As you can see the gross margin profile for the business are very similar, and as a result, *we are increasing our pro-forma gross margin expectations from 41-44% which was an improvement from the 40-43% model we issued during the IPO to a new pro-forma gross margin model of 42-47%*.

68.     Following the April 10, 2006 announcement, analysts repeated Bergeron's statements concerning VeriFone's increased gross-margin projections:

April 10, 2006 Credit Suisse-North America report: *Management expects the acquisition to be accretive from day one without assuming significant cost savings. Most of the cost savings will stem from increased purchasing power to the benefit of gross margin.*

April 11, 2006 SunTrust report: *VeriFone management indicated on the conference call yesterday that the high end of its long-term sustainable gross margin range is 47%. This is at least 200 basis points higher than our previous expectations.*

69.     As set forth below, despite defendants' bullish representations, investors were still concerned about the Lipman merger and drove VeriFone's stock price down 34% leading up to the Class Period.

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                              - 23 -

**C.    April 10, 2006-August 30, 2006: VeriFone's Stock Price Declines Due to Investor Concerns About Declining Margins at Lipman and the Operational Impact of the Merger**

70.    Prior to the Class Period, investors and analysts were concerned about the Lipman merger for several reasons. First, Lipman's own gross margin had been in a rapid and steady decline for *five consecutive years* leading up to the merger, from 56% gross margins in 2002 to only *41.9%* in 2006:

| ($ in 000s, Except EPS) | 2001 | 2002 | 2003 | 2004 | 2005 | 1Q06 |
|---|---|---|---|---|---|---|
| Net Revenues | $62,958 | $85,534 | $117,667 | $180,533 | $234,400 | $57,632 |
| Cost of Net Revenues | $27,781 | $37,116 | $58,413 | $99,630 | $136,381 | $33,464 |
| Gross Profit | $35,177 | $48,418 | $59,254 | $80,923 | $99,019 | $24,168 |
| Operating Income | $9,609 | $23,605 | $29,299 | $36,749 | $26,515 | $8,537 |
| Operating Margin | 15.3% | 27.6% | 24.9% | 20.3% | 11.3% | 14.8% |
| Gross Margin | 55.9% | 56.6% | 50.4% | 44.8% | 42.1% | 41.9% |

71.    Thus, investors were understandably troubled by VeriFone's projection of gross margin "increases" to as high as 47% after absorbing a complex foreign company with 41.9% margins. Indeed, following the merger announcement, Standard and Poor's Rating Service downgraded VeriFone from "stable" to "negative" due to concerns about the Lipman merger:

"The outlook revision reflects our *concerns about potential operational disruptions*, given that the acquisition represents the largest transaction undertaken by the company to date, as well as *Lipman's decline in EBITDA margins over the past two years*," said Standard & Poor's credit analyst Lucy Patricola.

72.    Investors were also concerned because Lipman's business was heavily dependent on "international" sales, which had lower prices and substantially lower gross margins than North American sales (*i.e.*, U.S. and Canada) which comprised a majority of VeriFone's business. Thus, any substantial increase in international sales put downward pressure on gross margins. As the Company acknowledged:

*Our international sales tend to carry lower prices and therefore have lower gross margins* than our sales in North America. As a result, *if we successfully expand our International sales*, *any improvement in our results of operations will likely not be as favorable* as an expansion of similar magnitude in the United States and Canada. . . .

73.    Following the acquisition of Lipman, VeriFone's lower-margin international sales nearly *doubled* from $66.6 million or 43% of total sales in 4Q06 (the quarter before the merger) to *60%* of total sales in 1Q07 (the first quarter after inclusion of Lipman results):

| ($ in 000s, Except EPS) | 1Q06 | 2Q06 | 3Q06 | 4Q06 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|---|
| Int'l Revenues | $57,657 | $61,845 | $62,289 | $66,592 | $129,070 | $122,095 | $128,027 |
| North American Revenues | $77,175 | $80,446 | $85,404 | $90,628 | $89,070 | $96,040 | $104,570 |
| Corp. Revenues | ($202) | ($14) | ($76) | ($694) | ($1,514) | ($922) | ($652) |
| Total Revenues | $134,630 | $142,190 | $147,617 | $156,633 | $216,626 | $217,213 | $231,945 |
| Int'l Revenues/ Total Revenues | 42.8% | 43.5% | 42.2% | 42.5% | **59.6%** | **56.2%** | **55.2%** |

74.     These and other concerns drove VeriFone's stock price down 34% leading up to the Class Period.  As one SunTrust analyst observed shortly before the Class Period: "[VeriFone] has lost about 34% of its value since May 26, [2006] as valuations in our universe have reset and ***investor concern regarding potential customer losses at Lipman have dampened enthusiasm for the pending merger***."  Importantly, SunTrust also noted that investors were already concerned that VeriFone was overstating its gross margins and overreaching on its guidance in the months leading up to the Class Period, but that VeriFone management dispelled those concerns and explained away the problems:

> ***Gross Margin is Overstated And The Balance Sheet Is Deteriorating.***  A recent competitor's report asserts that VeriFone over-stated its gross margin by 140 basis points in 2Q06, owing to a one-time settlement with a supplier. It also points out that [Days Sales Outstanding] rose from 62 days in 1Q06 to 68 days in 2Q06.  The analyst concluded from these observations that ***VeriFone's business is becoming more difficult and that the company is reaching to exceed the Street mean EPS estimate***.

> While our competitor makes an articulate argument, we disagree with his conclusions.  Specifically, ***VeriFone notes*** that there were at least equal and offsetting costs incurred in 2Q06 which effectively negated the one-time benefit to gross margin. . . .

75.     On August 30, 2006, the day before the Class Period, Credit Suisse issued a research report, stating "***[t]here has also been concern regarding PAY's gross margins*** . . . ."  However, based on defendants' representations that the Lipman merger would be immediately accretive to earnings and would result in increased gross margins up to 47%, the Credit Suisse analyst parroted defendants' representations: "[W]e believe the company will continue to generate solid gross margin improvements."

76.     Thus, leading up to the Class Period, defendants knew that in order to stop VeriFone's 34% stock price decline, they had to deliver increasing gross margins and earnings to convince investors that the Lipman merger was a success and would drive future growth.  When they

1   could not deliver, they engaged in fraud.  Defendants' false and misleading statements, material

2   omissions and fraudulent course of conduct are particularized below.

3   **VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
          FRAUDULENT COURSE OF CONDUCT**

4

5          **A.    VeriFone's False Financial Representations in 1Q07, 2Q07 and 3Q07**

6                  **1.    The False Financial Results**

7          77.    Throughout the Class Period, defendants made numerous false and misleading

8   representations concerning VeriFone's financial results in (a) press releases announcing quarterly

9   financial and earnings results to the public, (b) follow-up conference calls with investors and

10  analysts which were published to the market, and (c) quarterly filings with the SEC on Forms 10-Q,

11  signed and certified by CEO Bergeron and CFO Zwarenstein.  The following is a chart of the dates

12  of the false and misleading earnings releases, conference calls and SEC filings which incorporated

13  VeriFone's false financial results:

| Period | Press Release Date | Conference Call Date | SEC Form 10-Q Date |
|--------|--------------------|-----------------------|--------------------|
| **1Q07** | March 1, 2007 | March 1, 2007 | March 9, 2007 |
| **2Q07** | May 29, 2007 | May 29, 2007 | May 31, 2007 |
| **3Q07** | Sept. 6, 2007 | Sept. 6, 2007 | Sept. 7, 2007 |

14

15

16          78.    On each of the above dates, defendants issued materially false financial results and

17  concealed material facts concerning the Company's true financial condition.  As set forth in §VIII,

18  *infra*, the Company's false financial results violated numerous GAAP and SEC rules, and

19  misrepresented the Company's revenues, COGS, gross profits, gross margin, net income and

20  earnings, among other accounts.  The restated results are set forth in the following charts:

21

22

23

24

25

26

27

28

| 1Q07 (Ended January 31, 2007) | | | | |
|---|---|---|---|---|
| ($ in 000s, Except EPS) | Originally Reported | Restated | Amount Overstated | % Reported Amount was Overstated |
| Net Revenues | $216,626 | $216,363 | $263 | 0.12% |
| Cost of Net Revenues | $135,246 | $147,740 | ($12,494) | -9.24% |
| GAAP Gross Profit | $81,380 | $68,623 | $12,757 | 15.68% |
| GAAP Gross Profit % | 37.57% | 31.72% | | 15.57% |
| Pro forma Gross Profit | $102,060 | $89,597 | $12,463 | 12.21% |
| Pro forma Gross Profit % | 47.11% | 41.41% | | 12.10% |
| Pro forma Net Income | $31,151 | $26,631 | $4,520 | 14.51% |
| Pro forma EPS | $0.37 | $0.32 | $0.05 | 13.51% |
| GAAP Net Income | ($984) | ($5,679) | $4,695 | -477.13% |
| GAAP EPS | ($0.01) | ($0.07) | $0.06 | -600.00% |
| Inventories | $130,815 | $117,481 | $13,334 | 11.34% |

| 2Q07 (Ended April 30, 2007) | | | | |
|---|---|---|---|---|
| ($ in 000s, Except EPS) | Originally Reported | Restated | Amount Overstated | % Reported Amount was Overstated |
| Net Revenues | $217,213 | $216,883 | $330 | 0.15% |
| Cost of Net Revenues | $127,013 | $139,237 | ($12,224) | -9.62% |
| GAAP Gross Profit | $90,200 | $77,646 | $12,554 | 13.92% |
| GAAP Gross Profit % | 41.53% | 35.80% | | 13.79% |
| Pro forma Gross Profit | $104,382 | $91,675 | $12,707 | 12.17% |
| Pro forma Gross Profit % | 48.06% | 42.27% | | 12.04% |
| Pro forma Net Income | $32,636 | $20,422 | $12,214 | 37.43% |
| Pro forma EPS | $0.39 | $0.24 | $0.15 | 38.46% |
| GAAP Net Income | $4,859 | ($4,818) | $9,677 | 199.16% |
| GAAP EPS | $0.06 | ($0.06) | $0.12 | 200.00% |
| Inventories | $125,390 | $101,449 | $23,941 | 23.59% |

| 3Q07 (Ended July 31, 2007) | | | | |
|---|---|---|---|---|
| ($ in 000s, Except EPS) | Originally Reported | Restated | Amount Overstated | % Reported Amount was Overstated |
| Net Revenues | $231,945 | $231,701 | $244 | 0.11% |
| Cost of Net Revenues | $129,934 | $146,105 | ($16,171) | -12.45% |
| GAAP Gross Profit | $102,011 | $85,596 | $16,415 | 16.09% |
| GAAP Gross Profit % | 43.98% | 36.94% | | 16.00% |
| Pro forma Gross Profit | $111,857 | $95,444 | $16,413 | 14.67% |
| Pro forma Gross Profit % | 48.23% | 41.19% | | 14.58% |
| Pro forma Net Income | $35,585 | ($21,697) | $57,282 | 160.97% |
| Pro forma EPS | $0.42 | ($0.26) | $0.69 | 164.29% |
| GAAP Net Income | $13,439 | ($42,386) | $55,825 | 415.40% |
| GAAP EPS | $0.16 | ($0.51) | $0.67 | 418.75% |
| Inventories | $145,398 | $104,784 | $40,614 | 38.75% |

79.     The financial results in 1Q07, 2Q07 and 3Q07 were each reviewed, signed and certified under oath by defendants Bergeron and Zwarenstein.  They represented in each SEC Form 10-Q that the results (1) "*do not contain any untrue statement of a material fact or omit to state a material fact*," (2) "*have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information*;" and that (3) "*information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company*."  Bergeron and Zwarenstein also signed sworn Sarbanes-Oxley certifications representing the results were accurate.  *See* Ex. 3.

### 2.   Defendants' False Certifications of VeriFone's Internal Controls over Financial Reporting.

80.     In addition to VeriFone's false financial results, the Company expressly assured investors in each quarterly Form 10-Q that Bergeron and Zwarenstein, as CEO and CFO, had "*carried out an evaluation of the effectiveness of our disclosure controls and procedures*" and "*[b]ased upon that evaluation . . . concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report*."[5]

81.     Separately, Bergeron and Zwarenstein signed sworn Sarbanes-Oxley certifications attached to each Form 10-Q representing under oath that they:

(1) "*are responsible for establishing and maintaining disclosure controls and procedures* . . . .";

(2) "*designed* such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure* that material information relating to the registrant . . . *is made known to us* by others . . . .";

(3) *[e]valuated the effectiveness* of the registrant's disclosure controls and procedures . . . .";

(4) "*[d]isclosed*" any change that has materially affected, or is "reasonably likely to materially affect, the registrant's internal control over financial reporting";

---

[5]     Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the 1934 Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosures.  SEC Rule 13a-15(e), 17 C.F.R. §240.13a-15(e); SEC Rule 15d-15(e), 17 C.F.R. §240.15d-15(e).

(5) "*disclosed . . . [a]ll significant deficiencies and material weaknesses* in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's *ability to record, process, summarize and report financial information*"; and

(6) "*disclosed . . . [a]ny fraud, whether or not material, that involves management or other employees* who have a significant role in the registrant's internal control over financial reporting."

### 3. Defendants' False Statements to Investors Concerning the Reasons for the Inflated Financial Results[6]

82.     In addition to the issuance of the false financial results and sworn certifications in quarterly press releases and Forms 10-Q, defendants also repeated the false financial results and made false and misleading oral representations during conference calls concerning the *reasons* for the inexplicable gross margin and earnings increases, as follows.

### a.     1Q07 Conference Call:

83.     On March 7, 2007, during the first conference call with investors discussing the combined post-merger financial results, Bergeron falsely stated:

> *Gross margins, excluding acquisition charges and stock-related expenses were 47.1%. Now, this is equal to the record level obtained last quarter despite the incorporation of Lipman*, which, as we've indicated, had gross margins in the low 40's for the last several quarters that they reported publicly. . . .

84.     Zwarenstein repeated these false statements: "As Doug discussed in some detail, I will begin with *non-GAAP gross margins, which came in at 47.1%, equal to the fourth quarter of 2006 record*. . . ."

85.     Bergeron also falsely told investors that the higher gross margins and earnings growth were the result of "significant earnings accretion" from the Lipman merger and would be a sustainable "structural gross margin advantage" going forward:

> The successes we achieved in our first quarter go well beyond the strength of our earnings. Specifically, *we completed the corporate-wide integration of a major cross-border acquisition of Lipman and we achieved a significant earnings accretion in this, the first full quarter of combined operations*.

\*          \*          \*

---

[6]     All false statements in this section are designated with bold and italics.

*[W]e now have developed a structural gross margin advantage, which is going to be tough to beat*.

86.     In response to a direct question from an analyst surprised by the record level of gross margin, Bergeron went out of his way to convince investors that the surprising numbers were the result of the synergies of the Lipman merger and supply-chain efficiencies:

BARTOLAI, ANALYST, CREDIT SUISSE:  *First question – just on the gross margin I mean a pretty solid result there given the inclusion of Lipman and the international growth.  Can you give us some sense of where the improvement came?*  Was it mostly on the legacy VeriFone side?  And do you still have a lot more room to improve the Lipman operations?

BERGERON: *There really isn't Lipman operations any longer.  The business is treated at the gross margin level as one entity, driven by one senior executive, who is doing a splendid job.  We have said somewhat repeatedly that we think we're in the ZIP code that can be sustained.*  The only variance there is the effect of wireless sales are a net positive and the effect of some of our emerging market sales can be a net negative.  But *we're very comfortable in this range*.

And as to the first-quarter results, I think we spoke to it or Barry spoke to it in some length, but it was a combination of quality revenue, Paul, *brings quality margins, and we were all about quality revenue this quarter*.  That's the first thing.  *And then our supply chain efficiencies* – listen, when you are putting $215 million, $220 million worth of revenue through in a quarter, *your fixed overhead per dollar of sale goes down*.  And that's arithmetically beneficial to the Company.

Then we already have started to see and we entered it this last earnings call some *nice procurement synergies that come from our size.  And the good news is the last of those two or three things are not possible with competitors.  So we now have developed a structural gross margin advantage, which is going to be tough to beat*.

### b.     2Q07 Conference Call:

87.     During the May 29, 2007 conference call, in addition to repeating the false 2Q07 results that were drastically overstated, Bergeron and Zwarenstein again touted the Company's "record" gross margins that "exceeded" their own expectations:

BERGERON: *We had an outstanding quarter of margin performance, well exceeding our own expectations for profitability metrics.  Adjusted gross margins of 48.1% were a record, and our 10 quarter period of gross margin expansion continues*.

88.     Analysts were again surprised about the gross margin increase in 2Q07 and pressed defendants to explain how such a margin increase was possible.  In fact, the first question during the 2Q07 conference call was whether any unusual items contributed to the inexplicable margin increase to 48% and whether it was sustainable:

TIEN-TSIN HUANG – JPMorgan Analyst: I guess I will kick off with a question on gross margins, 48% was well ahead of our expectation, curious to hear [if] this level is sustainable going forward and were there any unusual items in the quarter? Sounds like wireless was a big contributor.

ZWARENSTEIN: Let me take the second part of the question first and the answer is, **no, there was no unusual items.** In terms of the wireless margins they are superior as you know. It depends on the particular wireless products and country mix and domestic and international mix but come to be talking about 10 percentage point differential between the two. Now, obviously that will give us a tailwind to the extent that wireless continues to grow faster and support the margin. That being said though, in any given quarter the mix, product mix and the country mix can have a material impact on the margin. So we would be more comfortable in saying that, yes, maybe the **48% is sustainable but it could drop to maybe 47% or something like that or it could go up to beyond that.** It really depends on the mix.

89.      Atlantic Trust analyst Fred Weiss also asked what caused the significant improvement in gross margins and Bergeron primarily attributed the results to increased wireless sales, scale advantages of the merger and lower fixed costs, none of which was true given Bergeron's knowledge of Periolat's accounting manipulations:

WEISS, Atlantic Trust Analyst: Two questions, one at a time. Could you just talk about the **gross margin variance, big positive move in it**, despite the revenues didn't come quite as good as expected or you hoped for, is it, could you talk about the factors behind that again? **I'm trying to understand exactly what led to the significant improvement in gross margins.**

BERGERON: There's probably three categories. **The first is the increase in the proportion of our systems which are wireless.** You pointed to it.

WEISS: Yes.

BERGERON: That has a more material impact. **The second is scale.** Despite the fact that we use outsourced manufacturing for 65% of our business, let's not underestimate the high fixed cost that a proper Company like VeriFone has in running a worldwide supply chain.

*      *      *

**And as we grow, our variable cost grows but our fixed cost as a percentage of our overall cost declines, so that is almost a mathematical contributor of margin expansion** that will continue to play out as revenue grows quarter-over-quarter, hopefully in the years ahead. I guess those are the two main factors. . . .

### c.      3Q07 Conference Call:

90.      During the 3Q07 conference call, Bergeron again falsely attributed the Company's success to "supply chain efficiencies" arising from the Lipman merger and the "tremendous financial

transparency" between the two companies, even though he knew that Periolat's accounting manipulations were the sole reason for the gross-margin increase:

> BERGERON: *[W]e're getting supply chain efficiencies in Israel that we never experienced before, and something we mentioned as well, we have tremendous transparency, financial transparency into the true cost of manufacturing and all the little nuanced items that roll up into that* as a result of having 30%, 35% of our own inside. So it's worked out splendidly and we're committed to it.

> WACHOVIA ANALYST: And *would you say this has been a key facet in driving gross margin expansion* in addition to the wireless mix?

> BERGERON: It's hard to pull them apart and in many cases, there's more than one component. But *there's clearly that, there's clearly wireless, there's clearly scale in general, and there's clearly just better commercial execution in many respects.*

### d.     Analysts Repeated Defendants' False Statements

91.     After VeriFone reported 1Q07 results, several analysts noted their surprise that VeriFone could report such rapidly increasing margins given that (a) Lipman's margins had dropped significantly leading up to the merger, (b) VeriFone's  international sales, which had drastically lower margins, had increased sharply from 42.5% of total sales before the Class Period to 55%-60% of total sales during the Class Period, and (c) VeriFone's competitors had gross margins that were 1000 basis points (roughly 10%) lower than VeriFone's.  However, based on defendants' false and misleading expectations for the inflated results, analysts parroted VeriFone's false explanations and incorporated and repeated those statements in their research reports to investors.

92.     For example, after defendants' false statements at the 1Q07 conference call on March 1, 2007, a SunTrust analyst wrote: "*Gross margin expanded again in the quarter, from 45.5% in 1Q06 to 47.1% in 1Q07.  This is particularly notable, in our opinion, as Lipman's historic gross margin was significantly lower than VeriFone's. . . .*"  In a follow-up report on March 20, 2007, SunTrust noted that VeriFone "*enjoys roughly a 1,000 basis point gross margin advantage, compared with its primary competitors, Hypercom and Ingenico.*"  These statements were based on the false financial results and inflated margins derived from defendants' accounting manipulations.

93.     Analysts issued similar reports repeating defendants' false statements after VeriFone reported 2Q07 results on May 29, 2007.  Although the Company reported disappointing revenues for the quarter, the analysts focused on VeriFone's "record" increase in gross margins:

- In a May 29, 2007 report, Credit Suisse analyst Bartolai wrote that VeriFone's 2Q07 adjusted EPS of $0.39 was $0.03 ahead of his model and that "***continued strong gross margins drove the upside to our estimate***." He also wrote that the 48.1% gross margin was "***96bps ahead of our model***." (Emphasis in original.)

- In a May 30, 2007 report, SunTrust analyst Jeffrey wrote: "***VeriFone continues improving its superior gross margin. 2Q07 gross margin was an impressive 48.1%, up 100 basis points, sequentially, and 250 basis points year-over-year.*** . . . We submit that the company's superior profitability is a reflection of leading technology and ***best-in-class supply chain management***."

94. After VeriFone reported 3Q07 results on September 6, 2007, analysts again repeated defendants' false explanations for the increase in gross margins:

- Wachovia analyst Perlin issued a report on September 6, 2007, stating that 3Q07 EPS of $0.42 was $0.02 above Wachovia's estimate and Street consensus "primarily due to better than expected adjusted gross margin of 48.2% vs. our estimate of 47.3% . . . . We attribute the higher than expected gross margin to lower than expected integration expenses related to the Lipman acquisition and higher profitability from the company's wireless product . . . . ***Adjusted gross margins remained at record levels coming in at 48.2%, 90 bps above are [sic] estimate***."

- Morgan Keegan analyst Dodd issued a report on September 7, 2007 and wrote that "overall, the 3Q:07 results showed solid revenue growth . . . along with ***continued gross margin improvements and overhead expense controls***."

- Credit Suisse analyst Bartolai issued a report on September 7, 2007, stating that the 3Q07 EPS of $0.42 was $0.02 above previous consensus and $0.03 above his model and that "[t]he upside was driven by solid growth in both Domestic and International with ***continued margin improvements***." He added that "***adjusted gross margins were 20 bps ahead of our model, increasing 234 basis points YTY to 48.2%. . . . PAY once again generated solid margin expansion, with improvements in both gross margin and operating expenses***." (Emphasis in original.)

95. Analysts and investors were not told, however, that the real reason for the increased gross margin was that VeriFone created fictitious inventory to reduce COGS and artificially inflate gross margins and earnings, under the direction and review of Bergeron and Zwarenstein. Analysts were misled just like investors.

**B. Facts Establishing Falsity and Scienter**

96. As set forth in §IX., *infra*, and the charts above, it is undisputed that VeriFone's financial results and defendants' certification of those results were materially false and misleading and had to be restated. A restatement is an admission that: (a) VeriFone's publicly reported financial results in 1Q07, 2Q07 and 3Q07 and defendants' statements repeating those results were materially false at the time they were originally issued; and (b) based on information available to defendants at

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                              - 33 -

1  the time the results were originally reported.  As the SEC has stated, "restatements should not be

2  used to make any adjustments to take into account subsequent information that did not and could not

3  have existed **at the time** the original financial statements were prepared," and "GAAP only allows a

4  restatement of prior financial statements based upon information 'that **existed at the time the**

5  **financial statements were prepared**.'"[7]  The restatement is an admission of both falsity and

6  materiality.

7        97.  As set forth below, the restatement was the result of a massive and systematic

8  accounting and financial fraud and deliberate inventory manipulations by Periolat under the direction

9  and knowledge of Bergeron and Zwarenstein.  Defendants knew that VeriFone's "record" gross

10  margin increases were not "structural" nor were they "sustainable."  The financial results were not

11  the result of "supply chain efficiencies and earnings accretion," they were the result of defendants'

12  financial manipulations, including double-counting inventory and creating fake profit from Lipman

13  transactions.

14        98.  The following nine categories of particularized facts conclusively establish a strong

15  inference that defendants knew or were deliberately reckless in not knowing that VeriFone's

16  financial results, defendants' representations about how those results were derived, and the sworn

17  certifications of VeriFone's results and its system of internal controls were deliberately false and

18  misleading when issued.

19        **1.  The Facts and Evidence Revealed in the SEC's Enforcement**
                       **Action Establish Deliberate Recklessness**

20

21        99.  On September 1, 2009, the SEC announced formal charges against VeriFone and

22  Periolat for numerous violations of federal securities laws.  Exs. 1-2.  The SEC charged VeriFone

23  and Periolat with "falsifying the company's accounting records which boosted gross margins and

24  income reported to shareholders."  The SEC alleged VeriFone's "reporting of dramatically inflated

25  [7]     *See* Statement of Financial Accounting Standards ("SFAS") No. 154, ¶2; *In re Sunbeam Sec.*

26  *Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange
   Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude Evidence of

27  the Restatement and Restatement Report at 11, 13 (S.D. Fla. Feb. 22, 2002) (quoting APB Opinion
   20, ¶13).

28

1    operating income" and that "***company personnel, facing an unexpected decline in gross margins,***

2    ***made unsupportable alterations to VeriFone's accounting records, inflating income by millions of***

3    ***dollars***." These "unsupportable alterations" were principally due to "erroneous inventory accounting

4    adjustments" that were made and distributed to Bergeron and Zwarenstein "***after*** Verifone's internal

5    reporting showed preliminary quarterly results ***substantially lower than expected***" and far lower

6    than the level represented to investors and Wall Street analysts. ¶2. The SEC alleged that when

7    defendants' "misrepresentations came to light in December 2007, the company's stock price dropped

8    46%, resulting in a one-day drop in market capitalization of ***$1.8 billion***." ¶1 (emphasis in original).

9         100. The facts set forth in the SEC action demonstrate that, contrary to Bergeron's and

10   Zwarenstein's repeated assertions to investors during the Class Period that VeriFone's purported

11   "record" gross margins and profits were due to "structural" and "sustainable" gross margin

12   advantages and "supply chain efficiencies" from the Lipman merger, they knew that the margin

13   levels were due to accounting manipulations done at their direction.

14        101. The SEC alleged that at the end of each quarter during each quarterly closing process

15   for 1Q07, 2Q07 and 3Q07 (the three restated quarters), Bergeron and Zwarenstein were provided

16   with internal reports and were expressly told that VeriFone's actual gross margins were "***markedly***

17   ***lower than previously released guidance to analysts***." Ex. 1; Ex. 2, ¶¶15-17, 23. In early February

18   2007, during the quarterly close process for 1Q07, VeriFone's internal results showed a gross margin

19   of 42.8%, which was approximately four percentage points ***lower*** than the Company's public

20   guidance of 45%-47%. ¶14.

21        102. After receiving the internal reports showing huge discrepancies between defendants'

22   public guidance and VeriFone's actual results, there was "considerable concern" by management.

23   ¶15. Bergeron and Zwarenstein had already represented to the market that the Lipman merger would

24   result in increasing gross margins and "immediate earnings accretion" to VeriFone's financial results

25   beginning in 1Q07. *See* §VI.C., *infra*. Defendants knew that any unfavorable gross-margin results

26   below expectations in the first quarter of the combined VeriFone-Lipman entity would be disastrous

27   to the Company's stock price.

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                    - 35 -

103.    At the direction of Bergeron and Zwarenstein, Periolat and others were "charged with" figuring out the reasons for the large variance between actual gross-margin results and defendants' public guidance. ¶¶15-17.  Periolat and other financial personnel initially focused their analysis on cost of goods sold and inventory line items, both of which are components of and directly impact gross margin. ¶15.  However, according to the SEC, Periolat could not explain the discrepancy between the actual results and VeriFone's guidance to investors. ¶¶15-16.  The reason he could not explain it is that the numbers were correct, and defendants' public representatives were wrong.  Indeed, the SEC confirmed that "[i]n fact, *the company's unreported results had been correct*."  Ex. 1.

104.    Knowing that any admission to the market that VeriFone's public representations were wrong and that Lipman caused a huge drop-off in profits and gross margin would result in a decrease in VeriFone's stock price, defendants "*began to express increasing frustration*."  ¶17. Bergeron and Zwarenstein sent e-mails characterizing the low gross margin results as an "*unmitigated disaster*" and instructed Periolat and other financial personnel to "*figure it [and related low results] out*" and "*fix the problem*" so that defendants could "*report results in line with forecasts*" and "*thereby avoid, in the words of a senior officer, [the] unmitigated disaster*."  *Id.* (alteration in original).

105.    Because Periolat could not initially "fix the problem" as Bergeron and Zwarenstein instructed (because "the Company's unreported numbers were in fact correct"), he was provided with "*analyses*" that explained the "*relation between specific reductions in COGS and the corresponding increase in gross margin*."  ¶17.  As the SEC explained, "[b]ecause gross margin is the result of revenue minus COGS, if COGS is reduced, gross margin is necessarily increased.  One way to reduce COGS is to *increase inventory*."  ¶16.  Thus, as part of Bergeron's and Zwarenstein's explicit instruction to "fix the problem," Periolat was given a specific road map to increase gross margins by reducing COGS – which is exactly what he did.  Periolat created fictitious inventory, which reduced COGS and falsified gross margin and earnings, just as he was encouraged to do.

106.    In 1Q07, Periolat "fix[ed] the problem" by preparing fictitious journal entries and "adjustments" that increased Lipman inventory by approximately $7 million, thereby decreasing

1    COGS by $7 million which increased VeriFone's gross margin.  ¶¶18-20.  According to the SEC,

2    **"[a]s a result of the false accounting adjustments"** the Company's gross margin in 1Q07 increased

3    from 42.8% to 47.1%, and VeriFone "overstated its net income by approximately $12.4 million."

4    ¶22.  These improper financial manipulations caused VeriFone's 1Q07 EPS to be overstated by

5    ***600%***.

6         107.    The SEC alleged that Periolat "***failed to take adequate steps to verify***" his improper

7    accounting manipulations.  ¶19.  "Had he done so," he would have learned that the adjustments were

8    false.  *Id.*  Periolat also "had been aware before making the adjustments" that Lipman "had proper

9    procedures in place for accounting for inventory."  ¶20.  He also "learned a month after the quarter

10   close" that Lipman had correctly accounted for inventory, "***putting him on notice that his***

11   ***adjustments may have been incorrect***."  *Id.*  Nevertheless, Periolat "did not take steps to verify or

12   correct his prior inventory adjustments."

13        108.    Importantly, the SEC Complaint confirms that "***[s]enior management was aware of***

14   ***[Periolat's] adjustments*** but never questioned them."  ¶27.  This was despite receiving the internal

15   reports at the end of each quarter showing substantially lower gross margins and despite receiving

16   "***monthly reports showing a sharp and unprecedented increase in inventory as a result of***

17   ***Periolat's adjustments***."  *Id.*  Nevertheless, when Bergeron and Zwarenstein were asked point-blank

18   at VeriFone's 1Q07 conference call to explain how the Company could report such high gross

19   margins and earnings, they deliberately concealed Periolat's accounting adjustments.  They falsely

20   attributed the "record" results to "significant earnings accretion" and "nice procurement synergies"

21   from VeriFone's recent merger with Lipman.  Bergeron boasted to investors that: **"[W]e now have**

22   **developed a structural gross margin advantage, which is going to be tough to beat."**  He knew,

23   however, that the only "structural advantage" was VeriFone's accounting manipulations.

24        109.    In 2Q07, defendants' financial improprieties were even more flagrant than 1Q07.  At

25   the end of 2Q07, Bergeron and Zwarenstein received internal reports showing actual gross margin of

26   43.7%, far below the 46%-48% guidance provided to investors.  ¶23.  Again, Periolat "fix[ed] the

27   problem" by preparing false journal entries that increased "in transit" inventory (*e.g.*, inventory

28   purportedly shipped from Lipman to VeriFone but not yet received) by approximately $10.6 million,

1   thereby decreasing COGS by $10.6 million.  ¶24.  This fraudulent accounting inflated VeriFone's

2   reported gross margin from 43.7% to 48.06% causing a **200%** overstatement of earnings and allowed

3   defendants to falsely report to investors that VeriFone met public guidance.  The SEC concluded that

4   "*[t]here was no reasonable basis for the manual entries*."  ¶25.  In fact, ***"goods were never actually***

5   ***shipped between the international headquarters and the United States and as a result could not***

6   ***have been 'in transit.'"***  ¶26.  As the SEC found, Bergeron and Zwarenstein, as members of

7   VeriFone's senior management, were "aware of [Periolat's] adjustments."  ¶27.

8        110.   At the 2Q07 conference call, Bergeron and Zwarenstein deliberately concealed the

9   accounting manipulations from investors.  They falsely touted the "record" earnings and gross

10  margin results and represented that the inflated 47%-48% margins were "sustainable" due to

11  legitimate business practices.  When asked pointedly by analysts if there were any "unusual" items

12  that caused VeriFone to report such inexplicably high gross margins, Zwarenstein falsely replied,

13  "no, there was no unusual items."

14       111.   In 3Q07, the financial improprieties were even more egregious than 1Q07 and 2Q07.

15  Bergeron and Zwarenstein received internal reports showing gross margin of **40.5%**, far below the

16  47%-48% needed to meet public guidance.  ¶23.  Periolat again "fix[ed] the problem" by preparing

17  journal entries that increased "in transit" inventory by approximately $9.4 million and decreased

18  COGS by $9.4 million, thereby inflating VeriFone's gross margin from 40.5% to 48.23%.  The false

19  accounting caused 3Q07 EPS to be overstated by **418%** and allowed VeriFone to meet public

20  guidance.  ¶25.

21       112.   At the 3Q07 conference call with investors, despite that fact that Bergeron and

22  Zwarenstein "***were aware of [Periolat's] adjustments***" and knew there "***was no reasonable basis for***

23  ***the manual entries***" because the "***goods were never actually shipped***," Bergeron deliberately misled

24  investors about the reasons for the increase in gross margin and earnings:

25       *[W]e're getting supply chain efficiencies in Israel that we never experienced*
         *before*, and something we mentioned as well, *we have tremendous transparency,*
26       *financial transparency* into the true cost of manufacturing and all the little nuanced
         items that roll up into that as a result of having 30%, 35% of our own inside.  So it's
27       worked out splendidly and we're committed to it.

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 38 -

1    Given Bergeron's knowledge of Periolat's accounting adjustments and the monthly reports showing

2    a "sharp and unprecedented increase in inventory as a result of Periolat's adjustments," Bergeron's

3    statements had no reasonable basis.

4          113.    Notably, the SEC stated that "Periolat was able to make his unwarranted adjustments

5    because *VeriFone had few internal controls to prevent them*. . . . *Nor were there proper controls*

6    *in place* to prevent the person responsible for forecasting financial results from making adjustments

7    which allowed the company to meet the forecasts."   ¶21.   These findings directly contradict

8    Bergeron's and Zwarenstein's sworn Sarbanes-Oxley certifications to investors in 1Q07, 2Q07 and

9    3Q07.   Bergeron and Zwarenstein falsely represented in the certifications that they each had

10   "designed" VeriFone's internal controls, "reviewed" those controls within the past 90 days, and

11   certified the accuracy of VeriFone's financial results and internal controls over financial reporting,

12   including the journal entries made by Periolat.   Ex. 3.   VeriFone also announced that it was

13   increasing Zwarenstein's salary for his "*work in building out [VeriFone's] financial and*

14   *accounting infrastructure*."   Based on the evidence in the SEC Complaint, Bergeron, Zwarenstein

15   and Periolat knew those certifications were false.

16               **2.     The Magnitude, Nature, and Quality of VeriFone's**
                 **Restatement Combined with Witness Testimony Concerning**
17               **Pervasive Inventory Manipulations Reinforce a Strong**
                 **Inference of Scienter**
18

19         114.    In 1Q07, 2Q07 and 3Q07, VeriFone overstated GAAP EPS results by *600%*, *200%*,

20   and *418%*, respectively.   The SEC Complaint confirms that defendants' accounting violations were

21   not due to technical mistakes or negligent applications of GAAP.   The accounting manipulations

22   were done deliberately "so the company could report results in line with forecasts and thereby avoid,

23   in the words of a senior officer, an 'unmitigated disaster.'"   Ex. 1.

24         115.    Furthermore, the accounting improprieties did not require subjective accounting

25   interpretations of ambiguous accounting rules, such as rules for cost accounting of internal use

26   software or derivative mark-to-market accounting for hedging investments.   VeriFone's restatement

27   here revealed traditional and rudimentary accounting manipulations – double counting and creating

28   fictitious inventory, booking fake intercompany profits, and generating false income and profits

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                    - 39 -

where none existed.  In fact, the SEC Complaint confirms that VeriFone's accounting improprieties were simple and methodical, and "[s]enior management was aware of his adjustments."

116.    Defendants' financial manipulations fundamentally altered VeriFone's financial condition, future outlook and ability to generate a profit.  Indeed, under GAAP, the restatement erased every dollar of profit purportedly earned by the Company from 1Q07-3Q07 as illustrated below:

|  | 1Q07 | 2Q07 | 3Q07 |
| --- | --- | --- | --- |
| **Originally Reported Pro forma Gross Margin** | 47.11% | 48.06% | 48.2% |
| **Restated Pro forma Gross Margin** | **41.4%** | **42.3%** | **41.2%** |
| **Originally Reported Pro forma EPS** | $0.37 | $0.39 | $0.42 |
| **Restated Pro forma EPS** | **$0.32** | **$0.24** | **($0.26)** |
| **Originally Reported GAAP EPS** | ($0.01) | $0.06 | $0.16 |
| **Restated GAAP EPS** | **($0.07)** | **($0.06)** | **($0.51)** |

117.    Much of the restatement related to the fraudulent creation of fictitious inventory.  Overstating inventory directly reduces COGS (also variously called "cost of sales" or "cost of net revenues"), which in turn, inflates gross margins, net income and EPS.  As the SEC noted in its charges against VeriFone, "[b]ecause gross margin is the result of revenue minus COGS, if COGS is reduced, gross margin is necessarily increased. *One way to reduce COGS is to increase inventory*." ¶16.  Below are the major components of the restatement that related directly to the fraudulent inventory accounting:

### **Inventory-Related Accounting Manipulations**

- Inventory: Overstated by *$77.8 million* ($13.3 million in 1Q07, $23.9 million in 2Q07 and $40.6 million in 3Q07).

- Improper Overhead Applied to Lipman Inventory: *$25.9 million* ($7.7 million in 1Q07, $7.7 million in 2Q07 and $10.5 million in 3Q07).

- Fictitious In-transit Inventory: *$32.8 million* ($12.7 million in 2Q07 and $20.1 million in 3Q07).

- Fake Intercompany Profit: *$13.4 million total* ($3.2 million in 1Q07, $3.9 million in 2Q07 and $6.3 million in 3Q07).

1 • Understated Cost of Sales. *$41.2 million* understatement of cost of sales, including
2 the failure to record $900,000 of component inventory replacement costs for Lipman
inventory and the failure to record $1.4 million in other various "unidentified" costs.

3 118. The details surrounding each inventory accounting impropriety during 1Q07, 2Q07

4 and 3Q07 are particularized below:

5 119. **1Q07 Inventories:** VeriFone reported that the $13.3 million reduction in inventory in

6 1Q07 included: (1) a $7.7 million decrease due to the duplicate recording of manufacturing and

7 distribution overhead to inventories at former Lipman subsidiaries; (2) a $2.2 million decrease

8 related to inventory recorded in 2Q07 for a change in inventories at former Lipman entities due to

9 standards revaluation that should have been recorded in 1Q07; (3) a $3.2 million decrease to

10 eliminate intercompany profit in inventory; and (4) a $200,000 net decrease as a result of various

11 adjustments, each individually less than $500,000.

12 120. **1Q07 Cost of Net Revenues:** The Company also reported that the $12.5 million

13 understatement of the cost of net revenues in 1Q07 was caused by: (1) the duplicate recording of

14 $7.7 million of manufacturing and distribution overhead to inventories at former Lipman

15 subsidiaries; (2) the failure to record a $2.2 million expense to reduce Lipman inventories due to

16 standards revaluation; (3) the failure to record $900,000 of component inventory replacement costs

17 for Lipman inventory; (4) the failure to record $900,000 of costs when recording and eliminating

18 intercompany transactions; and (5) the failure to record $800,000 in other various unidentified costs.

19 121. **2Q07 Inventories:** VeriFone reported that the $23.9 million reduction in inventory in

20 2Q07 included: (1) a $12.7 million decrease to eliminate intercompany in-transit inventory that did

21 not exist; (2) a $7.7 million decrease due to the duplicate recording of manufacturing and

22 distribution overhead to inventories at former Lipman subsidiaries; (3) a $3.9 million decrease to

23 eliminate intercompany profit in inventory; (4) a $500,000 decrease to correct errors in recording

24 and eliminating intercompany transactions; and (5) a $100,000 decrease due to various unidentified

25 adjustments.

26 122. **2Q07 Cost of Net Revenues:** The Company also reported that the $12.5 million

27 understatement of the cost of net revenues in 2Q07 was caused by: (1) the failure to record a $11.5

28 million expense to eliminate in-transit inventory that did not exist; (2) the failure to record a $3.5

1    million expense to eliminate intercompany profit in inventory; (3) the failure to record $800,000 of

2    overhead expenses that were improperly capitalized to inventory; (4) the improper recording of $2.2

3    million of expenses to reduce inventory that should have been recorded in 1Q07; and (5) the failure

4    to record $500,000 in other various unidentified costs.

5           123.   **3Q07 Inventories:** VeriFone reported that the $40.6 million reduction in inventory in

6    3Q07 included: (1) a $20.1 million decrease to eliminate intercompany in-transit inventory that did

7    not exist; (2) a $10.5 million decrease due to the duplicate recording of manufacturing and

8    distribution overhead to inventories at former Lipman subsidiaries; (3) a $6.3 million decrease to

9    eliminate intercompany profit in inventory; (4) a $2.4 million decrease to correct errors in the

10   capitalization of overhead; (5) a $600,000 decrease to correct errors in excess and obsolete

11   inventory; (6) a $1.1 million decrease to correct errors in recording and eliminating intercompany

12   transactions; and (7) a $400,000 net increase due to various unidentified adjustments.

13          124.   **3Q07 Cost of Net Revenues:** The Company also admitted that the $16.4 million in

14   understatement of cost of net revenue in 3Q07 was caused by: (1) a $8.4 million increase to

15   eliminate intercompany in-transit inventory that did not exist; (2) a $2.8 million increase due to the

16   duplicate recording of manufacturing and distribution overhead to inventories at former Lipman

17   subsidiaries; (3) a $2.4 million increase to eliminate intercompany profit in inventory; (4) a $2.1

18   million increase to correct errors in the capitalization of overhead; (5) a $600,000 increase to correct

19   errors in excess and obsolete inventory; and (6) a $100,000 net decrease as a result of various

20   adjustments, each individually less than $500,000.

21          125.   As demonstrated above, the magnitude, nature and simplicity of the restatement

22   supports a strong inference of scienter.  The inventory manipulations were deliberate and pervasive

23   and done for the specific purpose of meeting public guidance and avoiding the "unmitigated

24   disaster."  Further, as set forth in the SEC action and below, defendants' own admissions combined

25   with first-hand reports of witnesses confirm that VeriFone's manipulations of inventory and the lack

26   of internal controls were widespread and well known to executive management.

27

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                    - 42 -

3. **Information Provided by Multiple Former VeriFone Inventory Managers Confirms Defendants' Exploitation of VeriFone's Nonexistent Inventory Controls to Falsify the Company's Financial Results**

126.   During the Class Period, Bergeron and Zwarenstein repeatedly swore under oath that they monitored inventory controls and procedures each quarter.  As set forth in §VI.B.4., Bergeron and Zwarenstein represented in VeriFone's SEC filings stated that "***we review the adequacy of our inventories valuation on a quarterly basis***" and "***our methodology involves matching our on-hand and on-order inventories with our sales estimate over the next twelve to eighteen months***."

127.   However, VeriFone has admitted to drastically overstating its inventories during the Class Period by over $77 million, which equated to an ***11.3%*** overstatement in 1Q07, ***23.59%*** in 2Q07 and ***38.75%*** in 3Q07, thereby understating COGS and overstating net income and GAAP earnings by 600%, 200% and 418% in those three quarters.  The SEC Complaint establishes that the inventory manipulations were deliberate in order to inflate gross margins and meet public guidance. *See* §VI.B.1.

128.   Information provided by CW11 and CW12, two former VeriFone managers involved in inventory operations at VeriFone's primary distribution center in Lincoln, California,[8] confirms that inventory control problems at VeriFone were widespread and well-known to VeriFone executive management.  The reckless and nonexistent system of inventory controls allowed defendants to freely manipulate inventory levels during the Class Period to inflate gross margins.  CW11 and CW12 reported that there were significant, pervasive and widespread inventory-control problems at VeriFone's major Lincoln facility.

129.   CW12, a former warehouse operations manager at VeriFone's Lincoln, California distribution center, reported that there were widespread and significant problems tracking and accounting for both Lipman and VeriFone legacy inventory before he/she arrived at VeriFone, and

---

[8]    According to CW11, CW12 and CW13, the Lincoln, California facility was the primary hub for storing and distributing VeriFone's inventory.  This is confirmed by VeriFone's 2006 Form 10-Q filed with the SEC, which stated that the Lincoln, California distribution center was its largest "principal" facility in the United States.

1 the problems continued during his/her employment.  He/she stated that the problems arose from

2 VeriFone's inadequate systems and controls for inventory.  Problems included inaccurate recording

3 of the quantity and location of received inventory from Lipman and the failure to change the status

4 of the inventory from "in-transit" to "received."  Because "in-transit" inventory was not changed to

5 "received" inventory when delivered to the Lincoln facility, the amount of total inventory recorded

6 on the 10.7 system was overstated.  In addition, CW12 confirmed that numerous inventory recorded

7 in the 10.7 system could not be found.

8        130.    CW12 said that Lipman inventory had been transferred to the Lincoln facility when

9 CW12 joined VeriFone in March 2007. CW11, a former inventory control supervisor at the Lincoln

10 facility, also said Lipman inventory was being transferred to the Lincoln facility in December 2006,

11 when CW11 joined VeriFone, and continued up to and after May 2007, the date CW11 left

12 VeriFone. CW12 explained that "in-transit" inventory to the Lincoln facility was separated into two

13 groups when received – inventory that needed to be delivered to customers right away and inventory

14 that did not.  Inventory not delivered to customers right away was evaluated by Quality Assurance

15 personnel and, if it met quality standards, was returned to receiving personnel who recorded the

16 quantities of each type of inventory and the locations where the inventory was stored at the Lincoln

17 facility.  This information was then manually entered into the Oracle 10.7 ERP system. CW12 said

18 that none of the Lipman inventory needed to be delivered to customers right away and was therefore

19 recorded and stored at the Lincoln facility. CW11 and CW12 both reported that once "in-transit"

20 inventory, including "in-transit" Lipman inventory, was received and stored at the Lincoln facility,

21 the "in-transit" status of the inventory should have been changed in the 10.7 system to "received."

22 This did not happen, and VeriFone restated $32.8 million in in-transit inventory.

23        131.    CW12 said the widespread inventory problems were a direct result of inadequate

24 systems, procedures and supervision at VeriFone. CW12 knew of the pervasive problems because

25 CW12 spent a week in each warehouse/distribution department – shipping, picking and receiving

26 inventory – learning how each department operated as part of CW12's job of cleaning up VeriFone's

27 distribution operations for the transition from Oracle's 10.7 system to Lipman's 11i system.  As part

28 of the planned conversion of VeriFone's computer systems from 10.7 to 11i, CW12 oversaw a

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                          - 44 -

1   complete recount of inventory in the Lincoln warehouse over two weekends in 4Q07 which

2   confirmed that inventory was not being properly recorded on the Company's 10.7 system and

3   inventory on the Company's 10.7 system was physically missing.  CW12 said these discrepancies

4   were widespread and pervasive and noted one example where 9,000 "sku's" (stock keeping units) of

5   inventory had to be eliminated because of the discrepancies in inventory data.  CW12 was certain

6   that the inventory problems had accounting implications but could not estimate the errors.  The

7   restatement confirmed the amount of the errors:  *$32.8 million* in fictitious in-transit inventory,

8   *$13.4 million* in fake intercompany profit, and *$77.8 million* overstatement in overall inventory

9   during 1Q07-3Q07, the same time period that CW12 worked at VeriFone and discovered inventory

10   problems.

11       132.    CW12 said that the inventory discrepancies were investigated by the Company's

12   inventory control group that was overseen by CW11.  CW11 confirmed this fact.  CW11 reported

13   that he/she was hired to clean up inventory, improve accuracy and to ease the workload of

14   Grantham, CW11's supervisor.   CW11 stated that missing component inventory reflected

15   widespread and chronic inventory control problems at the Lincoln facility and that inventory control

16   at VeriFone was a "huge mess" when he/she arrived in December 2006 and was still a "huge mess"

17   when CW11 left VeriFone in May 2007.

18       133.    CW11 said inventory would be used without being properly input into the Company's

19   10.7 system.  As a result, there were major variances between the inventory recorded on the

20   Company's 10.7 system and inventory actually in stock.  CW11 said this problem occurred

21   frequently and was never fixed. CW11 said that inventory accuracy was 69% when CW11 arrived at

22   VeriFone in December 2006, which meant that 31% of the inventory recorded on 10.7 did not exist.

23   CW11 stated that inventory accuracy never improved to more than 70%-75%, resulting in

24   approximately 25%-31% inventory inaccuracy from December 2006 to March 2007.  These facts are

25   corroborated by VeriFone's restatement which revealed that VeriFone's total inventory was

26   overstated by *23.59%* in 2Q07 and *38.75%* in 3Q07, near the range reported by CW11, and indeed

27   even worse than CW11 reported.

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                          - 45 -

1       134.   Although CW11 was brought in for the specific purpose of fixing the inventory

2   control problems, CW11 stated the problems could not be corrected or eliminated because the

3   problems were so widespread.  CW11 stated that it would have taken at least six months to correct

4   the problems with everyone working together.  CW11 stated this never happened and never even

5   came close.  CW11 said that at the end of each quarter, CW11 participated in conference calls where

6   the pervasive inventory-control problems were discussed.  The calls were attended by CW11's

7   supervisors, Grantham and Mangelsdorf, other personnel at the Lincoln facility, and at least three

8   VeriFone vice presidents from corporate headquarters in San Jose.  The problems were so severe that

9   CW11 said VeriFone's vice presidents threatened to close the Lincoln facility if the inventory

10  problems were not corrected.  Both CW11 and CW12 said the problems were not corrected, the

11  Lincoln facility was not shut down and, indeed, continued to report inaccurate inventory, as

12  confirmed by the restatement of VeriFone's inventories in 1Q07-3Q07.  The inventory problems and

13  the massive overstatement of inventory were never disclosed to investors.

14      135.   CW11 explained that despite knowing about the major inventory control problems at

15  the Lincoln facility, before he/she left in May 2007, VeriFone decided to consolidate and transfer

16  millions of dollars of inventory to the Lipman facility from another warehouse in the same area

17  because more leased space became available at the Lincoln facility.  CW11 was tasked with

18  conducting a physical inventory count at the other warehouse and discovered that the warehouse was

19  a disorganized "mess," with pallets tipped over and major discrepancies between the physical count

20  and what was already input into VeriFone's 10.7 system.  CW11 stated that he/she determined that

21  as much as $500,000 worth of reported inventory from the other warehouse was completely missing.

22  CW11 documented this problem in a report that was submitted to his/her supervisor Grantham.

23  CW11 stated that the missing inventory was expressly discussed during an end-of-quarter conference

24  call in 2007 with VeriFone's vice presidents from San Jose headquarters, who were required to "sign

25  off" on any inventory adjustments larger than $20,000.  After leaving VeriFone in May 2007, CW11

26  also learned from a source inside Verifone that there were several additional inventory problems,

27  including that two truckloads of Lipman inventory being transferred from the off-site facility to the

28  Lincoln facility went missing and were never found.

1      136.    CW11's and CW12's reports of pervasive and widespread inventory problems

2  including 25%-31% of inventory on VeriFone's books that did not exist were confirmed by the

3  Company's admissions in connection with the restatement.  After CW11 and CW12 left VeriFone in

4  May 2007 and December 2007, respectively, VeriFone restated its inventories by *$77.8 million*,

5  *11.3%* in 1Q07, *23.59%* in 2Q07 and *38.75%* in 3Q07.  The restatement also corroborated the

6  problems CW11 and CW12 described concerning missing inventory and discrepancies in in-transit

7  inventory.  Indeed, VeriFone admitted to falsely booking *$32.8 million* in fictitious in-transit

8  inventory from Lipman, nearly *$30 million* in improperly allocated inventory overhead and *$13.4*

9  *million* in false intercompany profit from inventory-related transactions.  The Company also

10  admitted to various other inventory problems, including failure to record component inventory

11  replacement costs (to replace missing component inventory, as CW11 described), the failure to

12  record $1.4 million in other various "unidentified" inventory costs, and hundreds of thousands of

13  dollars in other "various" adjustments that were never disclosed.

14      137.    In 1Q07, CW13, a former senior manager hired to oversee the merger of VeriFone's

15  Oracle 10.7 system with Lipman's 11i system, was asked by VeriFone's Vice President of Global

16  Operations, Patrick McGivern, to analyze a $9 million variance between the inventory valuation

17  derived by the supply chain operations group and the supply chain finance group.  CW13 determined

18  that the supply chain finance group had applied a "*wild amount of overhead*" to inventory, which

19  "*inflated inventory*" valuations.  CW13 said he/she was concerned with VeriFone's business

20  practices and prepared an Excel spreadsheet that showed the inventory valuations before and after

21  the allocations of overhead and submitted it to Welch, McGivern and Periolat.  CW13 received an

22  e-mail from Periolat or Keith Schaall rejecting CW13's report.  CW13 said that the reaction was

23  hostile, and despite CW13's report, VeriFone included the inflated inventory in the Company's

24  publicly reported results.  CW13 stated that the restatement confirmed the problems documented in

25  his report.  CW13 also confirmed that VeriFone's Lincoln, California facility contained the "lion's

26  share" of VeriFone's inventory.

27      138.    VeriFone's deliberately reckless and virtually non-existent system of inventory

28  controls described by the witnesses above allowed defendants Bergeron and Zwarenstein to freely

1   exploit and manipulate VeriFone's inventory balances to inflate gross margins.  Additionally,

2   because Zwarenstein and Bergeron, as the Company's CFO and CEO, respectively, conducted the

3   final review of all financial results and certified those results under oath before they were

4   communicated to investors, they knew that their inventory manipulations would not subsequently be

5   caught, if ever, until a full year-end audit.  By that time, Bergeron and Zwarenstein had already

6   profited from the inflated results by selling $100 million in VeriFone stock before the restatement

7   was announced.

8        139.    The magnitude of the inventory manipulations (massive) and the nature of the fraud

9   (intentionally manipulating inventory at the direction of the CEO and CFO; double-booking

10  inventory that did not exist; creating fake income by increasing inventory; applying a "wild amount

11  of" overhead to inventory), when combined with the SEC enforcement charges, the numerous

12  witness reports of inventory manipulations, suspicious stock sales, incompatible computer systems

13  and deliberately reckless inventory controls, demonstrate that there were obvious red flags that were

14  known to, or deliberately disregarded by, defendants when they reported VeriFone's false financial

15  results and defended those results during conference calls.  This is also supported by defendants'

16  sworn public admissions, set forth below, that they carefully reviewed, analyzed and reconciled

17  VeriFone's inventory each quarter.

### 4.    Defendants' Admissions Regarding Inventory Controls Support a Strong Inference of Scienter

20       140.    In addition to defendants' certifications under oath that they reviewed and confirmed

the accuracy of VeriFone's false financial results and designed and assessed its internal controls over

financial reporting, they also made specific representations in VeriFone's 2006 Form 10-K (filed on

December 18, 2006) concerning their review, analysis and scrutiny of VeriFone's inventory as

follows:

**Inventory Valuation**

The valuation of inventories *requires us to determine* obsolete or excess inventory and inventory that is not of saleable quality.  The determination of obsolete or excess inventories *requires us to estimate* the future demand for our products within specific time horizons, generally twelve months to eighteen months. . . .

*We review the adequacy of our inventories valuation on a quarterly basis. For production inventory, our methodology involves matching our on-hand and on-order inventories with our sales estimate* over the next twelve and eighteen months. *We then evaluate* the inventory found to be in excess of the twelve-month demand estimate and take appropriate write-downs to reflect the risk of obsolescence.

141.   Defendants also touted their ability to measure, control and "balanc[e] our inventory position" to address changes arising from the Lipman merger:

The beginning inventory balance for the previous year, as measured by inventory turns, was at an unusually low balance due to a number of factors including higher than expected demand and transitional issues with two contract manufacturers.  In addition, *we increased inventory as a result of balancing our inventory position* to meet the demand changes triggered by the acquisition of Lipman.

142.   In VeriFone's March 1, 2007 press release, defendants boasted about their ability to "reduc[e] inventory" because of their purportedly integrated distribution and supply chain:

"VeriFone's newly configured worldwide sales force is serving customers through a *fully integrated distribution channel and supply chain*.  At the same time we have been *reducing inventory* and generating considerable operating cash flow," continued Bergeron.

143.   In VeriFone's quarterly Forms 10-Q, defendants also made representations concerning their inventory accounting, controls and monitoring procedures:

"*Inventories are stated at the lower of standard cost or market. . . .  The Company regularly monitors inventory quantities on hand* and records write-downs for excess and obsolete inventories based primarily on the Company's estimated forecast of product demand and production requirements.  Such write-downs establish a new cost-basis of accounting for the related inventory."

144.   Defendants also stated that they closely monitored, scrutinized and accounted for *Lipman inventory* each quarter and made proper accounting adjustments to the inventory:

*The Company has increased Lipman's historical value of inventory* by [$13.4 million in 1Q07] [$13.7m in 2Q07] [$13.7m in 3Q07] to *adjust inventory to an amount equivalent to the selling price less an appropriate sales margin*. . . .

145.   Defendants' sworn admissions concerning their detailed review and monitoring of inventory corroborate their knowledge and awareness of VeriFone's inventory manipulations and the 11%-38% overstatement of inventory during the Class Period.  If defendants did *not* conduct the careful and detailed inventory reviews as represented to investors, then their statements above were knowingly false and are actionable false statements.  If they did carefully account for inventory as represented, then they certainly were aware of VeriFone's pervasive inventory-control problems and

were deliberately reckless in issuing grossly inflated inventory results.  Either way, the combination of facts set forth in the SEC enforcement action, the reports of former VeriFone inventory managers, the restatement disclosures, defendants' insider selling, suspicious terminations, defendants' positions and responsibilities at the Company, and defendants' specific admissions to investors concerning their purported reviews of inventory support a strong inference of defendants' scienter.

> **5.      Defendants' Scienter Is Corroborated by Numerous Red Flags, Including the Rapidly Declining Margins at Lipman Before the Merger and the 93% Increase in VeriFone's Lower-Margin International Sales After the Merger**

146.    As explained in §V.A., *infra*, VeriFone's gross margin was one of the most important financial measures of VeriFone's overall financial condition.  Defendants  touted the Company's gross margin in every major earnings press release, conference call and SEC filing and acknowledged that they closely monitored gross margins.  In addition to the evidence set forth in the SEC Complaint – which shows actual knowledge of the fictitious accounting adjustments – additional facts show that defendants were aware of multiple red flags that seriously undermined the truthfulness of their publicly reported gross margins.

147.    One obvious red flag was that Lipman's own margins rapidly declined for *five consecutive years* leading up to the merger and Class Period:

|  | **2001** | **2002** | **2003** | **2004** | **2005** | **1Q06** |
|---|---|---|---|---|---|---|
| **Lipman's Declining Gross Margin Prior to Class Period** | **55.9%** | **56.6%** | **50.4%** | **44.8%** | **42.1%** | **41.9%** |

148.    Thus, defendants knew that consolidating Lipman's sales and 41.9% margins would put downward pressure on VeriFone's margins, and their representations of increasing gross margins of up to 48% during the Class Period had no reasonable basis.

149.    Another red flag was that a majority of Lipman's sales were heavily skewed toward international sales which carried substantially lower margins than North American sales.  During a September 6, 2007 conference call, Bergeron acknowledged that fact: "*there's a huge variation in the gross margin percentage, domestically versus internationally*."  Accordingly, defendants knew that any change in VeriFone's product mix to increase the percentage of international sales would

1   cause VeriFone's gross margins to decline.  Defendants admitted this fact in the Company's 2006

2   Form 10-K:

3              ***Our international sales tend to carry lower prices and therefore have lower***

              ***gross margins than our sales in North America.  As a result, if we successfully***

4              ***expand our International sales, any improvement in our results of operations will***

              ***likely not be as favorable*** as an expansion of similar magnitude in the United States

5              and Canada. . . .

6        150.    That is precisely what happened during the Class Period.  In 4Q06 prior to the

7   incorporation of Lipman into VeriFone's financial results, VeriFone's lower margin international

8   sales were $66.6 million or only ***42.5%*** of total sales for the quarter.[9]  In 1Q07, after incorporating

9   Lipman's sales into VeriFone's results, VeriFone's lower-margin international sales nearly ***doubled***,

10   increasing by over 93% from $66.6 million to $129.1 million, or ***59.6%*** of total sales in 1Q07, as

11   illustrated below:

12

| | 1Q06 | 2Q06 | 3Q06 | 4Q06 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|---|
| **VeriFone's International Revenues as a % of Total Revenues Pre- and Post Lipman Merger** | 42.8% | 43.5% | 42.2% | 42.5% | **59.6%** | **56.2%** | **55.2%** |

15        151.    Accordingly, defendants knew that the Company's reportedly "record" margins of

16   47.1%, 48% and 48.2% in 1Q07, 2Q07 and 3Q07, respectively, had no reasonable basis in fact and

17   were seriously undermined by the huge spike in lower-margin international sales and Lipman's

18   declining margins.  Further, as set forth in §VI.B.1., defendants were well aware that the reported

19   margins were the result of Periolat's financial manipulations and that there was a "sharp and

20   unprecedented" increase in inventory that called into question VeriFone's reported gross margins

21   and inventory.

22        152.    The restatement also confirms the lack of any basis for the reported margins.  Once

23   restated, the reported margins in 1Q07, 2Q07 and 3Q07 were 500-700 basis points lower – 41.4%,

24   42.3% and 41.2%, respectively.  In fact, during VeriFone's August 19, 2008 conference call

25

26   [9]     In 2006, lower-margin international sales accounted for approximately 43% of the

27   Company's total sales, and North American sales accounted for approximately 57% of total sales.  In 2006, international operating income was 24.5% of international sales.  By contrast, North American operating income was 38.8% of North American sales.

28

1  Bergeron admitted that the Company would not even break the 40% pro forma gross margin

2  threshold for five or six quarters until the end of FY09 because the Lipman acquisition caused a huge

3  increase in VeriFone's lower-margin international sales.  VeriFone reported pro forma gross margins

4  of *32.5%* in 4Q07, *35.7%* in 1Q08, *34.9%* in 2Q08, *37.6%* in 3Q08, *34.7%* in 4Q08, *35.2%* in 1Q09,

5  *33.8%* in 2Q09 and *36.8%* in 3Q09.  These margins were over 1,000 basis points below the false

6  margins reported to investors during the Class Period.

7           **6.      Zwarenstein's Admitted Role in "Building Out [VeriFone's]**
                 **Financial and Accounting Infrastructure" and Defendants'**
8               **Representations of "Tremendous Financial Transparency"**
                 **After the Lipman Merger Reinforce a Strong Inference of**
9               **Scienter**

10         153.    Defendant Zwarenstein was not a hands-off CFO.  He was heavily involved in the

11  Lipman merger and the combined financial and accounting systems.  In fact, according to

12  VeriFone's September 10, 2008 Proxy Statement, Zwarenstein received a salary raise in 2007

13  because of "***his work in building out [VeriFone's] financial and accounting infrastructure***."  The

14  Company justified the salary increase by pointing to Zwarenstein's "increased job responsibilities"

15  and his "instrumental" involvement in the Lipman merger:

16         In addition, the Compensation Committee considered the ***increased job***
           ***responsibilities*** that Mr. Zwarenstein undertook in our business and corporate
17         development.  In particular, the Compensation Committee noted that ***Mr.***
           ***Zwarenstein's efforts were instrumental towards our successful completion of the***
18         ***acquisition of Lipman*** in the prior fiscal year and that his base salary should be
           adjusted accordingly.
19
20         154.    In addition to Zwarenstein's intimate knowledge of VeriFone's accounting and

21  financial infrastructure, Bergeron and Zwarenstein also represented to investors that, despite

22  absorbing a complex foreign company, Verifone had "tremendous financial transparency" into the

23  "true cost of manufacturing" (*i.e.*, inventory and cost of sales) *after* combining Lipman's operations.

24  At the September 6, 2007 conference call, Bergeron falsely told investors:

25         [W]e are extremely happy with the decision that we took this time last year and that
           was to maintain Lipman's manufacturing capabilities in Israel and optimize those
26         facilities in a way that allowed us to run them at 100% capacity, something they were
           never able to do before, by moving some of the volatility in and out of our contract
27         manufacturers to Israel, and then use all of the volatility in our product mix as
           business for the contract manufacturers.  ***This has proven to be wonderful because***
28         ***we're getting supply chain efficiencies in Israel that we never experienced before,***
           ***and something we mentioned as well, we have tremendous transparency, financial***

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 52 -

1    *transparency into the true cost of manufacturing and all the little nuanced items
     that roll up into that as a result of having 30%, 35% of our own inside.* So it's
2    worked out splendidly and we're committed to it.

3        155.    Additionally, Bergeron and Zwarenstein represented in their sworn certifications that

4    they "**ensured the adoption of VeriFone's accounting policies and processes for Lipman's**

5    **transactions**." These admissions reinforce a strong inference of defendants' scienter. If there was

6    "tremendous . . . financial transparency into the true cost of manufacturing and all the little nuanced

7    items that roll up into that," then defendants knew or were deliberately reckless in not knowing that

8    VeriFone's "true cost of manufacturing" (*i.e.* cost of sales) was understated by **$41.2 million** during

9    1Q07-3Q07, and that VeriFone's gross margins and earnings were substantially overstated.

10       156.    When combined with the other particularized facts including witness reports, lack of

11   inventory and financial controls, the facts set forth in the SEC enforcement action, Zwarenstein's

12   review of erroneous manual journal entries followed by his termination, Bergeron and Zwarenstein's

13   actual knowledge of Periolat's financial manipulations, the incompatible accounting systems, the

14   suspicious insider trading and executive compensation, defendants' admissions regarding the

15   Company's financial transparency, accounting infrastructure, and supply-chain synergies support a

16   strong inference of scienter.

17           **7.    Information Provided by Former VeriFone Accounting
                    Employees Raises a Strong Inference that Bergeron and**
18                  **Zwarenstein Knew About the Erroneous Manual Journal
                    Entries and Other Internal Control Deficiencies that Caused**
19                  **the Restatement**

20       157.    VeriFone initially disclosed its restatement in a press release and a conference call on

21   December 3, 2007, and provided additional information in the Company's April 1, 2008 press

22   release and in the amended SEC reports filed on August 19, 2008. VeriFone disclosed that the

23   restatement was required because of "erroneous" manual journal entries made by the Company's

24   supply-chain accounting organization that caused VeriFone to overstate inventories and understate

25   the cost of net revenues by tens of millions of dollars. On December 3, 2007, Bergeron stated the

26   manual journal entries were required because VeriFone's Oracle ERP system was not configured to

27   automatically account for these critical financial statement accounts. Specifically, VeriFone stated

28   that the supply-chain management team:

- improperly recorded millions of dollars of intercompany in-transit inventory that did not exist by making identical manual journal entries for both in-transit inventories and direct shipments when the manual entries should not have been made for the direct shipments;[10]

- improperly double booked millions of dollars of manufacturing and distribution overhead costs to inventory at former Lipman subsidiaries by making identical manual journal entries for in-transit inventories and direct shipments when the entries should not have been made for the direct shipments; and

- improperly failed to eliminate millions of dollars in intercompany profit in inventory acquired by one VeriFone entity from another VeriFone entity that should have been eliminated upon consolidation.

158.   As set forth in §VI.B.1., the SEC Complaint confirms that Bergeron and Zwarenstein knew about the accounting adjustments at the time they were made.  Information provided by several former VeriFone accounting employees with direct knowledge of the problems that led to the restatement further corroborate this fact.  The witnesses reported that Bergeron and Zwarenstein knew the erroneous manual journal entries were received and reviewed by the San Jose accounting department headed up by Zwarenstein, that Zwarenstein participated in monthly teleconferences with the personnel who prepared and submitted the journal entries, and that Bergeron and Zwarenstein knew there were numerous problems with VeriFone's accounting department and inventory controls that led to the accounting improprieties.

159.   CW1 and CW2 stated that the Company's San Jose accounting department handled consolidated accounting and general ledger closing procedures.  CW1 and CW2 said VeriFone created a Consolidations Group in late 2006 that was tasked with consolidating the accounting data from Lipman's financial system to VeriFone's financial system.  According to CW1 and CW2, the San Jose accounting department was headed up by Zwarenstein.  CW1 and CW2 reported to the Company's Controller for North America, and both stated that was initially Gil Lacuna.  CW1 and CW2 said Lacuna was replaced by John Marsh in August 2006.  Marsh was replaced by Selena Miller, who was replaced by Mike Dowd, who was replaced by Rosalie Aducci.  The Company's

---

[10]      According to the Company, intercompany in-transit inventory was inventory that was in the process of being shipped between VeriFone entities, primarily from either Israel or Singapore to the United States.

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 54 -

1   Controller for North America reported to Corporate Controller Laura Merkl, who reported to

2   Zwarenstein.

3         160.    CW1, CW2 and CW9 confirmed that Periolat was the controller at the Rocklin

4   facility who was responsible for initially posting the erroneous manual journal entries that led to the

5   restatement.  CW1, CW2 and CW9 said Periolat was responsible for reviewing all accounting

6   procedures and activities for supply-chain operations in North America.  That included assigning and

7   approving valuations for VeriFone inventory, which, in turn, included assigning manufacturing and

8   distribution overhead costs to the inventory.  CW1 and CW 9 said Periolat made the journal entries

9   directly into VeriFone's Oracle general ledger system for Lipman inventory because the two

10  companies had different Oracle general ledger systems.  Lipman was using the Oracle 11i system,

11  and VeriFone was using the Oracle 10.7 system.  VeriFone was in the process of upgrading to 11i,

12  but the upgrade was not completed until November 2007.

13        161.    According to CW9, the journal entries for the Lipman inventory and cost of goods

14  sold were prepared, reviewed and approved by Periolat, then entered onto Excel spreadsheets, and

15  then posted to the 10.7 general ledger accounting system.  CW9 said hard copies of the journal

16  entries and Excel spreadsheets were kept on file for audit purposes and were reviewed by the

17  Company's internal auditors.  CW9 also said that once the entries were posted to the Oracle 10.7

18  general ledger accounting system, they were reviewed by various accounting personnel in San Jose.

19  As part of the monthly and quarterly closing process, CW1 reviewed VeriFone's Oracle 10.7 general

20  ledger system to make sure Periolat had input the manual journal entries and informed Corporate

21  Controller Merkl that the entries had been made.  CW1 said that Merkl would then review the actual

22  entries.

23        162.    According to CW9, the erroneous manual journal entries were the result of the

24  companies using different Oracle ERP general ledger systems.  In fact, CW9 said the Lipman

25  acquisition, the fact that the two companies used different Oracle ERP general ledger systems, and

26  problems with the conversion from 10.7 to 11i by VeriFone overwhelmed the Company.

27        163.    CW1, CW2 and CW9 also said they attended monthly balance sheet review meetings

28  that were also attended by Zwarenstein, Merkl and other accounting personnel.  According to CW9,

1   personnel from the Rocklin facility, including CW9, Periolat and others, participated in monthly

2   financial statement review teleconferences with Zwarenstein, Merkl and Gilford.  CW9 said that

3   during these meetings, Rocklin's reported financial results – which would have included the

4   overstated Lipman inventory and understated cost of goods sold – were discussed.

5       164.    Thus, the erroneous manual journal entries that were posted to VeriFone's Oracle

6   10.7 general ledger system, causing the Company to report materially false and misleading financial

7   results were received and reviewed by Merkl, Zwarenstein's direct report, and the financial results of

8   the Rocklin facility which included the false financial results were discussed with Zwarenstein

9   during monthly meetings.  CW1, CW2 and CW9 believed that Periolat was terminated due to the

10  inventory issues that led to the restatement.  The facts set forth in the SEC Complaint confirm that

11  fact.

12      165.    Several former VeriFone accounting employees stated that the San Jose accounting

13  department headed up by Zwarenstein was disorganized, understaffed, plagued by high turnover and

14  in a general state of disarray.  CW1 and CW2 said it was very difficult to work for Merkl because

15  she constantly made unrealistic demands on her subordinates and constantly changed the directives

16  she had previously given to them.  CW1 said Merkl's management style and directives compromised

17  VeriFone's accounting operations as a whole.  CW2 said Merkl's constant changing of the directives

18  she assigned to the accounting group led to inefficiencies.  CW2 said accounting personnel were

19  often told to work on "special projects" ordered by Zwarenstein that caused customary accounting

20  duties such as reviewing journal entries and conducting reconciliations to be compromised.

21      166.    The problems were magnified at the end of the month and quarter because, as CW2

22  stated, there was a significant increase in the work for the accounting department at the end of each

23  month and especially at the end of each quarter.  CW2 said some of the increased workload was

24  caused by VeriFone's increased efforts at the end of a reporting period to send out as many products

25  as possible so the Company would meet or exceed its financial forecasts.  The Company disclosed in

26  its SEC reports that quarterly revenues were "back end loaded" because "sales orders are received

27  and revenue recognized disproportionately towards the end of each fiscal quarter."  CW2 said this

28  resulted in accounting personnel having to work very long hours, including working until midnight

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                          - 56 -

1    at the end of every quarter.  CW2 described the work environment in San Jose as extremely chaotic,

2    where everyone was running around like chickens with their heads cut off.  CW2 said various

3    personnel expressed their frustrations and concerns about the intense work conditions to Merkl but

4    also said Merkl never took steps to modify and improve working conditions.

5          167.    CW5 also stated that VeriFone was chronically understaffed and that it resulted in

6    VeriFone's constantly reacting to problems that often arose because of the understaffing, as opposed

7    to being proactive and preventing problems from occurring in the first place.  CW5 had decreasing

8    confidence in VeriFone's senior management, was not proud of the direction taken by the Company

9    and stated that employee morale was extremely low for more than a year before CW5 resigned in

10   December 2007.

11         168.    CW1 and CW2 stated many employees resigned because they were dissatisfied with

12   Merkl, the heavy workload, the changing directives and overall inefficiencies in the accounting

13   department.  In fact, that is why CW1 and CW2 resigned.  CW2 said the Consolidations Group

14   experienced a very high rate of attrition that severely impacted the efforts to properly consolidate

15   and reconcile Lipman's financial records.  CW2 also said the Consolidations Group was often unable

16   to locate or reconcile Lipman's financial data and documents.  CW2 said that Lipman personnel did

17   not provide needed information to close the books at the end of the quarter on a timely basis, which

18   caused VeriFone personnel in San Jose to rush their reconciliation of the information and the closing

19   of the Company's books.  CW2 said CW1 and North American Controller Dowd were very

20   frustrated by these issues because they were responsible for integrating the Lipman financial data.

21   Indeed, when asked how VeriFone could report its consolidated results given the problems, CW2

22   stated, "I have no idea, but that's the million dollar question."

23         169.    The general state of disarray in the finance and accounting department was also

24   confirmed by CW8, who was hired as a contractor and assistant controller in August 2007 to rebuild

25   the finance and accounting department.  CW8 said the rebuilding required CW8 to staff a large

26   number of vacant positions and hire full-time employees to replace consultants.  But CW8 said that it

27   was difficult to hire accounting and finance employees because recruiters told CW8 that VeriFone

28   had a poor reputation among finance and accounting personnel as well as recruiters because there

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                        - 57 -

1   was so much turnover.  CW8 left VeriFone after a few weeks because of the inability to fill the

2   positions.

3         170.   As detailed in §V.D.4., *infra*, after the Class Period, VeriFone admitted the

4   Company's financial reporting controls were deficient and that it did not have qualified accounting

5   personnel during the Class Period.  This allowed defendants to freely manipulate VeriFone's

6   financial results and exploit the lack of accounting controls.  The findings of the SEC confirm this.

7         **8.   Former VeriFone Employees Reported Problems Obtaining
    Accurate Financial Data from Lipman Because VeriFone and
8   Lipman Used Different Oracle Accounting Systems**

9         171.   As noted above, Bergeron and Zwarenstein knew Periolat submitted Lipman

10  inventory data to the San Jose accounting department by posting manual journal entries to

11  VeriFone's Oracle 10.7 ERP system because VeriFone's 10.7 system was not configured to

12  automatically retrieve this information from Lipman's 11i system.  The facts set forth in the SEC

13  Complaint also confirm that Bergeron and Zwarenstein were well aware of Periolat's accounting

14  adjustments that resulted in inflated inventory, gross margins and earnings.  Other former employees

15  of VeriFone and Lipman confirmed there were problems retrieving accurate financial data from

16  Lipman's 11i system because the two companies utilized different versions of Oracle ERP system.

17        172.   CW4 and CW5 said VeriFone was in the process of converting from the 10.7 system

18  to the 11i system in 2006 and 2007 because Lipman was using 11i.  CW1 and CW2 stated the

19  conversion was extremely problematic for a number of reasons.  CW1 and CW2 both stated that the

20  integration of Lipman, the high attrition rate and chaotic atmosphere in the accounting group

21  negatively impacted overall productivity and delayed and impaired the implementation process.

22  CW5 said the conversion to 11i was not completed until November 2007.  Although not involved,

23  CW9 was aware of problems with the implementation of Oracle 11i and said those problems,

24  combined with the additional work created by the Lipman acquisition, overwhelmed the Company.

25        173.   CW4 was the project manager for the implementation of 11i since September 2006

26  and said the upgrade from 10.7 to 11i was initiated in conjunction with the acquisition of Lipman

27  because Lipman was already using the 11i platform.  CW4 said the plan to complete the

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                       - 58 -

1   implementation in less than 18 months was very aggressive and that there were many problems and

2   challenges.

3       174.    The delay in converting VeriFone's 10.7 system to an 11i system until November

4   2007 and the inability to automatically transfer Lipman financial information on the 11i system to

5   VeriFone's 10.7 system created problems, including the need for Periolat to post manual journal

6   entries for Lipman inventory data to the 10.7 system.  This allowed Periolat to make fictitious

7   adjustments to VeriFone's results manually at the direction of Bergeron and Zwarenstein.

8       175.    CW3 was the controller at Lipman's Syosset distribution center from February 2006

9   until February 2007 when CW3 was laid off after the Syosset facility was closed.  CW3 was

10   responsible for all of Lipman's major accounting functions in North America.  According to CW3,

11   the Syosset facility began winding down its operations after the Lipman acquisition was completed

12   in November 2006 and shipped all its inventory to VeriFone's facility in Alpharetta, Georgia.  CW3

13   said this process was completed in February 2007.

14       176.    Like other witnesses, CW3 said that Lipman utilized the Oracle 11i ERP system and

15   VeriFone used the Oracle 10.7 ERP system.  CW3 said there were problems transmitting accurate

16   Lipman financial data to accounting personnel in San Jose because the two systems were not

17   interlinked.  Because the systems were not interlinked, CW3 e-mailed financial reports on Excel

18   spreadsheets to personnel in VeriFone's San Jose headquarters.

19       177.    Approximately one or two weeks before the close of a month or quarter, VeriFone

20   personnel in San Jose e-mailed CW3 an Excel spreadsheet containing various fields for CW3 to

21   input Lipman's North American financial information.  The spreadsheet included "macros" which

22   performed various calculations to assist VeriFone personnel when they consolidated the financial

23   data into VeriFone's comprehensive financial reports.  CW3 would download data from Lipman's

24   11i system into the Excel spreadsheet but said VeriFone had substantial difficulty "merging" the

25   information into the Company's consolidated financial reports.  According to CW3, the totals in the

26   VeriFone Excel spreadsheet were not balancing with the financial information in VeriFone's San

27   Jose headquarters because the "macros" included in the spreadsheet were incorrect and did not allow

28   the spreadsheet to properly "roll up" into VeriFone's consolidated financial reports.  CW3 said that

1    VeriFone made structural modifications to the spreadsheet reports, which caused the macros and

2    financial information to be flawed when they were tied to VeriFone consolidated accounts.  CW3

3    was aware immediately when he began working with the spreadsheets that the macros were not

4    working properly.  CW3 submitted multiple monthly reports with the flawed macros and warned and

5    cautioned one of VeriFone's controllers, Lisa Hamm, about the problems and financial errors.  CW3

6    stated that he did not and could not fix the problems because they were systemic and structural, and

7    CW3 already notified CW3's superiors.

8         178.    After submitting three to four erroneous monthly reports with the flawed macros that

9    were never fixed, CW3 was directed on several occasions by accounting personnel in San Jose to

10   change the macros so the Excel spreadsheets would include proper balances thereby allowing the

11   figures in the spreadsheet to properly rollup into VeriFone's consolidated financial reports.  CW3

12   recalled the first occasion where Zwarenstein called CW3 at home on a Friday night after CW3 had

13   already gone home.  CW3 stated that Controller Hamm was also on the call, and Zwarenstein's and

14   Hamm's demeanor was "a state of panic" because of errors in the Excel reports.  He recalled

15   Zwarenstein acknowledged the problems and instructed CW3 to figure it out because Zwarenstein

16   needed the results for an earnings conference call the following week.  CW3 stated even though he

17   manually corrected the one report, the problems were fundamental and persisted until CW3 left

18   VeriFone.

19        179.    CW10, the former Vice President of Operations at Lipman's Syosset facility, was also

20   aware of the difficulties converting the accounting for the Syosset operations over to VeriFone

21   caused by the companies' use of different Oracle ERP general ledger accounting systems.  CW10

22   said another factor contributing to the problem was the fact that Lipman and VeriFone had different

23   fiscal years.  VeriFone's fiscal year ended on October 31, and Lipman's fiscal year ended on

24   December 31.

25        180.    CW10 also said the Syosset facility was holding excess and obsolete inventory when

26   the acquisition closed on November 1, 2006 because a customer had cancelled an order for Lipman's

27   Nurit 20-55 terminals.  According to CW10, Lipman was unable to sell the terminals after the

28   cancellation by the customer and understood that VeriFone did not plan to include the Nurit 20-55

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                    - 60 -

1  model in its product suite.  CW10 said that VeriFone personnel at the Syosset facility, including

2  Mark Norman and Patrick McGivern, knew about the excess and obsolete inventory.  VeriFone's

3  restatement included a $600,000 adjustment to correct errors for excess and obsolete inventory.

4      181.    CW5 explained that the Oracle 10.7 ERP system included all transactional data

5  related to VeriFone's various business operations, including accounting, finance, sales and

6  inventories.  CW5 said Sivar Saravanan was responsible for handling inventory data in the Oracle

7  10.7 system and that reports were generated from the 10.7 system.  CW5 said VeriFone input a wide

8  variety of the transactional data from the Oracle 10.7 ERP system to a data warehouse because the

9  data warehouse offered superior reporting functions.  CW5 said the data warehouse stored sales,

10  invoicing, ordering, revenue – including sales identified by customer and region – and other data

11  which allowed various reports to be generated.  Tano, CW5's boss, was responsible for creating

12  reports from the data warehouse and directed CW5 to input data needed to prepare the reports.

13      182.    Lipman data could not be automatically transferred to the data warehouse because the

14  data could not be automatically transferred from Lipman's 11i system to VeriFone's 10.7 system.

15  Instead, CW5 received the data from the individual controllers responsible for Lipman's myriad of

16  business segments. According to CW5, some Lipman operations, including facilities in New York

17  and the United Kingdom, were shut down, which required the data to be transferred to VeriFone's

18  10.7 system.

19      183.    Like CW3, CW5 said transferring data from 11i to 10.7 involved major challenges in

20  "data mapping" that could have caused significant problems.  CW6 knew of one such problem even

21  though CW6 only worked at VeriFone for a few weeks in April or May 2007.  CW6 said a great deal

22  of accounts receivable data from Lipman was lost when it was transferred to VeriFone because the

23  data was not properly mapped before being transferred from Lipman's 11i system to VeriFone's 10.7

24  system.  Specifically, CW6 said that VeriFone could not identify the customers associated with

25  hundreds of Lipman's receivables that were transferred to VeriFone's system, and it was CW6's job

26  to determine the customers for the receivables.

27      184.    Finally, as CW13 explained, *infra*, the incompatible Oracle systems caused

28  accounting problems and "inflated inventory" that he documented in a report to Periolat, which was

rejected. The above facts establish that defendants knew there were severe problems obtaining accurate financial information from Lipman throughout 2007 because the companies were using different versions of the Oracle ERP system and had different fiscal years. Indeed, Zwarenstein was purportedly responsible for "*building out [the Company's] financial and accounting infrastructure*" and was "instrumental" in the Company's merger with Lipman. The problems surrounding VeriFone's financial reporting systems and internal controls provided defendants with adequate cover needed to manipulate VeriFone's financial results.

> **9.    The Termination of Periolat and Zwarenstein and VeriFone's Admission that There Were Material Weaknesses in the Company's Internal Controls Strengthens the Inference of Scienter**

185.    On April 1, 2008, VeriFone issued a press release announcing the "resignation" of Zwarenstein and that it was removing Bergeron as Chairman. However, in the Company's Proxy Statement filed with the SEC on September 10, 2008, it was reported that Zwarenstein was actually "terminated." Moreover, it was reported that the separation agreement between VeriFone and Zwarenstein required Zwarenstein to reimburse the Company $150,000 of bonuses that he was paid in 2007 because the Company's restated results did not achieve the quarterly bonus targets. On April 1, 2008, the Company also announced that it had terminated the Company's supply-chain controller but did not disclose the name of that individual. That individual was Periolat.

186.    In the April 1, 2008 press release and in VeriFone's Reports on Forms 10-Q and 10-K filed with the SEC on August 19, 2008, VeriFone admitted numerous material weaknesses in VeriFone's internal control over financial reporting throughout 2007. The Company admitted that "*management has concluded that VeriFone did not maintain effective internal control over financial reporting*" and that a number of remedial measures had been taken, including:

- Implementation of a more stringent voucher approval process for manual journal entries;

- Implementation of enhanced information technology/enterprise resource planning systems commensurate with the increased size and complexity of VeriFone's businesses;

- Adding appropriate accounting and finance resources through additional centralized staffing with individuals having sufficient knowledge and experience in cost accounting and other GAAP principles;

1          •       Enhanced segregation of duties between the financial planning and accounting and
                   control functions;

2

3          •       Improvements in governance and compliance functions to improve control
                   consciousness and appropriate adherence to [GAAP], as well as improved tone,
                   communication, documentation, education and training for employees involved in

4                  the financial reporting process, including the appointment of a chief legal and
                   compliance officer; and

5

6          •       Personnel actions, including the termination of the Company's supply-chain
                   controller, enhanced supervision and other actions.

7          187.   VeriFone disclosed additional material weaknesses in its SEC reports filed on August

8    19, 2008, including:

9          •       ***A transaction-level material weakness in the design and operation of control
                   activities relating to the preparation, review, approval and entry of manual, non-***

10                 ***standard journal entries*** . . . ;

11         •       ***An entity-level material weakness in the control environment related to our period-
                   end financial reporting process due to an insufficient number of qualified***

12                 ***personnel*** with the required proficiency to apply our accounting policies in
                   accordance with U.S. GAAP following the November 1, 2006 acquisition of

13                 Lipman . . . ;

14         •       ***An entity-level material weakness in control activities related to the design and
                   operation of our supervision, monitoring, and monthly financial statement review***

15                 ***processes*** . . . ; and

16         •       ***A transaction-level material weakness*** in the design and operating effectiveness of
                   controls related to income taxes.  Specifically, processes and procedures were not

17                 designed to provide for adequate and timely identification, documentation and
                   review of various income tax calculations, reconciliations and related supporting

18                 documentation required to apply [VeriFone's] accounting policy for income taxes in
                   accordance with U.S. GAAP, ***particularly following the November 1, 2006***

19                 ***acquisition of Lipman*** . . . .

20         188.   VeriFone also reported that it was forced to review and make necessary changes to

21   improve the Company's inadequate internal controls over financial reporting, including:

22         •       an enhanced manual journal entry policy, including a more stringent manual journal
                   entry review and approval process that requires tiered approval levels in which

23                 escalating dollar amounts require additional approval by increasingly more senior
                   personnel;

24

25         •       the migration to a new worldwide, integrated, ERP system.  The new ERP system is
                   our principal computing platform and provides for a single unified chart of accounts
                   worldwide.  This system was activated for the majority of [VeriFone's] worldwide

26                 operations in the first fiscal quarter of 2008 and by the end of the second fiscal
                   quarter of 2008 over 90% of [VeriFone's] consolidated net revenues and cost of net

27                 revenues were processed on this system;

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 63 -

- • **the addition of qualified accounting and finance personnel** having sufficient knowledge and experience in general accepted accounting principles, cost accounting, tax, and management of financial systems;

- • **enhancing the Company's review process over the monthly financial results by requiring additional documentation and analysis to be provided that will then be reviewed by appropriate key senior personnel from both finance and non-finance areas**;

- • **enhancing the segregation of duties** between the financial planning and the accounting and control functions; and

- • **enhancing the Company's governance and compliance functions** to improve control consciousness and prevention of errors in financial reporting, as well as to improve tone, communication, education, and training for employees involved in the financial reporting process, including the **appointment of a chief legal and compliance officer**.

189.   Defendants' admissions of inadequate internal controls directly contradict defendants' representations to investors that there was "tremendous financial transparency" at VeriFone after the Lipman merger.  The admissions also contradict defendants' representations of "supply chain efficiencies" and integration benefits received as a result of the Lipman merger.  The admissions of reckless internal controls were made after Zwarenstein's salary was increased in 2007 because of his purported work in "**building out VeriFone's financial and accounting infrastructure**."  They were also made after defendants represented that they had strict and detailed inventory valuation controls to prevent inaccurate inventory reporting.  Moreover, the admissions were made **after** Bergeron and Zwarenstein repeatedly certified, under oath, in SEC filings on March 9, 2007, May 31, 2007 and September 6, 2007, that they had personally "evaluated" the Company's internal controls, certified the financial results and that the controls were sufficient to detect improprieties to ensure that VeriFone's financial results were fairly presented and complied with GAAP.  As noted above, defendants exploited VeriFone's lack of internal controls to manipulate its financial results.

**C.    Defendants' False Statements in 2006 Concerning the Financial Benefits of the Lipman Merger and the Purported Supply Chain Efficiencies Due to the Lipman Merger[11]**

190.    In addition to defendants' false statements in 1Q07, 2Q07 and 3Q07, defendants also made false statements in 2006 concerning the financial benefits of the Lipman merger and the gross margin increases, synergies and so-called "supply chain efficiencies" derived as a result.

**1.    False August 2006 Statements**

191.    <u>August 31, 2006 Press Release</u>: On August 31, 2006, VeriFone issued a press release announcing that, despite the fact that it was about to absorb Lipman, a complex Israeli corporation with declining margins, manufacturing facilities thousands of miles away and a whole new management team, VeriFone was nevertheless increasing its FY06 and FY07 guidance.  Bergeron falsely stated in the press release:

> "Based on our confidence with our near term and long term outlook, we are raising our FY06 year end guidance to $1.07 to $1.08 of adjusted net income per share. *We are also raising our FY07 guidance to $1.40 to $1.42 of adjusted net income per share, assuming a November 1, 2006 completion of the Lipman acquisition*."

192.    <u>August 31, 2006 Conference Call</u>: During the Company's follow up conference call with investors and Wall Street analysts, Zwarenstein also misled investors about the short-term benefits of the Lipman merger and its purported immediate "accretion" to VeriFone's earnings:

> Based upon our improved 2006 results, our expectations for 2007 adjusted earnings are now in the range of $1.28 to $1.30 excluding the impact of the Lipman acquisition.  Incremental to this, we are also reaffirming our previous statements made on April 10, 2006 where we announced the Lipman offer.  *That is, we expect to enjoy the benefit of full-year accretion from the acquisition of approximately $0.12 per share.*
>
> Taking into account both the anticipated organic growth *and the accretion from the Lipman acquisition, we are currently anticipating EPS, on a net income adjusted basis, in the range of $1.40 to $1.42 per share for fiscal 2007 year starting November 1, 2006*.

193.    In response to a direct question from a SunTrust analyst, Bergeron falsely and emphatically assured investors that gross margins would expand as a result of the Lipman acquisition:

---

[11]    All false statements in this section are designated with bold and italics.

JEFFREY: Anything particular to this quarter or is this the start of a trend during which we are going to see better gross margin and better cost ratios?

BERGERON: I think, starting two quarters ago, on these conference calls and on our public meetings with shareholders or webcasts or whatever, we have said that, looking forward, the big story here is EBITDA margin expansion more than gross margin expansion. That was pre-Lipman. *I have to tell you that with Lipman's manufacturing in-house and with this hybrid model that we are very cleverly putting together and getting the best of both worlds, there is going to be gross margin expansion in our future.*

### 2.   False September 2006 Statements

194.   On September 6, 2006, VeriFone issued a press release updating investors on the status of their business and the Lipman merger.  Defendant Atkinson, who was paid millions of dollars in incentives purportedly for his work on the Lipman merger, falsely told the market that VeriFone and Lipman "*will begin Day 1, completely integrated.  We are locked and loaded.*" Neither Atkinson, Bergeron nor Zwarenstein qualified the statement or gave any warnings to investors that the merger of Lipman, a foreign company with different operations, management structures and manufacturing facilities thousands of miles away, would likely result in material operational problems that the Company would have to work through.

### 3.   False December 2006 Statements

195.   December 7, 2006 Press Release: On December 7, 2006, VeriFone issued a press release announcing its 4Q06 and FY06 financial results.  In the press release, Bergeron falsely represented that the integration of Lipman "has been completed ahead of schedule" and that VeriFone was "already" enjoying several supply-chain efficiencies and earnings accretion:

"*The integration of Lipman into VeriFone has been completed ahead of schedule* and we have created a single-branded, unified company with tremendous scale advantages.  *Already, we are enjoying several supply chain efficiencies and earnings accretion*."

"As a result, *we have increased our internal expectations for fiscal Q1 2007* net earnings per share, as adjusted, to be in the range of $0.33 to $0.34.  *We remain very confident of our prospects in fiscal 2007*."

196.   December 7, 2006 Conference Call: During the follow-up conference call with investors and analysts, Bergeron falsely represented that the two companies were already fully integrated operationally, including integrated management, organizational structure and reporting relationships—all of which were key to accurate financial reporting:

1

2       With respect to integration, I could not be happier with the results.  We
        invested a lot of time and money planning for a November 1 integration of two
        companies as one.  ***Lipman is not being run as a standalone entity.  The integrated
        management team, which was announced on November 1 and which includes
        several key Lipman executives, is functioning very well.  Everyone throughout the
        Company clearly understands the organizational structure and the reporting
        relationships. . . .***

3

4

5       **D.      Facts Establishing Material Falsity of Defendants' 2006 Statements
                  and a Strong Inference of Scienter**

6

7       197.    Defendants' statements in August 2006, September 2006 and December 2006

concerning VeriFone's projected margins and earnings growth and the success, financial benefits

and "supply chain efficiencies and earnings accretion" derived as a result of the Lipman merger were

deliberately false and misleading.  Defendants' representations of increased pro forma 2007 EPS of

$1.40-$1.42 had no reasonable basis given the widespread internal control problems, inventory

manipulations and incompatible software tracking systems, as confirmed by the SEC's enforcement

action, the witnesses, and the Company's own admissions.  In fact, the inclusion of Lipman's in-

house manufacturing did not expand gross margins in 2007, as Bergeron represented during the

August 31, 2006 conference call.  After reporting a pro forma gross margin of 45.9% in 3Q06 and

47.1% in 4Q06, VeriFone's pro forma gross margin ***dropped*** rapidly as a direct result of the Lipman

merger to 41.4% in 1Q07, 42.3% in 2Q07, 41.2% in 3Q07, 32.5% in 4Q07, 35.7% in 1Q08, 34.9%

in 2Q08 and 37.6% in 3Q08.

198.    Finally, defendants' representations concerning the integration benefits of the Lipman

merger, the "supply chain efficiencies," "integrated management team," and streamlined

organizational structure and reporting relationships cannot be squared with the reports of witnesses

and admissions made in conjunction with the restatement.  Defendants later blamed the fraud on

"supply chain" issues and integration-related problems merging a foreign company thousands of

miles away, the very same issues they touted as "functioning very well" during the Class Period.

These facts, combined with the facts set forth in §VI.B.1. and defendants' massive and suspicious

insider selling and bonuses gives rise a strong inference of scienter.

1

VII.    **DEFENDANTS' INSIDER TRADING AND MOTIVE ALLEGATIONS**

2

A.    **The Amount, Timing and Coordination of Defendants' Sales of More than $465 Million in VeriFone Stock While Knowing of Periolat's Accounting Manipulations and Reporting Financial Results that Were Overstated by as Much as 600% Reinforces a Strong Inference of Scienter**

3

4

5      199.    At the time defendants made their 2006 false statements touting the Lipman merger

6  and issued the false 2007 financial results that overstated inventories by $77 million, net income by

7  over $70 million, GAAP earnings by 200%-600%, and gross margins by 500-800 basis points,

8  defendants suspiciously sold millions of VeriFone shares for proceeds of over ***$465 million***.  The

9  sales are summarized in the following chart, and the detailed sales information is attached as Ex. 4

10  hereto:

11

12

| Date Range | Insider | Shares Sold | Proceeds | Percentage of Shares Sold |
|---|---|---|---|---|
| August 31, 2006-March 1, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 1,023,100<br>42,000<br>64,000<br>3,000,000 | $35,381,341<br>$1,473,784<br>$2,314,180<br>$107,340,000 | – |
| March 2, 2007-May 29, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson | 409,535<br>54,000<br>46,000 | $15,122,616<br>$2,004,942<br>$1,699,920 | – |
| June 1, 2007-September 6, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 433,700<br>54,000<br>35,800<br>3,500,000 | $15,510,188<br>$1,907,846<br>$1,243,290<br>$123,795,000 | – |
| September 7, 2007-December 11, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 600,000<br>72,000<br>35,000<br>3,300,000 | $25,957,657<br>$2,743,876<br>$1,507,760<br>$127,413,000 | – |
| **Subtotal** | **1. Bergeron**<br>**2. Zwarenstein**<br>**3. Atkinson**<br>**4. Bondy** | **2,466,335**<br>**222,000**<br>**180,800**<br>**9,800,000** | **$91,971,802**<br>**$8,130,447**<br>**$6,765,148**<br>**$358,548,000** | **61.93%**<br>**99.10%**<br>**97.31%**<br>**50.36%** |
| **Grand Total** | **–** | **12,669,135** | **$465,415,397** | **–** |

27      200.    A comparison of defendants' pre-Class Period sales is also summarized in the

28  following chart:

| Defendant | Pre-Class Period Shares Sold | Pre-Class Period Proceeds | Class Period Shares Sold | Class Period Proceeds |
|---|---|---|---|---|
| Douglas G. Bergeron | 2,584,870 | $59,501,051 | *2,466,335* | *$91,971,802* |
| Barry Zwarenstein | 32,000 | $906,906 | *222,000* | *$8,130,447* |
| William G. Atkinson | 90,614 | $2,184,207 | *180,800* | *$6,765,148* |
| Craig A. Bondy | 18,896,399 | $350,060,309 | *9,800,000* | *$358,548,000* |
| **TOTALS** | 21,603,883 | $412,652,473 | *12,665,135* | *$465,415,397* |

**Defendant CEO/Chairman Bergeron:**

201.     During the Class Period, Bergeron sold over 2.4 million shares, or approximately *62%*, of his total VeriFone stock holdings (59.71% of stock plus vested options) for proceeds of nearly *$92 million*.  Conspicuously, $56.5 million of Bergeron's sales occurred *after* he learned of the "unmitigated disaster" in VeriFone's gross margins, *after* he told Periolat to "fix the problem" and after he was aware of Periolat's false accounting.  The sales also took place *after* March 1, 2007, the date on which VeriFone first announced its false financial results for 1Q07 and falsely touted the financial benefits of the first full quarter incorporating the Lipman results.  Bergeron also sold $25.9 million in stock after VeriFone announced its 3Q07 results on September 6, 2007, less than two months before admitting that VeriFone's earnings were overstated by 200%-600%.  Bergeron continued selling shares as late as November 26, 2007, only *one week before* defendants' sudden restatement disclosure, causing VeriFone's stock to crash 46% in a single day.

202.     The amount and proximity of Bergeron's insider selling to Periolat's accounting adjustments and Bergeron's false statements, and his continued selling up to a week before the stock collapsed, support a strong inference of scienter.  Unlike average investors who paid up to $50.00 per share during the Class Period for their shares, Bergeron only paid *$0.033* per share for the two million shares he sold at prices as high as $46.00 per share during the Class Period.  Thus, over 99% of the nearly $92 million received by Bergeron during the Class Period was pure profit.

203.     Bergeron's pre-Class Period sales reinforce the suspicious nature of his Class Period trades.  The majority of his pre-Class Period sales took place on September 23, 2005, the first day after the expiration of VeriFone's post IPO lock-up period.  On that date, Bergeron sold 1,873,636

1   shares for proceeds of $38,934,156.  These IPO-related sales constituted 72% of Bergeron's pre-
2   Class Period stock sales and 65% of his pre-Class Period proceeds.  The IPO-related sales were an
3   unusual one-time sale and outlier that had no bearing on Bergeron's selling trends prior to the Class
4   Period.  In fact, following the one-time IPO lock-up sale, Bergeron's stock sales slowed significantly
5   leading up to the Class Period.  Then, when Bergeron realized the Lipman merger was not as
6   favorable as represented and VeriFone's margins were an "unmitigated disaster," Bergeron ramped
7   up his sales to nearly $92 million during the Class Period, including $25.9 million *after* VeriFone
8   issued its false 3Q07 results, only two months before the restatement was announced.  Bergeron's
9   detailed trading history is set forth in Ex. 4.

10  **Defendant CFO Zwarenstein**

11          204.    During the Class Period, Zwarenstein sold 222,000 shares of his VeriFone stock for
12  proceeds of ***$8.1 million***.  Zwarenstein's sales constituted ***99%*** of his total shares (55.44% of stock
13  plus vested options).  Notably, Zwarenstein sold hundreds of thousands of shares for prices as high
14  as $46.00 per share that were acquired through stock options at prices as low as ***$3.28*** per share.
15  Zwarenstein sold over 80% of his Class Period sales *after* e-mailing that VeriFone's margins were
16  an "unmitigated disaster" and *after* he learned of Periolat's accounting adjustments.  Further,
17  Zwarenstein sold $2.74 million of his VeriFone shares *after* he certified VeriFone's false 3Q07
18  results on September 6, 2007, the quarter in which earnings were overstated by 600%.

19          205.    Unlike class members, Zwarenstein paid artificially low prices for his stock, including
20  thousands of Restricted Stock Units ("RSUs") that he received for free.  For example, the 222,000
21  shares Zwarenstein sold during the Class Period at prices as high as $46.00 per share included 8,837
22  RSUs that cost absolutely nothing and 151,748 shares of stock acquired via stock options at an
23  average price of $4.38 (exercise prices were $3.28 and $10.00).  As a result, Zwarenstein's profit
24  was $4,955,974, more than seven times his $664,656 acquisition cost.

25          206.    Moreover, the Form 4s submitted by Zwarenstein establish that he suspiciously
26  amended his 10b5-1 trading plan during the Class Period.  Pursuant to his original September 30,
27  2005 10b5-1 trading plan, Zwarenstein sold an average of 4,000 shares per month between
28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                              - 70 -

1    December 2005 and January 2007.  After amending his plan on December 10, 2006, Zwarenstein

2    drastically increased his sales to 18,000 shares per month from February 2007 to December 2007.

3          207.    Zwarenstein's pre-Class Period sales reinforce the suspicious nature of his Class

4    Period trades.  Prior to the Class Period, Zwarenstein only sold 32,000 shares of VeriFone stock for

5    $906,906 in proceeds.  He then increased his sales by *600%* and sold 222,000 shares for $8.1 million

6    while in possession of material adverse information.  Thus, his Class Period sales were dramatically

7    out of line with prior sales.  Zwarenstein's detailed VeriFone trading history is set forth in Ex. 4

8    hereto.

9    **Former EVP Defendant Atkinson**

10         208.    During the Class Period, defendant and EVP Atkinson sold over 180,800 shares, or

11   over *97%*, of his total VeriFone holdings for proceeds of over *$6.76 million*.  Atkinson was

12   substantially involved in the Lipman merger, at one point bragging to investors on September 6,

13   2006 that VeriFone and Lipman "*will begin Day 1, completely integrated.  We are locked and*

14   *loaded*."  As the witnesses and defendants' admissions confirmed, the integration was anything but

15   complete.

16         209.    Notably, Atkinson sold $4.45 million of his VeriFone shares *after* VeriFone

17   announced its false results for 1Q07, the first quarter in which Lipman's results were consolidated

18   with VeriFone as a combined entity.  Atkinson acquired 47,750 of the shares he sold via options with

19   exercise prices of $3.05 and $10.00 for an average cost of $6.36.  Another 3,125 of the shares he

20   sold were RSUs that cost nothing.  The remaining 87,313 shares were acquired at a substantially

21   reduced price before the Company's IPO.

22         210.    Atkinson's pre-Class Period sales reinforce the suspicious nature of his Class Period

23   trades.  Prior to the Class Period, Atkinson only sold 90,614 shares of VeriFone stock for $2,184,207

24   in proceeds.  The 180,800 shares sold by Atkinson during the Class Period was nearly double the

25   90,614 shares he sold before the Class Period.  Further, the majority of Atkinson's pre-Class Period

26   sales was a unique one-time sale on September 23, 2005, the first day after the expiration of

27   VeriFone's post IPO lock up period.  On that date, Atkinson sold 50,614 shares for proceeds of

28   $1,051,759.  Further, like Zwarenstein, Atkinson modified his 10b5-1 trading plan and then

1    substantially increased his sales. Atkinson sold 60,000 shares in 2006 (5,000 shares in each month)

2    and then modified his 10b5-1 trading plan on January 22, 2007 and **tripled** the number of shares

3    sold. He sold 18,000 shares per month from January 2007 through July 2007, and 35,000 shares in

4    September 2007. Accordingly, Atkinson's Class Period stock sales were inconsistent with his usual

5    trading patterns and are consistent with his knowledge of adverse non-public information regarding

6    the disastrous financial and operational problems arising from the Lipman merger.

7        211.    As a senior officer at the Company who made misleading statements regarding the

8    Lipman merger and received extra bonuses and stock awards for his participation in the merger, a

9    strong inference arises that Atkinson was aware of VeriFone's internal control problems and its

10   grossly distorted gross margin and EPS results. His suspicious termination during the middle of the

11   Class Period and his sale of 97% of his VeriFone shares supports the inference of knowledge of

12   undisclosed adverse facts regarding VeriFone's financial condition. Atkinson's detailed trading

13   history is set forth in Ex. 4 hereto.

14   **Former Director Defendant Bondy**

15       212.    During the Class Period, VeriFone director Bondy unloaded **9.8 million shares** of

16   VeriFone stock for proceeds of over **$358 million**. Millions of shares were sold indirectly through

17   Bondy's private equity/hedge fund partnership, GTCR, and its related entities which were run by

18   Bondy and two other VeriFone directors. According to VeriFone's 2006 Proxy Statement, the

19   GTCR entities are related through a cryptic labyrinth of partnership agreements as follows: "GTCR

20   Golder Rauner, L.L.C. is the **general partner of the general partner** of GTCR Fund VII, L.P., **the**

21   **general partner of the general partner of the general partner** of GTCR Capital Partners, L.P., and

22   the **general partner** of GTCR Co-Invest, L.P. GTCR Golder Rauner, L.L.C."

23       213.    Bondy and GTCR were principal architects of the spinoff and recapitalization of

24   VeriFone from Hewlett-Packard in 2002 and later took an equity stake and Board positions at the

25   Company, which continued through the Company's IPO in 2005. Following the Company's IPO,

26   Bondy and GTCR became VeriFone's largest shareholder. Bondy is a principal of GTCR and was

27   expressly listed as a beneficial owner of all GTCR controlled VeriFone stock in each of the

28   Company's Class-Period proxy statements. As such, Bondy repeatedly filed Form 4s disclosing that

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 72 -

1  he was selling VeriFone stock.  Notably, Bondy's conditional disclaimer of beneficial ownership of

2  GTCR controlled VeriFone stock expressly reserved "***his pecuniary interest***" in all of the shares

3  traded by GTCR during the Class Period.  Bondy's Class Period sales represented over 50% of the

4  VeriFone shares he owned.  Just a few months before the Company disclosed its accounting

5  manipulations, Bondy inexplicably (and conveniently) resigned on October 1, 2007.

6          214.    Bondy's pre-Class Period sales reinforce the suspicious nature of his Class Period

7  trades.  Although Bondy sold 18,896,399 shares of VeriFone stock for $350,060,309 prior to the

8  Class Period, the overwhelming majority (13.39 million shares; $208.7 million in proceeds) of those

9  sales took place between May 4, 2005 (the date VeriFone's underwriters including GTCR exercised

10  the over-allotment of 2.31 million shares from selling stockholders) and September 23, 2005, the

11  date on which VeriFone's post-IPO lock up expired.  As a result, absent Bondy's unique one-time

12  IPO-related stock sales, Bondy's Class Period trading history demonstrates an inconsistency with his

13  usual trading patterns.  A detailed chart of Bondy's trades is included in Ex. 4.

14          215.    The facts set forth above also give rise to a strong inference that defendant Bondy was

15  in possession of material adverse nonpublic information concerning VeriFone's financial condition,

16  the problems with the Lipman merger and VeriFone's lack of internal controls at the time he traded.

17  As set forth in ¶¶45-46, *supra*, Bondy was intimately involved with and aware of VeriFone's

18  business dealings and operations since it was spun off from Hewlett-Packard in 2002.  Bondy held

19  key positions on VeriFone Board committees and met frequently on corporate governance issues

20  related to VeriFone's internal controls.  His partners at GTCR were also Board members of the

21  Company, and, as the Company's largest shareholder, Bondy and GTCR were familiar with

22  VeriFone's business and governance practices.  Bondy's suspicious resignation from the Board

23  while selling $358.5 million in VeriFone stock supports an inference of his scienter.

24      **B.    Defendants' Compensation and Bonuses Were Tied Directly to
               VeriFone's Earnings Targets**

25

26          216.    In addition to the massive $465 million in insider sales, defendants were also

27  motivated to keep VeriFone's gross margins, earnings and stock price inflated during the Class

28  Period to reap millions of dollars in bonuses, incentives and stock option grants, all of which were

1  contingent on VeriFone maintaining its artificially inflated stock price and earnings targets in 2006

2  and 2007.

3  **Defendant Bergeron**

4      217.   In addition to Bergeron's nearly $92 million in illicit stock sales during the Class

5  Period, he also received millions of dollars in bonuses and stock option grants arising from

6  VeriFone's inflated earnings and stock price during the Class Period.  In 2006, Bergeron received a

7  base salary of $600,000 and *$1.5 million* in cash bonuses.  These bonuses were 200% of Bergeron's

8  stated "target bonus" of $750,000 and were directly tied to VeriFone's 2006 earnings and stock price

9  performance.  The Company expressly stated that "[b]ased on *VeriFone's performance during*

10  *fiscal 2006*, the Compensation Committee, in its discretion, determined that for fiscal 2006 Mr.

11  Bergeron should receive an annual bonus of 200% of his target bonus."  Bergeron was also given an

12  additional *$1.1 million* in new restricted stock awards during 2006 and 225,000 stock options with a

13  stated potential realizable value of more than $6 million.

14      218.   On January 4, 2007, Bergeron and VeriFone entered into an "amended and restated"

15  employment contract, which raised his 2007 base salary to $700,000, plus a target cash bonus of

16  $900,000 with a potential of $1.8 million if certain performance metrics were met.  Additionally,

17  Bergeron was given *900,000 restricted stock units* over a three-year period "based upon *growth in*

18  *our net income per share* as adjusted and if *certain improvements to our share price are achieved*."

19  For 2007, Bergeron's amended and restated employment contract stated that 200,000 restricted stock

20  units would vest if the Company "report[s] improvements in *net income*, as adjusted, per share that

21  *exceed management's current expectations*."

22      219.   In the 2008 Proxy Statement, VeriFone provided additional detail on the metrics used

23  to determine the vesting of Bergeron's 900,000 restricted stock shares: "For fiscal year 2007, vesting

24  of 200,000 RSUs [Restricted Stock Units] required that we report net income, as adjusted, per share

25  of *$1.60, which exceeded management's guidance* for fiscal year 2007 at the date of the

26  agreement."  On September 6, 2007, when VeriFone reported its false 3Q07 financials, Bergeron

27  stated that the Company was increasing FY07 pro forma EPS expectations to *$1.59-$1.60, the*

28  *precise number Bergeron needed to trigger the vesting of an additional 200,000 restricted stock*

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 74 -

1    *shares*. This fact clearly demonstrates Bergeron's motive for directing Periolat to "fix the problem"

2    and inflate VeriFone's gross margins and EPS results in 2007.

3         220.    Bergeron was also motivated to inflate VeriFone's earnings and stock price because

4    he received "substantial equity" in VeriFone when it was spun off from Hewlett-Packard, and that

5    equity did not become fully vested until the *end of 3Q07*. In the Company's 2008 Proxy Statement,

6    VeriFone noted that the Compensation Committee undertook a "review" of Bergeron's

7    compensation in 2007 and the "*substantial equity* that Mr. Bergeron had acquired in 2002 in

8    connection with [VeriFone's] investment and recapitalization led by Mr. Bergeron and GTCR

9    Golder Rauner and that the portion of the equity acquired in 2002 that was subject to vesting

10   conditions would *become fully vested by the end of the third quarter of fiscal year 2007*."

11        221.    Accordingly, Bergeron had powerful personal financial motives to keep VeriFone's

12   net income, gross margin earnings and stock price inflated until the *end of 3Q07*, before the stock

13   price came crashing down. Bergeron received millions of dollars in concrete benefits as a direct

14   result of defendants' accounting manipulations and the resulting artificial increase in VeriFone's

15   stock price. When combined with Bergeron's massive $92 million in insider sales, Bergeron's stock

16   grants and bonuses provided a powerful incentive to report false financial results that "exceed[ed]

17   management's current expectations" for VeriFone's earnings and stock price.

18   **Defendant Zwarenstein**

19        222.    In addition to Zwarenstein's $8.1 million in stock sales during the Class Period, he

20   also received millions of dollars in bonuses and stock option grants directly correlated to VeriFone's

21   inflated earnings and stock price. In 2006, Zwarenstein received a base salary of $319,000 and a

22   cash bonus of $250,000. Zwarenstein also received over *$1.38 million* in restricted stock awards

23   during 2006, including 10,000 restricted stock units granted in March 2006, and a special Lipman

24   bonus award of 40,000 additional restricted stock units in September 2006 "*in recognition of [his]*

25   *efforts on the Lipman acquisition*."

26        223.    On March 22, 2007, the "first anniversary" and vesting date of 2,500 shares, or 25%,

27   of Zwarenstein's March 2006 stock grants, VeriFone's shares were trading at $37.60, or a 30%

28   premium above the price that Zwarenstein received for the stock grant. On September 12, 2007, the

1  "first anniversary" and vesting day of 10,000 shares, or 25%, of Zwarenstein's September 2007

2  restricted grants, VeriFone's stock was trading at $39.85, or more than 43% above the grant price of

3  Zwarenstein's September 2007 stock awards.

4       224.  In 2007, Zwarenstein's salary was raised from $320,000 to $400,000.  The Proxy

5  Statement noted the following:

6      In the case of Mr. Zwarenstein, the Compensation Committee noted his work in **building out our financial and accounting infrastructure**.  In addition, the

7      Compensation Committee considered the increased job responsibilities that Mr. Zwarenstein undertook in our business and corporate development.  In particular, the

8      Compensation Committee noted that **Mr. Zwarenstein's efforts were instrumental towards our successful completion of the acquisition of Lipman** in the prior fiscal

9      year and that his base salary should be adjusted accordingly.

10       225.  In short, Zwarenstein had powerful and concrete financial motives to keep VeriFone's

11  results artificially inflated as long as possible to accumulate insider-trading profits, stock grants and

12  higher salary and bonuses.  After Zwarenstein sold 99% of his stock, VeriFone's stock price

13  collapsed.

14       226.  VeriFone later announced that Zwarenstein was "resigning" in connection with the

15  Company's restatement.  In a footnote to VeriFone's 2008 Proxy Statement, the Company disclosed

16  that Zwarenstein was "terminated" by the Company.  He was also forced to "reimburse" the

17  Company for $150,000 in cash bonuses received in 2007 because VeriFone's "restated results did

18  not achieve the quarterly bonus targets" – a small price to pay after misleading investors, directing

19  an accounting fraud and walking away with $8.1 million.

20  **Defendant Atkinson**

21       227.  Former EVP Atkinson received concrete benefits as a result of VeriFone's inflated

22  earnings and stock price.  Atkinson's base salary in 2006 was $300,000, and he received a cash

23  bonus of nearly $225,000.  Like Zwarenstein, Atkinson was awarded $1.38 million in restricted

24  stock awards in 2006, comprised of 50,000 restricted stock shares, 10,000 of which were granted in

25  March 2006, and 40,000 issued in September 2006.  Also, like Zwarenstein, the 40,000-share grant

26  issued to Atkinson in September 2006 was "**in recognition of [his] efforts on the Lipman**

27  **acquisition**."  The vesting schedules for Atkinson's restricted stock awards were the same as

28  Zwarenstein's, allowing 2,500 shares to fully vest on March 22, 2007 and 10,000 shares to vest on

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                                - 76 -

1    September 12, 2007.  According to VeriFone's 2007 Proxy Statement, Atkinson's "performance-

2    based goals were based on (A) the amount contributed by their respective business unit to our

3    operating income for the quarter and (B) the ***gross margin achieved by their respective business***

4    ***unit for the quarter***."  Thus, Atkinson paid close attention to the Company's gross margin results.

5         228.    In 2007, Atkinson's base salary was increased from $300,000 to $348,120.  VeriFone

6    stated that the 33% raise "was appropriate in light of our strong performance in international and

7    emerging markets."  Atkinson was then suddenly fired on July 18, 2007.  His punishment: $6.76

8    million in illicit insider-trading proceeds and more than a quarter of a million dollars in cash

9    bonuses.

10   **VIII.   VERIFONE ANNOUNCES A MASSIVE RESTATEMENT AND ADMITS**
         **ITS PRIOR STATEMENTS WERE MATERIALLY FALSE CAUSING A**
11       **46% STOCK PRICE DECLINE IN A SINGLE TRADING DAY**

12        229.    As late as November 30, 2007, four days before VeriFone announced its restatement,

13   analysts were still repeating the false statements made by defendants and touting the Company's

14   gross margins and earnings potential for 4Q07.  Defendants had conditioned analysts and investors

15   to believe that the artificial increase in gross margins was real, sustainable and based on legitimate

16   business practices, all of which were untrue.

17        230.    In a November 30, 2007 Wachovia report, analysts stated:

18        We believe adjusted gross margin could come in above our 48.3% estimate as PAY
          (1) continues to leverage its larger purchasing power and in-house manufacturing
19        capabilities with its contract manufactures and (2) benefits from higher wireless sales
          in high market share regions.  In addition, we believe operating leverage, slightly
20        lower interest expense than modeled, and mostly lower taxes could also provide a lift
          to cash EPS.
21
          231.    In a November 30, 2007 Wedbush Morgan Securities, Inc. ("Wedbush") report,
22
     analysts continued to rely upon defendants' earlier false representations:
23
          **Margins positioned for continued expansion.**  VeriFone continues to maintain its
24        dominant unit share position in the highest gross margin U.S. market, and wireless
          terminals, its highest gross margin products, continue to garner a greater mix of
25        overall company sales.   Combined with more operating leverage, we believe
          VeriFone is well positioned to see margins expand towards the high end of recently
26        increased long-term targets of 45-50% gross and 25-30% EBITDA margins.

27        232.    On December 3, 2007, VeriFone stunned investors and analysts by abruptly issuing a

28   press release announcing that it would be drastically restating its financial results for 1Q07, 2Q07

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 77 -

1    and 3Q07 and that it would not complete the restatement until January 2008.  In response, the

2    Company's stock price crashed *46%* from $48.03 on November 30, 2007, to $26.03 on December 3,

3    2007, compared to a 0.6% decline in both the S&P 500 and VeriFone's peer group.[12]  The stock

4    price declined another *22.4%* from December 3, 2007 to December 6, 2007, compared to a 2.5%

5    increase in the peer group.  Despite the immediate 46% stock price decline on the adverse news of

6    the accounting misconduct, VeriFone's stock price remained partially inflated because the full

7    details, extent and economic consequences of the restatement were not yet clear to investors.

8            233.    On December 31, 2007, VeriFone announced that it was delaying the reporting of its

9    final restated financial results.  The Company stated that it had disclosed to the SEC that it was

10   extending the time of filing of its Form 10-K to January 14, 2008, but stated that "it does not expect

11   that it will complete this process and make the required filings prior to March 2008."  On this news,

12   VeriFone's stock declined another *15%* from $23.75 on December 31, 2007 on the news, to $19.81

13   on January 2, 2008, compared to a 1.4% decline in the S&P 500 and a 3% decline in the peer group.

14           234.    On March 6, 2008, VeriFone unexpectedly canceled an April appearance at the

15   SunTrust annual institutional investors conference.  VeriFone's stock price declined another *21%*

16   from $19.64 on March 5, 2008 to $15.45 on March 6, 2008, compared to a 2.2% decline in the S&P

17   500 and a 1.8% decline in the peer group.  Bloomberg reported the news and quoted one Wall Street

18   analyst as stating:  "The cancellation suggests VeriFone will again delay issuing its restated results

19   for the first three quarters of 2007, which had been promised this month . . . .  'There is some

20   concern about the timing of when they'll be done with internal accounting . . . .'"  The analyst did

21   not recommend buying VeriFone stock because "'there is a still a risk that there are more mistakes

22   and accounting issues.'"   Thus, the full extent and economic consequences of defendants'

23   misconduct was still not fully revealed and VeriFone's stock price remaining partially inflated.

24

25

26   [12]     The peer group index is the same index VeriFone compared its stock price to in its 2007
27   Proxy Statement and includes Hypercom Corporation, Igenico S.A., IBM, MICROS Systems, Inc.
     NCR Corporation and Radiant Systems, Inc.
28

1    235.   On April 1, 2008, VeriFone revealed that the restatement would be much worse than

2  initially reported and that CFO Zwarenstein had "resigned."  In response to this new adverse

3  information, the Company's stock price declined another *19%* from $16.83 on April 1, 2008 to

4  $13.64 on April 1, 2008, compared to a 0.2% decline in the S&P 500 and a 0.3% decline in the peer

5  group.

6    236.   Investors and analysts were incensed about the news of a larger restatement and

7  ousting of CFO Zwarenstein and openly questioned the integrity of VeriFone's management.  In a

8  report issued on April 3, 2008, entitled "Update Worse than Expected; Outlook Remains Vague,"

9  Wedbush analyst Gil B. Luria stated:

10   ***Results of internal investigation indicate more than a simple mistake***.  We believe
     the significant reorganization, the stepping down of the CFO, the CEO relinquishing
11   the Chairman position, and the inclusion of the SEC ***point to more than the simple***
     ***clerical error the company previously indicated***. . . .

12   237.   Wachovia analyst Perlin issued a report on April 4, 2008, openly ridiculing the lack

13  of clarity in VeriFone's disclosures and concluding that management's representations "creat[e]

14  more questions than answers":

15   **Independent Investigation Complete; Now in the Hands of Government**.  ***PAY***
16   ***announced yesterday that it had completed the independent investigation*** into its
     accounting and although ***the release was anything but conclusive***, the company did
17   provide some insight into what's to come. . . .

18   **Business Update Creates More Questions than Answers**.  Two key points came
     out of the business update including (1) ***4Q07 gross margins are expected to be in***
19   ***the range of 32%-34%*** (including a charge, which was not disclosed) and
     (2) challenging net revenue growth in 1Q08.  ***So rather than provide more clarity***
20   ***around these two points the company just left them out there with no additional***
     ***color***. . . .

21   238.   On April 30, 2008, VeriFone filed a Form 8-K with the SEC stating that it would not

22  meet its previous deadline for filing restated financial results.  It also announced that it was forced to

23  amend its credit agreements with its lenders because of the accounting misconduct and delay in

24  filing of financial statements.  Because of defendants' fraud and delays in financial reporting, the

25  Company was forced to agree to pay an extra 0.25% "lenders fee" and an extra 0.75% interest per

26  year on its outstanding debt, and 0.125% per annum for the commitment fee for unused revolving

27  commitments.

28

239.    On this news, Merrill Lynch cut VeriFone's earnings targets for 2008 and 2009 and stated "*[t]he lack of visibility into future results and potential collateral damage arising from the accounting issues keeps us a 'Neutral' rating as we continue to see a balance risk/reward at current levels*."

240.    On May 14, 2008, *The Financial Times* published an article entitled "***Fidelity Slashes VeriFone Stake***."  The article stated:  "Some institutional investors are fed up with [VeriFone] even though its share has begun to recover from the collapse that followed the company's announcement that it will restate revenue for the past few years.  VeriFone yesterday notified the [SEC] that Fidelity Management & Research Company is no longer a party at interest in the company after selling shares. . . ."

## IX.    VERIFONE'S GAAP VIOLATIONS

241.    Defendants' accounting improprieties violated GAAP and SEC rules.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. §210.10-01(a).

**VeriFone Overstated Inventory and Understated Cost of Sales**

242.    Among other improprieties during the Class Period, VeriFone overstated its inventory and understated its cost[13] of sales expense, resulting in inflated gross profits and net earnings. VeriFone primarily accomplished this in at least six ways.

243.    *First*, defendants admitted that in 2Q07 and 3Q07 VeriFone improperly recorded millions of dollars of intercompany "in-transit inventory" that simply did not exist.  The facts set

---

[13]    As applied to inventories, cost is the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an item to its existing condition and location, as defined by Accounting Research Bulletin ("ARB") No. 43, Chapter 4, Statement 3.

1   forth in the SEC Complaint establish that the GAAP violations were deliberate. §VI.B.1.  VeriFone

2   also admitted in its restated SEC filings that the non-existent inventory was "originally recorded

3   based upon erroneous methodology and application of source documents."  By doing so, defendants

4   violated GAAP, which requires that information be relevant and reliable and that there be

5   correspondence or agreement between a measure and the phenomenon it purports to represent.  *See*

6   Statement of Financial Accounting Concepts ("SFAC") No. 2, ¶¶58-59, 63.   The improper

7   accounting also violated ARB No. 43, Chapter 4, Statement 3, which states that "the primary basis of

8   accounting for inventories is cost," which is zero for nonexistent inventory.  The violation of these

9   basic concepts resulted in an understatement of total cost of net revenues of $11.5 million and $8.4

10  million in 2Q07 and 3Q07, respectively, and an overstatement of inventory of $12.7 million and

11  $20.1 million in 2Q07 and 3Q07, respectively.

12          244.   ***Second***, in order to overstate gross margins and inventory and understate cost of

13  revenues expense, defendants improperly double booked manufacturing and distribution overhead

14  costs to inventory at former Lipman subsidiaries by making identical manual journal entries for

15  (a) in-transit inventories; and (b) direct shipments when the entries should not have been made for

16  the direct shipments.  The SEC Complaint confirms that the goods were never even shipped.

17  §VI.B.1.  This improper accounting violated GAAP, which requires that information be relevant and

18  reliable and that there be correspondence or agreement between a measure and the phenomenon it

19  purports to represent.  *See* SFAC No. 2, ¶¶58-59, 63.  The improper accounting also violated ARB

20  No. 43, Chapter 4, Statement 3, which states that inventories are to be stated at cost, which means

21  acquisition and production costs.   The violation of these simple concepts resulted in the

22  understatement of total cost of net revenues of $7.7 million and $2.8 million in 1Q07 and 3Q07,

23  respectively, and the overstatement of inventory of $7.7 million, $7.7 million and $10.5 million in

24  1Q07, 2Q07 and 3Q07, respectively.

25          245.   ***Third***, in order to overstate gross margins and inventory and understate cost of goods

26  sold, defendants improperly failed to account for its intercompany transactions appropriately, such as

27  by failing to eliminate intercompany profit in inventory.   These false intercompany transactions

28  violated GAAP, which states, "Where combined statements are prepared for a group of related

1    companies, such as a group of unconsolidated subsidiaries or a group of commonly controlled

2    companies, intercompany transactions and profits or losses should be eliminated. . . ." *See* ARB No.

3    51, *Consolidated Financial Statements*, ¶23. As admitted in the restated SEC filings, this GAAP

4    violation resulted in the understatement of total cost of net revenues of approximately $900,000, $3.5

5    million and $2.4 million in 1Q07, 2Q07 and 3Q07, respectively; and the overstatement of inventory

6    of approximately $3.2 million, $3.4 million and $7.4 million in 1Q07, 2Q07 and 3Q07, respectively.

7        246.    *Fourth*, in order to overstate inventory and gross margins and/or understate cost of

8    goods sold, VeriFone improperly capitalized certain additional overhead into inventory in violation

9    of GAAP, specifically, ARB No. 43, Chapter 4, Statement 3. As admitted in the restated SEC

10    filings, this resulted in the understatement of total cost of goods sold by $800,000 and $2.1 million in

11    2Q07 and 3Q07, respectively, and the overstatement of inventory of $2.4 million in 3Q07.

12        247.    *Fifth*, in order to inflate gross margins and inventory and understate total cost of

13    goods sold by $600,000 in 3Q07, defendants failed to write off excess and obsolete inventory in

14    violation of GAAP. GAAP requires excess and obsolete inventory to be written down as a charge

15    against income in the period in which it occurs. *See* ARB No. 43, Chapter 4, Statement 5. In fact,

16    throughout the Class Period, VeriFone falsely stated in its Form 10-K and in all its Forms 10-Q that

17    its policy was to "review the adequacy of [its] inventories valuation on a quarterly basis" and that

18    "inventories are stated at the lower of standard cost or market." Defendants represented that "the

19    Company regularly monitors inventory quantities on hand and ***records write-downs for excess and***

20    ***obsolete inventories***. . . ." By failing to write down the value of excess and obsolete inventory in a

21    timely fashion, defendants knew or recklessly disregarded that VeriFone violated GAAP and its own

22    stated policy, resulting in an overstated gross margin and understated loss in 3Q07.

23        248.    *Sixth*, in order to overstate gross margins and inventory and understate cost of goods

24    sold expense in 1Q07, VeriFone delayed taking a necessary charge to decrease inventory at former

25    Lipman entities until a subsequent quarter. Defendants delayed a $2.2 million charge for a change in

26    inventories at former Lipman entities due to inventory cost standards revaluation in conjunction with

27    the Lipman acquisition, which should have been recorded in 1Q07, and improperly recorded it in

28    2Q07. Defendants admitted that this GAAP violation resulted in the understatement of total cost of

1   goods sold of $2.2 million, an overstatement of inventory of $2.2 million in 1Q07 and a

2   corresponding overstatement of total cost of goods sold by $2.2 million in 2Q07.

3        249.   As a result of the numerous accounting manipulations, only a portion of the true cost

4   of manufacturing and distribution was recognized as an expense, and the remaining costs were

5   inappropriately buried in the inventory balance on VeriFone's books.[14]   This resulted in the

6   understatement of the total cost of goods sold recorded on the Company's Income Statement and the

7   overstatement of inventory on the Balance Sheet, resulting in materially false financial statements in

8   1Q07-3Q07.  *See* table, ¶77 above.

9   **Defendants' Violations of Internal Control Provisions**

10       250.   Internal control[15] is a process, carried out by an entity's board of directors,

11  management and other personnel, designed to provide reasonable assurance that, among other things,

12  the financial statements are reliable and accurate and that a company complies with applicable laws

13  and regulations.  Management is responsible for establishing and maintaining adequate internal

14  control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the 1934 Act.[16]

15       251.   VeriFone has admitted that its independent auditor and the investigation

16  commissioned by the Audit Committee concluded there were significant control deficiencies that

---

17

18  [14]   ARB No. 43, Chapter 4, ¶4 states, "In accounting for the goods in the inventory at any point
of time, the major objective is the matching of appropriate costs against revenues in order that there
19  may be proper determination of the realized income.  Thus, the inventory at any given date is the
balance of costs applicable to goods on hand remaining after the matching of absorbed costs with
20  concurrent revenues."

21  [15]   AU 319.06, *Internal Control in a Financial Statement Audit*, defines internal control as "a
process – effected by an entity's board of directors, management, and other personnel – designed to
22  provide reasonable assurance regarding the achievement of objectives in the following categories:
(a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and
23  (c) compliance with applicable laws and regulations.

24  [16]   Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must:
"(A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly
25  reflect the transactions and dispositions of the assets of the issuer; and (B) devise and maintain a
system of internal controls sufficient to provide reasonable assurances that . . . transactions are
26  recorded as necessary . . . to permit the preparation of financial statements in conformity with
[GAAP]."  These provisions require an issuer to employ and supervise reliable personnel, maintain
27  reasonable assurances that transactions are executed as authorized, properly record transactions on
an issuer's books and, at reasonable intervals, compare accounting records with physical assets.

28

1   constituted material weaknesses[17] in the Company's control environment, specifically related to the

2   following: internal controls over the process for preparation, review approval and entry of manual,

3   nonstandard journal entries; maintaining sufficient qualified accounting and finance personnel; the

4   supervision, monitoring and monthly financial statement review processes; and the identification,

5   documentation and review of various income tax calculations, reconciliations and related supporting

6   documentation.  *See* Item 8, Report of Independent Registered Public Accounting Firm, in the Form

7   10-K for the fiscal year ended October 31, 2007, filed August 19, 2008.  Moreover, VeriFone

8   disclosed in its 1Q07 10-Q/A, 2Q07 10-Q/A, 3Q07 10-Q/A and FY07 10-K, all filed on August 19,

9   2008, that it has been forced to implement no less than six remediation initiatives to bring internal

10   controls to an adequate level.

11        252.    Throughout the Class Period, defendants were aware of the numerous control

12   deficiencies.  Defendants knew manual journal entries were submitted to the Company headquarters

13   in San Jose for review by defendant Zwarenstein's group and that the accounting department which

14   was headed by defendant Zwarenstein was disorganized, understaffed, overworked and plagued by

15   high levels of attrition and turnover.  Defendants also knew that there were problems with the

16   integration of the Lipman acquisition, including the inability to obtain necessary accounting

17   information from Lipman to close the Company's books at the end of each quarter.  Defendants

18   knew that Lipman and VeriFone were using different, incompatible ERP systems.  Defendants

19   exploited this known lack of internal controls to falsify the Company's financial results.  The SEC

20   charged Periolat with "***knowingly*** circumventing a system of internal accounting controls."  Ex. 2 at

21   ¶37.  Despite this knowledge, VeriFone did not comply with the following requirements for internal

22   control over financial reporting: Rules 13a-15(f) and 15d-15(f) under the 1934 Act, §§302, 404 and

23   906 of Sarbanes-Oxley, and Item 308 of Regulation S-K.  These require management certifications

24   or reports regarding the Company's internal controls and/or the fair presentation of the financial

25   ─────────────────

26   [17]  AU 325.06, *Communicating Internal Control Related Matters Identified in an Audit*, defines
      a material weakness as "a significant deficiency, or a combination of significant deficiencies, that
27   results in more than a remote likelihood that a material misstatement of the financial statements will
      not be prevented or detected."

28

1    statements.  During FY07, defendants provided false certifications and violated the requirements for

2    internal control over financial reporting including the following:

3              (a)     VeriFone's Forms 10-Q contained certifications required by Rule 13a-14(a) of

4    the 1934 Act.  The certifications for the periods ended January 31, 2007, April 30, 2007 and July 31,

5    2007 were signed by Bergeron and Zwarenstein.  The certifications signed by Bergeron and

6    Zwarenstein knowingly or recklessly were false or misleading given defendants' later admissions

7    about VeriFone's financial reports and internal controls;

8              (b)     Defendants failed to establish and maintain an adequate system of internal

9    controls and failed to regularly evaluate the status of those controls or the lack thereof;

10             (c)     Defendants did not maintain effective entity-level control; and

11             (d)     Defendants did not maintain effective process and transaction level controls.

12          253.   VeriFone's failure to strengthen its known inadequate internal controls rendered

13   VeriFone's financial reporting inherently unreliable and contributed to the Company's inability to

14   prepare financial statements that complied with GAAP.  Throughout the Class Period, the Company

15   regularly issued quarterly and annual financial statements without ever disclosing the known

16   existence of the significant and material deficiencies in its internal accounting controls and falsely

17   asserted that its financial statements complied with GAAP.

18   **Other GAAP Violations**

19          254.   In addition to the GAAP and SEC violations described above, the Company also

20   violated the following fundamental GAAP principles relating to financial reporting requirements:

21   APB No. 28, ¶10; SFAC No. 1, ¶¶34, 40, 42, 50; and SFAC No. 2, ¶¶58-59, 79, 95, 97.

22          255.   Defendant Zwarenstein also admitted in the December 3, 2007 conference call that

23   the Company violated SFAS No. 86, *Accounting for the Costs of Computer Software to Be Sold,*

24   *Leased, or Otherwise Marketed.*

25          256.   Further, the undisclosed adverse information concealed by defendants during the

26   Class Period is the type of information which, because of SEC regulations, regulations of the

27   national stock exchanges and customary business practice, is expected by investors and securities

28

1   analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

2   be the type of information which is expected to be and must be disclosed.

3   **X.      LOSS CAUSATION**

4          257.    As detailed above, defendants' financial misconduct, false representations and

5   omissions of material facts caused VeriFone's stock to trade at artificially inflated prices and

6   operated as a fraud and deceit on Class Period purchasers of VeriFone securities.  From August 31,

7   2006 to October 31, 2007, VeriFone's stock price more than doubled from $23.15 to $50.00 and

8   continued to trade at inflated prices above $43.00 per share until VeriFone began to reveal adverse

9   facts concerning its financial condition and the impact of defendants' misconduct.  As a result,

10  VeriFone's stock price declined more than 75% from its Class Period high as the artificial inflation

11  was removed from the Company's stock price.  Class members who purchased VeriFone stock

12  during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

13         258.    On August 31, 2006, VeriFone announced 3Q06 results and Bergeron and

14  Zwarenstein told investors the Lipman acquisition would improve gross margins and result in

15  immediate accretion to FY07 earnings.  On the news, the Company's stock price increased 23%

16  compared to a 0.55% increase in the S&P 500 and a 0.1% increase in the peer group.

17         259.    On December 7, 2006, VeriFone  reported 4Q06 results, and Bergeron and

18  Zwarenstein again told investors gross margins and EPS would increase in FY07.  The Company's

19  stock price increased 5% on the news, compared to a 0.18% increase in the S&P 500 and a 0.24%

20  decline in the peer group.

21         260.    On March 1, 2007, after VeriFone's stock price had already been inflated from

22  $23.15 on the first day of the Class Period to over $39 per share, VeriFone announced 1Q07 results.

23  Although its stock price stayed relatively flat, declining only $0.26 or 0.2%, it was significantly

24  better than the 1.1% decline in the S&P 500 and the 2.4% decline in the peer group.  On May 26,

25  2007, VeriFone reported false 2Q07 results and lower-than-expected revenue.  Although the

26  Company's stock price declined 6.1% compared to a 0.8% increase in the S&P 500 and a 0.4%

27  decline in the peer group, it still traded at artificially inflated prices because the market was unaware

28  that VeriFone's results, although light on revenue, were drastically overstated by 200% in earnings

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                                        - 86 -

1    and millions in gross margins due to deliberate accounting manipulations.  Had investors known the

2    truth, the stock-price decline would have been far worse.

3            261.    After VeriFone reported fictitious 3Q07 results on September 6, 2007, the Company's

4    stock price increased 6% compared to a 1.7% decline in the S&P 500 and a 1.3% decline in the peer

5    group.  The stock price continued to maintain its artificial inflation, reaching a Class Period high of

6    $50.00 per share on October 31, 2007, and closed at $48.03 on November 30, 2007, the last trading

7    day before VeriFone announced the restatement.

8            262.    The artificial inflation in VeriFone's stock price began to be removed following

9    several partial disclosures of adverse facts relating to defendants' misconduct on the following dates:

10   December 3-6, 2007, December 31, 2007, March 6, 2008 and April 1, 2008.  Each partial disclosure

11   revealed bits and pieces of the previously concealed information and partial but incomplete

12   information about the economic consequences of defendant's misconduct on VeriFone's current

13   financial condition and the Company's future results.  The partial disclosures caused VeriFone's

14   stock price to decline significantly more than the changes in the peer group and the S&P 500.  As a

15   result, the price declines following the partial disclosures provide a measurement of class members'

16   economic losses.

17           263.    Defendants' first partial disclosure of adverse facts concerning defendants'

18   accounting violations occurred on December 3, 2007, when defendants first announced the need to

19   restate VeriFone's financial results.  On this news, VeriFone's stock dropped over 46% from $48.03

20   to $26.03, removing a substantial portion of the artificial inflation that had built up in VeriFone's

21   stock price as a result of defendants' misconduct.  The news also resulted in an additional 22.4%

22   drop from December 3-6, 2007 compared to a 2.5% increase in the peer group.  However, the

23   Company's stock price remained artificially inflated because defendants had not yet revealed the full

24   amount, extent and details surrounding the restatement, the specific financial manipulations

25   underlying the restatement, or the final impact on VeriFone's historical results and future earnings.

26           264.    Another partial disclosure occurred on December 31, 2007, when VeriFone

27   announced a delay in reporting its full restated financial results.  On this news, VeriFone's stock

28   price declined another 15% compared to only a 1.4% decline in the peer group and a 3% decline in

1  the S&P 500. Despite this additional removal of inflation in VeriFone's stock price, it remained

2  inflated because defendants had not yet revealed the final restated numbers, the extent and depth of

3  the accounting manipulations and the full economic consequences of the restatement and defendants'

4  misconduct.

5      265.   Another partial disclosure occurred on March 6, 2008, when VeriFone unexpectedly

6  cancelled an appearance at a prominent institutional investor conference. Bloomberg and Wall

7  Street analysts reported that the cancellation suggested that VeriFone's restatement would be

8  delayed further, which turned out to be true. On that new information, VeriFone's stock price

9  declined 21%, compared to only a 1.8% drop in the industry peer group. The restatement delay and

10  removal of additional inflation in VeriFone's stock price was directly related to defendants'

11  accounting misconduct and the pervasiveness of the restatement. However, VeriFone shares

12  remained inflated because the full impact of the restatement and the true financial condition of the

13  Company were still not fully disclosed.

14      266.   On April 1, 2008, the last day of the Class Period, defendants finally disclosed the

15  final restated numbers, which revealed that VeriFone's restatement was much larger than originally

16  represented to investors on December 3, 2007. Defendants also announced that, based on the

17  internal investigation, "management has concluded that VeriFone did not maintain effective internal

18  control over financial reporting." Defendants also disclosed that CFO defendant Zwarenstein was

19  forced to "resign." On this new information, VeriFone's stock price plummeted another 19%

20  (versus a 0.3% drop in the peer group and 0.2% drop in the S&P 500), to $12.50 per share, capping

21  an aggregate 75% decline from its Class Period high.

22      267.   The declines in VeriFone's stock price as the bad news was incrementally disclosed,

23  revealing the relevant truth concerning VeriFone's financial condition and accounting controls and

24  the risks concealed by defendants, were directly related and causally connected to defendants' prior

25  misrepresentations and fraudulent conduct. Each partial but incomplete disclosure of adverse facts

26  which removed inflation from VeriFone's stock price (thereby causing damages), was directly

27  connected to the restatement, defendants' accounting manipulations, the resulting false financial

28  statements and the material facts concealed by defendants during the Class Period.

268.   The declines in VeriFone's stock price following the partial disclosures compared to the changes in the peer group and S&P 500 negate any inference that the losses suffered by class members were caused by changed market or industry conditions or Company-specific facts unrelated to the fraudulent conduct.   The following chart (which is also attached hereto in foldout form) illustrates the changes in VeriFone's stock price during the Class Period compared to the peer group and the S&P 500:



VeriFone Holdings, Inc.
Indexed to Peer Group*, S&P 500 Composite Index
April 3, 2006 to August 29, 2008

## XI.   CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

269.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased VeriFone common stock on the open market during the Class Period, and were damaged thereby (the "Class").   Excluded from the Class are defendants, directors and officers of VeriFone and their families and affiliates.

270.   The members of the Class are so numerous that joinder of all members is impracticable.   During the Class Period, there were approximately 68 million to 84 million outstanding shares owned by hundreds, if not thousands, of persons.   Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

1    271.   There is a well-defined community of interest in the questions of law and fact

2    involved in this case.  Questions of law and fact common to the members of the Class that

3    predominate over questions which may affect individual Class members include:

4              (a)    Whether the federal securities laws were violated by defendants;

5              (b)    Whether defendants engaged in a fraudulent scheme and omitted and/or

6    misrepresented material facts;

7              (c)    Whether defendants' statements omitted material facts necessary to make the

8    statements made, in light of the circumstances under which they were made, not misleading;

9              (d)    Whether defendants knew or recklessly disregarded that their statements were

10   materially false and misleading;

11             (e)    Whether the prices of VeriFone common stock were artificially inflated;

12             (f)    Whether defendants' fraudulent scheme, misrepresentations and omissions

13   caused Class members to suffer economic losses, *i.e.*, damages; and

14             (g)    The extent of damage sustained by Class members and the appropriate

15   measure of damages.

16   272.   Plaintiff's claims are typical of those of the Class because plaintiff and the Class

17   purchased VeriFone common stock during the Class Period and sustained damages from defendants'

18   wrongful conduct.  Plaintiff will adequately protect the interests of the Class and has retained

19   counsel who are experienced in class action securities litigation.  Plaintiff has no interests that

20   conflict with those of the Class.

21   273.   A class action is superior to other available methods for the fair and efficient

22   adjudication of this controversy.  A class action will achieve economies of time, effort and expense

23   and provide uniformity of decision to the similarly situated members of the Class without sacrificing

24   procedural fairness or bringing about other undesirable results.  Class members have not indicated an

25   interest in prosecuting separate actions as none have been filed.  The number of Class members and

26   the relatively small amounts at stake for individual Class members make separate suits

27   impracticable.  No difficulties are likely to be encountered in the management of this action as a

28   class action.

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 90 -

1    274.   In addition, a class action is superior to other methods of fairly and efficiently

2    adjudicating this controversy because the questions of law and fact common to the Class

3    predominate over any questions affecting only individual Class members.  Although individual Class

4    members have suffered disparate damages, the fraudulent scheme and the misrepresentations and

5    omissions causing damages are common to all Class members.  Further, there are no individual

6    issues of reliance that could make this action unsuited for treatment as a class action because all

7    Class members relied on the integrity of the market and are entitled to the fraud-on-the-market

8    presumption of reliance.

9    275.   The market for VeriFone's common stock was open, well developed and efficient at

10   all relevant times.  VeriFone's stock met the requirements for listing, and was listed and actively

11   traded on the NYSE, a highly efficient and automated market.  As a regulated issuer, VeriFone filed

12   periodic public reports with the SEC and the NYSE.  VeriFone regularly communicated with public

13   investors via established market communication mechanisms, including through regular

14   disseminations of press releases on the national circuits of major newswire services and through

15   other wide-ranging public disclosures, such as communications with the financial press and other

16   similar reporting services.

17   276.   As alleged herein, the change in the price of VeriFone's stock – compared to the

18   changes in the peer group and NYSE – in response to the release of unexpected material positive and

19   negative information about the Company shows there was a cause-and-effect relationship between

20   the public release of the unexpected information about VeriFone and the price movement in the

21   Company's stock.  The average weekly trading volume of VeriFone's stock during the Class Period

22   was approximately 7.1 million shares, or 8.5% of total outstanding shares.  Numerous analysts

23   followed VeriFone, attended the Company's conference calls and issued reports throughout the Class

24   Period.  The Company was eligible to register securities on Form S-3 during the Class Period.

25   Institutional investors owned between 64% and 90% of the total outstanding shares.

26   277.   As a result of the foregoing, the market for VeriFone common stock promptly

27   digested current information regarding VeriFone from all publicly available sources and reflected

28   such information in the Company's stock price.  Under these circumstances, all purchasers of

1  VeriFone common stock during the Class Period suffered similar injury through their purchases of

2  VeriFone common stock at artificially inflated prices and the subsequent revelations concerning

3  declines in price, and a presumption of reliance applies.

4  <center>**FIRST CLAIM FOR RELIEF**</center>

5  <center>For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
(Against Defendants VeriFone, Periolat, Bergeron and Zwarenstein)</center>

6

7  278.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

8  279.   During the Class Period, defendants engaged in a scheme and fraudulent course of

9  conduct to inflate VeriFone's financial results and disseminated, approved or furnished false

10 information underlying the false statements specified above, which they knew or recklessly

11 disregarded were misleading in that they contained misrepresentations and failed to disclose material

12 facts necessary in order to make the statements made, in light of the circumstances under which they

13 were made, not misleading.

14 280.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

15 (a)   employed devices, schemes and artifices to defraud;

16 (b)   made untrue statements of material facts or omitted to state material facts

17 necessary in order to make the statements made, in light of the circumstances under which they were

18 made, not misleading; or

19 (c)   engaged in acts, practices and a course of business that operated as a fraud or

20 deceit upon plaintiff and others similarly situated in connection with their purchases of VeriFone's

21 publicly traded securities during the Class Period.

22 281.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

23 the market, they paid artificially inflated prices for VeriFone's publicly traded securities and suffered

24 economic loss when the inflation was removed through multiple disclosures of adverse facts.

25 Plaintiff and the Class would not have purchased VeriFone's publicly traded securities at the prices

26 they paid, or at all, if they had been aware that the market prices had been artificially and falsely

27 inflated by defendants' fraudulent conduct and misleading statements.

28

282.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of VeriFone's publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

For Insider-Trading Violations of Rule 10(b) and SEC Rule 10b-5
(Against Defendants Bergeron, Zwarenstein, Atkinson and Bondy)

283.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

284.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they are liable for making false and misleading statements and failing to disclose adverse facts necessary to make the statements made not misleading, and by selling over $465 million worth of VeriFone stock at artificially inflated prices while in possession of adverse, material, non-public information about the Company's financial results, the Lipman merger and the overall financial condition of the Company.

## THIRD CLAIM FOR RELIEF

For Violation of Section 20A of the 1934 Act
(Against Defendants Bergeron, Zwarenstein, Atkinson and Bondy)

285.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

286.    While VeriFone securities traded at artificially inflated and distorted prices, defendants personally profited by selling a total of more than 12.6 million shares of VeriFone securities while in possession of adverse, material, non-public information about VeriFone, pocketing over $465 million in illegal insider-trading proceeds, as detailed above.

287.    Plaintiff National Elevator and other Class members purchased VeriFone securities contemporaneously with defendants' insider sales and suffered damages.  National Elevator's purchases and sales of VeriFone stock during the Class Period are set forth as Exhibit 5 hereto, which is a copy of Exhibit B to the Declaration of Ramzi Abadou in Support of National Elevator Industry Pension Fund's Motion for Appointment as Lead Plaintiff and for Approval of Its Selection of Lead Counsel (Docket No. 36-3, filed on February 4, 2008).  Plaintiff National Elevator's contemporaneous purchases of VeriFone stock while defendants were selling include the following:

1    (a)    On September 5, 2006, defendant Bergeron sold 119,800 shares of VeriFone

2    stock at artificially inflated prices.  On September 7, 2006, plaintiff National Elevator purchased

3    5,550 VeriFone shares at artificially inflated prices.

4    (b)    On October 2, 2006, Bergeron sold 28,300 shares of VeriFone stock at

5    artificially inflated prices.  On October 4, 5 and 6, 2006, plaintiff National Elevator purchased 3,240

6    shares, 1,360 shares and 2,025 shares, respectively, of VeriFone stock at artificially inflated prices.

7    (c)    On December 1, 2006, defendant Bergeron sold 68,000 shares of VeriFone at

8    artificially inflated prices.  On December 1, 2006, plaintiff National Elevator purchased 2,200 shares

9    of VeriFone stock at artificially inflated prices.

10    (d)    On January 10, 2007, defendant Bergeron sold 200,000 shares of VeriFone at

11    artificially inflated prices.  On January 11 and 12, 2007, plaintiff National Elevator purchased 2,925

12    shares and 1,595 shares, respectively, of VeriFone stock at artificially inflated prices.

13    (e)    On March 15, 2007, defendant Bergeron sold 200,000 shares of VeriFone at

14    artificially inflated prices.  On March 19 and 20, 2007, plaintiff National Elevator purchased 6,725

15    shares and 3,075 shares, respectively, of VeriFone stock at artificially inflated prices.

16    (f)    On April 11, 2007, defendant Bergeron sold 24,000 shares of VeriFone stock

17    at artificially inflated prices.  On April 16 and 18, 2007, plaintiff National Elevator purchased 4,025

18    shares and 4,725 shares of VeriFone stock, respectively, at artificially inflated prices.

19    (g)    On November 14, 2007, defendant Bergeron sold 142,295 shares of VeriFone

20    stock at artificially inflated prices.  On November 16, 2007, plaintiff National Elevator purchased

21    14,000 shares of VeriFone stock at artificially inflated prices.

22    (h)    On October 31, 2006, defendant Zwarenstein sold 4,000 shares of VeriFone

23    stock at artificially inflated prices.  On October 31, 2006, plaintiff National Elevator purchased 3,600

24    shares of VeriFone securities at artificially inflated prices.

25    (i)    On November 30, 2006, defendant Zwarenstein sold 4,000 shares of VeriFone

26    stock at artificially inflated prices.  On November 30, 2006, plaintiff National Elevator purchased

27    5,460 shares of VeriFone stock at artificially inflated prices.

28

1       (j)      On January 9, 2007, defendant Zwarenstein sold 4,000 shares of VeriFone stock at artificially inflated prices.  On October 31, 2006, plaintiff National Elevator purchased 5,600 shares of VeriFone stock at artificially inflated prices.

       (k)      On March 15, 2007, defendant Zwarenstein sold 18,000 shares of VeriFone stock at artificially inflated prices.  On March 19 and 20, 2007, plaintiff National Elevator purchased 6,725 shares and 3,075 shares, respectively, of VeriFone stock at artificially inflated prices.

       (l)      On April 10, 2007, defendant Zwarenstein sold 18,000 shares of VeriFone stock at artificially inflated prices.  On April 10, 2007, plaintiff National Elevator purchased 5,070 shares of VeriFone stock at artificially inflated prices.

       (m)      On October 9, 2007, defendant Zwarenstein sold 18,000 shares of VeriFone stock at artificially inflated prices.  On October 9, 2007, plaintiff National Elevator purchased 8,200 shares of VeriFone stock at artificially inflated prices.

       (n)      On November 13, 2007, defendant Zwarenstein sold 18,000 shares of VeriFone stock at artificially inflated prices.  On  November 16, 2007, plaintiff National Elevator purchased 14,000 shares of VeriFone stock at artificially inflated prices.

288.     Plaintiff National Elevator and members of the class traded contemporaneously with defendants Atkinson and Bondy and suffered damages thereby:

       (a)      On October 2, 2006, defendant Atkinson sold 5,000 shares of VeriFone at artificially inflated prices.  On October 4, 5 and 6, 2006, plaintiff National Elevator purchased 3,240 shares, 1,360 shares and 2,025 shares, respectively, of VeriFone stock at artificially inflated prices.

       (b)      On December 1, 2006, defendant Atkinson sold 5,000 shares of VeriFone stock at artificially inflated prices.  On December 1, 2006, plaintiff National Elevator purchased 2,200 shares of VeriFone stock at artificially inflated prices.

       (c)      On March 1, 2007, defendant Atkinson sold 8,000 shares of VeriFone stock at artificially inflated prices.  On March 5, 2007, plaintiff National Elevator purchased 6,300 shares of VeriFone stock at artificially inflated prices.

1          (d)      On April 10, 2007, defendant Atkinson sold 10,000 shares of VeriFone stock

2   at artificially inflated prices.  On April 10, 2007 plaintiff National Elevator purchased 5,070 shares

3   of VeriFone stock at artificially inflated prices.

4          (e)      On June 11, 2007, defendant Atkinson sold 9,800 shares of VeriFone stock at

5   artificially inflated prices.  On June 11, 2007, plaintiff National Elevator purchased 4,325 shares of

6   VeriFone stock at artificially inflated prices.

7          (f)      On July 2, 2007, defendant Atkinson sold 8,000 shares of VeriFone stock at

8   artificially inflated prices.  On July 3 and 5, 2007, plaintiff National Elevator purchased 3,025 shares

9   and 4,525 shares of VeriFone stock, respectively, at artificially inflated prices.

10          (g)      On September 26, 2007, defendant Atkinson sold 35,000 shares of VeriFone

11   stock at artificially inflated prices.  On September 26 and 28, 2007, plaintiff National Elevator

12   purchased 20,000 shares and 21,000 shares, respectively, of VeriFone stock at artificially inflated

13   prices.

14          (h)      On June 25, 2007, defendant Bondy sold 3.5 million shares of VeriFone stock

15   at artificially inflated prices.  On July 3 and 5, 2007, plaintiff National Elevator purchased 3,025

16   shares and 4,525 shares of VeriFone stock, respectively, at artificially inflated prices.

17          289.    Plaintiff and all the other members of the Class who purchased VeriFone securities

18   contemporaneously with the sales of VeriFone securities by defendants:

19          (a)      have suffered substantial damages in that they paid artificially inflated prices

20   for VeriFone securities as a result of violations of §10(b) of the 1934 Act and Rule 10b-5 herein, and

21   the inflation was removed from the stock price; and

22          (b)      would not have purchased VeriFone securities at the prices they paid, or at all,

23   if they had been aware that the market prices had been artificially inflated and/or distorted by

24   defendants' false and misleading statements and misconduct.

25          290.    As a result of the wrongful conduct alleged herein, plaintiff and other members of the

26   Class have suffered damages.

27

28

291.   By reason of the foregoing, defendants violated §20A of the 1934 Act and are liable to plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchase of VeriFone securities during the Class Period.

**FOURTH CLAIM FOR RELIEF**

For Violation of Section 20(a) of the 1934 Act
(Against All Defendants)

292.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

293.   By reason of their senior executive positions at VeriFone, their shareholdings and their responsibility for the Company's financial results and overall financial condition, defendants Bergeron, Zwarenstein, Periolat, Atkinson and Bondy had the power and authority to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the VeriFone's false financial statements and the acts committed by its officers and employees.

294.   The Company had the power to control and influence, and did control and influence, defendants.  Bergeron and Zwarenstein had the power and ability to control and influence VeriFone and Periolat, and they exercised that control by directing, encouraging and monitoring Periolat's financial manipulations during the Class Period.  Bergeron's and Zwarenstein's power, influence and control are also demonstrated by the facts set forth *supra*, including their instruction to Periolat to "fix the problem" when VeriFone's gross margins were far lower than projected, their knowledge of his accounting adjustments, and their role in supervising, directing and controlling the Company and Periolat's fraudulent conduct.  Bergeron and Zwarenstein also controlled and directed VeriFone's financial and accounting systems and its dissemination of financial results, press releases, SEC filings and statements made during conference calls.  Periolat had the power and authority to influence and control the Company through his financial manipulations and his position as a supply-chain "controller," and he exercised that power and control by manipulating VeriFone's financial results.

295.   As set forth in ¶¶44, 208-211, 227-228, *supra*, Atkinson had the power and influence to control VeriFone by virtue of his executive position and his seminal role in the Lipman merger,

1    and he exercised that power, as shown by his statements regarding the merger and the extra stock

2    awards he received from the Company as a result of his role.

3          296.    Bondy was involved in controlling and exerting influence over VeriFone since its

4    spin-off from Hewlett Packard in 2002.  As set forth in ¶¶45-46, 212-215, *supra*, Bondy and his

5    partners in the private-equity and venture capital fund, GTCR, were among the principal architects in

6    spinning off VeriFone from HP and taking the Company public in 2005.  As the largest combined

7    shareholder and member of the Board of Directors along with two of his other GTCR partners,

8    Bondy had the ability and power to control and direct the Company, and he utilized that power

9    during the Class Period as shown by his role on the "Corporate Governance and Nominating

10   Committee" at the Company.  By reason of such control, defendants are liable pursuant to §20(a) of

11   the 1934 Act.

12   **XII.    PRAYER FOR RELIEF**

13          WHEREFORE, plaintiff prays for judgment as follows:

14          A.      Declaring this action to be a proper class action pursuant to Rule 23;

15          B.      Awarding plaintiff and the members of the Class damages, interest and costs; and

16          C.      Awarding such other relief as the Court may deem just and proper.

17   **XIII.   JURY DEMAND**

18          Plaintiff demands a trial by jury.

19   DATED:  January 19, 2010                COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
20                                           ELI R. GREENSTEIN

21

22                                                    /s/
                                            ELI R. GREENSTEIN
23
                                            100 Pine Street, Suite 2600
24                                          San Francisco, CA  94111
                                            Telephone:  415/288-4545
25                                          415/288-4534 (fax)

26

27

28

SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 98 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

1

<center>CERTIFICATE OF SERVICE</center>

2    I hereby certify that on January 19, 2010, I electronically filed the foregoing with the Clerk

3 of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7    I further certify that I caused this document to be forwarded to the following Designated

8 Internet Site at:  http://securities.stanford.edu.

9    I certify under penalty of perjury under the laws of the United States of America that the

10 foregoing is true and correct.  Executed on January 19, 2010.

11

12
<div style="text-align:center">s/ Eli R. Greenstein<br>ELI R. GREENSTEIN</div>

13
<div style="text-align:center">COUGHLIN STOIA GELLER<br>RUDMAN & ROBBINS LLP</div>

14 100 Pine Street, 26th Floor

15 San Francisco, CA  94111
Telephone:  415/288-4545

16 415/288-4534 (fax)

17 E-mail: elig@csgrr.com

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case 3:07-cv-06140-MHP**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com,brett@johnsonbottini.com,derekw@johnsonbottini.com,paralegal@johnsonbottini.com

- **Brendan P. Cullen**
  cullenb@sullcrom.com,carrejoa@sullcrom.com,singhl@sullcrom.com,halls@sullcrom.com

- **Timothy Alan DeLange**
  kristinas@blbglaw.com,timothyd@blbglaw.com

- **Jordan Eth**
  jeth@mofo.com,nurbina@mofo.com

- **Daniel C. Girard**
  dcg@girardgibbs.com,sfs@girardgibbs.com

- **Eli Greenstein**
  e_file_sf@csgrr.com,Elig@csgrr.com,e_file_sd@csgrr.com

- **Stanley M. Grossman**
  smgrossman@pomlaw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Brian Lawrence Levine**
  BLevine@mofo.com,vvandergrift@mofo.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Mark Cotton Molumphy**
  mmolumphy@cpmlegal.com,jthigpen@cpmlegal.com,oszeto@cpmlegal.com,bgoldman@cpmlegal.com,jacosta@cpmlegal.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Juden Justice Reed**
  plee@schubert-reed.com,akeng@schubert-reed.com,rschubert@schubert-reed.com

- **Dana Anthony Rodriguez**
  drodriguez@mofo.com,cpeplinski@mofo.com

- **Eran Rubinstein**
  erubinstein@chitwoodlaw.com

- **Robert C. Schubert**
  rschubert@schubertlawfirm.com

- **Aaron M. Sheanin**
  ams@girardgibbs.com,ras@girardgibbs.com,amv@girardgibbs.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com,ssawyer@scott-scott.com

- **Michael Howard Steinberg**
  steinbergm@sullcrom.com

- **Steven Noel Williams**
  swilliams@cpmlegal.com,jverducci@cpmlegal.com,cwalker@cpmlegal.com,rjit@cpmlegal.com,aliang@cpmlegal.com,mcompesi@cpmlegal.com,pmenzel@cpmlegal.com,medling

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)