Robert A. Sacks (SBN 150146)
(sacksr@sullcrom.com)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067
Telephone:      (310) 712-6600
Facsimile:      (310) 712-8800

Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Scott C. Hall (SBN 232492)
(halls@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
Achyut J. Phadke (SBN 261567)
(phadkea@sullcrom.com)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:      (650) 461-5600
Facsimile:      (650) 461-5700

Attorneys for Defendants VERIFONE HOLDINGS, INC.,
DOUGLAS G. BERGERON, WILLIAM G. ATKINSON
and CRAIG A. BONDY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE VERIFONE HOLDINGS, INC. SECURITIES LITIGATION<br><br><br>This Document Relates To: All Actions | Master File No.<br><br>C 07-6140 MHP<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>Judge: The Hon. Marilyn H. Patel<br>Courtroom 15<br>Hearing Date:   May 17, 2010<br>Hearing Time:  2:00 p.m. |

SULLIVAN
&
CROMWELL LLP

## NOTICE OF MOTION AND MOTION

TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 17, 2010 at 2:00 p.m., or as soon thereafter as counsel may be heard in Courtroom 15 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants VeriFone Holdings Inc., Douglas Bergeron, William Atkinson and Craig Bondy will and hereby do move this Court to dismiss the Second Amended Consolidated Complaint and related documents on the ground that it fails to state a claim upon which relief can be granted.  This Motion is made pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a) *et seq.*, and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the motions and Memoranda of Points and Authorities respectively filed by defendants Barry Zwarenstein and Paul Periolat, all pleadings and papers filed herein, oral argument of counsel, and any matter which may be submitted at the hearing.

Date: March 5, 2010

  /s/ Brendan P. Cullen
Brendan P. Cullen (SBN 194057)
Scott C. Hall (SBN 232492)
Sverker K. Hogberg (SBN 244640)
Achyut J. Phadke (SBN 261567)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:      (650) 461-5600
Facsimile:      (650) 461-5700

Robert A. Sacks (SBN 150146)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067
Telephone:      (310) 712-6600
Facsimile:      (310) 712-8800

Attorneys for Defendants VERIFONE
HOLDINGS, INC., DOUGLAS G.
BERGERON, WILLIAM G. ATKINSON
and CRAIG A. BONDY

SULLIVAN
&
CROMWELL LLP

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS AND ALLEGATIONS.........................................................................2

Background..........................................................................................................................2

Dismissal of Plaintiff's Consolidated Complaint ..............................................................2

Allegations of the Second Amended Complaint.................................................................4

ARGUMENT .......................................................................................................................5

I.      Plaintiff Again Fails to Plead Scienter Adequately ...................................................5

      A.      The PSLRA Establishes Exacting Standards for Pleading Scienter ...................5

      B.      The New Allegations of the SAC Do Not Raise a Strong Inference of Scienter...........6

            1.      The SEC Complaint Does Not Raise a Strong Inference of Scienter ...................6

                  a.      The SEC Complaint Provides a Cogent Explanation of Accounting Mistakes that Undermines an Inference of Scienter ...............................8

                  b.      The SEC Complaint Does Not Support an Inference of Scienter...........10

            2.      The Three New Confidential Witnesses Do Not Raise a Strong Inference of Scienter ....................................................................................12

                  a.      CW11 and CW12 .................................................................................12

                  b.      CW13 ...................................................................................................14

             3.      Even if Periolat's Scienter Were Adequately Pleaded, This Is Not Attributable to Any Other Defendant. .......................................................15

      C.      Plaintiff Has Failed to Cure the Deficiencies of the Consolidated Complaint ...............16

            1.      Defendants' Stock Trades Still Do Not Raise a Strong Inference of Scienter ....................................................................................................16

                  a.      The Amount of Defendants' Stock Trades Was Not Unusual................17

                  b.      The Timing of Sales and Trading History Were Not Unusual ...............19

             2.      VeriFone's Restatement Still Does Not Raise a Strong Inference of Scienter ....................................................................................................20

            3.      Plaintiff's Other Recycled Allegations Still Do Not Raise a Strong Inference of Scienter ................................................................................22

      D.      The Totality of Plaintiff's Allegations Do Not Raise a Strong Inference of Scienter ..............................................................................................................23

II.     Plaintiff Fails to State a Claim Under Section 10(b) and SEC Rule 10b-5 or Under Section 20A for Insider Trading Against Defendants.........................................23

III.    Plaintiff Fails to State a Claim Under Section 20(a) for Control Person Liability Against Any Defendant ......................................................................................24

IV.     The Second Amended Complaint Should Be Dismissed With Prejudice.....................25

SULLIVAN
&
CROMWELL LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Berson* v. *Applied Signal Tech., Inc.*
    527 F.3d 982 (9th Cir. 2008) ............................................................................................21

*Brodsky* v. *Yahoo! Inc.*
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...........................................................................18

*Cozarelli* v. *Inspire Pharmaceuticals Inc.*
    549 F.3d 618 (4th Cir. 2008) ..............................................................................................6

*Dent* v. *U.S. Tennis Ass'n*
    No. CV-08-1533, 2008 WL 2483288 (E.D.N.Y. June 17, 2008) .......................................7

*Dura Pharmaceuticals, Inc.* v. *Broudo*
    544 U.S. 336 (2005) ............................................................................................................5

*Glazer Capital Management* v. *Magistri*
    549 F.3d 736 (9th Cir. 2008) .........................................................................................6, 16

*Higginbotham* v. *Baxter Int'l, Inc.*
    495 F.3d 753 (7th Cir. 2007) ............................................................................................12

*In re Apple Computer, Inc., Sec. Litig.*
    243 F. Supp. 2d 1012 (N.D. Cal. 2002) ...........................................................................15

*In re ASTResearch Sec. Litig.*
    887 F. Supp. 231 (C.D. Cal. 1995) ...................................................................................24

*In re Cadence Design Sys., Inc., Sec. Litig.*
    654 F. Supp. 2d 1037 (N.D. Cal. 2009) ...........................................................................21

*In re Countrywide Fin. Corp. Sec. Litig.*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...........................................................................24

*In re Hansen Natural Corp. Sec. Litig.*
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...........................................................................25

*In re Int'l Rectifier Corp. Sec. Litig.*
    No. CV 07-2544-JFW, 2008 WL 4555794 (C.D. Cal. May 23, 2008) .............................15

*In re McKesson HBOC, Inc. Sec. Litig.*
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...........................................................................24

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*
218 F.R.D. 76 (S.D.N.Y. 2003) ............................................................................7

*In re Silicon Graphics Inc. Sec. Litig.*
183 F.3d 970 (9th Cir. 1999) ...............................................................................6

*In re Vantive Corp. Sec. Litig.*
283 F.3d 1079 (9th Cir. 2002) ...................................................................... *passim*

*In re Worlds of Wonder Sec. Litig.*
35 F.3d 1407 (9th Cir. 1994) ..............................................................................17

*Ind. Elec. Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*
537 F.3d 527 (5th Cir. 2008) .............................................................................12

*Lipsky* v. *Commonwealth United Corp.*
551 F.2d 887 (2d Cir. 1976).................................................................................7

*Lipton* v. *Pathogenesis Corp.*
284 F.3d 1027 (9th Cir. 2002) ...........................................................................23

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*
540 F.3d 1049 (9th Cir. 2008) ...........................................................5, 16, 18, 19

*Neubronner* v. *Milken*
6 F.3d 666 (9th Cir. 1993) .................................................................................24

*Nordstrom* v. *Chubb*
54 F.3d 1424 (9th Cir. 1995) .............................................................................16

*RSM Prod. Corp.* v. *Fridman*
643 F. Supp. 2d 382 (S.D.N.Y. 2009)...................................................................7

*Sanders* v. *Brown*
504 F.3d 903 (9th Cir. 2007) ...............................................................................5

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*
551 U.S. 308 (2007)...................................................................................2, 6, 12

*Zucco Partners, LLC* v. *Digimarc Corp.*
552 F.3d 981 (9th Cir. 2009) ....................................................................... *passim*

**FEDERAL STATUTES**

Fed. R. Civ. P. 9(b) ...................................................................................................5

Fed. R. Civ. P. 12(b)(6)...........................................................................................5

Fed. R. Civ. P. 12(f) .................................................................................................7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SULLIVAN
&
CROMWELL LLP

15 U.S.C. § 78b...................................................................................................................6

15 U.S.C. § 78j(b) [Section 10(b)]............................................................................ *passim*

15 U.S.C. § 78t-1(a) [Section 20A] ...........................................................................2, 4, 23, 24

15 U.S.C. § 78t(a) [Section 20(a)] ............................................................................2, 4, 24

15 U.S.C. § 78u-4(a) *et seq.* [PSLRA].................................................................... *passim*

17 C.F.R. § 240.10b5-1 [SEC Rule 10b-5]...............................................................5, 23, 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SULLIVAN
&
CROMWELL LLP

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants VeriFone Holdings, Inc. ("VeriFone" or the "Company"), Douglas Bergeron, William Atkinson, and Craig Bondy (collectively, "Defendants") submit this Memorandum in support of their motion to dismiss the Second Amended Consolidated Complaint ("Second Amended Complaint" or "SAC"), filed by Lead Plaintiff National Elevator Industry Pension Fund ("Plaintiff"). Defendants hereby incorporate by reference the arguments and authorities contained in the Memoranda of Points and Authorities respectively submitted on behalf of defendants Barry Zwarenstein and Paul Periolat.

## PRELIMINARY STATEMENT

Ignoring this Court's order that the amended complaint be "more in the form of a 'short and plain statement,'" (Memorandum & Order of May 26, 2009, Docket Entry ("D.E.") 191 ("Order"), at 16), Plaintiff returns with a 98-page behemoth.[1] But like the equally prolix Consolidated Complaint ("CC") that this Court dismissed, the SAC fails to plead scienter on the part of any Defendant. The bulk of the SAC consists of the same allegations that this Court found wanting in the prior complaint. Even where this Court provided Plaintiff a road map to improve its allegations – with respect to Defendants' stock sales – Plaintiff's allegations are still as inadequate and for the same reasons as last time.

Plaintiff's new allegations not only fail to give rise to the required strong inference of scienter, they actually tend to suggest the opposite – that the mistakes disclosed in the restatement were just that: mistakes. Plaintiff makes extensive use – or misuse – of the Securities and Exchange Commission's civil complaint in *Sec. & Exch. Comm'n* v. *VeriFone Holdings, Inc.* (the "SEC Complaint"). The extent to which the SEC Complaint undermines Plaintiff's case is evidenced by the lengths to which Plaintiff goes to characterize the SEC Complaint as something it manifestly is not. The allegations of the SEC Complaint are, of course, just allegations and for that reason alone are of limited usefulness to Plaintiff. But, worse for Plaintiff, they are allegations not of fraud or of intentional wrongdoing. The SEC did not charge VeriFone or any officer or director with any intentional wrongdoing. Its complaint describes a series of mistakes – and it describes them the way one would describe mistakes. Notwithstanding Plaintiff's misleading quotations from it, the SEC Complaint, filed

---

[1] The 98-page SAC itself amends the 96-page First Amended Complaint (D.E. 205) by adding Paul Periolat as a defendant.

1    after the SEC conducted an investigation into the causes of VeriFone's restatement, supports just the

2    opposite of a strong inference of scienter on the part of any Defendant.

3            Plaintiff's remaining new allegations are from three more confidential witnesses ("CWs")

4    (the same ten CWs from the prior complaint reprise their roles, rehearsing the same scienter-free

5    assertions, in the SAC). The new CWs fare no better, failing to allege that they or anyone else engaged

6    in fraud or intentional misconduct of any kind. These new CWs do not even purport ever to have

7    communicated with Defendants Bergeron or Zwarenstein, and nothing in the CWs' allegations remotely

8    provides competent evidence of any mental state on the part of Bergeron or Zwarenstein.

9            Taken individually or together, the allegations of the SAC are just as insufficient to raise

10   the required "cogent" and "compelling" inference of scienter as those in Plaintiff's last complaint. *See*

11   *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

12           Plaintiff's insider trading claims under Sections 10(b) and 20A warrant dismissal again

13   because Plaintiff fails to plead scienter adequately, and because Plaintiff does not allege adequately that

14   Defendants possessed material non-public information or engaged in contemporaneous trading.

15   Plaintiff's claims under Section 20(a) for "control person" liability also fail once more, as Plaintiff has

16   not pleaded a requisite primary violation or adequately alleged "control" on the part of any Defendant.

17           The SAC should be dismissed with prejudice.

18                              **STATEMENT OF FACTS AND ALLEGATIONS**

19   *BACKGROUND*

20           VeriFone designs, manufactures and markets secured electronic payment solutions for

21   use by consumers and merchants. (Order at 1-2.) In November 2006, VeriFone acquired Israel-based

22   Lipman Electronic Engineering Ltd. ("Lipman") and began work to integrate the two companies. (*Id.* at

23   2.) On December 3, 2007, VeriFone announced that it would restate its financial statements for the first

24   three quarters of fiscal year 2007 due to accounting errors that caused VeriFone to overstate inventory

25   and, thus, its gross margins and earnings. (*Id.*) Lawsuits were filed against Defendants the next day.

26   (*Id.*) Ultimately, nine putative class actions were consolidated with Plaintiff as lead plaintiff. (*Id.* at 6.)

27   *DISMISSAL OF PLAINTIFF'S CONSOLIDATED COMPLAINT*

28           On May 26, 2009, this Court granted VeriFone's motion to dismiss Plaintiff's

SULLIVAN
&
CROMWELL LLP

                                                      2

1   Consolidated Complaint, holding that Plaintiff failed to allege scienter as required by the Private

2   Securities Litigation Reform Act of 1995 ("PSLRA").  (*Id.* at 15-17.)

3                    This Court determined that Plaintiff's allegations concerning Defendants' stock trades did

4   not provide the basis for an inference of scienter because Plaintiff failed to base its allegations on a

5   history of trades over a period of years with specific trade dates for each Defendant.  (*Id.* at 9-10.)  Even

6   the data that Plaintiff belatedly provided in its opposition brief were described as "inadequate to meet

7   the requirement of providing a 'meaningful trading history for purposes of comparison.'"  (*Id.* at 10

8   (quoting *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009)).

9                    Likewise, Plaintiff "pled nothing" to suggest that VeriFone's restatement, itself,

10  evidenced scienter.  (Order at 12.)  The inventory accounting errors that led to the restatement "d[id] not

11  have such prominence that it would be 'absurd' to suggest management had no knowledge of the

12  matter," nor were the errors "obvious from the operations of the company" such that they "appear to be

13  something about which [D]efendants 'must have known.'"  (*Id.* at 11-12.)  The Court thus held that

14  "[g]enerally, the restatement of financials is not itself a ground to infer scienter."  (*Id.* at 12.)

15                   The other facts that Plaintiff alleged also fell short of showing scienter.  Defendants'

16  signatures on Sarbanes-Oxley certifications and their positions at the company "add[ed] nothing

17  substantial to the scienter inquiry."  (*Id.* at 13.)  The Court found that Plaintiff's allegations based on

18  CWs, who described the disorganization of VeriFone's accounting department after its merger with

19  Lipman, merely indicated that VeriFone was "overwhelmed or underprepared to confront the challenges

20  before it," and "d[id] not raise an inference of scienter."  (*Id.* at 13.)  Plaintiff alleged "no facts . . . to

21  support [its] interpretation" that personnel changes involving Defendants were evidence of scienter.  (*Id.*

22  at 14.)  Defendants' forward-looking statements from 2006 gave no support to Plaintiff's allegations of

23  scienter.  (*Id.*)  Plaintiff's reliance on revised projections made in 2008 to accompany the corrective

24  restatement "ma[de] even less sense."  (*Id.* at 14-15.)  And, finally, Plaintiff's attempt to allege that

25  Defendants' compensation was evidence of scienter failed because there was "no strong correlation"

26  between financial results and compensation.  (*Id.* at 15.)

27                   The Court further held that Plaintiff's allegations of scienter "fare no better when read in

28  combination than when read independently."  (*Id.*)  Accordingly, the Court dismissed Plaintiff's claim

1    under Section 10(b) of the Exchange Act.  (*Id.*)  As Plaintiff failed to state a Section 10(b) claim, the

2    Court also dismissed Plaintiff's insider trading and control person claims under Section 20A and Section

3    20(a).  (*Id.*)  The Court granted Plaintiff leave to amend, observing that this was the first consolidated

4    complaint and that "detailed and comprehensive comparisons of trades stretching over the course of a

5    number of years . . . and containing specific dates for all sales may be more persuasive" if "activity

6    during the class period was 'dramatically out of line with prior trading practices.'" (*Id.* at 16.)

7    ***ALLEGATIONS OF THE SECOND AMENDED COMPLAINT***

8              The SAC sets forth many of the same factual allegations in support of scienter as did the

9    Consolidated Complaint (D.E. 161).  Once again, Plaintiff relies on Defendants' stock trades and on the

10   fact of the restatement, itself, to support allegations of scienter, even though this Court rejected those

11   very same attempts the first time.  (*Compare* SAC ¶¶ 114, 116-25 *with* CC ¶¶ 77-78, 81-89; *and*

12   *compare* SAC ¶¶ 199-215 *with* CC ¶¶ 136-44; *see also* Order at 9-10.)  Yet again, the allegations of ten

13   CWs regarding disorganization in VeriFone's accounting department after the Lipman merger are said

14   to evidence scienter.  (*Compare* SAC ¶¶ 157-70, 172-83 *with* CC ¶¶ 91-104, 106-17.)  And once more,

15   Plaintiff holds out as evidence of scienter Defendants' roles in the company and sworn public

16   certifications (*compare* SAC ¶¶ 153, 155, 189 *with* CC ¶¶ 99, 126, 153, 181-84), specific personnel

17   changes at VeriFone (*compare* SAC ¶¶ 185 *with* CC ¶¶ 119-20), forward-looking statements from 2006

18   (*compare* SAC ¶¶ 191-196 *with* CC ¶¶ 157-61), Defendants' incentive compensation (*compare*

19   SAC ¶¶ 216-28 *with* CC ¶¶ 145-56), and details regarding Lipman's international sales and gross

20   margins (*compare* SAC ¶¶ 146-52 *with* Pl.'s Opposition to Defs' Motions To Dismiss, D.E. 174 ("Pl.'s

21   Opp."), at 13-14 and CC ¶¶ 54, 65-67, 73, 77, 133-34).

22             The new allegations are principally those allegations that Plaintiff purports to find in the

23   SEC Complaint against VeriFone and its former supply chain controller, Paul Periolat.  As described

24   below, the allegations that Plaintiff attributes to the SEC and those that actually appear in the SEC

25   Complaint bear little resemblance.  Plaintiff misleadingly strings together – and then repeats and repeats

26   – snippets from the SEC Complaint to insinuate that Defendants intentionally falsified VeriFone's

27   financial statements.  (*See* SAC ¶¶ 99-113.)  As described below (*infra* § I.B.1.), however, the SEC

28   made no factual allegation suggesting any knowledge or deliberate recklessness by Defendants Bergeron

1   or Zwarenstein with respect to Periolat's errors (or, for that matter, knowledge by Periolat that his

2   inventory calculations were in error).  (*See* SEC Compl. ¶¶ 11-32.)

3              Plaintiff's other new allegations relate to purported problems with inventory records and

4   valuation and come from three new CWs.  (SAC ¶¶ 128-37.)  Plaintiff alleges, based on the claims of

5   CW11 and CW12, that the inventory recordkeeping system at VeriFone's Lincoln, California facility

6   was extremely disorganized after the VeriFone-Lipman merger, and that this disorganization is evidence

7   of scienter.  (*Id.* ¶¶ 59-60, 128-36; *see also id.* ¶¶ 157-70; CC ¶¶ 90-104.)  Plaintiff also suggests that

8   Defendants' public statements as to inventory values and controls were fraudulent in light of these

9   inventory issues.  (SAC ¶¶ 140-45.)  Finally, Plaintiff points to the testimony of a third new CW, CW13,

10  who claims to have submitted an analysis to VeriFone's supply chain finance group that suggested that

11  inventory and overhead valuations were inflated and had this analysis rejected.  (*Id.* ¶¶ 61, 137.)

12                                    **ARGUMENT**

13             "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) 'tests the legal

14  sufficiency of a claim.'"  (Order at 7 (citation omitted).)  Well-pleaded factual allegations are taken as

15  true and construed in the light most favorable to the plaintiff.  *Zucco Partners, LLC* v. *Digimarc Corp.*,

16  552 F.3d 981, 989 (9th Cir. 2009).  "Conclusory allegations and unreasonable inferences, however, are

17  insufficient to defeat a motion to dismiss."  *Sanders* v. *Brown*, 504 F.3d 903, 910 (9th Cir. 2007).

18  "[R]eview is generally limited to the face of the complaint, materials incorporated into the complaint by

19  reference, and matters of which [the court] may take judicial notice."  *Digimarc*, 552 F.3d at 989.

20  **I.    PLAINTIFF AGAIN FAILS TO PLEAD SCIENTER ADEQUATELY**

21             The elements of a claim under Section 10(b) and Rule 10b-5 are:  (1) a material

22  representation or omission; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the

23  purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura*

24  *Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005).

25        **A.    The PSLRA Establishes Exacting Standards for Pleading Scienter**

26             "[P]laintiffs in private securities fraud class actions face formidable pleading

27  requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)."  *Metzler Inv.*

28  *GMBH* v. *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008).  Under Fed. R. Civ. P.

SULLIVAN
&
CROMWELL LLP

5

1    9(b), plaintiffs must plead fraud with particularity, a "requirement [that] has long been applied to

2    securities fraud complaints."  *Digimarc*, 552 F.3d at 990.  The PSLRA imposes the additional

3    requirement that a complaint "plead with particularity both falsity and scienter" and that sufficient facts

4    be pleaded to establish a "strong inference" of scienter.  *Id.* at 990-91 (internal citations omitted).

5            Under the "strong inference" standard, a "complaint will survive . . . only if a reasonable

6    person would deem the inference of scienter cogent and at least as compelling as any opposing inference

7    one could draw from the facts alleged."  *Tellabs,* 551 U.S. at 324.  Mere allegations of recklessness will

8    not suffice:  "'[A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity

9    to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong*

10   inference of deliberate recklessness.'"  *Digimarc*, 552 F.3d at 991 (quoting *In re Silicon Graphics Inc.*

11   *Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (emphasis in original)); (Order at 9).

12   **B.     The New Allegations of the SAC Do Not Raise a Strong Inference of Scienter**

13          **1.     The SEC Complaint Does Not Raise a Strong Inference of Scienter**

14          It is difficult to imagine a turn of events less helpful to a securities fraud plaintiff than to

15   have the SEC – the government agency created to "insure the maintenance of fair and honest markets"

16   in securities, 15 U.S.C. § 78b – complete an investigation into the conduct underlying that plaintiff's

17   case and conclude that mistakes were made but that no one committed fraud.  This is the situation

18   Plaintiff was presented with in September 2009 when the SEC completed its investigation and filed a

19   complaint against VeriFone and Paul Periolat that asserted no fraud claims and no claims at all against

20   any officer or director of VeriFone.  Plaintiff's attempt to make lemonade out of this lemon has chutzpah

21   and a certain amount of ingenuity going for it, but not much else.

22          In the first place, the fact that the SEC has filed an action against a company is not

23   evidence of scienter – *even if that action asserts intentional wrongdoing by the company.  See Glazer*

24   *Capital Management* v. *Magistri*, 549 F.3d 736, 748-49 (9th Cir. 2008) (holding that allegations based

25   on DOJ and SEC settlement agreement did not plead scienter under PSLRA).[2]  The allegations of the

26

27          [2] Nor does the fact that there was an SEC investigation support an inference of scienter.  *See*,
     *e.g.*, *Cozarelli* v. *Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008) (noting that
28   allegation of SEC investigation in private securities complaint does not "add much, if anything, to an

1   SEC Complaint are just that – allegations.  Allegations lifted from a separate complaint do not equate to

2   well-pleaded, particularized facts.  As numerous courts have held, "references to preliminary steps in

3   litigations and administrative proceedings that did not result in an adjudication on the merits or legal or

4   permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) of the Federal Rules of

5   Civil Procedure."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79

6   (S.D.N.Y. 2003) (striking private securities complaint's references and adoption of allegations of SEC

7   and NASD complaints) (*citing Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir.

8   1976)).  This includes "paragraphs in a complaint that are either based on, or rely on, complaints in other

9   actions that have been dismissed, settled, or otherwise not resolved."  *RSM Prod. Corp.* v. *Fridman*, 643

10  F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (striking references to "complaints filed in actions that were never

11  resolved on the merits" because they are immaterial as a matter of law).  In VeriFone's case, the SEC

12  Complaint was settled *without* adjudication on the merits and *without* any admission by VeriFone to the

13  allegations contained therein.  (*See* Final Judgments against VeriFone and Periolat, attached as Exs. A

14  and B, respectively, to the Declaration of Brendan P. Cullen ("Cullen Decl.").)

15          Thus, even if Plaintiff had fairly quoted the SEC's allegations (and even if those

16  allegations were *proved*), they would fail to provide factual support for an inference of scienter.[3]  *See*

17  *generally Dent* v. *U.S. Tennis Ass'n*, No. CV-08-1533, 2008 WL 2483288, at *3 (E.D.N.Y. June 17,

18  2008) ("In addition to being inadmissible as hearsay, unproved allegations of misconduct are not proof

19  of anything.").  But here, where the SEC Complaint's allegations are flatly inconsistent with the notion

20  that anyone engaged in intentional misconduct, the call is not a close one.

21

22  _____

    inference of scienter," where parties indicated that "the SEC's investigation has already settled without a

23  finding of culpability for securities fraud.").

24      [3] If allegations taken from another complaint cannot help Plaintiff meet its pleading burden, then
    statements from a press release purporting to describe a complaint obviously cannot either.  Plaintiff

25  undoubtedly understands this, which may explain its practice of quoting phrases from the SEC's press
    release that accompanied the filing of the SEC Complaint as though they were part of the SEC

26  Complaint.  So, for example, when Plaintiff alleges that "Bergeron and Zwarenstein . . . instructed
    Periolat and other financial personnel to . . . '*fix the problem*' so that defendants could '*report results in*

27  *line with forecasts*,'" Plaintiff cites on to ¶ 17 of the SEC Complaint (*see* SAC ¶ 104).  But the
    highlighted portion of that quote is nowhere to be found in the SEC Complaint – it appeared only in the

28  press release.  (*See* SEC Litigation Release of September 1, 2009, SAC, Ex. 1.)

SULLIVAN
&
CROMWELL LLP

### a.   The SEC Complaint Provides a Cogent Explanation of Accounting Mistakes that Undermines an Inference of Scienter

The allegations of the SEC Complaint describe the SEC's view of the circumstances that gave rise to VeriFone's December 3, 2007 restatement announcement.  Not only are the circumstances described by the SEC devoid of indicia of fraud, they are described in a way that squarely conflicts with a fraud claim.[4]  Because Plaintiff so fundamentally misdescribes the SEC Complaint, the actual allegations of that complaint bear a careful reading.

The SEC alleges that, in early February 2007, internal preliminary results at VeriFone for the first quarter of FY 2007 showed a gross margin approximately 4% lower than VeriFone (and Paul Periolat in particular) had forecasted.  (SEC Compl. ¶ 14.)  Periolat and others, the SEC alleges, "were charged with determining why there was such a large discrepancy" between the preliminary results and the forecasts.  (Id. ¶ 15.)  "In the past, Periolat's forecasts had been accurate and relied on by VeriFone senior management, so there was considerable concern" over the discrepancy.  (Id.)  Because gross margin increases with a reduction in cost of goods sold ("COGS"), "Periolat and others focused on COGS and inventory accounting to determine the reasons for the variance."  (Id. ¶ 16.)  VeriFone's CEO and then-CFO (by which the SEC presumably means to refer to Bergeron and Zwarenstein), are alleged to have "express[ed] increasing frustration" and "sent emails characterizing the low gross margin as an 'unmitigated disaster' and instructed management to 'figure it [and related low results] out.'"  (Id. ¶ 17 (alteration in original).)  "In addition, Periolat and others were provided with analyses which laid out the relation between specific reductions in COGS and the corresponding increase in gross margin."  (Id.)

The SEC alleges that Periolat then erroneously determined that the problem was caused by incorrect accounting for inventory at certain of the former Lipman entities.  (Id. ¶ 18.)  He made a manual accounting adjustment of $7 million, as a result of which VeriFone's gross margin increased.  (Id.)  The SEC alleges that Periolat "failed to take adequate steps to verify that [the adjustment] was appropriate."  (Id. ¶ 19.)  In particular, he is alleged to have failed to confirm the adjustments with

---

[4] Lest Defendants again be accused of using the SEC Complaint as a "sword" (such that the "shield" of the PSLRA discovery stay should be lifted (D.E. 200; D.E. 222)), it bears emphasizing that Defendants are simply responding to those allegations that Plaintiff purportedly bases on the SEC Complaint and demonstrating that that complaint does not assist Plaintiff in pleading the required "strong inference" of scienter in this case.

SULLIVAN & CROMWELL LLP

1   Lipman's controller.  (*Id.*)  Had he done so, the SEC contends that he would have learned that Lipman's

2   inventory report was correct and his manual adjustment was in error.  (*Id.*)  The SEC further alleges that

3   Periolat was also aware that Lipman had proper procedures in place for accounting inventory, and that,

4   one month after the close of the quarter, Periolat learned that Lipman had correctly accounted for

5   inventory through fiscal year 2006, putting him on notice that his adjustments may have been incorrect.

6   (*Id. ¶ 20.*)  Periolat did not verify or correct his prior adjustment, the SEC alleges.  (*Id.*)

7           The SEC contends that neither Periolat's supervisor nor any other senior manager

8   reviewed his work, and VeriFone did not have procedures in place to prevent the person responsible for

9   internal forecasting from later making adjustments to allow VeriFone to meet those forecasts.  (*Id. ¶ 21.*)

10  As a result, VeriFone overstated its net income by $12.4 million.  (*Id. ¶ 22.*)

11          According to the SEC, at the end of the second and third quarters of FY 2007, VeriFone's

12  internal preliminary results again reflected lower gross margins than VeriFone's forecasts and public

13  guidance.  (*Id. ¶ 23.*)  At the end of both quarters, Periolat is alleged to have determined that the reason

14  for the lower-than-expected gross margins was a failure to account for in-transit inventory (reflecting

15  inventory shipped overseas from a VeriFone subsidiary but not yet received in the United States).  (*Id.*

16  *¶¶ 24-25.*)  For both quarters, the SEC alleges, Periolat incorrectly determined, based on shipping and

17  receiving reports, that there was a gap between inventory shipped and inventory received.  (*Id.*)  Periolat

18  purportedly received positive feedback from a subordinate and then entered his adjustments into

19  VeriFone's financial reporting system.  (*Id.*)  The SEC concludes that "[t]here was no reasonable basis

20  for the manual entries," which relied on an allegedly unfounded assumption that goods were in transit

21  between overseas headquarters and the United States when no goods were actually shipped.  (*Id. ¶ 26.*)

22          "[N]o one reviewed Periolat's work during the second and third quarters closing

23  process," alleges the SEC.  (*Id. ¶ 27.*)  "Senior management was aware of his adjustments but never

24  questioned them."  (*Id.*)  "Senior management" is also alleged not to have questioned the initial forecasts

25  for the second and third quarters; "instead, they simply assumed the preliminary actual results were

26  wrong when they differed from the forecasts."  (*Id.*)

27          The SEC alleges that the "accounting irregularities came to light in late November 2007

28  during the annual audit.  Periolat was unable to explain his adjustments and ultimately concluded that

1    they were wrong.  He then reported the problem to senior management."  (*Id*. ¶ 29.)

2                    **b.      The SEC Complaint Does Not Support an Inference of Scienter**

3                    Given what the SEC Complaint actually alleges, Plaintiff's attempt to use this document

4    to its advantage in pursuing a fraud case against Defendants is senseless.  There is no support in the SEC

5    Complaint for Plaintiff's allegation that Periolat knowingly created fictitious entries at Bergeron's and

6    Zwarenstein's encouragement or direction.  (*See* SAC ¶¶ 105-06 (alleging that "Periolat created

7    fictitious inventory, which reduced COGS and falsified gross margin and earnings, just as he was

8    encouraged to do"); *id*. ¶ 104 ("Bergeron and Zwarenstein . . .  instructed Periolat and other financial

9    personnel to . . . '*fix the problem*' so that defendants could '*report results in line with forecasts*'").)

10   While the SEC Complaint alleges that "Periolat and others were charged with determining why there

11   was such a large discrepancy" between preliminary results and the forecast, it does not allege that it was

12   Bergeron or Zwarenstein who "charged" Periolat with this task or that they directed or encouraged any

13   fraudulent accounting.  (SEC Compl. ¶ 15.)  There is no allegation in the SEC Complaint that Bergeron

14   or Zwarenstein communicated with Periolat at all.[5]  Rather, the SEC Complaint alleges that Bergeron

15   and Zwarenstein "instructed *management*" – not Periolat – "to 'figure it [and related low results] out.'"

16   (*Id*. ¶ 17 (emphasis added; bracketed material in original).)  Periolat was allegedly "provided with

17   analyses which laid out the relation between specific reductions in COGS and the corresponding

18   increase in gross margin," but the SEC Complaint does not allege that Bergeron or Zwarenstein

19   provided Periolat with these analyses, saw these analyses, or had any idea that Periolat had them, let

20   alone encouraged Periolat to make inaccurate entries based on them.  (*Id*. ¶ 17.)  The SEC Complaint

21   does not allege that Periolat, himself – let alone two senior officers that the SEC Complaint does not

22   allege he ever spoke to – knew that his entries were "fictitious" or erroneous when made.

23                    The SEC's description of Periolat's entries contradicts any such notion.  When Periolat

24   made his first incorrect adjustment, the SEC alleges that it was because he "determined that the problem

25

26          [5] On this point, the actual allegations of the SEC Complaint are also in obvious conflict with
     Plaintiff's counsel's baseless assertion to this Court in a recent hearing that the SEC Complaint showed
27   that "[Bergeron and Zwarenstein] were in the room with Periolat. He came to them and said, you know,
     'Our numbers are not what we told the market they are.'"  (Transcript of February 1, 2010 Proceedings,
28   Cullen Decl. Ex. C, at 5.)

1   with the gross margin had been caused by incorrect accounting for inventory by a foreign subsidiary,"

2   (*id*. ¶ 18), not because he was allegedly told to produce a particular number or result.  His second

3   incorrect entry was made, the SEC alleges, because "Periolat determined that the reason for the lower-

4   than-expected gross margin was a failure to properly account for in-transit inventory," (*id*. ¶ 24), not,

5   again, because he was told to ensure that VeriFone made a particular number.  The allegation that

6   Periolat "was unable to explain his adjustments and *ultimately concluded* that they were wrong," (*id*. ¶

7   29 (emphasis added)), makes no sense in the context of a fraud complaint – if the SEC had actually

8   accused Periolat of making false entries at the instance of VeriFone management, the SEC would not

9   assert that Periolat "ultimately concluded" that his adjustments were wrong months after the adjustments

10  were made.  He would have known that from the moment he made them.  Likewise, if the SEC intended

11  to allege that "senior management" knew that the entries were incorrect from the beginning, then

12  alleging that Periolat "reported the problem to senior management" in late November 2007, (*id.*), is a

13  strange word choice since "senior management" would have been aware of the "problem" all along.

14          Plaintiff also alleges that, because the SEC alleged that "[s]enior management was aware

15  of Periolat's adjustments but never questioned them," (*id*. ¶ 17), Bergeron and Zwarenstein therefore

16  possessed scienter with respect to their statements during the first and second quarter conference calls.

17  (SAC ¶¶ 108-10.)  Even if "senior management" is to be understood as a reference to Bergeron and

18  Zwarenstein (the term is nowhere defined in the SEC Complaint), the SEC Complaint does not allege –

19  or even hint – that Bergeron or Zwarenstein or anyone else was aware that Periolat's accounting

20  adjustments were incorrect.  (SEC Compl. ¶ 27.)  The SEC Complaint alleges more than once that no

21  member of senior management reviewed Periolat's entries or underlying work, (*id*. ¶¶ 21, 27), meaning

22  that no member of senior management had the opportunity to learn that Periolat's entries were incorrect.

23  Indeed, the SEC Complaint makes clear that "senior management" believed that the accounting

24  adjustments made were *correct* because they "assumed the preliminary actual results," which were

25  adjusted by Periolat's entries, "were wrong when they differed from the forecasts" – forecasts that had

26  been accurate in the past.  (*Id*. ¶¶ 15, 27.)[6]

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

    [6] Plaintiff makes much of the SEC's citation to emails that describe the gap between the forecast
28  and apparent actual results as an "unmitigated disaster."  (SAC ¶¶ 11, 104.)  Obviously, a substantial and

1      Plaintiff also fails to allege scienter in connection with Defendants' third quarter

2   conference call statements. Plaintiff's manipulation of the SEC Complaint is especially stark here. (*See*

3   SAC ¶ 112 ("Bergeron and Zwarenstein 'were aware of [Periolat's] adjustments' and knew there 'was

4   no reasonable basis for the manual entries' because the 'goods were never actually shipped'"); *see also*

5   *id.* ¶ 19.) Quoting from separate paragraphs in the SEC Complaint, and out of order, Plaintiff asserts

6   without support that Bergeron and Zwarenstein *knew* there was no reasonable basis for Periolat's entries.

7   The SEC Complaint, however, makes no such assertion. Rather, the SEC alleges that Periolat

8   "incorrectly determined" that an inventory gap justified the adjustment. (SEC Compl. ¶ 24.) "Senior

9   management" is merely alleged to have been aware of the adjustments. (*Id.* ¶ 27.) The SEC does not

10  allege that Periolat, let alone "senior management," knew that the adjustments were in error when made.

### 2. The Three New Confidential Witnesses Do Not Raise a Strong Inference of Scienter

12      In the SAC, Plaintiff adds allegations from three more confidential witnesses pertaining

13  to VeriFone's inventory control and records. (*See* SAC ¶¶ 59-61, 128-135, 137.) As the Ninth Circuit

14  noted in *Digimarc*, multiple courts of appeals have held that the Supreme Court's decision in *Tellabs*

15  requires a "stricter standard for evaluating the sufficiency of securities fraud complaints relying on

16  confidential witnesses." 552 F.3d at 995 n.2. Some courts have "discount[ed]" CW allegations because

17  "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we

18  could take account of plausible opposing inferences." *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753,

19  756-57 (7th Cir. 2007); *accord Ind. Elec. Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*, 537

20  F.3d 527, 535 (5th Cir. 2008). But even at full retail, none of CW11, CW12, or CW13 provides any

21  more basis for a strong inference of scienter than did CW1 through CW10.

### a. CW11 and CW12

23      Plaintiff relies on allegations by CW11 (an independent contractor who worked for

24  VeriFone for six months, leaving in May 2007) and CW12 (a warehouse manager who worked at

25  VeriFone for nine months, starting after the first of Periolat's alleged adjustments) regarding general

---

27  unexpected (and unexplained) discrepancy between forecasted and actual results is troubling, and an
28  executive can say so without meaning to communicate "this discrepancy must be resolved by fraud."

SULLIVAN
&
CROMWELL LLP

1    problems in physical inventory control at VeriFone's Lincoln, California facility.  (SAC ¶¶ 59-60, 129-

2    35.)  These alleged statements come nowhere near demonstrating scienter on the part of any Defendant.

3    Neither CW11 nor CW12 ever claims to have met, communicated with, or worked with any Defendant –

4    neither of them mentions any Defendant by name or title.  CW11 alleges that he or she participated in

5    conference calls with his or her supervisors (neither of whom is a Defendant and neither of whom is

6    even alleged to have reported to a Defendant) and "at least three VeriFone vice presidents from

7    corporate headquarters in San Jose."  (*Id*. ¶ 134.)  Neither CW11 nor CW12 names these vice presidents,

8    let alone alleges whether any of them communicated anything concerning the inventory issues to anyone

9    senior to them.  Accordingly, even if CW11 and CW12 themselves knew something about the problems

10   that resulted in the restatement or knew that VeriFone's financial statements were false in some respect,

11   they provide no basis to conclude that this knowledge was shared with or by any Defendant.

12           Just as importantly, however, nothing CW11 or CW12 describes has any relationship to

13   VeriFone's restatement.  The inventory problems described by CW11 and CW12 (that "inventory

14   recorded on the [Oracle] 10.7 system as being located at the Lincoln facility did not exist" (SAC ¶¶ 59-

15   60)), are not even the inventory problems that Plaintiff alleges led to the restatement.  (*See* SAC ¶¶ 13-

16   14, 16-19 (alleging that Periolat incorrectly allocated overhead to former Lipman inventory and prepared

17   false journal entries that increased "in-transit" inventory even though "goods were never actually

18   shipped between the international headquarters and the United States and as a result could not have been

19   'in transit'").)  Inventory in former Lipman facilities and allegedly fictitious "in-transit" inventory

20   would, of course, not exist – or be recorded on the Oracle system as existing – at the Lincoln warehouse.

21   So, whether inventory was well or badly controlled at the Lincoln facility, Plaintiff does not allege any

22   way in which VeriFone's financial statements were false as a consequence.[7]  Neither CW11 nor CW12

23   alleges knowing anything about VeriFone's financial statements or about any accounting entry made by

---

24   [7] Given the total lack of any relationship between the inventory control problems described by
25   CW11 and CW12, it is risible for Plaintiff to allege that the "25%-31% inventory inaccuracy from
     December 2006 to March 2007" that it attributes to CW11 is "corroborated by VeriFone's restatement
26   which revealed that VeriFone's total inventory was overstated by *23.59%* in 2Q07 and *38.75%* in
     3Q07."  (SAC ¶ 133 (emphasis in original).)  These inventory overstatements – from the quarters ending
27   two and five months after the period described by CW11 – are alleged to have related to Periolat's in-
     transit inventory accounting entries, (*id.* ¶¶ 16, 18, 109, 111), not to any inventory problem in the
28   warehouse where CW11 briefly worked.

1    Periolat or anyone else.  They do not even attempt to describe the mental state of any Defendant as to

2    these things, let alone do so plausibly.  Accordingly, even if true, the allegations attributed to CW11 and

3    CW12 cannot possibly establish scienter on the part of any Defendant.

4                                    **b.      CW13**

5                Plaintiff also relies on the allegations of CW13, purportedly a former VeriFone employee

6    who left the company in February 2008.  CW13 alleges that he or she was asked in the first quarter of

7    2007 to assess an inventory valuation variance between the supply chain operations and supply chain

8    finance groups, and that he/she determined that the supply chain finance group's inventory valuations

9    were overvalued.  (*Id.* ¶¶ 61, 137.)  CW13 claims to have provided a report to "supervisors, including

10   Periolat," that documented this supposed variance, which was allegedly met with "an e-mail from

11   Periolat or Keith Schaall rejecting CW13's report."  (*Id.*)  As with CW11 and CW12, however, CW13

12   does not allege that he provided his report to, or shared any concerns over this purported inventory issue

13   or VeriFone's financial statements with, Defendants Bergeron or Zwarenstein.

14               But even if he had communicated his inventory issue to Bergeron or Zwarenstein, that

15   would not establish scienter.  In the first place, it is not at all clear what inventory issue CW13 is

16   describing or whether it has any relationship to the restatement – all available evidence strongly suggests

17   that it does not.  CW13's analysis is described as having occurred as to a variance that existed "in

18   1Q07." (*Id.*)  That analysis purported to find that "improper in-transit accruals" had been applied to

19   inventory in the *first* quarter of 2007.  (*Id.* ¶ 61.)  But the accounting errors that Plaintiff alleges gave

20   rise to the restatement were not made until *after* the first quarter of 2007.  (*Id.* ¶ 13 (errors "***after*** 1Q07

21   already closed . . . ." (emphasis in original); *id*. ¶¶ 16-19.)  And the in-transit inventory errors were not

22   alleged to have been made until after the second and third quarters.  (*Id.* ¶¶ 16, 18, 119-20 (no mention

23   of "in-transit" inventory in alleged 1Q07 adjustments).)  CW13 claims that "VeriFone included the

24   inflated inventory in the Company's publicly reported results" and that "the restatement confirmed the

25   problems documented in his report." (*Id.* ¶ 137.)  What he does not say, however, is whether the

26   restatement had anything to do with the "inflated inventory" that CW13 purported to find.  Given that

27   the restatement was principally based on errors that had not even been made until *after* CW13's work is

28   alleged to have been completed, it is difficult to see how it could.

SULLIVAN
&
CROMWELL LLP

14

CW13 says nothing at all about Periolat's incorrect entries.  He does not claim that he believed that those entries were in error when they were made or that they made VeriFone's financial statements materially false.  He does not allege that he ever told anyone that he believed this to be the case at any relevant time.  Even if he had, given that the problem that his report purported to describe was not addressed by the restatement, this report could not have contributed to the knowledge on the part of Defendants Bergeron or Zwarenstein that the later-restated results were incorrect.  Given that VeriFone's restatement does not appear to have corroborated CW13's view as to the inventory "variance" existing in Q1 2007, the more likely explanation for the alleged rejection of his report is that his report was incorrect.  CW13's allegations provide no basis for a strong inference of scienter.[8]

### 3. Even if Periolat's Scienter Were Adequately Pleaded, This is Not Attributable to any Other Defendant.

As noted above, one other way in which the SAC is different from the CC is the addition of Paul Periolat as a defendant.  But even if Plaintiff had successfully alleged knowledge or deliberate recklessness with respect to Periolat (which as set forth above and in Mr. Periolat's separate motion, it has not), this would still not suffice to allege scienter against any other Defendant, including VeriFone, Periolat's former employer, because Periolat was not an officer.  "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter."  *In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002); *see also In re Int'l Rectifier Corp. Sec. Litig.*, No. CV 07-2544-JFW, 2008 WL 4555794, at *21) (C.D. Cal. May 23, 2008) ("For scienter to be attributed to International Rectifier, Plaintiffs must sufficiently plead that at least one of International Rectifier's officers had the requisite scienter at the time they made the allegedly misleading statements").  Periolat, a non-officer, is not alleged to have made any of the public statements that Plaintiff challenges as false or misleading.  Because Plaintiff fails to show that any Defendant who did make statements possessed scienter, neither the individual

---

[8] Plaintiff also alleges that VeriFone's SEC filings and press releases somehow support an inference of scienter in their discussion of inventory valuation and inventory figures.  (*See* SAC ¶¶ 140-45.)  As discussed, Plaintiff fails elsewhere in the SAC to allege specific facts indicating that any Defendant knew that Periolat had made erroneous inventory entries at the time that VeriFone made these filings and statements.  Plaintiff alleges no particular fact indicating any such knowledge in this section of the SAC, either.  Thus, there is no basis for inferring scienter based on these inventory-related comments in Company filings.

SULLIVAN
&
CROMWELL LLP

1     Defendants nor VeriFone can be liable for securities fraud.  *See Glazer*, 549 F.3d at 745 (holding that

2     "the PSLRA requires [plaintiff] to plead scienter with respect to those individuals who actually made the

3     false statements"); *Nordstrom* v. *Chubb*, 54 F.3d 1424, 1435-36 (9th Cir. 1995) (rejecting plaintiff's

4     "collective scienter" theory).

5        **C.**      **Plaintiff Has Failed to Cure the Deficiencies of the Consolidated Complaint**

6        Plaintiff's new allegations do not plead scienter adequately.  The allegations lifted (and,

7     in some respects, repackaged) from Plaintiff's Consolidated Complaint do not either.

8        **1.**      **Defendants' Stock Trades Still Do Not Raise a Strong Inference of Scienter**[9]

9        When granting Plaintiff leave to amend the Consolidated Complaint, the Court identified

10    Defendants' stock sales as an area where Plaintiff's allegations might improve and provided specific

11    suggestions for how that might be done.  Tellingly, Plaintiff has not taken up the Court's suggestion.

12        Stock sales by corporate insiders "may constitute circumstantial evidence of

13    scienter . . . only when such sales are 'dramatically out of line with prior trading practices at times

14    calculated to maximize the personal benefit from undisclosed inside information.'"  (Order at 9 (quoting

15    *Metzler*, 540 F.3d at 1066-67).)  "Three factors are relevant to this inquiry:  (1) the amount and

16    percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with

17    the insider's trading history."  (Order at 9 (citing *Metzler*, 540 F.3d at 1067).)  These factors, which are

18    discussed below, weigh heavily against the required strong inference of scienter.

19        Certain other factors undermine Plaintiff's attempt to plead scienter even more.  First,

20    because "insufficient allegations of fraud elsewhere in the complaint have a spillover effect" on insider

21    stock sale allegations, *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002), Plaintiff's

22    failure to allege particularized facts demonstrating Defendants' knowledge as to incorrect financial

23    statements necessarily weakens any inferences that can be drawn from stock trading.  Second, nearly all

24    of the sales of personal stock made by VeriFone insiders during this period were made pursuant to non

25    discretionary 10b5-1 plans, further negating an allegation of suspiciousness.[10]  *See Metzler*, 540 F.3d at

26

27

28

---

[9] This brief only addresses stock trade allegations concerning Atkinson, Bergeron, and Bondy.

[10] While Plaintiff insists that Defendant Atkinson amended his 10b5-1 trading plan during the Class Period, he is alleged to have done so in January 2007, *prior* to the first of Periolat's alleged

1    1067 n.11 (stating that "[s]ales according to pre-determined plans may 'rebut [ ] an inference of

2    scienter'") (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir. 1994)).  Third,

3    Paul Periolat, the person who is alleged to have made the erroneous accounting entries (and to have done

4    so knowingly, according to Plaintiff), is not alleged to have sold a single share of VeriFone stock.

5    Accordingly, Plaintiff attempts to portray a fraudulent scheme, the purpose of which was to enrich the

6    wrongdoers, in which the person alleged to be the principal wrongdoer is not alleged to have benefited

7    by so much as a dollar.

8          **a.**   **The Amount of Defendants' Stock Trades Was Not Unusual**

9        This Court has already rejected the type of stock trading data that Plaintiff again presents

10   in the SAC.  In its prior order, the Court held that Plaintiff's allegations of stock trading for Zwarenstein

11   and Atkinson – which were divided in Plaintiff's opposition to Defendants' and Zwarenstein's motions

12   to dismiss into simplistic "before the Class Period" and "during the Class Period" time periods – was

13   "inadequate to meet the requirement of providing a 'meaningful trading history for purposes of

14   comparison,'" and therefore insufficient to create an inference of scienter.  (Order at 10 (quoting

15   *Digimarc*, 552 F.3d at 1005).)  Undeterred, Plaintiff alleges that simply listing Defendants' stock sales

16   and dividing them up into broad "before the Class Period" and "during the Class Period" data provides

17   for a strong inference of scienter.  (*See* SAC ¶¶ 199-215 & Ex. 4.)  As this Court has already

18   determined, this data "does little to provide context" for Defendants' trading, and cannot support an

19   inference of scienter.  (Order at 10.)

20         **(i)**   **Bergeron and Bondy/GTCR**

21       Even if this type of crude before/during analysis could support an inference of scienter,

22   the new allegations in the SAC actually *rebut* any inference that the amount of stock sold by Bergeron

23   and GTCR was suspicious.  According to the SAC itself, Bergeron sold more shares before the Class

24   Period (2,584,870) than during the Class Period (2,466,335), and Bondy's employer, GTCR, sold nearly

25
26   accounting errors and the subsequent erroneous earnings reports.  (*See* SAC ¶¶ 13, 210.)  In any event,
     as discussed below, Plaintiff presents no allegations supporting any inference that Atkinson possessed
     material nonpublic information about VeriFone's inaccurate financials at any time, let alone at the time
27   he amended his 10b5-1 plan.  Plaintiff does not allege that Defendant Bergeron modified his 10b5-1
     trading plan during the Class Period.  (*See* SAC at ¶¶ 201-03.)  Defendant Bondy made no sales of
28   personal Verifone stock.

SULLIVAN
&
CROMWELL LLP

1   twice as many shares before the Class Period (18,896,399) as during the Class Period (9,800,000).

2   (SAC ¶ 200.)  Similarly, the value of the stock that GTCR and Bergeron allegedly sold during the Class

3   Period was in line with pre-Class Period amounts – GTCR allegedly sold $350 million in shares before

4   the Class Period, and $359 million in shares during the class period; Bergeron allegedly sold $60 million

5   in shares before the Class Period, and $92 million in shares during the Class Period.  (*Id.*)  Simply put,

6   Plaintiff's allegations reveal that Bergeron and GTCR's trading amounts were not "'dramatically out of

7   line with prior trading practices.'"  (Order at 9 (quoting *Metzler*, 540 F.3d at 1066-67).)  The amount of

8   stock that Bergeron and GTCR retained *after* the allegedly fraudulent sales further rebuts an inference of

9   scienter.  Both Bergeron and GTCR held on to enough stock after the challenged sales (over 11 million

10  shares worth in excess of $400 million) to incur enormous losses – losses that negate any inference that

11  either of them "pumped" the price of VeriFone's stock in order to profitably "dump" their holdings.

12  (*See* D.E. 164 at 16-17.)

13                          **(ii)      Atkinson**

14              Plaintiff similarly fails to allege facts demonstrating that Defendant Atkinson's stock

15  sales were of an unusual amount.  In the Pre-Class Period, Atkinson is alleged to have sold

16  approximately 91,000 shares.  (SAC ¶ 200.)  This is roughly half of – and in line with – the 181,000 that

17  he is alleged to have sold during the Class Period.  (*Id.*); *cf. Vantive*, 283 F.3d at 1095 (holding that

18  insider's sales during class period were not "dramatically out of line" with prior trading practices where

19  she had sold 10,000 shares prior to class period, and sold 61,000 shares during period).  This conclusion

20  is still more obvious when the Class Period sales are reduced by the 35,000 shares that Atkinson

21  allegedly sold *after he left VeriFone*.  (*See* SAC ¶ 28; SAC Ex. 4.)[11]

22              [11] As in the CC, Atkinson is treated as an afterthought in the SAC.  Plaintiff's lone allegation as

23  to Atkinson's mental state is that, "[a]s a senior officer at the Company who made misleading statements
    regarding the Lipman merger and received extra bonuses and stock awards for his participation in the

24  merger, a strong inference arises that Atkinson was aware of VeriFone's internal control problems and
    its grossly distorted gross margin and EPS results."  (SAC ¶ 211; see also CC ¶¶ 142, 155-56.)

25  Plaintiff's allegation that Atkinson made a single false statement provides no facts supporting its
    assertion that Atkinson would have known the statement to be misleading – assuming that Atkinson's

26  alleged statement that the post-merger company "will begin Day 1, completely integrated.  [We] are
    locked and loaded," (SAC ¶¶ 28, 194, 208), can even appropriately be considered a statement of fact

27  capable of being misleading.  *See Brodsky* v. *Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113 (N.D. Cal. 2009)
    (finding "general optimistic statements" such as defendant's claim that "'all the pieces are coming

28  together'" to be non-actionable).  Plaintiff provides no allegation whatsoever as to what inside

1

\*   \*   \*

2        Defendants' Class Period sales are in-line with their Pre-Class Period sales.  In the Pre-

3   Class Period, Defendants allegedly sold 21.6 million shares for approximately $413 million, while in the

4   Class Period, Defendants allegedly sold 12.7 million shares for approximately $465 million.  (SAC

5   ¶ 200.)  The history of the amounts that Defendants traded at various times does not "actually support[]

6   plaintiffs' assertions that the activity during the class period was 'dramatically out of line with prior

7   trading practices.'"  (Order at 16 (quoting *Metzler*, 540 F.3d at 1066-67).)

8                **b.        The Timing Of Sales and Trading History Were Not Unusual**

9        "[S]tock sales are helpful only in demonstrating that certain statements were misleading

10  and made with knowledge or deliberate recklessness when those sales are able to be related to the

11  challenged statements."  *Vantive*, 283 F.3d at 1093.  Plaintiff has failed to remedy its previously rejected

12  allegation that Defendants' stock sales were suspiciously timed.  While Plaintiff now includes lists of

13  alleged stock trades by Defendants as Exhibit 4 to the SAC, it makes no effort to link the specific trades

14  on its lists to any alleged misstatement or guilty knowledge on the part of a single Defendant.

15                        **(i)        Bergeron**

16        At the outset, Bergeron's stock sales could not have been suspiciously timed because they

17  were sold at non-discretionary times pursuant to his 10b5-1 plan.  Plaintiff generally alleges that

18  Bergeron's trading was somehow linked to Periolat's accounting adjustments and Bergeron's alleged e-

19  mail request to "fix the problem," (SAC ¶ 201), but a glance at Plaintiff's own trade-by-trade summary

20  for Bergeron belies Plaintiff's assertion.  Bergeron's alleged e-mail in response to the first below-

21  forecast internal reports, and Periolat's first erroneous accounting adjustment, both allegedly occurred in

22  February 2007.  (*See* SEC Compl. ¶¶ 13-21.)  But by January 10, 2007 – the month *before* Bergeron's

23  alleged email and five months into the Class Period – Bergeron had already allegedly sold more than

24  800,000 shares of his stock – nearly one third of all the stock he sold during the Class Period.  (*See* SAC

25  information Atkinson could conceivably have had and traded on after he left VeriFone.  This Court has

26  already observed that allegations based on Defendants' positions or their compensation are inadequate

27  evidence of scienter.  (*See* Order at 12, 15.)  Moreover, Atkinson's "senior position" was in marketing,
    not accounting or finance.  (SAC ¶ 28.)  The combination of Class Period stock trades that are in line
    with out-of-class-period trades and inadequate factual allegations as to Atkinson's knowledge of

28  VeriFone's accounting leave no basis for any inference of scienter on Atkinson's part.

SULLIVAN
&
CROMWELL LLP

1    Ex. 4.)  Bergeron then sold 1.64 million shares at regular intervals over the next ten months – Plaintiff

2    does not point to any particularly heavy trading at the time of the accounting entry or e-mail.  (*Id.*)

3    Plaintiff's own itemized list makes clear that Bergeron sold shares at a slower overall rate in the fifteen

4    class-period months after Periolat's erroneous accounting entries than before, refuting the bald assertion

5    that Bergeron's sales were linked to any alleged misstatements in VeriFone's financial statements.

6                                    **(ii)      Bondy/GTCR**

7                 Similarly, a glance at the itemized trading history that Plaintiff alleges for GTCR reveals

8    a consistent trading pattern from December 2005 through September 2007.  (*See id.* (showing 2.5

9    million shares sold on 12/27/2005; 3 million shares sold on 6/23/2006; 3 million shares sold on

10   12/19/2006; 3.5 million shares sold on 6/25/2007; and 3.3 million shares sold on 9/13/2007).)  Plaintiff's

11   failure even to mention these itemized trades makes clear that there is no inference to be drawn from

12   them that is useful to Plaintiff.[12]

13                                    **(iii)      Atkinson**

14                 In the case of Atkinson, Plaintiff's trading history allegations fare no better.  While

15   Plaintiff sets out some of Atkinson's Pre-Class Period and Class Period trading history, it fails to tie any

16   of Atkinson's alleged specific sales to any alleged misleading statements or guilty knowledge on

17   Atkinson's part.  (*See* SAC ¶ 210); *see Vantive*, 283 F.3d at 1093.  As discussed above, Plaintiff fails to

18   allege any facts demonstrating that Atkinson, a marketing executive, possessed, or could reasonably be

19   expected to have possessed, non-public information about VeriFone's inventory accounting or financial

20   reporting systems.  Atkinson's trading history thus provides no evidence of scienter.

21               **2.      VeriFone's Restatement Still Does Not Raise a Strong Inference of Scienter**

22                 Plaintiff repeats its allegation that the mere fact of VeriFone's restatement provides a

23   strong inference of scienter.  (*Compare* SAC ¶¶ 114, 116-25 *with* CC ¶¶ 77-78, 81-89.)  As this Court

24          _____

             [12] Other than the allegations about GTCR's trades, Bondy and GTCR get even shorter shrift in
25   the SAC than does Atkinson.  Plaintiff fails to allege any facts demonstrating that Bondy or GTCR made
     statements that would connect GTCR's alleged stock sales to purportedly fraudulent conduct.  And the
26   only facts that Plaintiff alleges to suggest possession of non-public information is the amount of stock
     that GTCR sold during the Class Period and Bondy's presence on VeriFone Board Committees.  (SAC
27   ¶¶ 213-15.)  But the extent of GTCR's holdings and its consistent sales pattern provide no basis to infer
     scienter.  And Plaintiff's allegations about Bondy's role at VeriFone provide absolutely no basis for any
28   inference of scienter.  (*See id.* ¶ 215.)

1   previously noted, however, "the necessity of a restatement is not enough, standing alone, to create a

2   strong inference of scienter."  (Order at 11 (quoting *Digimarc*, 552 F.3d at 1000).)  *Digimarc* makes

3   clear that Plaintiff has not satisfied the first exception to this rule, under which a false statement is

4   indicative of scienter where "allegations regarding a manager's role in that company . . . are particular

5   and suggest that defendant had actual access to the disputed information."  (Order at 11 (citing

6   *Digimarc*, 552 F.3d at 1000).)  In *Digimarc*, allegations that management "closely reviewed . . .

7   accounting numbers," and "that top executives had several meetings in which they discussed quarterly

8   inventory numbers" were "not enough to satisfy the narrow exception."  552 F.3d at 1000.  The Ninth

9   Circuit explained that allegations of management access to purportedly manipulated data "d[id] not

10   support the inference that management was in a position to know that such data was being manipulated."

11   *Id*. at 1000-01.  As noted above, the SEC Complaint simply alleges that management was "aware of

12   [Periolat's] adjustments."  (SEC Compl. ¶ 27; *see* SAC ¶ 115.)  Just as in *Digimarc*, management's

13   alleged awareness of Periolat's inventory adjustments does not support an inference that management

14   was aware that Periolat was wrong because there is no indication that management "had access to the

15   underlying information from which the accounting numbers were derived."  *Digimarc*, 552 F.3d at 1001.

16           As this Court recognized, the second exception to the general rule that the mere fact of a

17   restatement is not sufficient to allege scienter is also inapposite here.  (*See* Order at 11-12.)  This

18   exception "permits an inference of scienter where the information misrepresented is readily apparent to

19   the defendant corporation's senior management," and "the defendants' awareness of the information's

20   falsity can be assumed" because the falsity "was obvious from the operations of the company."

21   *Digimarc*, 552 F.3d at 1001 (citing *Berson* v. *Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir.

22   2008)).  The SAC contains no new allegations demonstrating why the technical inventory accounting

23   errors that led to the restatement were "obvious" to management.  Rather, the SAC's description of the

24   technical errors involving inventory calculations, (*see, e.g.*, SAC ¶¶ 119-24), combined with the facts

25   that 1Q07-3Q07 were the first reporting periods following the Lipman acquisition, (*see id.* ¶ 2) – and

26   that the restatement errors are alleged to relate to Lipman inventory issues, (*see id.* ¶¶ 119-24) – negates

27   such an inference.  *See Digimarc*, 552 F.3d at 1001 (holding that falsity of technical and "definitional"

28   accounting representations "would not be immediately obvious to corporate management"); *In re*

*Cadence Design Sys., Inc., Sec. Litig.*, 654 F. Supp. 2d 1037, 1049 (N.D. Cal. 2009) (same).

      **3.**      **Plaintiff's Other Recycled Allegations Still Do Not Raise a Strong Inference of Scienter**

Other allegations from the previously-rejected Consolidated Complaint that make encore appearances in the SAC still fail to plead scienter.

Plaintiff again relies on allegations from Confidential Witnesses 1-10.  (*Compare* SAC ¶¶ 157-70, 172-83 *with* CC ¶¶ 91-104, 106-17.)  The variety of shortcomings discussed in the previous round of briefing still apply to the allegations of CWs 1-10, which are largely unchanged in the SAC.  As this Court noted, the allegations by the ten CWs simply do not support an inference that Defendants knew about Periolat's allegedly incorrect journal entries, much less that Defendants intended the incorrect entries or were deliberately reckless as to the errors.  (Order at 13.)

Plaintiff's continued reliance on Zwarenstein and Bergeron's statements made in connection with boilerplate statements in the "Controls and Procedures" section of VeriFone's SEC filings, (SAC ¶ 145, 155, 189), provides no support for an inference of scienter.  (Order at 12-13); *see Digimarc*, 552 F.3d at 1003-04 (rejecting plaintiff's reliance on boilerplate language from "controls and procedures" section of defendant's 10-Q).[13]

Zwarenstein's resignation from VeriFone and Periolat's termination also do not provide evidence of scienter.  (*Compare* SAC ¶ 185 *with* CC ¶¶ 119-20.)  As this Court concluded last time, "[t]he most reasonable inference, absent other support, is that personnel changes occurred because of the mistake and real or perceived underlying negligence."  (Order at 14); *see also Digimarc*, 552 F.3d at 1002.  Plaintiff has provided no particular allegations indicating that Periolat left VeriFone because of fraud, rather than because of his inventory accounting errors.

Plaintiff's allegations that Defendants' incentive compensation provides evidence of scienter also founder once more.  (*Compare* SAC ¶¶ 216-228 *with* CC ¶¶ 145-156.)  As the Court

---

[13] Plaintiff's allegations that Defendants' forward-looking statements and predictions from 2006 and 2007 are indicative of scienter, rejected previously, are no more persuasive now.  (*Compare* SAC ¶¶ 154, 191-196 *with* CC ¶¶ 224-25, 157-61; Order at 14.)  Plaintiff's inexplicable reliance on Defendants' 2008 restatement-related public statements and filings as evidence of scienter, (*compare* SAC ¶¶ 186-88 *with* CC ¶¶ 121, 123, 125), also fails again.  These statements merely identify shortcomings in historical accounting controls that led to the restatement and provide no evidence of scienter. (*See* Order at 14-15.)

1   previously noted, in comparison to their alleged stock sales, Defendants' incentive bonuses were

2   relatively modest.  (Order at 15; *see* SAC ¶¶ 217-18, 222-24, 227.)

3            Finally, Plaintiff repeats its assertion that Lipman's pre-merger margins and sales data

4   provides compelling evidence of scienter.  (*Compare* SAC ¶¶ 147-52 *with* Pl.'s Opp. at 13-14; *see also*

5   CC ¶¶ 56-57, 65-67, 73.)  As detailed in Defendants' Reply Brief on the previous motion to dismiss,

6   there were several reasons – known at the time, accepted by analysts, and referenced in the CC – why it

7   was reasonable to believe the merged entity's gross margins could increase, even if Lipman's pre-

8   merger margins were lower than VeriFone's, as a result of the acquisition.  (*See* D.E. 182 at 5-6.)

9            **D.       The Totality of Plaintiff's Allegations Do Not Raise a Strong Inference of Scienter**

10           As detailed above – and, as to many of the allegations, in this Court's order dismissing

11  Plaintiff's prior complaint – not one of Plaintiff's SAC allegations establishes the required strong

12  inference of scienter.  The allegations taken together do not do so either.  If anything, the non-fraudulent

13  circumstances described in the SEC Complaint, combined with the non-suspicious stock trades

14  (including the total lack of alleged trading by Periolat) and Plaintiff's continuing inability to locate a

15  single confidential witness willing to allege that Periolat's entries were known by anyone at VeriFone to

16  have been false when made, renders an inference (much less a strong inference) of fraud totally

17  implausible.  As was true of Plaintiff's prior complaint, "[t]here are many allegations in this case, but

18  they fare no better when read in combination than when read independently."  (Order at 15.)

19  **II.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) AND SEC RULE
          10b-5 OR UNDER SECTION 20A FOR INSIDER TRADING AGAINST DEFENDANTS**

20           Plaintiff again alleges "suspicious" insider trading activity on the part of Defendants as a

21  primary violation under Sections 10(b) and 20A and SEC Rule 10b-5.  (SAC ¶¶ 199-215, 284.)

22  Plaintiff's allegations do not support these claims.  An insider trading claim, as with any alleged

23  violation of Section 10(b), requires an allegation of scienter.  *See Lipton* v. *Pathogenesis Corp.*, 284

24  F.3d 1027, 1035 n.15 (9th Cir. 2002).  Because, as demonstrated above, Plaintiff has failed adequately to

25  plead any allegations of scienter, the insider trading claims under Section 10(b) fail.

26           Similarly, "to prevail on their claims for violations of  . . . § 20A, plaintiffs must first

27  allege a violation of § 10(b) or Rule 10b-5."  *Id.*; (*see* Order at 15.)  Plaintiff's Section 20A claim, thus,

28

fails.  Plaintiff's Section 20A claim also fails because Plaintiff pleads no facts with specificity showing

that any of Defendants possessed material, non-public information when they traded.  *See Neubronner* v.

*Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (noting that plaintiffs must allege "specifically what information

[defendant] obtained, when and from whom he obtained it, and how he used it for his own advantage").

Finally, Plaintiff's Section 20A claim again fails because the SAC does not adequately plead

contemporaneous trades.  *See id.* at 670.  The purchases alleged by Plaintiff occurred days before or

after the sales by Defendants and, thus, are not contemporaneous.  (*See, e.g.*, SAC ¶¶ 287(a), (b), (d),

(e), (f), (g) (Bergeron); 288(h) (Bondy)).[14]   Courts are increasingly adopting a same-day trading

requirement because, in an active market, one who did not trade on the same day as the insider could not

have traded with the insider.  *In re ASTResearch Sec. Litig.*, 887 F. Supp. 231, 233-34 (C.D. Cal. 1995)

("The same day standard is the only reasonable standard given the way the stock market functions"); *In

re Countrywide Fin. Corp. Sec. Litig*., 588 F. Supp. 2d 1132, 1204 (C.D. Cal. 2008) (noting that, on a

motion to dismiss, the same-day rule is "a judicially manageable rule that balances market realities with

a strong deterrent effect" and adopting a same-day-or-the-day-after definition of "contemporaneous.").

## III.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(a) FOR CONTROL PERSON LIABILITY AGAINST ANY DEFENDANT

Plaintiff has likewise failed to state a claim under Section 20(a) of the Exchange Act.  To

establish "control person" liability under Section 20(a), a plaintiff must first allege (1) a primary

violation and (2) that the defendant exercised actual control over the primary violator.  *Digimarc*, 552

F.3d at 990.  Because Plaintiff has failed adequately to plead a primary violation as to any Defendant, its

Section 20(a) claim against Defendants should also be dismissed.  (Order at 15.)

Plaintiff has also again failed to plead that Defendants possessed or exercised the

"'significant degree of day-to-day operational control'" required for liability under Section 20(a).  *In re

McKesson HBOC*, *Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Cal. 2000) (citation omitted).

---

[14] The only "same-day" trade alleged with respect to Bergeron is on December 1, 2006, at least two months before Periolat's alleged accounting errors.  (*See* SAC ¶ 287(c).)  The only remotely contemporaneous trades with respect to Bondy are purchases *eight* and *ten* days after GTCR sold VeriFone stock. (*See id.* ¶ 288(h).)  And, while a number of the alleged trades against Defendant Atkinson are similarly defective, (*see, e.g.*, *id.* ¶¶ 288(a), (c), (f)), the failure to allege any basis for believing that Atkinson traded on material, non-public information is, itself, fatal to Plaintiff's claim.

1   Plaintiff has alleged no facts of control with respect to Atkinson and Bondy aside from Atkinson's

2   position as an executive vice president and Bondy's role as a director who served on one committee.

3   (*See* SAC ¶¶ 295-96.)  Generic boilerplate allegations are insufficient to state a claim for control person

4   liability.  *See In re Hansen Natural Corp. Sec. Litig.,* 527 F. Supp. 2d 1142, 1163 (C.D. Cal. 2007).  As

5   to Bergeron, Plaintiff has not alleged facts showing that he had operational control over Periolat, or even

6   communicated directly with Periolat.  Instead, Plaintiff relies on allegations regarding Bergeron's high-

7   level position and general awareness of VeriFone's operations, but nowhere alleges that Bergeron – who

8   is not alleged to have any kind of accounting background – directed Periolat or had any contact with him

9   at all.  Plaintiff's allegations simply are not sufficient.  *See id.*  But even if Bergeron did "control"

10  Periolat, Plaintiff has not alleged facts showing that Periolat committed a primary violation.

11  **IV.     THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE**

12              Courts consider five factors in deciding whether to grant leave to amend:  "(1) bad faith;

13  (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the

14  plaintiffs have previously amended their pleading."  (Order at 16.)  "Futility alone can justify the denial

15  of a motion for leave to amend."  (*Id.*)  Here, futility and the previous failed amendment strongly

16  counsel against granting further leave to amend.  The Court specifically gave leave to amend the first

17  time to permit Plaintiff to plead scienter based on stock trading history, asking for "detailed and

18  comprehensive comparisons of trades stretching over the course of a number of years."  (*Id.*)  Plaintiff

19  has failed to make these allegations, undoubtedly because the stock trading history simply does not

20  support an inference of scienter.  Plaintiff also bases the bulk of the new allegations in the SAC on an

21  SEC Complaint that actually undermines its case for scienter by providing a far more plausible and

22  cogent non-fraud alternative.  The remainder of Plaintiff's allegations is simply a rehash of claims this

23  Court has already rejected.  This is now Plaintiff's third attempt (consolidated, first amended and second

24  amended complaints).  That Plaintiff has "failed to correct the[] deficiencies in the [SAC] is 'a strong

25  indication that [it] ha[s] no additional facts left to plead.'"  *Digimarc*, 552 F.3d at 1007 (quoting *Vantive*,

26  283 F.3d at 1098).  Accordingly, this Court should dismiss the SAC with prejudice.

27  Date: March 5, 2010                                /s/ Brendan P. Cullen

28                                                       Brendan P. Cullen (SBN 194057)

SULLIVAN
&
CROMWELL LLP

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Scott C. Hall (SBN 232492)
Sverker K. Hogberg (SBN 244640)
Achyut J. Phadke (SBN 261567
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:      (650) 461-5600
Facsimile:      (650) 461-5700

Robert A. Sacks (SBN 150146)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067
Telephone:      (310) 712-6600
Facsimile:      (310) 712-8800

Attorneys for Defendants VERIFONE HOLDINGS,
INC., DOUGLAS G. BERGERON, WILLIAM G.
ATKINSON and CRAIG A. BONDY

SULLIVAN
&
CROMWELL LLP