ROBBINS GELLER RUDMAN
   & DOWD LLP
SANFORD SVETCOV (36561)
ELI R. GREENSTEIN (217945)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
sandys@rgrdlaw.com
elig@rgrdlaw.com
    – and –
PATRICK J. COUGHLIN (111070)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VERIFONE HOLDINGS, INC. SECURITIES LITIGATION | Master File No. 3:07-cv-06140-MHP |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT |
|     ALL ACTIONS. | |
| | DATE:      May 17, 2010 |
| | TIME:      2:00 p.m. |
| | COURTROOM: The Honorable Marilyn Hall Patel |

508338_1

1

**TABLE OF CONTENTS**

2

**Page**

3  I.    INTRODUCTION ........................................................................................1

4  II.   SUMMARY OF FACTS ALLEGED .......................................................5

5  A.    Periolat Was a Key Controller with High-Level Responsibility for
          VeriFone's Gross Margin Forecasting – Which VeriFone Identified as Its
6         "Most Important" Metric – Who Made "Unsupportable Alterations" in
          Inventory to Inflate Gross Margins Reported in VeriFone's False Financial
7         Statements .........................................................................................5

8  B.    Periolat Engaged in "Falsifying" Recorded Inventory by "Knowingly
          Circumventing" Deficient Internal Controls to Manually Enter "In-
9         Transit" Inventory that VeriFone Later Admitted "Did Not Exist" ...........7

10 C.    Witnesses Corroborate the SEC's Allegations and VeriFone's Restatement
          Admits that Its False Results Were Founded on Periolat's Deliberately
11        Reckless Unsupported Adjustments ..............................................8

12 III.  APPLICABLE LAW .............................................................................10

13 IV.   ARGUMENT ........................................................................................10

14 A.    Collective Facts from the SEC's Complaint, Witnesses, Core Business
          Inferences and Admissions in VeriFone's Enormous Restatement, Support
15        a Strong Inference of Periolat's Deliberate Recklessness......................10

16 B.    The SAC Sufficiently Alleges Periolat's Substantial Participation and
          Primary Liability for the Preparation of VeriFone's False Published
17        Financial Results..................................................................................15

18 C.    *Stoneridge* Does Not Excuse Periolat's Misconduct from Primary Section
          10(b) Liability Because as a Company Insider, Not a Third Party, It Was
19        "Necessary" and "Inevitable" the Company Would Publish the Overstated
          Inventory and Gross Margin He Falsified ..............................................17

20
   D.    The SAC Sufficiently Alleges that Periolat Was a Section 20(a) Control
21        Person of VeriFone by Virtue of His High-Level Responsibility for
          Company-Wide Gross Margin Forecasting and Related Inventory that Was
22        at the Heart of the Fraud ......................................................................19

23 V.    CONCLUSION.....................................................................................21

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP

1

# TABLE OF AUTHORITIES

2

**Page**

3  **CASES**

4  *Adams v. Kinder-Morgan Inc.,*
5      340 F.3d 1083 (10th Cir. 2003) .........................................................................11

6  *Bell Atl. Corp. v. Twombly,*
     550 U.S. 544 (2007).............................................................................................19
7
   *Berson v. Applied Signal Tech, Inc.,*
8      527 F.3d 982 (9th Cir. 2008) .......................................................................11, 15

9  *Burnett v. Rowzee,*
      561 F. Supp. 2d 1120 (C.D. Cal. 2008) ...........................................................16
10
   *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
11     511 U.S. 164 (1994)................................................................................................3

12 *Cooper v. Pickett,*
13     137 F.3d 616 (9th Cir. 1998) ........................................................................3, 16

14 *Dura Pharms v. Broudo,*
      544 U.S. 336 (2005).............................................................................................10
15
   *Higginbotham v. Baxter, Int'l Inc.,*
16     495 F.3d 753 (7th Cir. 2007) .......................................................................14, 15

17 *Hollinger v. Titan Capital Corp.,*
18     914 F.2d 1564 (9th Cir. 1990) (*en banc*) ..........................................................20

19 *Howard v. Everex Sys., Inc.,*
      228 F.3d 1057 (9th Cir. 2000) ...............................................................3, 16, 21
20
   *In re Bristol Myers Squibb Co. Sec. Litig.,*
21     586 F. Supp. 2d 148 (S.D.N.Y. 2008)...........................................................4, 18

22 *In re Cadence Design Sys., Inc. Sec. Litig.,*
23     No. 08-04966-SC, 2010 U.S. Dist. LEXIS 19003
      (N.D. Cal. Mar. 2, 2010)..........................................................3, 4, 15, 16
24
   *In re Calpine Corp. Sec. Litig.,*
25     288 F. Supp. 2d 1054 (N.D. Cal. 2003) .........................................................20

26 *In re CornerStone Propane Partners, L.P. Sec. Litig.,*
      416 F. Supp. 2d 779 (N.D. Cal. 2005) .......................................................3, 4, 16
27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP

1

2                                                                                          **Page**

3   *In re Cylink Sec. Litig.*,
4        178 F. Supp. 2d 1077 (N.D. Cal. 2001) ...................................................16

5   *In re Daou Sys., Inc.*,
         411 F.3d 1006 (9th Cir. 2005) ...............................................................15
6

7   *In re DVI Inc. Sec. Litig.*,
         249 F.R.D. 196 (E.D. Pa. 2008)..............................................................16

8   *In re Metawave Comm'ns Corp. Sec. Litig.*,
         298 F. Supp. 2d 1056 (W.D. Wash. 2003)...............................................17
9

10  *In re Micron Tech., Inc. Sec. Litig.*,
         No. 06-85-S-BLW, 2009 U.S. Dist. LEXIS 13793
11       (D. Idaho Feb. 23, 2009).................................................................4, 19

12  *In re Parmalat Sec. Litig.*,
         376 F. Supp. 2d 472 (S.D.N.Y. 2005)......................................................18
13

14  *In re UTStarcom, Inc. Sec. Litig.*,
         617 F. Supp. 2d 964 (N.D. Cal. 2009) ....................................................14

15  *Institutional Investors Group v. Avaya, Inc.*,
         564 F.3d 242 (3d Cir. 2009)....................................................................11
16

17  *Makor Issues & Rights Ltd. v. Tellabs, Inc.*,
         513 F.3d 702 (7th Cir. 2008) ...................................................11, 15, 17
18

19  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
         *Am. W. Holding Corp.*,
20       320 F.3d 920 ..........................................................................................20

21  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
         380 F.3d 1226 (9th Cir. 2004) ................................................................15
22

23  *Paracor Fin. Inc. v. GE Capital Corp.*,
         96 F.3d 1151 (9th Cir. 1996) ..................................................................21

24  *Pirraglia v. Novell, Inc.*,
         339 F.3d 1182 (10th Cir. 2003) ..............................................................11
25

26  *Price v. Seydel*,
         961 F.2d 1470 (9th Cir. 1992) ................................................................14

27  *Pugh v. Tribune Co.*,
28       521 F.3d 686 (7th Cir. 2008) ..................................................................19

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                                    - iii -

**Page**

*Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 378 (5th Cir. 2007) ...................................................................18

*Ross v. Abercrombie & Fitch Co.*,
    501 F. Supp. 2d 1102 (S.D. Ohio 2007) ............................................1

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) .......................................................10, 11

*South Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .........................................................10, 11

*Stoneridge Inv. Partners LLC v. Scientific-Atlantic, Inc.*,
    552 U.S. 148 (2008).................................................................... passim

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*,
    No. 06-2674-PHX-RCB, 2010 U.S. Dist. LEXIS 15232
    (D. Ariz. Feb. 22, 2010).................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................10, 11

*The New York City Employees' Ret. Sys. v. Berry*,
    616 F. Supp. 2d 992 (N.D. Cal. 2009) ..................................4, 17, 18, 19

*Wool v. Tandem Computer Corp.*,
    818 F.2d 1433 (9th Cir. 1987) ...........................................................20

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. 78
    §78j(b)....................................................................... *passim*
    §78t(a).......................................................................19, 20, 21
    §78u-4(b)(1)-(2) ..............................................................10

Private Securities Litigation Reform Act of 1995,
    Pub. L. No. 104-67, 109 Stat. 737 (1995) ....................................10, 19

Federal Rules of Civil Procedure
    Rule 8 ...............................................................................19
    Rule 8(a)(2) .......................................................................19
    Rule 9(b) ...........................................................................19
    Rule 12(b)(6)......................................................................10

Federal Rules of Evidence
    Rule 408 ............................................................................9

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP

1

2                                                                                      **Page**

3  17 C.F.R. §240

4       §240.10b-5 ....................................................................................................4, 15, 19
        §240.10b-5(a)..............................................................................................10, 19
5       §240.10b-5(b)..............................................................................................10, 19
        §240.10b-5(c)..............................................................................................10, 19

6

**SECONDARY AUTHORITIES**

7

Procedures Relating to Staff Investigators, Securities Act of 1933 Release No. 5310,
8       Securities Exchange Act of 1934 Release No. 9796, Investment Company Act
        Release No. 7390, Investment Advisors Act Release No. 336, 1972 SEC LEXIS 238
9       (Sept. 27, 1972)....................................................................................................14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND          - v -
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP

1  I.       INTRODUCTION

2         Lead Plaintiff National Elevator Industry Pension Fund ("plaintiff" or "Elevator Workers")

3  responds to the separate motion to dismiss ("MTD") the second amended complaint ("SAC") filed

4  by defendant Paul Periolat ("Periolat"), former Supply-Chain Controller at defendant VeriFone

5  Holdings, Inc. ("VeriFone" or the "Company").  Periolat's role as a primary violator of §10(b) was

6  revealed through various sources, including a U.S. Securities and Exchange Commission ("SEC")

7  complaint, attached to and incorporated in the SAC.  ¶9; Ex. 2.[1]  As noted in this Court's March 5,

8  2010 order: "To the extent plaintiff's complaint accurately reflects the allegations of the SEC

9  complaint, the court must accept the veracity of those allegations on a motion to dismiss."  (D.E.

10  223).

11         Periolat was the linchpin of the fraud.  According to the SEC, he "falsified" inventory that

12  inflated gross margin numbers incorporated in VeriFone's publicly-reported financial statements.

13  ¶9.  VeriFone later admitted that the "*in-transit*" *inventory* Periolat recorded "*did not exist*."  Ex. 2,

14  ¶32.  The MTD attempts to minimize Periolat as a "low-level employee" (MTD at 3), but according

15  to the SEC, he was a key "mid-level" executive (Ex. 2, ¶27) with *high-level* direct responsibility for

16  forecasting VeriFone's company-wide gross margins (¶43) – "the most important measure of

17  VeriFone's performance" (¶63) – and providing the forecasts and related accounting to senior

18  management for use in VeriFone's publicly-reported results (¶¶9-18).

19            As supply chain controller, one of Periolat's responsibilities was the *forecast*
          *of VeriFone's* annual and quarterly *gross margins* as well as to *monitor* and *update*

20         the *forecast throughout the year*.  In addition, Periolat was *responsible for making*
          *final inventory-related valuation adjustments*, such as royalties, warranty reserves

21         and reserves for obsolete inventory.

22  ¶43, Ex. 2, ¶12.  "A gross margin is simply the difference between revenue and the cost of goods

23  sold."  *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1107 n.2 (S.D. Ohio 2007).

24

25  _____

26  [1]      All "D.E." references are to docket entries on the Court's Electronic Case Filing system.  All
    "¶" and "Ex." references are to paragraphs in the SAC or Exhibits attached thereto.  Here and

27  elsewhere emphasis is added, citations and internal quotation marks are omitted unless otherwise
    indicated.

28

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                                    - 1 -

Periolat recorded false accounting adjustments at the direction of VeriFone Chief Executive Officer ("CEO") Douglas Bergeron and Chief Financial Officer ("CFO") Barry Zwarenstein. After Periolat provided internal reports showing gross margins that were "markedly lower than previously released guidance to analysts," they directed him to "*figure it . . . out*" so that VeriFone could "report results in line with forecasts" and avoid what their e-mails labeled an "unmitigated disaster." ¶11; Ex. 1, Ex. 2, ¶¶15-17. As drawn from the SEC's fact allegations, when Bergeron and Zwarenstein did not initially receive the response they wanted, they began to pressure Periolat, who used "analyses" provided to him that "laid out" how to reduce cost of goods sold and increase margins. Periolat then made "*unsupportable alterations*" – to increase inventory, reduce cost of goods sold and thereby inflate gross margins – for which the SEC alleged there was "*no reasonable basis*." ¶¶12-18; Ex. 2, ¶¶17, 26, 37, 40.

Contrary to defendants' accusation of mischaracterization by plaintiff (MTD at 7-8), the SAC accurately quotes the SEC Litigation Release which stated, based upon the total facts alleged by the SEC complaint, that VeriFone's senior management had instructed Periolat to "*fix the problem*" so that VeriFone could meet its "guidance to investors." Ex. 1, *see* Ex. 2, ¶¶14-21.

In making "*unsupportable adjustments*," Periolat "ignored information that his adjustments were incorrect." Ex. 2, ¶¶1-3. He "knowingly circumvent[ed]" internal controls, and "falsified VeriFone's books, records and accounts" which he knew would be used to grossly inflate gross margins and income publicly reported to shareholders for "three consecutive quarters in 2007" to enable VeriFone to meet its forecasts. ¶12; Ex. 2, ¶¶1, 37, 40. Without Periolat's deliberately manipulated inventory, actual gross margins in each of three 2007 quarters was "'markedly lower'" than VeriFone's public guidance. ¶11. Those results later had to be restated when VeriFone was audited and forced to admit $77.8 million in overstated inventory and over $70 million in fictitious net income – a 200% to 600% overstatement. ¶22. In combination, these facts bespeak conscious recklessness – not negligence.

According to the SEC, Periolat was "*unable to explain his adjustments*" during the annual audit. Ex. 2, ¶29. He reported that his numbers were wrong to "senior management" only after being caught by the auditors without any explanation. *Id.* He was no whistle-blower.

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                    - 2 -

1      Under *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000), Periolat is liable

2  as a primary violator of §10(b) because his recording of fictitious inventory which was incorporated

3  in VeriFone's publicly reported financial results constitutes "substantial participation" as a

4  contributing author in the preparation of VeriFone press releases and SEC filings.  *See also Cooper*

5  *v. Pickett*, 137 F.3d 616, 625 (9th Cir. 1998).  This Court has recognized that a non-speaking

6  corporate officer can be liable "as an ***author*** of CornerStone['s] financials as well as a ***primary***

7  ***perpetrator*** of a fraudulent scheme" when, as here, the SAC alleges with particularity "his role in

8  making . . . or otherwise generating false valuations" or alleges that he was "personally involved" in

9  the "orchestration of [company's] books to bury expenses and overstate goodwill" and was thereby

10  "responsible for misstating the [company's] financials."  *In re CornerStone Propane Partners, L.P.*

11  *Sec. Litig.*, 416 F. Supp. 2d 779, 788, 790-91 (N.D. Cal. 2005); *accord In re Cadence Design Sys.,*

12  *Inc. Sec. Litig.*, No. 08-04966-SC, 2010 U.S. Dist. LEXIS 19003, at *26-*28 (N.D. Cal. Mar. 2,

13  2010).  Like the officer found culpable in *CornerStone*, Periolat is "implicated as an author of

14  [VeriFone's] financials" as a primary violator of §10(b).  416 F. Supp. 2d at 791.[2]

15      *CornerStone* distinguished the U.S. Supreme Court's decision barring primary liability of

16  ***third-party*** secondary actors for fraudulent conduct that merely aids and abets the company's

17  misstatements.  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164,

18  191 (1994).  The subsequent decision in *Stoneridge Inv. Partners LLC v. Scientific-Atlantic, Inc.*,

19  552 U.S. 148 (2008), does not contradict *CornerStone*.  *Stoneridge* also involved non-speaking third-

20  parties outside the reporting company and expressly left open that "deceptive conduct" by company

21  ***insiders*** like Periolat "can still mislead" and remain actionable when such conduct "made it

22  ***necessary or inevitable*** for [the company] to record the transactions as it did."  *Id.* at 161.

23      Decisions subsequent to *Stoneridge* have upheld primary liability when a non-speaking

24  company insider – not a third-party actor – engages in the "falsification" of internal financial

25  information that were at the "heart" of the accounting fraud and it was "'necessary and inevitable for

---

[2]      Inexplicably, Periolat's MTD only cites the earlier decision in *CornerStone* (MTD at 10), but omits the later one discussed here which contradicts Periolat's characterization of the law.

- 3 -

1   [the company] to record the transaction as it did'" and communicate it to investors. *The New York*

2   *City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 992, 996-97 (N.D. Cal. 2009); *In re Bristol*

3   *Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008); *Cadence*, 2010 U.S. Dist.

4   LEXIS 19003, at *26-*28 & n.8; *In re Micron Tech., Inc. Sec. Litig.*, No. 06-85-S-BLW, 2009 U.S.

5   Dist. LEXIS 13793, at *8-*13 (D. Idaho Feb. 23, 2009).

6          Here, consistent with *CornerStone* and *Cadence*, and the exception left open in *Stoneridge*,

7   Periolat's deceptive conduct is actionable under all three subsections of Rule 10b-5, because he

8   engaged in "falsifying" inventory under circumstances that "made it necessary or inevitable for

9   [VeriFone] to record the transactions that it did." *Stoneridge*, 552 U.S. at 161.  As the SAC alleged,

10  and the SEC confirmed, Periolat's accounting was promptly incorporated in VeriFone's "earnings

11  releases, SEC filings and conference calls" and "communicated to investors." ¶¶47, 279-280; Ex. 1,

12  ¶3, Ex. 2, ¶¶1-3, 22, 28, 40.  Thus, he is primarily liable under §10(b).

13         Finally, in a transparent attempt to suggest that there was some doubt whether Periolat would

14  be named as a defendant despite the inculpatory facts in the SEC's complaint, his motion asserts that

15  "[d]espite the public nature of both the SEC Act complaint and the subsequent stipulation and final

16  judgment related to it, plaintiff did not name Mr. Periolat as a defendant."  MTD at 4:9.  Periolat

17  conveniently fails to mention that the ***only reason*** plaintiff did not name Periolat in its December 3,

18  2009 first amended complaint (D.E. 205) is because his counsel ***expressly requested a meeting*** with

19  plaintiff's counsel to discuss the matters in the complaint.  *See* Declaration of Eli R. Greenstein in

20  Support of Defendants VeriFone, Bergeron, Zwarenstein, Bondy and Periolat's Motions to Dismiss

21  ("Greenstein Decl.") ¶3, Ex. F (e-mails reflecting proposed meeting date).  As a professional

22  courtesy to Periolat's counsel and to develop any new facts or information Periolat may have wanted

23  to communicate, plaintiff obliged (*id.*) subject to a tolling agreement. *Id.*, Ex. E (tolling agreement).

24  On January 4, 2010, Periolat's counsel ***abruptly cancelled the meeting***, and said he was unable to

25  provide a reason.  *Id.* ¶4.  These events totally debunk the MTD's inaccurate suggestion that

26  Periolat's liability was in doubt.  Indeed, plaintiff had to expend substantial time and resources to

27  remove Periolat from the first amended complaint, and then file papers to add him back in to the

28  SAC.  Docs. 211-14.

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                                    - 4 -

## II.     SUMMARY OF FACTS ALLEGED[3]

On September 1, 2009, the SEC filed its complaint charging VeriFone and Periolat with multiple violations of the federal securities laws.  ¶¶9, 99; Exs. 1-2.  The SEC action arose from the same primary misconduct and events alleged here – VeriFone's massive financial restatement of over $70 million in fictitious net income, $77 million in fake inventory, and millions in falsified gross margins which caused VeriFone to overstate earnings per share ("EPS") by 600%, 200% and 418% over three consecutives quarters in 2007.  ¶¶7, 22.  The fraud wiped out 46% of VeriFone's stock price in one day and caused more than $1.8 billion in market capitalization losses.  ¶30.

As incorporated in the SAC, the SEC charged VeriFone and Periolat with "*falsifying the company's accounting records which boosted gross margins and income reported to shareholders*."  ¶9.  The SEC Litigation Release stated:

> [I]n three consecutive quarters in 2007, *the company made unsupportable alterations to its records* to compensate for an unexpected decline in gross margins, overstating VeriFone's operating income by a total of 129 percent.  When the misrepresentations came to light in December 2007, the company's stock price fell 46 percent, resulting in a one-day drop in market capitalization of $1.8 billion.

¶9; Ex. 1.  The combined facts in the SEC's complaint and from plaintiff's other sources cogently demonstrate that the financial manipulations were knowingly and recklessly executed by Controller Periolat under the direction of CEO Bergeron and CFO Zwarenstein.

### A.     Periolat Was a Key Controller with High-Level Responsibility for VeriFone's Gross Margin Forecasting – Which VeriFone Identified as Its "Most Important" Metric – Who Made "Unsupportable Alterations" in Inventory to Inflate Gross Margins Reported in VeriFone's False Financial Statements

CEO Bergeron and CFO Zwarenstein repeatedly told the market that gross margin was the Company's "most important" metric.  ¶63.  They knew the lower gross margin results included in the internal reports they received would adversely impact VeriFone's stock price if publicly disclosed.  They also repeatedly told investors that a merger with Lipman Electronic Engineering

---

[3]     Plaintiff here focuses on the allegations against Periolat, and incorporates by reference further context provided by the allegations summarized in plaintiff's opposition to VeriFone's motion to dismiss, filed contemporaneously with this opposition.

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                              - 5 -

1   Ltd. ("Lipman") would result in "gross margin expansion" and "earnings accretion" and that gross

2   margin was "'***the ultimate barometer of the operational success of [VeriFone]***.'"  ¶¶2-3, 62.

3   Analysts therefore reported that gross margin was "***the most important measure of VeriFone's***

4   ***financial performance***."  ¶63.

5          During each quarterly closing process for 1Q07, 2Q07 and 3Q07 (the three restated quarters),

6   Bergeron and Zwarenstein were provided with internal reports and were expressly told that

7   VeriFone's actual gross margins were "***markedly lower than previously released guidance to***

8   ***analysts***."  ¶¶11, 101; Ex. 1.  They personally sent e-mails characterizing the low gross margin

9   results as an "unmitigated disaster" and instructed Periolat and other financial personnel to "***figure it***

10  ***[and related low results] out***" so that defendants could "report results in line with forecasts" and

11  "thereby avoid, in the words of a senior officer, [the] 'unmitigated disaster.'"  *Id.*

12         Periolat was directly responsible for VeriFone's gross margin forecasts and inventory

13  accounting.  ¶43.  As drawn from the SEC facts, Periolat was tasked by Bergeron and Zwarenstein to

14  "fix the problem," when internal actual margins each of the first three quarters of 2007 were below

15  forecasts.  ¶104; Ex. 1.  Periolat acted directly for Bergeron and Zwarenstein in "fixing" the gross

16  margin "disaster."  ¶¶11, 101-105.

17         When Periolat could not initially "fix the problem" as instructed – because, as the SEC later

18  confirmed: "***In fact, the Company's unreported results had been correct***" (¶103; Ex. 1) – Bergeron

19  and Zwarenstein "began to express increasing frustration" and took matters into their own hands

20  (¶104).  Periolat was provided with "***analyses***" that explained the "relation between specific

21  reductions in COGS [cost of goods sold] and the corresponding increase in gross margin."  ¶105.  As

22  the SEC explained, "[b]ecause gross margin is the result of revenue minus COGS, if COGS is

23  reduced, gross margin is necessarily increased.  One way to reduce COGS is to increase inventory."

24  *Id.*  Thus, in furtherance of Bergeron's and Zwarenstein's explicit instruction to "fix the problem,"

25  Periolat was given a specific road map to increase gross margins by reducing cost of goods sold –

26  and he chose to follow it.  Periolat created tens of million in fictitious inventory which reduced cost

27  of goods sold and falsified gross margin and earnings, just as he was encouraged to do.  ¶¶106, 109,

28  111.

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                          - 6 -

1

**B.      Periolat Engaged in "Falsifying" Recorded Inventory by "Knowingly Circumventing" Deficient Internal Controls to Manually Enter "In-Transit" Inventory that VeriFone Later Admitted "Did Not Exist"**

2

3        In 1Q07, Periolat "fix[ed] the problem" by preparing fictitious manual journal entries and

4    "adjustments" that increased Lipman inventory by $7 million, thereby decreasing COGS by $7

5    million which falsified VeriFone's gross margin.  ¶¶13, 106.  According to the SEC, "*[a]s a result of*

6    *the false accounting adjustments*" the Company's gross margin in 1Q07 increased from 42.8% to

7    47.1%, and VeriFone "overstated its net income by approximately $12.4 million."  *Id.*  These

8    improper financial manipulations caused VeriFone's 1Q07 EPS to be overstated by ***600%***.  *Id.*

9        The SEC further alleged that Periolat "***failed to take adequate steps to verify***" his improper

10   accounting manipulations.   ¶¶14, 107.   "Had he done so," he would have learned that the

11   adjustments were false.  *Id.*  Periolat initially stated that his inventory adjustment increases were

12   caused by "incorrect accounting for inventory by a foreign subsidiary [Lipman]."  ¶18.  But the SEC

13   alleged that Periolat "had been aware ***before*** making the adjustments" that Lipman "had proper

14   procedures in place for accounting for inventory."  ¶20.  He also "learned a month after the quarter

15   close" that ***Lipman had correctly accounted*** for inventory, "***putting him on notice that his***

16   ***adjustments may have been incorrect***."  *Id.*  But Periolat "did not take steps to verify or correct his

17   prior inventory adjustments."  *Id.*  This is not surprising given his deliberately reckless accounting

18   manipulations to avoid publicly reporting reduced gross margins which Bergeron and Zwarenstein

19   knew would be an "unmitigated disaster."  ¶¶11, 104.

20       In 2Q07 and 3Q07, Periolat's financial improprieties were even more flagrant than in 1Q07.

21   At the end of 2Q07, Bergeron and Zwarenstein received internal reports showing actual gross margin

22   of 43.7%, far below the 46%-48% guidance provided to investors.  ¶16, 109.  Again, Periolat

23   "fix[ed] the problem," according to the SEC, by preparing false manual journal entries that increased

24   "in transit" inventory (*e.g.*, inventory purportedly shipped from Lipman to VeriFone but not yet

25   received) by $10.6 million, thereby decreasing cost of goods sold by $10.6 million.  *Id.*  This

26   fraudulent accounting inflated VeriFone's reported gross margin from 43.7% to 48.06% causing a

27   200% overstatement of earnings and allowed defendants to meet their public guidance.  *Id.*

28

1    The SEC concluded that "*[t]here was no reasonable basis for the manual entries*" made by

2    Periolat.   ¶17, 109.   In fact, "*goods were never actually shipped* between the international

3    headquarters and the United States and as a result could not have been 'in transit.'"   *Id.*   In other

4    words, Periolat deliberately created fake "'in-transit inventory *that did not exist*.'"   Ex. 2, ¶32.   The

5    SEC found that Bergeron and Zwarenstein, as members of VeriFone's senior management, were

6    "*aware of [Periolat's] adjustments*."   ¶¶20, 109; Ex. 2, ¶27.

7    In 3Q07, Bergeron and Zwarenstein received internal reports showing gross margin of

8    *40.5%*, far below the 47%-48% guidance provided to investors.   ¶¶18, 111.   Periolat again "fix[ed]

9    the problem" by preparing journal entries that increased "in transit" inventory by $9.4 million and

10   decreased cost of goods sold by $9.4 million, thereby inflating VeriFone's gross margin to *48.23%*

11   to meet public guidance, and causing its 3Q07 EPS to be overstated by *418%*.   *Id.*

12   The SEC charged Periolat with "*knowingly circumventing* a system of internal accounting

13   controls" and found that "Periolat was able to make his unwarranted adjustments because VeriFone

14   had few internal controls to prevent them."   ¶21; Ex. 2, ¶¶21, 37.   "Nor were there proper controls in

15   place to prevent the person responsible for forecasting financial results from making adjustments

16   which allowed the company to meet the forecasts."   ¶21, 113.   As drawn from the SEC, Periolat

17   followed defendants' orders and made "*unsupportable alterations*" in VeriFone's books creating

18   fictitious inventory which reduced cost of goods sold, thereby inflating gross margins and earnings

19   "so the company could report results in line with forecasts" and "allowed the company to meet its

20   internal forecasts and guidance to investors."   ¶12; Ex. 1-2, ¶¶1-2.

21   **C.    Witnesses Corroborate the SEC's Allegations and VeriFone's**
         **Restatement Admits that Its False Results Were Founded on**
22       **Periolat's Deliberately Reckless Unsupported Adjustments**

23   Apart from the SEC's allegations detailed in the SAC, plaintiff obtained corroboration from a

24   number of witnesses.   Confidential Witness ("CW") 9, a former VeriFone financial analyst from

25   2005 to 2007, who reported directly to Periolat, confirmed Periolat's role in posting false manual

26   journal entries that led to the restatement.   ¶¶57, 160-64.   CW13, a former VeriFone senior manager

27   from 2006 to 2008 in the supply chain operation, was asked to analyze a $9 million variance in

28   inventory.   ¶¶61, 137.   CW13 submitted a report to Periolat and others, reporting that the supply

1   chain finance group had applied a "wild amount of overhead" and improper in-transit accruals to

2   record "inflated inventory." *Id.*  Periolat rejected CW13's report with hostility and included the

3   inflated inventory in the Company's publicly reported results. ¶¶24, 61, 77-78, 97.  VeriFone later

4   admitted overstating its results due to improper allocation of overhead, just as CW13 reported. ¶24.

5   Three witnesses – CW1 (an accounting manager), CW2 (a senior accountant), and CW9 (the

6   financial analyst), all disclosed that Periolat was the controller responsible for posting the erroneous

7   journal entries that led to the restatement.  ¶¶160-163.

8          As a result of Periolat's fictitious accounting manipulations which were directly incorporated

9   in VeriFone's false quarterly results for 1Q07, 2Q07 and 3Q07, the Company's share price doubled

10  from $23.15 on August 31, 2006, to $50 by October 31, 2007.  ¶25.  On December 3, 2007,

11  however, VeriFone shocked the market by announcing a restatement, causing a 46% decline in stock

12  price from $48 to $26.  ¶30.  VeriFone admitted that it had reported fictitious "in-transit inventory

13  *that did not exist*" which Periolat had manually recorded.  Ex. 2, ¶¶25-26, 32.  According to the

14  SEC, Periolat was "unable to explain his adjustments" during the annual audit.  Ex. 1, ¶29.  He

15  reported that his numbers were wrong only after being caught by the auditors without any

16  explanation.  *Id.*

17         Plaintiff does not oppose Periolat's request for judicial notice (for pleading purposes only)

18  (D.E. 233, 234) of the filing of a consent decree to the SEC's complaint which states he is enjoined

19  from engaging in fraud, or falsifying books and records, and imposed a $25,000 civil penalty (D.E.

20  234, Ex. A).  To the extent, however, that Periolat seeks to use that decree to take notice of any fact

21  other than its *filing*, plaintiff objects.  Fed. R. Evid. 408 (excluding settlements as evidence).

22  Neither does plaintiff oppose judicial notice of the fact that VeriFone issued an April 2, 2008 press

23  release which admitted "incorrect manual" accounting for inventory, and decreased VeriFone's

24  previously restated income for three quarters even further – by $7.2 million – to $37 million,

25  confirming the SAC's allegation (¶185) that the Company's supply chain controller (*i.e.*, Periolat)

26  was terminated.  D.E. 234, Ex. B at 3.  What the press release says on its face is not disputed.

27  Defendants' interpretation of what it means is not judicially noticeable.  The witnesses all believed

28  Periolat was terminated due to the improper inventory adjustments that forced VeriFone's

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                                    - 9 -

1    restatement.  ¶164.  At the same time, Zwarenstein was terminated as CFO, and the stock price

2    declined another 20% from $16.83 to $13.64.  ¶¶31, 185.

3    **III.    APPLICABLE LAW**

4            The SAC alleges that defendants violated SEC Rule 10b-5(a), (b) and (c), and §10(b) by

5    engaging in a scheme to defraud, making false statements, omitting material facts and performing

6    deceptive acts.  ¶280.  Plaintiff must allege and prove six elements: (a) a primary violation –

7    fraudulent scheme, material misstatement or deceptive course of conduct, (b) scienter, (c) a

8    connection with the purchase or sale of stock, (d) reliance, (e) loss causation, and (f) economic loss.

9    *Dura Pharms v. Broudo*, 544 U.S. 336, 342 (2005).  Periolat only challenges the first two elements:

10   whether plaintiff has alleged an actionable primary violation and scienter.

11           The Private Securities Litigation Reform Act of 1995 ("PSLRA") governs the sufficiency of

12   a securities fraud complaint on a Fed. R. Civ. P. 12(b)(6) motion.  The statute requires plaintiff to

13   plead with particularity facts constituting the alleged violation and facts supporting a strong

14   inference of scienter.  15 U.S.C. 78u-4(b)(1)-(2).  The complaint's well-pleaded allegations must be

15   accepted as true and construed in plaintiff's favor.  *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d

16   1167, 1170 n.2 (9th Cir. 2009).  For scienter, the court considers competing inferences arising from

17   the complaint and determine whether the facts alleged, "taken collectively" and not "in isolation,"

18   support a strong inference of scienter, at least "as compelling" and "as likely" as any competing non-

19   culpable inferences that the court finds plausibly raised by the facts alleged.  *Tellabs, Inc. v. Makor*

20   *Issues & Rights, Ltd.* ("*Tellabs I*"), 551 U.S. 308, 322-24 (2007); *South Ferry LP v. Killinger*, 542

21   F.3d 776, 784 (9th Cir. 2008).

22   **IV.    ARGUMENT**

23           **A.    Collective Facts from the SEC's Complaint, Witnesses, Core Business
                     Inferences and Admissions in VeriFone's Enormous Restatement,**
24           **       Support a Strong Inference of Periolat's Deliberate Recklessness**

25           In his MTD, Periolat first contends that Elevator Workers' SAC fails to allege particularized

26   facts sufficient to support a strong inference that he acted with scienter.  MTD at 6-10.  But Periolat

27   challenges each allegation in "isolation" in violation of the collective analysis required by *Tellabs I*.

28

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                                    - 10 -

1        Viewed collectively, the facts alleged support a strong inference that Periolat – the key

2    financial executive responsible for company-wide gross margin forecasting, VeriFone's most

3    important metric – knowingly and recklessly inflated inventories, knowing his accounting would be

4    incorporated in VeriFone's SEC filings, press releases and conference calls.  Scienter here flows

5    from the SEC's allegations, the witnesses, the restatement and its magnitude, and Periolat's key role

6    in VeriFone "core operations" – forecasting and accounting for gross margins.  *South Ferry*, 542

7    F.3d at 782-86; *Berson v. Applied Signal Tech, Inc.*, 527 F.3d 982, 987-88 (9th Cir. 2008).  As the

8    SEC alleged, Periolat manually recorded ***fictitious*** "in-transit" ***inventory that*** VeriFone later

9    admitted "***did not exist***" and Periolat himself could not explain when confronted by the auditors.  Ex.

10   2, ¶¶29, 32.  Here, it would be "absurd" to suggest that he was "without knowledge" because he

11   executed the deliberately reckless manipulations himself.  *South Ferry*, 542 F.3d at 786.

12       Periolat was also provided with "analyses" giving him a road-map to the accounts that could

13   be used – and he did use – to "fix the problem" and inflate gross margins that internally were falling

14   below company forecasts.  Ex. 1, Ex. 2, ¶17.  The adjustments overstated VeriFone's inventory by

15   $77 million, income by $70 million and EPS by 200%-600%.  ¶7.  The magnitude is stunning.

16   Indeed, the magnitude of the falsification taken in relation to VeriFone's most important metric –

17   gross margin – further supports scienter.  *Adams v. Kinder-Morgan Inc.*, 340 F.3d 1083, 1106 (10th

18   Cir. 2003); *accord Makor Issues & Rights Ltd. v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702, 704 (7th

19   Cir. 2008) ("knowledge is inferable from gravity").

20       "The inferential significance of any single allegation can be determined only by reference to

21   all other allegations."  *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 273 & n.46 (3d

22   Cir. 2009).  "As [the court] take[s] up each allegation in turn, we have added to it the picture painted

23   by the previously considered allegation and asked: How does this addition affect the relative

24   strengths of the culpable and non-culpable inferences."  *Id.* at 280.  Although Periolat sold no stock,

25   the absence of motive is not fatal.  *Tellabs I*, 551 U.S. at 325; *Matrixx*, 585 F.3d at 1182.  Moreover,

26   Periolat had judicially recognized motive – fear of job loss if he didn't follow orders.  *Pirraglia v.*

27   *Novell, Inc.*, 339 F.3d 1182, 1191 (10th Cir. 2003).  He was later fired upon revelation of his

28   manipulations.  ¶¶164, 185.

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP          - 11 -

1       Further, Periolat was not a "low-level employee" as he claims.  MTD at 3.  The SEC alleged

2  he was a "mid-level controller," but the ***facts*** found by the SEC reveal Periolat had a ***high-level role***

3  – primary responsibility for preparing VeriFone's company-wide gross margin forecasts, its core

4  financial metric.  ¶3; Ex. 2, ¶¶12, 27.  Periolat's role in company-wide gross margin forecasting,

5  including recording of related underlying inventory, put him at the "heart" of what defendants

6  acknowledged was "the most important measure of VeriFone's financial performance."  ¶63.

7       Periolat's gross margin forecasts were provided directly to Bergeron and Zwarenstein and he

8  followed their orders by deliberately and recklessly engaging in accounting manipulations knowing

9  they had falsely touted VeriFone's inflated results and the benefits of the Lipman merger, and falsely

10  told investors the "record" results were due to "'***supply chain efficiencies***.'"  ¶4.  Bergeron and

11  Zwarenstein directly supervised Periolat and were fully "aware of [Periolat's] adjustments" and the

12  "sharp and unprecedented increase in inventory as a result of Periolat's adjustments" for three

13  consecutive quarters.  ¶15.  Periolat's insistence that he was a low-level employee is contradicted by

14  Zwarenstein and Bergeron's reliance on him to the point of "never question[ing]" his adjustments.

15  *Id.*  For gross margins – VeriFone's most "important" metric – Periolat's ***role*** was ***top-level***

16  irrespective of his location on an organizational chart.

17       The MTD also attempts to portray Periolat as a whistle-blower who voluntarily "reported"

18  his errors to management.  MTD at 2.  The facts in the SEC's complaint contradict Periolat's

19  purported spin.  The SEC alleges that the financial manipulations "came to light in late November

20  2007 during the annual audit."  Ex. 2, ¶29.  The SEC further alleges that "Periolat was ***unable to***

21  ***explain his adjustments***" during the annual audit.  *Id.*  Only ***then***, after being by the auditors without

22  an explanation, did he report "the problem to senior management."  *Id.*

23       Thus, read in context, Periolat did not "voluntarily" report anything for three consecutive

24  quarters – ***until he was cornered*** by VeriFone's auditors during the year-end audit and realized the

25  proverbial cat was out-of-the-bag and he could no longer conceal the fraud.  It is not surprising that

26  he "could not explain his adjustments" because they were based on fake inventory he created that

27  either did not exist, was never shipped and had "no reasonable basis."  If the adjustments were truly

28  just "mistakes" as the motion asserts, Periolat would have provided the auditors with a precise and

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP      - 12 -

1    reasonable explanation to show his adjustments were "innocent," but he had none because there were

2    none.  He knew his acts were fraudulent.  He was no whistle-blower.

3          Periolat misconstrues the SEC's complaint as alleging that he openly provided his

4    calculations to a subordinate.  MTD at 7.  But read in context, and in plaintiff's favor, the SEC

5    alleged that Periolat manipulated a subordinate into submitting the calculations to Periolat as the

6    "reviewer" with the power to authorize and record $20 million in fictitious in-transit inventory

7    manually, which VeriFone later admitted "did not exist."  Ex. 2, ¶¶24-27.  Periolat also knew that

8    Lipman had always "correctly accounted for inventory" (*Id.* ¶20), contradicting his initial attempt to

9    falsely shift blame for lower margins to "incorrect accounting by a foreign subsidiary [Lipman]."  *Id.*

10   ¶18.

11         The MTD also asserts that because the SEC used the word "negligence" in one of six claims

12   alleged, and because one witness said there was a "stressful and confusing" environment in

13   VeriFone's accounting department – due to the lack of internal controls – it means no fraud was

14   committed.  MTD at 8.  Periolat ignores that four of the other five SEC counts against Periolat

15   charge him with acting "knowingly."  *Id.* ¶¶37, 44, 48, 52  In particular, Periolat avoided any

16   "stress" by "***knowingly circumventing*** a system of internal accounting controls."  *Id.* ¶37.  The SEC

17   also alleged he made "***unsupportable alterations***," "***ignored information***" that "his adjustments

18   were incorrect," failed to "verify . . . his[] adjustments," was aware the Lipman "subsidiary" had

19   "correctly accounted for inventory" (contrary to his earlier assertions), and found "***no reasonable***

20   ***basis***" for his manual entries since VeriFone admits he recorded $20 million in "in-transit inventory

21   ***that did not exist***."  *Id.* ¶¶1-3, 18-20, 26, 32.  Thus, irrespective of the single charge of negligence

22   the SEC decided to prosecute, the other five charges and ***the actual facts alleged*** by the SEC give

23   rise to cogent and compelling inferences of his actual knowledge and deliberate recklessness.

24         The SEC's discretionary decision to settle with Periolat for a mere $25,000 civil penalty in

25   no way undermines the factual content of the SEC's complaint and the well-pled allegations in

26   plaintiff's SAC.  There are many reasons why the SEC may negotiate a lesser charge to facilitate

27   settlement – trial risks, staffing and resource priorities, obtaining the cooperation of the accused.

28   The SEC Chairman recently admitted that its failed inquiry into the Lehman Brothers collapse "'was

1   inadequately staffed almost from the beginning.'"  Fawn Johnson, "SEC on Lehman Oversight: Not

2   Good Enough," *The Wall Street Journal*, March 18, 2010, at C3.  As Judge Ware recently held:

3   "Although the SEC ultimately decided not to prosecute Defendants for fraud, the Court finds that ***the***

4   ***SEC's discretionary determination with respect to prosecution is not determinative of whether***

5   ***Defendants, in fact, committed securities fraud*.**"  *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d

6   964, 975 n.15 (N.D. Cal. 2009).[4]

7        Here, the SEC-based allegations in plaintiff's SAC ***alone*** support compelling inferences of

8   Periolat's deliberate recklessness, far more likely and cogent than any competing inference of

9   negligence.  Although Periolat's consent decree does not admit the SEC's complaint allegations,

10  neither does he deny them.  The ***facts*** drawn from the SEC support a strong inference of deliberate

11  recklessness as or more compelling than Periolat's unfounded speculation that the SEC believed it

12  could not establish scienter.  MTD at 6.  The SEC itself states that the decision not to take action can

13  "'in no way be construed as indicating that the party has been exonerated'" and any "attempted

14  use . . . as a purported defense in any action . . . would be clearly inappropriate and improper[.]"

15  Procedures Relating to Staff Investigators, Securities Act of 1933 Release No. 5310, Securities

16  Exchange Act of 1934 Release No. 9796, Investment Company Act Release No. 7390, Investment

17  Advisors Act Release No. 336, 1972 SEC LEXIS 238, at *7 (Sept. 27, 1972).

18       The SEC's allegations are not alone.  Four of plaintiff's witnesses corroborate that Periolat

19  recorded manual journal entries, including CW13, who said it was a "wild amount" of improper

20  inventory overhead.  ¶¶24, 57, 61, 77-78, 97, 160-164.  Even though the SAC alleged in detail the

21  basis of knowledge for the witnesses, Periolat resorts to *Higginbotham v. Baxter, Int'l Inc.*, 495 F.3d

22  _____

23  [4]       Periolat was recently arrested and charged with embezzling $38,000 from a Placer County
    youth sports group for which he was a former president and treasurer.  *See* Greenstein Decl., Ex. G.
24  According to the news reports, the youth group's current board president stated that Periolat
    admitted using $25,000 of the group's funds.  Coincidentally, his formal consent decree with the
25  SEC included a $25,000 penalty and was entered during the same time period.  Such related acts are
    relevant as additional proof of Periolat's deliberate recklessness here.  *See, e.g.*, *Price v. Seydel*, 961
26  F.2d 1470, 1474-75 (9th Cir. 1992) (Fed. R. Evid. 404(b) evidence admissible in private civil fraud
    suit when offered to prove misrepresentation).  If necessary, the SAC can be further amended to
27  include this information and any facts linking the embezzlement charges to the SEC fine.

28

     PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
     AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                              - 14 -

1    753, 756-57 (7th Cir. 2007), for the proposition that unnamed witnesses cannot be relied upon to

2    support scienter.  In this circuit, reports from confidential witnesses are accepted as relevant and

3    reliable when details about their jobs such as those pled here "'support the probability that a person

4    in the position occupied by the source would possess the information alleged.'"  *In re Daou Sys.,*

5    *Inc.*, 411 F.3d 1006, 1015-18 (9th Cir. 2005); *Nursing Home Pension Fund, Local 144 v. Oracle*

6    *Corp.*, 380 F.3d 1226, 1233-34 (9th Cir. 2004).

7            In fact, *Baxter* has been severely limited to its unique facts by a subsequent Seventh Circuit

8    decision.  *Tellabs II*, 513 F.3d 702.  *Tellabs II*, like *Daou* and *Oracle*, held that information from

9    confidential sources in a position to know the information they provide is relevant in pleading

10   scienter.  *Id.* at 711.  *Tellabs II* made clear that *Baxter* is limited to its facts – *i.e.*, there was "no

11   basis" for scienter except for a few poorly described overseas sources.  *Id.* at 711-12.  Here, when

12   combined with the SEC's allegations, the witness-based allegations from former employees in a

13   position to know compliment and solidify an already compelling inference of scienter.  *Berson*, 527

14   F.3d at 985 ("'engineers or technical editors'" can be in a position to know relevant facts even

15   though they are not "managers"); *Cadence*, 2010 U.S. Dist. LEXIS 19003, at *10-*13.

16           **B.     The SAC Sufficiently Alleges Periolat's Substantial Participation and**
                      **Primary Liability for the Preparation of VeriFone's False Published**
17                    **Financial Results**

18           Periolat next contends that the SAC does not allege his primary liability for any alleged

19   statement.  MTD at 11-13.  In fact, the SAC does allege that Periolat is a primary actor because, at

20   the direction of the CEO and CFO, he knowingly manipulated the inventory, gross margin, income

21   and earnings numbers knowing they were incorporated into VeriFone's published results, and as

22   such substantially participated in authoring and preparing them.  ¶¶43, 47.  The SAC alleges that

23   Periolat violated all three subsections of Rule 10b-5.  He participated in a "scheme" of deceptive

24   "conduct" by falsifying inventory which was incorporated in VeriFone's false financial "statements"

25   to the public.  ¶¶279-280.[5]

26   _____

27   [5]      Plaintiff does not rely on the group published information presumption because it has met the
     higher standard of alleging with particularity his actual involvement in preparing the misstatements.

28

     PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
     AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP              - 15 -

1    The Ninth Circuit has held that "substantial participation or intricate involvement in the

2    preparation of fraudulent statements is grounds for primary liability even though that participation

3    might not lead to the actor's actual making of the statements." *Everex*, 228 F.3d at 1061 n.5; *also*

4    *see Cooper*, 137 F.3d at 625. The relationship between the defendant's deceptive acts – here

5    booking manipulated inflated inventory that was incorporated in VeriFone's reported quarterly

6    results – "was sufficiently direct and immediate to find that [Periolat] was a primary violator."

7    *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1128 (C.D. Cal. 2008). Primary liability arises when a

8    defendant makes misleading statements, or is "involved in the process of revenue recognition or the

9    issuance of the company's financial statements." *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077,

10   1084 (N.D. Cal. 2001).

11   This Court's *CornerStone* decision supports primary liability under §10(b) for a non-

12   speaking company insider – not a third party – when, as here, he was "personally involved" in

13   "making" or "generating false valuations" in a company's books and thus "personally responsible for

14   misstating the [firm's] financials" as an "author" and as a "primary perpetrator" of the scheme. 416

15   F. Supp. 2d at 788-91. Under *CornerStone*, Periolat is a primary actor.

16   Recently, consistent with *CornerStone*, Judge Conti held in *Cadence* that a company

17   executive is liable as a primary actor under §10(b) even though he did not personally publicly utter

18   "any of the alleged misstatements" or even "prepare any of the statements that were ultimately

19   incorporated into the documents signed by the other Individual Defendants." *Cadence*, 2010 U.S.

20   Dist. LEXIS 19003, at *26-*28. The Court reasoned that the defendant "had control over the

21   information that was passed along to those within Cadence who were responsible for classifying the

22   transactions" and therefore he "substantially participated" in the alleged misstatements. *Id.* at *26-

23   *27 n.8 (citing *Cooper*, 137 F.3d at 625). This case is even stronger than *Cadence* because here

24   Periolat actually recorded the false and fictitious inventory numbers that decreased costs and inflated

25   gross margins and were incorporated in the Company's publicly reported financial statements.

26   In the cases cited by Periolat, the non-speaking defendant was either a third party, *In re DVI*

27   *Inc. Sec. Litig.*, 249 F.R.D. 196, 218-18 (E.D. Pa. 2008) (outside law firm); or a corporate officer

28   outside the accounting department who did not substantially participate in the preparation of the

company's publicly-reported financial statements (as Periolat did here by recording false inventory incorporated in the results reported). *In re Metawave Comm'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1088 (W.D. Wash. 2003) (marketing executive who engaged in fraudulent side-letters in China). Corporate insiders may be held liable when they recklessly "make or issue the statement" or "order or approve" its "making or issuing" or "furnish information or language for inclusion" in the company's published financial statements. *Tellabs II*, 513 F.3d at 708. Thus, Periolat is liable as a primary actor for his substantial involvement in VeriFone's published results since he was responsible for preparing the gross margin forecasts and doing the underlying accounting.

### C.    *Stoneridge* Does Not Excuse Periolat's Misconduct from Primary Section 10(b) Liability Because as a Company Insider, Not a Third Party, It Was "Necessary" and "Inevitable" the Company Would Publish the Overstated Inventory and Gross Margin He Falsified

Periolat further contends that plaintiff only pleads inactionable aiding and abetting conduct, and fails to sufficiently plead primary  §10(b) liability under *Stoneridge*.  MTD at 14-18; *In Stoneridge*, 552 U.S. 148, the Supreme Court held that third-party non-speakers, including a company's vendors or suppliers who engaged in deceptive acts in aid of fraud, were not primary actors, but only aiders and abettors, unless their deceptive conduct was communicated to and thereby relied upon by the market. *Id.* at 158-60.  To the Court, the third-party suppliers were too "remote" from the company's financial reporting to the public. *Id.* at 160-62.

*Stoneridge* left open, however, that non-speaking officials *inside* the reporting company could be subject to primary liability.  To the Supreme Court, although "[c]onduct itself can be deceptive," nothing the vendors did "made it ***necessary or inevitable*** for [the company] to record the transactions as it did." *Id.* at 158, 161.  Here, Periolat's manipulation was in-house solely to inflate VeriFone's published results to meet its guidance to investors.  It was "necessary," "inevitable," indeed certain to mislead the market.  Thus, the facts here fit the *Stoneridge* exception.

The facts here are also close to those addressed by Judge Ware in *Berry*, 616 F. Supp. 2d 997.  There, the defendant was the company's general counsel who engaged in the backdating of stock options and "falsification" of "internal" corporate records. *Id.* at 996-97 n.5.  As a direct result, the company filed false financial reports overstating its net income. *Id.* at 997.  The court

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                                    - 17 -

1   acknowledged that under *Stoneridge*, a third party's deceptive conduct was not actionable (and

2   merely constituted aiding and abetting), when the conduct is not disclosed publicly and thus does not

3   satisfy the requirement of reliance. *Id.* at 996. But the court held there is primary liability when the

4   deceptive conduct is by a "high-level corporate insider" – not a third party – and the conduct "'made

5   it necessary or inevitable for [the company] to record the transactions as it did'" and also made it

6   inevitable that the misrepresentations would be conveyed to investors who would rely upon them in

7   connection with the purchase of stock. *Id.* at 996-97 (quoting *Stoneridge*, 552 U.S. at 151). As such,

8   a company insider defendant's deceptive conduct is at the "heart" of the company's published

9   misstatements. *Id.* at 997 (quoting *Bristol Myers Squibb*, 586 F. Supp. 2d 148, 170 (distinguishing

10   *Stoneridge* and finding §10(b) primary liability as to corporate counsel who negotiated an unlawful

11   settlement whose inevitable publication misled investors)).

12       Here, too, Periolat was at the "heart" of the accounting manipulations that were designed to

13   be incorporated in VeriFone's published results. He was no "low-level accountant." The SEC

14   revealed that, as the supply-chain controller, Periolat was a mid-level executive, but one with a **high-**

15   **level role** responsible for VeriFone's **company-wide** gross margin forecasting – the "**most**

16   **important**" financial metric at the Company. His falsification of inventory contributed directly to

17   the false published gross margin results critical to VeriFone meeting its guidance, and was the sole

18   purpose of his manipulation.

19       Thus, Periolat was a contributing author of the published results, and satisfied all three of

20   Judge Ware's criteria in *Berry*: (1) key "level of responsibility," – margin forecasting and inventory

21   accounting, (2) the "magnitude" of the conduct – enabling 400% overstatement ($70 million) of net

22   income to enable VeriFone to achieve guidance, and (3) the "proximity" of the conduct to investors

23   – direct inclusion of the numbers in VeriFone's "false financial[s]." *Berry*, 616 F. Supp. 2d at 998.

24       None of the secondary actor cases cited by Periolat involved company insider accounting

25   officers directly involved in fraudulently recording numbers that were then transferred directly into

26   the company's publicly reported financial statements. MTD at 16 n.5, 17-18. For example, *In re*

27   *Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005), involved third party actors, **not**

28   company insiders. So did *Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482

1  F.3d 378, 390 (5th Cir. 2007).  Likewise, *Pugh v. Tribune Co.*, 521 F.3d 686, 696-98 (7th Cir. 2008),

2  involved the fraudulent inflation of newspaper circulation by a vice president of circulation at

3  **remote subsidiaries** of the parent company that published false financials, where the officer for the

4  subsidiary actually "took pains to hide the fraud" from the parent.  *Id.* at 695.  Unlike *Pugh*, Periolat

5  recorded false inventory and furnished the numbers to Zwarenstein and Bergeron, who were "aware

6  of his adjustments," and knew they were designed to "report results in line with forecasts."  ¶11; Ex.

7  2, ¶27.  Thus, under *Berry*, and related cases cited above, the facts alleged here fall within the

8  *Stoneridge* exception for fraudulent conduct by a corporate insider – not a third party – that

9  necessarily and inevitably is incorporated in the company's published misstatements, in violation of

10  Rule 10b-5(a)(b) and (c).  ¶¶47, 279-280; *see Micron*, 2009 U.S. Dist. LEXIS 13793, at *10-*12

11  (limiting *Stoneridge* to third-party secondary actors).

12          **D.      The SAC Sufficiently Alleges that Periolat Was a Section 20(a)**
                    **Control Person of VeriFone by Virtue of His High-Level**
13                  **Responsibility for Company-Wide Gross Margin Forecasting and**
                    **Related Inventory that Was at the Heart of the Fraud**
14
15          Periolat contends that the SAC does not sufficiently allege that he had "control" of any other

16  culpable violator of Rule 10b-5 sufficient to plead a claim under §20(a).  MTD at 19-21.  Periolat

17  asserts there must be "specific allegations" that he "supervised the preparation of the Company's

    financial statements."  *Id.* at 20.  No case authority is cited to support that proposition.  *Id.*
18
19          If Periolat's demand for "specifics" is a back-door attempt to apply either a PSLRA or Fed.

20  R. Civ. P. 9(b) particularity requirement to the pleading of a §20(a) claim, the case law

21  overwhelmingly rejects any such heightened standard.  *E.g.*, *Teamsters Local 617 Pension &*

22  *Welfare Funds v. Apollo Group, Inc.*, No. 06-2674-PHX-RCB, 2010 U.S. Dist. LEXIS 15232, at

23  *17-*31 (D. Ariz. Feb. 22, 2010), and cases there collected.  Rather, "section 20(a) control person

24  claims are subject to the more general notice pleading requirements of Fed. R. Civ. P. 8(a)(2)."  *Id.*

25  at *31.  Under Rule 8, plaintiff must simply plead "enough facts" to show that the control allegation

26  is "plausible."  *Id.* at *38-*41 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

27  Here, plaintiff's SAC far exceeds *Twombly* and provides specifics about Periolat's key high-level

28

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                                    - 19 -

1    role at VeriFone as the controller in charge of company-wide gross margin forecasting (¶¶43, 99-

2    116; Ex. 2, ¶12), all of which are incorporated in the §20(a) claim (¶292).

3           Periolat attempts to minimize his role by portraying himself as "a third-level junior

4    controller." MTD at 20.  In fact, the SAC alleges that Periolat was a control person of VeriFone by

5    virtue of responsibility for the very activity giving rise to the §10(b) violation – company-wide gross

6    margin forecasting and related accounting.   ¶¶293-294.  As noted above, the §20(a) claim

7    incorporates all of the substantive allegations of the SAC (¶292) which, in combination, sufficiently

8    allege Periolat's "control" of VeriFone with respect to its culpable public reporting of fake

9    inventory, inflated gross margins and inflated earnings.  Control is based on his high-level role and

10   direct responsibility for the Company's gross margin forecasting and accounting for gross margins.

11   Specifically, while CFO Zwarenstein and CEO Bergeron supervised the preparation of VeriFone's

12   financial statements, the SAC incorporates the SEC's allegations that Periolat's "responsibilities"

13   included "the forecast of VeriFone's annual and quarterly gross margins as well as to monitor and

14   update the forecast throughout the year" and for related inventory accounting that was incorporated

15   in the financial statements.  ¶43; Ex. 2, ¶12.  As such, Periolat had control over the ***content*** of

16   VeriFone's financial statements, at least jointly with Zwarenstein and Bergeron.  Nothing in §20(a)

17   demands exclusive control.

18          Further, there is solid authority holding a controller liable under §20(a) when the controller is

19   responsible for, and thus had the ability to control or influence "directly or indirectly" the operations

20   of the company where the culpable conduct occurred.  15 U.S.C. §78t(a) ("directly or indirectly"

21   control a violator).  *See, e.g.*, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.

22   W. Holding Corp.*, 320 F.3d 920, 924 n.1, 945 n.20 (9th Cir. 2003) (controller); *In re Calpine Corp.

23   Sec. Litig.*, 288 F. Supp. 2d 1054, 1059, 1081 (N.D. Cal. 2003) (controller); *Wool v. Tandem

24   Computer Corp.*, 818 F.2d 1433, 1440-42 (9th Cir. 1987) ("ability" to "control" or "influence" –

25   including controller).

26          Because §20(a) is remedial in purpose it "should be construed liberally and flexibly."  *Wool*,

27   818 F.2d at 1441; *accord Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990) (*en

28   banc*).  Any doubts concerning control are resolved in favor of upholding §20(a) pleading and

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                          - 20 -

1   allowing the development of proof in discovery.  *Paracor Fin. Inc. v. GE Capital Corp.*, 96 F.3d

2   1151, 1161 (9th Cir. 1996); *Everex*, 228 F.3d at 1065-66.  Accordingly, a §20(a) claim is sufficiently

3   alleged as to Periolat's control of VeriFone's gross margin forecasting and accounting.

4   **V.      CONCLUSION**

5         For the foregoing reasons, defendant Periolat's motion to dismiss should be denied.

6   DATED:  April 19, 2010                     Respectfully submitted,

7                                              ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
8                                              SANFORD SVETCOV
                                               ELI R. GREENSTEIN
9

10
                                               _____
                                                             /s/
11                                                    SANFORD SVETCOV

12                                             100 Pine Street, Suite 2600
                                               San Francisco, CA  94111
13                                             Telephone:  415/288-4545
                                               415/288-4534 (fax)
14
                                               ROBBINS GELLER RUDMAN
15                                               & DOWD LLP
                                               PATRICK J. COUGHLIN
16                                             655 West Broadway, Suite 1900
                                               San Diego, CA  92101
17                                             Telephone:  619/231-1058
                                               619/231-7423 (fax)
18
                                               Lead Counsel for Plaintiffs
19

20

21

22

23

24

25

26

27

28

508338_1

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP                    - 21 -

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on April 19, 2010, I electronically filed the foregoing with the Clerk of

3 the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7

I further certify that I caused this document to be forwarded to the following Designated

8 Internet Site at:  http://securities.stanford.edu.

9

I certify under penalty of perjury under the laws of the United States of America that the

10 foregoing is true and correct.  Executed on April 19, 2010.

11

12

```
                                    /s/
                           SANFORD SVETCOV
```

13

14

```
                           ROBBINS GELLER RUDMAN
                                & DOWD LLP
```

15

```
                           100 Pine Street, 26th Floor
                           San Francisco, CA  94111
```

16

```
                           Telephone:  415/288-4545
                           415/288-4534 (fax)
```

17

18

```
                           E-mail: ssvetcov@rgrdlaw.com
```

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANT PERIOLAT'S MOTION TO DISMISS SECOND
AMENDED CONSOLIDATED COMPLAINT - 3:07-cv-06140-MHP

## Mailing Information for a Case 3:07-cv-06140-MHP

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com,brett@johnsonbottini.com,derekw@johnsonbottini.com,paralegal@johnsonbottini.com

- **Brendan P. Cullen**
  cullenb@sullcrom.com,carrejoa@sullcrom.com,singhl@sullcrom.com,halls@sullcrom.com

- **Timothy Alan DeLange**
  kristinas@blbglaw.com,timothyd@blbglaw.com

- **Jordan Eth**
  jeth@mofo.com,nurbina@mofo.com

- **Daniel C. Girard**
  dcg@girardgibbs.com,akl@girardgibbs.com

- **Eli Greenstein**
  Elig@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Stanley M. Grossman**
  smgrossman@pomlaw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Brian Lawrence Levine**
  BLevine@mofo.com,vvandergrift@mofo.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Mark Cotton Molumphy**
  mmolumphy@cpmlegal.com,jhamilton@cpmlegal.com,jthigpen@cpmlegal.com,obacigalupi@cpmlegal.com,bgoldman@cpmlegal.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Juden Justice Reed**
  plee@schubert-reed.com,akeng@schubert-reed.com,rschubert@schubert-reed.com

- **Patrick David Robbins**
  probbins@shearman.com,rcheatham@shearman.com

- **Dana Anthony Rodriguez**
  drodriguez@mofo.com,cpeplinski@mofo.com

- **Eran Rubinstein**
  erubinstein@chitwoodlaw.com

- **Robert C. Schubert**
  rschubert@schubertlawfirm.com

- **Aaron M. Sheanin**
  ams@girardgibbs.com,ras@girardgibbs.com,amv@girardgibbs.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com,efile@scott-scott.com

- **Michael Howard Steinberg**
  steinbergm@sullcrom.com

- **Sean Travis Strauss**
  sean.strauss@shearman.com

- **Steven Noel Williams**
  swilliams@cpmlegal.com,jverducci@cpmlegal.com,cwalker@cpmlegal.com,rjit@cpmlegal.com,aliang@cpmlegal.com,medling@cpmlegal.com,pmenzel@cpmlegal.co

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)