1  Robert A. Sacks (SBN 150146)
   (sacksr@sullcrom.com)
2  SULLIVAN & CROMWELL LLP
   1888 Century Park East
3  Los Angeles, California  90067
   Telephone:      (310) 712-6600
4  Facsimile:      (310) 712-8800

5  Brendan P. Cullen (SBN 194057)
   (cullenb@sullcrom.com)
6  Scott C. Hall (SBN 232492)
   (halls@sullcrom.com)
7  Sverker K. Högberg (SBN 244640)
   (hogbergs@sullcrom.com)
8  Achyut J. Phadke (SBN 261567)
   (phadkea@sullcrom.com)
9  SULLIVAN & CROMWELL LLP
   1870 Embarcadero Road
10 Palo Alto, California 94303
   Telephone:      (650) 461-5600
11 Facsimile:      (650) 461-5700

12 Attorneys for Defendants VERIFONE HOLDINGS, INC.,
   DOUGLAS G. BERGERON, WILLIAM G. ATKINSON
13 and CRAIG A. BONDY

14

15              **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

17

18 IN RE VERIFONE HOLDINGS, INC.        )   Master File No.
   SECURITIES LITIGATION                )
19                                       )   C 07-6140 MHP
                                         )
20                                       )   **CLASS ACTION**
   This Document Relates To: All Actions )
21                                       )   **DEFENDANTS' REPLY BRIEF IN**
                                         )   **SUPPORT OF MOTION TO DISMISS THE**
22                                       )   **SECOND AMENDED CONSOLIDATED**
                                         )   **CLASS ACTION COMPLAINT**
23                                       )
                                         )   Judge: The Hon. Marilyn H. Patel
24                                       )   Courtroom: 15
                                         )   Hearing Date: May 17, 2010
25                                       )   Hearing Time: 2:00 p.m.
26 _____ )

27

28

SULLIVAN
&
CROMWELL LLP

## TABLE OF CONTENTS

INTRODUCTION..... ..................................................................................................................1

ARGUMENT...................................................................................................................................2

I.      PLAINTIFF'S CLAIMS UNDER SECTION 10(B) AND RULE 10B-5 FAIL...........................2

      A.     The PSLRA's High Pleading Standard Is Not Easily Met ..................................2

      B.     The SAC Fails to Plead Facts Giving Rise to a Strong Inference of Scienter ....................3

           1.     The SEC Complaint Does Not Give Rise to a Strong Inference of Scienter...........3

           2.     The Restatement Does Not Give Rise to the Required Strong Inference of Scienter ................................................................4

                 a.     The SAC and SEC Complaint Do Not Support Plaintiff's Allegation that Bergeron and Zwarenstein Had "Actual Access to the Disputed Information" ..................................................5

                 b.     The SAC and SEC Complaint Do Not Support Plaintiff's Allegation that the Accounting Errors were "Obvious" ..................................................7

           3.     The Allegations of the CWs Do Not Raise a Strong Inference of Scienter...........8

           4.     Defendants' Stock Sales Do Not Raise a Strong Inference of Scienter.................10

                 a.     Amount and Trading History ....................................................11

                 b.     Timing...................................................................................12

            5.     Recycled Allegations of SOX Certifications, Departures, 2006 Statements, and Incentive Compensation Do Not Raise a Strong Inference of Scienter..........13

           6.     A "Holistic" Review Does Not Raise a Strong Inference of Scienter ..................14

      C.     Periolat's Conduct Is Not Attributable to VeriFone .........................................14

II.     PLAINTIFF'S SECTION 10(B), 20A INSIDER TRADING, AND SECTION 20(A) CLAIMS FAIL...........................................................................................................15

CONCLUSION............................................................................................................................15

SULLIVAN & CROMWELL LLP

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Berson* v. *Applied Signal Tech., Inc.*
527 F.3d 982 (9th Cir. 2008) ..............................................................................7

*Broam* v. *Bogan*
320 F.3d 1023 (9th Cir. 2003) ...........................................................................11

*Clugston* v. *Nationwide Mut. Ins. Co.*
2006 WL 1290450 (M.D. Pa. May 10, 2006) ......................................................3

*Dent* v. *U.S. Tennis Ass'n.*
2008 WL 2483288 (E.D.N.Y. June 17, 2008) .....................................................3

*Glazer Capital Mgmt., L.P.* v. *Magistri*
549 F.3d 736 (9th Cir. 2008) .............................................................................15

*Glenn Holly Entm't* v. *Tektronix, Inc.*
352 F.3d 367 (9th Cir. 2003) ...............................................................................5

*In re Cadence Design Sys. Sec. Litig.*
2010 U.S. Dist. LEXIS 19003 (N.D. Cal. Mar. 2, 2010) .....................................8

*In re Copper Mountain Sec. Litig.*
311 F. Supp. 2d 857 (N.D. Cal. 2004) ..........................................................11, 14

*In re Daou Systems*
411 F.3d 1006 (9th Cir. 2005) ..............................................................................8

*In re Dot Hill Sys. Corp. Sec. Litig.*
594 F. Supp. 2d 1150 (S.D. Cal. 2008) .................................................................5

*In re FBR Inc. Sec. Litig.*
544 F. Supp. 2d 346 (S.D.N.Y. 2008) ...................................................................3

*In re Invision Techs., Inc. Sec. Litig.*
2006 U.S. Dist. LEXIS 76458 (N.D. Cal. Aug. 31, 2006) ..................................15

*In re Livent, Inc. Sec. Litig.*
78 F. Supp. 2d 194 (S.D.N.Y. 1999) .....................................................................3

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*
218 F.R.D. 76 (S.D.N.Y. 2003) ............................................................................3

*In re Microstrategy, Inc. Sec. Litig.*
115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................8

SULLIVAN
&
CROMWELL LLP

ii

*In re PMI Group, Inc. Sec. Litig.*
    2009 U.S. Dist. LEXIS 101582 (N.D. Cal. Nov. 2, 2009)..................................................7

*In re Silicon Graphics, Inc. Sec. Litig.*
    183 F.3d 970 (9th Cir. 1999) ........................................................................................2

*In re Vantive Corp. Sec. Litig.*
    283 F.3d 1079 (9th Cir. 2002) ...............................................................................11, 12

*In re Worlds of Wonder Sec. Litig.*
    35 F.3d 1407 (9th Cir. 1994) ......................................................................................12

*Institutional Investors Group* v. *Avaya*
    564 F.3d 242 (3d. Cir. 2009)........................................................................................7

*Ley* v. *Visteon Corp.*
    543 F.3d 801 (6th Cir. 2008) ........................................................................................8

*Limantour* v. *Cray Inc.*
    432 F. Supp. 2d 1129 (W.D. Wash. 2006)..................................................................12

*Lipsky* v. *Commonwealth United Corp.*
    551 F.2d 887 (2d Cir. 1976)...........................................................................................3

*Makor Issues & Rights, LTD* v. *Tellabs Inc.*
    513 F.3d 702 (7th Cir. 2008) ......................................................................................15

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*
    540 F.3d 1049 (9th Cir. 2008) ..............................................................................2, 6, 12

*No. 84 Employer-Teamster Joint Council Pension Trust Fund* v. *Am. West Holding Corp.*
    320 F.3d 920 (9th Cir. 2003) ...................................................................................7, 11

*Nordstrom* v. *Chubb*
    54 F.3d 1424 (9th Cir. 1995) ......................................................................................15

*Ross* v. *Abercrombie & Fitch Co.*
    501 F. Supp. 2d 1102 (S.D. Ohio 2007) ......................................................................7

*RSM Prod. Corp. v. Fridman*
    643 F. Supp. 2d 382 (S.D.N.Y. 2009)...........................................................................3

*Sanders* v. *Brown*
    504 F.3d 903 (9th Cir. 2007) ........................................................................................2

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007)......................................................................................................2

*Wietschner* v. *Monterey Pasta Co.*
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) .....................................................................12

Sullivan
&
Cromwell LLP

1

*Zucco Partners LLC* v. *Digimarc Corp.*
   552 F.3d 981 (9th Cir. 2009) .......................................................................................... passim

2

**FEDERAL STATUTES**

3

15 U.S.C. § 78j(b) [Section 10(b)]..........................................................................................2, 15

4

15 U.S.C. § 78t-1(a) [Section 20A] ...............................................................................................15

5

15 U.S.C. § 78t(a) [Section 20(a)] .................................................................................................15

6

15 U.S.C. § 78u-4(a) et seq. [PSLRA]..............................................................................................2

7

17 C.F.R. § 240.10b5-1 [SEC Rule 10b-5].............................................................................2, 15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN
&
CROMWELL LLP

Defendants VeriFone Holdings, Inc. ("VeriFone"), Douglas Bergeron, William Atkinson, and Craig Bondy ("Defendants") submit this reply brief in support of their motion to dismiss ("Motion" or "Mot.") the Second Amended Class Action Complaint ("SAC"). Defendants incorporate by reference the arguments and authorities in the reply briefs of Barry Zwarenstein and Paul Periolat.

## INTRODUCTION

There is a surreal aspect to Plaintiff's Opposition – and not just because of the 221 different parts of it that are bolded and italicized. As noted in the Motion, only two things have changed from the prior complaint that this Court dismissed: (1) Plaintiff has found three more confidential witnesses (CWs) who are not alleged to have spoken to any of Defendants Atkinson, Bergeron, Bondy or Zwarenstein on any subject and who do not contend that they were aware of the accounting entries that led to the restatement, let alone that those entries were incorrect when they were made, and (2) the SEC filed a books-and-records complaint against VeriFone and Periolat (not any of Defendants) in which it charged no one with securities fraud or any scienter-based violation and in which it described Periolat's accounting entries as errors that were not reported to VeriFone management until months after they were made. Neither of these developments improves Plaintiff's fraud claims. If anything, Plaintiff's continuing inability to find at least one person who can describe any Defendant engaging in intentional misconduct and the SEC's decision to charge no one with fraud in connection with the very same restatement that gives rise to Plaintiff's claims severely undercut Plaintiff's fraud claim.

Accordingly, Plaintiff's purported reaction to the SEC Complaint – "ah *ha*!" – is difficult to credit; its actual reaction was likely unprintable. Part of the difficulty is that Plaintiff's reliance on the SEC Complaint depends on ignoring the "holistic" approach that it elsewhere insists the Court use in assessing Plaintiff's allegations. Defendants agree with Plaintiff that this Court's assessment of Plaintiff's allegations should be holistic. That is, to the extent the SEC Complaint's allegations are considered at all (Defendants do not agree that they should be), the Court should not assess each alleged fact in isolation, but as part of the totality of the alleged facts. So while Plaintiff has excerpted (and bolded and italicized) individual clauses from the SEC Complaint that Plaintiff says support a scienter inference, because those clauses come from an SEC Complaint that alleges errors and not fraud, that inference is not reasonable.

1    The SEC Complaint does not assist Plaintiff in meeting its pleading burden.  If anything,

2    it raises the bar by providing a cogent, non-fraud explanation for VeriFone's restatement.  Plaintiff's

3    remaining allegations based on the SEC Complaint thus fail to plead scienter adequately – its other

4    allegations are not up to the task either.  Plaintiff has failed to provide the additional allegations

5    suggested by this Court with respect to stock sales.  Defendants' stock sales during the class period were

6    neither dramatically out of line with their pre-class period trading, nor suspiciously timed.  Plaintiff

7    rehashes its old allegations – some with a new gloss by reference to the SEC Complaint – concerning

8    SOX certifications, terminations, and Defendants' compensation.  But these allegations suffer the same

9    shortcomings as they did before and are not improved by the SEC Complaint.

10    Finally, Plaintiff's allegations as to control person liability still fail because Plaintiff has

11    neither established an underlying primary violation nor adequately alleged control as to any Defendant.

12    The SAC is Plaintiff's best shot at pleading scienter against any Defendant and it does

13    not come close.  It should be dismissed with prejudice.

**ARGUMENT**

14

I.     **PLAINTIFF'S CLAIMS UNDER SECTION 10(B) AND RULE 10B-5 FAIL**

15

16    A.     **The PSLRA's High Pleading Standard Is Not Easily Met**

17    Plaintiff must allege facts giving rise not merely to a reasonable inference, but to a

18    "strong inference" of scienter, which is "cogent and at least as compelling as any opposing inference one

19    could draw from the facts alleged."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324

20    (2007).  Although, as Plaintiff takes pains to repeat (Opp. at 8), the Court accepts a complaint's factual

21    allegations as true, it "must take into account plausible opposing inferences," *Tellabs*, 551 U.S. at 323,

22    and "[c]onclusory allegations and unreasonable inferences . . . are insufficient to defeat a motion to

23    dismiss." *Sanders* v. *Brown,* 504 F.3d 903, 910 (9th Cir. 2007).  A plaintiff seeking to satisfy its

24    scienter-pleading obligation by alleging deliberate recklessness still "must state specific facts indicating

25    no less than a degree of recklessness that strongly suggests *actual intent*."  *Metzler Inv. GMBH* v.

26    *Corinthian Colleges, Inc.,* 540 F.3d 1049, 1066 (9th Cir. 2008) (emphasis added) (quoting *In re Silicon*

27    *Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999)).  Plaintiff, again, has not met its burden.

28

**B.      The SAC Fails to Plead Facts Giving Rise to a Strong Inference of Scienter**

      **1.      The SEC Complaint Does Not Give Rise to a Strong Inference of Scienter**

As set forth in the Motion, courts routinely disregard allegations from other unadjudicated complaints like the SEC Complaint.[1]  (Mot. at 6-7.)  But even if the allegations lifted from the SEC Complaint are appropriately included in Plaintiff's SAC, the SAC still does not plead scienter.  It is with respect to the SEC Complaint that Plaintiff most clearly perverts the "holistic" analysis that it claims to call for.  The SEC Complaint does not plead a fraud case against any Defendant – or anyone else.  After its investigation – and despite having access to VeriFone's public filings, to Plaintiff's prior complaints, and to a host of materials to which Plaintiff has not had access – the SEC elected not to seek a fine against anyone or any entity other than Paul Periolat, the person who, the SEC alleges, made the incorrect accounting entries that led to VeriFone's restatement.  Were one truly assessing all of Plaintiff's allegations holistically, these facts would bear on one's assessment that the likely inference to be drawn was that VeriFone's restatement involved fraud.  No, no, says Plaintiff:  that would be crediting Defendants' "self-serving theories about *why* the SEC decided to settle" as opposed to the "underlying facts" set out in the SEC Complaint.  (*See* Opp. at 12 (emphasis in original).)  But the "underlying facts" of the SEC Complaint – considered holistically – not only do not support a fraud claim against any Defendant, they preclude such a claim.

So Plaintiff contends over and over that the SEC Complaint alleges that Defendants

---

[1] Plaintiff's attempt to distinguish the ample authority on this issue is unavailing.  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.* is squarely on point – the court there struck a plaintiff's serial references to a parallel SEC complaint against the same defendant because references to "proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are . . . immaterial. . . ."  218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (citing *Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976)).  The portion of *Merrill Lynch* that Plaintiff quotes (Opp. at 15 n.4) pertains to additional problems in the complaint and was not the basis for the court's decision to strike co-opted allegations.  *See Merrill Lynch*, 218 F.R.D. at 78.  Furthermore, *RSM Prod. Corp.* v. *Fridman* and *Dent* v. *U.S. Tennis Ass'n* (Mot. at 7) directly apply *Merrill Lynch*'s and *Lipsky*'s holdings to their respective facts.  Nor is this rule limited to courts of the Second Circuit.  *See*, *e.g.*, *Clugston* v. *Nationwide Mut. Ins. Co.*, No. 3:05-CV-2680, 2006 WL 1290450 at *4 (M.D. Pa. May 10, 2006) (citing *Merrill Lynch* and striking reference related to prior unadjudicated administrative complaint).  Plaintiff's cases (Opp. at 15 n.4) are not to the contrary.  *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 355 (S.D.N.Y. 2008) does not involve incorporated allegations.  And *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 216 (S.D.N.Y. 1999) preceded *Merrill Lynch*, and did not rule on the relevance of allegations co-opted from a parallel complaint, but, rather, discussed whether Plaintiffs had "allege[d] adequately the source of information in the Complaint" where an SEC complaint was but one of the sources that Plaintiff relied upon for "information and belief."

SULLIVAN
&
CROMWELL LLP

3

Bergeron and Zwarenstein had access to information indicating that the gross margins that VeriFone reported in the first three quarters were wrong – Plaintiff quotes the SEC's allegation that VeriFone's CEO or CFO described the actual gross margins for Q1 of 2007 as an "unmitigated disaster" eight times in its Opposition.  (Opp. at 2, 4, 14, 15, 16-17, 30 & n.10, 31)  But the SEC Complaint itself makes clear that Bergeron and Zwarenstein – and apparently everyone else at VeriFone involved in reviewing them – believed that these "unmitigated disaster" gross margins (and their counterparts in Q2 and Q3) were *incorrect and that the reported gross margins were correct*.  (Mot. at 8-9; SEC Compl. ¶¶ 15, 27.)[2]  The SEC Complaint does not even hint that these beliefs were not sincerely held.  Similarly, while Plaintiff goes on at extravagant length about the SEC's allegations that Periolat's accounting entries that resulted in VeriFone's later-restated gross margins were not appropriate (Opp. at 6-7, 15-17), Plaintiff ignores the allegations of the SEC Complaint that make clear that Periolat believed these accounting entries were correct – that they were fixing preliminary results that were incorrect.  (Mot. at 11; SEC Compl. ¶¶ 15, 27.)  And, while Plaintiff repeatedly points to the SEC Complaint's allegations that "senior management" was "aware" of Periolat's entries (Opp. at 3, 10, 14, 15, 16, 26 n.8), Plaintiff once again ignores the SEC's allegations that make clear that no one in VeriFone management, let alone any Defendant, reviewed these entries at all or had any reason to believe they were problematic until months later when Periolat himself reported the problem.  (Mot. at 11; SEC Compl. ¶¶ 21, 27, 29.)[3]

## 2. The Restatement Does Not Give Rise to the Required Strong Inference of Scienter

The SEC Complaint on its own does not help Plaintiff allege scienter.  Nor does it improve Plaintiff's other allegations, which remain inadequate largely for the reasons this Court rejected

---

[2] Defendants Atkinson and Bondy are not mentioned anywhere in the SEC Complaint – by name or title (Bergeron and Zwarenstein appear only to be mentioned by title).

[3] Additionally, according to Plaintiff, the allegation in the SEC Complaint stating that Bergeron and Zwarenstein "instructed *management*" to figure out the problem (SEC Compl. ¶ 17 (emphasis added)) actually means that "Bergeron and Zwarenstein . . . instructed *Periolat* and other financial personnel" to figure out the problem.  (SAC ¶ 11 (emphasis added); Opp. at 2.)  The SEC mentioned Periolat by name throughout the SEC Complaint, so it clearly knew how to do so had that been its intention.  Plaintiff offers no basis to conclude that this one time, when the SEC did *not* mention Periolat by name and used the term "management," which does not remotely describe him (the SEC elsewhere described him as a "mid-level controller" (SEC Compl. ¶ 27)), the SEC meant to include "Periolat."

1    them previously.  Thus, Plaintiff runs again into the Court's previous holding that the fact (or size or

2    duration) of the restatement here is insufficient to establish scienter.  (Order at 11-12; D.E. 182 at 3-4.)

3    Plaintiff, again, argues that this case meets the "narrow conditions" of the exceptions to the general rule

4    that a restatement by itself does not establish scienter.  (Opp. at 10-11, 18-20.)  Not even close.[4]

5                    a.    **The SAC and SEC Complaint Do Not Support Plaintiff's Allegation
                          that Bergeron and Zwarenstein Had "Actual Access to the Disputed
6                          Information"**

7                    The allegations in the SAC and the SEC Complaint do not, as Plaintiff contends, establish

8    any Defendant's "actual access to the disputed information" as required under the first exception.  *Zucco*

9    *Partners LLC* v. *Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009).  In fact, as noted above, the SEC

10   Complaint makes clear that no Defendant – or any member of "senior management" – reviewed

11   Periolat's accounting entries.[5]  (SEC Compl. ¶¶ 21, 27.)  Plaintiff argues that because the accounting

12   errors at issue had the effect of increasing gross margins, it would be "absurd" for Bergeron and

13   Zwarenstein to suggest that they did not have knowledge of them.  (Opp. at 18-19.)  But the accounting

14   errors at issue were not "gross margin errors."  No line-item adjustment was made that "fabricated

15   millions of dollars in gross margin" out of nothing.  (Opp. at 19.)  The accounting entries at issue here

16   (the "disputed information") involved:  (1) allocation of overhead expense – that is, an accounting entry

17   was made to increase the value at which that inventory was carried on VeriFone's books by adding an

18   amount of overhead expense to it – to inventory that sat in foreign subsidiaries that VeriFone had just

19   ───────────────

20          [4] The allegations with respect to the restatement itself are unchanged. (*Compare* SAC ¶¶ 114-25
     *with* CC ¶¶ 77-78, 81-89.)  Plaintiff's claims that the 2007 public statements regarding Lipman's
21   integration, gross margins, and inventory accounting raise an inference of scienter because they later had
     to be restated (Opp. at 20-21) fail for the same reasons already articulated in previous briefing. (D.E.
22   164 at 6-9, 10-11, 20-21).  Many of the statements, such as those regarding the quality and extent of the
     integration efforts, were nothing more than expressions of corporate optimism, which do not give rise to
23   securities violations.  *See Glenn Holly Entm't* v. *Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003); *In re*
     *Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1158-59 (S.D. Cal. 2008) (holding statements that
24   acquisition proceeding "very well," "on schedule," and was "already a success" not actionable).
     Plaintiff's "new" allegations (Opp. at 21-22) regarding statements of Defendants' periodic review of
25   inventory reports fail to provide any basis as to how Defendants supposedly knew such statements were
     false when made, as did Plaintiff's allegations for similar statements in the prior complaint.  (Order at
26   14; D.E. 164 at 9-10, 22; D.E. 182 at 18-19.)

27          [5] Contrary to Plaintiff's assertion, (Opp. at 15), Defendants do not dispute that the SEC
     Complaint's references to "senior management" are intended to include Bergeron and Zwarenstein.
28   They may well be (Mot. at 11) – but they may also be intended to include other unnamed VeriFone
     officers, or to refer to only one of Bergeron or Zwarenstein in any particular instance.  Because the SEC
     Complaint nowhere explicitly defines the term, no one but the SEC can say.

SULLIVAN
&
CROMWELL LLP

                                                         5

acquired, and (2) re-calculations of the amounts of in-transit inventory between VeriFone's manufacturing facilities – including those it had just acquired – and its warehouse. (SAC ¶¶ 106-111; SEC Compl.¶¶ 18, 24-25; *see also* Order at 11). These technical accounting errors affected gross margins, as would most any other aspect of VeriFone's business. The proper focus of the scienter inquiry is on Bergeron's and Zwarenstein's awareness of the underlying accounting errors, *not* the bottom line results affected by these errors.[6]  *See Digimarc*, 552 F.3d at 1001 (holding management's access to purportedly manipulated accounting numbers – "or that the management analyzed the inventory numbers closely" – did not raise inference of scienter); *Metzler*, 540 F.3d at 1067-69 (holding management's knowledge of bottom line revenue insufficient to plead scienter and focusing on whether management would have known about an alleged underlying fraud in student enrollment numbers).

While the SEC Complaint's allegations indicate that members of "senior management" may have been "aware" that adjustments were made by Periolat (SEC Compl. ¶ 27), there is no factual basis alleged in the SEC Complaint or in the SAC to infer that either Bergeron or Zwarenstein had access to, or awareness of, the underlying data from which the accounting numbers were derived or had any reason to believe that Periolat's technical inventory calculations were in error. *See Digimarc*, 552 F.3d at 1000-01. Plaintiff alleges no facts tending to show that Bergeron or Zwarenstein had any basis to assess whether the amount of overhead expense allocated to inventory at former Lipman subsidiary locations was reasonable or not. Neither does Plaintiff allege that Bergeron or Zwarenstein would have had any idea how much inventory was reported to be – as compared to how much actually was – "in transit" between its manufacturing and warehouse facilities around the world. Indeed, Plaintiff's allegations do not give rise to the inference that even Periolat was aware of his mistake when making these technical inventory accounting entries. (Mot. at 10-11; SEC Compl. ¶ 29.) Plaintiff asserts that Bergeron and Zwarenstein "looked the other way" (Opp. at 16), but the SAC provides no basis to believe that Bergeron or Zwarenstein had any reason to doubt Periolat's entries. Bergeron and

_____

[6] Plaintiff continues to argue that the forecasted gross margins themselves were implausible. (Opp. at 3, 5, 20-21.) The SEC Complaint says nothing of the kind. And the SAC itself contains several plausible reasons articulated by VeriFone and accepted by analysts as to why VeriFone's gross margins could well increase as a result of the Lipman merger. (SAC ¶¶ 65-75.) Plaintiff attempts to discredit those claims with the benefit of hindsight, but like it did last time (Order at 14; D.E. 182 at 18-19), fails to provide any basis to conclude that VeriFone personnel believed these forecasts unreasonable.

1   Zwarenstein are alleged to have been informed that Periolat had discovered the reasons for the variance

2   between preliminary results and the forecast, and that Periolat's adjustments brought the results in line

3   with the historically accurate forecast, which Bergeron and Zwarenstein were "convinced" was correct.

4   (SAC, Ex. 1; SEC Compl. ¶ 27.)  Plaintiff thus offers no basis to alter the Court's prior conclusion that

5   the first exception does not apply.  (*See* Order at 11.)

6
            **b.        The SAC and SEC Complaint Do Not Support Plaintiff's Allegation
                         that the Accounting Errors were "Obvious"**
7

8               Similarly, the errors in inventory accounting were not "obvious from the operations of the

9   company," as required by the second exception to the rule that a restatement does not give rise to an

10  inference of scienter.  The errors did not involve operational facts about VeriFone comparable to the

11  four stop-work orders in *Berson* v. *Applied Signal Tech., Inc.,* 527 F.3d 982, 987-88 & n.5 (9th Cir.

12  2008).  (Order at 11-12.)  They were accounting entries – as to aspects of VeriFone's business of which

13  its senior managers were especially unlikely to be aware.  Nowhere, for example, does the SAC allege

14  that any Defendant had any basis to assess that a particular amount of overhead allocated to the former

15  Lipman subsidiaries' inventory was appropriate or that a particular amount of inventory was likely to be

16  at a given time traveling between VeriFone facilities.  Even if these managers had some basis to know

17  these things as to VeriFone's legacy operations – none is alleged – the entries in question were made in

18  the immediate wake of, and with respect to parts of VeriFone's business acquired in, the Lipman

19  acquisition, meaning that errors in these entries were especially likely to escape VeriFone's managers'

20  notice.[7]  Similarly, Plaintiff's suggestion that the alleged "accounting manipulations" were "simple" and

21  ──────────────

22          [7] Plaintiff's reliance on *America West*, which dealt with facts of far greater operational
    significance, is misplaced.  *See No. 84 Employer-Teamster Joint Council Pension Trust Fund* v. *Am.
    West Holding Corp.,* 320 F.3d 920, 943 n.21 (9th Cir. 2003) (presuming Board knowledge of FAA
23  investigations, negotiations, and threatened $11 million fine related to maintenance failures, and "the
    repurchasing authorization for millions of dollars worth of stock").  Similarly, the inventory calculations
24  here are nothing like the operational data at issue in *PMI*, nor are there any specific allegations of
    defendant awareness of the challenged data comparable to *PMI*.  *In re PMI Group, Inc. Sec. Litig.*, No.
25  08-1405-SI, 2009 U.S. Dist. LEXIS 101582 at *8-9 (N.D. Cal. Nov. 2, 2009).  Plaintiff cites
    *Institutional Investors Group* v. *Avaya*, 564 F.3d 242, 270-71 (3d. Cir. 2009) and *Ross* v. *Abercrombie
26  & Fitch Co.*, 501 F. Supp. 2d 1102, 1107 (S.D. Ohio 2007), because they discuss errors that affected
    gross margins, but both of these cases involved company-wide practices such as widespread discounting
27  (*Avaya*) and declining sales and widespread markdowns at stores that management was aware of
    (*Abercrombie*).  They do not stand for the proposition that any error that affects bottom-line profits
28  permits a presumption of management awareness.

1    "basic" (Opp. 19), is mere say-so, unsupported by *any* facts.[8]

2         Plaintiff relies heavily on *In re Cadence Design Sys. Sec. Litig.*, No. 08-4966-SC, 2010

3    U.S. Dist. LEXIS 19003 (N.D. Cal. Mar. 2, 2010) in support of its argument that Bergeron and

4    Zwarenstein must have known of Periolat's errors.  (Opp. at 11, 14, 20.)  *Cadence*, however, involved

5    myriad CWs alleging that one senior executive defendant was "directly involved" in negotiations of

6    contracts with customers that were designed to achieve an erroneous accounting treatment, all within the

7    context of long-term instructions from management to engage in this practice in order to "engorge short-

8    term revenue at the expense of long-term profit."  *Cadence*, 2010 U.S. Dist. LEXIS 19003 at *18-19.

9    Neither the SAC allegations nor the SEC Complaint present facts showing that Bergeron or Zwarenstein

10   were involved in Periolat's adjustments, reviewed them, or thought that they were incorrect.

11        The case most like this one – as it was with Plaintiff's prior complaint – remains

12   *Digimarc*, which Plaintiff cannot distinguish.  The facts of *Digimarc*, as explained previously (*see* Defs'

13   Reply Brief, D.E. 182 at 1-2 & n.1, 7, 9, 19), are strikingly similar to those here:  A defendant

14   corporation "overwhelmed with integrating a large new division into its existing business" commits an

15   error in accounting for inventory and then issues a restatement.  552 F.3d at 988, 1007.  Periolat's

16   technical accounting entries here, like those in *Digimarc*, were not obvious enough to trigger any narrow

17   exception.  *Id.* at 1001.[9]

18        **3.    The Allegations of the CWs Do Not Raise a Strong Inference of Scienter**

19        The allegations of the three new CWs – and the allegations from the ten CWs from

20   Plaintiff's prior complaint – likewise provide no basis for an inference of scienter.  Plaintiff essentially

21   ─────────────

22        [8] The cases Plaintiff cites in support of the alleged "simplicity" of the accounting mistakes are
     inapposite.  (*See* Opp. at 19.)  *Ley* rejected the plaintiff's claim that "accounting improprieties" of $198

23   million in connection with a hundred-million dollar restatement with were so "obvious" or so "great in
     magnitude" as to evidence scienter.  *Ley* v. *Visteon Corp.*, 543 F.3d 801, 805, 810-12 (6th Cir. 2008).

24   And *Daou* and *Microstrategy* involved allegations of accelerated revenue recognition in circumstances
     where management had far greater insight into the accounting issues.  *See In re Daou Systems*, 411 F.3d

25   1006, 1019-20 (9th Cir. 2005) (premature recognition of revenue in major contracts before work had
     been performed or contract signed); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638-39

26   (E.D. Va. 2000) (premature recognition of revenue in connection with "three of the most important
     contracts in [corporation's] life").

27        [9] Plaintiff argues that the restatement in *Digimarc* was different because it was smaller in
     absolute terms than VeriFone's.  (Opp. at 18-19.)  But there is no indication that the restatement in

28   *Digimarc*, a case involving a "fledgling Delaware corporation," was not, on a relative basis, as
     significant as the restatement at issue here.  *Digimarc*, 552 F.3d at 987-88.

SULLIVAN
&
CROMWELL LLP

8

1   concedes this point (*see* Opp. at 26 ("Defendants spend many pages slicing, dicing and scrutinizing CWs

2   11-13 'in isolation' with no regard for their holistic import")), and relies on its interpretation of the SEC

3   Complaint to bolster its CW allegations.  (*Id.* at 25 ("In light of the new facts revealed in the SEC

4   action . . . the interlocking reports of the 13 witnesses take on improved corroborative strength.").)[10]  To

5   the extent that the CWs allege a chaotic VeriFone accounting department, overwhelmed by the Lipman

6   integration and lacking adequate inventory controls to prevent the errors that caused the restatement (*see*

7   Opp. at 25-26), these allegations are consistent with the SEC Complaint.  (SEC Compl. ¶¶ 21, 27.)  But

8   being overwhelmed or underprepared "does not raise an inference of scienter."  (Order at 13.)

9           Again, none of the CW allegations plausibly offer any insight into Bergeron's or

10  Zwarenstein's mental state because no CW claims to have reported directly to Bergeron or Zwarenstein.

11  No CW alleges that Bergeron or Zwarenstein ever instructed them or anyone else to make a false

12  accounting entry.  No CW alleges that he or she believed that the gross margins reported in FY 2007

13  were implausible.  With one possible exception, none of the CWs alleges that he or she believed, or

14  heard others express the view prior to the restatement that VeriFone's reported results for FY2007 were

15  in any way incorrect.  The fact that, among 13 CWs who are alleged to have worked in various

16  departments including VeriFone's finance department, not one can provide any evidence of fraudulent

17  activity at VeriFone is strongly suggestive that there was none.[11]

18          Plaintiff asserts that "CW11, CW12 and CW13 simply provide additional corroboration

19  that Periolat's inventory adjustments – which included booking inventory that ***did not exist*** – was

20  obvious to anyone who bothered to look."  (Opp. at 27 (emphasis in original).)  This is false as to all

21  three CWs.  This is the only sentence in the Opposition where CW11 and CW12 are substantively

22          [10] CWs 1-10 still provide no evidence of scienter, just as they did not in Plaintiff's prior
23  complaint.  (Order at 13; Mot. at 22; *see* D.E. 164 at 12-14.)  Plaintiff's "newly amended allegations"
    (Opp. at 25) regarding Zwarenstein's presence at monthly meetings or VeriFone' use of manual journal
24  entries are not new, were discussed in Defendants' previous reply, and have already been held
    insufficient by the Court.  (D.E. 182 at 9-11; Order at 11-13, 15.)

25          [11] Plaintiff proposes a "reasonable explanation" as to why "many of the CWs may not have
    expressly blown the whistle on Periolat's false journal entries."  (Opp. at 26 n.8.)  This is somehow to do
26  with the fact that "[t]he fraud was a top-down enterprise" and "CWs were not in a position to second
    guess such high-level manipulations."  (*Id.*)  To the extent that this "explanation" relies on Plaintiff's
27  misreading of the SEC Complaint, it is no explanation.  But even if there were a good reason for the
    CWs' failure to allege fraud, the fact remains that *they have failed to allege fraud*.  This may not exclude
28  the possibility of fraud, but it certainly does not help Plaintiff meet the burden of alleging fraud.

SULLIVAN
&
CROMWELL LLP

9

1   discussed, which means Plaintiff fails to respond to Defendants' demonstration that the inventory

2   problems they purport to describe bore no relationship to Periolat's entries or to VeriFone's restatement.

3   (Mot. at 12-14.)  As to CW13, he or she claims to have prepared a report "[i]n 1Q07" describing

4   allegedly inflated inventory valuations.  (SAC ¶ 137.)  Whatever problem this report purported to

5   uncover could not possibly have identified the errors that caused the restatement – they had not been

6   made yet and the gross margin issue to which they related had not yet become known.  Because Plaintiff

7   points to no aspect of VeriFone's restatement that relates to "inventory valuation" errors made prior to

8   Periolat's incorrect entries and because Plaintiff nowhere else alleges that these errors were later

9   corrected and led to its or class members' losses, it is not even clear that CW13 has adequately alleged

10  an error that anyone other than CW13 is aware of.  Even if CW13 had done so, however, he or she, like

11  the other CWs, fails to allege that Bergeron or Zwarenstein was aware of this error or of any other

12  inaccuracies in VeriFone's financial statements.  CW13 does not claim to have informed Bergeron or

13  Zwarenstein or any other member of management about the report despite allegedly believing that

14  VeriFone "included the inflated inventory in the Company's publicly reported results." (*Id.*)  And, no

15  other CW in VeriFone's finance department claims to have seen or heard of CW13's report, let alone

16  agreed that it accurately described an error in VeriFone's inventory.[12]

17          **4.      Defendants' Stock Sales Do Not Raise a Strong Inference of Scienter**

18                  The most telling stock trade allegation is the one that appears nowhere in the SAC:  the

19  allegation describing all the suspiciously timed stock sales of Paul Periolat.  The person who Plaintiff

20  claims was responsible for the incorrect accounting entries, which he supposedly made knowingly, is not

21

22          [12] Plaintiff's description of CW3's interaction with Zwarenstein (SAC ¶ 178) actually provides
    further basis for a *non-fraudulent* reading of the SEC Complaint.  Plaintiff's entire theory of fraud

23  depends on reading the SEC Complaint's allegations regarding Bergeron's and Zwarenstein's emails
    characterizing the low gross margins as an "***unmitigated disaster***" and instructing management to

24  "***figure it . . . out***" as directives to Periolat to bring financial results in line with forecasts by making
    fraudulent accounting entries.  (*See* Opp. at 2 (emphases in original).)  But Plaintiff's own allegations

25  concerning CW3 portray an almost identical directive from Zwarenstein as merely an instruction to
    correct an accounting error, not to make fraudulent adjustments.  CW3 claims to have received a call

26  from Zwarenstein, who was in a "state of panic" because of errors in a report that, if not fixed, would
    affect VeriFone's consolidated financial reports.  (SAC ¶ 178.)  CW3 claims that Zwarenstein instructed

27  him to "figure it out" which CW3 did not understand as a directive to commit fraud – just the opposite:
    Zwarenstein was allegedly panicked because the numbers were not correct and he directed CW3 to fix

28  the problem by *correcting the errors in the report*.  (*Id.*)

SULLIVAN
&
CROMWELL LLP

alleged to have made a single trade or received one cent in illicit gain from his purported misconduct. (*Cf.* D.E. 238 at 11 ("Periolat sold no stock . . .").)  This non-allegation is as solid corroboration that Periolat had no idea that his entries were incorrect as can be imagined.  The stock sales that Plaintiff *does* allege – especially those of Defendants Atkinson and Bondy who are not alleged to have played any role at all in the events giving rise to the restatement – do not further the inference of scienter.

### a.       Amount and Trading History

Based on Plaintiff's allegations in the SAC, the amount of stock that Bergeron, GTCR and Atkinson traded in the Class Period is consistent with the amount of stock they traded in the pre-Class period.  (*See* SAC ¶ 200; Mot. at 17-19.)  This no doubt explains Plaintiff's "Appendix" to the Opposition, which alters the SAC's allegations by drastically reducing pre-Class trading amounts for each Defendant.  (*Compare* SAC ¶ 200 *with* D.E. 240-1 ("Appendix") at 3, 6, 8.)  In the first place, this new "data" is not properly before the Court on this Motion – it should have been in the SAC.  (*See* Order at 10 (citing *Broam* v. *Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).)  But more importantly, the Appendix's elision of certain of Defendants' stock sales from the pre-class period has no legal basis. Other than Plaintiff's assertion that sales of VeriFone stock that allegedly followed the lifting of IPO-related restrictions are "outlier[s]" (Opp. at 29, 33), Plaintiff provides no rationale for not counting them. Plaintiff does not suggest that these trades did not involve public market sales of common stock.  In "examin[ing] whether [class period] trading practices were out of line with prior practice," this Court has previously included post-IPO lockup sales in a pre-class period without distinguishing the initial post-lockup sale from those that followed.  *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 874 (N.D. Cal. 2004).  Plaintiff's reliance on *America West* is misplaced – there, the pre-class trades (warrant sales to the corporation and private placements of stocks to underwriters) were not comparable to class period trades because they "did not occur on the open market."  *No. 84 Employer-Teamster Joint Council Pension Trust Fund* v. *Am. West Holding Corp.*, 320 F.3d 920, 941 (9th Cir. 2003).

Thus, Plaintiff's Appendix gambit to the side, the amount of trading and trading history alleged by Defendants are not suspicious.  "[B]y themselves, large numbers do not necessarily create a strong inference of fraud."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002).  And here, the consistent amounts of stock that Bergeron, GTCR, and Atkinson traded in both the pre-Class

SULLIVAN
&
CROMWELL LLP

11

1  and Class periods, (SAC ¶ 200), and the large amounts of unsold stock that Bergeron and GTCR

2  retained *after* the Class Period, undercut any inference of scienter.[13]

3            **b.**      **Timing**

4          "[S]tock sales are helpful only in demonstrating that certain statements were misleading

5  and made with knowledge or deliberate recklessness when those sales are able to be related to the

6  challenged statements." *Vantive*, 283 F.3d at 1093.  Defendants' stock sales were not suspiciously timed.

7          ***Bergeron:***  Plaintiff's allegations in the SAC (SAC ¶¶ 201-03, Ex. 4.) fail to establish

8  any suspicious pattern or timing of specific trades on the part of Bergeron.  Only in its Opposition does

9  Plaintiff attempt to link any of Bergeron's specified trades to any purported wrongdoing.  (*See* Opp. at

10  30 (discussing timing of 200,000 share trades in relation to "unmitigated disaster" e-mail in February

11  2007)).  But Bergeron's class period trading before early February 2007 (when Periolat made the first of

12  his alleged errors (SAC ¶ 201)) was at essentially the same rate as Bergeron's trading thereafter.  (Mot.

13  at 19-20.)  Rather than suggest a pattern of fraud, this trading pattern is consistent with Bergeron's

14  having the sort of non-discretionary 10b5-1 plan that governed his trading throughout the Class Period.

15  (*See* Bergeron Form 4 filings, D.E. 164-5 (footnotes thereto).)  Trading under such a plan tends to

16  negate an inference of scienter.  *See Metzler*, 540 F.3d at 1067 n.11.[14]

17          ***Atkinson:***  Plaintiff has not cured the defects of the SAC with respect to Atkinson, failing

18  to allege any actionable false statement, any basis for inferring that Atkinson had access to non-public

19  information about VeriFone's financial results, or any link between specific sales and specific alleged

20

---

21      [13] Plaintiff again minimizes Defendants' substantial stock losses (Opp. 30 n.10), but there is no

22  denying that GTCR and Bergeron held on to stock valued in the hundreds of millions of dollars (*see* SAC ¶¶ 199, 201 (noting percentage of shares sold)) – dollars that, were Plaintiff's fraud theory

23  plausible, they should have got while the getting was good.  Their failure to do so negates an inference of scienter.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424-25 (9th Cir. 1994); (D.E. 164 at 17).

24      [14] Contrary to Plaintiff's assertion (Opp. at  30 n.9), *Metzler* is not *dicta* on this point – the Ninth

25  Circuit noted that two defendants' trading "took place according to pre-determined 10b5-1 trading plans" in support of its holding that stock trading allegations did not plead scienter.  *Metzler,* 540 F.3d at

26  1067 n.11.  At the pleading stage, "the use of [10b5-1] plans may raise an inference in Defendants' favor that the sales may not be suspicious."  *Limantour* v. *Cray Inc.*, 432 F. Supp. 2d 1129, 1150 n.9 (W.D.

27  Wash. 2006); *Wietschner* v. *Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003).  Even if the 10b5-1 plans are not solely a basis on which Plaintiff's SAC could be dismissed – Defendants do not

28  assert that they are – certainly, a "holistic" analysis would take account of the fact that Defendants' class period trades were done pursuant to non-discretionary plans and thus unlikely to be suspiciously timed.

1   misstatements.  (*See* Mot. at 18 n.11.)  Plaintiff's claim that Atkinson's alleged amendment of his

2   10b5-1 plan is suspicious is baseless:  the amendment occurred in January 2007 (SAC ¶ 210), *before* the

3   events giving rise to the first of Periolat's accounting entries in February 2007.  (SAC ¶ 13).

4         ***Bondy/GTCR:***  Plaintiff fails, again, to show that GTCR's trading was suspiciously timed

5   in any way.  (Mot. at 20 & n.12.)  Nor does Plaintiff, even at this juncture, provide any authority for its

6   contention that stock owned and traded by GTCR is somehow evidence of scienter for Bondy, who

7   worked at GTCR.  Bondy – one of numerous "principals" of GTCR – expressly and repeatedly

8   disclaimed beneficial ownership of the VeriFone shares held by GTCR and is not alleged to have been a

9   member of the six-person GTCR committee that had actual voting authority over shares held by GTCR.

10  (D.E. 182 at 16 n.9; D.E. 164-3, Ex. C at 151 n.1 & Ex. D (footnotes 1 and 3 thereto)).  And Plaintiff

11  provides no authority for its assertion that Form 4s acknowledging that Bondy "may be deemed to have"

12  an unspecified, "indirect pecuniary interest" in GTCR's VeriFone stock proportionate to his unspecified

13  interest in GTCR (Opp. at 32; *see* D.E. 164-3, Ex. D (Form 4s (footnotes 4-6 thereto))), somehow

14  afforded him any insight into or influence concerning any aspect of VeriFone's business, let alone the

15  specific accounting entries that gave rise to its restatement.

**5.      Recycled Allegations of SOX Certifications, Departures, 2006 Statements,
and Incentive Compensation Do Not Raise a Strong Inference of Scienter**

18        This Court has already held that required certifications under Sarbanes-Oxley section

19  302(a) "add nothing substantial to the scienter inquiry."  (Order at 13 (citing *Digimarc*, 552 F.3d at

20  1003-04).)  To the extent that Plaintiff's curiously lengthy disquisition on the Sarbanes-Oxley

21  certifications of Bergeron and Zwarenstein depends on Plaintiffs' misreading of the SEC Complaint –

22  and that is the only basis for these allegations not already rejected by this Court (Order at 12-13) –

23  plainly, these assertions do not assist Plaintiff.

24        Plaintiff's argument that Zwarenstein's resignation in April 2008 supports an inference of

25  scienter – because VeriFone must have kept him on and continued to pay him and had him act as its

26  CFO and sign additional Sarbanes-Oxley certifications on its behalf (D.E. 164-3, Ex. C at 159) because

27  he was uniquely situated to undo all the fraudulent transactions he had previously masterminded (Opp.

28  at 33-34) – is just nutty.  Even in Plaintiff's most fevered version of its fraud theory, it is Periolat, not

1    Zwarenstein, conceiving of and making the improper accounting entries.  Plainly, the more reasonable

2    inference to draw from Zwarenstein's staying on for months after the restatement was announced is that

3    he was not implicated in any wrongdoing associated with it.  The Court already concluded that the

4    inference of scienter is not as plausible as the competing inference that large mistakes frequently have

5    employment consequences, and has also already rejected Plaintiff's incentive compensation allegations.

6    (Order at 14-15.)  The only way these allegations have been improved is by reference to the SEC

7    Complaint, which, once again, does not support a fraud claim in this (or any) regard.[15]

8              **6.       A "Holistic" Review Does Not Raise a Strong Inference of Scienter**

9              As noted above, what *Digimarc* said about its "holistic" assessment of the allegations in

10   that case could just as easily have been said about Plaintiff's allegations here:  "Although the allegations

11   in this case are legion, even together they are not as cogent or compelling as . . . . the conclusion that

12   [the company] was simply overwhelmed with integrating a large new division into its existing business."

13   *Digimarc,* 552 F.3d at 1007.  Here, the SEC conducted an investigation and filed a complaint that

14   described the non-fraudulent circumstances leading to the restatement.  Defendants' trading – and Paul

15   Periolat's total lack of trading – is not remotely suspicious.  13 CWs have come forward and not one of

16   them claims that they knew that the accounting entries that led to VeriFone's restatement were incorrect

17   when made, let alone that any Defendant knew it.  These circumstances, *especially* when considered

18   together, reinforce the conclusion that Plaintiff's proposed inference of scienter is totally implausible.

19         **C.      Periolat's Conduct Is Not Attributable to VeriFone**

20              Plaintiff's allegations do not establish scienter with regard to any Defendant.  For the

21   reasons stated above and in his motion, they also fail to do so as to Periolat.  But even if Periolat had

22   acted with scienter, Periolat's conduct is not attributable to VeriFone.  In the Ninth Circuit, a corporation

23   is deemed to have acted with scienter with regard to a public statement only if the *director* or *officer*

24

25   _____

     [15] As to Defendants' "prototypical[ly] forward-looking" statements made in 2006 (Order at 14),
26   Plaintiff continues to insist that those statements are actionable and accuses Defendants of failing to
     substantively address them. (Opp. at 20, 21 n.7)  But Plaintiff offers no new information regarding these
27   forward-looking statements, and they remain protected by the PSLRA safe harbor provision.  *Copper
     Mountain*, 311 F. Supp. 2d at 880.  Plaintiff's repeated references to "undisclosed facts," such as
28   Lipman's declining margins and increasing international sales, which analysts publicly discussed in
     2006, obviously were not "undisclosed."  (Opp. at  21 n.7; SAC ¶¶ 71, 72, 74, 75, 86.)

SULLIVAN
&
CROMWELL LLP

1   who made the alleged misstatement acted with scienter.  *Nordstrom* v. *Chubb*, 54 F.3d 1424, 1436 (9th

2   Cir. 1995) ("[C]orporate scienter relies heavily on the awareness of the directors and officers, who . . .

3   are necessarily aware of the requirements of SEC regulations and state law and of the 'danger of

4   misleading buyers and sellers.'" (citation omitted)); *In re Invision Techs., Inc. Sec. Litig.*, No. C04-

5   03181 MJJ, 2006 U.S. Dist. LEXIS 76458, at *23-24, 25 n.6 (N.D. Cal. Aug. 31, 2006) (holding that

6   even though some employees may have been aware of fraud, scienter cannot be imputed to corporation

7   where plaintiffs failed to establish scienter of officers who made public misstatements), *aff'd sub nom.*,

8   *Glazer Capital Mgmt., L.P.* v. *Magistri*, 549 F.3d 736, 744-45 (9th Cir. 2008).  (*See also* Mot. at 15-16.)

9           Periolat was not a VeriFone officer, and he made none of the challenged statements.

10  Periolat was the quintessential non-officer employee working in the company's finance department who

11  "accidentally overstated the company's earnings and the erroneous figure got reported in good faith up

12  the line to [the CEO] and other senior management, who then included the figure in their public

13  announcements."  *Makor Issues & Rights, LTD* v. *Tellabs Inc.*, 513 F.3d 702, 707 (7th Cir. 2008).  His

14  conduct – and even his misconduct, were there any – is thus not chargeable to VeriFone.[16]

## II.     PLAINTIFF'S SECTION 10(B), 20A INSIDER TRADING, AND SECTION 20(A) CLAIMS FAIL

16          Because Plaintiff has failed to plead scienter on the part of any Defendant, Plaintiff's

17  claims under § 10(b), Rule 10b-5, § 20A, and § 20(a) all fail.  (*See* Mot. at 23-25.)  The further bases set

18  forth in Defendants' Motion (*id.*), on which Defendants submit, also require dismissal of these claims.

### CONCLUSION

20          For the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice.

21  Date: May 3, 2010                               /s/ Brendan P. Cullen
22                                                   Brendan P. Cullen

---

26          [16]  Although Plaintiff accuses Defendants of understating Periolat's "unmistakably high-level"
27  role at VeriFone (Opp. at 4), it is difficult to see how Defendants' description of Periolat as VeriFone's
    "former supply chain controller" (Mot. at 4) is the least bit misleading – the SAC itself describes him as
28  VeriFone's "Supply-Chain Controller during the Class Period" (SAC ¶ 43) and the SEC Complaint
    describes him as a "mid-level controller."  (SEC Compl. ¶ 27.)

SULLIVAN
&
CROMWELL LLP

Brendan P. Cullen (SBN 194057)
Scott C. Hall (SBN 232492)
Sverker K. Högberg (SBN 244640)
Achyut J. Phadke (SBN 261567)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone:      (650) 461-5600
Facsimile:       (650) 461-5700

Robert A. Sacks (SBN 150146)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067
Telephone:      (310) 712-6600
Facsimile:       (310) 712-8800

Attorneys for Defendants VERIFONE HOLDINGS,
INC., DOUGLAS G. BERGERON, WILLIAM G.
ATKINSON and CRAIG A. BONDY

DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS SAC; MASTER FILE NO. C 07-6140 MHP