ROBBINS GELLER RUDMAN
  & DOWD LLP
SANFORD SVETCOV (36561)
ELI R. GREENSTEIN (217945)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
sandys@rgrdlaw.com
elig@rgrdlaw.com
        – and –
PATRICK J. COUGHLIN (111070)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VERIFONE HOLDINGS, INC. SECURITIES LITIGATION | ) ) ) ) | Master File No. 3:07-cv-06140-MHP <br><br> CLASS ACTION |
| This Document Relates To: <br><br> ALL ACTIONS. | ) ) ) ) ) ) | REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

577425_1

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 14 |
| III. | THE PARTIES | 14 |
| IV. | CONFIDENTIAL WITNESSES | 18 |
| V. | BACKGROUND LEADING UP TO THE CLASS PERIOD | 22 |

A. VeriFone's Gross Margin Was One of Its Most Important and Closely Monitored Financial Metrics .......... 22

B. April 10, 2006: VeriFone Announces the Acquisition of Lipman and Bergeron and Zwarenstein Assure Investors that the Merger Will Increase the Company's Gross Margins and Earnings in 2007 .......... 23

C. April 10, 2006-August 30, 2006: VeriFone's Stock Price Declines Due to Investor Concerns About Declining Margins at Lipman and the Operational Impact of the Merger .......... 24

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND FRAUDULENT COURSE OF CONDUCT .......... 26

A. VeriFone's False Financial Representations in 1Q07, 2Q07 and 3Q07 .......... 26

1. The False Financial Results .......... 26

2. Defendants' False Certifications of VeriFone's Internal Controls over Financial Reporting .......... 28

3. Defendants' False Statements to Investors Concerning the Reasons for the Inflated Financial Results .......... 29

a. 1Q07 Conference Call: .......... 29

b. 2Q07 Conference Call: .......... 31

c. 3Q07 Conference Call: .......... 32

d. Analysts Repeated Defendants' False Statements .......... 32

B. Facts Establishing Falsity and Scienter .......... 34

1. The Facts and Evidence Revealed in the SEC's Enforcement Action Establish Deliberate Recklessness .......... 35

2. Numerous Facts Set Forth in Transcripts of Testimony Taken by the SEC Reinforce the Strong Inference of Scienter .......... 40

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

1

2                                                                                                    **Page**

3            a.      The SEC Transcripts Confirm that Periolat's Role and
                     Responsibilities Were Senior Level and He Substantially
4                    Participated in and Co-Authored VeriFone's False
                     Financial Results................................................................................40
5
             b.      The SEC Transcripts Confirm that VeriFone's Accounting
6                    Manipulations Were a Top-Down Directive from
                     Defendants Who Were Aware of Gross Margin Problems
7                    as Early as 2006 When They Falsely Touted the Lipman
                     Merger as an Unmitigated Success..................................................44
8
             c.      Bergeron and Zwarenstein Supervised, Directed and
9                    Controlled Periolat's Accounting Adjustments and
                     Communicated with Periolat Throughout the Period of the
10                   Accounting Fraud.............................................................................49

11           d.      Bergeron and Zwarenstein Were Aware of Periolat's
                     Manipulations of VeriFone's 2Q07 Financial Results...................59
12
             e.      Bergeron and Zwarenstein Directed Periolat's Fraudulent
13                   Manipulations in 3Q07 ...................................................................61

14           f.      Merkl's Testimony Confirms that Periolat Had Senior-
                     Level Responsibilities and that Bergeron and Zwarenstein
15                   Were Aware of His Adjustments ......................................................64

16           g.      Bergeron and Zwarenstein Had Actual Knowledge of
                     VeriFone's Gross Margin and COGS Manipulations
17                   Through Weekly Reports and Direct Updates From Periolat
                     and Others .......................................................................................66
18
             h.      The SEC Testimony Shows that Bergeron and Zwarenstein
19                   Closely Scrutinized and Reviewed Inventory and Knew
                     Periolat's Adjustments Caused a "Sharp and
20                   Unprecedented Increase in Inventory"............................................68

21      3.   Facts Revealed in the Court's August 26, 2010 Derivative Order
             Show that Defendants Were Aware of Severe Undisclosed
22           Financial Reporting Problems that They Concealed from Investors
             and Deliberately Exploited to Facilitate Periolat's Accounting
23           Manipulations .........................................................................................70

24           a.      Prabhavalkar's Warning.................................................................70

25           b.      Bergeron's and Zwarenstein's Presentations to the Board
                     and Periolat's Presentation to the Audit Committee.....................72
26
             c.      The E&Y Letter and Meetings........................................................74

27

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE          - ii -
           FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

**Page**

4.  The Magnitude, Nature, and Quality of VeriFone's Restatement Combined with Witness Testimony Concerning Pervasive Inventory Manipulations Reinforce a Strong Inference of Scienter .........77

5.  Information Provided by Multiple Former VeriFone Inventory Managers Confirms Defendants' Exploitation of VeriFone's Nonexistent Inventory Controls to Falsify the Company's Financial Results.................................................................81

6.  Defendants' Admissions Regarding Inventory Controls Support a Strong Inference of Scienter .........................................86

7.  Defendants' Scienter Is Corroborated by Numerous Red Flags, Including the Rapidly Declining Margins at Lipman Before the Merger and the 93% Increase in VeriFone's Lower-Margin International Sales After the Merger.....................................88

8.  Zwarenstein's Admitted Role in "Building Out [VeriFone's] Financial and Accounting Infrastructure" and Defendants' Representations of "Tremendous Financial Transparency" After the Lipman Merger Reinforce a Strong Inference of Scienter.................91

9.  Information Provided by Former VeriFone Accounting Employees Raises a Strong Inference That Bergeron and Zwarenstein Knew About the Erroneous Manual Journal Entries and Other Internal Control Deficiencies that Caused the Restatement ...................93

10. Former VeriFone Employees Reported Problems Obtaining Accurate Financial Data from Lipman Because VeriFone and Lipman Used Different Oracle Accounting Systems...............................97

11. The Termination of Periolat and Zwarenstein and VeriFone's Admission that There Were Material Weaknesses in the Company's Internal Controls Strengthens the Inference of Scienter.......101

C.  Defendants' False Statements in 2006 Concerning the Financial Benefits of the Lipman Merger and the Purported Supply Chain Efficiencies Due to the Lipman Merger ...................................................104

    1.  False August 2006 Statements ..................................104

    2.  False September 2006 Statements ...........................105

    3.  False December 2006 Statements ...........................105

D.  Facts Establishing Material Falsity of Defendants' 2006 Statements and a Strong Inference of Scienter ...................................................106

VII.  DEFENDANTS' INSIDER TRADING AND MOTIVE ALLEGATIONS ...................107

1

2                                                                                          **Page**

3         A.      The Amount, Timing and Coordination of Defendants' Sales of More than
                  $465 Million in VeriFone Stock While Knowing of Periolat's Accounting
4                 Manipulations and Reporting Financial Results that Were Overstated by as
                  Much as 600% Reinforces a Strong Inference of Scienter ...................................107
5
          B.      Defendants' Compensation and Bonuses Were Tied Directly to
6                 VeriFone's Earnings Targets .....................................................................117

7  VIII.   VERIFONE ANNOUNCES A MASSIVE RESTATEMENT AND ADMITS ITS
           PRIOR STATEMENTS WERE MATERIALLY FALSE CAUSING A 46%
8          STOCK PRICE DECLINE IN A SINGLE TRADING DAY .........................................120

9  IX.     VERIFONE'S GAAP VIOLATIONS ..........................................................................123

10 X.      LOSS CAUSATION......................................................................................................129

11 XI.     CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET
           PRESUMPTION OF RELIANCE ...............................................................................133
12
   XII.    PRAYER FOR RELIEF ...............................................................................................141
13
   XIII.   JURY DEMAND..........................................................................................................141

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

1.   This is a securities fraud class action on behalf of all persons who purchased the publicly traded securities of VeriFone Holdings, Inc. ("VeriFone" or the "Company") between August 31, 2006 and April 1, 2008 (the "Class Period").[1]  VeriFone designs, manufactures, markets and sells electronic payment solutions, such as credit-card terminals for point-of-sale payments for goods and services.

2.   On April 10, 2006, VeriFone announced the acquisition of Lipman Electronic Engineering Ltd. ("Lipman"), an Israeli provider of wireless electronic payment systems.  The acquisition closed on November 1, 2006, the beginning of VeriFone's 2007 fiscal year.  VeriFone's CEO, Bergeron, and CFO, Zwarenstein, repeatedly represented to investors that the Lipman merger would increase market-share, expand VeriFone's international presence and leverage Lipman's in-house manufacturing capabilities and supply chain.  Most importantly, Bergeron and Zwarenstein told investors that the merger would result in significant increases in the Company's ***gross margin*** (*e.g.*, the amount or "margin" of profit generated on each sale), which would purportedly drive growth in VeriFone's earnings per share ("EPS") and its stock price.

3.   Defendants' representations of increasing gross margin were key to selling investors on the propriety of the merger because gross margin was the focal point of VeriFone's business.  Bergeron and Zwarenstein repeatedly told investors that the gross margin was "***the ultimate barometer of the operational success of [VeriFone]***" and that "our continuing, almost ***obsessive approach to gross margin expansion is something that is an important part of VeriFone's future.***"[2]  Wall Street analysts following the Company also focused on the gross margin as "***the most important measure of VeriFone's financial performance.***"

---

[1]   Defendants include: VeriFone; CEO and former Chairman Douglas G. Bergeron ("Bergeron"); former CFO and Executive Vice President Barry Zwarenstein ("Zwarenstein"); former Supply-Chain Controller Paul Periolat ("Periolat"); former Executive Vice President of Global Marketing and Business Development William G. Atkinson ("Atkinson"); and former board member Craig A. Bondy ("Bondy").

[2]   Emphasis is added unless otherwise noted.

4.      On August 31, 2006, the first day of the Class Period, Bergeron and Zwarenstein emphasized the success of the Lipman integration and increased VeriFone's gross-margin expectations and its 2007 pro forma EPS guidance by $0.12 to $1.40-$1.42 per share.  Bergeron specifically attributed the increases to the Lipman merger: "I have to tell you that with Lipman's manufacturing in-house and with this hybrid model that we are very cleverly putting together and getting the best of both worlds, ***there is going to be gross margin expansion in our future***."  During a December 7, 2006 conference call a month after the merger closed, Bergeron continued to mislead investors about the success of the Lipman merger:

> The integration of Lipman into VeriFone has been completed ahead of schedule and we have created a single-branded, unified company with tremendous scale advantages.  ***Already, we are enjoying several supply chain efficiencies and earnings accretion. . . .  As a result, we have increased our internal expectations for fiscal Q1 2007 net earnings per share***.

5.      Throughout the Class Period – as top VeriFone executives were unloading $465 million in VeriFone stock – Bergeron and Zwarenstein repeatedly told investors that the Lipman merger was a financial and operational success.  They represented that the merger was "immediately accretive" to VeriFone's earnings, resulting in "nice procurement synergies" and "supply chain efficiencies" that would provide VeriFone with significant advantages over its competitors.  They falsely reported "record" gross margins of 47.1%, 48.1% and 48.2% in 1Q07, 2Q07 and 3Q07, respectively, despite the fact that Lipman's gross margins were only 41.9% prior to the merger and had rapidly declined for five consecutive years.  During VeriFone's 1Q07 conference call, Bergeron was emphatic: ***"[W]e now have developed a structural gross margin advantage, which is going to be tough to beat***."  Defendants never warned investors about any problems with the integration, accounting or financial condition of Lipman, a foreign company with different management teams and different accounting systems thousands of miles away.

6.      Instead, when pressed by analysts during the Class Period about how VeriFone was reporting such high gross margins and earnings given the inclusion of Lipman's declining gross margins, Bergeron and Zwarenstein falsely attributed the Company's success to the integration benefits of the Lipman merger and its "***supply chain efficiencies and earnings accretion***."  They represented that VeriFone's executives had "***proven integration experience***" and a "***phenomenal***

*supply chain management team*" that was "extremely operationally focused" due to "highly disciplined and experienced managers."  They falsely represented that the Company was "*getting supply chain efficiencies in Israel that we never experienced before*" and that there was "*tremendous . . . financial transparency*" at the integrated Company that ensured the accuracy and reliability of the post-merger results.  The Company even *increased* CFO Zwarenstein's salary and awarded him extra VeriFone stock bonuses because of his "instrumental" efforts in completing the merger and "*his work in building out [VeriFone's] financial and accounting infrastructure*."

7.     Defendants' representations during the Class Period have now been revealed to be materially and deliberately false.  The "financial and accounting infrastructure" built by Zwarenstein was deliberately exploited to execute a pervasive accounting scheme to inflate VeriFone's stock price and enrich defendants at the expense of ordinary investors.  Only after selling $465 million in stock and cashing out did defendants finally admit to a massive financial restatement, including over *$70 million* in fictitious income, *$77 million* in fake inventory, millions in overstated gross margins, *129%* overstatement of operating income, and EPS overstatements of *600%, 200% and 418%* under Generally Accepted Accounting Principles ("GAAP") for three consecutive quarters.   The restatement revealed that VeriFone's publicly reported gross margin of 47%-48% during the Class Period – allegedly the "most important measure of VeriFone's financial performance" – was actually only *41%-42%*, far lower than the level represented to investors:

|  | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|
| **Originally Reported Pro forma Gross Margin** | 47.11% | 48.06% | 48.2% |
| **Restated Pro forma Gross Margin** | **41.4%** | **42.3%** | **41.2%** |
| **Originally Reported Pro forma EPS** | $0.37 | $0.39 | $0.42 |
| **Restated Pro forma EPS** | **$0.32** | **$0.24** | **($0.26)** |
| **Originally Reported GAAP EPS** | ($0.01) | $0.06 | $0.16 |
| **Restated GAAP EPS** | **($0.07)** | **($0.06)** | **($0.51)** |

8.     As illustrated above, in addition to the gross-margin impact, defendants' accounting improprieties were so egregious that the restatement erased all of VeriFone's profit in some quarters

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                          - 3 -

1  and revealed that the Lipman merger caused **net losses** at the combined Company.  For example,

2  VeriFone's financial manipulations were so significant in 3Q07 that reported pro forma EPS of

3  $0.42 was restated to a **net loss of $0.26**.  Under more conservative GAAP rules, the overstatement

4  was even worse – VeriFone's reported EPS of $0.16 per share in 3Q07 was restated to a **net loss of**

5  **$0.51**.  Following the Class Period, VeriFone's pro forma gross margins plummeted to the **low to**

6  **mid-30%** range as a result of the disastrous Lipman merger.  The significant impact of defendants'

7  misconduct on VeriFone's EPS results is illustrated below:

8

9



10

11

12

13

14

15

16

17

18

19

20

21

22

23  9.      On September 1, 2009, the Securities and Exchange Commission ("SEC") formally

24

25  charged VeriFone and its former Supply-Chain Controller, Periolat, with "**falsifying the company's**

26

27

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 4 -

*accounting records which boosted gross margins and income reported to shareholders*." Ex. 1 (SEC Litigation Release); Ex. 2 (SEC Complaint).[3]   The SEC's Litigation Release stated:

> The SEC alleges that *in three consecutive quarters in 2007, the company made unsupportable alterations to its records to compensate for an unexpected decline in gross margins, overstating VeriFone's operating income by a total of 129 percent*. When the misrepresentations came to light in December 2007, the company's stock price dropped 46 percent, resulting in a one-day drop in market capitalization of $1.8 billion.

Ex. 1 at 1.

10.     The facts set forth in the SEC's enforcement action, when combined with plaintiff's other allegations, demonstrate that Bergeron's and Zwarenstein's representations to investors throughout the Class Period were deliberately false and misleading.  The SEC Complaint shows that the accounting manipulations giving rise to the restatement were intentionally executed by Periolat at the specific direction and with full knowledge of defendants Bergeron and Zwarenstein.

11.     The SEC Complaint establishes that during each quarterly closing process for 1Q07, 2Q07 and 3Q07, defendants Bergeron and Zwarenstein were provided with internal reports and were *expressly told* that VeriFone's actual gross margins were "*markedly lower than previously released guidance to analysts*." Ex. 1; Ex. 2, ¶¶15-17, 23.  Bergeron and Zwarenstein personally sent e-mails characterizing the low gross margin results as an "*unmitigated disaster*" and instructed Periolat and other financial personnel to "*figure it . . . out*" and "*fix the problem*" so that defendants could "*report results in line with forecasts*" and "*thereby avoid, in the words of a senior officer, [the] unmitigated disaster*." Ex. 1; Ex. 2, ¶¶15-17.

12.     When Periolat could not initially "fix the problem" as Bergeron and Zwarenstein instructed (because, as the SEC confirmed, "the Company's unreported numbers were in fact correct"), Bergeron and Zwarenstein "*began to express increasing frustration*." Ex. 2, ¶17.  They knew that telling the market that the first post-merger financial results were far lower than public guidance would be disastrous for VeriFone's stock price.  Accordingly, Periolat was provided with "*analyses*" that explained the "relation between specific reductions in COGS [Cost of Goods Sold]

---

[3]     *SEC v. VeriFone Holdings, Inc., et al.*, No. 09-4046, Complaint (N.D. Cal. Sept. 1, 2009).

1    and the corresponding *increase in gross margin*." *Id*.  As the SEC explained, "[b]ecause gross

2    margin is the result of revenue minus COGS, *if COGS is reduced, gross margin is necessarily*

3    *increased*.  *One way to reduce COGS is to increase inventory*." Ex. 2, ¶16.  Thus, as part of

4    Bergeron's and Zwarenstein's directive to "fix the problem," Periolat was given a specific road map

5    to increase gross margins by reducing COGS – which is exactly what he did in falsifying VeriFone's

6    results.  Periolat made "*unsupportable alterations*" to VeriFone's books and created fictitious

7    inventory, which reduced COGS and increased gross margin and earnings, just as he was directed to

8    do.  As the SEC concluded, "*the accounting adjustments allowed the company to meet its internal*

9    *forecasts and guidance to investors*." Ex. 1.  As set forth below, these accounting manipulations

10   were not isolated.  They continued and even accelerated for three consecutive quarters.

11            13.    1Q07: In early February 2007, *after* 1Q07 already closed but before defendants

12   reported results, Bergeron and Zwarenstein received a report showing that 1Q07 gross margin was

13   only 42.8%, approximately four percentage points below the 45%-47% guidance previously

14   provided to investors. Ex. 2, ¶14.  Periolat "fix[ed] the problem" by preparing fictitious journal

15   entries and "adjustments" that increased Lipman inventory by approximately $7 million, decreased

16   COGS by $7 million and inflated VeriFone's gross margin. Ex. 2, ¶¶18-20.  According to the SEC,

17   "[a]s a result of the false accounting adjustments" in 1Q07, the Company's gross margin increased

18   from 42.8% to 47.1%, and VeriFone "overstated its net income by $12.4 million." Ex. 2, ¶22.  The

19   accounting adjustments caused VeriFone's 1Q07 GAAP EPS to be overstated by *600%*.

20            14.    The SEC alleged that Periolat "failed to take adequate steps to verify" his improper

21   accounting manipulations.  "Had he done so," he would have learned that the adjustments were false.

22   Ex. 2, ¶19.  Periolat also "had been aware *before* making the adjustments" that Lipman "had proper

23   procedures in place for accounting for inventory." Ex. 2, ¶20.  Thus, he knew that his manipulations

24   of Lipman inventory had no reasonable basis.  He also "learned a month after the quarter close" that

25   Lipman had correctly accounted for inventory, "putting him on notice that his adjustments may have

26   been incorrect." *Id*.  Nevertheless, Periolat "*did not take steps to verify or correct his prior*

27   *inventory adjustments*." *Id*.

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 6 -

15.     The SEC Complaint concluded that "*[s]enior management was aware of [Periolat's] adjustments* but never questioned them."  Ex. 2, ¶27.  Bergeron and Zwarenstein also received "*monthly reports showing a sharp and unprecedented increase in inventory as a result of Periolat's adjustments*."  *Id*.  Despite this knowledge, when Bergeron and Zwarenstein were asked point-blank at VeriFone's 1Q07 conference call to explain how the Company could report such inexplicably high gross margins given the incorporation of Lipman's declining margins and the doubling of VeriFone's lower-margin international sales, they deliberately concealed the accounting adjustments and misled investors.  They falsely attributed the "record" results to "significant earnings accretion" and "nice procurement synergies" from the Lipman merger and falsely asserted that "we now have developed a *structural gross margin advantage*, which is going to be tough to beat."  But they knew there was no "structural" advantage at all – the advantage was Periolat's improper accounting adjustments made at their direction *after* the quarter had already closed.

16.     <u>2Q07</u>:  In 2Q07, defendants' accounting manipulations accelerated.  At the end of 2Q07, Bergeron and Zwarenstein received internal reports showing a gross margin of 43.7%, far below the 46%-48% guidance provided to investors.  Ex. 2, ¶23.  Again, Periolat "fix[ed] the problem" by preparing false journal entries that increased "in-transit" inventory (*e.g.*, inventory purportedly shipped from Lipman to VeriFone but not yet received) by approximately $10.6 million, which decreased COGS by $10.6 million.  Ex. 2, ¶24.  This fraudulent accounting inflated VeriFone's reported gross margin from 43.7% to 48.06%, causing a *200% overstatement* of GAAP earnings.  The fictitious accounting in 2Q07 allowed defendants to meet public guidance.

17.     The SEC concluded that "*[t]here was no reasonable basis for the manual entries*."  Ex. 2, ¶26.  In fact, "*goods were never actually shipped between the international headquarters and the United States and as a result could not have been 'in transit*.'"  *Id*.  Despite defendants' knowledge of these improper adjustments, at the 2Q07 conference call, Bergeron and Zwarenstein concealed the accounting manipulations, bragged about the "record" gross margin results and falsely stated that 47%-48% margins were "sustainable" going forward.  When asked pointedly by analysts if there were any "unusual" items that caused VeriFone to report such inexplicably high gross margins, Zwarenstein falsely replied, "no, there was no unusual items."

18.      3Q07: In 3Q07, the accounting manipulations were even more egregious than 1Q07 and 2Q07.  Bergeron and Zwarenstein again received internal reports showing a gross margin of *40.5%*, far below the 47%-48% guidance provided to investors.  Ex. 2, ¶23.  Periolat again "fix[ed] the problem" by preparing journal entries that increased "in-transit" inventory by approximately $9.4 million and decreased COGS by $9.4 million, thereby inflating VeriFone's gross margin from 40.5% to 48.23% to meet public guidance.  The false accounting also caused 3Q07 EPS to be *overstated by 418%*.  Ex. 2, ¶25.

19.      Incredibly, at the 3Q07 conference call with investors, despite that fact that Bergeron and Zwarenstein "were aware of [Periolat's] adjustments" and knew there "was no reasonable basis for the manual entries" because the "goods were never actually shipped," Bergeron deliberately misled investors by manufacturing false reasons for the increase in gross margin:

> *[W]e're getting supply chain efficiencies in Israel that we never experienced before*, and something we mentioned as well, we have *tremendous transparency, financial transparency* into the true cost of manufacturing and all the little nuanced items that roll up into that as a result of having 30%, 35% of our own inside.  So it's worked out splendidly and we're committed to it.

20.      These statements had no basis whatsoever and were deliberately false.  Bergeron, Zwarenstein and Periolat knew that the increase in gross margins had nothing to do with "supply chain efficiencies in Israel" or "tremendous . . . financial transparency" between Lipman and VeriFone.  The increase in gross margin was due to Periolat's accounting adjustments – and, as the SEC found, "*[s]enior management was aware of [Periolat's] adjustments*."  Ex. 2, ¶27.  Indeed, the "adjustments" were made at the express direction of Bergeron and Zwarenstein to "fix the problem" and avoid the "unmitigated disaster" that would negatively impact VeriFone's stock price if defendants did not meet their public forecasts.

21.      Periolat, Bergeron and Zwarenstein were able to freely manipulate VeriFone's financial results because the Company's system of internal controls was virtually nonexistent.  The SEC charged Periolat with "*knowingly* circumventing a system of internal accounting controls" and concluded that "Periolat was able to make his unwarranted adjustments because *VeriFone had few internal controls to prevent them . . . .  Nor were there proper controls in place* to prevent the person responsible for forecasting financial results from *making adjustments which allowed the*

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                                    - 8 -

1  ***company to meet the forecasts***." Ex. 2, ¶¶17, 21.  These findings directly contradict Bergeron's and

2  Zwarenstein's sworn certifications to investors under the Sarbanes-Oxley Act of 2002 ("Sarbanes-

3  Oxley") that they "reviewed," "designed" and certified VeriFone's system of internal controls each

4  quarter to ensure the accuracy of VeriFone's financial results, including the journal entries made by

5  Periolat.  *See* §VI.A.2.  In reality, defendants intentionally exploited the lack of internal controls and

6  circumvented any deficient controls that did exist to falsify and inflate VeriFone's financial results.

7        22.  The SEC's findings about VeriFone's inventory manipulations also contradict

8  defendants' representations that they "***review the adequacy of our inventories valuation on a***

9  ***quarterly basis***" and "***regularly monitor[] inventory quantities on hand***."  VeriFone's restatement

10  confirmed that inventory was overstated by ***$77.8 million*** during the Class Period, including ***$13.3***

11  ***million*** or 11.35% of total inventory in 1Q07, ***$23.9 million*** or 23.6% in 2Q07 and ***$40.6 million*** or

12  39% of total inventory in 3Q07.  VeriFone also admitted improperly booking ***$32.8 million*** in

13  fictitious in-transit inventory, ***$30 million*** in improperly allocated overhead to inventory and ***$13.4***

14  ***million*** in fake intercompany profit during the Class Period – due to the inventory manipulations

15  executed by Periolat and approved and certified by Bergeron and Zwarenstein.

16        23.  On July 7-15, 2010, plaintiff obtained through the Freedom of Information Act, 5

17  U.S.C. §552, 776 pages of certified transcripts of testimony taken in connection with the SEC's

18  investigation of VeriFone's accounting improprieties.  Relevant excerpts of the transcripts are

19  attached hereto and incorporated by reference as Ex. 6 (Bergeron transcript), Ex. 7 (Zwarenstein

20  transcript) and Ex. 8 (former VeriFone Controller Laura Merkl transcript).  The facts, e-mails and

21  testimony revealed in the transcripts provide direct evidence that Bergeron and Zwarenstein not only

22  had actual knowledge of Periolat's fictitious accounting manipulations during 1Q07, 2Q07 and

23  3Q07, but that they also personally directed, participated in, and authorized Periolat's false

24  adjustments at the time they were executed.  The transcripts (and especially the e-mails quoted in the

25  transcripts) demonstrate that Bergeron and Zwarenstein tracked Periolat's deceptive accounting

26  manipulations every step of the way during the Class Period.  They authorized and certified the false

27  adjustments to the public and blatantly misled investors to believe that the Company's "record"

28  financial results were due to a host of false reasons related to purported synergies and "efficiencies"

1  arising from the Lipman merger.  The particularized facts revealed in the SEC transcripts are set

2  forth in §VI.B.2, *infra*.

3      24.  Documents and facts revealed by the Court's August 26, 2010 Order in *In re*

4  *VeriFone Holdings, Inc. S'holder Derivative Litig.*, No. C 07-6347 MHP, Order at 11 (N.D. Cal.

5  Aug. 26, 2010) (the "Derivative Order"), are also consistent with a strong inference of scienter.  As

6  set forth in §VI.B.3 herein, at the time Bergeron, Zwarenstein and Periolat manipulated VeriFone's

7  financial results, they were also aware of material warnings from both VeriFone's Internal Audit

8  Director, Sameer Prabhavalkar ("Prabhavalkar"), and its accounting firm, Ernst & Young LLP

9  ("E&Y"), that VeriFone was exposed to "***an increased financial statement disclosure risk*** both

10  from an ***accuracy*** and timing perspective," and that its financial closing process resulted in a "high"

11  concern that posed a "high" overall risk to the Company.  When combined with the facts revealed in

12  the SEC transcripts and the other numerous indicia of scienter, the facts from the Court's Derivative

13  Order are consistent with a strong inference of deliberate recklessness.

14      25.  The inference of scienter is also supported by several confidential witnesses ("CWs"),

15  including former VeriFone accounting employees who reported that the erroneous manual journal

16  entries that caused gross margins and inventory to be overstated were received and reviewed by the

17  San Jose, California accounting department headed up by Zwarenstein ***before*** VeriFone reported its

18  financial results.  Further, according to former VeriFone inventory managers who worked at

19  VeriFone's "principal" distribution center in Lincoln, California (VeriFone's largest) and were hired

20  to address VeriFone's inventory control problems, the Company's inventories were materially

21  misstated and its inventory controls were severely deficient, causing pervasive and widespread

22  inventory reporting problems, including the false reporting of 25%-31% of inventory that ***did not***

23  ***exist***.  One of those witnesses stated that multiple vice presidents from VeriFone's San Jose

24  headquarters were made aware of the inventory-control problems through reports and conference

25  calls and were constantly threatening to close the Lincoln facility if the problems were not corrected.

26  The problems were never corrected, and VeriFone was forced to restate.

27      26.  Another former VeriFone employee reported that he/she discovered during the Class

28  Period that VeriFone was applying "wild amounts of overhead" to Lipman inventory which "inflated

1   inventory" valuations.  The witness prepared a formal report on the issue and submitted it to Periolat,

2   who rejected the report and included the false inventory in VeriFone's financial results.  The report

3   was later corroborated by VeriFone's restatement disclosures, which admitted to pervasive and

4   widespread manipulations of inventory and gross margins – including improper application of

5   overhead to inventory – and a knowingly reckless system of internal controls, just as the witness

6   described.

7           27.     As a result of defendants' financial manipulations and false statements during the

8   Class Period, VeriFone's stock price more than *doubled* – from $23.15 on August 31, 2006 (the first

9   day of the Class Period) to a Class Period high of $50.00 per share on October 31, 2007.  While class

10  members unwittingly purchased VeriFone shares at inflated prices, defendants took advantage of

11  their inside information by selling over *$465 million* in VeriFone stock, including *$100 million* in

12  sales by Bergeron and Zwarenstein alone.

13          28.     Given Bergeron's and Zwarenstein's actual knowledge of Periolat's accounting

14  manipulations, their stock sales constituted illegal insider trading.  CEO Bergeron sold nearly *$92*

15  *million* in VeriFone stock or *62%* of his shares during the Class Period, despite his knowledge that

16  the Company's gross margins were an "unmitigated disaster" and that Periolat was inflating

17  VeriFone's results because Bergeron and Zwarenstein instructed him to "fix the problem."  Unlike

18  average investors, Bergeron paid an average price of only *$0.033 per share* for his VeriFone stock

19  and sold at prices as high as $46 per share.

20          29.     Defendant Zwarenstein also fraudulently sold *99%* of his VeriFone shares for *$8.1*

21  *million* despite his actual knowledge of Periolat's improper financial adjustments and his purported

22  role in "building out" VeriFone's financial and accounting infrastructure.  Prior to those sales,

23  Zwarenstein had only sold $912,672 in VeriFone stock in the preceding two years.  Unlike regular

24  investors, Zwarenstein only paid an average price of *$4.38 per share* for the shares he sold, and sold

25  at prices as high as $45.00.  Zwarenstein also suspiciously modified his 10b5-1 trading plan during

26  the middle of the Class Period to *increase* his stock sales by 450%, from 4,000 shares per month to

27  18,000 shares per month during the height of the fraud.  Zwarenstein's employment was later

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 11 -

1    "terminated" for his role in VeriFone's misconduct, and he was forced to reimburse VeriFone

2    $150,000 in inflated bonuses.

3        30.    Defendant Atkinson, VeriFone's Executive Vice President of Global Marketing, who

4    was heavily involved in the Lipman acquisition, suspiciously sold over **97%** of his VeriFone stock

5    for proceeds of **$6.76 million**.  Atkinson apparently did not believe his own misleading statements to

6    investors during the Class Period that VeriFone and Lipman "**will begin Day 1, completely**

7    **integrated. [We] are locked and loaded**."  Atkinson was also awarded 40,000 free restricted stock

8    awards as an extra bonus "in recognition of [his] efforts on the Lipman acquisition."  But the Lipman

9    merger had not been completely integrated – it was an operational and financial disaster – and on

10   July 18, 2007, during the heart of the Class Period, Atkinson was suddenly fired.

11       31.    Defendant Bondy, a member of VeriFone Board of Directors and one of the principal

12   architects of the spinoff and recapitalization of VeriFone from Hewlett-Packard in 2002, dumped

13   over **$358 million** in VeriFone stock, $100 million of which was jointly owned by two of his private

14   equity firm's partners, who also (not so coincidentally) happened to be VeriFone board executives.

15   After cashing out, Bondy suspiciously resigned from the Board only a few months before the

16   restatement was disclosed to investors.  Bondy's personal biography on his firm's website touts

17   VeriFone as one of his "**successful past investments**."  Average investors were not so "successful."

18   They lost over $1 billion.

19       32.    When defendants suddenly announced the restatement on December 3, 2007,

20   VeriFone's stock price collapsed – dropping $22.00 per share, from $48.03 to $26.03, or **46%** in a

21   **single trading day** – erasing $1.8 billion in market capitalization in less than eight hours.  When

22   defendants revealed additional negative disclosures relating to the restatement and defendants'

23   misconduct, investors were further damaged as VeriFone's stock suffered additional precipitous

24   drops of 22%, 15% and 21% due to revelations related to defendants' misconduct.

25       33.    Finally, on April 1, 2008, the last day of the Class Period, VeriFone announced that

26   defendant Zwarenstein was "resigning" and that the financial impact of the restatement was far

27   worse than initially represented to investors.  On this news, VeriFone's stock price declined another

28   19%, from $16.83 to $13.64 – capping a catastrophic **75% decline** from the Class Period high.

Following the April 1, 2008 announcements, Wall Street analysts openly questioned the integrity of VeriFone's management and their purported explanation for the restatement. One analyst observed:

> *Results of internal investigation indicate more than a simple mistake*. We believe the significant reorganization, the stepping down of the CFO, the CEO relinquishing the Chairman position, and the inclusion of the SEC *point to more than the simple clerical error the company previously indicated*.

34.     Now that VeriFone's financial fraud has been exposed, the Company has reported drastically lower pro forma gross margins in every quarter since 3Q07. In stark contrast to the huge earnings increases touted during the Class Period, the Company reported a *$51.2 million net loss* in 4Q07, a *$425.3 million net loss* in 2008 and a *$141.5 million net loss* in the first three quarters of 2009. Defendants' fraud has cost shareholders millions of dollars in expenses on government and internal investigations. Despite defendants' repeatedly glowing statements about the Lipman merger, VeriFone has written off hundreds of millions of dollars in goodwill as a result of the disastrous acquisition. The SEC investigated and charged the Company with numerous federal securities law violations, and the Company is being investigated by the United States Attorney's Office in New York. VeriFone's stock price has never fully recovered and traded as low as $2.31 per share following the restatement. VeriFone's stock price currently hovers in the mid-$20s, a fraction of the inflated $50.00 price at which the stock traded during the Class Period.

35.     The following chart (which is also attached hereto in foldout form) illustrates the events surrounding defendants' misconduct during the Class Period:



REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

## II.    JURISDICTION AND VENUE

36.    Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act"). The claims asserted herein arise under §§10(b), 20(a) and 20(A) of the 1934 Act and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

37.    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the acts alleged herein, including the dissemination of false statements and omissions substantially occurred in this District.  The Company's corporate headquarters are in San Jose, California where the daily operations of the Company are directed and managed.

38.    In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchange markets.

## III.    THE PARTIES

39.    National Elevator Industry Pension Fund ("National Elevator") was appointed lead plaintiff on August 22, 2008.  National Elevator is a Taft-Hartley pension fund and fiduciary for investments made on behalf of tens of thousands of elevator service workers.  National Elevator purchased VeriFone securities at artificially inflated prices during the Class Period as a result of defendants' misconduct and suffered damages when the artificial inflation was removed from the stock price.

40.    Defendant VeriFone is a public corporation which has its principal place of business located at 2099 Gateway Place, Suite 600, San Jose, California, 95110.  VeriFone was founded and incorporated in Hawaii on April 14, 1981.  In 1984, the Company introduced the first mass-market electronic payment system intended to replace manual credit card authorization devices for small merchants.  The Company went public on the NASDAQ in 1990.

41.    In 1995, the Company's shares moved to the NYSE and was later acquired by Hewlett-Packard in 1997.  In June 2001, Gores Technology Group acquired VeriFone from Hewlett-Packard in a transaction led by defendant Bergeron.  In July 2002, Bergeron and certain funds associated with defendant Bondy's venture capital firm, GTCR Golder Rauner ("GTCR"), led a

1  recapitalization of the Company in which VeriFone Holdings, LLC acquired all of the shares of

2  VeriFone.

3         42.     VeriFone completed an initial public offering ("IPO") on April 19, 2005 at $10.00 per

4  share, raising $85 million in gross proceeds.   On May 4, 2005, the Company's underwriters

5  exercised the over-allotment of 2.31 million shares from selling stockholders.   On September 20,

6  2005, VeriFone completed a follow-on offering, raising another $52 million in gross proceeds.

7  VeriFone has approximately 2,224 employees and its stock trades on the NYSE under the ticker

8  symbol "PAY."

9         43.     Defendant Bergeron was the CEO and Chairman of VeriFone during the Class Period.

10  Bergeron prepared and approved the Company's quarterly earnings releases and repeated the

11  information during VeriFone's conference calls.  He also signed and certified the quarterly and year-

12  end financial statements filed with the SEC and sworn Sarbanes-Oxley certifications attesting to the

13  truth and accuracy of VeriFone's financial statements and its system of internal controls.  During the

14  Class Period, Bergeron sold 2,466,335 shares of VeriFone stock for proceeds of $91,971,802 while

15  in possession of material, adverse, undisclosed information.

16         44.     Defendant Zwarenstein was VeriFone's CFO and Executive Vice President during the

17  Class Period.  Zwarenstein prepared and approved the Company's quarterly earnings releases and

18  repeated the information during VeriFone's conference calls.   He also signed and certified the

19  quarterly and year-end financial statements filed with the SEC and signed sworn certifications

20  pursuant to Sarbanes-Oxley attesting to the truth and accuracy of VeriFone's financial statements

21  and the Company's internal controls over financial reporting.  During the Class Period, Zwarenstein

22  sold 222,000 shares of his VeriFone stock for proceeds of $8,130,447, while in possession of

23  material, adverse, undisclosed information.  On April 1, 2008, VeriFone announced that Zwarenstein

24  was "resigning" in connection with the Company's restatement.  The Company later admitted that

25  his employment was "terminated."

26         45.     Defendant Periolat was VeriFone's Supply-Chain Controller during the Class Period.

27  Periolat was responsible for, *inter alia*, forecasting gross margins and preparing accounting entries

28  and financial information pertaining to VeriFone's COGS, inventory and gross margin results that

1    were provided to Bergeron and Zwarenstein for review and dissemination to investors. Periolat

2    furnished and disseminated false accounting information with actual knowledge that the information

3    was for the purpose of communicating the results to investors in earnings releases, SEC filings and

4    conference calls. His deliberate financial manipulations were done in furtherance of defendants'

5    fraudulent scheme and course of conduct to inflate VeriFone's gross margin earnings and stock price

6    to meet Wall Street expectations. Periolat was charged by the SEC for numerous securities law

7    violations in connection with his primary role in the financial misconduct giving rise to VeriFone's

8    restatement, including "*knowingly* circumventing a system of internal accounting controls." The

9    SEC issued a consent decree permanently enjoining Periolat from future violations of the anti-fraud

10   and other provisions of the federal securities laws and charged Periolat a $25,000 civil penalty for

11   his misconduct.

12       46.     Defendant Atkinson was VeriFone's Executive Vice President of Global Marketing

13   and Business Development during the Class Period until he was fired on July 17, 2007. Atkinson

14   was heavily involved in VeriFone's acquisition of Lipman and, along with defendant Zwarenstein,

15   was awarded tens of thousands of bonus stock option grants by VeriFone's compensation committee

16   "in recognition of [his] efforts on the Lipman acquisition." During the Class Period, Atkinson sold

17   180,800 shares and over 97% of his VeriFone stock for proceeds of $6,765,148.

18       47.     Defendant Bondy was a member of VeriFone's Board of Directors from July 2002 to

19   October 1, 2007, when he resigned. Bondy was also a principal partner of GTCR a private

20   equity/venture financing firm that manages numerous investment funds, including GTCR Fund VII,

21   L.P., GTCR Capital Partners, L.P. and GTCR Co-Invest.[4] In July 2002, GTCR took a large stake in

22   VeriFone, and after the Company's IPO on April 27, 2005, GTCR, Bondy, Collin E. Roche (another

23   VeriFone director) and Daniel Timm (a former member of the Board of Directors) became

---

[4]      According to VeriFone's 2006 Proxy Statement, the GTCR entities are related through a cryptic labyrinth of partnerships as follows: "GTCR Golder Rauner, L.L.C. is the *general partner of the general partner* of GTCR Fund VII, L.P., the *general partner of the general partner of the general partner* of GTCR Capital Partners, L.P., and the *general partner* of GTCR Co-Invest, L.P. GTCR Golder Rauner, L.L.C."

1   VeriFone's largest shareholder, owning 22.5 million shares, or 33.2%, of the Company's stock.

2   According to the Company's 2006 Proxy Statement filed with the SEC on February 27, 2007,

3   Bondy, GTCR and Roche were the Company's largest shareholder, owning 16.5 million shares, or

4   20%, of VeriFone's common stock.  During the Class Period, Bondy sold 9.8 million shares of

5   VeriFone stock for $358.5 million while in possession of material, adverse undisclosed information,

6   Bondy then resigned from the Board of Directors.

7        48.    In 2006, Bondy was a member of the VeriFone Board of Directors' "Corporate

8   Governance and Nominating Committee."  According to the Company's 2006 Proxy Statement, the

9   committee met six times during FY06 and "met in executive session at each such meeting."  In the

10  2006 Proxy Statement, Bondy signed the "Report of the Corporate Governance and Nominating

11  Committee," which represented, among other things, that the committee reviewed "VeriFone's

12  Corporate Governance Guidelines" to determine whether any changes were "deemed necessary or

13  desirable" by the committee.

14       49.    Periolat, Bergeron and Zwarenstein are the Individual Defendants.  The Individual

15  Defendants are liable for the statements (and omissions of material facts) directly attributed to them

16  and also the false statements pled in §VI.A and C, as those statements were "group-published"

17  information and the Individual Defendants were substantially involved in preparing, disseminating

18  and certifying VeriFone's press releases and SEC filings.  The Individual Defendants are also liable

19  for VeriFone's false financial results, material omissions and acts in furtherance of the accounting,

20  financial and insider-trading schemes to inflate VeriFone's results and enrich themselves.  Periolat is

21  also liable for participating in deceptive conduct, knowingly concealing facts necessary to render

22  VeriFone's financial results and its statements not misleading, and for knowingly furnishing false

23  information (and omitting material facts) to investors through VeriFone's earnings releases, SEC

24  filings and conference calls.  Periolat's accounting manipulations were done for the specific purpose

25  of inflating VeriFone's results to meet public guidance, and it was necessary and inevitable that the

26  fraudulent financial information would be communicated to investors.  Bergeron, Zwarenstein,

27  Atkinson and Bondy are the "Insider Trading Defendants" liable for insider trading violations of the

28  federal securities laws.

## IV.   CONFIDENTIAL WITNESSES

50.   Some of the allegations included herein are based on information provided by several former VeriFone employees referred to as confidential witnesses ("CW").  The information provided by the former employees is reliable and credible because: (a) each of the witnesses worked at VeriFone during the Class Period; (b) each witness stated he/she had personal knowledge of the information provided; (c) the witnesses' job titles and responsibilities show they had personal knowledge of the information provided; (d) many of the witness accounts corroborate one another; and (e) the witness accounts are corroborated by other information alleged herein.

51.   CW1 was an accounting manager at VeriFone's San Jose headquarters from August 2005 until July 2007 when CW1 resigned.  CW1 reported to the Company's Controller for North America (which included various individuals due to high rates of attrition and reorganizations of the principal accounting group) who reported to corporate controller Laura Merkl ("Merkl"), who reported to defendant CFO Zwarenstein.  CW1 was responsible for reviewing accounting information from the Company's Rocklin office, knew about the problems that caused the restatement and also described numerous problems with the Company's accounting department.

52.   CW2 was a senior accountant at VeriFone's San Jose headquarters from December 2005 until February 2007 when CW2 resigned.  CW2 also reported to the Company's Controller for North America.  CW2 managed a group of staff accountants that handled accounting functions (journal entries and reconciliations) for various accounts, including marketing, facility allocation, executive expenses and bonus plans.  CW2 also participated in monthly balance sheet review meetings with CW1, North American Controller Mike Dowd, Merkl and other accounting personnel. Like CW1, CW2 knew about the problems that caused the restatement and also described numerous problems with the Company's accounting department.

53.   CW3 was a controller at Lipman's Syosset, New York facility from February 2006 until February 2007 when CW3 was laid off in conjunction with the closing of the Syosset facility. As a controller, CW3 was responsible for all of Lipman's major accounting functions in North America.  CW3 reported to Lipman's North America CEO Robert Striano.  As detailed herein, CW3 was directly involved in providing Lipman financial information to the San Jose accounting

1  department, described problems in providing accurate financial information due to VeriFone and

2  Lipman utilizing different versions of the Oracle ERP general ledger system, and discussed the

3  problems with defendant Zwarenstein.

4       54.    CW4 worked at VeriFone from 1992 to June 2008 when CW4 resigned.  CW4 was

5  the project manager for supply-chain solutions since early 2003 at the Company's Rocklin facility

6  and reported to CIO Ipolani Tano, who was based in Hawaii and reported to defendant Bergeron.  As

7  detailed herein, in September 2006, CW4 became the project manager for the implementation of the

8  Oracle 11i system and described various problems with the implementation involving supply chain

9  and inventory.

10       55.    CW5 was a business systems analyst at VeriFone's San Jose headquarters from 2001

11  until December 2007 when CW5 resigned.  CW5 reported to Information Technology Manager Tina

12  Pegg, who reported to CIO Ipolani Tano, who reported to defendant Bergeron.  As detailed herein,

13  CW5 knew about problems with retrieving financial data from Lipman caused, in part, by Lipman

14  utilizing the Oracle 11i platform while VeriFone was utilizing the 10.7 platform.

15       56.    CW6 was a temporary staff accountant at VeriFone's Alpharetta, Georgia facility for

16  several weeks in April or May 2007.  According to CW6, a great deal of data from Lipman was lost

17  when it was transferred to VeriFone because the data was not properly mapped before being

18  transferred from Lipman's 11i system to VeriFone's 10.7 system.  Specifically, CW6 said that

19  VeriFone could not identify the customers associated with hundreds of Lipman's receivables that

20  were transferred to VeriFone's system, and it was CW6's job to determine the customers for the

21  receivables.  However, CW6 was transferred to another company before commencing work on the

22  project.  The temporary agency informed CW6 that Lisa Hamm, CW6's supervisor, had informed it

23  that VeriFone did not want any more accounting staff.

24       57.    CW7 was a senior accountant at VeriFone's San Jose headquarters from May 2006 to

25  August 2007 when CW7 resigned.  CW7 reported to CW1 and then Chris Cunningham, who became

26  the accounting manager after CW1 resigned in July 2007.  Like the other CWs, CW7 stated that

27  working in the VeriFone accounting department was very stressful and confusing and caused CW7

28  to resign.

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP      - 19 -

58.     CW8 was a contractor and assistant controller at VeriFone for several weeks in August 2007. CW8 was responsible for rebuilding the finance and accounting department to staff a large number of vacant positions and to hire full-time employees to replace consultants. CW8 said that it was difficult to hire accounting and finance employees because recruiters told CW8 that VeriFone had a poor reputation among finance and accounting personnel as well as recruiters because there was so much turnover.

59.     CW9 was a financial analyst at VeriFone's Rocklin, California facility from October 2005 to March 2007, when CW9 resigned. CW9 reported to supply-chain controller Periolat, who reported to Vice President of Financial Analysis Dave Gilford who reported to defendant Zwarenstein. As a financial analyst, CW9 was responsible for profit and loss forecast-to-budget variance analyses for all research and development groups at VeriFone. As detailed herein, CW9 described how the erroneous manual journal entries that led to the restatement were posted to the Company's Oracle 10.7 ERP general ledger accounting system, how the journal entries were reviewed by the San Jose accounting department headed by Zwarenstein and how CW9, Periolat and other Rocklin personnel participated in monthly financial statement review teleconferences with Zwarenstein, Merkl, Gilford and others.

60.     CW10 was Vice President of Operations at Lipman's Syosset, New York facility from 1994 until December 31, 2006, when CW10 and many other personnel at the Syosset facility were laid off. Following the close of the Lipman acquisition on November 1, 2006, CW10 was primarily involved in transferring inventory from Syosset to a VeriFone warehouse in California. As detailed herein, CW10 said there were difficulties converting the accounting for Lipman's Syosset operations to VeriFone because the companies used different Oracle ERP general ledger accounting systems and because the companies did not have the same fiscal year. CW10 also said that VeriFone personnel, including Patrick McGivern and Mark Norman, knew the Syosset facility was holding excess and obsolete inventory due to a cancelled customer order.

61.     CW11 was an independent contractor and inventory control supervisor at VeriFone's Lincoln, California distribution center (which was VeriFone's primary distribution center) from December 2006 until May 2007 when CW11's contract was terminated. CW11 was hired to clean

1   up and improve inventory accuracy by performing daily cycle counts of inventory on site at the

2   Lincoln facility, quarterly physical inventory counts and determining the reasons for any variances

3   between inventory on site and inventory recorded on the Company's books.  CW11 reported to

4   David Grantham, the distribution operations manager, who reported to Dave Mangelsdorf, the

5   Lincoln facility site manager and currently Vice President of Global Logistics.  As detailed below,

6   CW11 said there were widespread and chronic inventory control problems at the Company's

7   Lincoln, California facility throughout CW11's tenure.  CW11 reported that 25%-31% of the

8   inventory recorded on the 10.7 system as being located at the Lincoln facility did not exist, and that

9   several vice presidents from VeriFone's San Jose headquarters were told about the inventory

10  problems and constantly threatened to close down the Lincoln facility.  CW11 also documented the

11  missing inventory problems in a report that was submitted to CW11's supervisor and discussed on a

12  quarter-end conference call with VeriFone's vice presidents, but the problems were never fixed.

13  CW11 stated that VeriFone's inventory controls were a "huge mess" when CW11 joined VeriFone

14  in December 2006 and were a "huge mess" when CW11 left in May 2007.

15       62.   CW12 was a warehouse operations manager at VeriFone's Lincoln, California facility

16  from March 2007 until December 2007 when CW12 left the Company.  CW12 oversaw 60-80

17  warehouse employees and was responsible for all of the receiving, distribution, picking and shipping

18  operations for inventory at the Lincoln, California distribution center.  CW12 was also responsible

19  for preparing VeriFone's distribution operations for the upcoming transition to Oracle's 11i ERP

20  system.  Like CW11, CW12 reported to Grantham who reported to Mangelsdorf.  Also like CW11,

21  CW12 said there were widespread and pervasive problems at the Lincoln facility and that inventory

22  recorded on the 10.7 system as being located at the Lincoln facility did not exist.

23       63.   CW13 was a former VeriFone senior manager of business processes from October

24  2006 to February 2008.  CW13 was hired to oversee the merger of VeriFone's Oracle 10.7 system

25  with Lipman's 11i system and reported to director of supply chain Don Welch, who reported to

26  Patrick McGivern, VeriFone's Vice President of Global Operations and Supply Chain.  CW13's

27  duties included learning the systems used by Lipman and VeriFone and analyzing variances in

28  inventory valuations.  CW13 reported that in 1Q07, he/she was asked to analyze a $9 million

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 21 -

inventory variance and discovered that the supply chain finance group had applied a "wild amount of overhead" and improper in-transit accruals to inventory which "inflated inventory" levels.  CW13 documented the problem in a report and sent it to his/her supervisors, including Periolat, who responded with hostility and rejected the report and later included the inflated inventory valuations in the Company's publicly reported results.

## V.   BACKGROUND LEADING UP TO THE CLASS PERIOD

### A.   VeriFone's Gross Margin Was One of Its Most Important and Closely Monitored Financial Metrics

64.   During the Class Period, defendants positioned investors to believe that VeriFone's gross margin was one of the most important financial measures of its overall financial success.  Bergeron and Zwarenstein repeatedly touted and emphasized the Company's increasing "record" gross margins in virtually every public earnings press release, conference call and major public filing with the SEC.  For example, during the April 10, 2006 conference call announcing the acquisition of Lipman, Bergeron stated that gross margin was "***the ultimate barometer of the operational Excellence of this business***."   During VeriFone's December 7, 2006 conference call, Bergeron stated that "revenue quality as evidenced by ***our continuing, almost obsessive approach to gross margin expansion***, is something that is an important part of VeriFone's future."

65.   Wall Street analysts also focused on VeriFone's gross margin and considered it the most important measure of VeriFone's financial performance.  For example, after VeriFone reported its results for 2Q06 (the quarter preceding the Class Period), SunTrust Robinson Humphrey ("SunTrust") analyst Andrew W. Jeffrey ("Jeffrey") issued a report on June 21, 2006, stating:

> Gross margin expanded again in 2Q06.  ***We believe this is the most important measure of VeriFone's financial performance***, as it demonstrates the company's pricing power, the relative superiority of its solutions and its ***impressive supply chain efficiency***.  ***VeriFone continues enjoying the highest gross margin in the POS terminal industry, and management expects further gross margin expansion following the Lipman acquisition***.

66.   Thus, leading up to the Class Period, defendants closely monitored VeriFone's gross margin and knew that any publicly disclosed negative gross-margin trends or results would cause VeriFone's stock price to decline.

    **B.**    **April 10, 2006: VeriFone Announces the Acquisition of Lipman and Bergeron and Zwarenstein Assure Investors that the Merger Will Increase the Company's Gross Margins and Earnings in 2007**

67.    On April 10, 2006, VeriFone announced its acquisition of Lipman, and Bergeron assured investors the acquisition would be accretive to earnings and increase the Company's gross margins.  VeriFone's April 10, 2006 press release reported that "[f]ollowing the acquisition, VeriFone will become the largest global provider of electronic payment solutions and services, capitalizing on accelerating growth in the emerging markets and demand for IP-based and wireless payment systems."

68.    During the April 10, 2006 conference call, Bergeron touted the "immediate accretion" of the Lipman merger and VeriFone's focus on gross margin expansion:

> Within the last five years and as a public company over the last one year, hopefully we've defined ourselves to our shareholders as a *company with fantastic operational Excellence [and] as a company that is built by highly disciplined and experienced managers*.
>
> \*    \*    \*
>
> *Our gross margins, in many respects – the ultimate barometer of the operational Excellence of this business*, has been increasing sequentially for five quarters in a row – last quarter providing 45.6%.
>
> \*    \*    \*
>
> *There is a strategic rationale for VeriFone and Lipman joining forces.  The first, strong financial performance plus strong financial performance equals stronger financial performance and immediate accretion and very complementary geographic profile.*  Together this cements VeriFone's leading position in North America.  This creates the number [one] position for VeriFone across emerging markets.  And finally, it creates a number 1 or number 2 position in most other markets worldwide.

69.    Bergeron also attempted to convince investors that the integration of Lipman would not disrupt VeriFone's business because of the proven integration experience of VeriFone's "management team":

> Let me talk a little about the integration plan.  Firstly, this will be a full integration of the businesses at every level.  *VeriFone's management team has proven integration experience.  This is the management team*, consistently, that bought the business out of HP five years ago, and *is extremely operationally focused*.
>
> And as a joint business, *we will continue our profit focus, disciplined approach to sales, and to running VeriFone*.

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP     - 23 -

1                                        *       *       *

2          As you can see the gross margin profile for the business are very similar, and
as a result, *we are increasing our pro-forma gross margin expectations from 41-*
3   *44% which was an improvement from the 40-43% model we issued during the IPO*
    *to a new pro-forma gross margin model of 42-47%.*
4
5          70.    Following the April 10, 2006 announcement, analysts repeated Bergeron's statements
6   concerning VeriFone's increased gross-margin projections:

7          April 10, 2006 Credit Suisse-North America report: *Management expects the*
    *acquisition to be accretive from day one without assuming significant cost savings.*
8   *Most of the cost savings will stem from increased purchasing power to the benefit*
    *of gross margin.*

9          April 11, 2006 SunTrust report: *VeriFone management indicated on the conference*
    *call yesterday that the high end of its long-term sustainable gross margin range is*
10  *47%.  This is at least 200 basis points higher than our previous expectations.*

11         71.    As set forth below, despite defendants' bullish representations, investors were still

12  concerned about the Lipman merger and drove VeriFone's stock price down 34% leading up to the

13  Class Period.

14      C.     **April 10, 2006-August 30, 2006: VeriFone's Stock Price Declines Due**
               **to Investor Concerns About Declining Margins at Lipman and the**
15             **Operational Impact of the Merger**

16         72.    Prior to the Class Period, investors and analysts were concerned about the Lipman

17  merger for several reasons.  First, Lipman's own gross margin had been in a rapid and steady decline

18  for *five consecutive years* leading up to the merger, from 56% gross margins in 2002 to only *41.9%*

19  in 2006:

20

| ($ in 000s, Except EPS) | 2001 | 2002 | 2003 | 2004 | 2005 | 1Q06 |
|---|---|---|---|---|---|---|
| **Net Revenues** | $62,958 | $85,534 | $117,667 | $180,533 | $234,400 | $57,632 |
| **Cost of Net Revenues** | $27,781 | $37,116 | $58,413 | $99,630 | $136,381 | $33,464 |
| **Gross Profit** | $35,177 | $48,418 | $59,254 | $80,923 | $99,019 | $24,168 |
| **Operating Income** | $9,609 | $23,605 | $29,299 | $36,749 | $26,515 | $8,537 |
| **Operating Margin** | 15.3% | 27.6% | 24.9% | 20.3% | 11.3% | 14.8% |
| **Gross Margin** | **55.9%** | **56.6%** | **50.4%** | **44.8%** | **42.1%** | **41.9%** |

24         73.    Thus, investors were understandably troubled by VeriFone's projection of gross

25  margin "increases" to as high as 47% after absorbing a complex foreign company with 41.9%

26  margins.   Indeed, following the merger announcement, Standard and Poor's Rating Service

27  downgraded VeriFone from "stable" to "negative" due to concerns about the Lipman merger:

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 24 -

"The outlook revision reflects our ***concerns about potential operational disruptions***, given that the acquisition represents the largest transaction undertaken by the company to date, as well as ***Lipman's decline in EBITDA margins over the past two years***," said Standard & Poor's credit analyst Lucy Patricola.

74.     Investors were also concerned because Lipman's business was heavily dependent on "international" sales, which had lower prices and substantially lower gross margins than North American sales (*i.e.*, United States and Canada) which comprised a majority of VeriFone's business. Thus, any substantial increase in international sales put downward pressure on gross margins. As the Company acknowledged:

> ***Our international sales tend to carry lower prices and therefore have lower gross margins*** than our sales in North America. As a result, ***if we successfully expand our International sales***, ***any improvement in our results of operations will likely not be as favorable*** as an expansion of similar magnitude in the United States and Canada.

75.     Following the acquisition of Lipman, VeriFone's lower-margin international sales nearly ***doubled*** from $66.6 million or 43% of total sales in 4Q06 (the quarter before the merger) to ***60%*** of total sales in 1Q07 (the first quarter after inclusion of Lipman results):

| ($ in 000s, Except EPS) | 1Q06 | 2Q06 | 3Q06 | 4Q06 | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|---|---|---|---|
| Int'l Revenues | $57,657 | $61,845 | $62,289 | $66,592 | $129,070 | $122,095 | $128,027 |
| North American Revenues | $77,175 | $80,446 | $85,404 | $90,628 | $89,070 | $96,040 | $104,570 |
| Corp. Revenues | ($202) | ($14) | ($76) | ($694) | ($1,514) | ($922) | ($652) |
| Total Revenues | $134,630 | $142,190 | $147,617 | $156,633 | $216,626 | $217,213 | $231,945 |
| Int'l Revenues/ Total Revenues | 42.8% | 43.5% | 42.2% | 42.5% | **59.6%** | 56.2% | **55.2%** |

76.     These and other concerns drove VeriFone's stock price down 34% leading up to the Class Period. As one SunTrust analyst observed shortly before the Class Period: "[VeriFone] has lost about 34% of its value since May 26, [2006] as valuations in our universe have reset and ***investor concern regarding potential customer losses at Lipman have dampened enthusiasm for the pending merger***." Importantly, SunTrust also noted that investors were already concerned that VeriFone was overstating its gross margins and overreaching on its guidance in the months leading up to the Class Period, but that VeriFone management dispelled those concerns and explained away the problems:

> ***Gross Margin is Overstated And The Balance Sheet Is Deteriorating.*** A recent competitor's report asserts that VeriFone over-stated its gross margin by 140 basis points in 2Q06, owing to a one-time settlement with a supplier. It also points out that [Days Sales Outstanding] rose from 62 days in 1Q06 to 68 days in 2Q06. The

analyst concluded from these observations that *VeriFone's business is becoming more difficult and that the company is reaching to exceed the Street mean EPS estimate*.

While our competitor makes an articulate argument, we disagree with his conclusions.  Specifically, *VeriFone notes* that there were at least equal and offsetting costs incurred in 2Q06 which effectively negated the one-time benefit to gross margin.

77.   On August 30, 2006, the day before the Class Period, Credit Suisse issued a research report, stating "*[t]here has also been concern regarding PAY's gross margins*."  However, based on defendants' representations that the Lipman merger would be immediately accretive to earnings and would result in increased gross margins up to 47%, the Credit Suisse analyst parroted defendants' representations: "[W]e believe the company will continue to generate solid gross margin improvements."

78.   Thus, leading up to the Class Period, defendants knew that in order to stop VeriFone's 34% stock price decline, they had to deliver increasing gross margins and earnings to convince investors that the Lipman merger was a success and would drive future growth.  When they could not deliver, they engaged in fraud.  Defendants' false and misleading statements, material omissions and fraudulent course of conduct are particularized below.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND FRAUDULENT COURSE OF CONDUCT

### A.   VeriFone's False Financial Representations in 1Q07, 2Q07 and 3Q07

#### 1.   The False Financial Results

79.   Throughout the Class Period, defendants made numerous false and misleading representations concerning VeriFone's financial results in (a) press releases announcing quarterly financial and earnings results to the public, (b) follow-up conference calls with investors and analysts which were published to the market, and (c) quarterly filings with the SEC on Forms 10-Q, signed and certified by CEO Bergeron and CFO Zwarenstein.  The following is a chart of the dates of the false and misleading earnings releases, conference calls and SEC filings which incorporated VeriFone's false financial results:

| Period | Press Release Date | Conference Call Date | SEC Form 10-Q Date |
|--------|-------------------|---------------------|--------------------|
| **1Q07** | March 1, 2007 | March 1, 2007 | March 9, 2007 |
| **2Q07** | May 29, 2007 | May 29, 2007 | May 31, 2007 |
| **3Q07** | Sept. 6, 2007 | Sept. 6, 2007 | Sept. 7, 2007 |

80.    On each of the above dates, defendants issued materially false financial results and concealed material facts concerning the Company's true financial condition.  As set forth in §§VIII and IX, *infra*, the Company's false financial results violated numerous GAAP and SEC rules, and misrepresented the Company's revenues, COGS, gross profits, gross margin, net income and earnings, among other accounts.  The restated results are set forth in the following charts:

| 1Q07 (Ended January 31, 2007) | | | | |
|---|---|---|---|---|
| **($ in 000s, Except EPS)** | **Originally Reported** | **Restated** | **Amount Overstated** | **% Reported Amount was Overstated** |
| Net Revenues | $216,626 | $216,363 | $263 | 0.12% |
| Cost of Net Revenues | $135,246 | $147,740 | ($12,494) | -9.24% |
| GAAP Gross Profit | $81,380 | $68,623 | $12,757 | 15.68% |
| GAAP Gross Profit % | 37.57% | 31.72% | | 15.57% |
| Pro forma Gross Profit | $102,060 | $89,597 | $12,463 | 12.21% |
| Pro forma Gross Profit % | 47.11% | 41.41% | | 12.10% |
| Pro forma Net Income | $31,151 | $26,631 | $4,520 | 14.51% |
| Pro forma EPS | $0.37 | $0.32 | $0.05 | 13.51% |
| GAAP Net Income | ($984) | ($5,679) | $4,695 | -477.13% |
| GAAP EPS | ($0.01) | ($0.07) | $0.06 | -600.00% |
| Inventories | $130,815 | $117,481 | $13,334 | 11.34% |

| 2Q07 (Ended April 30, 2007) | | | | |
|---|---|---|---|---|
| **($ in 000s, Except EPS)** | **Originally Reported** | **Restated** | **Amount Overstated** | **% Reported Amount was Overstated** |
| Net Revenues | $217,213 | $216,883 | $330 | 0.15% |
| Cost of Net Revenues | $127,013 | $139,237 | ($12,224) | -9.62% |
| GAAP Gross Profit | $90,200 | $77,646 | $12,554 | 13.92% |
| GAAP Gross Profit % | 41.53% | 35.80% | | 13.79% |
| Pro forma Gross Profit | $104,382 | $91,675 | $12,707 | 12.17% |
| Pro forma Gross Profit % | 48.06% | 42.27% | | 12.04% |
| Pro forma Net Income | $32,636 | $20,422 | $12,214 | 37.43% |
| Pro forma EPS | $0.39 | $0.24 | $0.15 | 38.46% |
| GAAP Net Income | $4,859 | ($4,818) | $9,677 | 199.16% |
| GAAP EPS | $0.06 | ($0.06) | $0.12 | 200.00% |
| Inventories | $125,390 | $101,449 | $23,941 | 23.59% |

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

| 3Q07 (Ended July 31, 2007) | | | | |
|---|---|---|---|---|
| ($ in 000s, Except EPS) | Originally Reported | Restated | Amount Overstated | % Reported Amount was Overstated |
| Net Revenues | $231,945 | $231,701 | $244 | 0.11% |
| Cost of Net Revenues | $129,934 | $146,105 | ($16,171) | -12.45% |
| GAAP Gross Profit | $102,011 | $85,596 | $16,415 | 16.09% |
| GAAP Gross Profit % | 43.98% | 36.94% | | 16.00% |
| Pro forma Gross Profit | $111,857 | $95,444 | $16,413 | 14.67% |
| Pro forma Gross Profit % | 48.23% | 41.19% | | 14.58% |
| Pro forma Net Income | $35,585 | ($21,697) | $57,282 | 160.97% |
| Pro forma EPS | $0.42 | ($0.26) | $0.69 | 164.29% |
| GAAP Net Income | $13,439 | ($42,386) | $55,825 | 415.40% |
| GAAP EPS | $0.16 | ($0.51) | $0.67 | 418.75% |
| Inventories | $145,398 | $104,784 | $40,614 | 38.75% |

81.    The financial results in 1Q07, 2Q07 and 3Q07 were each reviewed, signed and certified under oath by defendants Bergeron and Zwarenstein.  They represented in each SEC Form 10-Q that the results (a) "*do not contain any untrue statement of a material fact or omit to state a material fact*," (b) "*have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information*;" and that (c) "*information contained in such Report fairly presents, in all material respects, the financial condition and results of operations of the Company*."  Bergeron and Zwarenstein also signed sworn Sarbanes-Oxley certifications representing the results were accurate.  *See* Ex. 3.

### 2.    Defendants' False Certifications of VeriFone's Internal Controls over Financial Reporting.

82.    In addition to VeriFone's false financial results, the Company expressly assured investors in each quarterly Form 10-Q that Bergeron and Zwarenstein, as CEO and CFO, had "*carried out an evaluation of the effectiveness of our disclosure controls and procedures*" and "*[b]ased upon that evaluation . . . concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report*."[5]

---

[5]    Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the 1934 Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar

83.     Separately, Bergeron and Zwarenstein signed sworn Sarbanes-Oxley certifications attached to each Form 10-Q representing under oath that they:

(1) "*are responsible for establishing and maintaining disclosure controls and procedures* . . . .";

(2) "*designed* such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure* that material information relating to the registrant . . . *is made known to us* by others . . . .";

(3) *[e]valuated the effectiveness* of the registrant's disclosure controls and procedures . . . .";

(4) "*[d]isclosed*" any change that has materially affected, or is "reasonably likely to materially affect, the registrant's internal control over financial reporting";

(5) "*disclosed . . . [a]ll significant deficiencies and material weaknesses* in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's *ability to record, process, summarize and report financial information*"; and

(6) "*disclosed . . . [a]ny fraud, whether or not material, that involves management or other employees* who have a significant role in the registrant's internal control over financial reporting."

### 3.     Defendants' False Statements to Investors Concerning the Reasons for the Inflated Financial Results[6]

84.     In addition to the issuance of the false financial results and sworn certifications in quarterly press releases and Forms 10-Q, defendants also repeated the false financial results and made false and misleading oral representations during conference calls concerning the *reasons* for the inexplicable gross margin and earnings increases, as follows.

### a.     1Q07 Conference Call:

85.     On March 7, 2007, during the first conference call with investors discussing the combined post-merger financial results, Bergeron falsely stated:

*Gross margins, excluding acquisition charges and stock-related expenses were 47.1%. Now, this is equal to the record level obtained last quarter despite the incorporation of Lipman*, which, as we've indicated, had gross margins in the low 40's for the last several quarters that they reported publicly.

---

functions, as appropriate to allow timely decisions regarding required disclosures.  SEC Rule 13a-15(e), 17 C.F.R. §240.13a-15(e); SEC Rule 15d-15(e), 17 C.F.R. §240.15d-15(e).

[6]     All false statements in this section are designated with bold and italics.

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 29 -

86.     Zwarenstein repeated these false statements:  "As Doug discussed in some detail, I will begin with **non-GAAP gross margins, which came in at 47.1%, equal to the fourth quarter of 2006 record**."

87.     Bergeron also falsely told investors that the higher gross margins and earnings growth were the result of "significant earnings accretion" from the Lipman merger and would be a sustainable "structural gross margin advantage" going forward:

> The successes we achieved in our first quarter go well beyond the strength of our earnings.  Specifically, **we completed the corporate-wide integration of a major cross-border acquisition of Lipman and we achieved a significant earnings accretion in this, the first full quarter of combined operations**.
>
> *          *          *
>
> **[W]e now have developed a structural gross margin advantage, which is going to be tough to beat**.

88.     In response to a direct question from an analyst surprised by the record level of gross margin, Bergeron went out of his way to convince investors that the surprising numbers were the result of the synergies of the Lipman merger and supply-chain efficiencies:

> BARTOLAI, ANALYST, CREDIT SUISSE:  **First question – just on the gross margin I mean a pretty solid result there given the inclusion of Lipman and the international growth.  Can you give us some sense of where the improvement came?**  Was it mostly on the legacy VeriFone side?  And do you still have a lot more room to improve the Lipman operations?
>
> BERGERON: **There really isn't Lipman operations any longer.  The business is treated at the gross margin level as one entity, driven by one senior executive, who is doing a splendid job.  We have said somewhat repeatedly that we think we're in the ZIP code that can be sustained**.  The only variance there is the effect of wireless sales are a net positive and the effect of some of our emerging market sales can be a net negative.  But **we're very comfortable in this range**.
>
> And as to the first-quarter results, I think we spoke to it or Barry spoke to it in some length, but it was a combination of quality revenue, Paul, **brings quality margins, and we were all about quality revenue this quarter**.  That's the first thing.  **And then our supply chain efficiencies –** listen, when you are putting $215 million, $220 million worth of revenue through in a quarter, **your fixed overhead per dollar of sale goes down**.  And that's arithmetically beneficial to the Company.
>
> Then we already have started to see and we entered it this last earnings call some **nice procurement synergies that come from our size.  And the good news is the last of those two or three things are not possible with competitors.  So we now have developed a structural gross margin advantage, which is going to be tough to beat**.

### b.    2Q07 Conference Call:

89.    During the May 29, 2007 conference call, in addition to repeating the false 2Q07 results that were drastically overstated, Bergeron and Zwarenstein again touted the Company's "record" gross margins that "exceeded" their own expectations:

> BERGERON: *We had an outstanding quarter of margin performance, well exceeding our own expectations for profitability metrics.  Adjusted gross margins of 48.1% were a record, and our 10 quarter period of gross margin expansion continues*.

90.    Analysts were again surprised about the gross margin increase in 2Q07 and pressed defendants to explain how such a margin increase was possible.  In fact, the first question during the 2Q07 conference call was whether any unusual items contributed to the inexplicable margin increase to 48% and whether it was sustainable:

> TIEN-TSIN HUANG – JPMorgan Analyst: I guess I will kick off with a question on gross margins, 48% was well ahead of our expectation, curious to hear [if] this level is sustainable going forward and were there any unusual items in the quarter? Sounds like wireless was a big contributor.

> ZWARENSTEIN: Let me take the second part of the question first and the answer is, *no, there was no unusual items.*  In terms of the wireless margins they are superior as you know.  It depends on the particular wireless products and country mix and domestic and international mix but come to be talking about 10 percentage point differential between the two.  Now, obviously that will give us a tailwind to the extent that wireless continues to grow faster and support the margin.  That being said though, in any given quarter the mix, product mix and the country mix can have a material impact on the margin.  So we would be more comfortable in saying that, yes, maybe the *48% is sustainable but it could drop to maybe 47% or something like that or it could go up to beyond that*.  It really depends on the mix.

91.    Atlantic Trust analyst Fred Weiss also asked what caused the significant improvement in gross margins and Bergeron primarily attributed the results to increased wireless sales, scale advantages of the merger and lower fixed costs, none of which was true given Bergeron's knowledge of Periolat's accounting manipulations:

> WEISS, Atlantic Trust Analyst: Two questions, one at a time.  Could you just talk about the *gross margin variance, big positive move in it*, despite the revenues didn't come quite as good as expected or you hoped for, is it, could you talk about the factors behind that again?  *I'm trying to understand exactly what led to the significant improvement in gross margins*.

> BERGERON: There's probably three categories.  *The first is the increase in the proportion of our systems which are wireless*.  You pointed to it.

> WEISS: Yes.

BERGERON: That has a more material impact.  ***The second is scale.*** Despite the fact that we use outsourced manufacturing for 65% of our business, let's not underestimate the high fixed cost that a proper Company like VeriFone has in running a worldwide supply chain.

\*       \*       \*

***And as we grow, our variable cost grows but our fixed cost as a percentage of our overall cost declines, so that is almost a mathematical contributor of margin expansion*** that will continue to play out as revenue grows quarter-over-quarter, hopefully in the years ahead.  I guess those are the two main factors.

### c.       3Q07 Conference Call:

92.       During the 3Q07 conference call, Bergeron again falsely attributed the Company's success to "supply chain efficiencies" arising from the Lipman merger and the "tremendous financial transparency" between the two companies, even though he knew that Periolat's accounting manipulations were the sole reason for the gross-margin increase:

BERGERON: ***[W]e're getting supply chain efficiencies in Israel that we never experienced before, and something we mentioned as well, we have tremendous transparency, financial transparency into the true cost of manufacturing and all the little nuanced items that roll up into that*** as a result of having 30%, 35% of our own inside.  So it's worked out splendidly and we're committed to it.

WACHOVIA ANALYST: And ***would you say this has been a key facet in driving gross margin expansion*** in addition to the wireless mix?

BERGERON: It's hard to pull them apart and in many cases, there's more than one component.  But ***there's clearly that, there's clearly wireless, there's clearly scale in general, and there's clearly just better commercial execution in many respects***.

### d.       Analysts Repeated Defendants' False Statements

93.       After VeriFone reported 1Q07 results, several analysts noted their surprise that VeriFone could report such rapidly increasing margins given that (a) Lipman's margins had dropped significantly leading up to the merger, (b) VeriFone's  international sales, which had drastically lower margins, had increased sharply from 42.5% of total sales before the Class Period to 55%-60% of total sales during the Class Period, and (c) VeriFone's competitors had gross margins that were 1000 basis points (roughly 10%) lower than VeriFone's.  However, based on defendants' false and misleading expectations for the inflated results, analysts parroted VeriFone's false explanations and incorporated and repeated those statements in their research reports to investors.

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                        - 32 -

94. For example, after defendants' false statements at the 1Q07 conference call on March 1, 2007, a SunTrust analyst wrote: "***Gross margin expanded again in the quarter, from 45.5% in 1Q06 to 47.1% in 1Q07. This is particularly notable, in our opinion, as Lipman's historic gross margin was significantly lower than VeriFone's***." In a follow-up report on March 20, 2007, SunTrust noted that VeriFone "***enjoys roughly a 1,000 basis point gross margin advantage, compared with its primary competitors, Hypercom and Ingenico***." These statements were based on the false financial results and inflated margins derived from defendants' accounting manipulations.

95. Analysts issued similar reports repeating defendants' false statements after VeriFone reported 2Q07 results on May 29, 2007. Although the Company reported disappointing revenues for the quarter, the analysts focused on VeriFone's "record" increase in gross margins:

- In a May 29, 2007 report, Credit Suisse analyst Bartolai wrote that VeriFone's 2Q07 adjusted EPS of $0.39 was $0.03 ahead of his model and that "***continued strong gross margins drove the upside to our estimate***." He also wrote that the 48.1% gross margin was "***96bps ahead of our model***." (Emphasis in original.)

- In a May 30, 2007 report, SunTrust analyst Jeffrey wrote: "***VeriFone continues improving its superior gross margin. 2Q07 gross margin was an impressive 48.1%, up 100 basis points, sequentially, and 250 basis points year-over-year***. . . . We submit that the company's superior profitability is a reflection of leading technology and ***best-in-class supply chain management***."

96. After VeriFone reported 3Q07 results on September 6, 2007, analysts again repeated defendants' false explanations for the increase in gross margins:

- Wachovia analyst Perlin issued a report on September 6, 2007, stating that 3Q07 EPS of $0.42 was $0.02 above Wachovia's estimate and Street consensus "primarily due to better than expected adjusted gross margin of 48.2% vs. our estimate of 47.3% . . . . We attribute the higher than expected gross margin to lower than expected integration expenses related to the Lipman acquisition and higher profitability from the company's wireless product . . . . ***Adjusted gross margins remained at record levels coming in at 48.2%, 90 bps above are [sic] estimate***."

- Morgan Keegan analyst Dodd issued a report on September 7, 2007 and wrote that "overall, the 3Q:07 results showed solid revenue growth . . . along with ***continued gross margin improvements and overhead expense controls***."

- Credit Suisse analyst Bartolai issued a report on September 7, 2007, stating that the 3Q07 EPS of $0.42 was $0.02 above previous consensus and $0.03 above his model and that "[t]he upside was driven by solid growth in both Domestic and International with ***continued margin improvements***." He added that "***adjusted gross margins were 20 bps ahead of our model, increasing 234 basis points YTY to 48.2%. . . . PAY once again generated solid margin expansion, with improvements in both gross margin and operating expenses***." (Emphasis in original.)

1   97.     Analysts and investors were not told, however, that the real reason for the increased

2   gross margin was that VeriFone created fictitious inventory to reduce COGS and artificially inflate

3   gross margins and earnings, under the direction and review of Bergeron and Zwarenstein.  Analysts

4   were misled just like investors.

5   **B.     Facts Establishing Falsity and Scienter**

6   98.     As set forth in §IX, *infra*, and the restatement charts in ¶80 above, it is undisputed

7   that VeriFone's financial results and defendants' certification of those results were materially false

8   and misleading and had to be restated.  A restatement is an admission that: (a) VeriFone's publicly

9   reported financial results in 1Q07, 2Q07 and 3Q07 and defendants' statements repeating those

10  results were materially false at the time they were originally issued; and (b) based on information

11  available to defendants at the time the results were originally reported.  As the SEC has stated,

12  "restatements should not be used to make any adjustments to take into account subsequent

13  information that did not and could not have existed ***at the time*** the original financial statements were

14  prepared," and "GAAP only allows a restatement of prior financial statements based upon

15  information 'that ***existed at the time the financial statements were prepared***.'"[7]  The restatement is

16  an admission of both falsity and materiality.

17  99.     As set forth below, the restatement was the result of a massive and systematic

18  accounting and financial fraud and deliberate inventory manipulations by Periolat under the direction

19  and knowledge of Bergeron and Zwarenstein.  Defendants knew that VeriFone's "record" gross

20  margin increases were not "structural" nor were they "sustainable."  The financial results were not

21  the result of "supply chain efficiencies and earnings accretion," they were the result of defendants'

22  financial manipulations, including double-counting inventory and creating fake profit from Lipman

23  transactions.

24  

25  [7]      *See* Statement of Financial Accounting Standards ("SFAS") No. 154, ¶2; *In re Sunbeam Sec.*

26  *Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange
    Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude Evidence of

27  the Restatement and Restatement Report at 11, 13 (S.D. Fla. Feb. 22, 2002) (quoting APB Opinion
    20, ¶13).

28

100.    The following 11 categories of particularized facts – in addition to allegations of insider trading – conclusively establish a strong inference that defendants knew or were deliberately reckless in not knowing that VeriFone's financial results, defendants' representations about how those results were derived, and the sworn certifications of VeriFone's results and its system of internal controls were deliberately false and misleading when issued.

### 1.    The Facts and Evidence Revealed in the SEC's Enforcement Action Establish Deliberate Recklessness

101.    On September 1, 2009, the SEC announced formal charges against VeriFone and Periolat for numerous violations of federal securities laws.  Exs. 1-2.  The SEC charged VeriFone and Periolat with "falsifying the company's accounting records which boosted gross margins and income reported to shareholders."  The SEC alleged VeriFone's "reporting of dramatically inflated operating income" and that "***company personnel, facing an unexpected decline in gross margins, made unsupportable alterations to VeriFone's accounting records, inflating income by millions of dollars***."  These "unsupportable alterations" were principally due to "erroneous inventory accounting adjustments" that were made and distributed to Bergeron and Zwarenstein "***after*** VeriFone's internal reporting showed preliminary quarterly results ***substantially lower than expected***" and far lower than the level represented to investors and Wall Street analysts.  Ex. 2, ¶2.  The SEC alleged that when defendants' "misrepresentations came to light in December 2007, the company's stock price dropped 46%, resulting in a one-day drop in market capitalization of ***$1.8 billion***."  Ex. 2, ¶1 (emphasis in original).

102.    The facts set forth in the SEC action demonstrate that, contrary to Bergeron's and Zwarenstein's repeated assertions to investors during the Class Period that VeriFone's purported "record" gross margins and profits were due to "structural" and "sustainable" gross margin advantages and "supply chain efficiencies" from the Lipman merger, they knew that the margin levels were due to accounting manipulations done at their direction.

103.    The SEC alleged that at the end of each quarter during each quarterly closing process for 1Q07, 2Q07 and 3Q07 (the three restated quarters), Bergeron and Zwarenstein were provided with internal reports and were expressly told that VeriFone's actual gross margins were "***markedly***

1  *lower than previously released guidance to analysts*.” Ex. 1; Ex. 2, ¶¶15-17, 23.  In early February

2  2007, during the quarterly close process for 1Q07, VeriFone’s internal results showed a gross margin

3  of 42.8%, which was approximately four percentage points *lower* than the Company’s public

4  guidance of 45%-47%.  Ex. 2, ¶14.

5        104.  After receiving the internal reports showing huge discrepancies between defendants’

6  public guidance and VeriFone’s actual results, there was “considerable concern” by management.

7  ¶15.  Bergeron and Zwarenstein had already represented to the market that the Lipman merger would

8  result in increasing gross margins and “immediate earnings accretion” to VeriFone’s financial results

9  beginning in 1Q07.  *See* §VI.C, *infra*.  Defendants knew that any unfavorable gross-margin results

10  below expectations in the first quarter of the combined VeriFone-Lipman entity would be disastrous

11  to the Company’s stock price.

12        105.  At the direction of Bergeron and Zwarenstein, Periolat and others were “charged

13  with” figuring out the reasons for the large variance between actual gross-margin results and

14  defendants’ public guidance.  Ex. 2, ¶¶15-17.  Periolat and other financial personnel initially focused

15  their analysis on cost of goods sold and inventory line items, both of which are components of and

16  directly impact gross margin.  Ex. 2, ¶15.  However, according to the SEC, Periolat could not

17  explain the discrepancy between the actual results and VeriFone’s guidance to investors.  Ex. 2,

18  ¶¶15-16.  The reason he could not explain it is that the numbers were correct, and defendants’ public

19  representatives were wrong.  Indeed, the SEC confirmed that “[i]n fact, *the company’s unreported*

20  *results had been correct*.”  Ex. 1.

21        106.  Knowing that any admission to the market that VeriFone’s public representations

22  were wrong and that Lipman caused a huge drop-off in profits and gross margin would result in a

23  decrease in VeriFone’s stock price, defendants “*began to express increasing frustration*.”  Ex. 2,

24  ¶17.  Bergeron and Zwarenstein sent e-mails characterizing the low gross margin results as an

25  “*unmitigated disaster*” and instructed Periolat and other financial personnel to “*figure it [and*

26  *related low results] out*” and “*fix the problem*” so that defendants could “*report results in line with*

27  *forecasts*” and “*thereby avoid, in the words of a senior officer, [the] unmitigated disaster*.”  *Id.*

28  (alteration in original).

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP        - 36 -

107.     Because Periolat could not initially "fix the problem" as Bergeron and Zwarenstein instructed (because "the Company's unreported numbers were in fact correct"), he was provided with "*analyses*" that explained the "***relation between specific reductions in COGS and the corresponding increase in gross margin***." Ex. 2, ¶17.  As the SEC explained, "[b]ecause gross margin is the result of revenue minus COGS, if COGS is reduced, gross margin is necessarily increased.  One way to reduce COGS is to ***increase inventory***." Ex. 2, ¶16.  Thus, as part of Bergeron's and Zwarenstein's explicit instruction to "fix the problem," Periolat was given a specific road map to increase gross margins by reducing COGS – which is exactly what he did.  Periolat created fictitious inventory, which reduced COGS and falsified gross margin and earnings, just as he was encouraged to do.

108.     In 1Q07, Periolat "fix[ed] the problem" by preparing fictitious journal entries and "adjustments" that increased Lipman inventory by approximately $7 million, thereby decreasing COGS by $7 million which increased VeriFone's gross margin. Ex. 2, ¶¶18-20.  According to the SEC, "***[a]s a result of the false accounting adjustments***" the Company's gross margin in 1Q07 increased from 42.8% to 47.1%, and VeriFone "overstated its net income by approximately $12.4 million." Ex. 2, ¶22.  These improper financial manipulations caused VeriFone's 1Q07 EPS to be overstated by ***600%***.

109.     The SEC alleged that Periolat "***failed to take adequate steps to verify***" his improper accounting manipulations.  Ex. 2, ¶19.  "Had he done so," he would have learned that the adjustments were false.  *Id*.  Periolat also "had been aware before making the adjustments" that Lipman "had proper procedures in place for accounting for inventory." Ex. 2, ¶20.  He also "learned a month after the quarter close" that Lipman had correctly accounted for inventory, "***putting him on notice that his adjustments may have been incorrect***." *Id*.  Nevertheless, Periolat "did not take steps to verify or correct his prior inventory adjustments."

110.     Importantly, the SEC Complaint confirms that "***[s]enior management was aware of [Periolat's] adjustments*** but never questioned them." Ex. 2, ¶27.  This was despite receiving the internal reports at the end of each quarter showing substantially lower gross margins and despite receiving "***monthly reports showing a sharp and unprecedented increase in inventory as a result***

*of Periolat's adjustments*." *Id.*  Nevertheless, when Bergeron and Zwarenstein were asked point-blank at VeriFone's 1Q07 conference call to explain how the Company could report such high gross margins and earnings, they deliberately concealed Periolat's accounting adjustments.  They falsely attributed the "record" results to "significant earnings accretion" and "nice procurement synergies" from VeriFone's recent merger with Lipman.  Bergeron boasted to investors that: "*[W]e now have developed a structural gross margin advantage, which is going to be tough to beat*."  He knew, however, that the only "structural advantage" was VeriFone's accounting manipulations.

111.    In 2Q07, defendants' financial improprieties were even more flagrant than 1Q07.  At the end of 2Q07, Bergeron and Zwarenstein received internal reports showing actual gross margin of 43.7%, far below the 46%-48% guidance provided to investors.  Ex. 2, ¶23.  Again, Periolat "fix[ed] the problem" by preparing false journal entries that increased "in transit" inventory (*e.g.*, inventory purportedly shipped from Lipman to VeriFone but not yet received) by approximately $10.6 million, thereby decreasing COGS by $10.6 million.  Ex. 2, ¶24.  This fraudulent accounting inflated VeriFone's reported gross margin from 43.7% to 48.06% causing a *200%* overstatement of earnings and allowed defendants to falsely report to investors that VeriFone met public guidance.  The SEC concluded that "*[t]here was no reasonable basis for the manual entries*."  Ex. 2, ¶25.  In fact, *"goods were never actually shipped between the international headquarters and the United States and as a result could not have been 'in transit.'"*  Ex. 2, ¶26.  As the SEC found, Bergeron and Zwarenstein, as members of VeriFone's senior management, were "aware of [Periolat's] adjustments."  Ex. 2, ¶27.

112.    At the 2Q07 conference call, Bergeron and Zwarenstein deliberately concealed the accounting manipulations from investors.  They falsely touted the "record" earnings and gross margin results and represented that the inflated 47%-48% margins were "sustainable" due to legitimate business practices.  When asked pointedly by analysts if there were any "unusual" items that caused VeriFone to report such inexplicably high gross margins, Zwarenstein falsely replied, "no, there was no unusual items."

113.    In 3Q07, the financial improprieties were even more egregious than 1Q07 and 2Q07.  Bergeron and Zwarenstein received internal reports showing gross margin of *40.5%*, far below the

1   47%-48% needed to meet public guidance.  Ex. 2, ¶23.  Periolat again "fix[ed] the problem" by

2   preparing journal entries that increased "in transit" inventory by approximately $9.4 million and

3   decreased COGS by $9.4 million, thereby inflating VeriFone's gross margin from 40.5% to 48.23%.

4   The false accounting caused 3Q07 EPS to be overstated by *418%* and allowed VeriFone to meet

5   public guidance.  Ex. 2, ¶25.

6          114.    At the 3Q07 conference call with investors, despite that fact that Bergeron and

7   Zwarenstein "*were aware of [Periolat's] adjustments*" and knew there "*was no reasonable basis for*

8   *the manual entries*" because the "*goods were never actually shipped*," Bergeron deliberately misled

9   investors about the reasons for the increase in gross margin and earnings:

10          *[W]e're getting supply chain efficiencies in Israel that we never experienced*
           *before*, and something we mentioned as well, *we have tremendous transparency,*
11          *financial transparency* into the true cost of manufacturing and all the little nuanced
           items that roll up into that as a result of having 30%, 35% of our own inside.  So it's
12          worked out splendidly and we're committed to it.

13   Given Bergeron's knowledge of Periolat's accounting adjustments and the monthly reports showing

14   a "sharp and unprecedented increase in inventory as a result of Periolat's adjustments," Bergeron's

15   statements had no reasonable basis.

16          115.    Notably, the SEC stated that "Periolat was able to make his unwarranted adjustments

17   because *VeriFone had few internal controls to prevent them*. . . . *Nor were there proper controls*

18   *in place* to prevent the person responsible for forecasting financial results from making adjustments

19   which allowed the company to meet the forecasts."  Ex. 2, ¶21.  These findings directly contradict

20   Bergeron's and Zwarenstein's sworn Sarbanes-Oxley certifications to investors in 1Q07, 2Q07 and

21   3Q07.   Bergeron and Zwarenstein falsely represented in the certifications that they each had

22   "designed" VeriFone's internal controls, "reviewed" those controls within the past 90 days, and

23   certified the accuracy of VeriFone's financial results and internal controls over financial reporting,

24   including the journal entries made by Periolat.   Ex. 3.   VeriFone also announced that it was

25   increasing Zwarenstein's salary for his "*work in building out [VeriFone's] financial and*

26   *accounting infrastructure*."  Based on the evidence in the SEC Complaint, Bergeron, Zwarenstein

27   and Periolat knew those certifications were false.

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                                    - 39 -

### 2. Numerous Facts Set Forth in Transcripts of Testimony Taken by the SEC Reinforce the Strong Inference of Scienter

116. In connection with its enforcement investigation of VeriFone's financial restatement, the SEC took testimony of multiple VeriFone executives and employees. The transcripts include testimony of CEO Bergeron (Ex. 6) (one day of testimony), former CFO Zwarenstein (Ex. 7) (two days) and former Corporate Controller Merkl (Ex. 8) (one day). The facts, e-mails and testimony revealed in the transcripts demonstrate that VeriFone's massive financial restatement was the result of deliberately deceptive conduct by Bergeron, Zwarenstein, Periolat and VeriFone. Defendants deliberately engaged in fraudulent accounting manipulations for the sole purpose of beating Wall Street expectations and cashing out hundreds of millions of dollars in VeriFone stock.

117. As set forth below, the new facts – most notably, quotes from defendants' own contemporaneous e-mails – show that Bergeron and Zwarenstein worked closely with Periolat for three consecutive quarters to inflate VeriFone's gross margins and EPS after they learned that actual results were far lower than public guidance. Bergeron and Zwarenstein were not merely "aware" of Periolat's fraudulent financial manipulations as they occurred. They personally directed his adjustments, told him exactly which accounts to manipulate, how he should do it, when he should do it, and the precise amounts he needed to "adjust" in order to hit the public gross margin and EPS guidance represented to investors. They tracked and reviewed Periolat's adjustments in painstaking detail on a daily and weekly basis until the desired number was reached. Zwarenstein even calculated some of the false numbers himself.

### a. The SEC Transcripts Confirm that Periolat's Role and Responsibilities Were Senior Level and He Substantially Participated in and Co-Authored VeriFone's False Financial Results

118. The SEC transcripts demonstrate that Periolat's role and responsibilities for VeriFone's corporate-wide accounting and public financial reporting during the Class Period were far more senior level than his official title indicated. Bergeron and Zwarenstein deliberately put Periolat in a high-level position and controlled and directed his accounting manipulations. In fact, Bergeron testified that "*[Periolat] clearly was Barry's go to guy*" for COGS, the most important component of gross margin. Ex. 6, Transcript Excerpts of Testimony of Douglas Bergeron,

1   *VeriFone Holdings, Inc.*, No. SF-03312-A (Securities and Exchange Commission Oct. 23, 2008)

2   ("Berg. Tr.") at 83:19-23.  As the SEC noted, "[I]f COGS is reduced, gross margin is necessarily

3   increased." Ex. 2, ¶16.  Merkl testified that COGS and gross margin were discussed interchangeably

4   at VeriFone and were interconnected.  Ex. 8, Transcript Excerpts of Testimony of Laura Merkl,

5   *VeriFone Holdings, Inc.*, No. SF-03312-A (Securities and Exchange Commission Aug. 28, 2008)

6   ("Merkl Tr.") at 157:2-13 ("***COGS are so high, so our gross margin is low***.  You know, if you say

7   one piece, it means the same thing as the other piece.  You really can't distinguish.  Q. They're

8   interconnected?  A. Yes.").

9       119.    Numerous e-mails and testimony show that Periolat was responsible for forecasting

10  gross margin before quarters began, maintaining and tracking gross margin during the quarters, and

11  accounting for gross margin after quarters closed.  *See, e.g.*, Ex. 7, Transcript Excerpts of Testimony

12  of Barry Zwarenstein, *VeriFone Holdings, Inc.*, No. SF-03312-A (Securities and Exchange

13  Commission Oct. 14-15, 2008) ("Zwar. Tr.") at 256:15-18 ("***It was Paul's work, and it was known***

14  ***that it was Paul's work***"); *id*. at 291:22-292:2 ("He has the responsibility of rejecting the gross

15  margin percent, including these COGS reliefs, and he needed to make sure that he kept track of them

16  and properly reflected them in his forecast."); *id*. at 42:12-14 ("Q. Why were you sending an email

17  to Paul [Periolat]?  A. ***Paul was the person that would be working on the gross margins***.").

18      120.    VeriFone's purported "Controller," Merkl, testified that Periolat was not only

19  responsible for gross margin – VeriFone's most important financial metric – but also for COGS,

20  supply chain and cost accounting functions, all of which were crucial accounting inputs directly

21  impacting gross margins and EPS.  Merkl Tr. at 125:19-23 ("Q. [H]e handles the accounting for

22  inventory?  A. Yes.  Q. And the COGS accounting?  A. Yes.").  Merkl also testified that Periolat

23  "***was responsible for worldwide inventory***."  *Id*. at 34:15-16; *see also id*. at 32:11-13 ("Q. Who was

24  in charge of GAAP accounting for inventory?  A. ***Paul Periolat***."); *id*. at 86:15-19 ("Q. So your area

25  of expertise was revenue recognition and accounts receivable, and you were somewhat in your mind

26  at the time ***leaving inventory up to Mr. Periolat***?  A. ***Oh, yes***.").

27      121.    Merkl also confirmed that Periolat was responsible for monthly gross margin

28  forecasting and written reports comparing the actuals to the forecasts.  *Id*. at 49:10-60:9.  Periolat

1   played an important role at Bergeron and Zwarenstein's monthly executive-level meetings and

2   would present for "30 to 60 minutes" and walk through detailed reports setting forth VeriFone's

3   actual gross margins versus projections, including any variances.   *Id*. at 213:6-10 ("[N]ormal

4   protocol ***when Paul [Periolat] gave his presentation, you discussed gross margin***."); *id*. at 45:21-

5   46:13, 49:10-60:9, 56:16-58:17 ("Q. ***Would he talk about gross margin***? A. ***Yes***. . . . Q. Did he talk

6   about costs? A. Yes. Q. What type of issues, if you remember, would he typically focus on? A. ***If***

7   ***there was a large variance between actual and forecast, he would ensure that he discussed that***.").

8   Zwarenstein regularly attended the meetings.  *Id*. at 56:25-57:2; Ex. 7, Zwar. Tr. at 16:15-24.

9          122.    Zwarenstein also testified about Periolat's high-level financial role at VeriFone and

10  admitted to countless discussions, e-mails and meetings with Periolat throughout the Class Period

11  regarding gross margins, inventory and COGS:

12      •   ***I would talk to him*** about inventory forecast.  ***I'd talk to him about*** gross margin
            expectations.  ***I'd talk to him about*** . . . expected margins on particular deals. Ex. 7,
13          Zwar. Tr. at 228:9-15.

14      •   ***I'd speak to him multiple times during the quarter and the close process***.  It would
            be something that we'd ***speak pretty intensely*** during the beginning of the quarter, it
15          would abate during the quarter, and then again at the end of the quarter.  *Id*. at
            230:14-231:1.
16
17      •   ***I had a lot of conversations with Paul*** over the course of the quarter end, including
            during the close.  *Id*. at 61:11-12, 102:3-4.

18      •   ***I would certainly call him*** and ask him, you know 'What's happening? Do you still
            have – how are you feeling about the quarter?  Are we going to come in okay or
19          not?'  That type of thing.  *Id*. at 203:21-25.

20         123.    Zwarenstein also admitted that Periolat played a key role in preparing and authoring

21  the underlying financial results for VeriFone's SEC reporting to investors:

22          The biggest area of concern is in COGS . . . .  And the guy who had made that
            forecast, and the guy who, along with Brian, but especially him, is going to be able to
23          see ***what are the right numbers we're going to report to the SEC, is Paul***.

24  *Id*. at 81:25-82:5; *see also id*. at 265:16-17 ("[W]e've got Paul at the head of this.").

25         124.    Zwarenstein also testified that Periolat substantially participated in the Sarbanes-

26  Oxley certification process by providing "sub-certifications" of VeriFone's financial results that

27  were communicated directly to the market.  *Id*. at 176:15-17 ("It would have included . . . Paul

28  Periolat."); *id*. at 176:22-177:2 ("Q. And was the primary purpose of the sub-certification process,

1  was it to support your quarterly 302 certification?  A. Yes.").  Zwarenstein also admitted that he

2  spoke to Periolat more frequently at the end of 1Q07, the first restated quarter.  *Id*. at 259:23-260:1

3  ("So during the close of the first quarter, did you talk more often with Paul than you'd had to in

4  previous quarter closes?  A. [Y]es.").

5      125.    Thus, despite Periolat's official corporate title, he had senior-level responsibilities and

6  substantially participated in creating, manipulating, authoring, disseminating – and ultimately

7  controlling – VeriFone's false gross margins communicated to investors.  Periolat's fraudulent

8  financial adjustments and his substantial participation in VeriFone's financial reporting made it

9  necessary and inevitable that his misconduct would mislead investors.

10     126.    CEO Bergeron admitted being aware of Periolat's senior-level role and

11  responsibilities from the very beginning of the Class Period.  Ex. 6, Berg. Tr. at 48:10 ("I would say

12  Paul [Periolat] was the numbers guy."); *id*. at 39:17-18 ("Paul Periolat and his team in Sacramento

13  were very instrumental in these items.").  Also as set forth in ¶¶145, 147, 149, 152, 154, 162-162,

14  166, *infra*, Bergeron's own e-mails with Zwarenstein show that he knew Periolat had senior-level

15  responsibilities and communicated with him directly.  For example, in early November 2006, at a

16  time when Bergeron was internally saying he was "totally uncomfortable" with VeriFone's low

17  gross margin results and was "worrying about the end of Q4 [2006] discounting," he wrote in an

18  e-mail: "*[b]ut, importantly, when can I get the confident Paul Periolat confirmation of where we*

19  *are?*"  *Id*. at 106:6-18, 113:2-5.  Bergeron admitted that he knew Periolat was responsible for COGS

20  (which reflects discounting) and that Periolat worked directly with Zwarenstein.  *Id*. at 113:12-23

21  ("Q. And so in your mind that [COGS] was something that *Paul was responsible for?  A. Through*

22  *Barry [Zwarenstein], yes*.").

23     127.    Zwarenstein testified that he and Bergeron frequently discussed VeriFone's gross

24  margin results, including Periolat's accounting adjustments.  Ex. 7, Zwar. Tr. at 59:17-22 ("Q. And

25  would you – it would be your general practice to somehow apprise [Bergeron] of your

26  communications with Mr. Periolat?  A. [Bergeron] sat two offices down from me.  We would have

27  been speaking about this probably, you know, pretty frequently."); *id*. at 84:4-5 ("I normally would

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                          - 43 -

1    have wanted to update [Bergeron] pretty periodic – pretty often."); Ex. 6, Berg. Tr. at 75:21-22 ("I

2    remember over multiple days and weeks getting lots of status email from [Zwarenstein].").

3       128.    In fact, as set forth in more detail below, Bergeron and Zwarenstein personally

4    communicated with Periolat directly throughout the Class Period – in numerous phone calls, e-mails

5    and face-to-face meetings – regarding VeriFone's gross margin shortfall and Periolat's

6    manipulations during the Class Period.  Numerous contemporaneous e-mails between Periolat,

7    Bergeron and Zwarenstein demonstrate that they were heavily involved in Periolat's fraudulent

8    accounting adjustments every step of the way throughout the three restated quarters.  Those e-mails

9    are particularized below.

10               **b.**     **The SEC Transcripts Confirm that VeriFone's**
                          **Accounting Manipulations Were a Top-Down Directive**

11                           **from Defendants Who Were Aware of Gross Margin**
                          **Problems as Early as 2006 When They Falsely Touted**

12                           **the Lipman Merger as an Unmitigated Success**

13       129.    Bergeron and Zwarenstein were controlling and highly intimidating executives who

14    micromanaged the financials and demanded that employees follow aggressive and improper

15    accounting tactics in order to hit VeriFone's public forecasts at any cost.  Unlike companies that use

16    a "bottom-up" forecasting process to ensure that expectations are closely tied to actual results on the

17    ground, VeriFone's forecast came directly from Bergeron and was pushed and executed by

18    Zwarenstein and Periolat during the Class Period. Ex. 7, Zwar. Tr. at 15:10-11 ("*[Bergeron] would*

19    *put out expectations from the top down*, which is what this is.");  255:3-21.  Numerous e-mails

20    described *infra* show that VeriFone's financial results were driven not by what the numbers actually

21    were, but rather what Bergeron and Zwarenstein decided they would be.

22       130.    Even before the Class Period, Zwarenstein was already instructing subordinates about

23    what their numbers had to be, or else.  On June 6, 2006, after Zwarenstein received a weekly

24    financial report and update of the results and "goals" for 3Q06, he wrote: "Since we are going to

25    treat June 30th like it was July 31st, and *since we always get to our number*, and since we are

26    *therefore going to make the [$]60 million*, it is misleading to use the word 'goal' in this context."

27    Ex. 7, Zwar. Tr. at 320:6-321:6.

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP          - 44 -

131.     On or around September 11, 2006, Bergeron sent Zwarenstein his forecast and budget for FY07.  *Id.* at 15:10-11.  Zwarenstein testified that Bergeron "would then convene a series of extremely high-profile meetings" in Atlanta where Bergeron would demand an agreement or "contract" with his own officers and staff for the commitment to his forecasts.  *Id.* at 15:11-19.  Zwarenstein admitted that Periolat attended the "pretty important meetings" and presented reports regarding gross margin forecasts, and "those would be *reviewed in some considerable detail in Atlanta by Doug [Bergeron] and myself*."  *Id.* at 256:15-257:14 ("*We reviewed them* with vim and vigor"); *see also id.* at 16:15-24; Ex. 8, Merkl Tr. at 45:21-46:13, 49:10-50:2, 56:16-58:17.

132.     At the time of the September 2006 forecast, defendants already knew that VeriFone's gross margins were not increasing at the rate and level represented to investors.  In one e-mail exchange between Bergeron and Zwarenstein on September 11, 2006, Zwarenstein openly questioned the reasonableness of Bergeron's gross margin forecast of 46% for VeriFone, and 48.8% for the combined entity.  Ex. 6, Berg. Tr. at 21:16-21 ("Looks very reasonable *except gross margin percentage*.").  This concern was not surprising given that Lipman's margins were only 41.9% and had dropped precipitously for five consecutive years heading into the merger.  The gross margin forecast from the field at the time of Bergeron's 46%-48.8% top-down forecast was only *43.2%*.  Ex. 7, Zwar. Tr. at 25:23-26:2.

133.     VeriFone's gross margin problems continued to grow in late 2006.  On November 9, 2006, just eight days after the Lipman merger closed and after defendants had already recklessly represented to investors that the merger was a roaring success, Bergeron sent an internal e-mail to several VeriFone executives, including Zwarenstein and Atkinson with the subject line: "*What is Keeping me from Sleeping*."  Ex. 6, Berg. Tr. 106:10-19.  The e-mail stated: "*On gross margin percentages, I'm totally uncomfortable*, we need to be at 46 percent, given a 55 percent mix of INTL [International]."  *Id.*

134.     Bergeron's reference to the "55 percent mix" of international sales shows that he was clearly aware of the negative impact of Lipman's lower-margin international business on VeriFone's overall margins.  As discussed in §VI.B.7, defendants knew that Lipman's business was heavily skewed toward international sales, which carried much lower margins than VeriFone's legacy

1    business.  This was confirmed by testimony.  Ex. 7, Zwar. Tr. at 30:23-24.  ("Internationally, the

2    margins were lower.").  Prior to the merger, VeriFone's international sales were only 42.5% of total

3    sales, or $66.6 million.  In the first quarter after the merger, that number nearly doubled to $129.1

4    million, or **59.6%** of total sales.  The sharp increase in international sales put downward pressure on

5    VeriFone's margins.   Bergeron and Zwarenstein were well aware of this problem when they

6    recklessly increased VeriFone's gross margin forecasts and continued to tout the success of the

7    Lipman merger in August-December 2006.

8            135.    Bergeron and Zwarenstein also tracked VeriFone's gross margins closely during the

9    Class Period.  They acknowledged receiving "Flash Report[s]" containing VeriFone's real-time

10   gross margin results after each month or quarter closed, and Zwarenstein admitted they closely

11   reviewed and scrutinized VeriFone's gross margin numbers in November and December 2006.  *Id.* at

12   40:4-8, 252:2-10 ("Well in general and in COGS, those November and December balance sheet P&L

13   reviews were very fraught reviews, in the sense that the numbers were not . . . they were difficult

14   reviews.").  Defendants also knew that, at the time defendants were telling investors that the Lipman

15   merger "will begin Day 1 completely integrated" and was already resulting in "earnings accretion,"

16   "supply chain efficiences" and increased gross margins, there were major undisclosed problems and

17   delays in closing the books after the Lipman merger.  *Id.* at 245:5-8 ("***We did not finally close***

18   November 2006 until early in January, after the holidays of 2007.  So ***a month-and-a-half late***,

19   because '[t]his doesn't make sense, you have to change this, you have to change that.'").   Yet

20   defendants continued to falsely tell investors that the merger was an integrated success.  *See*

21   §VI.A.3, C.2-3, *infra*.

22           136.    In addition to gross margin problems, defendants also knew that the merger resulted

23   in severe inventory problems.  Several e-mails from Periolat, Zwarenstein and others on December

24   22, 2006, show that defendants instructed VeriFone managers to hit a certain number, to the digit.

25   Ex. 7, Zwar. Tr. at 325:6-326:3 ("We now have the financial consolidated inventory number for

26   November.  ***It is disturbingly high***, $179M. . . .  We absolutely and utterly have to get the total

27   recorded inventory at the end of January, so that ideally it has a '2' as a second digit.  But at the

28   very, very worst, it has to have a '3' as the second digit.").  Later that same day, Zwarenstein

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                          - 46 -

e-mailed Periolat directly to make sure he understood exactly what inventory numbers Periolat had

to come up with to report to investors:

> **Paul** . . . What I do know for sure is that ***he [Bergeron] . . . wants to report on our next earnings press release*** a January 31st, 2007, inventory to shareholders which as a '2' as a second digit, and ***he wants*** our operating cash flow hugely positive, driven by inventory reduction . . . . Also ***we told our investors in our press release*** that the ***November 1 opening inventory*** would be in the range of [$]155 million to [$]165 million.

*Id*. at 327:12-328:11.  Given the fact that the "November 1 opening inventory" results were nearly

two months old, Zwarenstein's directive demonstrates that VeriFone's reported numbers were not

driven by the actual results, but rather the results that Bergeron and Zwarenstein demanded.  Thus,

Periolat knew that the sole purpose of any accounting adjustments he made was to hit the numbers

Bergeron and Zwarenstein needed to communicate to investors.  It was both necessary and inevitable

that Periolat's false accounting manipulations would mislead investors, and he knew it.

137.     On January 7, 2007, Bergeron continued to instruct VeriFone staff about what the

numbers had to be to meet Wall Street expectations, regardless of how they got there.  In response to

an e-mail setting forth a "commitment" revenue number that Bergeron did not like, he wrote: "This

is in response to an e-mail from [redacted by the SEC] where current commitment is 218 [million in

revenue] . . . .  Team, just a reminder that ***we need to be above 221 million*** [revenue] ***for Wall Street

to believe we made the quarter***."  Ex. 8, Merkl Tr. at 101:3-25; Ex. 6, Berg. Tr. at 115:22-116:4.

Bergeron expressly warned Zwarenstein, Merkl and others that Wall Street would not react well to

VeriFone's failure to hit the number, using one of VeriFone's peers as an example.  Ex. 8, Merkl Tr.

at 101:3-25 (Bergeron e-mail: "Last week, [G]lobal [P]ayments came in within their guidance, but

didn't beat both revenue and EPS for the first time in three years.  And their stock price went down

[$]8.50 as a result.").  Merkl testified that it was typical for Bergeron to send e-mails connecting

VeriFone's financial results to its stock price.  *Id*. at 102:2-6.

138.     Other e-mails show that Bergeron was so obsessed with VeriFone's stock price that

Bergeron gave Zwarenstein a suspicious directive that if VeriFone could not hit the revenue target in

1Q07 using "best practices accounting," VeriFone had to be more "aggressive" to hit the desired

target:

1      **Barry, we need to be at 220** [million], if we get there I support all of the best practices accounting you are recommending, **if we need to be a bit aggressive in order to get to 220, we must do it**.

2

3 Ex. 6, Berg. Tr. at 117:19-23; Ex. 7, Zwar. Tr. at 322:8-11.  Zwarenstein testified that Bergeron "was

4 **trying to push us** to not adopt this more stringent revenue recognition policy" and "[h]e would do

5 that sort of thing **quite often**."  Ex. 7, Zwar. Tr. at 322:24-25, 323:14.  Zwarenstein's cryptic e-mail

6 response to Bergeron's instruction was to ask if "**we can speak**" offline.  *Id*. at 323:1-6; Ex. 6, Berg.

7 Tr. at 120:12-14.  When Bergeron was asked about this follow-up offline conversation, he testified:

8 "I don't remember."  Ex. 6, Berg. Tr. at 120:14.

9      139.  On January 10, 2007, Periolat issued a monthly report to VeriFone executives

10 documenting the first two months of actual gross margins for 1Q07 (November and December

11 2006).  Ex. 8, Merkl Tr. at 49:10-50:2, 56:3-57:18, 60:3-6.  The report showed that VeriFone's gross

12 margin results were far lower than public projections (42.4% vs. 47% forecast).  *Id*. at 57:9-18, 60:3-

13 6, 62:8-63:20, 67:15-20.  Another report dated January 21, 2007, confirmed that the actual GAAP

14 Gross Margin for 1Q07 was still much lower than forecast.  *Id*. at 65:10-13, 70:19 (showing GAAP

15 gross margin of 42%).  The person responsible for discussing these gross margins with VeriFone's

16 executives was Periolat.  *Id*. at 64:3-7.  ("Q. So it was Paul [Periolat] primarily?  A. Yes.  Q. Nearly

17 exclusively, would you say, who answered the questions?  A. Yes.").

18      140.  On January 26, 2007 – only five days before 1Q07 closed – Zwarenstein circulated an

19 unfavorable report about VeriFone's revenues.  Bergeron responded as follows: "Bill and Bud

20 [VeriFone's senior salesmen], **I don't care what kind of orders you pull in, we must be at 220**

21 [million], **work with me, I've delivered your stock price before**, **Barry is not bluffing**."  Ex. 6, Berg.

22 Tr. at 123:19-25.  Bergeron admitted that his instruction included a push for lower-margin deals.  *Id*.

23 at 124:1-25.  Ultimately, VeriFone could not "pull in" enough deals to hit the revenue number, and

24 VeriFone reported $216.6 million in 1Q07.  To make up for the revenue shortfall and still meet

25 defendants' public gross margin and EPS expectations, defendants knew they had to manipulate the

26 non-revenue side of the gross margin equation – *i.e.*, COGS and inventory – and they directed

27 Periolat to do so, as set forth below.

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP        - 48 -

**c.      Bergeron and Zwarenstein Supervised, Directed and
Controlled Periolat's Accounting Adjustments and
Communicated with Periolat Throughout the Period of
the Accounting Fraud**

141.    On or about February 5-6, 2007, less than a week after 1Q07 closed, Bergeron and Zwarenstein received a "Flash Report" confirming the alarming trend that defendants had seen for months – VeriFone's actual gross margins were only 42.8%, drastically lower than publicly represented.  Ex. 8, Merkl Tr. at 119:16-120:13, 125:5-126:16.  Bergeron admitted receiving the negative information:

> QUESTION: [A]t some point in the first week to ten days of February [2007], you received information *from Barry* [Zwarenstein] that the *gross margins were lower than what the projections had been* during the quarter, is that correct?
>
> BERGERON: I recall generally receiving information from Barry [Zwarenstein] that the first roll up, whatever level of confidence I wanted, or he wanted to place on that, *showed that the actual gross margins were lower than the plan, not higher*.

Ex. 6, Berg. Tr. at 50:25-51:8.  Zwarenstein admitted it was a "big problem."  Ex. 7, Zwar. Tr. at 102:8-11 ("Q. And I think from your earlier testimony it's clear that the gross margin and the COGS was a *big problem* in the quarter close.  A. *That is correct*.").  He also admitted that the magnitude of the discrepancy between the Flash reports and the budget in 1Q07 was largely unprecedented.  Ex. 7, Zwar. Tr. at 63:9-14 ("Q. I think you had mentioned that in previous quarters there had been some discrepancies between the Flashes and the budgets, but *not of this magnitude*.  Is that right?  A. [T]he first quarter with Lipman was one of the bigger ones, *if not the biggest*.").

142.    The next day, on February 7, 2007, Bergeron and Zwarenstein expressly discussed the massive shortfall in an e-mail.  Ex. 6, Berg. Tr. at 52:15-16 ("Let's focus on the *big swing item as gross margin*.").  Zwarenstein testified that "there was a *$10 or $11 million variance* in the forecast."  Ex. 7, Zwar. Tr. at 37:9-12.  He also admitted that the $10-$11 million variance presented "pretty serious issues" for the "*business model of the company*, with our level of head count, *with the guidance we'd give in the street*."  *Id*. at 41:15-19.  He testified that the variance "would have been a very material sum of money" and that higher COGS was causing the shortfall in gross margin.  *Id*. at 41:22-42:14.

143.    On or about February 8, 2007, Zwarenstein e-mailed Periolat directly about the disastrous gross margin shortfall:

> **Good luck.  You do not need me to tell you** it would be an **unmitigated disaster** if COGS are truly what is in what [redacted by SEC] sent out at midnight.

*Id*. at 41:5-8.  Merkl confirmed the "unmitigated disaster" e-mails were dated February 8, 2007 and were sent to Periolat, among others.  Ex. 8, Merkl Tr. at 153:14-155:1.

144.    Zwarenstein admitted that COGS was too high and that Periolat was directed to fix the gross margin.  *Id*. at 41:6-42:14 ("COGS at this stage were higher than the forecast.  Q. And that was leading to the lower gross margin, is that correct?  A. Correct. . . .  Q. Why were you sending an e-mail to Paul [Periolat]?  A. *Paul was the person that would be working on the gross margins*.").  Merkl confirmed that higher COGS equates to lower margins and the two were "interconnected" and VeriFone executives would "talk interchangeably about the two."  Ex. 8, Merkl Tr. at 157:5-13.

145.    That same day, February 8, 2007, Bergeron and Zwarenstein exchanged several e-mails, one of which attached a draft of a VeriFone "joint press release" to investors.  One e-mail confirmed that Bergeron and Zwarenstein were well aware of Periolat's manipulations and the severity of the problem:

> ZWARENSTEIN: *Just checked with Paul* [Periolat] and he is going to continue to work it *but we are stuck at around 43 percent*. . . .  And it is *going to take a huge silver bullet*.
>
> BERGERON: *Barry, the party would be over big time for us*.

Ex. 6, Berg. Tr. at 68:22-70:13; Ex. 7, Zwar. Tr. at 54:4-55:20.

146.    When asked about the e-mails, Zwarenstein admitted, "I'm referring there to the non-GAAP gross margins."  Ex. 7, Zwar. Tr. at 55:9-14.  He also testified that "*this is pretty serious*" and that the gross margin shortfall was a "considerable gap" and a "*material difference from the forecast*."  *Id*. at 54:18-55:3, 56:22-57:11.  Zwarenstein acknowledged that, "[c]learly, I was less confident than I was in one of the earlier e-mails."  *Id*. at 57:10-11.  He also admitted that he was concerned about the accuracy of VeriFone's public forecasts.  *Id*. at 64:17-20 ("Q. Do you recall having any concerns that the forecast simply could have been wrong?  A. Yes. I had – *I certainly would be concerned that the forecast could have been wrong*.").  The fact that Bergeron and

1   Zwarenstein discussed this while attaching an ***investor press release*** shows they knew the danger of

2   misleading VeriFone investors was obvious and that Periolat's manipulations were done for the sole

3   purpose of hitting the public guidance.

4        147.    Another e-mail in February 2007 shows that Zwarenstein and Bergeron were

5   monitoring Periolat's adjustments closely: (e-mail from Zwarenstein to Bergeron) "Paul and

6   [redacted by SEC] are still dueling over the $12 million. [Redacted by SEC] thought he had made an

7   error, but recanted. . . .   Paul is now checking [COGS]. . . .   ***I have my money on Paul***." *Id.* at

8   44:22-45:18.  Another e-mail shows that Zwarenstein assisted Periolat on COGS issues by e-mailing

9   a Lipman executive to help Periolat. *Id.* at 49:20-50:17 ("I think what I was doing here is ***helping***

10  ***Paul*** out by getting [redacted by SEC] to – to make a call into Paul.").

11       148.    Countless other e-mails during February 5-14, 2007 confirm that Bergeron and

12  Zwarenstein had actual knowledge of Periolat's manipulations, encouraged and reviewed those

13  manipulations, and directed Periolat to artificially reduce COGS by specific amounts to hit the target

14  gross margin and EPS numbers in 1Q07.

15       149.    On or about February 9, 2007, Zwarenstein e-mailed Periolat, Bergeron and Merkl

16  after an updated Flash Report showed that their adjustments were not working.  The e-mail to

17  Periolat and Merkl stated: "***Still awful***" and "***[s]till $11 million too high***." Ex. 7, Zwar. Tr. at 61:20-

18  62:17; Ex. 8, Merkl Tr. at 160:4-161:15.  Zwarenstein testified that "I'm saying that the numbers are

19  still ***considerably off what we had forecasted***" and that "the forecast had $11 million less COGS

20  than the actual numbers in the Flash [Report]." *Id.* at 62:11-17.  Zwarenstein also admitted that as of

21  February 9, 2007, "***I would have had some concerns at this stage***." *Id.* at 71:6-13.  Zwarenstein's

22  e-mail to Bergeron stated: "***Paul*** is to focus on number two to the exclusion of all else for now,"

23  which meant that Periolat would focus on the $11 million COGS variance that was impacting gross

24  margin. *Id.* at 75:7-15.

25       150.    On or about February 10, 2007, Zwarenstein e-mailed Bergeron, telling him exactly

26  which adjustments they needed to fix the gross margin forecast: "***We need a little over $10 million***

27  ***to get to 46.5 percent***." *Id.* at 69:1-9, 72:22-24; Ex. 6, Berg. Tr. at 75:10-12.  Zwarenstein testified

28  that his statement meant that "we would need a little over $10 million to – in errors to ***get to the***

1  *forecasted number*." Ex. 7, Zwar. Tr. 69:11-15.  Zwarenstein also admitted that the issue was

2  COGS and that "*clearly the work had to happen with Paul* and his team in [Rocklin]." *Id.* at 71:1-

3  2.  The e-mail string reveals that Bergeron even calculated how they could try to "sell" a lower 46%

4  gross margin to investors if Periolat could not hit the target. Ex. 6, Berg. Tr. at 77:1-13 ("I think we

5  can *sell* 46 percent without much effort, which is really the weighted average of the two businesses.

6  I hope we can get to that.").

7       151.  But, as set forth in §VI.B.7, Lipman's margins were only 41.9% at the time of the

8  merger (and had been dropping for five consecutive years), and VeriFone's stand-alone margins

9  were only 46% prior to the merger.  Furthermore, Bergeron knew that the combined margins

10  dropped significantly because of the massive increase in VeriFone's lower-margin international

11  sales, from $66.6 million or 42.5% of total sales, to $129.1 million or *59.6% of total sales* after the

12  merger.  As reflected in e-mails in December 2006, January 2007 and February 2007, Bergeron also

13  knew that VeriFone's margin results had dropped significantly and that the "weighted average" was

14  substantially lower than 46%.  In fact, it was consistently 42.8% throughout early February 2007

15  until Periolat executed his fraudulent adjustments to inflate the number to 47%, which equated to the

16  $0.37 EPS that Bergeron demanded.

17       152.  The February 2007 e-mail string shows that both Bergeron and Zwarenstein had

18  actual knowledge that Periolat was deliberately manipulating VeriFone's COGS to get to the 46.5%

19  gross margin result, and they expressly encouraged it.  After Zwarenstein relayed the bad news to

20  Bergeron about the low margins, Bergeron wrote: "*Paul* [Periolat] *will have to take a good clean*

21  *look at accruals and see where he can trim*." *Id.* at 77:11-13; Ex. 7, Zwar. Tr. at 72:22-24.

22  "Trimming" accruals means reducing expenses and COGS, which increases gross margin.

23  Zwarenstein admitted that he talked to Periolat about the "accruals" during the close of 1Q07 and

24  that he knew accruals were made.  Ex. 7, Zwar. Tr. at 73:24-75:2.

25       153.  Bergeron's response to the incriminating "trimming" e-mail string above was to

26  suggest that he may not have read it: "I don't think I read this far in the string, even at that time,

27  because this is new to me." Ex. 6, Berg. Tr. at 75:15-17.  This explanation strains credulity given

28  Bergeron's obsession with gross margin results and VeriFone's stock price, as evidenced by other

1    e-mails cited herein.  Bergeron later admitted that he was aware of the gross margin shortfall during

2    this time.  Ex. 6, Berg. Tr. at 76:14-20 ("Q. And then you remember at this point whether you had

3    any questions as to whether at this point they were going to get to the 46.5 percent?  A. Sure.  I could

4    say that there was enough email traffic or Barry [Zwarenstein] seeing me, but I accepted the fact

5    that, you know, maybe the Lipman numbers were lower than we had forecasted.").

6        154.    Additional evidence shows that in February 2007, after Bergeron was updated by

7    Zwarenstein about Periolat's attempted adjustments to fix the gross margin shortfall, Bergeron

8    e-mailed Periolat directly, and discussed "overhead" issues with Periolat.  *Id*. at 60:22-64:14.  In a

9    subsequent e-mail, Periolat wrote: "***Overhead, overhead, overhead, double counting of overhead in***

10   ***the process***."  Ex. 8, Merkl Tr. at 180:7-21.  Bergeron confirmed that he discussed the issues with

11   Zwarenstein directly.  Ex. 6, Berg. Tr. at 63:24-64:7.  The restatement later revealed that VeriFone

12   improperly applied and double counted millions of dollars of overhead: $7.7 million in 1Q07, $7.7

13   million in 2Q07 and $10.5 million in 3Q07.  The overhead manipulations reduced COGS and

14   increased gross margins – the very issue that Bergeron discussed with Periolat before the fraudulent

15   adjustments were made.  This is also corroborated by CW13, who confirmed that Periolat's group

16   was applying "wild amounts of overhead" to inventory and when CW13 raised a red flag, Periolat

17   was hostile and rejected it.  Further, as set forth in ¶205, *infra*, Bergeron and Zwarenstein both had

18   actual knowledge that Periolat was manipulating inventory overhead to reduce COGS and increase

19   gross margin.

20       155.    In another February 2007 e-mail from Zwarenstein to Merkl (copying Periolat), the

21   $10.7 million VeriFone needed to hit the EPS target jumped to $12 million: "My calculations are

22   showing that ***Paul would have to come up with 12.3 million*** [in COGS] ***for us to get to 36.6 cents***."

23   Ex. 7, Zwar. Tr. at 118:24-120:20, 160:1-8; Ex. 8, Merkl Tr. at 172:10-173:2.  This e-mail was

24   corroborated by another February 2007 e-mail from Zwarenstein to Bergeron.  Ex. 6, Berg. Tr. at

25   58:2-11 (citing e-mail: "***Paul [Periolat]*** and Brian are ***still doing over $12 million***.").  The

26   restatement disclosures confirmed that defendants overstated COGS by $12.4 million in 1Q07.

27       156.    In the same e-mail string, Zwarenstein observed that the accounting manipulations

28   could not be too drastic or the market would not believe the higher gross margin number.  Ex. 7,

1    Zwar. Tr. at 121:5-122:2 (Zwarenstein e-mail: "***This is not believable***.").  Zwarenstein testified that

2    "to come up with that high a number ***just did not seem credible*** . . . .  Q. So 47.7 [percent gross

3    margin] was too high?  A. Yeah.").  *Id.*  Zwarenstein also admitted to calculating and reviewing the

4    numbers ***himself***.  Ex. 7, Zwar. Tr. at 125:6-12 (Q. [Y]ou performed calculations when you were on

5    the plane on the way to Mexico?  A. That's my recollection. . . .  And I may have finished it up in the

6    hotel room or something like that.").

7         157.    Another February 10, 2007 e-mail shows that Zwarenstein was, in fact, providing

8    Periolat with the "analyses" to which the SEC referred in its complaint.  He continued to direct

9    Periolat to manipulate COGS and gross margin to hit the EPS target: "I calculated that if everything

10   else stayed the same, first ***[m]argin percentage would need to be 47 percent exactly to get to 36***

11   ***cents*** [EPS] rounded."  *Id.* at 77:6-10.  Zwarenstein also provided Periolat with the precise amount of

12   COGS that he needed to reduce in order to hit the public forecast: "***Paul, this is where we are still***

13   ***off by $10,784,000 versus the forecasting*** that we've already done.  Is there an error [in] there

14   somewhere?"  *Id.* at 77:22-24.  Merkl testified that "what it will take to get to 36.6 cents" meant

15   "[w]hat the gross margin would have to be holding the other expenses the same."  Ex. 8, Merkl Tr. at

16   170:11-14.

17        158.    In another e-mail string during the second week of February 2007, Zwarenstein

18   circulated an attachment showing what the EPS results would be after Periolat executed his $10.7

19   million adjustment to COGS – as he directed Periolat to do.  Ex. 7, Zwar. Tr. at 105: 7-12.

20   Zwarenstein wrote that they needed to "[g]et a crystal clear understanding of ***what it will take to get***

21   ***to 36.6 cents [EPS]*** cash using the correct model for EPS, and ***let Paul know what his goal is*** in

22   terms of non-GAAP COGS reduction."  Ex. 8, Merkl Tr. at 170:5-8; Ex. 7, Zwar. Tr. at 108:22-24.

23        159.    When asked about this e-mail, Merkl agreed that it appeared that Periolat was being

24   told what numbers to manipulate to hit EPS targets:

25        QUESTION: So is [Zwarenstein] asking somebody to calculate what the gross
          margin that the company has to report ***to get to a certain earnings per share result***?
26
          MERKL: ***As written, that's what it would be interpreted to***.
27

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                           - 54 -

1    QUESTION: And similarly, where it says, "Let Paul [Periolat] know what his goal is
2    in terms of non-GAAP COGS reduction" . . . Again *that sounds like Paul has to be
     *given a number, and he's going to reduce COGS by that number*?

3    MERKL: *My interpretation would be yes*, but I don't know.

4    Ex. 8, Merkl Tr. at 170:5-25.  Zwarenstein acknowledged that Bergeron was aware of the situation

5    with Periolat.  "So I know at this stage we were in communications *with Doug* [Bergeron] at 37

6    [cents EPS].  I picked the 36.6 in order to *focus the discussion with Paul*."  Ex. 7, Zwar. Tr. at

7    109:16-18.

8         160.    Merkl also acknowledged an e-mail from Periolat to her (and other recipients

9    redacted by the SEC) setting forth exactly how Periolat was going to manipulate the 42% gross

10   margin number to hit the 47% gross margin target.  Ex. 8, Merkl Tr. at 140:25-144:1.  Periolat wrote:

11   "For us to come close to the flash GM [Gross Margin] *we have to put a $10 million plug* into direct

12   material."  *Id*. at 142:10-12.  Merkl testified, "I believe he's saying that *they would have to reduce*

13   *COGS by 10 million to get to the eventual gross margin*."  *Id*. at 143:1-3.  Merkl also admitted that,

14   from an accounting point of view, Periolat's $10 million "plug" meant, "*he's making an entry that*

15   *has no detail behind it*."  *Id*. at 143:24-144:1 ("Q. So the [$]10 million plug to you means an *entry*

16   *without support*?  A. *Correct*.").  Reports indicated that the proposed unsupported "plug" was

17   documented and discussed in February 2007.  Ex. 8, Merkl Tr. at 150:3-153:1, 161:17-162:17.

18        161.    On February 11, 2007, Bergeron and Zwarenstein had yet another e-mail exchange

19   about whether Periolat was able to manipulate VeriFone's numbers to get to 47% gross margins,

20   which would equate to $0.37 cents in EPS.  Ex. 6, Berg. Tr. at 80:6-82:11.  Zwarenstein wrote to

21   Bergeron:

22        So, I know that you want 37 cents but I did the following calculation on 36 cents and
     *Paul [Periolat] will not stop looking* just because he gets to 36 cents, and with the
23        numbers above to get to 35.6 cents, *Paul has to come up with 10.4 million will*
     *mean a gross margin of 47 percent*.
24
     Ex. 6, Berg. Tr. at 80:6-82:8; 83:3-84:11; Ex. 7, Zwar. Tr. at 85:10-87:20.
25
          162.    Zwarenstein then wrote to Bergeron: "Paul stated that he . . . feels better now about
26
     being able to *close the entire gap* than he has in the past.  He has more clarity on *how to get there*
27
     than he had before.  I certainly detected more assurance in his voice than before, *let's hope he*
28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                      - 55 -

1    *delivers.*" Ex. 6, Berg. Tr. at 83:24-84:4, 86:3-87:13; Ex. 7, Zwar. Tr. at 91:24-92:3. The e-mail

2    also confirmed that Bergeron and Zwarenstein had a "big session" with Periolat the next day. Ex. 7,

3    Zwar. Tr. at 87:24-25. The e-mail also revealed that Bergeron was feeding Periolat "ideas" of how

4    to get the desired results. Ex. 6, Berg. Tr. at 84:9-11 (Zwarenstein to Bergeron: "Included in the

5    seven to eight million is a *one million place holder for your idea* on components."). "Component"

6    prices are an input of COGS and impact gross margin. Bergeron knew that his "idea" for adjusting

7    component prices that was communicated to Periolat and Zwarenstein had the effect of reducing

8    COGS, thereby increasing gross margin. Ex. 6, Berg. Tr. at 85:6-7 ("It turns out that by doing that,

9    *you will reduce the COGS* of the products that you made in the quarter.").

10        163.   Not coincidentally, VeriFone's restatement revealed that 1Q07 gross margins were

11   overstated due in part to the failure to properly account for $900,000 in "*component*" inventory.

12   Thus, Bergeron participated directly with Periolat and Zwarenstein to come up with fictitious ways

13   to inflate VeriFone's gross margin results. When confronted with this incriminating e-mail, as with

14   many others, Bergeron lamely testified that he did not recall the e-mail and stated, "[I]t's very likely

15   I didn't read this far into the email at the time." Ex. 6, Berg. Tr. at 84:6-8.

16        164.   On February 11, 2007, defendants received a Flash Report showing that Periolat was

17   heeding Bergeron's and Zwarenstein's directives: "*I needed to reduce COGS by $10.7 [million] to*

18   *get to what I think is 36.6 cents.*" Ex. 8, Merkl Tr. at 164:10-166:13. Merkl acknowledged that the

19   adjustment appeared to be made to get to a certain EPS target.

20        QUESTION: Sitting here today, though, what it sounds like to an untrained eye,
     which, I mean, I'm not an accountant, *it sounds to me like he is reducing COGS by*
21   *a certain dollar amount to get to a certain earnings per share*?

22        MERKL: Correct.

23        QUESTION: *He's just making that assumption because that's what he wants to*
     *get*?
24        MERKL: *Yes*.

25   *Id.* 166:1-8; Ex. 7, Zwar. Tr. at 108:21-109:18. Merkl also admitted that she had to open up

26   VeriFone's books for Periolat to make his adjustments. Ex. 8, Merkl Tr. at 109:18-21.

27

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP       - 56 -

165.   At one point during the second week of February 2007, Bergeron got so angry that VeriFone was still not hitting the gross margin and EPS numbers that he fired off an expletive-laced e-mail ordering Zwarenstein and others to get to $0.37 EPS:

BERGERON: *We need to get to 36.5 cents.  Figure it out*.

ZWARENSTEIN: Can I speak to you?

BERGERON: You should wait until I cool down, *use the time to figure out how we get to 36.5 cents*.

Ex. 6, Berg. Tr. 88:24-93:20; Ex. 7, Zwar. Tr. at 95:12-96:11.

166.   Even Zwarenstein testified that "I'm not used to seeing swear words in writing and thought it was a little bit harsh . . . .  I felt like he was being out of line." Ex. 7, Zwar. Tr. at 95:12-21.  In another e-mail during the same period, Zwarenstein wrote Bergeron: "You are a very big man.  There are *additional developments with [Periolat] and me*, but I want to hold off until he responds.  I might have a part answer to the GM percentage issue." *Id*. at 101:4-8.

167.   On or around February 12, 2007, an e-mail string to Periolat and others includes what appeared to be a proposed $12 million adjustment to carry out Bergeron's earlier idea concerning overhead. Ex. 7, Zwar. Tr. at 156:15-158:8.  Merkl testified about the e-mail: "Q.  It says reduction of COGS and offsetting increased to inventory *due to duplication of overhead*, and then it shows 12,000, which I assume is 12 million?  A. Yes.  Q. *Paul*, 2/12/07, p.m. . . . A. Yes." Ex. 8, Merkl. Tr. at 196:5-198:10.  Merkl confirmed that the reduction of COGS had the effect of increasing gross margin.  *Id*. at 198:7-10 ("Q. [W]hen you read this, you would have understood that the reduction of COGS would have the impact of *increasing gross margin*, is that correct?  A. Oh, *yes*.").  The restatement disclosures revealed that COGS was indeed overstated by $12.4 million in 1Q07.

168.   In another February 12, 2007 e-mail string, Zwarenstein admitted knowing about Periolat's adjustments: "[i]t appears that yesterday evening rather, *Paul cracked the code* with [redacted by SEC] big time and we are safe." Ex. 7, Zwar. Tr. at 128:15-27.  In context, this is a reference to Periolat's improper manipulations of the numbers to hit the desired 47% gross margin result.  When the SEC asked Zwarenstein about this obviously important (and memorable) e-mail, he testified, "I don't recall."  *Id*.  Zwarenstein received another e-mail on February 12, 2007, showing

1  him the proposed manipulations and specific adjustments made by Periolat to inventory overhead,

2  which reduced COGS and inflated gross margin to the desired levels. *Id.* at 156:2-158:15 (E-mail to

3  Zwarenstein stating "reduction of COGS . . . and offsetting increased inventory due to ***duplication of***

4  ***overhead***.").

5       169.   Other evidence shows that Zwarenstein monitored and reviewed Periolat's

6  adjustments closely in real time. Ex. 7, Zwar. Tr. at 160:18-22 (e-mail to Zwarenstein stating "just

7  got off the hall (sic) ***with Paul. He's at 11.3 [million] and we need 12.4, 11.3 puts us slightly below***

8  ***36*** [cents EPS]."). Zwarenstein received a follow-up e-mail showing that another manipulation was

9  made so that VeriFone could hit the $0.37 EPS using Periolat's $11.3 million. *Id.* at 163:2-4

10  ("***[T]his puts us at 36.6 cents with [Periolat] at 11.3 [million]***."). Zwarenstein also received an

11  e-mail with the precise breakout of Periolat's manipulations and knew those adjustments were the

12  primary driver in increasing margins. Ex. 7, Zwar. Tr. at 165:1-167:2 ("And do you see where the

13  entries for Paul are now broken up into several categories?") ("I know I got it . . . ."). Zwarenstein

14  admitted that he was updating Bergeron on Periolat's adjustments. *Id.* at 162:2-19. Zwarenstein

15  also admitted that he knew about overhead issues with inventory. Ex. 7, Zwar. Tr. at 263:16-18 ("***I***

16  ***knew then*** and know now that ***overhead was a very large part of it***.").

17       170.   On February 14, 2007, VeriFone executive management received another Flash

18  Report showing a reduction in COGS by $11.2 million that inflated gross margins to 47%. Merkl

19  admitted:

20       QUESTION: And that also fits in with the earlier e-mails and discussions with
        [redacted] that essentially he was looking for about 11 million in a reduction in
21       COGS to ***get to the gross margin that they were expecting***?

22       MERKL: ***Correct.***

23  Ex. 8, Merkl Tr. at 208:14-210:10.

24       171.   In early March 2007, around the same time defendants announced VeriFone's

25  fraudulent 1Q07 results and misrepresented the reasons for the "record" gross margin increases,

26  Zwarenstein admitted that he and Bergeron spoke directly with Periolat regarding VeriFone's gross

27  margins, including their projections for 2Q07, which had already been communicated to investors

28  during a March 1, 2009 conference call. Ex. 7, Zwar. Tr. at 182:17-20, 183:19-22 (e-mail from

Zwarenstein: "**[Bergeron] and I spoke to Paul**. . . . [W]e did, indeed, from this e-mail, **speak with Paul**.").

### d.   Bergeron and Zwarenstein Were Aware of Periolat's Manipulations of VeriFone's 2Q07 Financial Results

172.    On or about March 5, 2007, only four days after defendants reported the  fictitious 1Q07 results (and 2Q07 forecasts) to investors, Zwarenstein, Bergeron and Periolat already knew about additional problems with gross margin in 2Q07.  Ex. 7, Zwar. Tr. at 185:14-188:17 (Zwarenstein to Bergeron: "This means a total field GM percentage goes up **but by less**."); Ex. 7, Zwar. Tr. at 185:14-188:17 (Periolat: "That didn't take long.  In our discussion on Friday we assumed the regions would drop to 43.7 [percent] just **not this quickly**.").  Although Periolat tried to calm Bergeron by saying, "[a]s long as it holds at this level our GM forecast should be okay," other evidence shows that it did not hold, and defendants once again had to manufacture false margins resulting in a 600% overstatement of GAAP EPS in 2Q07.  They also discussed specific calculations underlying the declining margins, including the "logic" of calculations done by Zwarenstein and/or Bergeron.  *Id.* (Periolat e-mail: "I believe that was [Zwarenstein's] logic."  Zwarenstein denied it was his "logic" and pointed the finger at Bergeron: "**Doug is the one that does the calculation**.").

173.    Another e-mail from Periolat indicates that VeriFone knew gross margins were deteriorating, despite what defendants were telling investors.  *Id.* at 189:1-16, 190:7-13 ("I think the regions are getting **pretty desperate to find revenue**, and I think **we should expect some gross margin deterioration** as a result.").  As set forth in §VI.A.3, Bergeron and Zwarenstein continued to mislead investors about the source of their "record" gross margin results and the purported "supply chain efficiencies," "quality margins" and synergies arising from the Lipman merger – all of which were knowingly false.

174.    In early May 2007, a few days after 2Q07 closed, defendants again confirmed that 2Q07 gross margins were far lower than represented.  Defendants received a May 6, 2007 Flash Report showing that gross margins were only 43.6%, substantially below the 46%-48% guidance to investors.  Ex. 7, Zwar. Tr. at 192:15-24 ("Q. [W]as that lower than forecast?  A. Yes."); *id.* at 192:25-193:4 ("Q. [A]nd you received a copy of this around the time it was first published?

1   A. Yes."). Merkl testified that there were discussions with VeriFone's top executives about the

2   2Q07 gross margin results being lower than forecast. Ex. 8, Merkl Tr. at 224:4-15 ("Q. Was there

3   any discussion that it was lower than forecast? A. There would have been, yes."). Merkl admitted

4   that such discussions "would happen on a very regular basis throughout the process." *Id*. at 224:13-

5   15. She confirmed that a top VeriFone executive [redacted by SEC, but appears to be Zwarenstein]

6   was specifically concerned about COGS being higher than forecast, thereby reducing margins

7   ("Q. *He was very aware that COGS were higher than the forecast, and you had discussions about*

8   *that and e-mails about that*? A. *Yes*."). Ex. 8, Merkl Tr. at 225:6-9. According to a May 6, 2007

9   e-mail, defendants were also aware that VeriFone's total revenues were lower than public guidance

10   and that EMEA sales (Europe, Middle East and Africa) "were considerably under-performed on the

11   hardware sales." Ex. 7, Zwar Tr. at 192:2-3, 23-24.

12       175. According to e-mails and other documents in May 2007, defendants also knew that

13   "Finished Goods in Transit" (*i.e.*, in-transit inventory) had increased by *609%*. *Id*. at 197:21-198:14.

14   Merkl admitted that VeriFone executives and Periolat would have discussed it during their monthly

15   P&L meetings because it's "over the scope . . . I would be positive that it was discussed." Ex. 8,

16   Merkl Tr. at 220:4-19. The documents also showed Zwarenstein's calculations of how Periolat's

17   manipulations to COGS could cause 43.6% gross margin to increase to the desired 48% level to hit

18   defendants' public guidance. Ex. 7, Zwar. Tr. at 200:19-202:10. Zwarenstein admitted getting the

19   reports with Periolat's COGS manipulations. *Id*. at 202:8-10 ("I sat in on most of these meetings,

20   and certainly most of the ones at the end of the quarter. *So I would have seen this sheet of paper*.").

21   He also admitted that he likely talked to Periolat about it. *Id*. at 203:17-25. The falsification and

22   overstatement of "in-transit inventory" was one of the major components of the restatement resulting

23   in $32.8 million in fictitious in-transit inventory ($12.7 million in 2Q07; $20.1 million in 3Q07).

24   *See* ¶220.

25       176. According to additional e-mails sent by Periolat during May 2007, Zwarenstein gave

26   Periolat specific instructions about the content and timing of certain adjustments. Ex. 8, Merkl Tr. at

27   231:18-21; Ex. 7, Zwar. Tr. at 205:11-22 (e-mail from Periolat: "*My instructions from*

28   *[Zwarenstein]* were not to book anything other than the ICP [inter-company profit] *until after* the

1    Flash II is issued."); Ex. 8, Merkl Tr. at 232:6-235:6.  VeriFone later admitted to booking $13.4

2    million in fictitious inter-company profit, including $3.2 million in 1Q07, $3.9 million in 2Q07 and

3    $6.3 million in 3Q07.  *See* ¶220.  Zwarenstein admitted he directed Periolat about the timing of

4    certain adjustments. Ex. 7, Zwar. Tr. at 208:22-209:2 ("He [Periolat] often made his entries towards

5    the end of the process.  Q. ***Had he done those also on your instructions?  A. Yes.***"); *Id*. at 210:14-15

6    ("[H]e would have judgments that he wanted to make and wanted to consult with me."); *id*. at

7    210:18-211:2, 211:21-214:4 (admitting to reviewing Periolat's accrual and COGS adjustments each

8    quarter).  Zwarenstein also admitted that he knew Periolat's adjustments in 2Q07 impacted gross

9    margins.  Ex. 7, Zwar. Tr. at 215:11-14 ("Yes.  They would.  Because they're part of COGS.").

10         177.    Evidence also shows that Zwarenstein worked directly with Periolat in 2Q07 and

11   instructed him that they could not finish the adjustments until Zwarenstein had a chance to review

12   the numbers himself. Ex. 7, Zwar. Tr. at 209:22-211:2 (Periolat e-mail: "I called [Zwarenstein] to

13   see if we will finish tonight, and ***he says he still wants to noodle it overnight***.").  Zwarenstein

14   admitted to personally reviewing Periolat's adjustments, including journal entries.  *Id*. at 278:8-24

15   ("He was providing me with a narrow range of numbers, and I wanted to think about that overnight

16   and ***advise him in the morning***. . . .  [H]e inevitably would have numbers to book at the end of the

17   quarter, and he would have those journal entries, and I would, along with the rest of the team, pick a

18   number.").   Zwarenstein admitted that he looked at these particular numbers by himself.  *Id*. at

19   278:23-24 ("[C]ertainly overnight ***I was looking at them myself***.").  Periolat's 2Q07 journal entries

20   were also documented.  Ex. 8, Merkl Tr. at 235:11-236:8.  Zwarenstein understood that Periolat's

21   accounting manipulations allowed VeriFone to hit its target in 2Q07.  *Id*. at 283:5-10.

22              **e.      Bergeron and Zwarenstein Directed Periolat's**
                          **Fraudulent Manipulations in 3Q07**
23

24         178.    In late June 2007, Bergeron and Zwarenstein – for the third quarter in a row –

25   received reports showing that VeriFone's gross margins were lower than public guidance. Ex. 7,

     Zwar. Tr. at 292:23-293:25 ("Well, I guess when the CEO is coming to me and ***telling me that he's***
26
     ***worried about the gross margin percentage***, and I'm seeing, you know, a quickening tempo of
27
     COGS reliefs, ***I started getting concerned***.").  Zwarenstein also admitted that he was concerned that
28

revenues were lower than projections, which also affected gross margin. *Id*. at 293:23-25. Zwarenstein sent an e-mail to Periolat and copied Bergeron expressing Bergeron's concerns over COGS and gross margin issues. Ex. 6, Berg. Tr. at 138:2-6; Ex. 7, Zwar. Tr. at 289:18-24. ("***Doug [Bergeron] is concerned that the GM [Gross Margin] percentage pendulum would swing entirely***"). In the same e-mail, Zwarenstein expressly instructed Periolat that gross margins could not be lower and needed to increase:

> ***Bottom line Paul***, we cannot have a general gross margin percentage decline at the corporate level. In fact, ***we likely will need a slight increase***.

Ex. 7, Zwar. Tr. at 291:2-8. Zwarenstein testified that "I was communicating to him that we had forecasted an increase, and that ***we would need that increase***." Periolat obliged by cooking the books, just as he had done in 1Q07 and 2Q07.

179.    In early August 2007, Bergeron and Zwarenstein received the first Flash Report after 3Q07 closed. The report showed VeriFone's gross margins were massively lower than projected – 40.5% vs. 48.7% forecasted. Ex. 7, Zwar. Tr. at 294:6-295:9. Following the reports, Periolat and Zwarenstein exchanged e-mails about the variance, and Zwarenstein again directed Periolat how to manipulate COGS to increase gross margins.

> The inventories in the Flash are 132 million. ***If COGS are overstated by, say, 18 million, the amount we need to get the gross margin to 48 percent range***, then inventory is going to be way-high.

*Id*. at 299:14-18.

180.    Zwarenstein also understood that reducing COGS by $18 million would not only allow VeriFone to hit the 48% gross margin target but would also cause a massive increase in inventory: "I was calculating that we would have to have inventories on the order of $150 million, because the ***other side of the COGS entry would be inventory***. And I'd never seen an inventory projection quite that high from Patrick [McGivern] and Paul [Periolat]." *Id*. at 299:22-300:1. Zwarenstein thus had actual knowledge that Periolat's COGS and gross margin adjustments increased inventory. He also testified that Bergeron focused on inventory. *Id*. at 300:16-21.

181.    Additional e-mails confirm that Zwarenstein was directing, controlling and participating in the false journal entries made by Periolat as they occurred. As in 1Q07 and 2Q07,

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

1  the "analyses" given to Periolat in 3Q07 came directly from Zwarenstein.  On August 6, 2007, an

2  e-mail to Periolat states: "***Barry asked me to send you the margin analysis worksheet***." *Id*. at

3  312:1-6.  Another e-mail exchange between Zwarenstein and Merkl discusses Periolat's specific

4  accounting entries, including an $11.3 million "true-up" of "receiving" inventory.  Ex. 7, Zwar. Tr.

5  at 313:1-25; Ex. 8, Merkl Tr. at 247:10-249:6.  Here, "receiving inventory" meant in-transit

6  inventory.  *E.g.*, Ex. 7, Zwar. Tr. at 314:15-16.  In the e-mail, Merkl wrote to Zwarenstein: "***Paul's***

7  ***entry is being posted now***.  This is the last one.  Flash will take about two hours. . . .  I assume the

8  offset is to COGS, but not certain."  Ex. 8, Merkl Tr. at 251:5-12.  Merkl then confirmed that the

9  adjustment was debit (increase) to inventory and credit (decrease) to COGS.  Ex. 8, Merkl Tr. at

10  247:10-249:6, 251:5-17; Ex. 7, Zwar. Tr. at 313:8-9.  Zwarenstein responded: "***It is, Paul called***."

11  Ex. 7, Zwar. Tr. at 313:19-21.

12        182.  Zwarenstein admitted that his response was an answer to Merkl's question and that

13  the $11.3 million entry reduced COGS and increase gross margins.  *Id*. at 313:23-314:5 ("Q. So the

14  11 – those entries would reduce COGS, is that correct?  A. That is correct.  Q. And ***that would***

15  ***increase the gross margin?  A. That is correct***.").  Zwarenstein admitted to having actual

16  knowledge of the false accounting entries and speaking with Periolat about the entries.  Ex. 7, Zwar.

17  Tr. at 312:24 ("***I evidently did, I normally would***."); *Id*. at 315:23-25 ("If he's going to be speaking

18  to me about . . . ***an entry of that magnitude***, then he probably would have mentioned something to

19  me about it, yes.").  Merkl acknowledged that in 3Q07, margins increased from 40% to 48% because

20  of Periolat's adjustments.  Ex. 8, Merkl Tr. at 275:17-276:21.

21        183.  Zwarenstein also testified that the false entries in 3Q07 were related to "in-transit

22  inventory," one of the major components of the restatement.  Ex. 7, Zwar. Tr. at 317:1-11.  He also

23  admitted to being aware of in-transit inventory issues in August 2007.  *Id*. at 317:11-20.  Another

24  document shows that Zwarenstein and Bergeron received documents showing that Periolat's false

25  adjustments caused a huge increase in "in-transit" inventory from $6.5 million to $12 million from

26  April to July 2007.  *Id*. at 318:23-319:10.  The restatement disclosures revealed that defendants

27  ended up booking $20.1 million in fictitious in-transit inventory in 3Q07.  *See* ¶220.  The totality of

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 63 -

1  the evidence shows that Bergeron and Zwarenstein had actual knowledge of Periolat's fictitious

2  adjustments as they occurred and were deliberately reckless throughout 3Q07.

3           **f.**     **Merkl's Testimony Confirms that Periolat Had Senior-Level Responsibilities and that Bergeron and**

4                 **Zwarenstein Were Aware of His Adjustments**

5       184.    Merkl testified that Periolat discussed gross margins in detail with Bergeron and

6  Zwarenstein at high-level meetings every month.  Ex. 8, Merkl Tr. at 45:21-46:13, 49:10-50:2,

7  56:16-58:17.  She noted that Periolat would go over the numbers in painstaking detail, including,

8  *inter alia*, "overhead," "direct material" and "purchased price variance."  *Id.* at 58:10-17.  She also

9  testified that Bergeron, Zwarenstein (and other redacted executives) attended the meetings and

10  discussed the issues with Periolat.  Ex. 8, Merkl Tr. at 56:19-57:4 ("Q. And were there a lot of

11  questions of Mr. Periolat?  A. Yes.  Q. Who would generally ask the questions?  A. [Redacted by the

12  SEC]  Q. ***Was Mr. Zwarenstein on these review calls***?  A. ***Yes***.  Q. Would you say regularly?

13  A. ***Regularly***.").  She also testified that when VeriFone's reports in January 2007 were showing

14  actual gross margins of 42.4% versus the 47% forecast, Periolat would explain the variance.  Ex. 8,

15  Merkl Tr. at 57:13-18.

16       185.    Merkl consistently testified that Periolat was responsible for critical areas and tried to

17  downplay her own responsibilities, claiming that her primary area of expertise was limited to

18  "revenue recognition" and operating expenses.  *Id.* at 31:25-32:1; 86:15-19.  In fact, Merkl stated

19  that when she learned VeriFone's 1Q07 gross margin was far lower than projected (42.8% versus

20  47% forecast) after the quarter closed, it "wouldn't be something that I would think about" because

21  "[i]t's really not my area of responsibility."  *Id.* at 66:19-24; *id.* at 125:13-15 ("I responded to have

22  . . . Paul handle gross margin since that was generally in his – ***that was his responsibility***.").  Merkl

23  acknowledged that gross margin was important for financial reporting to investors and "how it's

24  viewed by the analysts" in SEC filings, conference calls and press releases.  *Id.* at 127:5-15, 128:9-

25  15.

26       186.    Based on the totality of evidence, Periolat was the *de facto* Corporate Controller of

27  gross margin, COGS, inventory, supply chain and cost accounting and had more senior-level

28  responsibilities than Merkl in many of VeriFone's most important financial areas.  Shockingly, after

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP        - 64 -

the SEC pressed Merkl about whether she thought it was strange that, for three straight quarters, VeriFone's actual results were far lower than public guidance until Periolat's "adjustments" magically inflated the numbers to the exact level they needed to be, she testified:

> QUESTION: [B]ut the same process is happening each quarter. The forecast comes in higher than the flashes – or flashes come in lower than what had been forecasted . . . . ***Paul makes an entry, and now they're up to where the forecast was***. Did you at any time question whether the – and that's in the first quarter, then the second quarter, and then the third quarter. Did you at any time question whether or not the forecast was actually accurate?
>
> MERKL: No.
>
> QUESTION: Did you believe the forecast to be accurate?
>
> MERKL: I didn't believe or disbelieve, meaning –
>
> QUESTION: You didn't care one way or the other?
>
> MERKL: ***I didn't really care to be honest***.

Ex. 8, Merkl Tr. at 279:9-23. Such blatant deliberate recklessness by a purported corporate officer supports a strong inference of VeriFone's scienter.

187.     Merkl also revealed that Periolat was substantially involved in the accounting due diligence for the Lipman merger and even traveled to Israel for meetings in 2006. *Id*. at 75: 6-8, 76:16-8, 78:5-10, 85:4-15. She stated that Periolat was responsible for summarizing Lipman's raw inventory data and providing a report to the merger due diligence auditor, Deloitte & Touche. *Id*. at 75:6-8 ("Lipman provided the raw detail, and then ***Paul*** provided the summary that Deloitte used."). She acknowledged that inventory was an important item to understand in conducting due diligence and that Periolat was responsible for addressing any comments in the due diligence report. *Id*. at 76:16-18, 78:4-10 ("Q. [D]id you have a sense at the time as to . . . who at VeriFone was responsible for addressing any comments that may have been in the due diligence report with respect to Lipman inventory? A. Yes. Q. And who was that person? A. ***Paul Periolat***."). Accordingly, Periolat had detailed and extensive knowledge of Lipman inventory issues before the merger, and he knew exactly how to manipulate those numbers to get the desired gross margin result.

g.    **Bergeron and Zwarenstein Had Actual Knowledge of VeriFone's Gross Margin and COGS Manipulations Through Weekly Reports and Direct Updates From Periolat and Others**

188.    In addition to the direct evidence of scienter above, Bergeron and Zwarenstein had access to, and personally kept track of, VeriFone's gross margins and the COGS associated with gross margins on a weekly basis during the Class Period. Ex. 6, Berg. Tr. at 141:14-20 ("It's one of the higher quality pieces of work that's done. ***It's a week to week update*** as to where the sales are coming from for the quarter, and according to plan COGS ***where the overall margin structure is***."); Ex. 6, Berg. Tr. at 49:10 ("I was getting ***real time views of that every week*** through Mark Brown's report, and just dialoguing with sales people.").

189.    Bergeron and Zwarenstein also received numerous detailed "Flash Reports" on a day-to-day basis after the close of each quarter. The Flash Reports were well documented and included detailed "worksheet tracking the changes Flash-to-Flash." Ex. 7, Zwar. Tr. at 287:7-8. The Flash Reports showed every journal entry, calculation and change made to VeriFone's gross margins. Ex. 7, Zwar. Tr. at 285:7-288:21. During the Class Period, Bergeron and Zwarenstein monitored the Flash Reports closely and knew the reports showed VeriFone's margins were far lower than represented to investors. *Id.* at 33:24-34:14 ("[W]as it typical for you . . . to receive copies of the Flash Reports? A. Yes, it was.") ("And the gross margin was lower than you had been expecting? A. It was."). The numerous iterations of the Flash Reports showed exactly how Periolat was manipulating the numbers – and allowed Bergeron and Zwarenstein to guide the process – to get the result they wanted.

190.    Bergeron and Zwarenstein would also discuss updates at the close of each quarter. Ex. 6, Berg. Tr. at 42:5-15 ("Q. So, [Zwarenstein] would report back to you on what was happening at the quarter close. A. Yes."); *id.* at 45:8 ("At some point I would have been given where they were in their calculations of gross margins."); *id.* at 56:16-57:4 ("Q. And it looks like Barry wrote, Barry Zwarenstein wrote, was providing you an update on the quarter [1Q07] results. A. Yes."). Indeed, Zwarenstein testified that:

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP    

1   ZWARENSTEIN: [S]ubsequent to the quarter *we would be doing a thorough*
2   *cutting and dicing of the gross margins* between domestic, international, corporate, and mix, to explain that to investors, and to explain it to a board.

3   And in there *we would break out all of the variances* by major products between
4   system solution and services, and, you know, be asking certainly scores, if not hundreds of questions.  And you know, that's . . . what we did, as well.

5   QUESTION: So in doing that, then if you understood all the component parts that
6   went into the gross margin analysis, then if there were any anomalies *you would have picked that up*.  Is that what you're . . . .

7   ZWARENSTEIN: That's where I was heading.

8   Ex. 7, Zwar. Tr. at 266:22-267:11.

9   191.   Bergeron and Zwarenstein also had detailed knowledge of VeriFone's supply chain,

10   including inventory and COGS – the inputs that drove Gross Margins.  Every Thursday throughout

11   the Class Period, Bergeron and Zwarenstein received real-time updates on VeriFone's forecasts,

12   actual results and any variances between the two.  Ex. 7, Zwar. Tr. at 68:7-19; 189:5-14; 235:18-

13   237:25.  Zwarenstein testified that the "key [COGS] updates would follow the close of the first and

14   second month of the quarter."  Ex. 7, Zwar. Tr. at 68:13-14; Ex. 6, Berg. Tr. at 30:7-31:11 ("The

15   supply chain management team would *present to Barry and me* their view of the world from a cost

16   of inventory side. . . .   I remember sitting through a couple of days of many management

17   presentations [made] by many people, in which gross margins were discussed in many of those.").

18   192.   Bergeron also admitted intimate understanding of the details of VeriFone's supply

19   chain and how it impacted VeriFone's accounting and financial results.  Ex. 6, Berg. Tr. at 34:4-

20   35:11 ("[W]e had the effective outcome of *turning our supply chain group into a profit center* by

21   having them create this wedge between what plan COGS and actual COGS were.").  Bergeron also

22   received weekly reports documenting VeriFone's gross margins and COGS.  *Id*. at 35:24-36:13.

23   193.   Bergeron and Zwarenstein were also directly involved in reviewing and analyzing

24   COGS and the impact of changes to COGS on gross margin results on a deal-by-deal basis.  *Id*. at

25   138:19-140:23.   Bergeron even admitted that he and Zwarenstein had more detailed COGS

26   information than VeriFone's salespeople:

27   So, early in Q2 or Q3 [2007], I don't know, certainly before this, I said, listen, it's
28   not for you, the manager of Thailand or the manager of India to make this decision, *it's for Barry [Zwarenstein], ultimately me*.  So, if you think you have a deal that

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                                  - 67 -

1  you believe the company doesn't want, bring it to us and we will decide, *because maybe we have more information than you have*, *particularly actual COGS* versus
2  plan COGS.

3  *Id*. at 138:19-25.

4        194.    Bergeron also stated that he and Zwarenstein were intimately involved in analyzing

5  COGS impact on gross margin:

6        QUESTION: I think you said that if there was a COGS relief deal, that it would have
         to be approved by you.  What did you rely upon to approve a COGS relief?
7
         BERGERON: *Barry*.
8
         QUESTIONS: *So Barry would give you an analysis of the affect it might have on*
9        *gross margin*?

10       BERGERON: *He would do that* and he would also try to talk to Mark Brown and
         others about the timing of other deals.
11
   Ex. 6, Berg. Tr. at 140:10-17.
12
                  **h.    The SEC Testimony Shows that Bergeron and**
13                        **Zwarenstein Closely Scrutinized and Reviewed**
                          **Inventory and Knew Periolat's Adjustments Caused a**
14                        **"Sharp and Unprecedented Increase in Inventory"**

15       195.    As set forth above, Periolat's creation of fictitious inventory to reduce COGS and

16 increase gross margins was obvious and well known to Bergeron and Zwarenstein.  Scienter is also

17 inferred from Bergeron's obsession with keeping inventory levels low and his close scrutiny of

18 inventory every quarter.   In September 2006, Bergeron sent an e-mail to Periolat and others

19 demanding that inventory be low: "[a]ctually talking about inventory levels, *it must be at end of*

20 *July levels* full stop. . . .  This is *absolutely critical and it's important as any goal we've set in the*

21 *past*."  Ex. 6, Berg. Tr. at 101:5-8.  Bergeron admitted that the levels in September 2006 were

22 unacceptable, and he was "barking about where the October levels should be" and that it was "really

23 important."  *Id*. at 101:20-23.  Bergeron also testified that "*[r]educing inventory* has been a theme of

24 mine for a couple of years" and admitted that VeriFone had been "less than perfect in terms of our

25 ability to manager [sic] our inventory levels."  *Id*. at 101:13-15.

26       196.    During the Class Period, however, Bergeron and Zwarenstein knew that Periolat's

27 adjustments caused inventory levels to skyrocket, increasing from $86.6 million in 4Q06 to $130.8

28 million in 1Q07, $125 million in 2Q07 and $145 million in 3Q07 (as originally reported).

1   According to the SEC, Bergeron and Zwarenstein both were well aware of this increase during the

2   Class Period because they received "*monthly reports showing a sharp and unprecedented increase*

3   *in inventory as a result of [Periolat's] adjustments*." Ex. 2, ¶27. Bergeron was forced to admit he

4   was aware of the massive spike in inventory during the Class Period and spoke with Zwarenstein

5   about it:

6        QUESTION: [D]o you remember not liking the inventory?

7        BERGERON: Yes.

8        QUESTION: That it was higher than you wanted it to be?

9        BERGERON: I remember my emotions a lot better than I remember . . . *I remember*
     *being PO'd about it.*

10

11       QUESTION: Right. And who did you express your PO'dness to?

     BERGERON: The usual suspects.

12

13  Ex. 6, Berg. Tr. at 129:3-16; *id*. at 126:1-19 ("I would have talked to predominantly to Barry and Pat

McGivern.").

14

15       197.    Given Bergeron's own e-mails showing that *reducing* inventory was so critical to

16  VeriFone, the sharp and "unprecedented" increase in inventory due to Periolat's accounting

17  manipulations (at his and Zwarenstein's direction) was an obvious and major red flag. The fact that

18  Bergeron allowed such a massive rise in inventory after demanding that inventory be *reduced* shows

19  that he knew the inventory increases were necessary for Periolat to manipulate COGS, gross

20  margins and EPS. This is even more suspicious given that Bergeron copied *Periolat* on the e-mail in

21  November 2006 about reducing inventory referenced above. *Id*. at 104:2-105:4. Bergeron testified

22  he knew Periolat was "watching" the inventory numbers, which is why Periolat was included on

23  Bergeron's e-mail. *Id*. Bergeron was always kept apprised of the inventory increases from quarter

24  to quarter. *Id*. at 126:1-19. He allowed the large increases in inventory because he knew it was

25  necessary for Periolat to execute his COGS adjustments to inflate margins.

26

27

28

577425_1

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP         - 69 -

3. **Facts Revealed in the Court's August 26, 2010 Derivative Order Show that Defendants Were Aware of Severe Undisclosed Financial Reporting Problems that They Concealed from Investors and Deliberately Exploited to Facilitate Periolat's Accounting Manipulations**

a. **Prabhavalkar's Warning**

198. Facts and documents cited in the Court's August 26, 2010 Derivative Order reveal that VeriFone's Internal Audit Director, Prabhavalkar, made a presentation to VeriFone's Audit Committee during the relevant time period warning that VeriFone's general ledger closing process was an area of "high" concern that posed a "high" overall risk to VeriFone. Derivative Order at 11. This warning is similar to E&Y's warning to VeriFone's audit committee "***and management***" that VeriFone's lack of adequate financial statement controls exposed "the Company to an ***increased financial statement disclosure risk*** both from an ***accuracy*** and timing perspective." *Id.*

199. At the time of these warnings, Bergeron, Zwarenstein and Periolat were already aware of the inadequate financial controls and the "high" risk of inaccurate financial reporting because they controlled, directed and personally participated in the quarterly financial closing process and were involved in calculating and authorizing Periolat's fictitious financial adjustments in 1Q07, 2Q07 and 3Q07. They knew VeriFone's financial closing procedures were such that they could calculate exactly how much Periolat would need to reduce COGS to inflate gross margin and EPS to the desired target level. They would then communicate the instruction to Periolat, and Periolat would manufacture a deceptive accounting "adjustment" to execute the false entry they needed. The SEC transcripts confirm that Bergeron, Periolat and Zwarenstein knew about the risky and reckless financial closing process and exploited that process so they could freely manipulate gross margin to the result they wanted to report to investors.

200. Defendants' knowledge of Prabhavalkar's and E&Y's warnings is also inferred from their participation in Audit Committee meetings and their role in controlling the information provided to E&Y. Zwarenstein, although not a member of the Audit Committee, testified that he made presentations directly to the Audit Committee and thus had direct access to the Committee:

> And as I mentioned earlier today, as we started getting the results, for the first and second month of the quarter, we would true it up. Then when it came to write the script for the earnings release, we needed to understand, you know, very well, to be

1    able to explain to investors where our margins were changing.  So we had a sheet

2    which broke it out between mix – domestic, international and global.  And then *we*
     *would also present that to the board – to the audit committee and the board*.

3    Ex. 7, Zwar. Tr. at 178:11-19.  Merkl, who reported directly to Zwarenstein, testified that she

4    attended every Audit Committee meeting.  Ex. 8, Merkl Tr. at 266:19-24 ("Q. [H]ave you attended

5    every Audit Committee meeting since you started?  A. Yes.").  Bergeron also admitted attending

6    Audit Committee meetings.  Ex. 6, Berg. Tr. at 97:22-23 ("I attend the audit committee meeting

7    where Ernst & Young is present.").  Periolat also made direct presentations to the Audit Committee,

8    further confirming his key high-level role in VeriFone's financial reporting.  Derivative Order at 9.

9    When combined with the other particularized facts revealed in the SEC transcripts, a strong

10   inference arises that Bergeron, Zwarenstein and Periolat were expressly aware of the warnings and

11   "high" risks communicated by Prabhavalkar and E&Y, but deliberately disregarded those risks and

12   continued to manipulate VeriFone's financial results during the quarter closing process in 1Q07,

13   2Q07 and 3Q07.

14           201.   The warnings by both E&Y and Prabhavalkar also contradict Bergeron and

15   Zwarenstein's representations made in their SOX certifications on March 9, 2007, May 31, 2007 and

16   September 7, 2007.  ¶¶81-83, *supra*.  In particular, those facts contradict three specific provisions of

17   the certifications, where Bergeron and Zwarenstein falsely stated that they:

18   •    "***carried out an evaluation*** of the effectiveness of our disclosure controls and
          procedures" and "[b]ased on that evaluation . . . concluded that our ***disclosure***
19        ***controls and procedures were effective***" (¶82);

20   •    "***disclosed***" any change that has materially affected, or is "***reasonably likely*** to
          materially affect, [VeriFone's] internal control over financial reporting" (¶83); and
21
     •    "***disclosed . . . [a]ll significant deficiencies and material weaknesses*** in the design or
22        operation of internal control over financial reporting which are reasonably likely to
          adversely affect [VeriFone's] ***ability to record, process, summarize and report***
23        ***financial information***" (*id*.).

24           202.   These statements were knowingly false.  Bergeron and Zwarenstein knew that

25   VeriFone was exposed to "increased financial statement disclosure risk" from both an "accuracy"

26   and "timing" perspective, and that its financial closing process resulted in a "high" concern that

27   posed a "high" overall financial risk to the Company.  These are certainly "significant deficiencies"

28   and "material weaknesses" that are "reasonably likely" to adversely affect VeriFone's "ability to

1   record, process, summarize and report financial information." ¶¶81-83, *supra*.  Indeed, the ease with

2   which Zwarenstein and Bergeron were able to direct Periolat's accounting manipulations to the

3   precise dollar amount and the extent to which Periolat was able to carry out such large manipulations

4   for three straight quarters without detection by E&Y or the Board, confirms that Prabhavalkar's and

5   E&Y's warnings were well-founded and Bergeron and Zwarenstein consciously ignored them.

6   When combined with the facts revealed in the SEC transcripts, the warnings from E&Y and

7   Prabhavalkar are consistent with a compelling inference that Bergeron and Zwarenstein knew – or

8   deliberately disregarded – that their statements and SOX certifications misled investors.

9                    **b.    Bergeron's and Zwarenstein's Presentations to the
                             Board and Periolat's Presentation to the Audit
10                            Committee**

11          203.    Facts and documents revealed in the Court's August 26, 2010 Derivative Order also

12   show that Bergeron, Zwarenstein and Periolat variously made presentations to VeriFone's Board and

13   its Audit Committee regarding VeriFone's inventory.  Derivative Order at 7-9.  According to the

14   minutes from a March 2007 Board meeting cited by the Court's Derivative Order:

15          "Zwarenstein then updated the Board on accounts receivable and inventory trends,
            *which were impacted at the beginning of the first quarter by the Lipman acquisition*.
16          The directors discussed the trends over the quarter in detail.  Mr. Bergeron then
            presented an update of the forecast for the second quarter and directors asked further
17          questions."

18   Derivative Order at 7-8 (emphasis by the Court).  As set forth in ¶200, Zwarenstein also admitted to

19   making detailed presentations to the Audit Committee regarding gross margin, including a

20   breakdown of domestic and international margins.

21          204.    At the time of these presentations, Bergeron, Zwarenstein and Periolat knew that the

22   unprecedented increase in inventory in 1Q07 was not simply a matter of mechanically adding the

23   inventory acquired in the Lipman acquisition.  E-mails and testimony revealed in the SEC transcripts

24   confirm that, prior to this meeting, Bergeron and Zwarenstein knew that Periolat's reduction of

25   COGS – which increased gross margins – was the result of artificial increases in inventory by

26   manipulating inventory overhead.  *See, e.g.,* ¶¶154, 167-169.  In fact, e-mails from Zwarenstein to

27   Periolat show that Zwarenstein expressly discussed how multi-million-dollar adjustments to reduce

28   COGS would result in direct and immediate increases in inventory.  Ex. 7, Zwar. Tr. at 299:14-18

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                      - 72 -

1    ("The inventories in the Flash are 132 million.  *If COGS are overstated by, say, 18 million, the*

2    *amount we need to get the gross margin to 48 percent range*, then inventory is going to be way-

3    high.").  Zwarenstein testified that he knew COGS reductions increase inventory.  *Id.* at 299:22-

4    300:1 ("I was calculating that we would have to have inventories on the order of $150 million,

5    because *the other side of the COGS entry would be inventory*.  And I'd never seen an inventory

6    projection quite that high from Patrick [McGivern] and Paul [Periolat].").  These facts, when

7    combined with the numerous e-mails cited in §VI.B.2, *supra*, which show that Zwarenstein

8    repeatedly instructed Periolat to make certain COGS reductions that he knew would increase

9    inventory, give rise a strong inference of deliberate recklessness.

10          205.    Additional e-mails and testimony show that Zwarenstein and Bergeron both discussed

11   inventory "overhead" with Periolat throughout the Class Period and knew that Periolat manipulated

12   inventory overhead in 1Q07 to reduce COGS and increase gross margins from 42.8% to 47.1% to

13   reach the $0.37 EPS target that Bergeron insisted upon.  Ex. 7, Zwar. Tr. at 138:17-140:14, 144:24-

14   145:2.  Zwarenstein admitted that overhead was a "material item" and that he had actual knowledge

15   of, and discussions about, Periolat's manipulations to overhead in 1Q07.  Ex. 7, Zwar. Tr. 144:24-

16   145:2 ("Q. But do you have an understanding that *Mr. Periolat made some entries* at the end of the

17   quarter to essentially account for the *overhead*?  A. Yes."); *id.* at 139:5-140:15 ("*[O]verhead*

18   *certainly would have been discussed at [illegible] because it's a material item*.") ("I would have

19   had a discussion with somebody.  *It's an important item*.  And probably would have gotten an

20   understanding"); *id.* at 49:20-23 ("Q. And you sent her an e-mail on COGS.  And *you asked her*

21   *about Tel Aviv overhead* . . . ?").  Bergeron and Zwarenstein also knew Periolat focused on "direct

22   material," which is an input of inventory that can be manipulated to reduce COGS.  Ex. 7, Zwar. Tr.

23   at 57:22-58:5 (e-mail from Zwarenstein to Bergeron: "[Periolat] is going over every single direct

24   material filed from the Lipman entities"); *id.* at 58:4-5 ("Q. Would the direct material files be *related*

25   *to COGS*?  A. Yes."); *id.* at 60:20-22 ("Q. And would that have been what you believed *at the time*?

26   A. Yes."); *id.* at 117:14-18 ("Direct material, the *overhead* on that.").

27          206.    At the time of Zwarenstein's March 2007 Board presentation, VeriFone's inventory

28   was overstated by $13.3 million, COGS was understated by $12.5 million, and net income and EPS

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                           - 73 -

1  were overstated by 477% and 600%, respectively.  ¶80 (chart of 1Q07 restatement).  None of the

2  accounting manipulations underlying those results were disclosed to investors, the public, the Board,

3  E&Y, or the Audit Committee during the March 2007, May 2007 or September 2007 meetings and

4  conference calls with investors.  Bergeron and Zwarenstein affirmatively concealed Periolat's false

5  accounting manipulations and their knowledge and role in Periolat's manipulations.

6  <center>**c.    The E&Y Letter and Meetings**</center>

7       207.    Documents referenced in the Court's August 26, 2010 Derivative Order also reveal

8  that VeriFone's Audit Committee specifically discussed "inventory and inventory valuation" with

9  E&Y in February 2007, May 2007 and September 2007.  Derivative Order at 8.  The Court also

10 referred to a March 19, 2007 letter sent by E&Y that "informed VeriFone's Audit Committee and

11 management regarding VeriFone's control deficiency by stating that 'entire pallets of inventory'

12 were 'missed,' part numbers were wrong and incomplete boxes were being counted as full." *Id*. at 9-

13 10.  E&Y then asked VeriFone to "'add further measures to validate the correctness of the counts

14 performed,'" and the VeriFone Board represented to E&Y that it was "enhancing its training

15 materials and also taking additional steps to identify and remove the poor performers."  Derivative

16 Order at 10 (citing E&Y letter at 5).

17      208.    The purported "remedial" measures that VeriFone's Board claimed to have taken in

18 response to the E&Y letter did not have any material impact in preventing VeriFone's false financial

19 reporting.  CWs 11-13 reported that the inventory problems (including problems nearly identical to

20 the ones cited by E&Y) were never fixed, resulting in pervasive overstatements of inventory.  ¶¶231-

21 241, *infra*.  This was confirmed by the rapid acceleration of VeriFone's manipulations of inventory

22 from an 11% overstatement in 1Q07, 23.6% in 2Q07, and 38.8% in 3Q07.  The financial

23 manipulations got worse, not better, after the purported remedial measures.  In any event, no

24 remedial measures could prevent Bergeron, Zwarenstein and Periolat from making improper

25 adjustments because they ultimately calculated, adjusted and decided themselves what the final

26 numbers would be – and Bergeron and Zwarenstein were the final authorities in reviewing and

27 signing off on the results.

28

209.    The most compelling inference arising from the totality of facts alleged is that E&Y failed to discover the fraudulent accounting because Zwarenstein and Periolat were the primary VeriFone representatives who interfaced with E&Y during those reviews, and thus, they could control and conceal the information and details given to E&Y and could also conceal Periolat's adjustments.  Indeed, Bergeron testified that E&Y's primary interface was Zwarenstein.  Ex. 6, Berg. Tr. at 98:10-11 ("***[T]he interaction and interface with Ernst & Young for the company is through Barry Zwarenstein***.").  Merkl testified that Periolat was the person responsible for providing gross margin analyses to E&Y during the quarterly reviews and responding to any document requests.  Ex. 8, Merkl Tr. at 264:22-265:15 ("And I would not be copied on those PBCs [prepared by client].  ***Paul would give them directly to Ernst & Young***.  Q. The 'PBCs' meaning the analysis that Ernst & Young was requesting?  A. Correct.  Q. ***So Paul would just interact with Ernst & Young directly***?  A. ***That's correct***."); *id*. at 263:18-21 ("Q. Who was the point person in Rocklin?  A. Paul.  Q. Paul Periolat?  A. Correct.").  Thus, Zwarenstein and Periolat – two of the perpetrators of the accounting falsifications – controlled the information given to E&Y.

210.    Additionally, E&Y ***did not audit*** or certify VeriFone's financial results during 1Q07, 2Q07 or 3Q07.  E&Y conducted a non-certified review of "interim" financial information, which primarily consists of performing certain "analytical procedures" and "making inquiries" of certain "persons responsible for financial and accounting matters" (namely, Zwarenstein and Periolat).  These quarterly reviews are not an audit, do not function like an audit, and expressly disclaim and omit the kind of rigorous review that takes place during annual audits.

211.    According to the rules governing auditing firms' conduct during quarterly reviews: "[a] review of interim financial information is ***not*** designed to obtain reasonable assurance that the interim financial information is free of material misstatement."  AU §722.25.  These rules, which are part of Generally Accepted Auditing Standards ("GAAS") that auditors are required to follow, clearly state: "The objective of a review of ***interim*** financial information ***differs significantly from that of an audit*** conducted in accordance with generally accepted auditing standards."  AU §722.07.  Instead, "[a] review consists principally of performing analytical procedures and ***making inquiries of persons responsible for financial and accounting matters***, and ***does not contemplate*** (a) tests of

accounting records . . . ; (b) tests of controls to evaluate their effectiveness; (c) the obtainment of corroborating evidence in response to inquiries; or (d) the performance of certain other procedures ordinarily performed in an audit." *Id.* Further, "[a] review may bring to the accountant's attention significant matters affecting the interim financial information, but ***it does not provide assurance that the accountant will become aware of all significant matters that would be identified in an audit***." *Id.* The auditing guidance also states that:

> [e]xpectations developed by the accountant in performing analytical procedures in connection with a review of interim financial information ordinarily are ***less precise than those developed in an audit***. Also, in a review the accountant ordinarily is ***not required to corroborate management's responses with other evidence***.

AU §722.17.

212.     Given that E&Y did not conduct an audit of VeriFone's quarterly results before they were issued and Zwarenstein and Periolat were the primary liaisons who controlled information flow to E&Y, the most cogent inference is that E&Y failed to discover the accounting manipulations because Zwarenstein and Periolat did not disclose them to E&Y.  This is further corroborated by the SEC Complaint which found that "[t]he accounting irregularities came to light in late November 2007 ***during the annual audit***" and that "Periolat was ***unable to explain his adjustments***."

213.     If Periolat truly believed his accounting adjustments were proper and supported by legitimate backup documentation and analysis, he would have simply supplied that information in connection with E&Y's year-end audit.  He was "unable to explain" his adjustments because he knew they were unsupported and improper.  They were based entirely on the specific amount of COGS reduction that Zwarenstein and Bergeron directed him to manufacture to hit the gross margin and EPS target.  The documentation underlying Periolat's manipulations was no different than it was during E&Y's "interim" reviews in 1Q07, 2Q07 and 3Q07.  E&Y did not discover the adjustments during their interim reviews because they did not audit the results, and Zwarenstein and Periolat controlled the information provided to E&Y.

214.     The E&Y letter also corroborates the reports of CWs 11, 12 and 13, who reported the same types of inventory control problems at VeriFone's "principal" and largest inventory facility, including missing inventory and VeriFone's accounting for inventory that did not exist.  ¶¶231-241,

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                          - 76 -

1    *infra*.  Although E&Y failed to discover the full severity of the inventory problems, the CWs – who

2    were much closer to  the inventory control problems than E&Y – reported that the issues were

3    pervasive, widespread, material and never fixed during the relevant time period, despite any so-

4    called remedial measures that the VeriFone Board claimed to have implemented.  *Id*.

5        215.    Furthermore, as set forth in ¶¶115, 289-291, both the SEC and VeriFone itself

6    admitted that VeriFone did ***not*** have adequate internal controls, confirming that whatever "remedial"

7    or "corrective" measures the Board claimed to have implemented (including filling certain positions,

8    hiring temporary personnel, and upgrading to a web-based interface) were insignificant and

9    immaterial.  Bergeron and Zwarenstein knew this because they "designed" the controls and reviewed

10   them every quarter.  *See* ¶¶81-83, *supra*.  In truth, they exploited and disregarded the lack of controls

11   to facilitate Periolat's financial manipulations.

12       216.    Periolat also exploited the known lack of controls.  He was charged by the SEC with

13   violations of provisions of the Securities Exchange Act that prohibit "***knowingly circumventing*** a

14   system of internal accounting controls."  Ex. 2, ¶37.  Thus, the most compelling inference is that any

15   "remedial" measures that the VeriFone Board asserted it was taking had no impact because Periolat

16   circumvented any controls that did exist to execute the accounting manipulations that Bergeron and

17   Zwarenstein directed him to make.  When combined with the totality of the new compelling facts

18   revealed in the SEC transcripts – and the other numerous indicia of scienter alleged below – these

19   facts support a strong inference of scienter.

20       **4.    The Magnitude, Nature, and Quality of VeriFone's**
21              **Restatement Combined with Witness Testimony Concerning**
             **Pervasive Inventory Manipulations Reinforce a Strong**
22              **Inference of Scienter**

23       217.    In 1Q07, 2Q07 and 3Q07, VeriFone overstated GAAP EPS results by ***600%***, ***200%***,

24   and ***418%***, respectively.  The SEC Complaint confirms that defendants' accounting violations were

25   not due to technical mistakes or negligent applications of GAAP.  The accounting manipulations

26   were done deliberately "so the company could report results in line with forecasts and thereby avoid,

27   in the words of a senior officer, an 'unmitigated disaster.'"  Ex. 1.

28

218.   Furthermore, the accounting improprieties did not require subjective accounting interpretations of ambiguous accounting rules, such as rules for cost accounting of internal use software or derivative mark-to-market accounting for hedging investments.  VeriFone's restatement here revealed traditional and rudimentary accounting manipulations – double counting and creating fictitious inventory, booking fake intercompany profits, and generating false income and profits where none existed.  In fact, the SEC Complaint confirms that VeriFone's accounting improprieties were simple and methodical, and "[s]enior management was aware of his adjustments." Ex. 2, ¶27.

219.   Defendants' financial manipulations fundamentally altered VeriFone's financial condition, future outlook and ability to generate a profit.  Indeed, under GAAP, the restatement erased every dollar of profit purportedly earned by the Company from 1Q07-3Q07 as illustrated below:

| | 1Q07 | 2Q07 | 3Q07 |
|---|---|---|---|
| **Originally Reported Pro forma Gross Margin** | 47.11% | 48.06% | 48.2% |
| **Restated Pro forma Gross Margin** | **41.4%** | **42.3%** | **41.2%** |
| **Originally Reported Pro forma EPS** | $0.37 | $0.39 | $0.42 |
| **Restated Pro forma EPS** | **$0.32** | **$0.24** | **($0.26)** |
| **Originally Reported GAAP EPS** | ($0.01) | $0.06 | $0.16 |
| **Restated GAAP EPS** | **($0.07)** | **($0.06)** | **($0.51)** |

220.   Much of the restatement related to the fraudulent creation of fictitious inventory.  Overstating inventory directly reduces COGS (also variously called "cost of sales" or "cost of net revenues"), which in turn, inflates gross margins, net income and EPS.  As the SEC noted in its charges against VeriFone, "[b]ecause gross margin is the result of revenue minus COGS, if COGS is reduced, gross margin is necessarily increased.  *One way to reduce COGS is to increase inventory*." Ex. 2, ¶16.  Below are the major components of the restatement that related directly to the fraudulent inventory accounting:

**Inventory-Related Accounting Manipulations**

- Inventory: Overstated by ***$77.8 million*** ($13.3 million in 1Q07, $23.9 million in 2Q07 and $40.6 million in 3Q07).

- Improper Overhead Applied to Lipman Inventory: ***$25.9 million*** (**$7.7 million in 1Q07, $7.7 million in 2Q07 and $10.5 million in 3Q07**).

- Fictitious In-transit Inventory: ***$32.8 million*** (**$12.7 million in 2Q07 and $20.1 million in 3Q07**).

- Fake Intercompany Profit: ***$13.4 million total*** (**$3.2 million in 1Q07, $3.9 million in 2Q07 and $6.3 million in 3Q07**).

- Understated Cost of Sales. ***$41.2 million*** understatement of cost of sales, including the failure to record $900,000 of component inventory replacement costs for Lipman inventory and the failure to record $1.4 million in other various "unidentified" costs.

221. The details surrounding each inventory accounting impropriety during 1Q07, 2Q07 and 3Q07 are particularized below:

222. **1Q07 Inventories:** VeriFone reported that the $13.3 million reduction in inventory in 1Q07 included: (a) a $7.7 million decrease due to the duplicate recording of manufacturing and distribution overhead to inventories at former Lipman subsidiaries; (b) a $2.2 million decrease related to inventory recorded in 2Q07 for a change in inventories at former Lipman entities due to standards revaluation that should have been recorded in 1Q07; (c) a $3.2 million decrease to eliminate intercompany profit in inventory; and (d) a $200,000 net decrease as a result of various adjustments, each individually less than $500,000.

223. **1Q07 Cost of Net Revenues:** The Company also reported that the $12.5 million understatement of the cost of net revenues in 1Q07 was caused by: (a) the duplicate recording of $7.7 million of manufacturing and distribution overhead to inventories at former Lipman subsidiaries; (b) the failure to record a $2.2 million expense to reduce Lipman inventories due to standards revaluation; (c) the failure to record $900,000 of component inventory replacement costs for Lipman inventory; (d) the failure to record $900,000 of costs when recording and eliminating intercompany transactions; and (e) the failure to record $800,000 in other various unidentified costs.

224. **2Q07 Inventories:** VeriFone reported that the $23.9 million reduction in inventory in 2Q07 included: (a) a $12.7 million decrease to eliminate intercompany in-transit inventory that did not exist; (b) a $7.7 million decrease due to the duplicate recording of manufacturing and distribution overhead to inventories at former Lipman subsidiaries; (c) a $3.9 million decrease to eliminate intercompany profit in inventory; (d) a $500,000 decrease to correct errors in recording

1  and eliminating intercompany transactions; and (e) a $100,000 decrease due to various unidentified

2  adjustments.

3      225.  **2Q07 Cost of Net Revenues:** The Company also reported that the $12.5 million

4  understatement of the cost of net revenues in 2Q07 was caused by: (a) the failure to record a $11.5

5  million expense to eliminate in-transit inventory that did not exist; (b) the failure to record a $3.5

6  million expense to eliminate intercompany profit in inventory; (c) the failure to record $800,000 of

7  overhead expenses that were improperly capitalized to inventory; (d) the improper recording of $2.2

8  million of expenses to reduce inventory that should have been recorded in 1Q07; and (e) the failure

9  to record $500,000 in other various unidentified costs.

10     226.  **3Q07 Inventories:** VeriFone reported that the $40.6 million reduction in inventory in

11  3Q07 included: (a) a $20.1 million decrease to eliminate intercompany in-transit inventory that did

12  not exist; (b) a $10.5 million decrease due to the duplicate recording of manufacturing and

13  distribution overhead to inventories at former Lipman subsidiaries; (c) a $6.3 million decrease to

14  eliminate intercompany profit in inventory; (d) a $2.4 million decrease to correct errors in the

15  capitalization of overhead; (e) a $600,000 decrease to correct errors in excess and obsolete

16  inventory; (f) a $1.1 million decrease to correct errors in recording and eliminating intercompany

17  transactions; and (g) a $400,000 net increase due to various unidentified adjustments.

18     227.  **3Q07 Cost of Net Revenues:** The Company also admitted that the $16.4 million in

19  understatement of cost of net revenue in 3Q07 was caused by: (a) a $8.4 million increase to

20  eliminate intercompany in-transit inventory that did not exist; (b) a $2.8 million increase due to the

21  duplicate recording of manufacturing and distribution overhead to inventories at former Lipman

22  subsidiaries; (c) a $2.4 million increase to eliminate intercompany profit in inventory; (d) a $2.1

23  million increase to correct errors in the capitalization of overhead; (e) a $600,000 increase to correct

24  errors in excess and obsolete inventory; and (f) a $100,000 net decrease as a result of various

25  adjustments, each individually less than $500,000.

26     228.  As demonstrated above, the magnitude, nature and simplicity of the restatement

27  supports a strong inference of scienter.  The inventory manipulations were deliberate and pervasive

28  and done for the specific purpose of meeting public guidance and avoiding the "unmitigated

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 80 -

disaster." Further, as set forth in the SEC action and below, defendants' own admissions combined with first-hand reports of witnesses confirm that VeriFone's manipulations of inventory and the lack of internal controls were widespread and well known to executive management.

**5.      Information Provided by Multiple Former VeriFone Inventory Managers Confirms Defendants' Exploitation of VeriFone's Nonexistent Inventory Controls to Falsify the Company's Financial Results**

229.    During the Class Period, Bergeron and Zwarenstein repeatedly swore under oath that they monitored inventory controls and procedures each quarter.  As set forth in §VI.B.6, Bergeron and Zwarenstein represented in VeriFone's SEC filings stated that "***we review the adequacy of our inventories valuation on a quarterly basis***" and "***our methodology involves matching our on-hand and on-order inventories with our sales estimate over the next twelve to eighteen months***."

230.    However, VeriFone has admitted to drastically overstating its inventories during the Class Period by over $77 million, which equated to an ***11.3%*** overstatement in 1Q07, ***23.59%*** in 2Q07 and ***38.75%*** in 3Q07, thereby understating COGS and overstating net income and GAAP earnings by 600%, 200% and 418% in those three quarters.  The SEC Complaint establishes that the inventory manipulations were deliberate in order to inflate gross margins and meet public guidance. *See* §VI.B.1.

231.    Information provided by CW11 and CW12, two former VeriFone managers involved in inventory operations at VeriFone's primary distribution center in Lincoln, California,[8] confirms that inventory control problems at VeriFone were widespread and well-known to VeriFone executive management.  The reckless and nonexistent system of inventory controls allowed defendants to freely manipulate inventory levels during the Class Period to inflate gross margins.  CW11 and CW12 reported that there were significant, pervasive and widespread inventory-control problems at VeriFone's major Lincoln facility.

---

[8]      According to CW11, CW12 and CW13, the Lincoln, California facility was the primary hub for storing and distributing VeriFone's inventory.  This is confirmed by VeriFone's 2006 Form 10-Q filed with the SEC, which stated that the Lincoln, California distribution center was its largest "principal" facility in the United States.

232.    CW12, a former warehouse operations manager at VeriFone's Lincoln, California distribution center, reported that there were widespread and significant problems tracking and accounting for both Lipman and VeriFone legacy inventory before he/she arrived at VeriFone, and the problems continued during his/her employment.  He/she stated that the problems arose from VeriFone's inadequate systems and controls for inventory.  Problems included inaccurate recording of the quantity and location of received inventory from Lipman and the failure to change the status of the inventory from "in-transit" to "received."  Because "in-transit" inventory was not changed to "received" inventory when delivered to the Lincoln facility, the amount of total inventory recorded on the 10.7 system was overstated.  In addition, CW12 confirmed that numerous inventory recorded in the 10.7 system could not be found.

233.    CW12 said that Lipman inventory had been transferred to the Lincoln facility when CW12 joined VeriFone in March 2007.  CW11, a former inventory control supervisor at the Lincoln facility, also said Lipman inventory was being transferred to the Lincoln facility in December 2006, when CW11 joined VeriFone, and continued up to and after May 2007, the date CW11 left VeriFone.  CW12 explained that "in-transit" inventory to the Lincoln facility was separated into two groups when received – inventory that needed to be delivered to customers right away and inventory that did not.  Inventory not delivered to customers right away was evaluated by Quality Assurance personnel and, if it met quality standards, was returned to receiving personnel who recorded the quantities of each type of inventory and the locations where the inventory was stored at the Lincoln facility.  This information was then manually entered into the Oracle 10.7 ERP system. CW12 said that none of the Lipman inventory needed to be delivered to customers right away and was therefore recorded and stored at the Lincoln facility. CW11 and CW12 both reported that once "in-transit" inventory, including "in-transit" Lipman inventory, was received and stored at the Lincoln facility, the "in-transit" status of the inventory should have been changed in the 10.7 system to "received." This did not happen, and VeriFone restated $32.8 million in in-transit inventory.

234.    CW12 said the widespread inventory problems were a direct result of inadequate systems, procedures and supervision at VeriFone.  CW12 knew of the pervasive problems because CW12 spent a week in each warehouse/distribution department – shipping, picking and receiving

1   inventory – learning how each department operated as part of CW12's job of cleaning up VeriFone's

2   distribution operations for the transition from Oracle's 10.7 system to Lipman's 11i system. As part

3   of the planned conversion of VeriFone's computer systems from 10.7 to 11i, CW12 oversaw a

4   complete recount of inventory in the Lincoln warehouse over two weekends in 4Q07 which

5   confirmed that inventory was not being properly recorded on the Company's 10.7 system and

6   inventory on the Company's 10.7 system was physically missing. CW12 said these discrepancies

7   were widespread and pervasive and noted one example where 9,000 "sku's" (stock keeping units) of

8   inventory had to be eliminated because of the discrepancies in inventory data. CW12 was certain

9   that the inventory problems had accounting implications but could not estimate the errors. The

10  restatement confirmed the amount of the errors: **$32.8 million** in fictitious in-transit inventory,

11  **$13.4 million** in fake intercompany profit, and **$77.8 million** overstatement in overall inventory

12  during 1Q07-3Q07, the same time period that CW12 worked at VeriFone and discovered inventory

13  problems.

14          235.   CW12 said that the inventory discrepancies were investigated by the Company's

15  inventory control group that was overseen by CW11. CW11 confirmed this fact. CW11 reported

16  that he/she was hired to clean up inventory, improve accuracy and to ease the workload of

17  Grantham, CW11's supervisor. CW11 stated that missing component inventory reflected

18  widespread and chronic inventory control problems at the Lincoln facility and that inventory control

19  at VeriFone was a "huge mess" when he/she arrived in December 2006 and was still a "huge mess"

20  when CW11 left VeriFone in May 2007.

21          236.   CW11 said inventory would be used without being properly input into the Company's

22  10.7 system. As a result, there were major variances between the inventory recorded on the

23  Company's 10.7 system and inventory actually in stock. CW11 said this problem occurred

24  frequently and was never fixed. CW11 said that inventory accuracy was 69% when CW11 arrived at

25  VeriFone in December 2006, which meant that 31% of the inventory recorded on 10.7 did not exist.

26  CW11 stated that inventory accuracy never improved to more than 70%-75%, resulting in

27  approximately 25%-31% inventory inaccuracy from December 2006 to March 2007. These facts are

28  corroborated by VeriFone's restatement which revealed that VeriFone's total inventory was

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

1  overstated by *23.59%* in 2Q07 and *38.75%* in 3Q07, near the range reported by CW11, and indeed

2  even worse than CW11 reported.

3      237.    Although CW11 was brought in for the specific purpose of fixing the inventory

4  control problems, CW11 stated the problems could not be corrected or eliminated because the

5  problems were so widespread.  CW11 stated that it would have taken at least six months to correct

6  the problems with everyone working together.  CW11 stated this never happened and never even

7  came close.  CW11 said that at the end of each quarter, CW11 participated in conference calls where

8  the pervasive inventory-control problems were discussed.  The calls were attended by CW11's

9  supervisors, Grantham and Mangelsdorf, other personnel at the Lincoln facility, and at least three

10 VeriFone vice presidents from corporate headquarters in San Jose.  The problems were so severe that

11 CW11 said VeriFone's vice presidents threatened to close the Lincoln facility if the inventory

12 problems were not corrected.  Both CW11 and CW12 said the problems were not corrected, the

13 Lincoln facility was not shut down and, indeed, continued to report inaccurate inventory, as

14 confirmed by the restatement of VeriFone's inventories in 1Q07-3Q07.  The inventory problems and

15 the massive overstatement of inventory were never disclosed to investors.

16     238.    CW11 explained that despite knowing about the major inventory control problems at

17 the Lincoln facility, before he/she left in May 2007, VeriFone decided to consolidate and transfer

18 millions of dollars of inventory to the Lipman facility from another warehouse in the same area

19 because more leased space became available at the Lincoln facility.  CW11 was tasked with

20 conducting a physical inventory count at the other warehouse and discovered that the warehouse was

21 a disorganized "mess," with pallets tipped over and major discrepancies between the physical count

22 and what was already input into VeriFone's 10.7 system.  CW11 stated that he/she determined that

23 as much as $500,000 worth of reported inventory from the other warehouse was completely missing.

24 CW11 documented this problem in a report that was submitted to his/her supervisor Grantham.

25 CW11 stated that the missing inventory was expressly discussed during an end-of-quarter conference

26 call in 2007 with VeriFone's vice presidents from San Jose headquarters, who were required to "sign

27 off" on any inventory adjustments larger than $20,000.  After leaving VeriFone in May 2007, CW11

28 also learned from a source inside VeriFone that there were several additional inventory problems,

1  including that two truckloads of Lipman inventory being transferred from the off-site facility to the

2  Lincoln facility went missing and were never found.

3      239.   CW11's and CW12's reports of pervasive and widespread inventory problems

4  including 25%-31% of inventory on VeriFone's books that did not exist were confirmed by the

5  Company's admissions in connection with the restatement.  After CW11 and CW12 left VeriFone in

6  May 2007 and December 2007, respectively, VeriFone restated its inventories by *$77.8 million*,

7  *11.3%* in 1Q07, *23.59%* in 2Q07 and *38.75%* in 3Q07.   The restatement also corroborated the

8  problems CW11 and CW12 described concerning missing inventory and discrepancies in in-transit

9  inventory.   Indeed, VeriFone admitted to falsely booking *$32.8 million* in fictitious in-transit

10  inventory from Lipman, nearly *$30 million* in improperly allocated inventory overhead and *$13.4*

11  *million* in false intercompany profit from inventory-related transactions.   The Company also

12  admitted to various other inventory problems, including failure to record component inventory

13  replacement costs (to replace missing component inventory, as CW11 described), the failure to

14  record $1.4 million in other various "unidentified" inventory costs, and hundreds of thousands of

15  dollars in other "various" adjustments that were never disclosed.

16      240.   In 1Q07, CW13, a former senior manager hired to oversee the merger of VeriFone's

17  Oracle 10.7 system with Lipman's 11i system, was asked by VeriFone's Vice President of Global

18  Operations, Patrick McGivern, to analyze a $9 million variance between the inventory valuation

19  derived by the supply chain operations group and the supply chain finance group.  CW13 determined

20  that the supply chain finance group had applied a "*wild amount of overhead*" to inventory, which

21  "*inflated inventory*" valuations.   CW13 said he/she was concerned with VeriFone's business

22  practices and prepared an Excel spreadsheet that showed the inventory valuations before and after

23  the allocations of overhead and submitted it to Welch, McGivern and Periolat.  CW13 received an

24  e-mail from Periolat or Keith Schaall rejecting CW13's report.  CW13 said that the reaction was

25  hostile, and despite CW13's report, VeriFone included the inflated inventory in the Company's

26  publicly reported results.  CW13 stated that the restatement confirmed the problems documented in

27  his report.  CW13 also confirmed that VeriFone's Lincoln, California facility contained the "lion's

28  share" of VeriFone's inventory.

241.    VeriFone's deliberately reckless and virtually non-existent system of inventory controls described by the witnesses above allowed defendants Bergeron and Zwarenstein to freely exploit and manipulate VeriFone's inventory balances to inflate gross margins.   Additionally, because Zwarenstein and Bergeron, as the Company's CFO and CEO, respectively, conducted the final review of all financial results and certified those results under oath before they were communicated to investors, they knew that their inventory manipulations would not subsequently be caught, if ever, until a full year-end audit.   By that time, Bergeron and Zwarenstein had already profited from the inflated results by selling $100 million in VeriFone stock before the restatement was announced.

242.    The magnitude of the inventory manipulations (massive) and the nature of the fraud (intentionally manipulating inventory at the direction of the CEO and CFO; double-booking inventory that did not exist; creating fake income by increasing inventory; applying a "wild amount of" overhead to inventory), when combined with the SEC enforcement charges, the numerous witness reports of inventory manipulations, suspicious stock sales, incompatible computer systems and deliberately reckless inventory controls, demonstrate that there were obvious red flags that were known to, or deliberately disregarded by, defendants when they reported VeriFone's false financial results and defended those results during conference calls.   This is also supported by defendants' sworn public admissions, set forth below, that they carefully reviewed, analyzed and reconciled VeriFone's inventory each quarter.

### 6.    Defendants' Admissions Regarding Inventory Controls Support a Strong Inference of Scienter

243.    In addition to defendants' certifications under oath that they reviewed and confirmed the accuracy of VeriFone's false financial results and designed and assessed its internal controls over financial reporting, they also made specific representations in VeriFone's 2006 Form 10-K (filed on December 18, 2006) concerning their review, analysis and scrutiny of VeriFone's inventory as follows:

**<u>Inventory Valuation</u>**

The valuation of inventories ***requires us to determine*** obsolete or excess inventory and inventory that is not of saleable quality.   The determination of obsolete or excess

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

1     inventories ***requires us to estimate*** the future demand for our products within
       specific time horizons, generally twelve months to eighteen months. . . .

2
       ***We review the adequacy of our inventories valuation on a quarterly basis. For***
3      ***production inventory, our methodology involves matching our on-hand and on-***
       ***order inventories with our sales estimate*** over the next twelve and eighteen months.
4      ***We then evaluate*** the inventory found to be in excess of the twelve-month demand
       estimate and take appropriate write-downs to reflect the risk of obsolescence.

5
       244.    Defendants also touted their ability to measure, control and "balanc[e] our inventory

6
position" to address changes arising from the Lipman merger:

7
       The beginning inventory balance for the previous year, as measured by inventory
8      turns, was at an unusually low balance due to a number of factors including higher
       than expected demand and transitional issues with two contract manufacturers.  In
9      addition, ***we increased inventory as a result of balancing our inventory position*** to
       meet the demand changes triggered by the acquisition of Lipman.

10
       245.    In VeriFone's March 1, 2007 press release, defendants boasted about their ability to

11
"reduc[e] inventory" because of their purportedly integrated distribution and supply chain:

12
       "VeriFone's newly configured worldwide sales force is serving customers through a
13     ***fully integrated distribution channel and supply chain***.  At the same time we have
       been ***reducing inventory*** and generating considerable operating cash flow,"
14     continued Bergeron.

15     246.    In VeriFone's quarterly Forms 10-Q, defendants also made representations

16 concerning their inventory accounting, controls and monitoring procedures:

17     "***Inventories are stated at the lower of standard cost or market. . . .  The Company***
       ***regularly monitors inventory quantities on hand*** and records write-downs for excess
18     and obsolete inventories based primarily on the Company's estimated forecast of
       product demand and production requirements.  Such write-downs establish a new
19     cost-basis of accounting for the related inventory."

20     247.    Defendants also stated that they closely monitored, scrutinized and accounted for

21 ***Lipman inventory*** each quarter and made proper accounting adjustments to the inventory:

22     ***The Company has increased Lipman's historical value of inventory*** by [$13.4
       million in 1Q07] [$13.7m in 2Q07] [$13.7m in 3Q07] to ***adjust inventory to an***
23     ***amount equivalent to the selling price less an appropriate sales margin***.

24     248.    Defendants' sworn admissions concerning their detailed review and monitoring of

25 inventory corroborate their knowledge and awareness of VeriFone's inventory manipulations and the

26 11%-38% overstatement of inventory during the Class Period.  If defendants did ***not*** conduct the

27 careful and detailed inventory reviews as represented to investors, then their statements above were

28 knowingly false and are actionable false statements.  If they did carefully account for inventory as

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                          - 87 -

represented, then they certainly were aware of VeriFone's pervasive inventory-control problems and were deliberately reckless in issuing grossly inflated inventory results. Either way, the combination of facts set forth in the SEC enforcement action, the reports of former VeriFone inventory managers, the restatement disclosures, defendants' insider selling, suspicious terminations, defendants' positions and responsibilities at the Company, and defendants' specific admissions to investors concerning their purported reviews of inventory support a strong inference of defendants' scienter.

> **7.  Defendants' Scienter Is Corroborated by Numerous Red Flags, Including the Rapidly Declining Margins at Lipman Before the Merger and the 93% Increase in VeriFone's Lower-Margin International Sales After the Merger**

249.   As explained in §V.A, *infra*, VeriFone's gross margin was one of the most important financial measures of VeriFone's overall financial condition. Defendants touted the Company's gross margin in every major earnings press release, conference call and SEC filing and acknowledged that they closely monitored gross margins. In addition to the evidence set forth in the SEC Complaint – which shows actual knowledge of the fictitious accounting adjustments – additional facts show that defendants were aware of multiple red flags that seriously undermined the truthfulness of their publicly reported gross margins.

250.   One obvious red flag was that Lipman's own margins rapidly declined for *five consecutive years* leading up to the merger and Class Period:

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 1Q06 |
|---|---|---|---|---|---|---|
| **Lipman's Declining Gross Margin Prior to Class Period** | 55.9% | 56.6% | 50.4% | 44.8% | 42.1% | 41.9% |



251.    Thus, defendants knew that consolidating Lipman's sales and 41.9% margins would put downward pressure on VeriFone's margins, and their representations of increasing gross margins of up to 48% during the Class Period had no reasonable basis.

252.    Another red flag was that a majority of Lipman's sales were heavily skewed toward international sales which carried substantially lower margins than North American sales. During a September 6, 2007 conference call, Bergeron acknowledged that fact: "***there's a huge variation in the gross margin percentage, domestically versus internationally***." Accordingly, defendants knew that any change in VeriFone's product mix to increase the percentage of international sales would cause VeriFone's gross margins to decline. Defendants admitted this fact in the Company's 2006 Form 10-K:

> ***Our international sales tend to carry lower prices and therefore have lower gross margins than our sales in North America. As a result, if we successfully expand our International sales, any improvement in our results of operations will***

*likely not be as favorable* as an expansion of similar magnitude in the United States and Canada.

253.    That is precisely what happened during the Class Period.  In 4Q06 prior to the incorporation of Lipman into VeriFone's financial results, VeriFone's lower margin international sales were $66.6 million or only *42.5%* of total sales for the quarter.[9]  In 1Q07, after incorporating Lipman's sales into VeriFone's results, VeriFone's lower-margin international sales nearly *doubled*, increasing by over 93% from $66.6 million to $129.1 million, or *59.6%* of total sales in 1Q07, as illustrated below:

|  | 1O06 | 2O06 | 3O06 | 4O06 | 1O07 | 2O07 | 3O07 |
|---|---|---|---|---|---|---|---|
| **VeriFone's International Revenues as a % of Total Revenues Pre- and Post Lipman Merger** | 42.8% | 43.5% | 42.2% | 42.5% | **59.6%** | **56.2%** | **55.2%** |



VeriFone's International Revenues as a Percentage of Total Revenues Pre- and Post Lipman Merger: 2001 - 2006

---

[9]    In 2006, lower-margin international sales accounted for approximately 43% of the Company's total sales, and North American sales accounted for approximately 57% of total sales.  In 2006, international operating income was 24.5% of international sales.  By contrast, North American operating income was 38.8% of North American sales.

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

254.     Accordingly, defendants knew that the Company's reportedly "record" margins of 47.1%, 48% and 48.2% in 1Q07, 2Q07 and 3Q07, respectively, had no reasonable basis in fact and were seriously undermined by the huge spike in lower-margin international sales and Lipman's declining margins.  Further, as set forth in §VI.B.1-2, defendants were well aware that the reported margins were the result of Periolat's financial manipulations and that there was a "sharp and unprecedented" increase in inventory that called into question VeriFone's reported gross margins and inventory.

255.     The restatement also confirms the lack of any basis for the reported margins.  Once restated, the reported margins in 1Q07, 2Q07 and 3Q07 were 500-700 basis points lower – 41.4%, 42.3% and 41.2%, respectively.  In fact, during VeriFone's August 19, 2008 conference call Bergeron admitted that the Company would not even break the 40% pro forma gross margin threshold for five or six quarters until the end of FY09 because the Lipman acquisition caused a huge increase in VeriFone's lower-margin international sales.  VeriFone reported pro forma gross margins of *32.5%* in 4Q07, *35.7%* in 1Q08, *34.9%* in 2Q08, *37.6%* in 3Q08, *34.7%* in 4Q08, *35.2%* in 1Q09, *33.8%* in 2Q09 and *36.8%* in 3Q09.  These margins were over 1,000 basis points below the false margins reported to investors during the Class Period.

### 8.     Zwarenstein's Admitted Role in "Building Out [VeriFone's] Financial and Accounting Infrastructure" and Defendants' Representations of "Tremendous Financial Transparency" After the Lipman Merger Reinforce a Strong Inference of Scienter

256.     Defendant Zwarenstein was not a hands-off CFO.  He was heavily involved in the Lipman merger and the combined financial and accounting systems.  In fact, according to VeriFone's September 10, 2008 Proxy Statement, Zwarenstein received a salary raise in 2007 because of "***his work in building out [VeriFone's] financial and accounting infrastructure***."  The Company justified the salary increase by pointing to Zwarenstein's "increased job responsibilities" and his "instrumental" involvement in the Lipman merger:

> In addition, the Compensation Committee considered the ***increased job responsibilities*** that Mr. Zwarenstein undertook in our business and corporate development.   In particular, the Compensation Committee noted that ***Mr. Zwarenstein's efforts were instrumental towards our successful completion of the***

*acquisition of Lipman* in the prior fiscal year and that his base salary should be adjusted accordingly.

257.   In addition to Zwarenstein's intimate knowledge of VeriFone's accounting and financial infrastructure, Bergeron and Zwarenstein also represented to investors that, despite absorbing a complex foreign company, VeriFone had "tremendous financial transparency" into the "true cost of manufacturing" (*i.e.*, inventory and cost of sales) *after* combining Lipman's operations. At the September 6, 2007 conference call, Bergeron falsely told investors:

> [W]e are extremely happy with the decision that we took this time last year and that was to maintain Lipman's manufacturing capabilities in Israel and optimize those facilities in a way that allowed us to run them at 100% capacity, something they were never able to do before, by moving some of the volatility in and out of our contract manufacturers to Israel, and then use all of the volatility in our product mix as business for the contract manufacturers. *This has proven to be wonderful because we're getting supply chain efficiencies in Israel that we never experienced before, and something we mentioned as well, we have tremendous transparency, financial transparency into the true cost of manufacturing and all the little nuanced items that roll up into that as a result of having 30%, 35% of our own inside.* So it's worked out splendidly and we're committed to it.

258.   Additionally, Bergeron and Zwarenstein represented in their sworn certifications that they "*ensured the adoption of VeriFone's accounting policies and processes for Lipman's transactions*." These admissions reinforce a strong inference of defendants' scienter.  If there was "tremendous . . . financial transparency into the true cost of manufacturing and all the little nuanced items that roll up into that," then defendants knew or were deliberately reckless in not knowing that VeriFone's "true cost of manufacturing" (*i.e.* cost of sales) was understated by *$41.2 million* during 1Q07-3Q07, and that VeriFone's gross margins and earnings were substantially overstated.

259.   When combined with the other particularized facts including witness reports, lack of inventory and financial controls, the facts set forth in the SEC enforcement action, Zwarenstein's review of erroneous manual journal entries followed by his termination, Bergeron and Zwarenstein's actual knowledge of Periolat's financial manipulations, the incompatible accounting systems, the suspicious insider trading and executive compensation, defendants' admissions regarding the Company's financial transparency, accounting infrastructure, and supply-chain synergies support a strong inference of scienter.

9. **Information Provided by Former VeriFone Accounting Employees Raises a Strong Inference that Bergeron and Zwarenstein Knew About the Erroneous Manual Journal Entries and Other Internal Control Deficiencies that Caused the Restatement**

260.    VeriFone initially disclosed its restatement in a press release and a conference call on December 3, 2007, and provided additional information in the Company's April 1, 2008 press release and in the amended SEC reports filed on August 19, 2008.  VeriFone disclosed that the restatement was required because of "erroneous" manual journal entries made by the Company's supply-chain accounting organization that caused VeriFone to overstate inventories and understate the cost of net revenues by tens of millions of dollars.  On December 3, 2007, Bergeron stated the manual journal entries were required because VeriFone's Oracle ERP system was not configured to automatically account for these critical financial statement accounts.  Specifically, VeriFone stated that the supply-chain management team:

- improperly recorded millions of dollars of intercompany in-transit inventory that did not exist by making identical manual journal entries for both in-transit inventories and direct shipments when the manual entries should not have been made for the direct shipments;[10]

- improperly double booked millions of dollars of manufacturing and distribution overhead costs to inventory at former Lipman subsidiaries by making identical manual journal entries for in-transit inventories and direct shipments when the entries should not have been made for the direct shipments; and

- improperly failed to eliminate millions of dollars in intercompany profit in inventory acquired by one VeriFone entity from another VeriFone entity that should have been eliminated upon consolidation.

261.    As set forth in §VI.B.1-2, the SEC Complaint confirms that Bergeron and Zwarenstein knew about the accounting adjustments at the time they were made.  Information provided by several former VeriFone accounting employees with direct knowledge of the problems that led to the restatement further corroborate this fact.  The witnesses reported that Bergeron and Zwarenstein knew the erroneous manual journal entries were received and reviewed by the San Jose

---

[10]    According to the Company, intercompany in-transit inventory was inventory that was in the process of being shipped between VeriFone entities, primarily from either Israel or Singapore to the United States.

1 accounting department headed up by Zwarenstein, that Zwarenstein participated in monthly

2 teleconferences with the personnel who prepared and submitted the journal entries, and that

3 Bergeron and Zwarenstein knew there were numerous problems with VeriFone's accounting

4 department and inventory controls that led to the accounting improprieties.

5      262. CW1 and CW2 stated that the Company's San Jose accounting department handled

6 consolidated accounting and general ledger closing procedures. CW1 and CW2 said VeriFone

7 created a Consolidations Group in late 2006 that was tasked with consolidating the accounting data

8 from Lipman's financial system to VeriFone's financial system. According to CW1 and CW2, the

9 San Jose accounting department was headed up by Zwarenstein. CW1 and CW2 reported to the

10 Company's Controller for North America, and both stated that was initially Gil Lacuna. CW1 and

11 CW2 said Lacuna was replaced by John Marsh in August 2006. Marsh was replaced by Selena

12 Miller, who was replaced by Mike Dowd, who was replaced by Rosalie Aducci. The Company's

13 Controller for North America reported to Corporate Controller Laura Merkl, who reported to

14 Zwarenstein.

15      263. CW1, CW2 and CW9 confirmed that Periolat was the controller at the Rocklin

16 facility who was responsible for initially posting the erroneous manual journal entries that led to the

17 restatement. CW1, CW2 and CW9 said Periolat was responsible for reviewing all accounting

18 procedures and activities for supply-chain operations in North America. That included assigning and

19 approving valuations for VeriFone inventory, which, in turn, included assigning manufacturing and

20 distribution overhead costs to the inventory. CW1 and CW 9 said Periolat made the journal entries

21 directly into VeriFone's Oracle general ledger system for Lipman inventory because the two

22 companies had different Oracle general ledger systems. Lipman was using the Oracle 11i system,

23 and VeriFone was using the Oracle 10.7 system. VeriFone was in the process of upgrading to 11i,

24 but the upgrade was not completed until November 2007.

25      264. According to CW9, the journal entries for the Lipman inventory and cost of goods

26 sold were prepared, reviewed and approved by Periolat, then entered onto Excel spreadsheets, and

27 then posted to the 10.7 general ledger accounting system. CW9 said hard copies of the journal

28 entries and Excel spreadsheets were kept on file for audit purposes and were reviewed by the

1   Company's internal auditors.  CW9 also said that once the entries were posted to the Oracle 10.7
2   general ledger accounting system, they were reviewed by various accounting personnel in San Jose.
3   As part of the monthly and quarterly closing process, CW1 reviewed VeriFone's Oracle 10.7 general
4   ledger system to make sure Periolat had input the manual journal entries and informed Corporate
5   Controller Merkl that the entries had been made.  CW1 said that Merkl would then review the actual
6   entries.

7          265.    According to CW9, the erroneous manual journal entries were the result of the
8   companies using different Oracle ERP general ledger systems.  In fact, CW9 said the Lipman
9   acquisition, the fact that the two companies used different Oracle ERP general ledger systems, and
10  problems with the conversion from 10.7 to 11i by VeriFone overwhelmed the Company.

11         266.    CW1, CW2 and CW9 also said they attended monthly balance sheet review meetings
12  that were also attended by Zwarenstein, Merkl and other accounting personnel.  According to CW9,
13  personnel from the Rocklin facility, including CW9, Periolat and others, participated in monthly
14  financial statement review teleconferences with Zwarenstein, Merkl and Gilford.  CW9 said that
15  during these meetings, Rocklin's reported financial results – which would have included the
16  overstated Lipman inventory and understated cost of goods sold – were discussed.

17         267.    Thus, the erroneous manual journal entries that were posted to VeriFone's Oracle
18  10.7 general ledger system, causing the Company to report materially false and misleading financial
19  results were received and reviewed by Merkl, Zwarenstein's direct report, and the financial results of
20  the Rocklin facility which included the false financial results were discussed with Zwarenstein
21  during monthly meetings.  CW1, CW2 and CW9 believed that Periolat was terminated due to the
22  inventory issues that led to the restatement.  The facts set forth in the SEC Complaint confirm that
23  fact.

24         268.    Several former VeriFone accounting employees stated that the San Jose accounting
25  department headed up by Zwarenstein was disorganized, understaffed, plagued by high turnover and
26  in a general state of disarray.  CW1 and CW2 said it was very difficult to work for Merkl because
27  she constantly made unrealistic demands on her subordinates and constantly changed the directives
28  she had previously given to them.  CW1 said Merkl's management style and directives compromised

1    VeriFone's accounting operations as a whole.  CW2 said Merkl's constant changing of the directives

2    she assigned to the accounting group led to inefficiencies.  CW2 said accounting personnel were

3    often told to work on "special projects" ordered by Zwarenstein that caused customary accounting

4    duties such as reviewing journal entries and conducting reconciliations to be compromised.

5          269.    The problems were magnified at the end of the month and quarter because, as CW2

6    stated, there was a significant increase in the work for the accounting department at the end of each

7    month and especially at the end of each quarter.  CW2 said some of the increased workload was

8    caused by VeriFone's increased efforts at the end of a reporting period to send out as many products

9    as possible so the Company would meet or exceed its financial forecasts.  The Company disclosed in

10   its SEC reports that quarterly revenues were "back end loaded" because "sales orders are received

11   and revenue recognized disproportionately towards the end of each fiscal quarter."  CW2 said this

12   resulted in accounting personnel having to work very long hours, including working until midnight

13   at the end of every quarter. CW2 described the work environment in San Jose as extremely chaotic,

14   where everyone was running around like chickens with their heads cut off.  CW2 said various

15   personnel expressed their frustrations and concerns about the intense work conditions to Merkl but

16   also said Merkl never took steps to modify and improve working conditions.

17         270.    CW5 also stated that VeriFone was chronically understaffed and that it resulted in

18   VeriFone's constantly reacting to problems that often arose because of the understaffing, as opposed

19   to being proactive and preventing problems from occurring in the first place.  CW5 had decreasing

20   confidence in VeriFone's senior management, was not proud of the direction taken by the Company

21   and stated that employee morale was extremely low for more than a year before CW5 resigned in

22   December 2007.

23         271.    CW1 and CW2 stated many employees resigned because they were dissatisfied with

24   Merkl, the heavy workload, the changing directives and overall inefficiencies in the accounting

25   department.  In fact, that is why CW1 and CW2 resigned.  CW2 said the Consolidations Group

26   experienced a very high rate of attrition that severely impacted the efforts to properly consolidate

27   and reconcile Lipman's financial records.  CW2 also said the Consolidations Group was often unable

28   to locate or reconcile Lipman's financial data and documents.  CW2 said that Lipman personnel did

1   not provide needed information to close the books at the end of the quarter on a timely basis, which

2   caused VeriFone personnel in San Jose to rush their reconciliation of the information and the closing

3   of the Company's books.   CW2 said CW1 and North American Controller Dowd were very

4   frustrated by these issues because they were responsible for integrating the Lipman financial data.

5   Indeed, when asked how VeriFone could report its consolidated results given the problems, CW2

6   stated, "I have no idea, but that's the million dollar question."

7        272.    The general state of disarray in the finance and accounting department was also

8   confirmed by CW8, who was hired as a contractor and assistant controller in August 2007 to rebuild

9   the finance and accounting department.   CW8 said the rebuilding required CW8 to staff a large

10   number of vacant positions and hire full-time employees to replace consultants.   But CW8 said that it

11   was difficult to hire accounting and finance employees because recruiters told CW8 that VeriFone

12   had a poor reputation among finance and accounting personnel as well as recruiters because there

13   was so much turnover.   CW8 left VeriFone after a few weeks because of the inability to fill the

14   positions.

15        273.    As detailed in §V.D.4, *infra*, after the Class Period, VeriFone admitted the

16   Company's financial reporting controls were deficient and that it did not have qualified accounting

17   personnel during the Class Period.   This allowed defendants to freely manipulate VeriFone's

18   financial results and exploit the lack of accounting controls.   The findings of the SEC confirm this.

19             **10.    Former VeriFone Employees Reported Problems Obtaining**

**Accurate Financial Data from Lipman Because VeriFone and**

20                    **Lipman Used Different Oracle Accounting Systems**

21        274.    As noted above, Bergeron and Zwarenstein knew Periolat submitted Lipman

22   inventory data to the San Jose accounting department by posting manual journal entries to

23   VeriFone's Oracle 10.7 ERP system because VeriFone's 10.7 system was not configured to

24   automatically retrieve this information from Lipman's 11i system.   The facts set forth in the SEC

25   Complaint also confirm that Bergeron and Zwarenstein were well aware of Periolat's accounting

26   adjustments that resulted in inflated inventory, gross margins and earnings.   Other former employees

27   of VeriFone and Lipman confirmed there were problems retrieving accurate financial data from

28   Lipman's 11i system because the two companies utilized different versions of Oracle ERP system.

275.     CW4 and CW5 said VeriFone was in the process of converting from the 10.7 system to the 11i system in 2006 and 2007 because Lipman was using 11i.  CW1 and CW2 stated the conversion was extremely problematic for a number of reasons.  CW1 and CW2 both stated that the integration of Lipman, the high attrition rate and chaotic atmosphere in the accounting group negatively impacted overall productivity and delayed and impaired the implementation process. CW5 said the conversion to 11i was not completed until November 2007.  Although not involved, CW9 was aware of problems with the implementation of Oracle 11i and said those problems, combined with the additional work created by the Lipman acquisition, overwhelmed the Company.

276.     CW4 was the project manager for the implementation of 11i since September 2006 and said the upgrade from 10.7 to 11i was initiated in conjunction with the acquisition of Lipman because Lipman was already using the 11i platform.   CW4 said the plan to complete the implementation in less than 18 months was very aggressive and that there were many problems and challenges.

277.     The delay in converting VeriFone's 10.7 system to an 11i system until November 2007 and the inability to automatically transfer Lipman financial information on the 11i system to VeriFone's 10.7 system created problems, including the need for Periolat to post manual journal entries for Lipman inventory data to the 10.7 system.  This allowed Periolat to make fictitious adjustments to VeriFone's results manually at the direction of Bergeron and Zwarenstein.

278.     CW3 was the controller at Lipman's Syosset distribution center from February 2006 until February 2007 when CW3 was laid off after the Syosset facility was closed.  CW3 was responsible for all of Lipman's major accounting functions in North America.  According to CW3, the Syosset facility began winding down its operations after the Lipman acquisition was completed in November 2006 and shipped all its inventory to VeriFone's facility in Alpharetta, Georgia.  CW3 said this process was completed in February 2007.

279.     Like other witnesses, CW3 said that Lipman utilized the Oracle 11i ERP system and VeriFone used the Oracle 10.7 ERP system.  CW3 said there were problems transmitting accurate Lipman financial data to accounting personnel in San Jose because the two systems were not

1  interlinked.  Because the systems were not interlinked, CW3 e-mailed financial reports on Excel

2  spreadsheets to personnel in VeriFone's San Jose headquarters.

3      280.  Approximately one or two weeks before the close of a month or quarter, VeriFone

4  personnel in San Jose e-mailed CW3 an Excel spreadsheet containing various fields for CW3 to

5  input Lipman's North American financial information.  The spreadsheet included "macros" which

6  performed various calculations to assist VeriFone personnel when they consolidated the financial

7  data into VeriFone's comprehensive financial reports.  CW3 would download data from Lipman's

8  11i system into the Excel spreadsheet but said VeriFone had substantial difficulty "merging" the

9  information into the Company's consolidated financial reports.  According to CW3, the totals in the

10  VeriFone Excel spreadsheet were not balancing with the financial information in VeriFone's San

11  Jose headquarters because the "macros" included in the spreadsheet were incorrect and did not allow

12  the spreadsheet to properly "roll up" into VeriFone's consolidated financial reports.  CW3 said that

13  VeriFone made structural modifications to the spreadsheet reports, which caused the macros and

14  financial information to be flawed when they were tied to VeriFone consolidated accounts.  CW3

15  was aware immediately when he began working with the spreadsheets that the macros were not

16  working properly.  CW3 submitted multiple monthly reports with the flawed macros and warned and

17  cautioned one of VeriFone's controllers, Lisa Hamm, about the problems and financial errors.  CW3

18  stated that he did not and could not fix the problems because they were systemic and structural, and

19  CW3 already notified CW3's superiors.

20      281.  After submitting three to four erroneous monthly reports with the flawed macros that

21  were never fixed, CW3 was directed on several occasions by accounting personnel in San Jose to

22  change the macros so the Excel spreadsheets would include proper balances thereby allowing the

23  figures in the spreadsheet to properly rollup into VeriFone's consolidated financial reports.  CW3

24  recalled the first occasion where Zwarenstein called CW3 at home on a Friday night after CW3 had

25  already gone home.  CW3 stated that Controller Hamm was also on the call, and Zwarenstein's and

26  Hamm's demeanor was "a state of panic" because of errors in the Excel reports.  He recalled

27  Zwarenstein acknowledged the problems and instructed CW3 to figure it out because Zwarenstein

28  needed the results for an earnings conference call the following week.  CW3 stated even though he

1   manually corrected the one report, the problems were fundamental and persisted until CW3 left

2   VeriFone.

3       282.   CW10, the former Vice President of Operations at Lipman's Syosset facility, was also

4   aware of the difficulties converting the accounting for the Syosset operations over to VeriFone

5   caused by the companies' use of different Oracle ERP general ledger accounting systems.  CW10

6   said another factor contributing to the problem was the fact that Lipman and VeriFone had different

7   fiscal years.  VeriFone's fiscal year ended on October 31, and Lipman's fiscal year ended on

8   December 31.

9       283.   CW10 also said the Syosset facility was holding excess and obsolete inventory when

10  the acquisition closed on November 1, 2006 because a customer had cancelled an order for Lipman's

11  Nurit 20-55 terminals.  According to CW10, Lipman was unable to sell the terminals after the

12  cancellation by the customer and understood that VeriFone did not plan to include the Nurit 20-55

13  model in its product suite.  CW10 said that VeriFone personnel at the Syosset facility, including

14  Mark Norman and Patrick McGivern, knew about the excess and obsolete inventory.  VeriFone's

15  restatement included a $600,000 adjustment to correct errors for excess and obsolete inventory.

16      284.   CW5 explained that the Oracle 10.7 ERP system included all transactional data

17  related to VeriFone's various business operations, including accounting, finance, sales and

18  inventories.  CW5 said Sivar Saravanan was responsible for handling inventory data in the Oracle

19  10.7 system and that reports were generated from the 10.7 system.  CW5 said VeriFone input a wide

20  variety of the transactional data from the Oracle 10.7 ERP system to a data warehouse because the

21  data warehouse offered superior reporting functions.  CW5 said the data warehouse stored sales,

22  invoicing, ordering, revenue – including sales identified by customer and region – and other data

23  which allowed various reports to be generated.  Tano, CW5's boss, was responsible for creating

24  reports from the data warehouse and directed CW5 to input data needed to prepare the reports.

25      285.   Lipman data could not be automatically transferred to the data warehouse because the

26  data could not be automatically transferred from Lipman's 11i system to VeriFone's 10.7 system.

27  Instead, CW5 received the data from the individual controllers responsible for Lipman's myriad of

28  business segments. According to CW5, some Lipman operations, including facilities in New York

1  and the United Kingdom, were shut down, which required the data to be transferred to VeriFone's

2  10.7 system.

3      286.    Like CW3, CW5 said transferring data from 11i to 10.7 involved major challenges in

4  "data mapping" that could have caused significant problems.  CW6 knew of one such problem even

5  though CW6 only worked at VeriFone for a few weeks in April or May 2007.  CW6 said a great deal

6  of accounts receivable data from Lipman was lost when it was transferred to VeriFone because the

7  data was not properly mapped before being transferred from Lipman's 11i system to VeriFone's 10.7

8  system.  Specifically, CW6 said that VeriFone could not identify the customers associated with

9  hundreds of Lipman's receivables that were transferred to VeriFone's system, and it was CW6's job

10  to determine the customers for the receivables.

11      287.    Finally, as CW13 explained, *infra*, the incompatible Oracle systems caused

12  accounting problems and "inflated inventory" that he documented in a report to Periolat, which was

13  rejected.  The above facts establish that defendants knew there were severe problems obtaining

14  accurate financial information from Lipman throughout 2007 because the companies were using

15  different versions of the Oracle ERP system and had different fiscal years.  Indeed, Zwarenstein was

16  purportedly responsible for "***building out [the Company's] financial and accounting***

17  ***infrastructure***" and was "instrumental" in the Company's merger with Lipman.  The problems

18  surrounding VeriFone's financial reporting systems and internal controls provided defendants with

19  adequate cover needed to manipulate VeriFone's financial results.

20          **11.    The Termination of Periolat and Zwarenstein and VeriFone's**
21                  **Admission that There Were Material Weaknesses in the**
                    **Company's Internal Controls Strengthens the Inference of**
22                  **Scienter**

23      288.    On April 1, 2008, VeriFone issued a press release announcing the "resignation" of

24  Zwarenstein and that it was removing Bergeron as Chairman.  However, in the Company's Proxy

25  Statement filed with the SEC on September 10, 2008, it was reported that Zwarenstein was actually

26  "terminated."  Moreover, it was reported that the separation agreement between VeriFone and

27  Zwarenstein required Zwarenstein to reimburse the Company $150,000 of bonuses that he was paid

28  in 2007 because the Company's restated results did not achieve the quarterly bonus targets.  On

April 1, 2008, the Company also announced that it had terminated the Company's supply-chain

controller but did not disclose the name of that individual.  That individual was Periolat.

289.    In the April 1, 2008 press release and in VeriFone's Reports on Forms 10-Q and 10-K

filed with the SEC on August 19, 2008, VeriFone admitted numerous material weaknesses in

VeriFone's internal control over financial reporting throughout 2007.  The Company admitted that

"*management has concluded that VeriFone did not maintain effective internal control over*

*financial reporting*" and that a number of remedial measures had been taken, including:

- Implementation of a more stringent voucher approval process for manual journal entries;

- Implementation of enhanced information technology/enterprise resource planning systems commensurate with the increased size and complexity of VeriFone's businesses;

- Adding appropriate accounting and finance resources through additional centralized staffing with individuals having sufficient knowledge and experience in cost accounting and other GAAP principles;

- Enhanced segregation of duties between the financial planning and accounting and control functions;

- Improvements in governance and compliance functions to improve control consciousness and appropriate adherence to [GAAP], as well as improved tone, communication, documentation, education and training for employees involved in the financial reporting process, including the appointment of a chief legal and compliance officer; and

- Personnel actions, including the termination of the Company's supply-chain controller, enhanced supervision and other actions.

290.    VeriFone disclosed additional material weaknesses in its SEC reports filed on August

19, 2008, including:

- *A transaction-level material weakness in the design and operation of control activities relating to the preparation, review, approval and entry of manual, non-standard journal entries*;

- *An entity-level material weakness in the control environment related to our period-end financial reporting process due to an insufficient number of qualified personnel* with the required proficiency to apply our accounting policies in accordance with U.S. GAAP following the November 1, 2006 acquisition of Lipman;

- *An entity-level material weakness in control activities related to the design and operation of our supervision, monitoring, and monthly financial statement review processes*; and

- • *A transaction-level material weakness* in the design and operating effectiveness of controls related to income taxes.  Specifically, processes and procedures were not designed to provide for adequate and timely identification, documentation and review of various income tax calculations, reconciliations and related supporting documentation required to apply [VeriFone's] accounting policy for income taxes in accordance with U.S. GAAP, *particularly following the November 1, 2006 acquisition of Lipman*.

291.   VeriFone also reported that it was forced to review and make necessary changes to improve the Company's inadequate internal controls over financial reporting, including:

- • an enhanced manual journal entry policy, including a more stringent manual journal entry review and approval process that requires tiered approval levels in which escalating dollar amounts require additional approval by increasingly more senior personnel;

- • the migration to a new worldwide, integrated, ERP system.  The new ERP system is our principal computing platform and provides for a single unified chart of accounts worldwide.  This system was activated for the majority of [VeriFone's] worldwide operations in the first fiscal quarter of 2008 and by the end of the second fiscal quarter of 2008 over 90% of [VeriFone's] consolidated net revenues and cost of net revenues were processed on this system;

- • *the addition of qualified accounting and finance personnel* having sufficient knowledge and experience in general accepted accounting principles, cost accounting, tax, and management of financial systems;

- • *enhancing the Company's review process over the monthly financial results by requiring additional documentation and analysis to be provided that will then be reviewed by appropriate key senior personnel from both finance and non-finance areas*;

- • *enhancing the segregation of duties* between the financial planning and the accounting and control functions; and

- • *enhancing the Company's governance and compliance functions* to improve control consciousness and prevention of errors in financial reporting, as well as to improve tone, communication, education, and training for employees involved in the financial reporting process, including the *appointment of a chief legal and compliance officer*.

292.   Defendants' admissions of inadequate internal controls directly contradict defendants' representations to investors that there was "tremendous financial transparency" at VeriFone after the Lipman merger.  The admissions also contradict defendants' representations of "supply chain efficiencies" and integration benefits received as a result of the Lipman merger.  The admissions of reckless internal controls were made after Zwarenstein's salary was increased in 2007 because of his purported work in "*building out VeriFone's financial and accounting infrastructure*."  They were also made after defendants represented that they had strict and detailed inventory valuation controls

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                    - 103 -

1   to prevent inaccurate inventory reporting.  Moreover, the admissions were made *after* Bergeron and

2   Zwarenstein repeatedly certified, under oath, in SEC filings on March 9, 2007, May 31, 2007 and

3   September 6, 2007, that they had personally "evaluated" the Company's internal controls, certified

4   the financial results and that the controls were sufficient to detect improprieties to ensure that

5   VeriFone's financial results were fairly presented and complied with GAAP.  As noted above,

6   defendants exploited VeriFone's lack of internal controls to manipulate its financial results.

7        **C.    Defendants' False Statements in 2006 Concerning the Financial
    Benefits of the Lipman Merger and the Purported Supply Chain**

8             **Efficiencies Due to the Lipman Merger[11]**

9       293.    In addition to defendants' false statements in 1Q07, 2Q07 and 3Q07, defendants also

10  made false statements in 2006 concerning the financial benefits of the Lipman merger and the gross

11  margin increases, synergies and so-called "supply chain efficiencies" derived as a result.

12            **1.    False August 2006 Statements**

13      294.    <u>August 31, 2006 Press Release</u>: On August 31, 2006, VeriFone issued a press release

14  announcing that, despite the fact that it was about to absorb Lipman, a complex Israeli corporation

15  with declining margins, manufacturing facilities thousands of miles away and a whole new

16  management team, VeriFone was nevertheless increasing its FY06 and FY07 guidance.  Bergeron

17  falsely stated in the press release:

18        "Based on our confidence with our near term and long term outlook, we are raising
    our FY06 year end guidance to $1.07 to $1.08 of adjusted net income per share. ***We***

19  ***are also raising our FY07 guidance to $1.40 to $1.42 of adjusted net income per
    share, assuming a November 1, 2006 completion of the Lipman acquisition***."

20

21      295.    <u>August 31, 2006 Conference Call</u>: During the Company's follow up conference call

22  with investors and Wall Street analysts, Zwarenstein also misled investors about the short-term

    benefits of the Lipman merger and its purported immediate "accretion" to VeriFone's earnings:

23

24        Based upon our improved 2006 results, our expectations for 2007 adjusted
    earnings are now in the range of $1.28 to $1.30 excluding the impact of the Lipman

25  acquisition.  Incremental to this, we are also reaffirming our previous statements
    made on April 10, 2006 where we announced the Lipman offer. ***That is, we expect***

26

27  [11]    All false statements in this section are designated with bold and italics.

28

*to enjoy the benefit of full-year accretion from the acquisition of approximately $0.12 per share.*

Taking into account both the anticipated organic growth *and the accretion from the Lipman acquisition, we are currently anticipating EPS, on a net income adjusted basis, in the range of $1.40 to $1.42 per share for fiscal 2007 year starting November 1, 2006.*

296.  In response to a direct question from a SunTrust analyst, Bergeron falsely and emphatically assured investors that gross margins would expand as a result of the Lipman acquisition:

> JEFFREY: Anything particular to this quarter or is this the start of a trend during which we are going to see better gross margin and better cost ratios?
>
> BERGERON: I think, starting two quarters ago, on these conference calls and on our public meetings with shareholders or webcasts or whatever, we have said that, looking forward, the big story here is EBITDA margin expansion more than gross margin expansion.  That was pre-Lipman.  *I have to tell you that with Lipman's manufacturing in-house and with this hybrid model that we are very cleverly putting together and getting the best of both worlds, there is going to be gross margin expansion in our future.*

### 2.  False September 2006 Statements

297.  On September 6, 2006, VeriFone issued a press release updating investors on the status of their business and the Lipman merger.  Defendant Atkinson, who was paid millions of dollars in incentives purportedly for his work on the Lipman merger, falsely told the market that VeriFone and Lipman "*will begin Day 1, completely integrated.  We are locked and loaded*." Neither Atkinson, Bergeron nor Zwarenstein qualified the statement or gave any warnings to investors that the merger of Lipman, a foreign company with different operations, management structures and manufacturing facilities thousands of miles away, would likely result in material operational problems that the Company would have to work through.

### 3.  False December 2006 Statements

298.  <u>December 7, 2006 Press Release</u>: On December 7, 2006, VeriFone issued a press release announcing its 4Q06 and FY06 financial results.  In the press release, Bergeron falsely represented that the integration of Lipman "has been completed ahead of schedule" and that VeriFone was "already" enjoying several supply-chain efficiencies and earnings accretion:

> "*The integration of Lipman into VeriFone has been completed ahead of schedule* and we have created a single-branded, unified company with tremendous scale

advantages.  ***Already, we are enjoying several supply chain efficiencies and earnings accretion***."

"As a result, ***we have increased our internal expectations for fiscal Q1 2007*** net earnings per share, as adjusted, to be in the range of $0.33 to $0.34.  ***We remain very confident of our prospects in fiscal 2007***."

299.  <u>December 7, 2006 Conference Call</u>: During the follow-up conference call with investors and analysts, Bergeron falsely represented that the two companies were already fully integrated operationally, including integrated management, organizational structure and reporting relationships – all of which were key to accurate financial reporting:

> With respect to integration, I could not be happier with the results.  We invested a lot of time and money planning for a November 1 integration of two companies as one.  ***Lipman is not being run as a standalone entity.  The integrated management team, which was announced on November 1 and which includes several key Lipman executives, is functioning very well.  Everyone throughout the Company clearly understands the organizational structure and the reporting relationships***.

**D.    Facts Establishing Material Falsity of Defendants' 2006 Statements and a Strong Inference of Scienter**

300.  Defendants' statements in August 2006, September 2006 and December 2006 concerning VeriFone's projected margins and earnings growth and the success, financial benefits and "supply chain efficiencies and earnings accretion" derived as a result of the Lipman merger were deliberately false and misleading.  Defendants' representations of increased pro forma 2007 EPS of $1.40-$1.42 had no reasonable basis given the widespread internal control problems, inventory manipulations and incompatible software tracking systems, as confirmed by the SEC's enforcement action, the witnesses, and the Company's own admissions.  In fact, the inclusion of Lipman's in-house manufacturing did not expand gross margins in 2007, as Bergeron represented during the August 31, 2006 conference call.  After reporting a pro forma gross margin of 45.9% in 3Q06 and 47.1% in 4Q06, VeriFone's pro forma gross margin ***dropped*** rapidly as a direct result of the Lipman merger to 41.4% in 1Q07, 42.3% in 2Q07, 41.2% in 3Q07, 32.5% in 4Q07, 35.7% in 1Q08, 34.9% in 2Q08 and 37.6% in 3Q08.

301.  Finally, defendants' representations concerning the integration benefits of the Lipman merger, the "supply chain efficiencies," "integrated management team," and streamlined organizational structure and reporting relationships cannot be squared with the reports of witnesses

1    and admissions made in conjunction with the restatement.  Defendants later blamed the fraud on

2    "supply chain" issues and integration-related problems merging a foreign company thousands of

3    miles away, the very same issues they touted as "functioning very well" during the Class Period.

4    These facts, combined with the facts set forth in §VI.B.1-2 and defendants' massive and suspicious

5    insider selling and bonuses gives rise a strong inference of scienter.

6    **VII.    DEFENDANTS' INSIDER TRADING AND MOTIVE ALLEGATIONS**

7    **A.    The Amount, Timing and Coordination of Defendants' Sales of More
         than $465 Million in VeriFone Stock While Knowing of Periolat's
8        Accounting Manipulations and Reporting Financial Results that Were
         Overstated by as Much as 600% Reinforces a Strong Inference of
9        Scienter**

10   302.    At the time defendants made their 2006 false statements touting the Lipman merger

11   and issued the false 2007 financial results that overstated inventories by $77 million, net income by

12   over $70 million, GAAP earnings by 200%-600%, and gross margins by 500-800 basis points,

13   defendants suspiciously sold millions of VeriFone shares for proceeds of over ***$465 million***.   The

14   sales are summarized in the following chart, and the detailed sales information is attached as Ex. 4

15   hereto:

16

17

| Date Range | Insider | Shares Sold | Proceeds | Percentage of Shares Sold |
|---|---|---|---|---|
| August 31, 2006-<br>March 1, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 1,023,100<br>42,000<br>64,000<br>3,000,000 | $35,381,341<br>$1,473,784<br>$2,314,180<br>$107,340,000 | – |
| March 2, 2007-<br>May 29, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson | 409,535<br>54,000<br>46,000 | $15,122,616<br>$2,004,942<br>$1,699,920 | – |
| June 1, 2007-<br>September 6, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 433,700<br>54,000<br>35,800<br>3,500,000 | $15,510,188<br>$1,907,846<br>$1,243,290<br>$123,795,000 | – |
| September 7, 2007-<br>December 11, 2007 | 1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy | 600,000<br>72,000<br>35,000<br>3,300,000 | $25,957,657<br>$2,743,876<br>$1,507,760<br>$127,413,000 | – |
| **Subtotal** | **1. Bergeron<br>2. Zwarenstein<br>3. Atkinson<br>4. Bondy** | **2,466,335<br>222,000<br>180,800<br>9,800,000** | **$91,971,802<br>$8,130,447<br>$6,765,148<br>$358,548,000** | **61.93%<br>99.10%<br>97.31%<br>50.36%** |
| **Grand Total** | **–** | **12,669,135** | **$465,415,397** | **–** |

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

303.    A comparison of defendants' pre-Class Period sales is also summarized in the following chart:

| Defendant | Pre-Class Period Shares Sold | Pre-Class Period Proceeds | Class Period Shares Sold | Class Period Proceeds |
|---|---|---|---|---|
| Douglas G. Bergeron | 2,584,870 | $59,501,051 | *2,466,335* | *$91,971,802* |
| Barry Zwarenstein | 32,000 | $906,906 | *222,000* | *$8,130,447* |
| William G. Atkinson | 90,614 | $2,184,207 | *180,800* | *$6,765,148* |
| Craig A. Bondy | 18,896,399 | $350,060,309 | *9,800,000* | *$358,548,000* |
| **TOTALS** | 21,603,883 | $412,652,473 | *12,665,135* | *$465,415,397* |

**Defendant CEO/Chairman Bergeron:**

304.    During the Class Period, Bergeron sold over 2.4 million shares, or approximately *62%*, of his total VeriFone stock holdings (59.71% of stock plus vested options) for proceeds of nearly *$92 million*.  Conspicuously, $56.5 million of Bergeron's sales occurred *after* he learned of the "unmitigated disaster" in VeriFone's gross margins, *after* he told Periolat to "fix the problem" and after he was aware of Periolat's false accounting.  The sales also took place *after* March 1, 2007, the date on which VeriFone first announced its false financial results for 1Q07 and falsely touted the financial benefits of the first full quarter incorporating the Lipman results.  Bergeron also sold $25.9 million in stock after VeriFone announced its 3Q07 results on September 6, 2007, less than two months before admitting that VeriFone's earnings were overstated by 200%-600%.  Bergeron continued selling shares as late as November 26, 2007, only *one week before* defendants' sudden restatement disclosure, causing VeriFone's stock to crash 46% in a single day.

305.    The amount and proximity of Bergeron's insider selling to Periolat's accounting adjustments and Bergeron's false statements, and his continued selling up to a week before the stock collapsed, support a strong inference of scienter.  Unlike average investors who paid up to $50.00 per share during the Class Period for their shares, Bergeron only paid *$0.033* per share for the two million shares he sold at prices as high as $46.00 per share during the Class Period.  Thus, over 99% of the nearly $92 million received by Bergeron during the Class Period was pure profit.

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                                    - 108 -

306.     Bergeron's pre-Class Period sales reinforce the suspicious nature of his Class Period trades.  The majority of his pre-Class Period sales took place on September 23, 2005, the first day after the expiration of VeriFone's post IPO lock-up period.  On that date, Bergeron sold 1,873,636 shares for proceeds of $38,934,156.  These IPO-related sales constituted 72% of Bergeron's pre-Class Period stock sales and 65% of his pre-Class Period proceeds.  The IPO-related sales were an unusual one-time sale and outlier that had no bearing on Bergeron's selling trends prior to the Class Period.  In fact, following the one-time IPO lock-up sale, Bergeron's stock sales slowed significantly leading up to the Class Period.  Then, when Bergeron realized the Lipman merger was not as favorable as represented and VeriFone's margins were an "unmitigated disaster," Bergeron ramped up his sales to nearly $92 million during the Class Period, including $25.9 million **after** VeriFone issued its false 3Q07 results, only two months before the restatement was announced.  Bergeron's detailed trading history is set forth in Ex. 4.  A comparison of his non-IPO-related prior trading history to his Class Period sales is illustrated below:

### CEO Bergeron's Sales: Pre-Class & Class Period
VeriFone, Inc.




Charts exclude IPO-related trades.

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

**Defendant CFO Zwarenstein**

307.    During the Class Period, Zwarenstein sold 222,000 shares of his VeriFone stock for proceeds of *$8.1 million*.  Zwarenstein's sales constituted *99%* of his total shares (55.44% of stock plus vested options).  Notably, Zwarenstein sold hundreds of thousands of shares for prices as high as $46.00 per share that were acquired through stock options at prices as low as *$3.28* per share.  Zwarenstein sold over 80% of his Class Period sales *after* e-mailing that VeriFone's margins were an "unmitigated disaster" and *after* he learned of Periolat's accounting adjustments.  Further, Zwarenstein sold $2.74 million of his VeriFone shares *after* he certified VeriFone's false 3Q07 results on September 6, 2007, the quarter in which earnings were overstated by 600%.

308.    Unlike class members, Zwarenstein paid artificially low prices for his stock, including thousands of Restricted Stock Units ("RSUs") that he received for free.  For example, the 222,000 shares Zwarenstein sold during the Class Period at prices as high as $46.00 per share included 8,837 RSUs that cost absolutely nothing and 151,748 shares of stock acquired via stock options at an average price of $4.38 (exercise prices were $3.28 and $10.00).  As a result, Zwarenstein's profit was $4,955,974, more than seven times his $664,656 acquisition cost.

309.    Moreover, the Form 4s submitted by Zwarenstein establish that he suspiciously amended his 10b5-1 trading plan during the Class Period.  Pursuant to his original September 30, 2005 10b5-1 trading plan, Zwarenstein sold an average of 4,000 shares per month between December 2005 and January 2007.  After amending his plan on December 10, 2006, Zwarenstein drastically increased his sales to 18,000 shares per month from February 2007 to December 2007.  This is illustrated below:

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    310.    Zwarenstein's pre-Class Period sales reinforce the suspicious nature of his Class

17 Period trades.  Prior to the Class Period, Zwarenstein only sold 32,000 shares of VeriFone stock for

18 $906,906 in proceeds.  He then increased his sales by **600%** and sold 222,000 shares for $8.1 million

19 while in possession of material adverse information.  Thus, his Class Period sales were dramatically

20 out of line with prior sales.  Zwarenstein's detailed VeriFone trading history is set forth in Ex. 4

21 hereto.  A comparison of Zwarenstein's pre-Class Period stock sales with his Class Period sales is

22 illustrated below:

23

24

25

26

27

28



**CFO Zwarenstein's Sales: Pre-Class & Class Period**
VeriFone, Inc.

**Former EVP Defendant Atkinson**

311.    During the Class Period, defendant and EVP Atkinson sold over 180,800 shares, or over **97%**, of his total VeriFone holdings for proceeds of over **$6.76 million**.  Atkinson was substantially involved in the Lipman merger, at one point bragging to investors on September 6, 2006 that VeriFone and Lipman "**will begin Day 1, completely integrated.  We are locked and loaded**."  As the witnesses and defendants' admissions confirmed, the integration was anything but complete.

312.    Notably, Atkinson sold $4.45 million of his VeriFone shares **after** VeriFone announced its false results for 1Q07, the first quarter in which Lipman's results were consolidated with VeriFone as a combined entity.  Atkinson acquired 47,750 of the shares he sold via options with exercise prices of $3.05 and $10.00 for an average cost of $6.36.  Another 3,125 of the shares he

1  sold were RSUs that cost nothing.  The remaining 87,313 shares were acquired at a substantially

2  reduced price before the Company's IPO.

3      313.    Atkinson's pre-Class Period sales reinforce the suspicious nature of his Class Period

4  trades.  Prior to the Class Period, Atkinson only sold 90,614 shares of VeriFone stock for $2,184,207

5  in proceeds.  The 180,800 shares sold by Atkinson during the Class Period was nearly double the

6  90,614 shares he sold before the Class Period.  Further, the majority of Atkinson's pre-Class Period

7  sales was a unique one-time sale on September 23, 2005, the first day after the expiration of

8  VeriFone's post IPO lock up period.  On that date, Atkinson sold 50,614 shares for proceeds of

9  $1,051,759.  A comparison of Atkinson's non-IPO-related stock sales is illustrated below:



314.    Further, like Zwarenstein, Atkinson modified his 10b5-1 trading plan and then

substantially increased his sales.  Atkinson sold 60,000 shares in 2006 (5,000 shares in each month)

and then modified his 10b5-1 trading plan on January 22, 2007 and *tripled* the number of shares

1   sold.  He sold 18,000 shares per month from January 2007 through July 2007, and 35,000 shares in

2   September 2007.  This is illustrated below:



**EVP Atkinson's Monthly Insider Sales**
September 2006 to September 2007

19   Accordingly, Atkinson's Class Period stock sales were inconsistent with his usual trading patterns

20   and are consistent with his knowledge of adverse non-public information regarding the disastrous

21   financial and operational problems arising from the Lipman merger.

22   315.    As a senior officer at the Company who made misleading statements regarding the

23   Lipman merger and received extra bonuses and stock awards for his participation in the merger, a

24   strong inference arises that Atkinson was aware of VeriFone's internal control problems and its

25   grossly distorted gross margin and EPS results.  His suspicious termination during the middle of the

26   Class Period and his sale of 97% of his VeriFone shares supports the inference of knowledge of

27   undisclosed adverse facts regarding VeriFone's financial condition.  Atkinson's detailed trading

28   history is set forth in Ex. 4 hereto.

**Former Director Defendant Bondy**

316.     During the Class Period, VeriFone director Bondy unloaded **9.8 million shares** of VeriFone stock for proceeds of over **$358 million**. Millions of shares were sold indirectly through Bondy's private equity/hedge fund partnership, GTCR, and its related entities which were run by Bondy and two other VeriFone directors. According to VeriFone's 2006 Proxy Statement, the GTCR entities are related through a cryptic labyrinth of partnership agreements as follows: "GTCR Golder Rauner, L.L.C. is the **general partner of the general partner** of GTCR Fund VII, L.P., **the general partner of the general partner of the general partner** of GTCR Capital Partners, L.P., and the **general partner** of GTCR Co-Invest, L.P. GTCR Golder Rauner, L.L.C."

317.     Bondy and GTCR were principal architects of the spinoff and recapitalization of VeriFone from Hewlett-Packard in 2002 and later took an equity stake and Board positions at the Company, which continued through the Company's IPO in 2005. Following the Company's IPO, Bondy and GTCR became VeriFone's largest shareholder. Bondy is a principal of GTCR and was expressly listed as a beneficial owner of all GTCR controlled VeriFone stock in each of the Company's Class-Period proxy statements. As such, Bondy repeatedly filed Form 4s disclosing that he was selling VeriFone stock. Notably, Bondy's conditional disclaimer of beneficial ownership of GTCR controlled VeriFone stock expressly reserved "*his pecuniary interest*" in all of the shares traded by GTCR during the Class Period. Bondy's Class Period sales represented over 50% of the VeriFone shares he owned. Just a few months before the Company disclosed its accounting manipulations, Bondy inexplicably (and conveniently) resigned on October 1, 2007.

318.     Bondy's pre-Class Period sales reinforce the suspicious nature of his Class Period trades. Although Bondy sold 18,896,399 shares of VeriFone stock for $350,060,309 prior to the Class Period, the overwhelming majority (13.39 million shares; $208.7 million in proceeds) of those sales took place between May 4, 2005 (the date VeriFone's underwriters including GTCR exercised the over-allotment of 2.31 million shares from selling stockholders) and September 23, 2005, the date on which VeriFone's post-IPO lock up expired. As a result, absent Bondy's unique one-time IPO-related stock sales, Bondy's Class Period trading history demonstrates an inconsistency with his

usual trading patterns.  This comparison is illustrated in the chart below and in the detailed chart of Bondy's trades included in Ex. 4:

### Director Bondy's Sales: Pre-Class & Class Period
VeriFone, Inc.



Charts exclude IPO-related trades.

319.    The facts set forth above also give rise to a strong inference that defendant Bondy was in possession of material adverse nonpublic information concerning VeriFone's financial condition, the problems with the Lipman merger and VeriFone's lack of internal controls at the time he traded. As set forth in ¶¶47-48, *supra*, Bondy was intimately involved with and aware of VeriFone's business dealings and operations since it was spun off from Hewlett-Packard in 2002.  Bondy held key positions on VeriFone Board committees and met frequently on corporate governance issues related to VeriFone's internal controls.  His partners at GTCR were also Board members of the Company, and, as the Company's largest shareholder, Bondy and GTCR were familiar with VeriFone's business and governance practices.  Bondy's suspicious resignation from the Board while selling $358.5 million in VeriFone stock supports an inference of his scienter.

## B. Defendants' Compensation and Bonuses Were Tied Directly to VeriFone's Earnings Targets

320.    In addition to the massive $465 million in insider sales, defendants were also motivated to keep VeriFone's gross margins, earnings and stock price inflated during the Class Period to reap millions of dollars in bonuses, incentives and stock option grants, all of which were contingent on VeriFone maintaining its artificially inflated stock price and earnings targets in 2006 and 2007.

### Defendant Bergeron

321.    In addition to Bergeron's nearly $92 million in illicit stock sales during the Class Period, he also received millions of dollars in bonuses and stock option grants arising from VeriFone's inflated earnings and stock price during the Class Period.  In 2006, Bergeron received a base salary of $600,000 and ***$1.5 million*** in cash bonuses.  These bonuses were 200% of Bergeron's stated "target bonus" of $750,000 and were directly tied to VeriFone's 2006 earnings and stock price performance.  The Company expressly stated that "[b]ased on ***VeriFone's performance during fiscal 2006***, the Compensation Committee, in its discretion, determined that for fiscal 2006 Mr. Bergeron should receive an annual bonus of 200% of his target bonus."  Bergeron was also given an additional ***$1.1 million*** in new restricted stock awards during 2006 and 225,000 stock options with a stated potential realizable value of more than $6 million.

322.    On January 4, 2007, Bergeron and VeriFone entered into an "amended and restated" employment contract, which raised his 2007 base salary to $700,000, plus a target cash bonus of $900,000 with a potential of $1.8 million if certain performance metrics were met.  Additionally, Bergeron was given ***900,000 restricted stock units*** over a three-year period "based upon ***growth in our net income per share*** as adjusted and if ***certain improvements to our share price are achieved***."  For 2007, Bergeron's amended and restated employment contract stated that 200,000 restricted stock units would vest if the Company "report[s] improvements in ***net income***, as adjusted, per share that ***exceed management's current expectations***."

323.    In the 2008 Proxy Statement, VeriFone provided additional detail on the metrics used to determine the vesting of Bergeron's 900,000 restricted stock shares: "For fiscal year 2007, vesting

of 200,000 RSUs [Restricted Stock Units] required that we report net income, as adjusted, per share of *$1.60, which exceeded management's guidance* for fiscal year 2007 at the date of the agreement." On September 6, 2007, when VeriFone reported its false 3Q07 financials, Bergeron stated that the Company was increasing FY07 pro forma EPS expectations to *$1.59-$1.60, the precise number Bergeron needed to trigger the vesting of an additional 200,000 restricted stock shares*. This fact clearly demonstrates Bergeron's motive for directing Periolat to "fix the problem" and inflate VeriFone's gross margins and EPS results in 2007.

324.   Bergeron was also motivated to inflate VeriFone's earnings and stock price because he received "substantial equity" in VeriFone when it was spun off from Hewlett-Packard, and that equity did not become fully vested until the *end of 3Q07*.  In the Company's 2008 Proxy Statement, VeriFone noted that the Compensation Committee undertook a "review" of Bergeron's compensation in 2007 and the "*substantial equity* that Mr. Bergeron had acquired in 2002 in connection with [VeriFone's] investment and recapitalization led by Mr. Bergeron and GTCR Golder Rauner and that the portion of the equity acquired in 2002 that was subject to vesting conditions would *become fully vested by the end of the third quarter of fiscal year 2007*."

325.   Accordingly, Bergeron had powerful personal financial motives to keep VeriFone's net income, gross margin earnings and stock price inflated until the *end of 3Q07*, before the stock price came crashing down.  Bergeron received millions of dollars in concrete benefits as a direct result of defendants' accounting manipulations and the resulting artificial increase in VeriFone's stock price.  When combined with Bergeron's massive $92 million in insider sales, Bergeron's stock grants and bonuses provided a powerful incentive to report false financial results that "exceed[ed] management's current expectations" for VeriFone's earnings and stock price.

**Defendant Zwarenstein**

326.   In addition to Zwarenstein's $8.1 million in stock sales during the Class Period, he also received millions of dollars in bonuses and stock option grants directly correlated to VeriFone's inflated earnings and stock price.  In 2006, Zwarenstein received a base salary of $319,000 and a cash bonus of $250,000.  Zwarenstein also received over *$1.38 million* in restricted stock awards during 2006, including 10,000 restricted stock units granted in March 2006, and a special Lipman

bonus award of 40,000 additional restricted stock units in September 2006 "*in recognition of [his] efforts on the Lipman acquisition*."

327.   On March 22, 2007, the "first anniversary" and vesting date of 2,500 shares, or 25%, of Zwarenstein's March 2006 stock grants, VeriFone's shares were trading at $37.60, or a 30% premium above the price that Zwarenstein received for the stock grant.  On September 12, 2007, the "first anniversary" and vesting day of 10,000 shares, or 25%, of Zwarenstein's September 2007 restricted grants, VeriFone's stock was trading at $39.85, or more than 43% above the grant price of Zwarenstein's September 2007 stock awards.

328.   In 2007, Zwarenstein's salary was raised from $320,000 to $400,000.  The Proxy Statement noted the following:

> In the case of Mr. Zwarenstein, the Compensation Committee noted his work in ***building out our financial and accounting infrastructure***.  In addition, the Compensation Committee considered the increased job responsibilities that Mr. Zwarenstein undertook in our business and corporate development.  In particular, the Compensation Committee noted that ***Mr. Zwarenstein's efforts were instrumental towards our successful completion of the acquisition of Lipman*** in the prior fiscal year and that his base salary should be adjusted accordingly.

329.   In short, Zwarenstein had powerful and concrete financial motives to keep VeriFone's results artificially inflated as long as possible to accumulate insider-trading profits, stock grants and higher salary and bonuses.  After Zwarenstein sold 99% of his stock, VeriFone's stock price collapsed.

330.   VeriFone later announced that Zwarenstein was "resigning" in connection with the Company's restatement.  In a footnote to VeriFone's 2008 Proxy Statement, the Company disclosed that Zwarenstein was "terminated" by the Company.   He was also forced to "reimburse" the Company for $150,000 in cash bonuses received in 2007 because VeriFone's "restated results did not achieve the quarterly bonus targets" – a small price to pay after misleading investors, directing an accounting fraud and walking away with $8.1 million.

**Defendant Atkinson**

331.   Former EVP Atkinson received concrete benefits as a result of VeriFone's inflated earnings and stock price.  Atkinson's base salary in 2006 was $300,000, and he received a cash bonus of nearly $225,000.  Like Zwarenstein, Atkinson was awarded $1.38 million in restricted

1  stock awards in 2006, comprised of 50,000 restricted stock shares, 10,000 of which were granted in

2  March 2006, and 40,000 issued in September 2006.  Also, like Zwarenstein, the 40,000-share grant

3  issued to Atkinson in September 2006 was "*in recognition of [his] efforts on the Lipman*

4  *acquisition*."   The vesting schedules for Atkinson's restricted stock awards were the same as

5  Zwarenstein's, allowing 2,500 shares to fully vest on March 22, 2007 and 10,000 shares to vest on

6  September 12, 2007.  According to VeriFone's 2007 Proxy Statement, Atkinson's "performance-

7  based goals were based on (A) the amount contributed by their respective business unit to our

8  operating income for the quarter and (B) the *gross margin achieved by their respective business*

9  *unit for the quarter*."  Thus, Atkinson paid close attention to the Company's gross margin results.

10      332.    In 2007, Atkinson's base salary was increased from $300,000 to $348,120.  VeriFone

11  stated that the 33% raise "was appropriate in light of our strong performance in international and

12  emerging markets."  Atkinson was then suddenly fired on July 18, 2007.  His punishment: $6.76

13  million in illicit insider-trading proceeds and more than a quarter of a million dollars in cash

14  bonuses.

15  **VIII.    VERIFONE ANNOUNCES A MASSIVE RESTATEMENT AND ADMITS
         ITS PRIOR STATEMENTS WERE MATERIALLY FALSE CAUSING A**
16  **46% STOCK PRICE DECLINE IN A SINGLE TRADING DAY**

17      333.    As late as November 30, 2007, four days before VeriFone announced its restatement,

18  analysts were still repeating the false statements made by defendants and touting the Company's

19  gross margins and earnings potential for 4Q07.  Defendants had conditioned analysts and investors

20  to believe that the artificial increase in gross margins was real, sustainable and based on legitimate

21  business practices, all of which were untrue.

22      334.    In a November 30, 2007 Wachovia report, analysts stated:

23      We believe adjusted gross margin could come in above our 48.3% estimate as PAY
        (1) continues to leverage its larger purchasing power and in-house manufacturing
24      capabilities with its contract manufactures and (2) benefits from higher wireless sales
        in high market share regions.  In addition, we believe operating leverage, slightly
25      lower interest expense than modeled, and mostly lower taxes could also provide a lift
        to cash EPS.
26

27      335.    In a November 30, 2007 Wedbush Morgan Securities, Inc. ("Wedbush") report,

28  analysts continued to rely upon defendants' earlier false representations:

**Margins positioned for continued expansion.** VeriFone continues to maintain its dominant unit share position in the highest gross margin U.S. market, and wireless terminals, its highest gross margin products, continue to garner a greater mix of overall company sales.  Combined with more operating leverage, we believe VeriFone is well positioned to see margins expand towards the high end of recently increased long-term targets of 45-50% gross and 25-30% EBITDA margins.

336.    On December 3, 2007, VeriFone stunned investors and analysts by abruptly issuing a press release announcing that it would be drastically restating its financial results for 1Q07, 2Q07 and 3Q07 and that it would not complete the restatement until January 2008.  In response, the Company's stock price crashed *46%* from $48.03 on November 30, 2007, to $26.03 on December 3, 2007, compared to a 0.6% decline in both the S&P 500 and VeriFone's peer group.[12]  The stock price declined another *22.4%* from December 3, 2007 to December 6, 2007, compared to a 2.5% increase in the peer group.  Despite the immediate 46% stock price decline on the adverse news of the accounting misconduct, VeriFone's stock price remained partially inflated because the full details, extent and economic consequences of the restatement were not yet clear to investors.

337.    On December 31, 2007, VeriFone announced that it was delaying the reporting of its final restated financial results.  The Company stated that it had disclosed to the SEC that it was extending the time of filing of its Form 10-K to January 14, 2008, but stated that "it does not expect that it will complete this process and make the required filings prior to March 2008."  On this news, VeriFone's stock declined another *15%* from $23.75 on December 31, 2007 on the news, to $19.81 on January 2, 2008, compared to a 1.4% decline in the S&P 500 and a 3% decline in the peer group.

338.    On March 6, 2008, VeriFone unexpectedly canceled an April appearance at the SunTrust annual institutional investors conference.  VeriFone's stock price declined another *21%* from $19.64 on March 5, 2008 to $15.45 on March 6, 2008, compared to a 2.2% decline in the S&P 500 and a 1.8% decline in the peer group.  Bloomberg reported the news and quoted one Wall Street analyst as stating: "The cancellation suggests VeriFone will again delay issuing its restated results for the first three quarters of 2007, which had been promised this month . . . .  'There is some

---

[12]    The peer group index is the same index VeriFone compared its stock price to in its 2007 Proxy Statement and includes Hypercom Corporation, Igenico S.A., IBM, MICROS Systems, Inc. NCR Corporation and Radiant Systems, Inc.

1   concern about the timing of when they'll be done with internal accounting.'"  The analyst did not

2   recommend buying VeriFone stock because "'there is a still a risk that there are more mistakes and

3   accounting issues.'"  Thus, the full extent and economic consequences of defendants' misconduct

4   was still not fully revealed and VeriFone's stock price remaining partially inflated.

5        339.   On April 1, 2008, VeriFone revealed that the restatement would be much worse than

6   initially reported and that CFO Zwarenstein had "resigned."  In response to this new adverse

7   information, the Company's stock price declined another *19%* from $16.83 on April 1, 2008 to

8   $13.64 on April 1, 2008, compared to a 0.2% decline in the S&P 500 and a 0.3% decline in the peer

9   group.

10        340.   Investors and analysts were incensed about the news of a larger restatement and

11   ousting of CFO Zwarenstein and openly questioned the integrity of VeriFone's management.  In a

12   report issued on April 3, 2008, entitled "Update Worse than Expected; Outlook Remains Vague,"

13   Wedbush analyst Gil B. Luria stated:

14        ***Results of internal investigation indicate more than a simple mistake***.  We believe

15        the significant reorganization, the stepping down of the CFO, the CEO relinquishing the Chairman position, and the inclusion of the SEC ***point to more than the simple clerical error the company previously indicated***.

16

17        341.   Wachovia analyst Perlin issued a report on April 4, 2008, openly ridiculing the lack

18   of clarity in VeriFone's disclosures and concluding that management's representations "creat[e]

19   more questions than answers":

20        **Independent Investigation Complete; Now in the Hands of Government**.  ***PAY announced yesterday that it had completed the independent investigation*** into its accounting and although ***the release was anything but conclusive***, the company did

21        provide some insight into what's to come. . . .

22        **Business Update Creates More Questions than Answers**.  Two key points came out of the business update including (1) ***4Q07 gross margins are expected to be in***

23        ***the range of 32%-34%*** (including a charge, which was not disclosed) and (2) challenging net revenue growth in 1Q08.  ***So rather than provide more clarity***

24        ***around these two points the company just left them out there with no additional color***.

25        342.   On April 30, 2008, VeriFone filed a Form 8-K with the SEC stating that it would not

26   meet its previous deadline for filing restated financial results.  It also announced that it was forced to

27   amend its credit agreements with its lenders because of the accounting misconduct and delay in

28

filing of financial statements.  Because of defendants' fraud and delays in financial reporting, the Company was forced to agree to pay an extra 0.25% "lenders fee" and an extra 0.75% interest per year on its outstanding debt, and 0.125% per annum for the commitment fee for unused revolving commitments.

343.    On this news, Merrill Lynch cut VeriFone's earnings targets for 2008 and 2009 and stated "***[t]he lack of visibility into future results and potential collateral damage arising from the accounting issues keeps us a 'Neutral' rating as we continue to see a balance risk/reward at current levels***."

344.    On May 14, 2008, *The Financial Times* published an article entitled "***Fidelity Slashes VeriFone Stake***."  The article stated:  "Some institutional investors are fed up with [VeriFone] even though its share has begun to recover from the collapse that followed the company's announcement that it will restate revenue for the past few years.  VeriFone yesterday notified the [SEC] that Fidelity Management & Research Company is no longer a party at interest in the company after selling shares."

## IX.    VERIFONE'S GAAP VIOLATIONS

345.    Defendants' accounting improprieties violated GAAP and SEC rules.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. §210.10-01(a).

**VeriFone Overstated Inventory and Understated Cost of Sales**

346.   Among other improprieties during the Class Period, VeriFone overstated its inventory and understated its cost[13] of sales expense, resulting in inflated gross profits and net earnings. VeriFone primarily accomplished this in at least six ways.

347.   ***First***, defendants admitted that in 2Q07 and 3Q07 VeriFone improperly recorded millions of dollars of intercompany "in-transit inventory" that simply did not exist.  The facts set forth in the SEC Complaint establish that the GAAP violations were deliberate.  §VI.B.1.  VeriFone also admitted in its restated SEC filings that the non-existent inventory was "originally recorded based upon erroneous methodology and application of source documents."  By doing so, defendants violated GAAP, which requires that information be relevant and reliable and that there be correspondence or agreement between a measure and the phenomenon it purports to represent.  *See* Statement of Financial Accounting Concepts ("SFAC") No. 2, ¶¶58-59, 63.  The improper accounting also violated ARB No. 43, Chapter 4, Statement 3, which states that "the primary basis of accounting for inventories is cost," which is zero for nonexistent inventory.  The violation of these basic concepts resulted in an understatement of total cost of net revenues of $11.5 million and $8.4 million in 2Q07 and 3Q07, respectively, and an overstatement of inventory of $12.7 million and $20.1 million in 2Q07 and 3Q07, respectively.

348.   ***Second***, in order to overstate gross margins and inventory and understate cost of revenues expense, defendants improperly double booked manufacturing and distribution overhead costs to inventory at former Lipman subsidiaries by making identical manual journal entries for (a) in-transit inventories; and (b) direct shipments when the entries should not have been made for the direct shipments.  The SEC Complaint confirms that the goods were never even shipped.  §VI.B.1.  This improper accounting violated GAAP, which requires that information be relevant and reliable and that there be correspondence or agreement between a measure and the phenomenon it

---

[13]     As applied to inventories, cost is the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an item to its existing condition and location, as defined by Accounting Research Bulletin ("ARB") No. 43, Chapter 4, Statement 3.

1   purports to represent.  *See* SFAC No. 2, ¶¶58-59, 63.  The improper accounting also violated ARB

2   No. 43, Chapter 4, Statement 3, which states that inventories are to be stated at cost, which means

3   acquisition and production costs.   The violation of these simple concepts resulted in the

4   understatement of total cost of net revenues of $7.7 million and $2.8 million in 1Q07 and 3Q07,

5   respectively, and the overstatement of inventory of $7.7 million, $7.7 million and $10.5 million in

6   1Q07, 2Q07 and 3Q07, respectively.

7   349.   ***Third***, in order to overstate gross margins and inventory and understate cost of goods

8   sold, defendants improperly failed to account for its intercompany transactions appropriately, such as

9   by failing to eliminate intercompany profit in inventory.   These false intercompany transactions

10  violated GAAP, which states, "Where combined statements are prepared for a group of related

11  companies, such as a group of unconsolidated subsidiaries or a group of commonly controlled

12  companies, intercompany transactions and profits or losses should be eliminated." *See* ARB No. 51,

13  *Consolidated Financial Statements*, ¶23.  As admitted in the restated SEC filings, this GAAP

14  violation resulted in the understatement of total cost of net revenues of approximately $900,000, $3.5

15  million and $2.4 million in 1Q07, 2Q07 and 3Q07, respectively; and the overstatement of inventory

16  of approximately $3.2 million, $3.4 million and $7.4 million in 1Q07, 2Q07 and 3Q07, respectively.

17  350.   ***Fourth***, in order to overstate inventory and gross margins and/or understate cost of

18  goods sold, VeriFone improperly capitalized certain additional overhead into inventory in violation

19  of GAAP, specifically, ARB No. 43, Chapter 4, Statement 3.  As admitted in the restated SEC

20  filings, this resulted in the understatement of total cost of goods sold by $800,000 and $2.1 million in

21  2Q07 and 3Q07, respectively, and the overstatement of inventory of $2.4 million in 3Q07.

22  351.   ***Fifth***, in order to inflate gross margins and inventory and understate total cost of

23  goods sold by $600,000 in 3Q07, defendants failed to write off excess and obsolete inventory in

24  violation of GAAP.  GAAP requires excess and obsolete inventory to be written down as a charge

25  against income in the period in which it occurs.  *See* ARB No. 43, Chapter 4, Statement 5.  In fact,

26  throughout the Class Period, VeriFone falsely stated in its Form 10-K and in all its Forms 10-Q that

27  its policy was to "review the adequacy of [its] inventories valuation on a quarterly basis" and that

28  "inventories are stated at the lower of standard cost or market."  Defendants represented that "the

1   Company regularly monitors inventory quantities on hand and ***records write-downs for excess and***

2   ***obsolete inventories***."  By failing to write down the value of excess and obsolete inventory in a

3   timely fashion, defendants knew or recklessly disregarded that VeriFone violated GAAP and its own

4   stated policy, resulting in an overstated gross margin and understated loss in 3Q07.

5        352.   ***Sixth***, in order to overstate gross margins and inventory and understate cost of goods

6   sold expense in 1Q07, VeriFone delayed taking a necessary charge to decrease inventory at former

7   Lipman entities until a subsequent quarter.  Defendants delayed a $2.2 million charge for a change in

8   inventories at former Lipman entities due to inventory cost standards revaluation in conjunction with

9   the Lipman acquisition, which should have been recorded in 1Q07, and improperly recorded it in

10  2Q07.  Defendants admitted that this GAAP violation resulted in the understatement of total cost of

11  goods sold of $2.2 million, an overstatement of inventory of $2.2 million in 1Q07 and a

12  corresponding overstatement of total cost of goods sold by $2.2 million in 2Q07.

13       353.   As a result of the numerous accounting manipulations, only a portion of the true cost

14  of manufacturing and distribution was recognized as an expense, and the remaining costs were

15  inappropriately buried in the inventory balance on VeriFone's books.[14]  This resulted in the

16  understatement of the total cost of goods sold recorded on the Company's Income Statement and the

17  overstatement of inventory on the Balance Sheet, resulting in materially false financial statements in

18  1Q07-3Q07.  *See* table, ¶80 above.

19  **Defendants' Violations of Internal Control Provisions**

20       354.   Internal control[15] is a process, carried out by an entity's board of directors,

21  management and other personnel, designed to provide reasonable assurance that, among other things,

22

23

---

24  [14]   ARB No. 43, Chapter 4, ¶4 states, "In accounting for the goods in the inventory at any point
    of time, the major objective is the matching of appropriate costs against revenues in order that there
25  may be proper determination of the realized income.  Thus, the inventory at any given date is the
    balance of costs applicable to goods on hand remaining after the matching of absorbed costs with
26  concurrent revenues."

27  [15]   AU 319.06, *Internal Control in a Financial Statement Audit*, defines internal control as "a
    process – effected by an entity's board of directors, management, and other personnel – designed to
28  provide reasonable assurance regarding the achievement of objectives in the following categories:

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 126 -

1  the financial statements are reliable and accurate and that a company complies with applicable laws

2  and regulations.  Management is responsible for establishing and maintaining adequate internal

3  control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the 1934 Act.[16]

4       355.   VeriFone has admitted that its independent auditor and the investigation

5  commissioned by the Audit Committee concluded there were significant control deficiencies that

6  constituted material weaknesses[17] in the Company's control environment, specifically related to the

7  following: internal controls over the process for preparation, review approval and entry of manual,

8  nonstandard journal entries; maintaining sufficient qualified accounting and finance personnel; the

9  supervision, monitoring and monthly financial statement review processes; and the identification,

10  documentation and review of various income tax calculations, reconciliations and related supporting

11  documentation.  *See* Item 8, Report of Independent Registered Public Accounting Firm, in the Form

12  10-K for the fiscal year ended October 31, 2007, filed August 19, 2008.  Moreover, VeriFone

13  disclosed in its 1Q07 10-Q/A, 2Q07 10-Q/A, 3Q07 10-Q/A and FY07 10-K, all filed on August 19,

14  2008, that it has been forced to implement no less than six remediation initiatives to bring internal

15  controls to an adequate level.

16       356.   Throughout the Class Period, defendants were aware of the numerous control

17  deficiencies.  Defendants knew manual journal entries were submitted to the Company headquarters

18  in San Jose for review by defendant Zwarenstein's group and that the accounting department which

---

20  (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations.

21  [16]     Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP]."  These provisions require an issuer to employ and supervise reliable personnel, maintain reasonable assurances that transactions are executed as authorized, properly record transactions on an issuer's books and, at reasonable intervals, compare accounting records with physical assets.

26  [17]     AU 325.06, *Communicating Internal Control Related Matters Identified in an Audit*, defines a material weakness as "a significant deficiency, or a combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected."

1   was headed by defendant Zwarenstein was disorganized, understaffed, overworked and plagued by

2   high levels of attrition and turnover.  Defendants also knew that there were problems with the

3   integration of the Lipman acquisition, including the inability to obtain necessary accounting

4   information from Lipman to close the Company's books at the end of each quarter.  Defendants

5   knew that Lipman and VeriFone were using different, incompatible ERP systems.  Defendants

6   exploited this known lack of internal controls to falsify the Company's financial results.  The SEC

7   charged Periolat with "***knowingly*** circumventing a system of internal accounting controls."  Ex. 2,

8   ¶37.  Despite this knowledge, VeriFone did not comply with the following requirements for internal

9   control over financial reporting: Rules 13a-15(f) and 15d-15(f) under the 1934 Act, §§302, 404 and

10   906 of Sarbanes-Oxley, and Item 308 of Regulation S-K.  These require management certifications

11   or reports regarding the Company's internal controls and/or the fair presentation of the financial

12   statements.  During FY07, defendants provided false certifications and violated the requirements for

13   internal control over financial reporting including the following:

14            (a)     VeriFone's Forms 10-Q contained certifications required by Rule 13a-14(a) of

15   the 1934 Act.  The certifications for the periods ended January 31, 2007, April 30, 2007 and July 31,

16   2007 were signed by Bergeron and Zwarenstein.  The certifications signed by Bergeron and

17   Zwarenstein knowingly or recklessly were false or misleading given defendants' later admissions

18   about VeriFone's financial reports and internal controls;

19            (b)     Defendants failed to establish and maintain an adequate system of internal

20   controls and failed to regularly evaluate the status of those controls or the lack thereof;

21            (c)     Defendants did not maintain effective entity-level control; and

22            (d)     Defendants did not maintain effective process and transaction level controls.

23        357.    VeriFone's failure to strengthen its known inadequate internal controls rendered

24   VeriFone's financial reporting inherently unreliable and contributed to the Company's inability to

25   prepare financial statements that complied with GAAP.  Throughout the Class Period, the Company

26   regularly issued quarterly and annual financial statements without ever disclosing the known

27   existence of the significant and material deficiencies in its internal accounting controls and falsely

28   asserted that its financial statements complied with GAAP.

**Other GAAP Violations**

358.   In addition to the GAAP and SEC violations described above, the Company also violated the following fundamental GAAP principles relating to financial reporting requirements: APB No. 28, ¶10; SFAC No. 1, ¶¶34, 40, 42, 50; and SFAC No. 2, ¶¶58-59, 79, 95, 97.

359.   Defendant Zwarenstein also admitted in the December 3, 2007 conference call that the Company violated SFAS No. 86, *Accounting for the Costs of Computer Software to Be Sold, Leased, or Otherwise Marketed*.

360.   Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**X.    LOSS CAUSATION**

361.   As detailed above, defendants' financial misconduct, false representations and omissions of material facts caused VeriFone's stock to trade at artificially inflated prices and operated as a fraud and deceit on Class Period purchasers of VeriFone securities.  From August 31, 2006 to October 31, 2007, VeriFone's stock price more than doubled from $23.15 to $50.00 and continued to trade at inflated prices above $43.00 per share until VeriFone began to reveal adverse facts concerning its financial condition and the impact of defendants' misconduct.  As a result, VeriFone's stock price declined more than 75% from its Class Period high as the artificial inflation was removed from the Company's stock price.  Class members who purchased VeriFone stock during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

362.   On August 31, 2006, VeriFone announced 3Q06 results and Bergeron and Zwarenstein told investors the Lipman acquisition would improve gross margins and result in immediate accretion to FY07 earnings.  On the news, the Company's stock price increased 23% compared to a 0.55% increase in the S&P 500 and a 0.1% increase in the peer group.

363.   On December 7, 2006, VeriFone  reported 4Q06 results, and Bergeron and Zwarenstein again told investors gross margins and EPS would increase in FY07.  The Company's

1    stock price increased 5% on the news, compared to a 0.18% increase in the S&P 500 and a 0.24%

2    decline in the peer group.

3       364.    On March 1, 2007, after VeriFone's stock price had already been inflated from

4    $23.15 on the first day of the Class Period to over $39 per share, VeriFone announced 1Q07 results.

5    Although its stock price stayed relatively flat, declining only $0.26 or 0.2%, it was significantly

6    better than the 1.1% decline in the S&P 500 and the 2.4% decline in the peer group. On May 26,

7    2007, VeriFone reported false 2Q07 results and lower-than-expected revenue. Although the

8    Company's stock price declined 6.1% compared to a 0.8% increase in the S&P 500 and a 0.4%

9    decline in the peer group, it still traded at artificially inflated prices because the market was unaware

10    that VeriFone's results, although light on revenue, were drastically overstated by 200% in earnings

11    and millions in gross margins due to deliberate accounting manipulations. Had investors known the

12    truth, the stock-price decline would have been far worse.

13       365.    After VeriFone reported fictitious 3Q07 results on September 6, 2007, the Company's

14    stock price increased 6% compared to a 1.7% decline in the S&P 500 and a 1.3% decline in the peer

15    group. The stock price continued to maintain its artificial inflation, reaching a Class Period high of

16    $50.00 per share on October 31, 2007, and closed at $48.03 on November 30, 2007, the last trading

17    day before VeriFone announced the restatement.

18       366.    The artificial inflation in VeriFone's stock price began to be removed following

19    several partial disclosures of adverse facts relating to defendants' misconduct on the following dates:

20    December 3-6, 2007, December 31, 2007, March 6, 2008 and April 1, 2008. Each partial disclosure

21    revealed bits and pieces of the previously concealed information and partial but incomplete

22    information about the economic consequences of defendant's misconduct on VeriFone's current

23    financial condition and the Company's future results. The partial disclosures caused VeriFone's

24    stock price to decline significantly more than the changes in the peer group and the S&P 500. As a

25    result, the price declines following the partial disclosures provide a measurement of class members'

26    economic losses.

27       367.    Defendants' first partial disclosure of adverse facts concerning defendants'

28    accounting violations occurred on December 3, 2007, when defendants first announced the need to

1  restate VeriFone's financial results.  On this news, VeriFone's stock dropped over 46% from $48.03

2  to $26.03, removing a substantial portion of the artificial inflation that had built up in VeriFone's

3  stock price as a result of defendants' misconduct.  The news also resulted in an additional 22.4%

4  drop from December 3-6, 2007 compared to a 2.5% increase in the peer group.  However, the

5  Company's stock price remained artificially inflated because defendants had not yet revealed the full

6  amount, extent and details surrounding the restatement, the specific financial manipulations

7  underlying the restatement, or the final impact on VeriFone's historical results and future earnings.

8       368.  Another partial disclosure occurred on December 31, 2007, when VeriFone

9  announced a delay in reporting its full restated financial results.  On this news, VeriFone's stock

10  price declined another 15% compared to only a 1.4% decline in the peer group and a 3% decline in

11  the S&P 500.  Despite this additional removal of inflation in VeriFone's stock price, it remained

12  inflated because defendants had not yet revealed the final restated numbers, the extent and depth of

13  the accounting manipulations and the full economic consequences of the restatement and defendants'

14  misconduct.

15       369.  Another partial disclosure occurred on March 6, 2008, when VeriFone unexpectedly

16  cancelled an appearance at a prominent institutional investor conference.  Bloomberg and Wall

17  Street analysts reported that the cancellation suggested that VeriFone's restatement would be

18  delayed further, which turned out to be true.  On that new information, VeriFone's stock price

19  declined 21%, compared to only a 1.8% drop in the industry peer group.  The restatement delay and

20  removal of additional inflation in VeriFone's stock price was directly related to defendants'

21  accounting misconduct and the pervasiveness of the restatement.  However, VeriFone shares

22  remained inflated because the full impact of the restatement and the true financial condition of the

23  Company were still not fully disclosed.

24       370.  On April 1, 2008, the last day of the Class Period, defendants finally disclosed the

25  final restated numbers, which revealed that VeriFone's restatement was much larger than originally

26  represented to investors on December 3, 2007.  Defendants also announced that, based on the

27  internal investigation, "management has concluded that VeriFone did not maintain effective internal

28  control over financial reporting."  Defendants also disclosed that CFO defendant Zwarenstein was

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

1  forced to "resign."  On this new information, VeriFone's stock price plummeted another 19%

2  (versus a 0.3% drop in the peer group and 0.2% drop in the S&P 500), to $12.50 per share, capping

3  an aggregate 75% decline from its Class Period high.

4      371.  The declines in VeriFone's stock price as the bad news was incrementally disclosed,

5  revealing the relevant truth concerning VeriFone's financial condition and accounting controls and

6  the risks concealed by defendants, were directly related and causally connected to defendants' prior

7  misrepresentations and fraudulent conduct.  Each partial but incomplete disclosure of adverse facts

8  which removed inflation from VeriFone's stock price (thereby causing damages), was directly

9  connected to the restatement, defendants' accounting manipulations, the resulting false financial

10  statements and the material facts concealed by defendants during the Class Period.

11      372.  The declines in VeriFone's stock price following the partial disclosures compared to

12  the changes in the peer group and S&P 500 negate any inference that the losses suffered by class

13  members were caused by changed market or industry conditions or Company-specific facts unrelated

14  to the fraudulent conduct.  The following chart (which is also attached hereto in foldout form)

15  illustrates the changes in VeriFone's stock price during the Class Period compared to the peer group

16  and the S&P 500:



REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 132 -

1

**XI.    CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET
         PRESUMPTION OF RELIANCE**

2

3        373.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

4  of Civil Procedure on behalf of all persons who purchased VeriFone common stock on the open

5  market during the Class Period, and were damaged thereby (the "Class").  Excluded from the Class

6  are defendants, directors and officers of VeriFone and their families and affiliates.

7        374.    The members of the Class are so numerous that joinder of all members is

8  impracticable.  During the Class Period, there were approximately 68 million to 84 million

9  outstanding shares owned by hundreds, if not thousands, of persons.  Thus, the disposition of their

10 claims in a class action will provide substantial benefits to the parties and the Court.

11       375.    There is a well-defined community of interest in the questions of law and fact

12 involved in this case.  Questions of law and fact common to the members of the Class that

13 predominate over questions which may affect individual Class members include:

14              (a)    Whether the federal securities laws were violated by defendants;

15              (b)    Whether defendants engaged in a fraudulent scheme and omitted and/or

16 misrepresented material facts;

17              (c)    Whether defendants' statements omitted material facts necessary to make the

18 statements made, in light of the circumstances under which they were made, not misleading;

19              (d)    Whether defendants knew or recklessly disregarded that their statements were

20 materially false and misleading;

21              (e)    Whether the prices of VeriFone common stock were artificially inflated;

22              (f)    Whether defendants' fraudulent scheme, misrepresentations and omissions

23 caused Class members to suffer economic losses, *i.e.*, damages; and

24              (g)    The extent of damage sustained by Class members and the appropriate

25 measure of damages.

26       376.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

27 purchased VeriFone common stock during the Class Period and sustained damages from defendants'

28 wrongful conduct.  Plaintiff will adequately protect the interests of the Class and has retained

1  counsel who are experienced in class action securities litigation.  Plaintiff has no interests that

2  conflict with those of the Class.

3      377.    A class action is superior to other available methods for the fair and efficient

4  adjudication of this controversy.  A class action will achieve economies of time, effort and expense

5  and provide uniformity of decision to the similarly situated members of the Class without sacrificing

6  procedural fairness or bringing about other undesirable results.  Class members have not indicated an

7  interest in prosecuting separate actions as none have been filed.  The number of Class members and

8  the relatively small amounts at stake for individual Class members make separate suits

9  impracticable.  No difficulties are likely to be encountered in the management of this action as a

10  class action.

11      378.    In addition, a class action is superior to other methods of fairly and efficiently

12  adjudicating this controversy because the questions of law and fact common to the Class

13  predominate over any questions affecting only individual Class members.  Although individual Class

14  members have suffered disparate damages, the fraudulent scheme and the misrepresentations and

15  omissions causing damages are common to all Class members.  Further, there are no individual

16  issues of reliance that could make this action unsuited for treatment as a class action because all

17  Class members relied on the integrity of the market and are entitled to the fraud-on-the-market

18  presumption of reliance.

19      379.    The market for VeriFone's common stock was open, well developed and efficient at

20  all relevant times.  VeriFone's stock met the requirements for listing, and was listed and actively

21  traded on the NYSE, a highly efficient and automated market.  As a regulated issuer, VeriFone filed

22  periodic public reports with the SEC and the NYSE.  VeriFone regularly communicated with public

23  investors via established market communication mechanisms, including through regular

24  disseminations of press releases on the national circuits of major newswire services and through

25  other wide-ranging public disclosures, such as communications with the financial press and other

26  similar reporting services.

27      380.    As alleged herein, the change in the price of VeriFone's stock – compared to the

28  changes in the peer group and NYSE – in response to the release of unexpected material positive and

negative information about the Company shows there was a cause-and-effect relationship between the public release of the unexpected information about VeriFone and the price movement in the Company's stock.  The average weekly trading volume of VeriFone's stock during the Class Period was approximately 7.1 million shares, or 8.5% of total outstanding shares.  Numerous analysts followed VeriFone, attended the Company's conference calls and issued reports throughout the Class Period.  The Company was eligible to register securities on Form S-3 during the Class Period.  Institutional investors owned between 64% and 90% of the total outstanding shares.

381.   As a result of the foregoing, the market for VeriFone common stock promptly digested current information regarding VeriFone from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of VeriFone common stock during the Class Period suffered similar injury through their purchases of VeriFone common stock at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

## FIRST CLAIM FOR RELIEF

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### (Against Defendants VeriFone, Periolat, Bergeron and Zwarenstein)

382.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

383.   During the Class Period, defendants engaged in a scheme and fraudulent course of conduct to inflate VeriFone's financial results and disseminated, approved or furnished false information underlying the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

384.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

1        (c)     engaged in acts, practices and a course of business that operated as a fraud or

2 deceit upon plaintiff and others similarly situated in connection with their purchases of VeriFone's

3 publicly traded securities during the Class Period.

4        385.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

5 the market, they paid artificially inflated prices for VeriFone's publicly traded securities and suffered

6 economic loss when the inflation was removed through multiple disclosures of adverse facts.

7 Plaintiff and the Class would not have purchased VeriFone's publicly traded securities at the prices

8 they paid, or at all, if they had been aware that the market prices had been artificially and falsely

9 inflated by defendants' fraudulent conduct and misleading statements.

10       386.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

11 other members of the Class suffered damages in connection with their purchases of VeriFone's

12 publicly traded securities during the Class Period.

13 **SECOND CLAIM FOR RELIEF**

14 **For Insider-Trading Violations of Rule 10(b) and SEC Rule 10b-5**
**(Against Defendants Bergeron, Zwarenstein, Atkinson and Bondy)**

15

16       387.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

17       388.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they are liable for

18 making false and misleading statements and failing to disclose adverse facts necessary to make the

19 statements made not misleading, and by selling over $465 million worth of VeriFone stock at

20 artificially inflated prices while in possession of adverse, material, non-public information about the

21 Company's financial results, the Lipman merger and the overall financial condition of the Company.

22 **THIRD CLAIM FOR RELIEF**

23 **For Violation of Section 20A of the 1934 Act**
**(Against Defendants Bergeron, Zwarenstein, Atkinson and Bondy)**

24       389.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

25       390.    While VeriFone securities traded at artificially inflated and distorted prices,

26 defendants personally profited by selling a total of more than 12.6 million shares of VeriFone

27 securities while in possession of adverse, material, non-public information about VeriFone,

28 pocketing over $465 million in illegal insider-trading proceeds, as detailed above.

391.   Plaintiff National Elevator and other Class members purchased VeriFone securities contemporaneously with defendants' insider sales and suffered damages.  National Elevator's purchases and sales of VeriFone stock during the Class Period are set forth as Ex. 5 hereto, which is a copy of Ex. B to the Declaration of Ramzi Abadou in Support of National Elevator Industry Pension Fund's Motion for Appointment as Lead Plaintiff and for Approval of Its Selection of Lead Counsel (Docket No. 36-3, filed on February 4, 2008).    Plaintiff National Elevator's contemporaneous purchases of VeriFone stock while defendants were selling include the following:

(a)   On September 5, 2006, defendant Bergeron sold 119,800 shares of VeriFone stock at artificially inflated prices.  On September 7, 2006, plaintiff National Elevator purchased 5,550 VeriFone shares at artificially inflated prices.

(b)   On October 2, 2006, Bergeron sold 28,300 shares of VeriFone stock at artificially inflated prices.  On October 4, 5 and 6, 2006, plaintiff National Elevator purchased 3,240 shares, 1,360 shares and 2,025 shares, respectively, of VeriFone stock at artificially inflated prices.

(c)   On December 1, 2006, defendant Bergeron sold 68,000 shares of VeriFone at artificially inflated prices.  On December 1, 2006, plaintiff National Elevator purchased 2,200 shares of VeriFone stock at artificially inflated prices.

(d)   On January 10, 2007, defendant Bergeron sold 200,000 shares of VeriFone at artificially inflated prices.  On January 11 and 12, 2007, plaintiff National Elevator purchased 2,925 shares and 1,595 shares, respectively, of VeriFone stock at artificially inflated prices.

(e)   On March 15, 2007, defendant Bergeron sold 200,000 shares of VeriFone at artificially inflated prices.  On March 19 and 20, 2007, plaintiff National Elevator purchased 6,725 shares and 3,075 shares, respectively, of VeriFone stock at artificially inflated prices.

(f)   On April 11, 2007, defendant Bergeron sold 24,000 shares of VeriFone stock at artificially inflated prices.  On April 16 and 18, 2007, plaintiff National Elevator purchased 4,025 shares and 4,725 shares of VeriFone stock, respectively, at artificially inflated prices.

(g)   On November 14, 2007, defendant Bergeron sold 142,295 shares of VeriFone stock at artificially inflated prices.  On November 16, 2007, plaintiff National Elevator purchased 14,000 shares of VeriFone stock at artificially inflated prices.

1     (h)     On October 31, 2006, defendant Zwarenstein sold 4,000 shares of VeriFone

2   stock at artificially inflated prices.  On October 31, 2006, plaintiff National Elevator purchased 3,600

3   shares of VeriFone securities at artificially inflated prices.

4     (i)     On November 30, 2006, defendant Zwarenstein sold 4,000 shares of VeriFone

5   stock at artificially inflated prices.  On November 30, 2006, plaintiff National Elevator purchased

6   5,460 shares of VeriFone stock at artificially inflated prices.

7     (j)     On January 9, 2007, defendant Zwarenstein sold 4,000 shares of VeriFone

8   stock at artificially inflated prices.  On October 31, 2006, plaintiff National Elevator purchased 5,600

9   shares of VeriFone stock at artificially inflated prices.

10     (k)     On March 15, 2007, defendant Zwarenstein sold 18,000 shares of VeriFone

11   stock at artificially inflated prices.  On March 19 and 20, 2007, plaintiff National Elevator purchased

12   6,725 shares and 3,075 shares, respectively, of VeriFone stock at artificially inflated prices.

13     (l)     On April 10, 2007, defendant Zwarenstein sold 18,000 shares of VeriFone

14   stock at artificially inflated prices.  On April 10, 2007, plaintiff National Elevator purchased 5,070

15   shares of VeriFone stock at artificially inflated prices.

16     (m)     On October 9, 2007, defendant Zwarenstein sold 18,000 shares of VeriFone

17   stock at artificially inflated prices.  On October 9, 2007, plaintiff National Elevator purchased 8,200

18   shares of VeriFone stock at artificially inflated prices.

19     (n)     On November 13, 2007, defendant Zwarenstein sold 18,000 shares of

20   VeriFone stock at artificially inflated prices.  On November 16, 2007, plaintiff National Elevator

21   purchased 14,000 shares of VeriFone stock at artificially inflated prices.

22     392.   Plaintiff National Elevator and members of the class traded contemporaneously with

23   defendants Atkinson and Bondy and suffered damages thereby:

24     (a)     On October 2, 2006, defendant Atkinson sold 5,000 shares of VeriFone at

25   artificially inflated prices.  On October 4, 5 and 6, 2006, plaintiff National Elevator purchased 3,240

26   shares, 1,360 shares and 2,025 shares, respectively, of VeriFone stock at artificially inflated prices.

27

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                    - 138 -

1    (b)    On December 1, 2006, defendant Atkinson sold 5,000 shares of VeriFone

2  stock at artificially inflated prices.  On December 1, 2006, plaintiff National Elevator purchased

3  2,200 shares of VeriFone stock at artificially inflated prices.

4    (c)    On March 1, 2007, defendant Atkinson sold 8,000 shares of VeriFone stock at

5  artificially inflated prices.  On March 5, 2007, plaintiff National Elevator purchased 6,300 shares of

6  VeriFone stock at artificially inflated prices.

7    (d)    On April 10, 2007, defendant Atkinson sold 10,000 shares of VeriFone stock

8  at artificially inflated prices.  On April 10, 2007 plaintiff National Elevator purchased 5,070 shares

9  of VeriFone stock at artificially inflated prices.

10    (e)    On June 11, 2007, defendant Atkinson sold 9,800 shares of VeriFone stock at

11  artificially inflated prices.  On June 11, 2007, plaintiff National Elevator purchased 4,325 shares of

12  VeriFone stock at artificially inflated prices.

13    (f)    On July 2, 2007, defendant Atkinson sold 8,000 shares of VeriFone stock at

14  artificially inflated prices.  On July 3 and 5, 2007, plaintiff National Elevator purchased 3,025 shares

15  and 4,525 shares of VeriFone stock, respectively, at artificially inflated prices.

16    (g)    On September 26, 2007, defendant Atkinson sold 35,000 shares of VeriFone

17  stock at artificially inflated prices.  On September 26 and 28, 2007, plaintiff National Elevator

18  purchased 20,000 shares and 21,000 shares, respectively, of VeriFone stock at artificially inflated

19  prices.

20    (h)    On June 25, 2007, defendant Bondy sold 3.5 million shares of VeriFone stock

21  at artificially inflated prices.  On July 3 and 5, 2007, plaintiff National Elevator purchased 3,025

22  shares and 4,525 shares of VeriFone stock, respectively, at artificially inflated prices.

23    393.    Plaintiff and all the other members of the Class who purchased VeriFone securities

24  contemporaneously with the sales of VeriFone securities by defendants:

25    (a)    have suffered substantial damages in that they paid artificially inflated prices

26  for VeriFone securities as a result of violations of §10(b) of the 1934 Act and Rule 10b-5 herein, and

27  the inflation was removed from the stock price; and

28

(b) would not have purchased VeriFone securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by defendants' false and misleading statements and misconduct.

394. As a result of the wrongful conduct alleged herein, plaintiff and other members of the Class have suffered damages.

395. By reason of the foregoing, defendants violated §20A of the 1934 Act and are liable to plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchase of VeriFone securities during the Class Period.

### FOURTH CLAIM FOR RELIEF

### For Violation of Section 20(a) of the 1934 Act
### (Against All Defendants)

396. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

397. By reason of their senior executive positions at VeriFone, their shareholdings and their responsibility for the Company's financial results and overall financial condition, defendants Bergeron, Zwarenstein, Periolat, Atkinson and Bondy had the power and authority to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the VeriFone's false financial statements and the acts committed by its officers and employees.

398. The Company had the power to control and influence, and did control and influence, defendants. Bergeron and Zwarenstein had the power and ability to control and influence VeriFone and Periolat, and they exercised that control by directing, encouraging and monitoring Periolat's financial manipulations during the Class Period. Bergeron's and Zwarenstein's power, influence and control are also demonstrated by the facts set forth *supra*, including their instruction to Periolat to "fix the problem" when VeriFone's gross margins were far lower than projected, their knowledge of his accounting adjustments, and their role in supervising, directing and controlling the Company and Periolat's fraudulent conduct. Bergeron and Zwarenstein also controlled and directed VeriFone's financial and accounting systems and its dissemination of financial results, press releases, SEC filings and statements made during conference calls. Periolat had the power and authority to

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                    - 140 -

1   influence and control the Company through his financial manipulations and his position as a supply-

2   chain "controller," and he exercised that power and control by manipulating VeriFone's financial

3   results.

4       399.    As set forth in ¶¶46, 311-315, 331-32, *supra*, Atkinson had the power and influence

5   to control VeriFone by virtue of his executive position and his seminal role in the Lipman merger,

6   and he exercised that power, as shown by his statements regarding the merger and the extra stock

7   awards he received from the Company as a result of his role.

8       400.    Bondy was involved in controlling and exerting influence over VeriFone since its

9   spin-off from Hewlett Packard in 2002.  As set forth in ¶¶47-48, *supra*, Bondy and his partners in the

10  private-equity and venture capital fund, GTCR, were among the principal architects in spinning off

11  VeriFone from HP and taking the Company public in 2005.  As the largest combined shareholder

12  and member of the Board of Directors along with two of his other GTCR partners, Bondy had the

13  ability and power to control and direct the Company, and he utilized that power during the Class

14  Period as shown by his role on the "Corporate Governance and Nominating Committee" at the

15  Company.  By reason of such control, defendants are liable pursuant to §20(a) of the 1934 Act.

16  **XII.    PRAYER FOR RELIEF**

17      WHEREFORE, plaintiff prays for judgment as follows:

18      A.    Declaring this action to be a proper class action pursuant to Rule 23;

19      B.    Awarding plaintiff and the members of the Class damages, interest and costs; and

20      C.    Awarding such other relief as the Court may deem just and proper.

21  **XIII.    JURY DEMAND**

22      Plaintiff demands a trial by jury.

23  DATED: September 15, 2010        ROBBINS GELLER RUDMAN

24                                        &amp; DOWD LLP
                                                SANFORD SVETCOV
                                                ELI R. GREENSTEIN

25

26

27                                         s/ Eli R. Greenstein
                                                ELI R. GREENSTEIN

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP        - 141 -

1

2
Post Montgomery Center
One Montgomery Street, Suite 1800
3
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
4

5
ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
6
655 West Broadway, Suite 1900
San Diego, CA  92101
7
Telephone:  619/231-1058
619/231-7423 (fax)
8

9
Lead Counsel for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following Designated Internet Site at:  http://securities.stanford.edu.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 15, 2010.

<div style="text-align:center">s/ Eli R. Greenstein<br>ELI R. GREENSTEIN</div>

ROBBINS GELLER RUDMAN
 & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: elig@rgrdlaw.com

REVISED THIRD AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:07-cv-06140-MHP                                              - 143 -

## Mailing Information for a Case 3:07-cv-06140-MHP

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

- **Francis A. Bottini , Jr**
  frankb@johnsonbottini.com,brett@johnsonbottini.com,derekw@johnsonbottini.com,paralegal@johnsonbottini.com

- **Brendan P. Cullen**
  cullenb@sullcrom.com,Phadkea@sullcrom.com,greenn@sullcrom.com,carrejoa@sullcrom.com,McCauleyr@sullcrom.com,singhl@sullcrom.com,halls@sullcrom.com

- **Timothy Alan DeLange**
  kristinas@blbglaw.com,takeok@blbglaw.com,timothyd@blbglaw.com

- **Jordan Eth**
  jeth@mofo.com,nurbina@mofo.com

- **Linda M. Fong**
  lfong@kaplanfox.com,kweiland@kaplanfox.com,lbarry@kaplanfox.com

- **Daniel C. Girard**
  dcg@girardgibbs.com,akl@girardgibbs.com

- **Eli Greenstein**
  Elig@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Stanley M. Grossman**
  smgrossman@pomlaw.com

- **Lewis S. Kahn**
  lewis.kahn@kgscounsel.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,pashad@hbsslaw.com,sf_filings@hbsslaw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Brian Lawrence Levine**
  BLevine@mofo.com,vvandergrift@mofo.com

- **Jonathan Krasne Levine**
  jkl@girardgibbs.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Mark Cotton Molumphy**
  mmolumphy@cpmlegal.com,jhamilton@cpmlegal.com,jthigpen@cpmlegal.com,obacigalupi@cpmlegal.com,mmarcelino@cpmlegal.com,ckodani@cpmlegal.com

- **Alan Roth Plutzik**
  aplutzik@bramsonplutzik.com

- **Juden Justice Reed**
  plee@schubert-reed.com,akeng@schubert-reed.com,rschubert@schubert-reed.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Patrick David Robbins**
  probbins@shearman.com,rcheatham@shearman.com

- **Dana Anthony Rodriguez**
  drodriguez@mofo.com,cpeplinski@mofo.com

- **Eran Rubinstein**
  erubinstein@chitwoodlaw.com

- **Robert C. Schubert**
  rschubert@schubertlawfirm.com

- **Aaron M. Sheanin**
  ams@girardgibbs.com,ras@girardgibbs.com,amv@girardgibbs.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com,efile@scott-scott.com

- **Michael Howard Steinberg**
  steinbergm@sullcrom.com

- **Joel B. Strauss**
  jstrauss@kaplanfox.com

- **Sean Travis Strauss**
  sean.strauss@shearman.com

- **Sanford Svetcov**
  sandys@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Joseph J. Tabacco , Jr**
  jtabacco@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,travisd@rgrdlaw.com,cwood@rgrdlaw.com,e_file_sd@rgrdlaw.com,jdecena@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Steven Noel Williams**
  swilliams@cpmlegal.com,jverducci@cpmlegal.com,cwalker@cpmlegal.com,rjit@cpmlegal.com,aliang@cpmlegal.com,medling@cpmlegal.com,pmenzel@cpmlegal.co

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Jeffrey P. Campisi**
Kaplan, Fox & Kilsheimer LLP
805 Third Avenue, 14th Floor
New York, NY 10022

**Karen Hanson Riebel**
Lockridge Grindal Nauen
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401 2179